**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| VESTIS RETAIL GROUP, LLC, *et al.*,[1] | Case No.:  16-10971 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF MARK T. WALSH IN**
**SUPPORT OF FIRST DAY MOTIONS**

I, Mark T. Walsh, declare as follows:

1.       I am the Chief Executive Officer and a member of the Board of Managers of

Vestis Retail Group, LLC, a Delaware limited liability company ("Vestis Group").  I also serve

as the Chief Executive Officer for Vestis Group's direct or indirect wholly owned subsidiaries:

(a) EMS Operating Company, LLC, a Delaware limited liability company ("EMS Operating");

(b) Vestis IP Holdings, LLC, a Delaware limited liability company ("IP Holdings"); (c) Bob's

Stores, LLC, a New Hampshire limited liability company ("Bob's LLC"); (d) Sport Chalet, LLC,

a Delaware limited liability company ("SC LLC"); (e) Sport Chalet Value Services, LLC, a

Virginia limited liability company ("SC Value Services"); (f) Sport Chalet Team Sales, LLC, a

Delaware limited liability company ("SC Team Sales"); and (g) EMS Acquisition LLC ("EMS

Acquisition") (sometimes collectively with Vestis Group and Vestis Retail Financing, LLC

("Vestis Financing"), the "Debtors").  I am familiar with the day-to-day operations, business, and

financial affairs of the Debtors, having served in various capacities with the Debtors since

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Vestis Retail Group, LLC (1295); Vestis Retail Financing, LLC (9362); EMS Operating Company, LLC (2061); Vestis IP Holdings, LLC (2459); Bob's Stores, LLC (4675); EMS Acquisition LLC (0322); Sport Chalet, LLC (0071); Sport Chalet Value Services, LLC (7320); and Sport Chalet Team Sales, LLC (8015).  The Debtors' executive headquarters are located at 160 Corporate Court, Meriden, CT 06450.

January 2013, and having previously served as Chief Executive Officer of Bob's Stores Corp., the predecessor to Bob's LLC, from November 2008 to January 2013.

2.      I have over 25 years of experience in business and finance.  Prior to joining the Debtors, I was most recently a Group President of Liz Claiborne from 2002 to 2008.  Prior to that I held various roles at J.Crew, PepsiCo, and Deloitte & Touche.  I hold a Bachelor's degree from Brown University and a Master of Business Administration degree from The Wharton School at University of Pennsylvania.

3.      On the date of the filing of this Declaration (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "Court") under chapter 11 of the Bankruptcy Code, thus commencing these chapter 11 cases (the "Cases").  To enable the Debtors to operate effectively, minimize disruption to their operations, and maximize the value of their assets, the Debtors have filed various applications and motions seeking immediate or expedited relief.  Specifically, the following have been filed on behalf of the Debtors (collectively, the "First Day Motions").

(a)     Debtors' Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only (the "Joint Administration Motion");

(b)     Debtors' Motion for Entry of an Order (i) Authorizing Payment of Certain Prepetition Employee Claims, Including Wages, Salaries, and Other Compensation, (ii) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (iii) Authorizing Payment of Reimbursement to Employees for Prepetition Expenses, (iv) Authorizing Payment of Withholding and Payroll-Related Taxes, (v) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers, and (vi) Directing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments (the "Employee Compensation and Benefits Motion");

(c)     Debtors' Motion for Entry of Order (i) Authorizing Continued Use of Cash Management System, (ii) Authorizing the Continuation of Intercompany Transactions, (iii) Granting Administrative Priority Status to Postpetition Intercompany Transactions, (iv) Authorizing Use of

Prepetition Bank Accounts, Account Control Agreements, and Certain Payment Methods, and (v) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis (the "Cash Management Motion");

(d)     Debtors' Motion for an Order (i) Authorizing the Payment of Prepetition Sales, Use, and Franchise Taxes and Similar Taxes and Fees and (ii) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing (the "Taxes Motion");

(e)     Debtors' Motion for Entry of Interim and Final Orders (i) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (ii) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (iii) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (iv) Granting Related Relief (the "Utilities Motion");

(f)     Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing (a) Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with, Various Insurance Policies, and (b) Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with, Insurance Premium Financing Programs; and (ii) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto (the "Insurance Motion");

(g)     Debtors' Motion for Entry of an Order Authorizing Maintenance, Administration, and Continuation of Certain Customer Programs (the "Customer Programs Motion");

(h)     Debtors' Motion for Entry of an Order Authorizing Payment of Certain Prepetition Shipping, Delivery, and Customs Charges (the "Shippers Motion");

(i)     Debtors' Motion for Order Confirming Administrative Expense Priority Status of Debtors' Undisputed Obligations for Postpetition Delivery of Goods Ordered Prepetition (the "Postpetition Goods Motion");

(j)     Debtors' Emergency Motion for Interim and Final Orders (i) Authorizing the Continuation of Store Closing Sales in Accordance with the Disposition Agreement and Sale Guidelines, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances; (ii) Authorizing the Assumption of the Disposition Agreement; and (iii) Granting Related Relief (the "Store Closings Motion"); and

(k)     Application for an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C.

§ 156(c), *Nunc Pro Tunc* to the Petition Date (the "Section 156(c) Application").

4.     This Declaration is submitted in support of the First Day Motions, which are described in greater detail below, and may serve as support for additional motions, applications, and other papers that may be filed on or after the Petition Date.[2]

5.     If called as a witness, I could and would competently testify to the matters set forth herein based on my personal knowledge.  As a result of my tenure with the Debtors, I have become familiar with the Debtors' day-to-day operations, business affairs, financial condition, and books and records.  My testimony herein is based on my service as an officer of certain of the Debtors currently and in the past, my review of the Debtors' books and records and other relevant documents of which I am custodian, and my review of information compiled and communicated to me, at my request, by other employees of the Debtors.

6.     After a brief Preliminary Statement in Part I, Part II of this Declaration describes the business operations and background of the Debtors and of these Cases.  Part III then sets forth the facts relevant to each of the First Day Motions.

# I.
## PRELIMINARY STATEMENT

7.     The Debtors are comprised of three regional multi-channel retailers engaged in the apparel, footwear, and sporting goods lines of business: (a) Bob's Stores, (b) Eastern Mountain Sports ("EMS"), and (c) Sport Chalet.  Each of the three retailers is currently

---

[2] On the Petition Date, the Debtors also filed and requested first-day relief with respect to the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (i) Authorizing Debtors and Debtors in Possession to Obtain Postpetition Financing, (ii) Authorizing Use of Cash Collateral, (iii) Granting Liens and Super-Priority Claims, (iv) Granting Adequate Protection to Prepetition Secured Lenders, (v) Modifying the Automatic Stay; (vi) Scheduling a Final Hearing, and (vii) Granting Related Relief* (the "DIP Motion").  The DIP Motion is not addressed in this Declaration, as it is separately supported by the *Declaration of Alexander W. Stevenson* in support of the DIP Motion (the "Stevenson Declaration"), and the *Declaration of Robert J. Duffy in Support of (i) Debtors' DIP Financing Motion and (ii) Debtors' Emergency Store Closing Sales Motion* (the "Duffy Declaration" and, together with the Stevenson Declaration, the "DIP Declarations"), each concurrently filed herewith.

comprised of two primary units: (a) a retail store business and (b) an e-commerce business. Collectively, the Debtors currently operate 144 stores and 2 distributions centers across 15 states. Bob's Stores and EMS primarily operate stores located in the Northeastern states, while Sport Chalet's stores, which are currently being liquidated, are located in the Western states. The Debtors operate their e-commerce business through a consolidated technology platform, and Bob's Stores and EMS maintain an individual online store at, respectively, www.bobstores.com and www.ems.com.[3] Bob's Stores and Sport Chalet have roots dating back to the 1950's, while EMS was founded in the 1960's.

8.      Vestis Group directly and indirectly owns the entities that operate Bob's Stores, EMS, and Sport Chalet. The chains were acquired in three separate acquisitions: Bob's Stores in 2008, EMS in 2012, and most recently, Sport Chalet in 2014. Vestis Group was formed shortly after the EMS acquisition and was operationally based on the solid infrastructure and proficient management capabilities already in place at Bob's Stores. Although EMS was on the brink of immediate liquidation just prior to its acquisition, the successful integration of EMS with the Bob's Stores platform under the Vestis Group umbrella caused EMS to rebound with competitive comparable store sales and a growing online market presence. In the year and a half following the Sport Chalet acquisition, management worked to incorporate the best practices of the Bob's Stores and EMS brands.

9.      Despite their continuing and largely successful efforts to implement an array of internal restructuring and synergy initiatives, the Debtors have had to address a number of legacy challenges remaining from the prior ownership of EMS and Sport Chalet. Among other things,

---

[3] Sport Chalet stopped selling merchandise online on the Sale Commencement Date (as defined below).

EMS's progress has been hobbled by onerous liabilities with respect to certain pre-acquisition leases, while Sport Chalet faced more significant operational and sales challenges.

10.     In addition, both industry-wide and internal challenges have complicated the Debtors' efforts to stabilize and improve their brands.  The continuing shift in consumer behavior away from traditional brick-and-mortar retailers and toward online-only stores, together with increased competition from big-box and specialty sporting goods retailers, have contributed to an industry-wide weakness in the Debtors' business segments.  Indeed, Sports Authority, one of the Debtors' key competitors, commenced bankruptcy cases in March 2016.  As a result, the ongoing store-closing sales at certain Sports Authority locations have created unusual competition for the Debtors shortly prior to the Petition Date.

11.     The Debtors' short-term financial performance has also been adversely affected by, among other things, (i) record warm winter weather in the Northeastern states in 2015, which negatively affected the sales of cold-weather goods and items at Bob's Stores and EMS; and (ii) conversion issues with the Debtors' transition to a unified and integrated enterprise resource planning ("ERP") software platform in the fourth quarter of 2015, which negatively affected the Debtors' ability to process and deliver inventory to stores during the holiday season, primarily at Sport Chalet where the conversion was more complex than at Bob's Stores and EMS.

12.     The Debtors believe that their efforts to improve and streamline operations have had and will continue to have a positive impact on the future financial performance of Bob's Stores and EMS.  However, the operating losses suffered in 2015, as a consequence of the issues outlined above, caused a constraint on liquidity in the first quarter of 2016.  Despite the extension of loans totaling approximately $40 million through the Third Lien Loan (as defined below) since January 2016, the Debtors have continued to face significant financial pressure.

The Debtors ultimately were unable to preserve Sport Chalet as a going concern and, accordingly, the Debtors commenced going out of business sales (the "Store Closing Sales") of the Sport Chalet stores (along with eight (8) EMS stores and one Bob's Stores location) (collectively, the "Closing Stores" ) prior to the Petition Date, on April 16, 2016 (the "Sale Commencement Date").

13.     On the morning of the Sale Commencement Date, Sport Chalet stopped selling merchandise online and closed its online store.  Visitors to Sport Chalet's online store, accessible at www.sportchalet.com, were provided with information regarding the Store Closing Sales and the ways in which Sport Chalet customers can take opportunity of Store Closing Sales discounts and use their remaining gift cards and rewards.  Similar information was sent by e-mail to certain customers of Sport Chalet, also on the morning of the Sale Commencement Date.

14.     The purpose of the Cases is to facilitate the continuation, and completion, of the operating initiatives the Debtors have undertaken and that are underway at Bob's Stores and EMS, while allowing the Debtors to address external factors that have negatively contributed to the Debtors' recent financial performance.  The Cases also will enable the Debtors to continue the Store Closing Sales on an expedited and orderly basis.

15.     The Debtors embark upon these Cases with optimism for a swift and certain resolution of the issues they now face, despite the challenging retail environment.  The Bob's Stores and EMS brands enjoy competitive market positions.  The Debtors are confident that this restructuring effort will allow these core brands to emerge as part of a stable and strong enterprise, positioning the Debtors to take advantage of the many opportunities in the markets in which they will continue to operate.  The chapter 11 process also will allow the Debtors to

maximize value from their non-core businesses, primarily through the Store Closing Sales and the sale of the remaining related assets.

16.    Toward that end, the Debtors have entered into a transaction (the "Stalking Horse Bid"), pursuant to which Vestis BSI Funding II, LLC (the "Stalking Horse Bidder") has agreed to acquire substantially all of the Debtors' assets as a going concern, subject to the terms and conditions of that certain Asset Purchase Agreement (as the same may be amended, supplemented or modified from time to time, the "Stalking Horse APA").

17.    The Debtors have undertaken these efforts with the support and cooperation of their principal secured lenders.  In particular, as described in the DIP Declarations, the Debtors have entered into that certain *Ratification and Amendment Agreement* with Wells Fargo Capital Finance, LLC, as administrative agent (the "DIP Agent"), and the lenders party thereto (the "DIP Lenders"), pursuant to which, subject to Court approval, the Debtors will receive a senior secured debtor-in-possession revolver (the "DIP Facility") that should provide them with sufficient runway to navigate through the chapter 11 process.

18.    With the Stalking Horse Bid in place, the Debtors intend to conduct an overbid process under section 363 of the Bankruptcy Code to determine if a higher and better offer can be obtained.

## II.

## BACKGROUND

A.    **Overview of the Debtors.**

1.    **Bob's Stores.**

19.    Founded in 1954 in Connecticut by Bob Lapidus, Bob's Stores is a value-oriented retailer of apparel, footwear, and accessories for men, women, and children.  Spurred by the jeans craze of the 1970's, Bob's Stores experienced tremendous growth within Connecticut and

opened multiple store locations.  During the 1990's, Bob's Stores grew from five to forty-one stores.  In 2003, after experiencing poor financial results, Bob's Stores was purchased by The TJX Companies.

20.     In 2008, Bob's Stores was purchased from The TJX Companies by Vestis BSI Holding, Inc., an affiliate of Versa Capital Management, LLC ("Versa"), the Debtors' current equity sponsor.  The resulting turnaround at Bob's Stores was highly successful and the company enjoyed levels of financial success not realized since the early 1990's.  Bob's Stores is a stable brand with consistent historical performance that has provided the infrastructure and management capability for the subsequent growth of the Debtors, as described below.

**2.     EMS.**

21.     EMS was founded in 1967 by two climbers in Wellesley, Massachusetts, as a technically-focused outdoor gear retailer.  After opening a climbing school in 1969, EMS quickly became a leading name in the outdoor market and began its steady expansion of new stores and markets.  In the early 2000's, EMS successfully developed a focus on human-powered outdoor sports with the introduction of bikes and increased concentration on climbing and kayaking.  Despite a passionate devotion from its customers, EMS faced a crisis in 2012 due to poor sales, at least in part driven by the occurrence of one of the warmest winters on record in 2011-2012.

22.     In November 2012, EMS was acquired by Collis EMS Financing, an affiliate of Versa.  At the time of the acquisition, EMS lacked liquidity, was unprofitable, and suffered from poor management and sales performance.  At the same time, EMS remained a widely-recognized and highly valued brand name in the outdoor and active lifestyle retail categories.  Since its acquisition, EMS has been successfully integrated into the Vestis Group portfolio of companies

and is currently experiencing strong comparable sales growth in its stores, as well as a robust and growing e-commerce business.

### 3.    Sport Chalet.

23.     Sport Chalet was founded in 1959 by Norbert and Irene Olberz as a small shop in the northern Los Angeles suburb of La Cañada.  Sport Chalet's success and growth were a result of the wide selection of quality brand-name products and a high level of customer service provided by dedicated and well-trained employees.

24.     The Western states in which Sport Chalet operates were hit remarkably hard by the Great Recession of 2008, which had a strong negative impact on Sport Chalet sales and financial performance in the years that followed.  Facing the possibility of a bankruptcy filing and uncertain survival, Sport Chalet explored various restructuring options throughout 2014.

25.     Sport Chalet was acquired by Vestis Group as a portfolio company in August 2014.  At the time of the acquisition, as an orphaned public company with no liquidity alternatives, poor operating practices, and numerous other challenges, Sport Chalet was on the precipice of potential liquidation.  At the same time, as a long-standing sporting goods, footwear, and apparel retail player, Sport Chalet represented an opportunity for positive growth from consolidations of costs and economies of scale, while at the same time creating a coast-to-coast retail platform for further potential consolidating acquisitions under the Vestis Group platform.

### 4.    Vestis Group and the Debtors' Organizational and Operational Structure.

26.     Vestis Group was formed in December 2012, shortly after the acquisition of EMS. Vestis Group is based in Meriden, Connecticut and provides various operational and corporate support to its direct and indirect wholly-owned Debtor subsidiaries.  As of the Petition Date, Bob's Stores, EMS and Sport Chalet are all indirectly owned under Vestis Group by investment

funds advised by Versa.  The chart attached hereto as **Exhibit A** illustrates the corporate structure of the Debtors as of the Petition Date.

27.    Vestis Group, a Delaware limited liability company is the sole member and owner of (a) EMS Operating, a Delaware limited liability company, (b) IP Holdings, a Delaware limited liability company, (c) Bob's LLC, a New Hampshire limited liability company, (d) EMS Acquisition, a Delaware limited liability company, and (e) SC LLC, a Delaware limited liability company.  SC LLC, in turn, is the sole member and owner of SC Value Services, a Virginia limited liability company and SC Team Sales, LLC, a Delaware limited liability company. Vestis Group's direct parent is Vestis Financing, a Delaware limited liability company, which holds 100% of the membership interests of Vestis Group.

28.    EMS Operating is the entity which runs the day-to-day operations of EMS retail and holds the EMS assets and liabilities, with the exception of intellectual property assets as described below.  EMS Operating is also the successor in interest to certain assets and liabilities of Eastern Mountain Sports LLC (n/k/a SME Holding Company, LLC) ("EMS LLC"),[4] including with respect to certain leases that were transferred from EMS LLC to EMS Operating between February 2015 and August 2015.

29.    Similarly, Bob's LLC and SC LLC are the entities that run the operations and hold the assets and liabilities of, respectively, the Bob's Stores and Sport Chalet businesses (with the exception of intellectual property assets).  EMS Operating and Bob's LLC also administer the gift card businesses of their respective retailers, while the Sport Chalet gift card business is operated through the SC Value Services entity.

---

[4] EMS LLC has not commenced a chapter 11 case and is not one of the Debtors.  EMS Acquisition, the direct parent of EMS LLC, does not currently have any assets or operations aside from its membership interests in EMS LLC.

30.     Sport Chalet's team sales division, which shortly prior to the Petition Date sold equipment to teams in various sports disciplines, is operated through SC Team Sales.  Prior to the Petition Date, SC Team Sales incurred assets and liabilities in the ordinary course of its business, but does not have a separate payroll (SC Team Sales employees are instead administered under the SC LLC payroll).

31.     IP Holdings, which was formed in 2014, currently owns the intellectual property associated with the Debtors' businesses, including trademarks, domain names, and copyrights (collectively, the "Intellectual Property").  The Debtors' Intellectual Property was transferred to IP Holdings in October 2014 (for EMS and Sport Chalet) and January 2015 (for Bob's Stores).  IP Holdings subsequently entered into certain license agreements with the respective retailers pursuant to which the retailers license Intellectual Property from IP Holdings.

**B.     The Debtors' Business Operations.**

**1.     Employees and Stores.**

32.     As of the Petition Date, the Debtors collectively employ approximately 1527 individuals on a full time basis and 2961 individuals on a part time or temporary basis.  This reflects the reduction in force implemented by the Debtors on or about March 29, 2016, through which approximately 133 full time employees were terminated.  None of the Debtors' employees are unionized.

33.     Collectively, the Debtors operate 144 retail stores, which are located in 15 states.  Bob's Stores operates 36 stores throughout New England, New York, and New Jersey.  EMS operates 61 stores, located primarily in the Northeastern states.  Sport Chalet operates 47 stores throughout California, Arizona, and Nevada.

34.     In addition, the Debtors maintain their corporate headquarters and a distribution center for Bob's Stores and EMS in Meriden, Connecticut.  Most of the merchandising and

finance teams for Sport Chalet have been moved to these offices; however, some corporate functions (such as specialty merchandising functions for scuba and cycling, store operations, IT, and team sales) currently remain in Sport Chalet's corporate offices in La Cañada, California.  In addition, some corporate functions primarily related to customer service currently remain at the Debtors' corporate offices in Peterborough, New Hampshire.  All three brands share certain operational functions in Meriden.  Sport Chalet's primary distribution center is in Ontario, California, and it uses a facility in Van Nuys, California to house most of the inventory for its sports team sales division.

### 2.    The Debtors' Brands.

35.    While certain business and operational differences exist across the three brands, as described below, the Debtors' core brands enjoy a remarkable reputation and deep customer loyalty, and hold strong market positions and brand-level profitability.  The Debtors' businesses are seasonal in nature to varying degrees across the three retailers, with a traditional increase in sales during the back-to-school and holiday seasons.

36.    Bob's Stores aims to provide a one-stop-shop for the entire family, with a focus on casual apparel, denim, athletic apparel, workwear, and team apparel.  The stores have an extensive footwear selection that boasts over 20,000 pairs of shoes.  The stores carry popular brand names, including Nike, Levi's, Under Armour, Carhartt, and Timberland, at moderate price points, as well as Bob's Stores' own private label brands, BCC and Rugged Trails.  The Bob's Stores brand is best known for its outstanding branded selection, value, and prices.

37.    EMS is known as a retailer of gear, apparel, and accessories for outdoor activities such as rock climbing, camping, biking, snowshoeing, and kayaking.  With a heritage of nearly half a century, EMS provides customers with superior service through knowledgeable, credible

and authentic expertise.  EMS is an iconic brand in the outdoor sports industry and an established specialty retailer of outdoor gear and apparel.

38.    Finally, Sport Chalet, which is currently being liquidated, is a specialty sporting goods multi-channel retailer featuring first-to-market performance, technical, and lifestyle merchandise.

### 3.    E-Commerce and Information Technology.

39.    Prior to the Petition Date, each of the three Debtor retailers operated an e-commerce site at, respectively, www.bobstores.com, www.sportchalet.com, and www.ems.com.[5]  In 2015, the Debtors collectively generated 5% of their total sales, or approximately $32 million, through e-commerce.  At the beginning of October 2015, the Debtors transitioned to the new enterprise-wide ERP software, whereby all three brands were consolidated onto a single set of information technology platforms for point-of sale, warehouse management, merchandising, and e-commerce.

40.    The Debtors own a portfolio of IP that, as described above, is held by IP Holdings.  The Debtors' trademarks include the "Bob's Stores," "Eastern Mountain Sports," "EMS," and "Sport Chalet" marks, all of which are registered with the United States Patent and Trademark Office.  The Debtors also own a number of domain names and copyrights.

### 4.    Vendors.

41.    The Debtors have developed a product assortment and shopping experience that highlight a mix of branded and private label merchandise that caters to the Debtors' target customer bases in the apparel, footwear, and sporting goods lines.  Collectively, the Debtors offer thousands of products from branded labels, in addition to offering certain private label

---

[5]  As described above, the Sport Chalet online store closed on the Sale Commencement Date.

brands, such as Techwick for EMS and BCC for Bob's Stores, that are sold both in stores and on the website of the respective retailer.

42.     The Debtors do not have long-term contracts with any of their vendors at this time.  Prior to the Petition Date, the Debtors typically placed and paid for orders directly with most of their vendors.  Certain of the Debtors' vendors use factors to sell merchandise and/or provide credit insurance.  The Debtors are not party to the factoring agreements between the vendors and the factors.  In nearly all instances, the Debtors work directly with the vendors on terms in lieu of an unsecured credit line with the factors.  In the case of importing goods from overseas vendors that require factoring support, prepetition the Debtors had to cause letters of credits to be issued for the benefit of one of those factors – Rosenthal & Rosenthal, Inc. – in the aggregate amount of approximately $590,000.

**C.     Capital Structure.**

   **1.     Secured Debt.**

43.     *The Wells Fargo Revolving Credit Facility (First Lien)*.  Each of the Debtors is indebted under that certain Fourth Amended and Restated Loan and Security Agreement, dated as of February 11, 2015 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Pre-Petition Loan Agreement") by and among Bob's LLC, EMS LLC,[6] SC LLC, SC Value Services, EMS Operating, and SC Team Sales (collectively, the "Borrowers"), as borrowers, Vestis Financing, Vestis Group, EMS Acquisition, and IP Holdings (collectively, the "Guarantors"), as guarantors, the DIP Agent, as administrative agent, and the DIP Lenders.  The Pre-Petition Loan Agreement provides for an asset-based revolving credit

---

[6]  EMS LLC (n/k/a SME Holding Company, LLC) has not commenced a chapter 11 case and is not one of the Debtors.

facility and swing line credit facility[7] of up to a maximum of $180 million in the aggregate (subject to further possible increase to $205 million under certain circumstances)[8] (the "Pre-Petition Loans").  The Debtors' ability to borrow under the facility is further subject to a borrowing base calculation contained in the Pre-Petition Loan  Agreement.

44.      The Pre-Petition Loan Agreement provides for a varying interest rate based on the excess availability of Pre-Petition Loans as well as whether the Pre-Petition Loans are borrowed in the form of "Base Rate Loans" or "Eurodollar Rate Loans."  The Pre-Petition Loan Agreement also provides for, among the other costs and fees contained therein, an "early termination fee" (the "Pre-Petition Loan Termination Fee") equal to 0.25% of the maximum credit (i.e. $180,000,000) if the Pre-Petition Loan Agreement is terminated during the period August 19, 2015 to August 18, 2016 or upon the occurrence of an event of default resulting from the Debtors' commencement of bankruptcy cases before August 19, 2016.  The obligations of the Debtors under the Pre-Petition Loan Agreement are secured by first-priority security interests in and liens on certain of their assets, including accounts receivable, intellectual property and other general intangibles, inventory and equipment, deposit accounts, letters of credit, chattel paper, commercial tort claims, and the products and proceeds of the foregoing (collectively, the "Pre-Petition Loan Collateral").  The Pre-Petition Loan Collateral does not include certain "Excluded Property" (as defined in the Pre-Petition Loan Agreement), such as real property leases.  The Pre-Petition Loans mature on August 19, 2019.  As of the Petition Date, approximately $103,946,056.65 in Pre-Petition Loans was outstanding under the Pre-Petition Loan Agreement, inclusive of approximately $7,296,158 in letters of credit issued and outstanding under the Pre-

---

[7]  Availability under the swing line facility is limited by its terms to $18 million.

[8]  The conditions under which the Pre-Petition Loans could be increased beyond $180 million have not occurred.

Petition Loan Agreement, but not including the Pre-Petition Loan Termination Fee in the amount of $450,000, accrued and unpaid interest, costs, expenses and other fees owed to the DIP Agent and DIP Lenders.

45.    *The Wells Fargo Term Loan (Second Lien)*.  Each of the Debtors is also indebted under that certain Term Loan and Security Agreement dated as of February 11, 2015 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Pre-Petition Term Loan Agreement") by and among the Borrowers, as borrowers, the Guarantors, as guarantors, and Wells Fargo Bank, National Association as agent (the "Pre-Petition Term Agent") and lender (the "Pre-Petition Term Lenders"), pursuant to which the Pre-Petition Term Lenders extended to the Borrowers a term loan in the original principal amount of $10 million (the "Pre-Petition Term Loan").  The Pre-Petition Term Loan accrues interest at varying rates based on either LIBOR or the prime rate, plus an "applicable margin."  The Pre-Petition Term Loan Agreement also provides for an early termination fee (the "Pre-Petition Term Loan Termination Fee") equal to: (i) 2.0% of the outstanding principal amount of the Pre-Petition Term Loan in the event the Pre-Petition Term Loan Agreement is terminated during the period February 12, 2016 to February 11, 2017 or (ii) 1.0% of the outstanding principal amount of the Pre-Petition Term Loan in the event the Pre-Petition Term Loan Agreement is terminated during the period February 12, 2017 to February 11, 2018.  Similar to the Pre-Petition Loan Termination Fee, the Pre-Petition Term Loan Termination Fee becomes immediately due and payable upon the occurrence of an event of default resulting from the Debtors' commencement of bankruptcy cases before February 12, 2018.  The obligations of the Debtors under the Pre-Petition Term Loan Agreement are secured by second-priority security interests in and liens on the same collateral that secures the Revolving Loans (the "Pre-Petition Term Loan Collateral"),

provided that the Pre-Petition Term Loan Collateral does not include any Excluded Property (as defined in the Pre-Petition Term Loan Agreement).[9]  The Pre-Petition Term Loan matures on August 19, 2019.  As of the Petition Date, approximately $9,435,000 was outstanding under the Pre-Petition Term Loan Agreement, not including the Pre-Petition Term Loan Termination Fee in the amount of $185,000, accrued and unpaid interest, costs, expenses, and other fees owed to the Pre-Petition Term Agent and Pre-Petition Term Lenders.

46.      *The Vestis BSI Term Loan (Third Lien)*.  Finally, each of the Debtors is indebted under that certain Term Loan and Security Agreement dated as of January 7, 2016 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Third Lien Loan Agreement") by and among the Borrowers, as borrowers, the Guarantors, as guarantors, and Vestis BSI Funding II, LLC, as administrative agent (the "Third Lien Agent"), and the lenders party thereto (the "Third Lien Lenders"), pursuant to which the Third Lien Lenders extended to the Borrowers a term loan in the original principal amount of $10 million (the "Third Lien Loan").  The Third Lien Lenders are affiliated with Versa.  Pursuant to a series of amendments to the Third Lien Loan Agreement, the Third Lien Loan was subsequently increased to $40 million.  Proceeds from the Third Lien Loan were used for, among other things, operating and working capital purposes (including to enable the Debtors to reduce the amounts owing on the Pre-Petition Loans, so as to maintain borrowing base compliance).  The Third Lien Loan accrues interest at varying rates based on either LIBOR or the prime rate, plus the same "applicable margin" as contained in the Pre-Petition Term Loan Agreement.  The Third Lien Loan Agreement also contains an early termination fee (the "Third Lien Loan Termination Fee") equal to the "Make Whole Amount" (described below) and: (i) 2.0% of the outstanding principal

---

[9]  The definition of Excluded Property is substantially identical in the Pre-Petition Loan Agreement and the Pre-Petition Term Loan Agreement, as well as in the Third Lien Loan Agreement (as defined below).

amount of the Third Lien Loan in the event the Third Lien Loan Agreement is terminated during the period February 19, 2016 to February 18, 2017 or (ii) 1.0% of the outstanding principal amount of the Third Lien Loan in the event the Third Lien Loan Agreement is terminated during the period February 19, 2017 to February 18, 2018.  The Make Whole Amount is equal to the sum of all amounts which are (or would be) payable on account of interest through the maturity date of the loan (February 19, 2020), less any interest paid in cash up to the date the Make Whole Amount becomes due and payable.  The Third Lien Loan Termination Fee becomes immediately due and payable upon the occurrence of an event of default resulting from the Debtors' commencement of bankruptcy cases prior to February 19, 2020.

47.    The obligations of the Debtors under the Third Lien Loan Agreement are secured by third-priority security interests in and liens on the same collateral that secures the Pre-Petition Loans and the Pre-Petition Term Loan (the Third Lien Loan Collateral").  As of the Petition Date, approximately $65,291,653 was outstanding under the Third Lien Loan Agreement, inclusive of interest and the Third Lien Loan Termination Fee in the amount of $24,788,483.

48.    *Intercreditor Agreements*.  The relative rights of the DIP Lenders and the Pre-Petition Term Lenders with respect to the Pre-Petition Loan Collateral and the Pre-Petition Term Loan Collateral are governed by the terms of that certain Intercreditor Agreement, dated as of February 11, 2015 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Pre-Petition Intercreditor Agreement"), by and between the DIP Agent and the Pre-Petition Term Agent.  The Pre-Petition Intercreditor Agreement provides, among other things, that the liens held by the Pre-Petition Term Agent are junior and subordinate to the liens held by the DIP Agent with respect to collateral that is both Pre-Petition Loan Collateral and Pre-Petition Term Loan Collateral.  The DIP Agent and Pre-Petition Term Agent, along with

the Third Lien Agent are also parties to that certain Intercreditor and Subordination Agreement, dated as of January 7, 2016 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Third Lien Intercreditor Agreement").  The Third Lien Intercreditor Agreement provides, among other things, that the liens and claims of the Third Lien Agent and Third Lien Lenders arising under the Third Lien Loan Agreement are junior and subordinate in right of payment to both the liens and claims of the DIP Agent and DIP Lenders arising under the Pre-Petition Loan Agreement and the liens and claims of the Pre-Petition Term Agent and Pre-Petition Term Lenders arising under the Pre-Petition Term Loan Agreement.  The Third Lien Intercreditor Agreement specifies that nothing in that agreement limits the right or ability of the Third Lien Agent and/or the Third Lien Lenders to purchase (by credit bid or otherwise) all or any portion of the Third Lien Loan Collateral, provided that the DIP Lenders and the Pre-Petition Term Lenders receive payment in full on account of, respectively, the Pre-Petition Loans and the Pre-Petition Term Loan.

49.     *Other Secured Debt*.  Except as described above, the Debtors do not believe that they have any other secured debt as of the Petition Date, other than capital lease obligations and secured claims of certain taxing authorities in the ordinary course of business, all of whom will receive notice.

**2.     Unsecured Debt.**

50.     As of the Petition Date, the Debtors believe that unsecured claims against the Debtors approximate $98 million.  Unsecured claims against the Debtors, excluding the litigation claims described below, include: (i) accrued and unpaid trade and other unsecured debt incurred in the ordinary course of the Debtors' business, (ii) unpaid amounts owed to the Debtors' vendors, and (iii) claims by landlords for unpaid rent and other obligations under the Debtors'

leases.  If leases are rejected during the Cases, the amount of unsecured claims could increase significantly.

51.     In addition, the Debtors are, from time to time, defendants in certain litigation matters relating to claims arising out of their operations in the normal course of business. Among other cases, one or more of the Debtors are currently defendants in certain general liability, property, and contractual dispute litigation, including a contractual dispute with the landlord of a Bob's Store in Totowa, New Jersey.

**3.    Equity Interests.**

52.     Vestis Financing is privately owned by Vestis Retail Holdings 2, LLC, which, in turn, is owned indirectly by investment funds advised by Versa.

53.     Certain of the Debtors are parties to that certain Amended and Restated Management Services Agreement (the "Management Agreement"), dated as of August 18, 2014, by and among EMS LLC, Bob's LLC, SC LLC (collectively, the "Managed Companies"), and Versa.  Pursuant to the Management Agreement, Versa provides, among other things, certain financial and management consulting services to the Managed Companies, in exchange for a quarterly management fee of $375,000 (the "Management Fee") and reimbursement of certain expenses.

**D.    Events Leading To These Cases.**

**1.    The Debtors Implement Internal Restructuring Initiatives.**

54.     Following the 2012 acquisition of EMS, the Debtors focused on integrating the new brand with the existing Bob's Stores platform.  The EMS integration initially centered on operations synergies which included, among others: (i) formation of a professional sourcing and product development team; and (ii) implementation of best practices tools like Kronos and 5S at the EMS stores, which drove labor savings, significant overhead savings, and created a

database-driven marketing focus.  All of these initiatives were completed within the first two years of EMS ownership under the Vestis Group umbrella.

55.     The Debtors have also had to address certain operational issues at EMS following the 2012 acquisition.  Although EMS has successfully integrated with the Vestis Group platform after its acquisition, costly legacy lease liabilities in certain locations have proved challenging and in some cases impossible to resolve in an out-of-court context.

56.     As previously noted, at the time of its acquisition in August 2014, Sport Chalet was a struggling company with significant liquidity and operating issues.  Following the acquisition, the Debtors' management team implemented numerous performance improvement initiatives, including inventory reductions and store payroll efficiency programs, as well as a focused drive to integrate Sport Chalet with the apparel and footwear merchandising best-practices in place at Bob's Stores and EMS.  Other efforts to improve profitability at Sport Chalet were also attempted.

57.     In addition to addressing operational issues at the individual retailer level, at the beginning of October 2015, the Debtors implemented a critical transition to the new enterprise-wide ERP software platform.  This new software provides an integrated suite of platforms for point-of sale, warehouse management, merchandising, and e-commerce and is enabling the Debtors to streamline operations and eliminate redundancies.

58.     In addition to planning and implementing the strategies described above, on or about March 29, 2016, the Debtors executed a cost savings plan which eliminated 133 full time employee positions, representing annualized savings of approximately $3.8 million.

**2.     The Debtors' Sales and Financial Challenges.**

59.     The Debtors' continuing efforts to implement the internal restructuring initiatives described above have already yielded some success through the stabilization and improvement of

EMS and Sport Chalet.  However, the Debtors also faced significant internal and external issues in the fourth quarter of 2015 that negatively affected their sales during the crucial holiday season.

60.     Although the transition to the new ERP platform occurred as scheduled in October 2015, the Debtors experienced severe post-implementation challenges, notably with respect to receiving and allocating inventory.  These challenges were most acute at Sport Chalet. Further, the Debtors had no access to key customer data during this crucial time.  Those issues negatively affected the Debtors' ability to process and send inventory out to Sport Chalet stores prior to and during the holiday season.  In an attempt to address the inventory issues, the Debtors' distribution center personnel attempted to create manual entries for much of the incoming inventory and inventory allocations throughout the month of October.  As a result, the inventory processing operated at an estimated 25% to 30% slower pace, and the distribution shifts had to be extended until 9:00 p.m. daily, with an added Saturday shift until 6:00 p.m. to make up for the slower pace.  These issues became a primary focus for the Debtors, involving daily meetings during the most critical periods, and contributed to a significant short-term degradation of useful and otherwise available management information.

61.     Complicating matters further, the Northeastern states (where Bob's Stores and EMS operate) experienced record-breaking warm winter weather in 2015, which caused a decrease in cold-weather sales and subsequently lowered margins as the retailers aggressively promoted their cold-weather gear in line with the competitive environment.  In addition, the Debtors faced increased competition in the marketplace resulting from the liquidation sales of many Sports Authority stores, which are direct competitors of the Debtors.

**3.     The Debtors' Consideration of Strategic Alternatives.**

62.     Notwithstanding the Debtors' internal restructuring efforts and the fact that Bob's Stores and EMS are operating on a reliable and stable basis, the Debtors continued to face

liquidity constraints in 2016.  Approximately $40 million in loans from the Third Lien Lenders during the first calendar quarter of 2016 were insufficient to address these issues.  In response, beginning in early 2016, the Debtors explored numerous restructuring alternatives, including a chapter 11 bankruptcy filing.

63.     In connection with their exploration of alternatives, the Debtors retained FTI Consulting, Inc. ("FTI") in March 2016 to serve as the Debtors' financial advisors, and Lincoln Partners Advisors LLC ("Lincoln") in March 2016 to serve as the Debtors' investment banker. In consultation with FTI, the Debtors concluded that the commencement of chapter 11 cases offered the best path for the Debtors to maximize the value of their businesses and assets for their estates and creditors.

64.     To achieve this goal, and as discussed in more detail in the Duffy Declaration, the Debtors determined that Sport Chalet was no longer viable as a going concern and that eight (8) EMS stores and one Bob's Stores location should be liquidated, and, accordingly, entered into an agreement with Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, "Agent") on or about April 15, 2016 to conduct the Store Closing Sales at the Closing Stores.  The Store Closing Sales commenced on April 16, 2016, the Sale Commencement Date. In addition, as described in the DIP Declarations, the Debtors approached the DIP Lenders about their providing debtor-in-possession financing to the Debtors, which the DIP Lenders have offered to provide.  Further, the Stalking Horse Bidder has provided the Debtors with the Stalking Horse Bid, which, upon Court approval and consummation, will allow their operations to continue as a going concern and maximize value.  Finally, a fulsome, albeit expedited, overbid process will test the market for higher and better offers.

**E.      The Debtors' Goals in These Cases.**

65.      The Debtors intend to sell all or substantially all of their remaining assets through section 363 sales processes, starting with the continuation of the Store Closing Sales and ending with the dispositions of EMS and Bob's Stores.

66.      In my view, the Stalking Horse APA affords the Debtors a viable path for their businesses to emerge from bankruptcy largely intact and as going concerns.  Furthermore, the Stalking Horse APA will be tested by a fulsome, albeit expedited, overbid process, which will afford the marketplace an opportunity to determine whether a higher and better transaction is available.

67.      After filing their petitions, the Debtors intend to operate their business in the ordinary course.  In the various First Day Motions, the Debtors seek relief on an expedited basis that will help preserve the value of their assets and permit them to conduct the Cases efficiently and economically.

## III.

## FACTS IN SUPPORT OF FIRST DAY MOTIONS

68.      In order to enable the Debtors to minimize the adverse effects of the commencement of these Cases, the Debtors have requested various types of relief in the First Day Motions filed concurrently with this Declaration.  A summary of the relief sought in each First Day Motion, as well as the factual basis for each First Day Motion, is set forth below.

69.      I have reviewed each of these First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption

to their current business operations; and (b) is essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

**A.    Joint Administration Motion.**

70.    As specifically outlined above and on **<u>Exhibit A</u>** hereto, the Debtors in these Cases are affiliated entities.  All of the Debtors are under common management.  The Debtors share many creditors and parties in interest.  As a result, joint administration will prevent duplicative efforts and unnecessary expenses.

71.    I understand that the joint administration of the Cases will permit the Clerk of the Court to utilize a single general docket for these Cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which will result in significant savings to the estates.  Accordingly, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates.

**B.    Employee Compensation and Benefits Motion.**

72.    The Debtors' workforce is comprised of full time salaried employees ("<u>Full Time Salaried Employees</u>"), full time hourly employees ("<u>Full Time Hourly Employees</u>" and together with the Full Time Salaried Employees, the "<u>Full Time Employees</u>"), part-time hourly employees ("<u>Part Time Employees</u>"), and temporary hourly employees ("<u>Temporary Employees</u>" and, together with the Full Time Employees and Part Time Employees, the "<u>Employees</u>").  As of the Petition Date, the Debtors employ approximately (i) 593 salaried Full Time Employees and 934 hourly Full Time Employees, for a total of approximately 1,527 Full Time Employees; (ii) 2,818 Part Time Employees; and (iii) 143 Temporary Employees.  In addition, four Full Time Employees are currently on leave.  The foregoing numbers reflect the reduction in force implemented by the Debtors on or about March 29, 2016, through which 133 Full Time Employees were terminated.  Of the Debtors' current workforce (including any on

leave), 856 are employed by EMS, 1,666 are employed by Bob's Sports, and 1,970 are employed

by Sport Chalet, and each of the three retailers has its own payroll system.[10]

73.     All Employees are paid bi-weekly for the prior two weeks ending on the Saturday

of any payroll week.  Currently, the Debtors utilize three methods of payment: direct deposit, pay

cards (debit cards funded on payroll date), and "live" paper checks.  About 900 Employees are

currently paid via paper checks.

74.     The Debtors currently utilize two different payroll systems with third-party

payroll administrators: Bob's Stores and EMS are administered by Lawson, while Sport Chalet is

administered by Abra Payroll ("Abra").  In addition, the Debtors currently utilize Automated

Data Processing ("ADP") to process payroll and distribute direct deposit payments, as well as to

administer certain "back end" payroll matters, such as the remittance of Payroll Taxes to local

state and federal agencies.  Finally, Bob's Stores and EMS also use ADP for the administration

of unemployment services, while Sport Chalet uses Employment Technology Solutions

("EmpTech") for such services.  The Debtors are in the final stages of migrating all of their

payroll administration to ADP, a process that is expected to be completed on or around May 20,

2016.

75.     In 2015, the average amount funded by the Debtors with respect to Employee

payrolls to their payroll administrators in each two-week period was approximately $3,590,000.

The Debtors' most recent prepetition payroll date was April 8, 2016, funded on April 6, 2016.  It

covered the pay period from March 20, 2016 through April 2, 2016.  The total amount of the

---

[10]   Certain of the Debtors' Employees provide shared services to the three retailers and are predominantly located out of the Debtors' headquarters (the "Home Office Employees").  These Home Office Employees are employed by Bob's Stores and administered under the Bob's Stores payroll system.  In addition, the Debtors contract with approximately 27 additional workers, who are either independent contractors or employees leased from temporary placement agencies (the "Contractors").  These Contractors are compensated outside of the Debtors' payroll system, and receive, in the aggregate, approximately $41,000 per week.  The Contractors are critical to the Debtors' business.

April 8, 2016 payroll was approximately $4,000,000.  The Debtors' next scheduled payroll date is April 22, 2016, and will cover the pay period from April 3, 2016 through April 16, 2016.  The Debtors expect that payroll expenses going forward will be lower than the foregoing historical amounts, in light of the ongoing Store Closing Sales and the orderly liquidation of Sport Chalet.

76.     The Debtors' ability to preserve the value of their assets and successfully conduct these Cases depends on the expertise and continued enthusiasm and service of their Employees.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the Debtors believe that the morale and performance of their Employees may be adversely affected.  This is critically important not only as to persons employed in connection with the Debtors' go-forward operations at EMS and Bob's Stores, but also persons who are employed in connection with the Store Closing Sales; the Debtors simply cannot conduct the Store Closing Sales without competent knowledgeable Employees.  If the Debtors fail to pay the Employee Claims in the ordinary course, their Employees will suffer personal hardship and, in some cases, may be unable to pay their basic living expenses.  This result would have a highly negative impact on workforce morale and likely would result in unmanageable performance issues, thereby resulting in immediate and irreparable harm to the Debtors and their estates.

77.     As of the Petition Date, approximately $3,680,000 was earned but remains unfunded with respect to Employees on account of accrued prepetition wages and salaries (inclusive of approximately $82,000 earned but unfunded with respect to the Debtors' Contractors).  In addition, the Debtors have Employees who choose to be paid by live check rather than by direct deposit.  Given that the most recent payroll checks were disbursed on April 8, 2016, most of the checks have subsequently been presented for payment.  However, a portion

of these payments may remain outstanding as of the Petition Date.  The Debtors estimate that this amount would not exceed $200,000.

78.    The amount owed to any individual Employee on account of prepetition Employee Claims does not exceed $12,850 and is not in respect of any time period more than 180 days before the Petition Date

79.    *Employee Bonus Programs*.  Prior to the Petition Date, in order to ensure optimal performance by the Employees, the Debtors implemented a number of bonus and incentive programs (collectively, the "Employee Bonus Programs") as follows:

a.    Store Credit Card Incentive Program.  Prior to the Petition Date, Bob's Stores, Sport Chalet, and EMS each offered store credit cards to its customers.  As part of that program, in March 2016, Sport Chalet and EMS began to offer their Employees an incentive to promote the store credit cards to their customers (the "Store Credit Card Incentive Program")[11].  Under the Store Credit Card Incentive Program, Employees were eligible to receive $10 for each store credit card customer application they submit until April 30, 2016 at Sport Chalet and April 22, 2016 at EMS, without limit.  Thereafter, Employees were eligible to receive $5 for each additional application they submit, also without limit.  In light of the ongoing Store Closing Sales and the orderly liquidation of Sport Chalet, the Debtors stopped offering the Store Credit Card Incentive Program at Sport Chalet shortly prior to the Petition Date.  Aggregate payments on account of the Store Credit Card Incentive Program in March 2016, the first month the program was available, were approximately $11,000.  As of the Petition Date, there is approximately $11,000 in accrued but unpaid amounts owing to Employees under the Store Credit Card Incentive Program.

b.    EMS Store Managers' Incentive Program.  EMS maintains two store managers' incentive plans, one that is only applicable to store managers at certain high volume stores, and one that is applicable to store managers at all other EMS stores (together, the "EMS Store Managers' Incentive Program").  Under both plans, store managers may earn payouts for meeting or exceeding target store sales for the month.  Once a monthly sales goal is attained, commissions are awarded depending on the month, with lowest commissions being awarded in February and March ($200), and highest commissions being awarded in December ($900).  Store managers at high volume stores are eligible for slightly higher commissions than store managers at other EMS

---

[11]    Bob's Stores is planning to launch a similar Store Credit Card Incentive Program in May or June 2016.

stores (from $300 to $1,000), and are subject to higher sales targets. If sales targets are missed for one or two months but achieved for the quarter, then store managers may be paid out for the months comprising that quarter. For all stores, sales managers may also earn payouts for exceeding planned customer data capture rate, planned conversion rate, planned new customer sign up rate, or units of Superfeet units sold as a percentage of footwear units sold. Aggregate payments on account of the EMS Store Managers' Incentive Program for calendar year 2015 were approximately $30,000. As of the Petition Date, there are no accrued but unpaid amounts owing to Employees under the EMS Store Managers' Incentive Program.

    c.    <u>Bob's Stores Performance Incentive Program</u>. Bob's Stores maintains a field bonus program for store managers, assistant store managers, department managers, asset protection managers, and senior asset protection managers (together, the "<u>Bob's Performance Incentive Program</u>"). Store managers, assistant store managers, and department managers are eligible for payouts if they meet certain targets for store sales, flex up components, sales reconciliation (quarterly), average check, annual shrink, CCR score, CCR quality shopping, experience consistency score, and e-reward capture rate. Eligible store managers are also eligible for payouts on the basis of meeting targets for AP survey scores. Eligible asset protection managers and senior asset protection managers are eligible for payouts if they meet certain targets for area shrink, area shrink improved, and AP survey scores. Aggregate payments on account of the Bob's Performance Incentive Program for calendar year 2015 were approximately $77,000. As of the Petition Date, there are no accrued but unpaid amounts owing to Employees under the Bob's Performance Incentive Program.

    d.    <u>Bob's Stores Tuition Assistance Program</u>. Bob's Stores offers tuition assistance (the "<u>Tuition Assistance Program</u>") to encourage Full Time Employees to further their education and professional development through job related coursework or work related degree programs. Tuition assistance is only granted for courses directly related to work or that go toward a job related degree. All Full Time Employees are eligible to apply for tuition assistance after completing six months of continuous service. Reimbursements under the plan are made at 75% of the total cost of tuition and lab fees up to an annual maximum of $5,000. If an Employee voluntarily terminates his or her employment within one year of accepting tuition assistance, he or she may be required to reimburse the company up to a certain amount. As of the Petition Date, there is approximately $1,000 in accrued but unpaid amounts owing to Employees under the Tuition Assistance Program

80.    <u>*Non-Insider Going Out of Business Retention Program*</u>. Shortly before the

Petition Date and in light of the commencement of the Store Closing Sales and the orderly

liquidation of Sport Chalet, the Debtors approved a modest going-out-of-business retention

program (the "GOB Retention Program") for certain non-insider Employees.

81.     Under the GOB Retention Program, certain field Employees at the Bob's Stores,

EMS, and Sport Chalet Closing Stores, as well as certain corporate Sport Chalet Employees, are

eligible to earn cash payments if they remain employed by the Debtors for the planned 9 week

duration of the Store Closing Sales and perform their duties satisfactorily.  Employees are

eligible to earn an additional cash payment if they meet certain sales metrics during the Store

Closing Sales, as recommended by the third party liquidators assisting in the Store Closing

Sales.  This is customary in connection with going out of business sales as a means of

maximizing proceeds, and in all instances will be subject to the Debtors' prior approval.

Employees will not receive any payments if they voluntarily leave their employment during the

Store Closing Sales or are terminated for cause.  The total payments for which Employees are

eligible under the GOB Retention Program range between $500 and $2,500 per person, based on

position with the Debtors (i.e. up to $500 for supervisors, $1,500 for assistant managers, and

$2,500 for store managers).  As of the Petition Date, there are no accrued unpaid amounts owing

to Employees on account of the GOB Retention Program.

82.     The GOB Retention Program covers (i) approximately 240 Sport Chalet field

Employees, at a maximum aggregate cost of approximately $300,000; (ii) approximately 12

Sport Chalet corporate Employees at a maximum aggregate cost of approximately $145,000; (iii)

and approximately 19 EMS and Bob's Stores field Employees at a maximum aggregate cost of

approximately $32,000.  In sum, the aggregate liability under the GOB Retention Program is

limited to approximately $477,000.  None of the Employees covered under the GOB Retention

Program are insiders -- none are corporate officers or controlling persons of the Debtors, have

check-writing authority, have authority over the disposition of the Debtors' assets, or report directly to the Debtors' CEO, CFO, general counsel, managing members, or the board of managers.

83.      The Store Closing Sales are already underway and thousands of customers are showing up to the Debtors' Closing Stores, increasing the need for retention of the Debtors' Employees at those locations.  The Store Closing Sales are for a limited duration, and it is essential that the Debtors provide adequate incentives to affected employees *immediately*.  The GOB Retention Program plays an integral role in motivating those Employees that are critical to the successful completion of the Store Closing Sales.  Moreover, the GOB Retention Program is modest in amount and designed to maximize Employee morale at a time when the Debtors faces a tremendous risk of Employee attrition.  Accordingly, it is essential for the Debtors to honor the GOB Retention Program, in order to provide certainty to eligible Employees and maximize the effect of the GOB Retention Program.

84.      *Vacation Time*.  The Debtors have varying vacation policies for their Employees who are awarded or accrue vacation time and paid time off (together, "Vacation") throughout the year:

  a.  Bob's Stores.  Bob's Stores field Full Time Employees are awarded vacation time annually based on years of service attained at the time of the award. Vacation time is awarded, not accrued.  Full Time Hourly Employees (who have worked an average of thirty or more hours per week in the previous vacation calendar year (February 1 – January 31) and hold a position classified by the company as full time) and Full Time Salaried Employees are eligible for vacation awards in accordance with the company's award schedule.  For Full Time Salaried Employees, the award schedule provides for two weeks of vacation for one year of service, for three weeks of vacation for two years of service, and for four weeks of vacation for ten years of service. For Full Time Hourly Employees who hold a position classified by the company as full time, the award schedule provides for one week of vacation for one year of service, for two weeks of vacation for two years of service, for three weeks of vacation for five years of service, and for four weeks of

vacation for ten years of service.  Vacation awards for Full Time Hourly Employees  are made based on the average weekly number of hours worked for all Full Time Hourly Employees during the previous vacation calendar year.  Awarded vacation not used by the end of the vacation year is forfeited.  Vacation award balances that remain unused at the time of separation are not paid out unless otherwise directed by state law.

b.  <u>Sport Chalet</u>.  Sport Chalet field Full Time Employees accrue vacation days based on years of full time employment.  Vacation days are earned on the following schedule: forty hours (five days) after one year of full time employment, eighty hours (ten days) after two years of full time employment, 120 hours (15 days) after five years of full time employment, and 160 hours (twenty days) after ten years of full time employment.  Vacation hours begin accruing immediately when the Employee is classified as full time, and stop accruing when an Employee's balance reaches the amount earned in one year plus five (5) days.  In extenuating circumstances and with approval, Employees may borrow up to a maximum of three days over the annual earned amount, in which case any unearned, negative balance remaining when leaving the company or changing to part-time status will be deducted from the last check.  Upon termination of employment or change to part-time status, Employees are paid for any accrued, unused vacation time.

c.  <u>EMS</u>.  EMS field Full Time Employees earn paid time off based on years of service.  Earnings are prorated by the percentage of full time (40) hours worked each week (for example, if an employee works only 30 hours a week, that employee will earn 75% of the time a person working 40 hours a week would).  Vacation days are earned on the following schedule: a maximum of ten days after 0-4 years of service, a maximum of fifteen days after 5-9 years of service, a maximum of twenty days after 10-19 years of service, and a maximum of 25 days after 20+ years of service.  Part Time Employees and Full Time Employees are paid for time away for bereavement (with benefits prorated for part-time employees).  Paid bereavement leave is limited to five days for immediate family, three days for extended family, one day for other relatives, and one-half day for coworkers.  Upon termination of employment, Employees are paid for any accrued, unused vacation time.  EMS Full Time Employees are also eligible for an Adventure Leave program, which allows for up to 30 days of unpaid leave for participation in an outdoor experience, subject to prior management approval.

d.  <u>Home Office Employees</u>.  Regular full time Home Office Employees (which, as noted above, are administered under the Bob's Stores payroll) with thirty consecutive days of full time employment accrue vacation time based on accumulated service, ranging from two days for two-four months of service to twenty-six days for ten or more years of service.  For Home Office Employees in their second through ninth year (beginning February 1), twenty-one vacation days are accrued for each fiscal year.  Paid time off is paid at normal base salary or hourly rate.  Remaining unused hours/days are not carried over into the new fiscal year, and Home Office Employees are not paid out for

unused paid time off, unless required by applicable law, specifically in Massachusetts and Rhode Island.

85.  At any point in time, Vacation is accruing or being used by Employees, making it difficult to quantify the cost of accrued Vacation as of the Petition Date.  However, as of the Petition Date, the Employees had approximately $1,300,000 in the aggregate of accrued and unused Vacation.

86.  *Sick Leave*.  The Debtors provide paid accrued sick time ("Sick Leave") to their Full Time and Part Time Employees as and where dictated by state law.  In addition, the Debtors' hourly Home Office Employees are eligible for up to four sick days each fiscal year, starting February 1 in their second year of service, which do not carry over at the end of the fiscal year, and are not paid out when employment ends.  As of the Petition Date, the Employees had approximately $560,000 in the aggregate of accrued and unused Sick Leave.

87.  *Non-Insider Severance Policy*.  The Debtors maintain a severance policy for certain of their non-insider Full Time Employees (the "Severance Policy").  In particular, Employees in the positions of vice president, director, associate vice president, manager, supervisors, and individual contributor are eligible to receive severance payments equal to a certain number of weeks' base pay, according to a matrix that provides for service factors of between 1.00 and 2.00.  For vice presidents, the number of weeks ranges from thirteen to twenty-six, for directors and associate vice presidents, the number of weeks ranges from ten to twenty, for managers, the number of weeks ranges from eight to sixteen, for supervisors and salaried individual contributors, the number of weeks ranges from six to ten, and for hourly individual contributors, the number of weeks ranges from four to eight.

88.  As of the Petition Date, there are no there are no unpaid amounts due to terminated Employees on account of prepetition Severance Policy obligations.  However, the

Debtors anticipate that, as a result of primarily of the ongoing Store Closing Sales and the orderly liquidation of Sport Chalet, approximately 70 Employees may be terminated post-petition.  Consequently, the Debtors estimate that, as a result of such terminations, they may incur up to $820,000 in the aggregate on account of the Severance Policy.  As with the GOB Retention Program, none of the Employees that will receive severance are insiders – none are corporate officers or controlling persons of the Debtors, have check-writing authority, have authority over the disposition of the Debtors' assets, or report directly to the Debtors' CEO, CFO, general counsel, managing members, or the board of managers.

89.     As part of their Employee Benefits, prior to the Petition Date, the Debtors offered their Full Time Employees various standard employee benefits (the "Benefit Programs"), including, without limitation, (a) health insurance, (b) dental insurance, (c) vision plan, (d) life insurance, (e) accidental death and dismemberment insurance, (f) short-term and long-term disability insurance, (g) COBRA coverage; (h) flexible spending accounts, (i) an employee assistance program, and (j) employee discounts and pro deals.  Some of these benefits are only available to Full Time Employees.

90.     Many of the Benefit Programs amongst Employees of Bob's Stores, Sport Chalet, and EMS overlap.  The Debtors expect that Benefit Programs expenses going forward will be lower than they have historically been, on account of the prepetition reduction in force and the ongoing Store Closing Sales and orderly liquidation of Sport Chalet.

91.     *Medical Insurance Program*.  The Debtors offer a self-insured medical and prescription drug program (the "Health Plan") to their Full Time Employees, which is administered by Cigna.  The Health Plan is approximately 69% paid by the Debtors and 31% paid by the Debtors' Full Time Employees through paycheck withholding.  The Debtors also

maintain a stop-loss insurance policy (the "Stop-Loss Policy") to provide protection against catastrophic losses under their self-insured medical insurance program, which is administered by Cigna.  Finally, the Debtors use the brokerage services of Mercer LLC ("Mercer") in connection with the management and maintenance of their Health Plan.

92.    The average monthly cost (after taking into account Employee contributions) of maintaining the Health Plan, including administrative costs and premiums, has been approximately $525,000 in the aggregate per month.  The average monthly cost of maintaining the Stop-Loss Policy, including administrative costs and premiums, has been approximately $90,500.  The average monthly cost of the brokerage services provided by Mercer has been approximately $15,000.

93.    The Health Plan administrator draws on an account maintained by the Debtors on a daily basis on account of claims paid by the administrators on the Debtors' behalf.  The Debtors are unable to estimate with specificity the prepetition amounts owing in respect of the Health Plan, due to the fact that there is lag time of approximately 60 days on Employees' submissions of medical claims.  However, based on historical data, the Debtors estimate that as of the Petition Date they owe approximately $1,250,000 in respect of "incurred but not reported" claims under the Health Plan and related administrative costs and premiums in respect of the Stop-Loss Policy (excluding amounts paid through Employee deductions), and approximately $210,000 in respect of filed claims that have not yet been paid.

94.    *Dental Insurance Program*.  The Debtors offer a fully-insured dental program (the "Dental Plan") to their Full Time Employees, which is administered by Cigna Dental.  The Dental Plan is approximately 39% paid by the Debtors and 61% paid by the Debtors' Full Time Employees through paycheck withholding.  The average cost (after taking into account

Employee contributions) of maintaining the Dental Plan, including administrative costs, has been approximately $34,000 per month. The Debtors are unable to estimate with specificity the prepetition amounts owing in respect of the Dental Plan, due to the fact that there is lag time of approximately 60 days on Employees' submissions of dental claims. However, based on historical data, the Debtors estimate that as of the Petition Date they owe approximately $68,000 in respect of "incurred but not reported" claims under the Dental Plan (excluding amounts paid through Employee deductions), and approximately $16,000 in respect of filed claims that have not yet been paid. The Debtors seek authorization to pay prepetition amounts in respect of the Dental Plan in an amount not to exceed $100,000 in the aggregate, and to continue to pay postpetition costs of the Dental Plan in the ordinary course of business during the pendency of these Cases.

95.    *Vision Insurance Program.*  The Debtors offer vision insurance to their Full Time Employees through EyeMed (the "Vision Plan"). Full Time Employees participating in the Vision Plan pay 100% of the plan premium. The average cost of maintaining the Vision Plan has been approximately $6,000 per month. The Debtors estimate that as of the Petition Date they owe approximately $3,000 on account of unpaid prepetition costs in respect of the Vision Plan.

96.    *Life and Accidental Death and Dismemberment Insurance Coverage.*  The Debtors provide their Full Time Employees with basic life insurance, accidental death and dismemberment insurance, and short-term and long-term disability insurance, all of which are provided by Cigna (collectively, the "Life and Disability Plans"). The Debtors pay 100% of the costs of the Life and Disability Plans (except with respect to optional supplemental life insurance, which is 100% paid by Employees who elect such insurance benefits). In the aggregate, the average monthly cost of maintaining the Life and Disability Plans has been

Case 16-10971-CSS    Doc 2    Filed 04/18/16    Page 38 of 66

approximately $40,000.  The Debtors estimate that as of the Petition Date they owe

approximately $18,600 on account of unpaid prepetition costs in respect of the Life and

Disability Plans.

97.     _COBRA_.  The Debtors perform certain obligations under Section 4980B of the

Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B)

("COBRA") in respect of former Employees and their covered dependents.  Discovery Benefits,

Inc. ("Discovery Benefits") is the third-party COBRA administrator for the Debtors.  The

Debtors pay approximately $900 in the aggregate per month for administration of their COBRA

obligations.  The Debtors do not believe they owe any prepetition amounts in respect of the

COBRA benefits.

98.     _Flexible Spending Accounts_.  The Debtors offer their Full Time Employees the

use of flexible spending accounts for various medical claims not otherwise covered or payable by

the Health Plan.  The flexible spending benefits (the "Flex Benefits") are administered by

Discovery Benefits, at a monthly cost of approximately $24,000 in the aggregate per month.  The

Debtors estimate that as of the Petition Date they owe approximately $11,266 on account of

unpaid prepetition costs in respect of Flex Benefits.

99.     _Employee Assistance Program_.  The Debtors offer their Full Time Employees and

their family members counseling services to help resolve personal issues (the "EAP") through

CMG Associates.  The EAP has been funded at an average monthly cost to the Debtors of

$1,100.  The Debtors estimate that as of the Petition Date they owe approximately $2,200 on

account of unpaid prepetition costs in respect of the EAP.

100.     _Employee Discounts and Deal Programs_.  Prior to the Petition Date, the Debtors

offered all of their Full Time Employees and Temporary Employees, their dependents, and their

immediate family members cross-brand discounts at each of the Bob's Stores, EMS, and Sport Chalet locations, as well as online.  The discounts range between 10-50% of the original product price, subject to certain exclusions.  The Debtors also offered all of their Full Time Employees and Temporary Employees certain "Pro Deals" discounts on product offered directly through third-party vendors.  Pro Deals can be obtained directly from the applicable vendor or through a third-party website.

101.    In addition, prior to the Petition Date, EMS Full Time Employees and Temporary Employees could rent sports equipment for free, subject to certain exceptions.[12]  At EMS, Full Time Employees and Temporary Employees could also take up to two free lessons per year for rock and ice climbing, kayaking, and telemark skiing.  There are no amounts owing to Employees with respect to these policies as of the Petition Date.

102.    As of the Petition Date, certain of the Benefit Programs described above remained unpaid or not yet provided because certain obligations of the Debtors under the applicable plan, program or policy accrued either in whole or in part prior to the commencement of these Cases, but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date.  I believe that failing to honor these obligations would have devastating consequences on the reorganization of the Debtors' surviving businesses, as well as on the ongoing Store Closing Sales and the orderly liquidation of Sport Chalet that is necessary to maximize the value of the Debtors' estates.  I believe that the expenses associated with such Benefit Programs are reasonable and necessary in light of that potential attrition, loss of morale and loss of productivity that would occur if such programs were discontinued.

---

[12]  The Debtors maintained a similar free rental program at Sport Chalet, which was discontinued shortly prior to the Petition Date, in light of the ongoing Store Closing Sales and the orderly liquidation of Sport Chalet.

103.     *Retirement Plan*.  Debtors maintain a 401(k) plan (the "Retirement Plan"),

administered by Prudential Retirement, through which qualified and participating Employees

may defer a portion of their salary to help meet their financial goals and accumulate savings for

their future.  The Retirement Plan is funded by Employee contributions, and Employees pay

Prudential Retirement's administrative and consulting fees.  The Debtors do not match Employee

contributions.  The Debtors pay approximately $45,000 in the aggregate each year for audits of

the Retirement Plan.  An audit for the last plan year was recently performed by KPMG LLP for

Bob's Stores, by Berry Dunn for EMS, and by Moss Adams for Sport Chalet.  I believe that

maintaining the Retirement Plan is important to maintaining Employee morale.

104.     *Employee Expenses*.  Prior to the Petition Date, the Debtors directly or indirectly

reimbursed their Employees for certain expenses incurred on behalf of the Debtors in the scope

of their employment (the "Employee Expenses").  The Employee Expenses are incurred in the

ordinary course of the Debtors' business operations and include, without limitation, expenses for

meals, travel, automobile mileage and other business-related expenses.  In addition, the Debtors

maintain certain cardholder-paid credit cards issued by American Express (the "Employee

Cards") on which cardholder Employees incur and pay expenses, and are subsequently

reimbursed by the Debtors after submission and approval of expense reimbursement requests.

105.     The Debtors allow Employees to utilize two methods for submitting Employee

Expenses reimbursement requests.  First, Employees can use an online expense report software

to submit expense reports and receive reimbursement for approved Employee Expenses directly

to their bank accounts.  Alternatively, Employees can submit expense reports directly and

receive a live check for approved Employee Expenses in lieu of a direct deposit payment.

106.    Historically, approximately $180,000 has been paid on account of Employee Expenses each month.  Because a delay often occurs between the time such expenses are incurred and the time a charge is posted, or an expense reimbursement request (in the case of the Employee Cards) is submitted, it is difficult to determine with precision the aggregate amount of outstanding Employee Expenses.  However, the Debtors estimate that, as of the Petition Date, half the monthly average or approximately $90,000 in Employee Expenses have not been submitted and thus remain unpaid.  Absent authority to pay the Employee Expenses incurred prepetition, the Debtors' Employees could be obligated to pay such amounts out of their personal funds, which would be unfair and would hurt morale.

107.    *Employee Withholdings*.  The Debtors routinely deduct certain amounts from Employees' compensation that represent earnings that judicial or government authorities or the Employees have designated for deduction, including, for example, various federal, state and local income, Federal Insurance Contribution Act ("FICA") and other taxes, support payments and tax levies, savings programs contributions, benefit plans insurance programs and other similar programs (collectively, the "Employee Withholdings").  The amount deducted and remitted by the Debtors in respect of Employee Withholdings is approximately $2,300,000 in the aggregate per month  Approximately $1,080,000 of deductions have accrued prepetition but have not yet been funded to various third parties.

108.    In addition, the Debtors are responsible for remitting to ADP, for their own account, various taxes and fees associated with payroll pursuant to the FICA and federal and state laws regarding unemployment and disability taxes ("Payroll Taxes").  The Debtors pay approximately $708,000 in the aggregate for employer-obligated Payroll Taxes each month.

The Debtors estimate that as of the Petition Date, approximately $354,000 is owing in respect of prepetition Payroll Taxes.

109.    *Employee Administrator and Broker Obligations*.  As discussed above, the Debtors utilize Lawson, Abra, and ADP as the payroll administrators for the different retail businesses.  For these administrative services, the Debtors pay approximately $40,000 in the aggregate per month.  The payroll administrators typically bills the Debtors in arrears for associated payroll costs.  As of the Petition Date, approximately $40,000 is owing to the payroll administrators in the aggregate in respect of prepetition costs and fees for payroll and administration fees.[13]

110.    As discussed above, the Debtors utilize EmpTech as the unemployment benefits administrator for Sport Chalet.  For these services, the Debtors pay approximately $1,000 in the aggregate per month.  As of the Petition Date, approximately $1,000 is owing to EmpTech in respect of prepetition costs for these administrative services.

111.    As discussed above, the Debtors utilize Cigna as their Health Plan, Dental Plan, Vision Plan, and Life and Disability Plan administrator.  The Debtors pay Cigna approximately $205,000 in the aggregate per month for these administrative services.  As of the Petition Date, the Debtors believe that approximately $205,000 is owing to Cigna in respect of prepetition costs and fees for these administrative services.

112.    As discussed above, the Debtors utilize CMG Associates as their EAP administrator.  The Debtors prepay CMG Associates approximately $1,100 in the aggregate per month for these administrative services.  As of the Petition Date, the Debtors believe that

---

[13]  In addition, the Debtors have posted bonds with the State of Rhode Island Department of Labor and Training in connection with their payroll, in the aggregate amount of $58,000.

approximately $2,200 is owing to CMG Associates in respect of prepetition costs and fees for these administrative services.

113.    As discussed above, the Debtors use the brokerage services of Mercer in connection with the management and maintenance of their Health Plan.  The Debtors pay Mercer approximately $15,000 in the aggregate per month for these brokerage services.  As of the Petition Date, the Debtors believe that approximately $15,000 is owing to Mercer in respect of prepetition costs and fees for these brokerage services.

114.    As discussed above, the Debtors utilize Discovery Benefits as their COBRA and Flex Benefits administrator.  The Debtors pay Discovery Benefits approximately $1,900 in the aggregate per month for these administrative services.  As of the Petition Date, the Debtors believe that approximately $1,900 is owing to Discovery Benefits in respect of prepetition costs and fees for these administrative services.

115.    I believe that the relief sought in the Employee Compensation and Benefits Motion represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates.  I  believe that without the relief requested in the Employee Compensation and Benefits Motion being granted, there is great risk that the Employees required going forward for the Debtors' success will seek alternative opportunities.  Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to successfully conduct these Cases.

C.    **Cash Management Motion.**

116.    In the ordinary course of their business, the Debtors maintain a complex cash management system (the "Cash Management System"), which includes all activities necessary and pertinent to collecting and disbursing the Debtors' cash assets.  The Cash Management System allows the Debtors to efficiently identify the Debtors' cash requirements and transfer

cash as needed to respond to these requirements.  The Cash Management System is important to the efficient execution and achievement of the Debtors' business objectives, and, ultimately, to maximizing the value of the Debtors' estates.  The Cash Management System consists of bank accounts (the "<u>Bank Accounts</u>"), which are maintained at Wells Fargo Bank, N.A. ("<u>Wells Fargo</u>") and certain other banks.[14]

117.    *Collections Process.*  Cash collections from brick and mortar sales are picked up by an armored car service from each store and deposited directly into individual depository accounts for each of the three retailers (collectively, the "<u>Depository Accounts</u>").  The Depository Account for Bob's Stores is maintained by Bob's LLC at Wells Fargo, the Depository Account for EMS is maintained by EMS Operating at Wells Fargo, and the Depository Account for Sport Chalet is maintained by SC LLC at Wells Fargo.[15]  Deposits from cash collections are made twice a week for Bob's Stores and Sport Chalet and weekly for EMS.

118.    The proceeds from brick-and-mortar credit card sales and other miscellaneous checks and wires are deposited by the third-party processors of those credit card or check transactions, net of certain customer returns, chargebacks and fees, directly into the respective retailer's Depository Account on a daily basis.  Similarly, the proceeds from credit card and PayPal purchases made through each retailer's respective e-commerce website, net of certain customer returns, chargebacks, and fees, are deposited directly into the respective retailer's Depository Account on a daily basis.

---

[14]    Prior to its 2014 acquisition by Vestis Group, Sports Chalet used a Bank of America ("<u>BofA</u>") cash management system.  As of the Petition Date, four BofA bank accounts associated with Sports Chalet remain open, but only one of them is still actively utilized, for purposes of payroll processing.

[15]    The Debtors maintain a separate fourth Depository Account with respect to sales by Sport Chalet's team sales division, which provides equipment to teams in various sports.  That Depository Account is maintained by SC Teams Sales at Wells Fargo.

119.    All of the Depository Accounts are linked directly to the Debtors' Pre-Petition

Loan Agreement.  Funds on deposit in the Depository Accounts are automatically swept daily to

pay down the Pre-Petition Loans balance to a main concentration account maintained by the DIP

Agent.  Under the DIP Facility, the process of sweeping and applying funds will be in

accordance with terms of the DIP Facility and any order thereon.

120.    Several of the Bank Accounts are subject to Deposit Account Control Agreements

by and among the applicable Debtor, the DIP Agent, the Pre-Petition Term Agent, the Third Lien

Agent, and the applicable banking institution (collectively, the "Deposit Account Control

Agreements").  The Debtors intend to maintain the Deposit Account Control Agreements in the

ordinary course of their business and intend that they should govern the postpetition cash

management relationship between the Debtors and their prepetition lenders, provided that no

enforcement actions with respect to those agreements may be taken except as provided in an

order of the Court.

121.    *Disbursements Process*.  The Debtors maintain a master standalone disbursement

account (the "Master Disbursement Account"), which is linked to and funded daily through the

Revolving Loan facility.  The Master Disbursement Account is maintained by Bob's LLC at

Wells Fargo.

122.    The Master Disbursement Account is, in turn, linked to individual zero-balance

operating accounts for each of the three retailers, as well as a zero-balance operating account for

the SC Team Sales division (collectively, the "Operating Accounts").  The Operating Account

for Bob's Stores is maintained by Bob's LLC at Wells Fargo; the Operating Account for EMS is

maintained by EMS Operating at Wells Fargo; the Operating Account for Sport Chalet is

maintained by SC LLC at Wells Fargo; and the Operating Account for SC Team Sales is

maintained by SC Team Sales at Wells Fargo.  Each of the Operating Accounts gets funded daily through the Master Disbursement Account.

123.    In addition, each of the Operating Accounts is used to fund between three to five related zero-balance disbursement accounts for the respective line of business.  The Disbursement Accounts are funded daily in order to pay checks that have been presented that day for payment as well as to fund any payroll and payroll taxes, non-payroll items relating to employee health benefits and insurance, vendor payments, sales taxes, and other expenditures as they come due.  The Debtors are required to fund each Disbursement Account manually, via wire transfer or book transfer, and ensure, on each business day, that there are sufficient collected and available funds in each Disbursement Account in the amount of all items drawn on such account, whether outstanding or presented for payment, and any other debit transactions initiated with respect to such Disbursement Account.  The Debtors make disbursements from the Disbursement Accounts directly to third parties.

124.    Finally, in the regular course of their business, the Debtors also use a commercial pay card (the "P-Card") in accordance with that certain WellsOne Commercial Card Agreement, dated on or around November 22, 2010 (as amended, restated, supplemented or otherwise modified from time to time, the "Card Agreement"), between Bob's Stores, LLC and Wells Fargo.  In accordance with the terms of the Card Agreement, Wells Fargo is authorized to make advances from time to time to the Debtors with a maximum exposure at any time up to $200,000.  The Debtors use the P-Card for a variety of purposes, including for inventory purchases and certain expense payments for costs such as marketing, customer shipping, and various other business purposes.  The balances on the P-Card are paid at the end of each fiscal month, and such

balances are secured by the collateral securing the Pre-Petition Loans and subject to the terms of the Pre-Petition Loan Agreement.

125.    _Intercompany Transactions._   Prior to the Petition Date, the Debtors engaged in certain intercompany transactions with each other in the ordinary course of business (collectively, the "Intercompany Transactions"), primarily related to allocations of their merchandise inventory.  Specifically, from time to time the Debtors transfer inventory from on Debtor to another to realize business efficiencies.  In addition, certain of the Debtors' funds may become intermingled as a result of their Cash Management System, as described above.  These costs are reconciled through Intercompany Transactions.

126.    The Debtors maintain records of transfers of cash and can trace and account for all such Intercompany Transactions.  The Debtors will continue to maintain such records, including records of all current intercompany accounts receivable and payable.  If the Intercompany Transaction were discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment.

127.    In light of the substantial size and complexity of the Debtors' operations, I believe that it is critical that the Debtors continue to utilize their existing Cash Management System without disruption and believe that the relief requested in the Cash Management Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

**D.    Taxes Motion.**

128.    In the ordinary course of business, the Debtors incur or collect and remit certain taxes including sales, use, franchise, property, business and occupation, and various other taxes, fees, charges, and assessments (the "Taxes and Fees").  The Debtors remit such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "Taxing Authorities") in

connection with the operation of their businesses and the sale of their products or services at

store locations, or through shipments of products purchased through the Debtors' websites to

customers.  The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the

respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing

Authority to which it is paid.  In addition, the Debtors have posted a bond with the Nevada

Department of Taxation in the amount of $105,516.  As of the Petition Date, the Debtors

estimate that they owe approximately $1,000,000 in unremitted Taxes and Fees, which are

comprised entirely of current tax obligations, and are not in respect of "catch-up" payments.

129.    Any regulatory dispute or delinquency that impacts the Debtors' ability to

conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the

Debtors' operations as a whole, as described further in the Taxes Motion.  I believe that payment

of the Taxes and Fees is in the best interest of the Debtors and their estates, will not harm

unsecured creditors and may reduce harm and administrative expense to the Debtors' estates.

**E.    Utilities Motion.**

130.    In connection with the operation of their business and management of their

properties, the Debtors obtain electricity, natural gas, telephone, water, waste disposal, and other

similar services (collectively, the "Utility Services") from several utility companies or brokers

(collectively, the "Utility Companies").  Uninterrupted Utility Services are essential to the

Debtors' ongoing business operations and the overall success of these Cases.

131.    On average, the Debtors pay approximately $925,136 each month for third party

Utility Services in connection with their stores, corporate offices, and distribution centers.  In the

aggregate, the Utility Companies currently hold $500 in deposits from the Debtors.  In addition,

the Debtors have posted bonds with certain utility companies, including Salt River Project

Agricultural Improvement and Power District, Southern California Edison Company, Unitil

Energy Systems, Central Maine Power Company, Hingham Municipal Lighting Plan, Con

Edison, and Central Maine Power, in the aggregate amount of $266,680.

132.    For the reasons already set forth herein and in the Utilities Motion, I believe that

the relief requested in the Utilities Motion is necessary to avoid immediate and irreparable harm

to the Debtors, for the Debtors to operate their business without interruption, and to preserve

value for the Debtors' estates.

## F.    Insurance Motion.

133.    In connection with their business operations, the Debtors maintain multiple

prepetition insurance policies (the "Insurance Policies") that vary in amounts and types of

coverage in accordance with prudent business practices, state and local laws governing the

jurisdictions in which the Debtors operate and various contractual obligations.  The Insurance

Policies include (a) general liability, (b) automobile liability and automobile physical damage,

(c) umbrella liability, (d) excess liability, (e) cargo, (f) property, (g) foreign package, (h) flood,

(i) directors and officers liability, (j) employment practices liability, (k) employment practices

liability, (l) fiduciary liability, (m) commercial crime, (n) special crime, (o) premises

environmental liability, (p) workers' compensation and employers' liability,[16] and (q) California

earthquake difference in conditions.

---

16    Under the laws of various states, the Debtors are required to maintain workers' compensation
insurance to provide their employees with coverage for injury claims arising from or related to their employment
with the Debtors.  The Debtors maintain an Insurance Policy for their workers' compensation benefits program
through Zurich American Insurance Company (the "WC Program").  The WC Program provides benefits to all of
the Debtors' employees for claims arising from or related to the employees' employment with the Debtors.  The WC
Program is a guaranteed cost program, so there is no applicable deductible.  The annual premium for the WC
Program and amounts outstanding as of the Petition Date are disclosed on the Insurance Schedule to the Insurance
Motion.  .  While the current WC Program is guaranteed cost and does not involve the use of an administrator, the
Debtors have continued a previous administration agreement with Sedgwick Claims Management Services, Inc.
("Sedgwick") only as to certain legacy claims already received in connection with their prior policy for the policy
year ending before August 18, 2015.  That policy had a $250,000 deductible.  In connection with these legacy costs
of the Debtors' WC Program, the Debtors have also posted a standby letter of credit in favor of XL Specialty
Insurance Company and Greenwich Insurance Company, for which the contract balance is $2,590,000.  Failure to
maintain workers' compensation insurance could result in administrative or legal proceedings against the Debtors

134.     The total annual premiums under the current Insurance Policies are approximately $5,000,000, including all related fees and charges.  These premiums are paid to the relevant insurance carriers (the "Insurance Carriers") either as annual prepayments or as installment payments, including through the Financing Agreements (defined below).  In connection with the Insurance Policies, the Debtors have posted standby letters of credit, to National Union Fire Insurance and to Hartford Fire Insurance Company, for which the outstanding contract balances are $25,000 and $2,650,000, respectively.  The Debtors do not believe there are any prepetition amounts owing to the Insurance Carriers with respect to the Insurance Policies.

135.     In addition, most of the Debtors' premiums are financed.  The Debtors finance the premiums for all of their existing Insurance Policies, other than their flood insurance policies, because it is not economically advantageous for the Debtors to pay those premiums in full on a lump-sum basis.  The Financed Programs are financed pursuant to two Commercial Premium Finance Agreements (the "Financing Agreements") with AFCO Premium Credit LLC ("AFCO").

136.     The first Financing Agreement, dated September 15, 2015 (the "First Financing Agreement"), provides the Debtors with, generally, property, cargo, umbrella, environmental, excess liability, earthquake, foreign package, general liability, auto, and workers' compensation insurance through thirteen insurance policies with Affiliated FM Insurance Company, AGCS Marine Insurance Company, XL Insurance America Inc., Great American E&S Insurance Company, Ohio Casualty Insurance Company, Allied World National Assurance Company, Empire Indemnity Insurance Company, General Security Indemnity Company of Arizona, Zurich American Insurance Company, and Claims Payment Fund.  The thirteen insurance

---

and their officers and directors.  In accordance with this obligation, the Debtors maintain workers' compensation insurance policies in all jurisdictions where they operate.

policies subject to the First Financing Agreement have a range of expiration dates, with many expiring August 19, 2016.  Under the First Financing Agreement, the Debtors made a down payment of $575,539.00 and received a loan in the amount of $4,220,622.89, plus a $43,910.02 finance charge, at an annual percentage interest rate of 2.490%.  The Debtors are obligated to make monthly payments of $473,836.99 on the 19th of each month in advance for that month.  The Debtors have made 7 of their 9 payments under the First Financing Agreement and are current on their obligations thereunder.  The Debtors will be obligated to make a payment of $473,836.99 on April 19, 2016.

137.    The second financing agreement, dated November 13, 2015 (the "Second Financing Agreement"), provides the Debtors with directors and officers liability, employment practices liability, fiduciary liability, commercial crime, and special crime insurance through two insurance policies with National Union Fire Insurance Co. Pittsburgh PA and Zurich American Insurance Company.  The two insurance policies subject to the Second Financing Agreement expire on October 30, 2016.  Under the Second Financing Agreement, the Debtors did not make a down payment and received a loan in the amount of $146,190, plus a $1,104.00 finance charge, at an annual percentage interest rate of 2.490%.  The Debtors are obligated to make monthly payments of $21,042.00 on the 19th of each month in advance for that month.  The Debtors have made 5 of their 7 payments under the Second Financing Agreement and are current on their obligations thereunder.  The Debtors will be obligated to make a payment of $21,042.00 on April 19, 2016.

138.    In connection with the procurement and maintenance of their Insurance Policies, the Debtors obtain brokerage services from Marsh USA, Inc. (the "Broker").  The Broker assists the Debtors in obtaining comprehensive insurance for the Debtors' operations by, among other

things, assisting the Debtors' with the procurement and negotiation of the Insurance Policies, and

enabling the Debtors to obtain those policies on advantageous terms and at competitive rates.

Historically, the Debtors have paid the Broker approximately $495,000 in the aggregate on an

annual basis for its services (the "Brokerage Fees").  The Debtors do not believe there are any

prepetition amounts owing in respect of Brokerage Fees.

139.    In addition, as discussed above, the Debtors utilize Sedgwick as their WC

Program administrator only in connection with certain legacy claims.  The Debtors paid

Sedgwick prepetition in advance for its administrative services.  Consequently, as of the Petition

Date, the Debtors believe that nothing is owing to Sedgwick.

140.    The coverage provided under the Insurance Policies is essential for preserving the

value of the Debtors' assets and, in many instances, such coverage is required by various

regulations, laws and contracts that govern the Debtors' business operations.  Moreover, I

understand that maintenance of insurance policies is required by the operating guidelines

established by the Office of the United States Trustee.  If the Debtors fail to perform their

obligations under the Insurance Policies and Financed Programs, their coverage thereunder could

be voided.  The Debtors may also need to renew or replace certain of the Insurance Policies and

Financed Programs during the course of these Cases, or enter into new policies.  If the Debtors

do not pay prepetition amounts owing in respect of the Insurance Policies, there is a risk that the

Insurance Carriers will refuse to renew the Insurance Policies.  In addition, I believe that any

delay in the timely payment of workers' compensation benefits under the WC Program would

have a negative effect on the morale of the employees.  Without the support of their workforce,

the Debtors' operations would be impaired.

141.     Similarly, I believe that continuing to perform under the Financing Agreements on a postpetition basis is in the best interests of the Debtors' estates.  Moreover, given the Debtors' current financial circumstances, the Debtors may have difficulty securing alternative premium financing on terms as favorable as under the Financing Arrangements.  In any event, the Debtors are highly unlikely to obtain such financing on an unsecured basis.  Thus, the Debtors' ability to continue performing under and renew the Financing Agreements is likely to preserve estate value.  In addition, if the Debtors were unable to continue honoring their obligations under the Financing Agreements, AFCO may seek relief from the automatic stay to terminate the Financed Programs which, if granted, would require the Debtors to obtain replacement insurance on an expedited basis and likely at greater costs for the Debtors.  Even if the Financed Programs were not terminated, any interruption in the Debtors' payments could adversely affect the Debtors' ability to finance premiums for future policies.

142.     For the reasons already set forth herein and in the Insurance Motion, I believe the relief requested in the Insurance Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

**G.     Customer Programs Motion.**

143.     In the ordinary course of business, the Debtors provide customers with certain customer-related programs as described in the Customer Programs Motion (the "Customer Programs") that engender goodwill, maintain loyalty, increase the Debtors' sales opportunities, and allow the Debtors a comparative advantage over their competition.  Specifically, the Customer Programs relate to the Debtors' programs by which they offer gift cards, refunds and exchanges, coupons and other promotional offers to their customers, as well as processing customer purchases through the use of credit cards.  The Debtors believe that their ability to

continue the Customer Programs and to honor their obligations thereunder in the ordinary course of business is necessary to (i) retain their reputation for reliability, (ii) meet competitive market pressures, (iii) maintain positive customer relationships and (iv) ensure customer satisfaction, thereby retaining current customers, attracting new ones, and, ultimately, enhancing revenue and profitability for the benefit of all the Debtors' stakeholders.

144.    *Gift Cards.*  Prior to the Petition Date, the Debtors sold gift cards (collectively, the "Gift Cards"), in the ordinary course of business, to Bob's Stores, Sport Chalet, and EMS customers in amounts ranging from $5 to $500.  Customers can purchase Gift Cards in Bob's Stores and EMS retail stores and/or through their respective online stores, which can be accessed at www.bobstores.com and www.ems.com.[17]  In addition, all three retailers issue Gift Cards on account of store credit for returned merchandise.  Gift Cards can be used only for in-store purchases or online purchases and only with the respective retailer from which the Gift Cards were purchased.[18]  Gift card programs of this nature are commonplace and popular in the retail industry, and the Debtors' competitors offer similar programs to their customers.

145.    The Debtors' books and records reflect an aggregate net liability in respect of Gift Cards and store credit on account of as of the Petition Date of approximately $22,113,186 in the aggregate, of which approximately $7,040,107 is at Bob's Stores, approximately $6,108,530 is at EMS, and approximately $8,964,549 is at Sport Chalet.  In the Debtors' experience, Gift Cards

---

[17]    Sales of Gift Cards at Sport Chalet retail stores and online were discontinued shortly prior to the Petition Date in connection with the Store Closing Sales.

[18]    Shortly before  the Petition Date, in conjunction with the Sport Chalet Store Closing Sales and in order to ease the burdens imposed on customers and encourage use of the Bob's Stores and EMS on-line offerings, the Debtors expanded the permitted use of Sport Chalet Gift Cards.  Specifically, for a period from the Sale Commencement Date through July 29, 2016 (the "Expansion Period"), Sport Chalet Gift Card holders are permitted to exchange such Gift Cards for EMS or Bob's Stores Gift Cards of the same value (the "Exchange Gift Cards") (in addition to being able to use them for Sport Chalet retail purchases through April 29, 2016).  Because Sport Chalet stores are located in the Western states, whereas Bob's Stores and EMS stores are located in the Eastern states, the Debtors expect that Exchange Gift Cards will primarily be used for on-line purchases from the Bob's Stores and EMS e-commerce websites.

that have aged for over two years are unlikely to be redeemed.  The Debtors estimate that the Gift Card obligations that are likely to be redeemed amount to a liability of approximately $2,507,658 for Bob's Stores, $2,009,870 for EMS, and $1,805,742 for Sport Chalet.  Those sums represent the obligation on Gift Cards that are less than two years old.

146.   *Refund and Exchange Program.*  Prior to the Petition Date and subject to certain exceptions, the three Debtor retailers generally allowed their customers to return or exchange merchandise that is in saleable condition (collectively, the "Refund and Exchange Program").  Items that meet certain conditions may be returned for the same form of payment originally used for the purchase.  More specifically:

> (a)   Bob's Stores.  Bob's Stores accepts returns of merchandise that is unworn, unwashed, in good condition, and accompanied by receipt and presented within 60 days of original purchase for the same tender; merchandise presented after 60 days of original purchase but within a year of original purchase may be returned for a store credit at the original purchase price if returned at a retail location.

> (b)   Sport Chalet.  Sport Chalet accepts returns or exchanges of merchandise in saleable condition within a year of purchase, so long as the merchandise is accompanied by a receipt.  Sport Chalet will issue store credit for use on in-store purchases when a customer cannot provide the receipt or the original credit card used for the purchase.  Certain Sport Chalet merchandise, such as tire chains and life safety items, is not returnable, and other merchandise, such as GoPro items, bats, and eyewear, must be sent to the vendor.

> (c)   EMS.  EMS allows its customers to return or exchange merchandise that is unused, unworn, unwashed, not sold "final sale" or "as is", and accompanied by the original store receipt or web invoice for a full refund within one year of purchase.  Returns accompanied by a gift receipt will be refunded as a gear credit.  EMS also offers exchanges and returns for items with true manufacturing defects in materials or workmanship where the manufacturer does not offer its own warranty.

Programs similar to the Refund and Exchange Program are common in the retail industry, and similar programs are used by the Debtors' competitors.

147.    In light of the ongoing Store Closing Sales and the orderly liquidation of Sport Chalet, the Debtors intend to continue to honor their Refund and Exchange Program at Sport Chalet through April 29, 2016, and only with respect to merchandise sold by Sport Chalet prior to the Sale Commencement Date.  The Debtors do not at this time intend to make any changes to the Refund and Exchange Program at EMS and Bob's Stores.

148.    The Debtors are unable to estimate the value of their prepetition obligations with respect to the Refund and Exchange Program with precise accuracy due to the fact that returns and exchanges can be made for an extended period in the future following the original sale.  The Debtors, however, do not expect the commencement of these Cases to result in a significant deviation in the volume of returns and exchanges from that which they experienced prepetition, which average approximately $4 million per month in the aggregate.

149.    *Promotional Offers and Programs.*  Prior to the Petition Date, the Debtors offered various in-store and online promotional offers to customers throughout the year (collectively, the "Promotions").  The Promotions are aimed at driving sales, maintaining market competitiveness, and building brand loyalty.  The Promotions provide discounts to customers, such as "percentage off," "buy-one-get-one-free," and "gift with purchase."  The Promotions are similar to those routinely offered in the retail industry.

150.    Prior to the Petition Date, the Debtors also maintained an integrated private label credit card program whereby customers could open Bob's Stores, Sport Chalet, and EMS MasterCards through First Bankcard, a division of First National Bank of Omaha, pursuant to a license from MasterCard International Inc. (collectively, the "Store Credit Cards").  Holders of Store Credit Cards accumulate points from the use of the cards, which points are redeemable for rewards certificates that can be applied towards future purchases (the "Rewards Certificates").

Also, prior to the Petition Date, the Debtors offered promotional points in loyalty programs called "Best of Bob's," "Sport Chalet Action Pass," and "EMS Rewards" (together, the "Rewards Program").  Members of Best of Bob's earn a $10 welcome Rewards Certificate for signing up for the program, subsequently earn points for every dollar spent, and for every 200 points earned, receive a $10 Rewards Certificate.  Members of Sport Chalet Action Pass earn 100 points upon joining the program, and thereafter earn points for every dollar spent and a $10 Rewards Certificate for every 300 points earned.  Members of EMS Rewards earn 15% off all full price items as a welcome to the program, and thereafter earn a point for each dollar spent on qualifying purchases, earning a $10 Rewards Certificate for every 200 points accumulated.  In addition, members of EMS Rewards receive birthday rewards, double points events, and members-only offers and shopping events.  The Debtors' books and records reflect an aggregate net prepetition liability in respect of the Rewards Certificates earned via the Store Credit Cards and the Rewards Program of approximately $12,142,058 in the aggregate, of which approximately $6,182,800 is at Bob's Stores, approximately $2,276,318 is at EMS, and approximately $3,682,940 is at Sport Chalet.  All Rewards Certificates expire 90 days after issuance, in accordance with their terms.

151.    In light of the ongoing Store Closing Sales and the orderly liquidation of Sport Chalet, shortly prior to the Petition Date the Debtors stopped offering Promotions and accepting new Store Credit Card applications at Sport Chalet, and discontinued the Sport Chalet Action Pass Reward Program.  Consequently, the Debtors hereby seek two forms of relief with respect to these programs.

152.    Prior to the Petition Date, Sport Chalet offered certain paid scuba diving lesson programs and certifications to its customers (collectively, the "Scuba Programs").  A standard

Sport Chalet Scuba Program consisted of three 3-hour interactive workshops, three 3-hour confined water pool dives, and two days of open water dives, in which participants completed four dives, all under the guidance of certified scuba instructors.

153.     In light of the ongoing Store Closing Sales and the orderly liquidation of Sport Chalet, the Debtors stopped accepting new Scuba Program applications prior to the Petition Date.  The Debtors have also cancelled any Scuba Programs that were in progress, but not yet completed as of the Petition Date.  The Debtors estimate that as of the Petition Date they owe approximately $75,000 on account of prepetition unpaid costs with respect to the Scuba Programs.

154.     *Credit Card and Other Payment Processors.*  In addition to cash, the Debtors accept several other methods of payment from customers at their point of sale, including:  (i) credit cards, (ii) PayPal, (iii) gift cards, (iv) certificates, (v) checks, and (vi) Amazon.com.  For all methods of payment (other than a cash transaction), the Debtors receive the net customer sales less any chargebacks, returns, and processing fees charged.  The processing fees charged by each company vary, but are generally in the range of 1% to 4%.  The fees that are owing to these companies are set off from the funds that are remitted to the Debtors on a weekly basis. Maintaining use of the credit cards and other payment mechanisms, such as PayPal and Store Credit Cards, is essential to the continuing operation of the Debtors' business, because a significant amount of the Debtors' sales are made using non-cash payment methods.

155.     The Customer Programs are standard in the retail industry.  If the Debtors are unable to honor or continue their Customer Programs, their ability to conduct business and generate sales will be severely hampered.  On the other hand, continuing to administer their Customer Programs without interruption during the pendency of these Cases will help preserve

the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' stakeholders.

156.    For the reasons already set forth herein and in the Customer Programs Motion, I believe the relief requested in the Customer Programs Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

**H.    Shippers Motion.**

157.    The Debtors' business depends on the daily process of importing and shipping their products to stock the Debtors' stores.  In order to ensure the steady movement of products, the Debtors rely on a network of shippers, freight forwarders, and consolidators who process and ship the Debtors' merchandise (the "Merchandise") to and from the Debtors' distribution centers and stores.  If the Debtors fail to pay any of the foregoing entities for charges incurred in connection with the transportation of the Merchandise (collectively, the "Transporter Claims"), various statutes, tariffs, and agreements may permit the shippers, freight forwarders, and consolidators to assert possessory liens against any Merchandise in their possession.

158.    Merchandise that is received from overseas is shipped to various ports in the United States, cleared for customs, loaded onto railroad containers, and finally moved onto trucks, which, often with the help of consolidators, transport the Merchandise to the Debtors' distribution centers and their stores.  The Debtors are required to pay customs duty charges, which charges the Debtors pay directly without the use of an outside broker.  The Merchandise can be stopped in transit if customs duties are not paid in the ordinary course.  In addition, the Debtors have posted two bonds with the federal government in connection with their customs and excise tax obligations, in the aggregate amount of $600,000.

159.    As of the Petition Date, the Debtors estimate that approximately $1,338,000 is owed in the aggregate on account of prepetition Transporter Claims.  These amounts are in respect of shippers, freight forwarders, consolidators, and customs duties, and include both invoices that the Debtors have received, as well as amounts that the Debtors have not yet received, but are believed to have been incurred as of the Petition Date based on historical practice.[19]  Payment of the foregoing Transporter Claims will avoid disruption in the Debtors' business, prevent the possibility of possessory liens being asserted against the Merchandise, and enable the Debtors to realize the value of the Merchandise and continue their operations uninterrupted.

160.    Given the nature of the Debtors' industry, the failure to satisfy the shipping and warehouse charges could have a material adverse effect on the day-to-day operations of the Debtors' business.  Payment of the prepetition Transporter Claims is imperative to the Debtors' continued operation and ability to maximize the value of their estates for the benefit of their creditors.

161.    Moreover, although the Debtors believe that the above aggregate amount of unpaid prepetition Transporter Claims is accurate, to the extent that additional amounts are found to be outstanding (most likely due to delayed invoicing or the timing of certain shipments), the Debtors must be able to pay such amounts in order to gain access to the Merchandise, as any disruption in the Debtors' movement of Merchandise could result in significant adverse consequences to the Debtors' business.

---

[19]    These prepetition amounts are inclusive of approximately $15,000 owed on account of the Transporter Claims of Expeditors International of Washington, Inc. ("Expeditors"), which handles certain freight consolidation and forwarding, customs clearance, and other global logistics services for the Debtors.  Expeditors' existing contract is with non-debtor SME Holding Company, LLC (f/k/a Eastern Mountain Sports LLC), a non-operating entity.  The Debtors will continue to pay for services rendered by Expeditors, as they have in the past.

162.    For the reasons already set forth herein and in the Shippers Motion, I believe the relief requested in the Shippers Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

**I.    Postpetition Goods Motion.**

163.    As a result of the commencement of these Cases, the Debtors believe that several suppliers (collectively the "<u>Suppliers</u>") with whom, as of the Petition Date, the Debtors had outstanding prepetition purchase orders (collectively, the "<u>Outstanding Orders</u>") may perceive a risk that they will be treated as prepetition general unsecured creditors with respect to any shipments made after the Petition Date pursuant to the Outstanding Orders.  As a result, the Suppliers may refuse to deliver such goods to the Debtors unless the Debtors assure payment. The Debtors' business depends on the ability to quickly obtain necessary merchandise from their Suppliers in order to stock their stores and fulfill online orders.  The inability to maintain sufficient inventory due to the Suppliers' refusal to deliver goods could have a significant detrimental impact on the Debtors' business.

164.    For the reasons already set forth herein and in the Postpetition Goods Motion, the relief requested in the Postpetition Goods Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

**J.    Store Closings Motion**

165.    Prior to the Petition Date, the Debtors determined to close 56 stores (including 47 Sport Chalet stores, 8 EMS stores, and 1 Bob's store) and run the Store Closing Sales. Accordingly, in early April 2016, the Debtors and FTI contacted certain nationally recognized liquidators to solicit interest in bidding on the right to conduct the Store Closing Sales.

Ultimately, the Debtors received two individual bid packages: (i) a package consisting of separate bids for all 56 closing stores and for just the Sport Chalet closing stores; and (ii) a package consisting of a bid for all 56 closing stores.

166.    After an expedited but active negotiation process with the bidding liquidators, the Debtors, with assistance from FTI, selected the Agent to conduct the Store Closing Sales and determined to liquidate the merchandise and certain furnishings, trade fixtures, equipment, and improvements to real property at the respective closing stores, in accordance with the terms of that certain Letter Agreement Governing Inventory Disposition, dated as of April 15, 2016 (the "Disposition Agreement"), by and between the Agent, and EMS Operating, Bob's LLC, SC LLC, and SC Team Sales, on the other hand (the material terms of which are set forth below) and the store-closing sale guidelines (the "Sale Guidelines") attached as **Exhibit 2** to the Proposed Interim Order attached to the Store Closings Motion.  The Store Closing Sales commenced on or about April 16, 2016.  Following the Petition Date, the Debtors seek to assume the Disposition Agreement, and allow the Agent to continue with the Store Closing Sales.  I believe that assumption of the Disposition Agreement and that the ability to continue with Store Closing Sales, without interruption, is necessary to preserve the value of the Debtors' estate and avoid irreparable harm.

**K.    Section 156(c) Application**

167.    Prior to the selection of Kurtzman Carson Consultants, LLC ("KCC") as claims and noticing agent, the Debtors obtained and reviewed engagement proposals from at least two other claims and noticing agents to ensure selection through a competitive process.  I believe, based on all engagement proposals obtained and reviewed, that KCC's rates are competitive and reasonable given KCC's quality of services and expertise.

168.    In view of the number of anticipated claimants and the complexity of the Debtors'

business, I believe that the appointment of KCC as claims and noticing agent is both necessary

and in the best interests of the Debtors' estates and their creditors.

*Signature page follows*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _____18th_____ day of April, 2016 at Meriden, Connecticut.

Vestis Retail Group, LLC, *et al.*, Debtors and Debtors in Possession

By: _____
Mark T. Walsh
Chief Executive Officer

**<u>EXHIBIT A</u>**

# Vestis Retail Group

