## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| VESTIS RETAIL GROUP, LLC, *et al.*,[1] | Case No.:  16-10971 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS AND DEBTORS IN POSSESSION TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Vestis Retail Group, LLC and its chapter 11 affiliates, the debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Cases"), hereby move the Court (the "Motion") for entry of an interim order on an expedited basis (the "Interim Order")[2] substantially in the form attached hereto as **Exhibit A**, and following a final hearing to be set by the Court, entry of a final order (the "Final Order" and, with the Interim Order, the "DIP Orders"), pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), authorizing the Debtors, among other things, to obtain

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Vestis Retail Group, LLC (1295); Vestis Retail Financing, LLC (9362); EMS Operating Company, LLC (2061); Vestis IP Holdings, LLC (2459); Bob's Stores, LLC (4675); EMS Acquisition LLC (0322); Sport Chalet, LLC (0071); Sport Chalet Value Services, LLC (7320); and Sport Chalet Team Sales, LLC (8015).  The Debtors' executive headquarters are located at 160 Corporate Court, Meriden, CT 06450.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Interim Order.

senior secured postpetition financing (the "DIP Facility") and use cash collateral on an interim

and final basis pursuant to the terms and conditions of that certain Pre-Petition Loan Agreement

(as defined below), as ratified and amended by that certain *Ratification and Amendment*

*Agreement*, dated as of April 17, 2016, by and among the Debtors, as Borrowers and Guarantors,

Wells Fargo Capital Finance, LLC, as Administrative Agent (the "Agent"), and the lenders party

thereto (the "DIP Lenders") (the "Ratification Agreement" and together with the Pre-Petition

Loan Agreement, the "Loan Agreement") (attached hereto as **Exhibit B** and **Exhibit C**).[3]

In support of the Motion, the Debtors rely on the *Declaration of Mark T. Walsh in*

*Support of First Day Motions* (the "First Day Declaration"), the *Declaration of Alexander W.*

*Stevenson* in support of this Motion (the "Stevenson Declaration"), and the *Declaration of*

*Robert J. Duffy in Support of (I) Debtors' DIP Financing Motion and (ii) Debtors' Emergency*

*Store Closing Sales Motion* (the "Duffy Declaration"), each concurrently filed herewith.

In further support of the Motion, the Debtors respectfully represent as follows:

## I. OVERVIEW

1.      By this Motion, the Debtors seek entry of the Interim Order:

    a.      authorizing the Debtors to obtain and to guarantee, as applicable,
            unconditionally, on a joint and several basis, post-petition financing in the
            form of a revolving credit and letter of credit facility in accordance with
            the terms and conditions set forth in the Loan Agreement and the other
            Financing Agreements, and in accordance with the Interim Order, secured
            by perfected senior priority security interests in and liens on the Collateral
            pursuant to §§ 364(c)(2) and 364(c)(3), and 364(d) of the Bankruptcy
            Code (subject to the Carve-Out and the Permitted Liens);

    b.      authorizing the Debtors to remit all collections, asset proceeds and
            payments to the Agent and the DIP Lenders for application, or deemed
            application, first to all Pre-Petition Obligations until such obligations

---

[3] For the avoidance of doubt, there is no new, standalone debtor-in-possession credit agreement. Rather, the "Loan Agreement" is the Pre-Petition Loan Agreement, as ratified and amended by the Ratification Agreement. Reference should therefore be made to both the Pre-Petition Loan Agreement and the Ratification Agreement.

are fully repaid, and then to the repayment of all Post-Petition Obligations, and to deem all Pre-Petition Obligations with respect to Letters of Credit to have been issued or provided, as applicable, under the Loan Agreement and the other Financing Agreements;

c.      authorizing the Debtors to grant superpriority administrative claim status, pursuant to § 364(c)(1) of the Bankruptcy Code, to the Agent, for the benefit of itself and the other DIP Lenders, in respect of all Post-Petition Obligations (subject to the Carve-Out);

d.      subject to Section 4.1 of the Interim Order, approving certain stipulations by the Debtors as set forth in the Interim Order in connection with the Pre-Petition Loan Agreement, the Pre-Petition Term Loan Documents, and the Third Lien Loan Documents;

e.      authorizing the Debtors to provide adequate protection to the Agent and the DIP Lenders, Pre-Petition Term Agent and Pre-Petition Term Lenders, and Third Lien Agent and Third Lien Lenders;

f.      effective only upon entry of the Final Order, waiving the Debtors' right to assert claims to surcharge against the Collateral pursuant to § 506(c) of the Bankruptcy Code;

g.      modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order;

h.      setting a final hearing on the Motion (the "Final Hearing") to consider entry of the Final Order; and

i.      granting related relief.

## II. JURISDICTION

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

3.        Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry

of a final judgment or order with respect to the Motion if it is determined that the Court, absent

consent of the parties, cannot enter final orders or judgments consistent with Article III of the

United States Constitution.

4.        The statutory and legal predicates for the relief requested herein are sections

105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Rules 2002, 4001, and 9014 of the

Bankruptcy Rules, and Rule 4001-2 of the Local Rules.

### III. BACKGROUND

5.        On the date hereof (the "Petition Date"), each of the Debtors commenced a

voluntary case under chapter 11 of the Bankruptcy Code.

6.        The Debtors are authorized to continue to operate their businesses and manage

their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  No trustee, examiner or statutory committee has been appointed in these Cases by the

Office of the United States Trustee for the District of Delaware (the "U.S. Trustee").

7.        The Debtors are comprised of three national multi-channel retailers engaged in

the apparel, footwear, and sporting goods lines of business: (a) Bob's Stores, (b) Eastern

Mountain Sports ("EMS"), and (c) Sport Chalet.  Prior to the Petition Date, each of the three

retailers was comprised of two primary units: (a) a retail store business and (b) an e-commerce

business.  Collectively, the Debtors currently operate 144 stores and 2 distributions centers

across 15 states.  Bob's Stores and EMS primarily operate stores located in the Northeastern

states, while Sport Chalet's stores are located in the Western states.  Bob's Stores and Sport

Chalet have roots dating back to the 1950's, while EMS was founded in the 1960's.

8.        Vestis Group directly and indirectly owns the entities that operate Bob's Stores,

EMS, and Sport Chalet.  The chains were acquired in three separate acquisitions: Bob's Stores

01:18582954.1

in 2008, EMS in 2012, and most recently, Sport Chalet in 2014.  The Debtors currently employ over 4,000 full and part-time employees and generate over $660 million in annual consolidated revenues.  The Debtors transact business with a wide array of vendors and suppliers both nationally and internationally.

9.        As discussed at length in the First Day Declaration, prior to the Petition Date, the Debtors implemented a series of internal restructuring and synergy initiatives, designed to integrate the three chains into Vestis Group and streamline and improve operations, but various challenges remained, including from the prior ownership of EMS and Sport Chalet.  The Debtors ultimately were unable to preserve Sport Chalet as a going concern and, accordingly, shortly before the Petition Date, the Debtors commenced going out of business sales (the "Store Closing Sales") of the Sport Chalet stores (along with a limited number of EMS stores and one Bob's Stores location) (collectively, the "Closing Stores" ).

10.       The purpose of these Cases is to facilitate the continuation, and completion, of the operating initiatives the Debtors have undertaken and that are underway at Bob's Stores and EMS, while allowing the Debtors to address external factors that have negatively contributed to the Debtors' recent financial performance.  The Cases also will enable the Debtors to continue the Store Closing Sales on an expedited and orderly basis.

11.       The Debtors embark upon these Cases with optimism for a swift and certain resolution of the issues they now face, despite the challenging retail environment.  The Bob's Stores and EMS brands enjoy competitive market positions.  The Debtors are confident that this restructuring effort will allow these core brands to emerge as part of a stable and strong enterprise, positioning the Debtors to take advantage of the many opportunities in the markets in which they will continue to operate.  The chapter 11 process also will allow the Debtors to

01:18582954.1

5

maximize value from their non-core businesses, primarily through the Store Closing Sales and the sale of the remaining related assets.

12.       Toward that end, the Debtors have entered into the DIP Facility, pursuant to which, subject to Court approval, the Debtors will receive a senior secured debtor-in-possession revolver that should provide them with sufficient runway to navigate through the chapter 11 process.  The relief sought in this Motion is intended to preserve value and facilitate the Debtors' operations through this process.

13.       More detailed factual background regarding the Debtors and the commencement of these Cases is set forth in the First Day Declaration.

## IV.  PREPETITION CAPITAL STRUCTURE AND SECURED INDEBTEDNESS

14.       The Debtors' prepetition credit facilities impacted by this Motion are summarized herein.  A complete description of the Debtors' capital structure is provided in the First Day Declaration.  As described below, the Debtors are borrowers under three separate credit facilities, namely, (1) a first lien revolving credit facility, (2) a second lien term loan facility and (3) a third lien term loan facility, each as described below.

**A.       The Wells Fargo Revolving Credit Facility (First Lien).**

15.       Each of the Debtors is indebted under that certain Fourth Amended and Restated Loan and Security Agreement, dated as of February 11, 2015 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Pre-Petition Loan Agreement") by and among Bob's Stores, LLC (f/k/a Bob's Stores, Inc.), non-debtor SME Holding Company, LLC (f/k/a Eastern Mountain Sports LLC), Sport Chalet, LLC, Sport Chalet Value Services, LLC, EMS Operating Company, LLC and Sport Chalet Team Sales, LLC (collectively "Borrowers"), as borrowers, Vestis Retail Financing, LLC, Vestis Retail Group, LLC, EMS Acquisition LLC and Vestis IP Holdings, LLC (collectively, "Guarantors"), as

guarantors, the Agent and the DIP Lenders.  The Pre-Petition Loan Agreement provides for an

asset-based revolving credit facility and swing line credit facility[4] of up to a maximum of $180

million in the aggregate (subject to further possible increase to $205 million under certain

circumstances)[5] (the "Pre-Petition Loans").  The Debtors' ability to borrow under the facility is

further subject to a borrowing base calculation contained in the Pre-Petition Loan Agreement.

16.     The Pre-Petition Loan Agreement provides for a varying interest rate based on

the excess availability of Pre-Petition Loans as well as whether the Pre-Petition Loans are

borrowed in the form of "Base Rate Loans" or "Eurodollar Rate Loans."  The Pre-Petition

Loan Agreement also provides for, among the other costs and fees contained therein, an "early

termination fee" (the "Pre-Petition Loan Termination Fee") equal to 0.25% of the maximum

credit (i.e. $180,000,000) if the Pre-Petition Loan Agreement is terminated during the period

August 19, 2015 to August 18, 2016 or upon the occurrence of an event of default resulting

from the Debtors' commencement of bankruptcy cases before August 19, 2016.  The

obligations of the Debtors under the Pre-Petition Loan Agreement are secured by first-priority

security interests in and liens on certain of their assets, including accounts receivable,

intellectual property and other general intangibles, inventory and equipment, deposit accounts,

letters of credit, chattel paper, commercial tort claims and the products and proceeds of the

foregoing (collectively, the "Pre-Petition Loan Collateral").  The Pre-Petition Loan Collateral

does not include certain "Excluded Property" (as defined in the Pre-Petition Loan Agreement),

such as real property leases.  The Pre-Petition Loans mature on August 19, 2019.  As of the

Petition Date, approximately $103,946,056.65 in Pre-Petition Loans was outstanding under the

---

[4]  Availability under the swing line facility is limited by its terms to $18 million.

[5]  The conditions under which the Pre-Petition Loans could be increased beyond $180 million have not occurred.

Pre-Petition Loan Agreement, inclusive of approximately $7,296,158 in letters of credit issued and outstanding under the Pre-Petition Loan Agreement, but not including the Pre-Petition Loan Termination Fee in the amount of $450,000, accrued and unpaid interest, costs, expenses and other fees owed to the DIP Agent and DIP Lenders.

**B.      The Wells Fargo Term Loan (Second Lien).**

17.      Each of the Debtors is also indebted under that certain Term Loan and Security Agreement dated as of February 11, 2015 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Pre-Petition Term Loan Agreement") by and among the Borrowers, as borrowers, the Guarantors, as guarantors, and Wells Fargo Bank, National Association as agent (the "Pre-Petition Term Agent") and lender (the "Pre-Petition Term Lenders"), pursuant to which the Pre-Petition Term Lenders extended to the Borrowers a term loan in the original principal amount of $10 million (the "Pre-Petition Term Loan"). The Pre-Petition Term Loan accrues interest at varying rates based on either LIBOR or the prime rate, plus an "applicable margin."  The Pre-Petition Term Loan Agreement also provides for an early termination fee (the "Pre-Petition Term Loan Termination Fee") equal to: (i) 2.0% of the outstanding principal amount of the Pre-Petition Term Loan in the event the Pre-Petition Term Loan Agreement is terminated during the period February 12, 2016 to February 11, 2017 or (ii) 1.0% of the outstanding principal amount of the Pre-Petition Term Loan in the event the Pre-Petition Term Loan Agreement is terminated during the period February 12, 2017 to February 11, 2018.  Similar to the Pre-Petition Loan Termination Fee, the Pre-Petition Term Loan Termination Fee becomes immediately due and payable upon the occurrence of an event of default resulting from the Debtors' commencement of bankruptcy cases before February 12, 2018.  The obligations of the Debtors under the Pre-Petition Term Loan Agreement are secured

by second-priority security interests in and liens on the same collateral that secures the Pre-Petition Loans (the "Pre-Petition Term Loan Collateral"), provided that the Pre-Petition Term Loan Collateral does not include any Excluded Property (as defined in the Pre-Petition Term Loan Agreement).[6]  The Pre-Petition Term Loan matures on August 19, 2019.  The Pre-Petition Term Loan matures on August 19, 2019.  As of the Petition Date, approximately $9,435,000 was outstanding under the Pre-Petition Term Loan Agreement, not including the Pre-Petition Term Loan Termination Fee in the amount of $185,000, accrued and unpaid interest, costs, expenses, and other fees owed to the Pre-Petition Term Agent and Pre-Petition Term Lenders.

**C.      The Vestis BSI Term Loan (Third Lien).**

18.        Finally, each of the Debtors is indebted under that certain Term Loan and Security Agreement dated as of January 7, 2016 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Third Lien Loan Agreement") by and among the Borrowers, as borrowers, the Guarantors, as guarantors, and Vestis BSI Funding II, LLC, as administrative agent (the "Third Lien Agent") and the lenders party thereto (the "Third Lien Lenders"), pursuant to which the Third Lien Lenders extended to the Borrowers a term loan in the original principal amount of $10 million (the "Third Lien Loan").  The Third Lien Lenders are affiliated with Versa Capital Management, LLC ("Versa").  (As set forth in the First Day Declaration, Versa is also the Debtors' current equity sponsor.)  Pursuant to a series of amendments to the Third Lien Loan Agreement, the Third Lien Loan was subsequently increased to $40 million.  Proceeds from the Third Lien Loan were used for, among other things, operating and working capital purposes (including to enable the Debtors to reduce the amounts owing on the Pre-Petition Loans, so as to maintain borrowing base compliance).  The Third Lien Loan

---

[6]  The definition of Excluded Property is substantially identical in the Pre-Petition Loan Agreement and the Pre-Petition Term Loan Agreement, as well as in the Third Lien Loan Agreement (as defined below).

accrues interest at varying rates based on either LIBOR or the prime rate, plus the same

"applicable margin" as contained in the Pre-Petition Term Loan Agreement.  The Third Lien

Loan Agreement also contains an early termination fee (the "Third Lien Loan Termination Fee")

equal to the "Make Whole Amount" (described below) and: (i) 2.0% of the outstanding principal

amount of the Third Lien Loan in the event the Third Lien Loan Agreement is terminated during

the period February 19, 2016 to February 18, 2017 or (ii) 1.0% of the outstanding principal

amount of the Third Lien Loan in the event the Third Lien Loan Agreement is terminated during

the period February 19, 2017 to February 18, 2018.  The Make Whole Amount is equal to the

sum of all amounts which are (or would be) payable on account of interest through the maturity

date of the Third Lien Loan (February 19, 2020), less any interest paid in cash up to the date the

Make Whole Amount becomes due and payable.  The Third Lien Loan Termination Fee

becomes immediately due and payable upon the occurrence of an event of default resulting from

the Debtors' commencement of bankruptcy cases prior to February 19, 2020.

19.     The obligations of the Debtors under the Third Lien Loan Agreement are

secured by third-priority security interests in and liens on the same collateral that secures the Pre-

Petition Loans and the Pre-Petition Term Loan.  As of the Petition Date, approximately

$65,291,653 was outstanding under the Third Lien Loan Agreement, inclusive of interest and the

Third Lien Loan Termination Fee in the amount of $24,788,483.

**D.     Intercreditor Agreements.**

20.     The relative rights of the DIP Lenders and the Pre-Petition Term Lenders with

respect to the Pre-Petition Loan Collateral and the Pre-Petition Term Loan Collateral are

governed by the terms of that certain Intercreditor Agreement, dated as of February 11, 2015 (as

amended, amended and restated, supplemented or otherwise modified from time to time, the

"Pre-Petition Intercreditor Agreement"), by and between the Agent and the Pre-Petition Term

Agent.  The Pre-Petition Intercreditor Agreement provides, among other things, that the liens

held by the Pre-Petition Term Agent are junior and subordinate to the liens held by the Agent

with respect to collateral that is both Pre-Petition Loan Collateral and Pre-Petition Term Loan

Collateral.

21.      The Agent and Pre-Petition Term Agent, along with the Third Lien Agent are

also parties to that certain Intercreditor and Subordination Agreement, dated as of January 7,

2016 (as amended, amended and restated, supplemented or otherwise modified from time to

time, the "Third Lien Intercreditor Agreement").  The Third Lien Intercreditor Agreement

provides, among other things, that the liens and claims of the Third Lien Agent and Third Lien

Lenders arising under the Third Lien Loan Agreement are junior and subordinate in right of

payment to both the liens and claims of the Agent and DIP Lenders arising under the Pre-Petition

Loan Agreement and the liens and claims of the Pre-Petition Term Agent and Pre-Petition Term

Lenders arising under the Pre-Petition Term Loan Agreement.  The Third Lien Intercreditor

Agreement specifies that nothing in that agreement limits the right or ability of the Third Lien

Agent and/or the Third Lien Lenders to purchase (by credit bid or otherwise) all or any portion

of the Third Lien Loan Collateral, provided that the DIP Lenders and the Pre-Petition Term

Lenders receive payment in full on account of, respectively, the Pre-Petition Loans and the Pre-

Petition Term Loan.

**E.      Other Secured Debt.**

22.      As set forth in the First Day Declaration, other than the foregoing, the Debtors

do not believe that they have any other secured debt as of the Petition Date, other than capital

lease obligations and secured claims of certain taxing authorities in the ordinary course of

business, all of whom will receive notice.

## V.  EVENTS LEADING UP TO THE DIP FACILITY

23.        The Debtors' continuing efforts to implement the internal restructuring

initiatives described in the First Day Declaration have already yielded some success through the

stabilization and improvement of EMS and Sport Chalet.  However, the Debtors also faced

significant internal and external issues in the fourth quarter of 2015 that negatively affected their

sales during the crucial holiday season.  As described in the First Day Declaration, these issues

became a primary focus for the Debtors.

24.        Complicating matters further, the Northeastern states (where Bob's Stores and

EMS operate) experienced record-breaking warm winter weather in 2015, which caused a

decrease in cold-weather sales and subsequently lowered margins as the retailers aggressively

promoted their cold-weather gear in line with the competitive environment.  In addition, the

Debtors faced increased competition in the marketplace resulting from the liquidation sales of

many Sports Authority stores, which are direct competitors of the Debtors.

25.        Notwithstanding the Debtors' internal restructuring efforts and the fact that

Bob's Stores and EMS are operating on a reliable and stable basis, the Debtors continued to face

liquidity constraints in 2016.  Approximately $40 million in loans from the Third Lien Lenders

during the first calendar quarter of 2016 were insufficient to address these issues.  In response,

beginning in early 2016, the Debtors explored numerous restructuring alternatives, including a

chapter 11 bankruptcy filing.

26.        In connection with their exploration of alternatives, the Debtors retained FTI

Consulting ("FTI") in March 2016 to serve as the Debtors' financial advisors, and Lincoln

Partners Advisors LLC ("Lincoln") in March 2016 to serve as the Debtors' investment banker.

27.    In addition, as of March 26, 2016, Robert J. Duffy has served as CRO for each

of the Debtors and remained in such capacity until the Petition Date; as of the Petition Date he

has served as co-CRO for each of the Debtors, together with his colleague Mark Weinsten.

In their positions as co-CROs of the Debtors, they are vested with power and authority to

(i) negotiate the terms of DIP financing for the Debtors and related adequate protection

arrangements in respect of the Debtors' credit facilities, (ii) negotiate the terms of any plan or

pre- or post-petition asset purchase agreement to which any affiliate of Versa Capital

Management, LLC is proposed to act as sponsor or party thereto, and to enter into binding and

definitive agreement(s) on behalf of the Debtors with respect to the foregoing, and (iii) supervise

the structuring and conduct a sale or plan process for the Debtors, including negotiating the terms

of any competing bids.  They are also authorized to enter into binding agreements on behalf of

the Debtors with respect to the matters listed in the preceding sentence.

28.    As detailed in the Duffy Declaration, in consultation with FTI and Lincoln, the

Debtors determined that it would not be possible to restructure the Debtors out of court.  The

Debtors concluded that the commencement of chapter 11 cases offered the best path for the

Debtors to restructure their balance sheets and position themselves for future success of their

core brands, as well as to maximize the value of their businesses and assets for their estates and

creditors.  As a result, the Debtors determined to focus their efforts on negotiating a chapter 11

transaction and obtaining DIP financing.

## VI.  DIP FINANCING NEGOTIATIONS

29.    As set forth in the Stevenson Declaration, in March and April 2016, Lincoln,

working closely with the Debtors' management and other advisors, reached out to a number of

other potential lenders known to potentially have an interest in the apparel, footwear, and

sporting goods retail sectors to solicit interest in providing DIP financing to the Debtors on a *pari*

01:18582954.1

13

*passu* basis with the Debtors' existing secured lenders, on a junior secured basis, or on an unsecured, administrative expense basis, or, alternatively, by refinancing the existing secured debt.  No parties provided a term sheet or expressed an interest in providing such financing under the circumstances and in the timeframe required by the Debtors given their liquidity issues.

30.    In exploring their options, the Debtors recognized that the obligations owed to their prepetition secured creditors are secured by substantially all of the Debtors' assets (other than certain Excluded Property, which the Debtors do not believe has material value), such that either (a) the liens of the prepetition secured creditors would have to be primed to obtain postpetition financing, (b) the Debtors would have to find a postpetition lender willing to extend credit that would be junior to the liens of the prepetition secured creditors, or (c) a lender would have had to been willing to provide sufficient financing to satisfy at least the Wells Fargo revolver and term debt.  Only the DIP Lenders indicated a willingness to negotiate terms of a postpetition financing facility on the terms described herein.

31.    The Debtors (through the CRO, FTI and counsel) and the Agent engaged in extensive, arm's length negotiations with respect to the terms and conditions of the Loan Agreement, which again was the only proposal the Debtors received for postpetition financing. The material terms and conditions of the DIP Facility are summarized below.  The Debtors, the Agent, and the DIP Lenders have agreed upon an initial budget, which is attached hereto as **Exhibit D**, projecting cash flow for the next thirteen weeks (as it may be updated in accordance with the Loan Agreement and DIP Orders, the "Budget").  The Loan Agreement permits the Debtors to draw on the DIP Facility to make any disbursement specifically provided for in the Budget (subject to certain permitted variances).

32.    Based on the foregoing, the Debtors have determined, in the exercise of their sound business judgment, that they require financing under the terms of the Loan Agreement and hereby request authority to obtain such financing pursuant to the terms and conditions of the Loan Agreement and the proposed DIP Orders.

## VII.  NEED FOR THE DIP FACILITY AND CONTINUED USE OF CASH COLLATERAL

33.    The Debtors have an urgent and immediate need to obtain postpetition financing.  The Debtors do not have sufficient funds on hand or generated from their business to fund operations.  Without the postpetition financing and the use of cash collateral that will be provided under the Loan Agreement and the proposed DIP Orders, the Debtors would not be able to maintain operations pending the outcome of an orderly sale process and through the Store Closing Sales that together will maximize value for all constituents.

34.    As described above, the Debtors have filed these Cases to implement a sale of substantially all of their assets.  To that end, the Debtors have executed an asset purchase agreement with the Third Lien Agent (an affiliate of the Debtors' equity sponsor), subject to higher and better bids, and have commenced the Store Closing Sales.  Pending approval of a sale of substantially all of their assets by this Court, the Debtors intend to operate their business in the ordinary course and continue the Store Closing Sales and require immediate access to postpetition financing and cash collateral to continue their orderly sale efforts.

35.    Without the proposed credit facility and access to cash collateral, the Debtors will not have any liquidity, among other things, to operate their business, fund their ordinary course expenditures, including paying their over 4,000 employees, or to pay the expenses necessary to administer these chapter 11 cases.  Absent adequate funding, the Debtor would be

required to close their stores prematurely, otherwise cease operations, and liquidate on a piecemeal basis, causing irreparable harm to the Debtors and their estates.

36.     Hence, the Debtors have determined, in the exercise of their sound business judgment, that they require financing under the terms of the Loan Agreement and the use of cash collateral and hereby request authority to obtain such financing and use of cash collateral pursuant to the terms of the Loan Agreement and the proposed DIP Orders.

## VIII.  CONCISE STATEMENT OF RELIEF REQUESTED

37.     In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, below is a summary of the terms of the Loan Agreement and Interim Order:[7]

| | | |
|---|---|---|
| (a) | Borrowers: | Bob's Stores, LLC<br>Sport Chalet, LLC<br>Sport Chalet Value Services, LLC<br>Sport Chalet Team Sales, LLC<br>EMS Operating Company, LLC<br><br>Ratification Agreement, Preamble |
| (b) | Guarantors: | Vestis Retail Financing, LLC<br>Vestis Retail Group, LLC<br>EMS Acquisition LLC<br>Vestis IP Holdings, LLC<br><br>Ratification Agreement, Preamble |
| (c) | Agent: | Wells Fargo Capital Finance, LLC,<br>   as Administrative Agent and Collateral Agent<br><br>Ratification Agreement, Preamble |
| (d) | DIP Lenders: | Wells Fargo Capital Finance, LLC<br>Bank of America, N.A.<br><br>Ratification Agreement, Exhibit A |

---

[7]  This summary is intended solely for informational purposes and is qualified in its entirety by the Loan Agreement and the Interim Order.  In the event there is any conflict between this Motion and the DIP Orders, the DIP Orders will control in all respects.  Capitalized terms used in the following chart but not defined therein have the meanings set forth in the Loan Agreement and the Interim Order, as applicable.

| (e) | Purpose: | For (i) general working capital needs, (ii) the repayment of the Obligations and (iii) the payment of fees, expenses, and costs incurred in connection with the Ratification Agreement and the Cases, including the payment of any adequate protection payments approved in the DIP Orders. |
| | | Ratification Agreement, §§ 5.1 & 5.2 |
| (f) | Type and Amount of DIP Facility: | $125 million senior secured superpriority revolving credit facility, subject to the Borrowing Base and Reserves, with a Swing Line Loan sublimit of $18 million and a Letter of Credit sublimit of $15 million |
| | | Ratification Agreement, § 1.2(f) & 5.6; Petition Loan Agreement, § 2.2 & definition of "Swing Line Loan Limit" |
| (g) | Maturity Date: | The earliest to occur of (a) August 18, 2016, (b) thirty (30) days after the entry of the Interim Order if the Final Order has not been entered prior to the expiration of such thirty (30) day period (or such longer period if consented to in writing by the Agent), (c) the effective date of a plan of reorganization filed in the Cases pursuant to an order entered by the Court, (d) the consummation of the sale or sales of all or substantially all of the Debtors' assets and properties, (e) the date the Court orders the conversion of the Case of any Debtor to a chapter 7 liquidation, (f) the date the Loan Agreement is otherwise terminated for any reason whatsoever pursuant to the terms of the Ratification Agreement and (g) subject to the Interim Order or Final Order, as applicable, the acceleration of the Obligations or termination of the Commitments under the Loan Agreement, including without limitation, as a result of the occurrence of an Event of Default |
| | | Ratification Agreement, § 1.2(i) |
| (h) | Interest Rate: | For Revolving Loans: Base Rate plus 3.5% per annum |
| | | Default Rate: an additional 2% per annum |
| | | Ratification Agreement, § 1.2(a); Pre-Petition Loan Agreement, § 3.1 & definition of "Interest Rate" |
| (i) | Other Fees: | DIP Facility Fee: $1.25 million |
| | | Unused Line Fee: 3/8% per annum |
| | | Commercial Letter of Credit Fee: 3% per annum |

|   |   | Standby Letter of Credit Fee:  3.5% per annum |
|---|---|---|
|   |   | Default Rate:  an additional 2% per annum |
|   |   | Letter of Credit Fronting Fee:  0.125% per annum |
|   |   | Agent's Fee:  $10,000 per month |
|   |   | Ratification Agreement, §§ 6 & 7.5;<br>Pre-Petition Loan Agreement, §§ 3.2, 3.3 & 3.4 |
| (j) | Conditions Precedent to Lending: | The obligation to make the interim financing available is subject to certain conditions precedent, including that the Debtors have Excess Availability of no less than $5,000,000 after giving effect to initial Loans to be made or the initial Letters of Credit to be issued immediately after the Ratification Closing Date and the payment of the fees and expenses required to be paid, the first-day orders entered by the Court, including the cash management order, are satisfactory to the Agent, the Debtors have engaged the CRO and Investment Banker.<br><br>Ratification Agreement, § 9 |
| (k) | Interim Borrowing Limit: | For Revolving Loans: 110% of all disbursements in the "Total Cash Disbursements" line item of the Budget, plus (ii) all interest, costs, and fees, accrued or accruing under the Loan Agreement and other Financing Agreements, and the Pre-Petition Term Loan Agreement, in each case during the period commencing on the date of the Interim Order through and including the entry of the Final Order<br><br>For Letters of Credit:  $12 million<br><br>Interim Order, § 1.2 |
| (l) | Budget and Financial Covenants: | The Debtors are required to perform in accordance with the Budget, subject to the following permitted variances:<br><br>(i)    aggregate cash receipts for the applicable testing period (of up to 6 weeks) shall not be less than 90% of the projected aggregate cash receipts set forth in the Budget in respect of such period; and<br><br>(ii)    the actual aggregate cash disbursements, with certain exceptions, for the applicable testing period (of up to 6 weeks) shall not be more than 110% of the projected aggregate cash disbursements set forth in the Budget in respect of such period.<br><br>At all times from and after the Ratification Closing Date, Excess Availability shall be no less than the greater of |

<table>
<tr><td></td><td></td><td>(a) $7,500,000 or (b) 10% of the Borrowing Base.<br><br>Ratification Agreement, §§ 5.3 & 7.15(a)</td></tr>
<tr><td>(m)</td><td>Limitations on Use of Proceeds:</td><td>The Collateral and the proceeds of the DIP Financing cannot be used to pay fees or expenses incurred by any Professional in connection with any of the following:

(i)      an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of (A) the Pre-Petition Obligations or Agent's and any DIP Lender's liens on and security interests in the Pre-Petition Collateral, (B) the Pre-Petition Term Obligations or Pre-Petition Term Agent's or the Pre-Petition Term Lenders' liens on and security interests in the Pre-Petition Collateral, (C) the Third Lien Obligations or Third Lien Agent's or the Third Lien Lenders' liens on and security interests in the Third Lien Collateral, (D) the Post-Petition Obligations or Agent's or DIP Lenders' liens on and security interests in the Collateral, (E) the Term Loan Adequate Protection Parties' Term Loan Adequate Protection Liens, and (F) the Third Lien Adequate Protection Parties' Third Lien Adequate Protection Liens; (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, (A) the Pre-Petition Obligations or the Agent's and DIP Lenders' liens on and security interests in the Pre-Petition Collateral, (B) the Pre-Petition Term Obligations or Pre-Petition Term Agent's or the Pre-Petition Term Lenders' liens on and security interests in the Pre-Petition Collateral, (C) the Third Lien Obligations or Third Lien Agent's or the Third Lien Lenders' liens on and security interests in the Third Lien Collateral, (D) the Post-Petition Obligations or Agent's or DIP Lenders' liens on and security interests in the Collateral, (E) the Term Loan Adequate Protection Parties' Term Loan Adequate Protection Liens, or (F) the Third Lien Adequate Protection Parties' Third Lien Adequate Protection Liens; or (iii) preventing, hindering or delaying Agent's or DIP Lenders' assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral in</td></tr>
</table>

01:18582954.1

accordance with the terms and conditions of the Loan Agreement, the Financing Agreements, and the Interim Order;

(ii)      a request to use Cash Collateral (as such term is defined in section 363 of the Bankruptcy Code), except as set forth in the Loan Agreement, the Financing Agreements, and the Interim Order, without the prior written consent of Agent in accordance with the terms and conditions of the Interim Order;

(iii)      a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to section 364(c) or § 364(d) of the Bankruptcy Code, other than as provided in the Loan Agreement, the Financing Agreements, and the Interim Order, without the prior written consent of Agent;

(iv)      the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against Agent, any DIP Lender, Pre-Petition Term Agent, any Pre-Petition Term Lender, Third Lien Agent, any Third Lien Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from Agent, any DIP Lender, Pre-Petition Term Agent, any Pre-Petition Term Lender, Third Lien Agent or any Third Lien Lender under chapter 5 of the Bankruptcy Code;

(v)      the cost of investigation into any claims against Agent or any DIP Lender arising under or in connection with the Pre-Petition Revolving Loan Documents or Pre-Petition Term Agent, any Pre-Petition Term Lender, Third Lien Agent or any Third Lien Lender in excess of $50,000; or

(vi)      any act which has or could directly, materially and adversely modify or compromise the rights and remedies of Agent or any DIP Lender under the Interim Order, or which directly results in the occurrence of an Event of Default under any Financing Agreements, or the Interim Order.

Interim Order, § 2.3(b)

| (n) | Priming DIP Lien / Superpriority Claim: | The Agent is granted first-priority liens in the Collateral subordinate only to (i) the Carve-Out, and (ii) Permitted Liens.  In addition, the Agent is granted a superpriority administrative expense claim which is subordinate to (i) the Carve-Out, and (ii) Permitted Liens.<br><br>Interim Order, §§ 2.1 & 2.2 |
|---|---|---|
| (o) | Collateral: | The Collateral consists of substantially all of the assets of the Debtors and their estates, including, subject to entry of the Final Order, avoidance actions, but excluding the certain real property leases and executory contracts and agreements which prohibit the non-consensual grant of security interests and liens in them (but including the proceeds of such real property or executory contracts)<br><br>Ratification Agreement, §§ 1.1(r) & 1.2; Interim Order, § 2.1 |
| (p) | Carve-Out: | The sum of:<br><br>(i)     all allowed administrative expenses pursuant to 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of the Court and pursuant to 28 U.S.C. § 1930(a)(6) for fees payable to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code, plus interest at the statutory rate, as determined by agreement of the U.S. Trustee or by final order of the Court (without regard to the notice set forth in (iii) below);<br><br>(ii)     all reasonable fees and expenses up to $50,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below);<br><br>(iii)     to the extent allowed by the Court at any time, whether by interim order, procedural order, or otherwise, all Reported Fee Accruals (as defined in the Ratification Agreement), less the amount of any fee retainers received by professionals retained by the Debtors or any Committee pursuant to Sections 327, 328 or 1103 of the Bankruptcy Code (the "Professionals") and not previously applied to the fees and expenses of the Professionals (the "Pre-Trigger Allowed Professional Fees") incurred by such Professionals at any time before or on the date of delivery by the Agent of a Carve-Out Trigger Notice (as defined in the Ratification Agreement); |

|  |  | and |
|---|---|---|
|  |  | (iv)    all fees, disbursements, costs and expenses of the Professionals to the extent allowed by the Court, whether by interim order, procedural order or otherwise, incurred on and after the first Business Day following delivery by the Agent of a Carve Out Trigger Notice in an aggregate amount not to exceed $500,000<br><br>Interim Order, § 2.3(a) |
| (q) | Roll-up / Deemed Issuance of Existing Debt: | The proceeds of the Collateral shall be applied to payment of the Pre-Petition Obligations until the Pre-Petition Obligations are paid and satisfied in full.  The Debtors project that the Pre-Petition Obligations will be paid in full within six weeks.  In addition, the Letters of Credit are deemed issued under the DIP Facility.<br><br>Ratification Agreement, § 7.6;<br>Interim Order, §§ 1.2, 1.4 & 1.5 |
| (r) | Cross-Collateral-ization: | Under the Ratification Agreement, the Pre-Petition Obligations are treated the same as Post-Petition Obligations.  For example, the Pre-Petition Obligations are secured by the Post-Petition Collateral, and interest accrues on account of the Pre-Petition Obligations at the same interest rate as for Post-Petition Obligations.<br><br>Ratification Agreement, §§ 1.2(a), 2.3 & 5.5 |
| (s) | Perfection Other Than Under State Law: | The liens granted pursuant to the Interim Order are automatically perfected upon entry of the Interim Order.<br><br>Interim Order, §§ 2.1(c), 2.5(b), (d)(i) & (e)(i) |
| (t) | Adequate Protection: | As adequate protection, the Agent, Pre-Petition Term Agent, and Third Lien Agent are granted, among other things, replacement liens and superpriority claims, with the priorities and to the extent set forth in the Interim Order.  In addition, among other things, the Pre-Petition Term Agent shall receive cash payment of interest at the default rate and of its professional fees, costs, expenses, and, after the payment in full of the DIP Facility, shall be repaid from net sale proceeds generated from any sales, dispositions, or proceeds of casualty insurance of all Collateral outside the ordinary course of business.<br><br>Interim Order, § 2.5 |

| | | |
|---|---|---|
| (u) | <u>Waivers</u>: | Subject to entry of the Final Order, the Agent and the DIP Lenders shall be entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code, a waiver of the equitable doctrine of "marshalling" and any other similar doctrine, and a waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code.<br><br>In addition, the Debtors irrevocably waive any right that they may have to seek further authority:<br><br>(i)  to use cash collateral of Agent and DIP Lenders or of Pre-Petition Term Agent and Pre-Petition Term Lenders under section 363 of the Bankruptcy Code;<br><br>(ii)  to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, other than as provided in the Interim Order or as may be otherwise expressly permitted pursuant to the Financing Agreements;<br><br>(iii)  to challenge the application of any payments authorized by the Interim Order as pursuant to section 506(b) of the Bankruptcy Code, or to assert that the value of the Pre-Petition Collateral is less than the Pre-Petition Obligations, that the value of the Pre-Petition Term Collateral is less than the Pre-Petition Term Obligations, or that the value of the Third Lien Collateral is less than the Third Lien Obligations;<br><br>(iv)  to assert that the value of the Pre-Petition Collateral is less than the Pre-Petition Obligations, or that the value of the Pre-Petition Term Collateral is less than the Pre-Petition Term Obligations;<br><br>(v)  to propose, support or have a plan of reorganization or liquidation that does not provide for the indefeasible payment in cash in full and satisfaction of all Post-Petition Obligations (other than unmatured indemnity obligations for which claims have not been asserted) on the effective date of such plan in accordance with the terms and conditions set forth in the Loan Agreement; or<br><br>(vi)  to seek relief under the Bankruptcy Code, including without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and |

|  |  | remedies of Agent or any DIP Lender as provided in the Interim Order and the Financing Agreements or Agent's or any DIP Loan Lender's exercise of such rights or remedies<br><br>Interim Order, §§ 4.3 & 5.9 |
|---|---|---|
| (v) | Debtors' Stipulations / Challenge: | Subject to Section 4.1 of the Interim Order, the Debtors stipulate, among other things, to the validity, enforceability, perfection, non-avoidability, priority and amount of the liens and claims of the Agent, DIP Lenders, Pre-Petition Term Agent, Pre-Petition Term Lenders, Third Lien Agent, and Third Lien Lenders.<br><br>The Debtors' stipulations are potentially subject to challenge (x) by any Committee within sixty (60) calendar days from the date of appointment of the Committee by the U.S. Trustee, or (y) by any party in interest with requisite standing within seventy-five (75) calendar days from the date of entry of the Interim Order.<br><br>Subject to entry of the Final Order, from and after the Closing of transactions contemplated by the Stalking Horse APA, (i) no person or entity, including the Committee or any trustee, shall be entitled to file a Third Lien Objection and (ii) the Third Lien Obligations and the liens and security interests securing the same shall be, among other things, allowed and not subject to any challenge.<br><br>If a challenge is timely and properly filed and successfully pursued, the Court may grant appropriate relief.<br><br>Interim Order, §§ E & 4.1 |
| (w) | Right to Credit Bid: | The Interim Order affirms the right of the Agent, and, subject to entry of the Final Order, the Pre-Petition Term Agent and Third Lien Agent to "credit bid".<br><br>Interim Order, § 5.11 |
| (x) | Releases: | The Ratification Agreement and Interim Order provide for releases, upon, among other things, entry of the Final Order, of the Agent, the DIP Lenders, the Pre-Petition Term Agent, and the Pre-Petition Term Lenders of pre-petition claims and, upon the payment in full of all of the obligations owed to those parties, of further claims.<br><br>Ratification Agreement, §§ 8.1, 8.2 & 8.3; |

| | | Interim Order, § 4.5 |
|---|---|---|
| (y) | Sale Milestones: | The Loan Agreement requires, among other things:<br><br>(i)      On the Petition Date, the Debtors shall file motions, each in form and substance satisfactory to the Agent, requesting approval from the Court (a) to continue the Debtors' going out of business sales conducted at the nine (9) store locations identified on Schedule 1 (a) hereto on terms and conditions acceptable to Agent (the "Store Closing GOB Sales"); (b) to continue the Debtors' going out of business sales conducted at all of the Sport Chalet store locations on terms and conditions acceptable to Agent (the "SC GOB Sales"); and (c) of bidding and auction procedures, in form and substance satisfactory to Agent, in connection with the sale or sales of all or substantially all of the Debtors' assets and properties (the "Bidding Procedures Motion");<br><br>(ii)      On or before the third (3rd) day following the Petition Date, the Court shall have entered interim orders, each in form and substance satisfactory to Agent, authorizing the continuation of the Store Closing GOB Sales and the SC GOB Sales, which orders shall authorize and direct, among other things, that all proceeds from the Store Closing GOB Sales and the SC GOB Sales shall be remitted to Agent, for the ratable benefit of Lenders, for application against the Obligations;<br><br>(iii)      On or before the fifth (5th) day following the Petition Date, the Debtors shall file a motion, in form and substance satisfactory to the Agent, requesting approval from the Court to retain a nationally-recognized investment banking firm on terms and conditions acceptable to Agent ("Investment Banker") to conduct the marketing and sale process for all or substantially all of the assets of each Borrower and Guarantor;<br><br>(iv)      On or before the thirtieth (30th) day following the Petition Date, the Court shall have entered an order, in form and substance satisfactory to Agent, approving the Bidding Procedures Motion (the "Bidding Procedures Order");<br><br>(v)      On or before the thirtieth (30th) day following the Petition Date, the Court shall have |

01:18582954.1

25

entered an order, in form and substance satisfactory to Agent, authorizing the retention of the Investment Banker on terms and conditions acceptable to Agent;

(vi)    On or before the fiftieth (50th) day following the Petition Date, the Investment Banker shall have distributed Bid Packages (as defined in the Bidding Procedures Order) to each Person meeting the criteria for receipt of a Bid Package as set forth in the Bidding Procedures Order;

(vii)    On or before the fifty-seventh (57th) day following the Petition Date, the qualifying bid deadline shall have occurred in accordance with the Bidding Procedures Order;

(viii)    On or before the sixtieth (60th) day following the Petition Date, the Debtors shall conduct an auction in accordance with the Bidding Procedures Order, to select the highest and best bid(s) for the sale of all or substantially all of the Debtors' assets in accordance with the Bidding Procedures Order, which bid shall provide for, among other things, a minimum cash amount not less than the amount required to satisfy the Obligations owed to Agent and DIP Lenders in full in cash on or before the eighty-first (81st) day following the Petition Date, and copies of which shall be provided to the Agent;

(ix)    On or before the sixty-fifth (65th) day following the Petition Date, the Court shall have entered an order (the "Sale Order"), which order shall provide for, among other things, distribution of sale proceeds to the Agent in a minimum cash amount not less than the amount required to satisfy the Obligations owed to Agent and DIP Lenders in full in cash on or before the eighty-first (81st) day following the Petition Date, and otherwise, in form and substance satisfactory to Agent, approving the sale or sales of all or substantially of the Debtors' assets, on terms and conditions acceptable to Agent (the "363 Sale"), and authorizing and directing that all proceeds from the 363 Sale be remitted to Agent for application against and permanent reduction of the Obligations;

(x)    On or before the eighty-first (81st) day

<table>
<tr><td></td><td></td><td>following the Petition Date, the Debtors shall have consummated the 363 Sale; and<br><br>(xi)    On or before the sixtieth (60th) day following the Petition Date the Debtors shall have received court approval to extend the general time period to accept/reject leases from the permitted 120 day time period to not less than 210 days.<br><br>Ratification Agreement, § 5.4</td></tr>
<tr><td>(z)</td><td><u>Events of Default</u>:</td><td>The following, among others, constitute Events of Default:<br><br>(i)    any amendment, modification or termination of the retention agreement with the CRO without the prior written consent of the Agent;<br><br>(ii)    if the CRO resigns, failure to immediately notify the Agent, and failure to appoint a replacement or successor CRO reasonably acceptable to the Agent, approved by the Court and retained pursuant to a new retention agreement on terms and conditions reasonably acceptable to the Agent within five (5) Business Days immediately following the notice of resignation of the CRO;<br><br>(iii)    the filing of a plan of reorganization or liquidation by or on behalf of any Debtor, or the confirmation of any such plan of reorganization or liquidation, which does not provide for payment in full of all Obligations on the effective date;<br><br>(iv)    the failure of the Debtors to comply with any material provision, unless with the prior consent of the Agent, of the (A) the letter agreement dated as of April 15, 2016 between Intermediate Holdco and Hilco Merchant Resources and Gordon Brothers Group for the Store Closing GOB Sales and the SC GOB Sales (the "<u>GOB Agreement</u>"), (B) the letter of engagement dated as of March 14, 2016, as amended on April 16, 2016, between the Debtors and FTI Consulting, Inc. (the "<u>FTI Engagement Letter</u>"), or (C) the letter agreement dated as of April 16, 2016 between Intermediate Holdco and Lincoln Partners LLC (the "<u>Lincoln Engagement Letter</u>") or (ii) the termination of any such agreements for any reason without the prior written consent of the Required Lenders; and<br><br>(v)    any Material Budget Deviation.</td></tr>
</table>

| | | |
|---|---|---|
| | | Ratification Agreement, §§ 5.8 & 7.12; Interim Order, § 3.1 |
| (aa) | Remedies / Relief from Automatic Stay: | Following delivery of an Enforcement Notice, parties shall have five (5) business days to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred.  Unless the Court determines during the Default Notice Period that no Event of Default has occurred, the Agent shall be granted relief from the automatic stay to enforce its rights and remedies, and all authority to use cash collateral shall cease.<br><br>Interim Order, §§ 3.2 & 3.3 |
| (bb) | Prohibited Orders: | The following orders are prohibited:<br><br>(i)      an order authorizing the use of cash collateral of Debtors in which Agent or DIP Lenders have an interest, or the sale, lease, or other disposition of property of any Debtor's Estate in which Agent or DIP Lenders have a lien or security interest, except as expressly permitted in the Interim order or in the Financing Agreements; and<br><br>(ii)      an order authorizing under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal to or senior to a lien or security interest in property in which Agent or DIP Lenders hold a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to Agent and DIP Lenders in the Interim Order;<br><br>Interim Order, § 5.7 |

## IX.  REQUIRED DISCLOSURES

38.      The required disclosures under Local Rule 4001-2(a)(i) are limited to seeking approval of (i) the cross-collateralization protection to the Agent and DIP Lenders with respect to the Pre-Petition Obligations (disclosure required under Local Rule 4001-2(a)(i)(A)), (ii) the payment of the Pre-Petition Obligations from the proceeds of the DIP Facility and the "roll up," or deemed issuance, of the Pre-Petition Obligations relating to letters of credit into the DIP Facility (disclosure required under Local Rule 4001-

2(a)(i)(E)), and (iii) the waivers of the "equities of the case" exception under section 552(b) of the Bankruptcy Code (disclosure required under Local Rule 4001-2(a)(i)(H)).  While the Motion also seeks to waive any surcharge of costs or expenses under section 506(c) of the Bankruptcy Code and grant liens in avoidance actions, such relief is only being requested pursuant to the Final Order.  The waivers of the "equities of the case" exception and the doctrine of "marshalling" also are only being requested pursuant to the Final Order.

39.    These terms are justified because the Debtors are in immediate and critical need of the DIP Facility and the use of cash collateral.  As discussed in the Stevenson Declaration, the Debtors were unable to obtain financing on a *pari passu* basis with the Debtors' existing secured lenders, on a junior secured basis, or on an unsecured, administrative expense basis, or, alternatively, by refinancing the existing secured debt.  The only acceptable proposal that would provide the critical liquidity to the Debtors was provided after extensive negotiations with the Agent on the terms set forth in the Loan Agreement and the proposed DIP Orders.  Without this financing, the Debtors would not be able to pay their employees or vendors, or continue to operate as a going concern, which would doom the Debtors' sale process and any attempt to maximize value in these Cases.

## X.  BASIS FOR RELIEF

**A.    The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) and (d) of the Bankruptcy Code.**

40.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense . . . ." 11 U.S.C. § 364(c).

41.     Section 364(d) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis senior or equal in priority to existing secured debt cannot "obtain such credit otherwise . . . . [and] there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).

42.     In evaluating proposed postpetition financing under section 364(c) and (d) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

    a.    unencumbered credit or alternative financing without superpriority status is available to the debtor;

    b.    the credit transactions are necessary to preserve assets of the estate;

    c.    the terms of the credit agreement are fair, reasonable, and adequate;

    d.    the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

    e.    the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying the first three factors); *In re Aqua Assoc.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

43.     For the reasons discussed below, the Debtors satisfy the standards required to obtain postpetition financing under section 364(c) and (d) of the Bankruptcy Code.

**B.    The Debtors Were Unable to Obtain Financing on More Favorable Terms.**

44.    Whether debtors were unable to obtain unsecured credit is determined by application of a good faith effort standard, and debtors must make a good faith effort to demonstrate that credit was not available without granting a security interest.  *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009).  The required showing under section 364 of the Bankruptcy Code that unsecured credit was not available is not rigorous.  *See, e.g.*, *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise").

45.    Here, as detailed above, despite their efforts, the Debtors have been unable to (i) procure sufficient financing on a *pari passu* basis with the Debtors' existing secured creditors, on a junior secured basis, or on an unsecured, administrative expense basis, or, alternatively, by refinancing the existing secured debt, or (ii) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.  Indeed, as explained above, in March and April 2016, Lincoln contacted potential lenders known to potentially have an interest in the apparel, footwear, and sporting goods retail sectors regarding a potential DIP facility for the Debtors.  However, given the Debtors' liquidity needs and the fact that substantially all of the Debtors' material assets are encumbered, only the DIP Lenders were willing to provide postpetition financing.

46.     The Debtors respectfully submit that their efforts to obtain postpetition financing therefore satisfy the standards required under section 364(c) and (d) of the Bankruptcy Code.  *See, e.g.*, *In re Simasko Production Co.*, 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

**C.      The Proposed Financing Is Necessary to Preserve the Assets of the Debtors' Estates.**

47.     As described above, the Debtors have executed an asset purchase agreement with the Third Lien Agent (an affiliate of the Debtors' equity sponsor), subject to higher and better bids, in order to effectuate a going concern sale of their assets.  Pending approval of a sale by this Court, the Debtors intend to operate their business in the ordinary course and to continue the Store Closing Sales, and require immediate access to postpetition financing and cash collateral.  The Debtors require the proposed financing and use of cash collateral to provide the Debtors with the necessary capital with which to operate their business, including funding the Debtors' obligations to employees, and to preserve their business for the benefit of their estates and creditors pending the outcome of the Debtors' sale process.

48.     Cash is necessary for working capital, operating costs and expenses incurred during these Cases, including funding payroll to the Debtors' over 4,000 employees.  The

Debtors do not have sufficient sources of working capital, financing or cash collateral to carry on the operation of their business without additional financing.  The Debtors' ability to maintain their business pending the outcome of the sale process is dependent on their ability to continue to operate, and the Debtors cannot operate unless they can fund payments for postpetition rent, payroll, goods, services and other operating expenses. The DIP Facility thus is essential to the Debtors' continued operational viability and will provide the Debtors with the opportunity to preserve their business for purposes of the ongoing sale process.

49.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets.  *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004).  As noted above, the Debtors require postpetition financing and the use of cash collateral under the terms of the Loan Agreement and proposed DIP Orders to continue their operations pending the outcome of an orderly sale process.

**D.     The Terms of the Proposed Financing Are Fair, Reasonable, and Appropriate.**

50.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

51.     The terms of the Loan Agreement and the proposed DIP Orders were highly negotiated between the Debtors and the Agent (including their respective counsel and other advisors), resulting in agreements designed to permit the Debtors to obtain the needed liquidity

to maximize the value of their assets through an orderly sale process.  The terms are fair, reasonable and appropriate under the circumstances, and should be approved.

**E.      Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment.**

52.      A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See, e.g.*, *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").  One court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

53.      Here, the Debtors' sound business judgment clearly supports entry into the Loan Agreement to gain access to needed funding and maximize value for all constituents.

**F.      The DIP Lenders Are Extending Credit in Good Faith.**

54.      Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the

> pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

55.    As set forth in the Stevenson Declaration and the Duffy Declaration, the Debtors and the Agent negotiated the Loan Agreement and Interim Order at arm's length and good faith.  Accordingly, the DIP Orders should provide that the Agent and DIP Lenders are entitled to all of the protections set forth in section 364(e) of the Bankruptcy Code.

**G.    Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral.**

56.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (i) each entity that has an interest in such cash collateral provides consent, or (ii) the court approves the use of cash collateral after notice and a hearing. *See* 11 U.S.C. § 363(c).

57.    Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

58.    Section 361 of the Bankruptcy Code provides that:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
>
> > (1)    requiring the [debtor in possession] to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

> (2)     providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>
> (3)     granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.  "The determination of adequate protection is a fact-specific inquiry" to be decided on a case-by-case basis.  *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." (internal quotation marks omitted) (citation omitted)).

59.     Here, the interests of the Pre-Petition Term Lenders and Third Lien Lenders are adequately protected for purposes of section 363(e) of the Bankruptcy Code for the following reasons.  First, the Pre-Petition Term Lenders and Third Lien Lenders consent to the Debtors' use of property, including cash collateral, on the terms of the Loan Agreement and proposed DIP Orders.  Second, the Debtors intend to preserve value by maintaining operations pending the outcome of an orderly sale process and the continuation of the Store Closing Sales.  Third, the Pre-Petition Term Lenders and Third Lien Lenders will be adequately protected through the grant of adequate protection (which adequate protection they have consented to).  Section 361 of the Bankruptcy Code authorizes a debtor to provide adequate protection by granting replacement liens, making periodic cash payments, or granting such other relief "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property," *See* 11 U.S.C. § 361.  Pursuant to the DIP Orders, the Pre-Petition Term Lenders and Third Lien Lenders will have the benefit of, among other things, superpriority claims and replacement liens,

subject to the limitations and priorities set forth in the DIP Orders.   In addition, the Pre-Petition

Term Lenders shall receive, among other things, regular payments of interest at the default rate

and be entitled to mandatory prepayments from the proceeds of the sale of the Debtors' assets.

60.     The Debtors believe that such protections are adequate under the circumstances.

Further, given the significant value that the Debtors stand to lose in the event they are denied

access to continued use of cash collateral, such protections are wholly appropriate and justified.

**I.      Repayment of the Pre-Petition Obligations Is Necessary and Appropriate**

61.     Repayment of the Pre-Petition Obligations in accordance with the Interim and

Final Orders is necessary and appropriate, as the Agent and DIP Lenders have not otherwise

consented to the use of cash collateral and are not otherwise willing to provide the DIP Facility

unless the Pre-Petition Obligations are permitted to be paid down, without further order of the

Court, from amounts received by the Debtors following the Petition Date.[8]

62.     Such payments will not prejudice the Debtors or their estates, because such

payments are subject to the rights of parties in interest under Section 4.1 of the Interim Order to

assert an Objection.  If an Objection is successful, the Court may grant appropriate relief.

Courts have permitted debtors to use postpetition financing to pay prepetition claims of a

lender where, as here, the loan cannot be obtained on any other basis and the claims of the

prepetition lender are fully secured.  As the United States District Court for the District of

Delaware recently observed:

> [P]repetition secured claims can be paid off through a "roll-up."  Most simply, a
> [roll up] is the payment of a pre-petition debt with the proceeds of a post-petition
> loan.  Roll-ups most commonly arise where a pre-petition secured creditor is also
> providing a post-petition DIP loan under section 364(c) and/or (d) of the
> Bankruptcy Code.  The proceeds of the DIP loan are used to pay off or replace the
> pre-petition debt, resulting in a post-petition debt equal to the pre-petition debt

---

[8] As noted above, the Debtors project that the Pre-Petition Obligations will be paid in full within six weeks.

01:18582954.1

plus any new money being lent to the debtor.  As a result, the entirety of the pre-petition and post-petition debt enjoys the post-petition protection of section 364(c) and/or (d) as well as the terms of the DIP order.  In both a refinancing and a roll-up, the pre-petition secured claim is paid through the issuance of new debt rather than from unencumbered cash.

*Del. Trust Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 2015 U.S. Dist. LEXIS 19684, 20-21 (D. Del. Feb. 9, 2015) (*quoting In re Capmark Fin. Group, Inc.*, 438 B.R. 471, 511 (Bankr. D. Del. 2010)).  *See also, e.g., In re UniTek Global Servs., Inc.*, Case No. 14-12471 (PJW) (Bankr. D. Del. Dec. 2, 2014), *In re Coldwater Creek Inc.*, Case No. 14-10867 (BLS) (Bankr. D. Del. June 12, 2014); *In re Quantum Foods, LLC*, Case No. 14-10318 (KJC) (Bankr. D. Del. Mar. 20, 2014); *In re Tuscany Int'l Holdings (U.S.A.) Ltd.*, Case No. 14-10193 (KG) (Bankr. D. Del. Feb. 4, 2014); *In re Southern Air Holdings, Inc.*, Case No. 12-12690 (CSS) (Bankr. D. Del. Oct. 1, 2012); *In re Appleseed's Intermediate Holdings LLC*, Case No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011).

## XI.  INTERIM ORDER AND FINAL HEARING

63.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

64.    The urgent need to preserve the Debtors' business and to continue the Store Closing Sales, and thereby avoid immediate and irreparable harm to the Debtors' estates, makes it imperative that the Debtors be authorized to obtain postpetition financing and use cash collateral as soon as possible, pending the Final Hearing, in order to continue their operations and administer the Cases and to complete the Store Closing Sales.  Without the ability to obtain access to such funding and use cash collateral, the Debtors would be unable to meet their postpetition obligations, including payroll obligations to over 4,000 employees, and otherwise would be unable to fund their working capital needs, thus causing irreparable harm to the value

of the Debtors' estates and ending the Debtors' efforts to maintain operations through an orderly

sale process and the completion of the ongoing Store Closing Sales.

65.     Accordingly, the Debtors respectfully request that, pending the hearing on the

Final Order, the Interim Order be approved in all respects and that the terms and provisions of

the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the

Final Order be approved in all respects and the terms and provisions of the Final Order be

implemented and be deemed binding.

## XII.  IMMEDIATE RELIEF IS NECESSARY

66.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be

granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P.

6003.  The Debtors submit that for the reasons already set forth herein, the relief requested in this

Motion is necessary to avoid immediate and irreparable harm to the Debtors.

## XIII.  WAIVER OF ANY APPLICABLE STAY

67.     The Debtors also request that the Court waive any applicable stay of the DIP

Orders, including any stay that may be imposed by Bankruptcy Rule 4001(a)(3) and Bankruptcy

Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary

for the Debtors to operate their business without interruption and to preserve value for their

estates.  The exigent nature of the relief sought herein justifies immediate relief.[9]

## XIV.  NOTICE

68.     Notice of this Motion has been or will be given to (i) the Agent; (ii) the Pre-

Petition Term Agent, (iii) the Third Lien Agent, (iv) the U.S. Trustee, (v) the holders of the forty

(40) largest unsecured claims, on a consolidated basis, against the Debtors, (vi) the Internal

---

[9] The Debtors also seek waiver of the notice requirements of Bankruptcy Rule 6004(a), to the extent applicable.

Revenue Service and applicable state taxing authorities, (vii) all parties which, to the best of the

Debtors' knowledge, information, and belief, have asserted or may assert a lien in the Debtors'

assets; (viii) the Debtors' landlords, (ix) all parties who, as of the filing of this Motion, have filed

a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002; and

(x) the United States Securities and Exchange Commission.  As the Motion is seeking "first day"

relief, within two business days of the hearing on the Motion, the Debtors will serve copies of

the Motion and any order entered respecting the Motion as required by Local Rule 9013-1(m).

Due to the volume of the exhibits attached to this Motion and any interim or final orders

approving this Motion, the Debtors do not intend to serve such exhibits, but will note in the

orders approving this Motion and any related notices that such exhibits are available, free of

charge, at http://www.kccllc.net/VestisRetailGroup.  The Debtors submit that, in light of the

nature of the relief requested, no other or further notice need be given.

## XV.  NO PRIOR REQUEST

69.     No prior request for the relief sought in this Motion has been made to this or

any other court.

01:18582954.1

## XVI.  CONCLUSION

WHEREFORE, based upon the foregoing, the Debtors request entry of the DIP Orders

granting the relief requested herein and such other relief the Court deems just and proper.

Dated:  April 18, 2016

*/s/ Robert F. Poppiti, Jr.*

Robert S. Brady (No. 2847)
Robert F. Poppiti, Jr. (No. 5052)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:     (302) 571-6600
Fax:     (302) 571-1253
Email:  rbrady@ycst.com
            rpoppiti@ycst.com

and

Michael L. Tuchin, Esq.
Lee R. Bogdanoff, Esq.
Martin N. Kostov, Esq.
KLEE, TUCHIN, BOGDANOFF & STERN  LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Tel:     (310) 407-4031
Fax:     (310) 407-9090
Email:  mtuchin@ktbslaw.com
            lbogdanoff@ktbslaw.com
            mkostov@ktbslaw.com

*Proposed Counsel to the Debtors*

01:18582954.1

**<u>EXHIBIT A</u>**

**Proposed Interim Order**

01:18582954.1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- X
In re:                                          :    Chapter 11
                                                :
VESTIS RETAIL GROUP, LLC, *et al.*,[1]          :    Case No. 16-10971 (____)
                                                :
                            Debtors.            :    (Jointly Administered)
                                                :
---------------------------------------------------------- X  **Re:  Docket No. _____**

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS AND DEBTORS IN POSSESSION TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS, (V) MODIFYING THE AUTOMATIC STAY; (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") pursuant to §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2) and 364(c)(3), and 364(d) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "<u>Bankruptcy Rules</u>"), and Rule 4001-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), *inter alia* seeking, among other things:

---

[1]    The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Vestis Retail Group, LLC (1295); Vestis Retail Financing, LLC (9362); EMS Operating Company, LLC (2061); Vestis IP Holdings, LLC (2459); Bob's Stores, LLC (4675); EMS Acquisition LLC (0322); Sport Chalet, LLC (0071); Sport Chalet Value Services, LLC (7320); and Sport Chalet Team Sales, LLC (8015).  The Debtors' executive headquarters are located at 160 Corporate Court, Meriden, CT 06450.

[2]    Capitalized terms used but not defined in this Order shall have the same meanings ascribed to such terms in the Ratification Agreement.

01:18582955.1

(1)    authorization for Bob's Stores, LLC, as debtor and debtor-in-possession, ("Bob's"), Sport Chalet, LLC, as debtor and debtor-in-possession, ("Sport Chalet"), Sport Chalet Value Services, LLC, as debtor and debtor-in-possession, ("Value Services"), Sport Chalet Team Sales, LLC, as debtor and debtor-in-possession, ("Team Sales") and EMS Operating Company, LLC, as debtor and debtor-in-possession, ("EMS OpCo" and together with Bob's, Sport Chalet, Value Services and Team Sales, the "Borrowers") to obtain, and for Vestis Retail Financing, LLC, as debtor and debtor-in-possession, ("Parent"), Vestis Retail Group, LLC , as debtor and debtor-in-possession, ("Intermediate Holdco"), EMS Acquisition, LLC, as debtor and debtor-in-possession, ("EMS Acquisition") and Vestis IP Holdings, LLC, as debtor and debtor-in-possession, ("Vestis IP Holdings" and together with Parent, Intermediate Holdco, and EMS Acquisition, the "Guarantors"), to guarantee, unconditionally, on a joint and several basis, post-petition financing in the form of a revolving credit and letter of credit facility in accordance with the terms and conditions set forth in the Pre-Petition Loan Agreement (as defined below), as ratified and amended by that certain Ratification and Amendment Agreement dated as of April [__], 2016 (the "Ratification Agreement") a copy of which is attached hereto as **Exhibit 1** (as amended, supplemented or otherwise modified from time to time in accordance with the terms and conditions set forth herein, the "Loan Agreement"), by and among the Borrowers, the Guarantors, Wells Fargo Capital Finance, LLC, as administrative agent and collateral agent ("Agent"), and the lenders party thereto (the "DIP Lenders"), and the other Financing Agreements (as defined in the Ratification Agreement), and in accordance with this order ("Interim Order"), secured by perfected senior priority security interests in and liens on the Collateral (as defined below) pursuant to §§ 364(c)(2) and 364(c)(3), and 364(d) of the Bankruptcy Code (subject to the Carve-Out and the Permitted Liens (each as defined below));

01:18582955.1

(2)      authorization for Borrowers and Guarantors to remit all collections, asset proceeds and payments to Agent and Lenders for application, or deemed application, first to all Pre-Petition Obligations (as defined below) until such obligations are fully repaid in accordance with the Loan Agreement and subject to the terms of the Pre-Petition Intercreditor Agreement (as defined below), and then to the repayment of all Post-Petition Obligations (as defined in the Ratification Agreement) in accordance with the Loan Agreement and the other Financing Agreements, and to deem all Pre-Petition Obligations with respect to Letters of Credit to have been issued or provided, as applicable, under the Loan Agreement and the other Financing Agreements;

(3)      authorization for the Debtors to grant superpriority administrative claim status, pursuant to § 364(c)(1) of the Bankruptcy Code, to the Agent, for the benefit of itself and the other DIP Lenders, in respect of all Post-Petition Obligations (subject to the Carve-Out (as defined below));

(4)      as set forth below, subject to Section 4.1 of this Interim Order, approval of certain stipulations by the Debtors as set forth in this Interim Order in connection with the Pre-Petition Loan Agreement, the Pre-Petition Term Loan Documents, and the Third Lien Loan Documents (as each term is defined below);

(5)      as set forth below, authorization to provide adequate protection to the Agent and the DIP Lenders, Pre-Petition Term Agent and Pre-Petition Term Lenders, and Third Lien Agent and Third Lien Lenders (each in their respective capacities under the Pre-Petition Financing Agreements (as defined below);

01:18582955.1

3

(6)     effective only upon entry of a Final Order (as defined below), the waiver of the Debtors' right to assert claims to surcharge against the Collateral (as defined below) pursuant to § 506(c) of the Bankruptcy Code, to the extent set forth below;

(7)     the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order to the extent hereinafter set forth;

(8)     the setting of a final hearing on the Motion ("Final Hearing") to consider entry of a final order (the "Final Order") authorizing, among other things, the borrowing under the Financing Agreements on a final basis, as set forth in the Motion and the Loan Agreement filed with the Court, including the granting to Agent and Lenders the senior security interests and liens described above and super-priority administrative expense claims (subject to the Carve-Out); and

(9)     related relief.

The initial hearing on the Motion having been held by this Court on April 19, 2016 (the "Interim Hearing"), and upon the record made by the Debtors at the Interim Hearing, including the Motion, the Declaration of Mark T. Walsh in Support of First Day Motions (the "First Day Declaration"), the Declaration of Alexander W. Stevenson in Support of Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (i) Authorizing Debtors and Debtors in Possession to Obtain Postpetition Financing, (ii) Authorizing Use of Cash Collateral, (iii) Granting Liens and Super-Priority Claims, (iv) Granting Adequate Protection to Prepetition Secured Lenders, (v) Modifying the Automatic Stay, (vi) Scheduling a Final Hearing, and (viii) Granting Related Relief (the "Stevenson Declaration"), and Declaration of Robert J. Duffy in Support of (I) Debtors' DIP Financing Motion and (II) Debtors' Emergency Store Closing Sales Motion  (the

"Duffy Declaration"), and the filings and pleadings in the above-captioned chapter 11 cases (the "Cases"), the Court having found that the relief requested in the Motion is in the best interests of Debtors, their estates, their creditors and other parties in interest; and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (the "Notice") was appropriate under the circumstances; and the Notice having been served by the Debtors in accordance with Bankruptcy Rule 4001 on (i) counsel to the Agent; (ii) counsel to the Pre-Petition Term Agent, (iii) counsel to the Third Lien Agent, (iv) the office of the United States Trustee (the "U.S. Trustee"), (v) the holders of the forty (40) largest unsecured claims, on a consolidated basis, against the Debtors' estates (the "40 Largest Unsecured Creditors"), (vi) the Internal Revenue Service and applicable state taxing authorities, (vii) all parties which, to the best of the Debtors' knowledge, information, and belief, have asserted or may assert a lien in the Debtors' assets; (viii) the Debtors' landlords, (ix) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002; and (x) the United States Securities and Exchange Commission (collectively, the "Noticed Parties") and the opportunity for a hearing on the Motion was appropriate and no other notice need be provided; and after due deliberation sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    Petition.  On April 18, 2016 (the "Petition Date"), each Debtor filed a voluntary petition (each, a "Petition") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

01:18582955.1

5

B.     <u>Disposition</u>.  The Motion is hereby granted in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of the Interim Order that have not been withdrawn, waived, resolved, or settled are hereby denied and overruled.

C.     <u>Jurisdiction and Venue</u>.  The Court has jurisdiction of this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  The Motion is a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D) and (M).  Venue of the Cases and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     <u>Notice</u>.  The Notice was given in the manner described in the Motion.  Under the circumstances, the Notice given by the Debtors of the Motion, the Interim Hearing and the relief granted under this Interim Order constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001.

E.     <u>Debtors' Acknowledgments and Agreements</u>.  Without prejudice to the rights of any creditors' committee appointed in these Cases under Section 1102 of the Bankruptcy Code (the "<u>Committee</u>") or other parties-in-interest as and to the extent set forth in Section 4.1 of this Interim Order, the Debtors admit, stipulate, acknowledge and agree that:

(i)     <u>Pre-Petition Revolving Loan Documents</u>.  Prior to the commencement of the Cases, Agent and the DIP Lenders made loans, advances and provided other financial accommodations to Debtors and SME Holding Company, LLC (f/k/a Eastern Mountain Sports LLC) ("<u>SME</u>" and together with the Borrowers, the "<u>Pre-Petition Borrowers</u>") pursuant to the terms and conditions set forth in (1) the Pre-Petition Loan Agreement (as defined in the Ratification Agreement and referred to herein as the "<u>Pre-Petition Loan Agreement</u>"); and (2) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of Agent or any DIP Lender in connection with the Pre-Petition Loan Agreement, including,

without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Pre-Petition Loan Agreement, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Pre-Petition Revolving Loan Documents").  Copies of the operative Pre-Petition Financing Agreements are on file with counsel to the Debtors and available upon reasonable request.

(ii)        Pre-Petition Revolving Loan Obligations.  As of the Petition Date, the Debtors were indebted to Agent and the DIP Lenders under the Pre-Petition Revolving Loan Documents in respect of Loans, Letters of Credit, Bank Products, and all other Obligations (each as defined in the Pre-Petition Loan Agreement) in an aggregate outstanding principal amount of not less than $103,946,056.65, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, the "Pre-Petition Obligations", as such term is further defined in the Ratification Agreement).  The Pre-Petition Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Debtors, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and Debtors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Obligations or liens and security interest securing the same described in clause (E)(iii) below.

(iii)    Pre-Petition Revolving Loan Collateral. As of the Petition Date, the Pre-Petition Obligations were fully secured pursuant to the Pre-Petition Revolving Loan Documents by valid, perfected, enforceable and non-avoidable first-priority security interests and liens granted by Debtors to Agent, for the benefit of itself and the other DIP Lenders under the Pre-Petition Revolving Loan Documents, upon all of the Pre-Petition Collateral (as defined in the Ratification Agreement and hereinafter referred to as the "Pre-Petition Collateral"), subject only to the liens specifically permitted under Section 10.2 of the Pre-Petition Loan Agreement to the extent that such security interests, liens or encumbrances are (1) valid, perfected and non-avoidable security interests, liens or encumbrances existing as of the Petition Date, and (2) senior to and have not been or are not subject to being subordinated to Agent's and DIP Lenders' liens on and security interests in the Pre-Petition Collateral under the Pre-Petition Revolving Loan Documents or otherwise avoided, and, in each instance, only for so long as and to the extent that such encumbrances are and remain senior and outstanding (hereinafter referred to as the "Permitted Liens"). The Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of Agent's and DIP Lenders' liens, claims or security interests in the Pre-Petition Collateral.

(iv)    Proof of Claim. The acknowledgment by Debtors of the Pre-Petition Obligations and the liens, rights, priorities and protections granted to or in favor of Agent and DIP Lenders in respect of the Pre-Petition Collateral as set forth herein and in the Pre-Petition Revolving Loan Documents shall be deemed a timely filed proof of claim on behalf of Agent and the DIP Lenders in these Cases.

01:18582955.1

(v)        Pre-Petition Term Loan Documents.  Prior to the commencement of the Cases, Pre-Petition Term Agent (as defined below) and the Pre-Petition Term Lenders (as defined below) made loans, advances and provided other financial accommodations to Debtors pursuant to the terms and conditions set forth in (a) the Term Loan and Security Agreement, dated as of February 11, 2015 (as amended by Amendment No. 1 to Term Loan and Security Agreement, dated as of November 9, 2015, Amendment No. 2 to Term Loan and Security Agreement, dated as of January 7, 2016, Amendment No. 3 to Term Loan and Security Agreement, dated as of January 11, 2016, Amendment No. 4 to Term Loan and Security Agreement, dated as of February 9, 2016, and Amendment No. 5 to Term Loan and Security Agreement, dated as of March 15, 2016, and as the same may be amended, modified, supplemented or restated from time to time prior to the Petition Date, the "Pre-Petition Term Loan Agreement"), by and among the Pre-Petition Borrowers, Guarantors, the lenders party thereto (the "Pre-Petition Term Lenders") and Wells Fargo Bank, National Association, in its capacity as administrative agent and as collateral agent (the "Pre-Petition Term Agent"); and (b) all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Pre-Petition Term Lenders or Pre-Petition Term Agent in connection with the Pre-Petition Loan Agreement, including, without limitation, the Third Lien Intercreditor Agreement (as defined below), all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the Pre-Petition Term Loan Agreement, as all of the same have been supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Pre-Petition Term Loan Documents").  Copies of the operative

01:18582955.1

Pre-Petition Term Loan Documents are on file with counsel to the Debtors and available upon reasonable request.

(vi)    Pre-Petition Term Obligations.  As of the Petition Date, the Debtors were indebted to Pre-Petition Term Agent and Pre-Petition Term Lenders under the Pre-Petition Term Loan Documents in respect of loans and other obligations evidenced thereby in an aggregate outstanding principal amount of not less than $9,250,000.00, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, the "Pre-Petition Term Obligations"). The Pre-Petition Term Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Debtors, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and Debtors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Term Obligations, or the liens and security interests securing the same described in clause (E)(vii) below.

(vii)    Pre-Petition Term Loan Collateral.  As of the Petition Date, the Pre-Petition Term Obligations were fully secured pursuant to the Pre-Petition Term Loan Documents by valid, perfected, enforceable and non-avoidable security interests and liens granted by Debtors to Pre-Petition Term Agent, for the benefit of itself and the other Pre-Petition Term Lenders under the Pre-Petition Term Loan Documents (the "Term Loan Pre-Petition Liens"), upon all of the "Collateral" as defined in the Pre-Petition Term Loan Documents (the "Pre-Petition Term Collateral"), subject only to (A) the liens of Agent and DIP Lenders in accordance

with the Pre-Petition Intercreditor Agreement (defined below); (B) all other security interests, liens or encumbrances specifically permitted under Section 10.2 of the Pre-Petition Term Loan Agreement to the extent that such security interests, liens or encumbrances are (1) valid, perfected and non-avoidable security interests, liens or encumbrances existing as of the Petition Date, and (2) senior or equal to and have not been or are not subject to being subordinated to Pre-Petition Term Agent's and Pre-Petition Term Lenders' liens on and security interests in the Pre-Petition Term Collateral under the Pre-Petition Term Loan Documents or otherwise avoided, and, in each instance, only for so long as and to the extent that such encumbrances are and remain senior and outstanding.   The Term Loan Pre-Petition Liens in the Pre-Petition Term Collateral are junior and subordinate to the Agent's and DIP Lenders' liens in such collateral pursuant to the Pre-Petition Intercreditor Agreement (defined below).   The Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of Pre-Petition Term Agent's or Pre-Petition Term Lenders' Term Loan Pre-Petition Liens in the Pre-Petition Term Collateral.

(viii)    Pre-Petition Term Agent's Proof of Claim. The acknowledgment by Debtors of the Pre-Petition Term Obligations and the liens, rights, priorities and protections granted to or in favor of Pre-Petition Term Agent and Pre-Petition Term Lenders in respect of the Pre-Petition Term Collateral as set forth herein and in the Pre-Petition Term Loan Documents shall be deemed a timely filed proof of claim on behalf of Pre-Petition Term Agent and Pre-Petition Term Lenders in these Cases.

(ix)    Third Lien Loan Documents.  Prior to the commencement of the Cases, Third Lien Loan Agent (as defined below) and the Third Lien Loan Lenders (as defined below)

made loans, advances and provided other financial accommodations to Debtors pursuant to the terms and conditions set forth in (a) the Term Loan and Security Agreement, dated as of January 7, 2016 (as amended by Amendment No. 1 to Term Loan and Security Agreement dated as of January 11, 2013, Amendment No. 2 to Term Loan and Security Agreement dated as of February 9, 2016 and Amendment No. 3 to Term Loan and Security Agreement, dated as of March 15, 2016, or as the same may be amended, modified, supplemented or restated from time to time, the "Third Lien Loan Agreement"), by and among the Borrowers, Guarantors, SME, Vestis BSI Funding II, LLC, in its capacity as administrative agent and collateral agent (the "Third Lien Agent") and the lenders party thereto (the "Third Lien Lenders"); and (b) all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Third Lien Lenders or Third Lien Agent in connection with the Third Lien Loan Agreement, including, without limitation, the Third Lien Intercreditor Agreement (as defined below), all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the Third Lien Loan Agreement, as all of the same have been supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Third Lien Loan Documents").  Copies of the operative Third Lien Loan Documents are on file with counsel to the Debtors and available upon reasonable request.

(x)        Third Lien Loan Obligations.  As of the Petition Date, the Debtors were indebted to the Third Lien Agent and Third Lien Lenders under the Third Lien Loan Documents in respect of loans and other obligations evidenced thereby in an aggregate outstanding principal amount of not less than $40,274,945.28, plus $228,224.69 of accrued interest that has not been

paid or added to principal, and the Early Termination Fee (as defined in the Third Lien Loan Agreement) of $24,788,482.52 together with all other costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto, including without limitation the Early Termination Fee (as defined in the Third Lien Loan Agreement) (collectively, the "Third Lien Obligations"). The Third Lien Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Debtors, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and Debtors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Third Lien Obligations or the liens and security interests securing the same described in clause (E)(xi) below.

(xi)    Third Lien Collateral.  As of the Petition Date, the Third Lien Obligations were fully secured pursuant to the Third Lien Loan Documents by valid, perfected, enforceable and non-avoidable junior security interests and liens granted by Debtors to Third Lien Agent, for the benefit of itself and the other Third Lien Lenders under the Third Lien Loan Documents ("Third Lien Pre-Petition Liens"), upon all of the "Collateral" as defined in the Third Lien Loan Documents (the "Third Lien Collateral") subject only to (A) the liens of Agent, DIP Lenders, Pre-Petition Term Agent and Pre-Petition Term Lenders in accordance with the Third Lien Intercreditor Agreement; (B) all other security interests, liens or encumbrances the liens specifically permitted under Section 10.2 of the Third Lien Loan Agreement to the extent that such security interests, liens or encumbrances are (1) valid, perfected and non-avoidable security interests, liens or encumbrances existing as of the Petition Date, and (2) senior or equal to and

have not been or are not subject to being subordinated to Third Lien Agent's and Third Lien Lenders' liens on and security interests in the Third Lien Collateral under the Third Lien Loan Documents or otherwise avoided, and, in each instance, only for so long as and to the extent that such encumbrances are and remain senior and outstanding. The Third Lien Pre-Petition Liens in the Third Lien Collateral are junior and subordinate to the liens of Agent and DIP Lenders and Pre-Petition Term Agent and Pre-Petition Term Lenders pursuant to the Third Lien Intercreditor Agreement.   The Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of Third Lien Agent's or Third Lien Lenders' Third Lien Pre-Petition Liens in the Third Lien Collateral.

(xii)        Third Lien Agent's Proof of Claim. The acknowledgment by Debtors of the Third Lien Obligations and the liens, rights, priorities and protections granted to or in favor of the Third Lien Agent and Third Lien Lenders in respect of the Third Lien Collateral as set forth herein and in the Third Lien Loan Documents shall be deemed a timely filed proof of claim on behalf of the Third Lien Agent and Third Lien Lenders in these Cases.

(xiii)        Pre-Petition Intercreditor Agreement. Agent and Pre-Petition Term Agent are parties to that certain Intercreditor Agreement dated as of February 11, 2015 (as amended, supplemented or otherwise modified from time to time, the "Pre-Petition Intercreditor Agreement"), which (x) confirms the relative priority of the security interests of Agent and Pre-Petition Term Agent in the assets and properties of Borrowers, Guarantors, and SME, and (y) provides certain other rights and obligations between Agent and DIP Lenders, on the one hand, and the Pre-Petition Term Agent and Pre-Petition Term Lenders, on the other hand, relating to the Pre-Petition Collateral.

01:18582955.1

(xiv)    Third Lien Intercreditor Agreement. Third Lien Agent, Pre-Petition Term Agent, and Agent are parties to that certain Intercreditor and Subordination Agreement dated as of January 7, 2016 (as amended, supplemented or otherwise modified from time to time, the "Third Lien Intercreditor Agreement"), which (x) acknowledges and confirms the subordination of all liens and claims held by the Third Lien Agent and Third Lien Lenders against each Borrower and Guarantor and the Third Lien Collateral to all such liens and claims held by the Agent, DIP Lenders, Pre-Petition Term Agent and/or Pre-Petition Term Lenders, (y) confirms the relative priority of the security interests of Agent, Pre-Petition Term Agent, and Third Lien Agent in the assets and properties of Borrowers, Guarantors, and SME, and (z) provides for the orderly sharing among them, in accordance with such priorities, of proceeds of such assets and properties upon any foreclosure thereon or other disposition thereof.

F.    Findings Regarding the Post-Petition Financing.

(i)    Post-Petition Financing.  The Debtors have requested from each of the Agent and the DIP Lenders, and the Agent and DIP Lenders are willing, to extend certain loans, advances and other financial accommodations on the terms and conditions set forth in this Interim Order, the Loan Agreement and the other Financing Agreements (as defined in the Ratification Agreement), respectively.

(ii)    Need for Post-Petition Financing.  The Debtors do not have sufficient available sources of working capital, including cash collateral, to operate their businesses in the ordinary course of business without the financing requested in the Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of the Estates (as defined below) for the

benefit of all creditors of the Debtors.  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with the Agent and DIP Lenders as set forth in this Interim Order, the Loan Agreement, and other Financing Agreements, as applicable, is vital to the preservation and maintenance of the going concern value of each Debtor.  Accordingly, the Debtors have an immediate need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates (as defined under § 541 of the Bankruptcy Code, the "Estates") in order to maximize the recovery to all creditors of the Estates.

(iii)    No Credit Available on More Favorable Terms.  The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under §§ 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense, junior liens on encumbered property of the Estates, or liens on property of the Estates not subject to a lien pursuant to § 364(c)(1), 364(c)(2) or 364(c)(3) of the Bankruptcy Code.  The Debtors have been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by each of the Agent and DIP Lenders pursuant to the Financing Agreements.

(iv)    Budget.  The Debtors have prepared and delivered to Agent and DIP Lenders an initial 13-week budget (as defined in the Ratification Agreement, the "Budget").  Such Budget has been thoroughly reviewed by the Debtors and their management and sets forth, among other things, the projected cash receipts and disbursements of the Debtors for the periods covered thereby.  The Debtors represent that the Budget is achievable in accordance with the

terms of the Financing Agreements and this Interim Order and will allow the Debtors to operate at all times during these Cases.  The Agent and DIP Lenders are relying upon the Debtors' compliance with the Budget (subject to the variances permitted under Section 5.3(c) of the Ratification Agreement (the "Permitted Variances") in accordance with Section 5.3 of the Ratification Agreement, the other Financing Agreements, and this Interim Order in determining to enter into the post-petition financing arrangements provided for herein.

(v)        Business Judgment and Good Faith Pursuant to § 364(e).  The terms of the Financing Agreements and this Interim Order are fair, just and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The terms and conditions of the Financing Agreements and this Interim Order have been negotiated in good faith and at arms' length by and among the Debtors and Agent, with all parties being represented by counsel.  Any credit extended under the terms of this Interim Order shall be deemed to have been extended in good faith by the Agent and DIP Lenders, as that term is used in § 364(e) of the Bankruptcy Code.

(vi)       Good Cause.  The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' businesses and on-going operations, (2) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and (3) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

01:18582955.1

(vii)    <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  No party appearing in the Cases has filed or made an objection to the relief sought in the Motion or the entry of this Interim Order, or any objections that were made (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

IT IS HEREBY ORDERED THAT:

Section 1.    <u>Authorization and Conditions to Financing.</u>

1.1    <u>Motion Granted</u>.  The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Interim Order.  Except as otherwise expressly provided in this Interim Order, any objection to the entry of this Interim Order that has not been withdrawn, waived, resolved or settled, is hereby denied and overruled on the merits.

1.2    <u>Authorization to Borrow, Guaranty, and Use Loan Proceeds</u>.  Borrowers are hereby authorized and empowered to immediately borrow and obtain Loans, Letters of Credit and to incur indebtedness and other Post-Petition Obligations (as defined in the Ratification Agreement and hereinafter referred to as the "<u>Post-Petition Obligations</u>"), and the Guarantors are hereby authorized to guaranty such Post-Petition Obligations, up to an aggregate amount equal to the sum of (i) 110% of all disbursements for the Interim Financing Period (as defined below) in the "Total Cash Disbursements line item of the Budget, (ii) $12,000,000 with respect to all Obligations with respect to Letters of Credit (inclusive of all Pre-Petition Obligations with respect to Letters of Credit, which are deemed to have been issued or provided, as applicable, under the Loan Agreement and the other Financing Agreements, <u>plus</u> (iii) all interest, costs, and fees, accrued or accruing under the Loan Agreement and other Financing Agreements, and the Pre-Petition Term Loan Agreement, all pursuant to the terms and conditions of this Interim

01:18582955.1

Order, the Loan Agreement, the other Financing Agreements, and the Pre-Petition Term Loan Agreement during the period commencing on the date of this Interim Order through and including the entry of the Final Order (the "Interim Financing Period"). Subject to the terms and conditions contained in this Interim Order and the Financing Agreements, Borrowers shall use the proceeds of the Loans, Letters of Credit and other credit and financial accommodations provided by Agent and DIP Lenders under the Loan Agreement and the other Financing Agreements solely for payment of expenses set forth in the Budget (subject to the Permitted Variances) and amounts owing to Agent and DIP Lenders in accordance with the terms and conditions of the Financing Agreements and this Interim Order.

    1.3     Financing Documents

        (a)    Authorization. Debtors are hereby authorized to enter into, execute, deliver, perform, and comply with all of the terms, conditions and covenants of the Loan Agreement and the other Financing Agreements. Upon execution and delivery of the Loan Agreement and the other Financing Agreements, such agreements and documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of such agreements, documents and this Interim Order. No obligation, payment, transfer or grant of security under the Loan Agreement, the other Financing Agreements or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under § 502(d) of the Bankruptcy Code), or be subject to any defense, reduction, setoff, recoupment or counterclaim.

        (b)    Approval; Evidence of Borrowing Arrangements. All terms, conditions and covenants set forth in the Financing Agreements (including, without limitation,

the Loan Agreement) are approved to the extent necessary to implement the terms and provisions of this Interim Order.    All such terms, conditions and covenants shall be sufficient and conclusive evidence of (a) the borrowing arrangements by and among Debtors, Agent and DIP Lenders, and (b) each Debtor's assumption and adoption of all of the terms, conditions, and covenants of the Loan Agreement and the other Financing Agreements for all purposes, including, without limitation, to the extent applicable, the payment of all Post-Petition Obligations arising thereunder, including, without limitation, all principal, interest, fees and other expenses, including, without limitation, all of Agent's and DIP Lenders' consultant fees, professional fees, attorney fees and legal expenses, as more fully set forth in the Financing Agreements; provided that payment of Agent's and DIP Lenders' consultant fees, professional fees, attorney fees and legal expenses shall be made only in accordance with Section 5.12 of this Interim Order.

(c)    Amendment.    Subject to the terms and conditions of the Loan Agreement and the other Financing Agreements, Debtors, Agent and DIP Lenders may amend, modify, supplement or waive any provision of the Financing Agreements (a "DIP Loan Amendment") without further approval or order of the Court so long as (a) such DIP Loan Amendment is not material (for purposes hereof, a "material" DIP Loan Amendment shall mean any DIP Loan Amendment that operates to increase the interest rate other than as currently provided in the Financing Agreements, increase the Maximum Credit (as defined in the Ratification Agreement), increase or add an additional early termination fee, prepayment or repayment premium or any other fee that increases yield, add specific new events of default or enlarge the nature and extent of default remedies available to Agent and DIP Lenders following an event of default, or otherwise modify any terms and conditions in any Financing Agreement

in a manner materially less favorable to Debtors) and is undertaken in good faith by Agent, DIP

Lenders and Debtors; (b) the Debtors provide prior written notice of the DIP Loan Amendment

(the "DIP Loan Amendment Notice") to (i) the U.S. Trustee, (ii) counsel to any Committee, or in

the event no such Committee is appointed at the time of such DIP Loan Amendment, the 40

Largest Unsecured Creditors, (iii) counsel to the Pre-Petition Term Agent, and (iv) counsel to the

Third Lien Agent; (c) the Debtors file the DIP Loan Amendment Notice with the Court; and (d)

no objection to the DIP Loan Amendment is filed with the Court within five (5) business days

from the later of the date the DIP Loan Amendment Notice is served or the date the DIP Loan

Amendment Notice is filed with the Court in accordance with this Section.  Any material DIP

Loan Amendment to the Financing Agreements must be approved by the Court to be effective.

   1.4  <u>Payment of Pre-Petition Debt</u>.  The Debtors are authorized to repay all

Pre-Petition Obligations in accordance with the Loan Agreement, the other Financing

Agreements and this Interim Order, including, without limitation, Sections 1.5 and 1.6 of this

Interim Order.

   1.5  <u>Payments and Application of Payments</u>.  The Debtors are authorized to

make all payments and transfers of Estate property to the Agent as provided for, permitted and/or

required under the Loan Agreement and the other Financing Agreements, which payments and

transfers shall not be avoidable or recoverable from the Agent or any DIP Lender under §§ 547,

548, 550, 553 or any other section of the Bankruptcy Code, or by reason of any other claim,

charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law

or otherwise.  All proceeds of the Collateral (as defined herein) received by the Agent or any DIP

Lender, and any other amounts or payments received by the Agent or any DIP Lender in respect

of the Post-Petition Obligations, may be applied or deemed to be applied by the Agent, in its

discretion, first to the repayment in full of the Pre-Petition Obligations, and then in repayment of the Post-Petition Obligations, all in accordance with the Loan Agreement, the other Financing Agreements and this Interim Order.  Without limiting the generality of the foregoing, the Debtors are authorized without further order of this Court, subject to Section 5.12 of this Interim Order, to pay or reimburse Agent and the DIP Lenders for future costs and expenses, including, without limitation, all professional fees, consultant fees and legal fees and expenses paid or incurred by the Agent and the DIP Lenders in connection with the financing transactions as provided in this Interim Order and the Financing Agreements, all of which shall be and are included as part of the principal amount of the Post-Petition Obligations and secured by the Collateral (as defined herein).

      1.6    <u>Continuation of Pre-Petition Procedures</u>.  Except to the extent expressly set forth in the Financing Agreements, all pre-petition practices and procedures for the payment and collection of proceeds of the Collateral (as defined herein), the turnover of cash, the delivery of property to the Agent and the DIP Lenders, including the Deposit Account Control Agreements (as such term is defined in the Loan Agreement) and any other similar lockbox or blocked depository bank account arrangements, are hereby approved and shall continue without interruption after the commencement of the Cases.

**Section 2.**    <u>Post-Petition Lien; Superpriority Administrative Claim Status.</u>

      2.1    <u>Post-Petition Lien</u>.

      (a)    <u>Post-Petition Lien Granting</u>.  To secure the prompt payment and performance of any and all Post-Petition Obligations (as defined in  the Loan Agreement) of Debtors to the Agent and DIP Lenders of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, Agent, for the benefit of itself and the other DIP

Lenders, shall have and is hereby granted, effective as of the Petition Date, valid and perfected first-priority security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtors' Estates may have (but subject to the Carve-Out (as defined below) and the Permitted Liens), in and upon all of the Collateral (as defined in the Loan Agreement and referred to herein as the "Collateral").  For the avoidance of doubt, solely for purposes of this Interim Order, "Collateral" does not include (i) any leasehold interest in Real Property that was not previously encumbered by security interests or liens in favor of Administrative Agent, for the ratable benefit of Lenders, as of the Petition Date, but shall instead include all proceeds of such leasehold interests; (ii) any executory contract or agreement to the extent the  contract or agreement does not permit the grant of a lien thereon and was not previously encumbered by security interest or liens in favor of Administrative Agent, for the ratable benefit of Lenders; provided that, Agent and DIP Lenders shall have a valid and perfected first-priority security interests and liens, superior to all other liens, claims or security interests on the proceeds of any such real property or executory contracts set forth in the forgoing clauses (i) and (ii); and (iii) prior to the entry of the Final Order, any property recovered as a result of transfers or obligations avoided or actions maintained or taken Chapter 5 of the Bankruptcy Code (the "Avoidance Actions").

        (b)      Lien Priority in Collateral.  The liens and security interests of Agent and DIP Lenders granted under the Financing Agreements and this Interim Order in the Collateral securing all Post-Petition Obligations (as defined in the Loan Agreement) shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with §§ 363, 364 or

any other section of the Bankruptcy Code or other applicable law; provided, however, that Agent's and DIP Lenders' liens on and security interests in the Collateral shall be subject only to (a) Permitted Liens, and (b) the Carve-Out (as defined below).

        (c)    <u>Post-Petition Lien Perfection.</u>  This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the Collateral, or other act to validate or perfect such security interest or lien, including without limitation, control agreements with any financial institution(s) party to a Deposit Account Control Agreement or holding a Blocked Account (as defined in the Loan Agreement) or other depository account consisting of Collateral (a "<u>Perfection Act</u>"). Notwithstanding the foregoing, if Agent, shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, then Agent is authorized to perform such act, and the Debtors are authorized to perform such act to the extent necessary or required by Agent, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. Agent may choose to file, record or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law. Should Agent so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive

or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Interim Order.

(d)    Nullifying Pre-Petition Restrictions to Post-Petition Financing. Notwithstanding anything to the contrary contained in any pre-petition agreement, contract, lease, document, note or instrument to which any Debtor is a party or under which any Debtor is obligated, except as otherwise permitted under the Financing Agreements, any provision that restricts, limits or impairs in any way any Debtor from granting Agent security interests in or liens upon any of the Debtors' assets or properties (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which any Debtor is a party) under the Financing Agreements or this Interim Order, as applicable, or otherwise entering into and complying with all of the terms, conditions and provisions hereof or of the Financing Agreements, shall not (a) be effective and/or enforceable against any such Debtor(s), Agent or DIP Loan Lender(s), as applicable, or (b) adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to Agent and DIP Lenders pursuant to this Interim Order or the Financing Agreements, in each case, to the maximum extent permitted under the Bankruptcy Code and other applicable law that would not render any unexpired lease or executory contract non-assumable or non-assignable pursuant to section 365 of the Bankruptcy Code.

2.2    Superpriority Administrative Expenses.

(a)    DIP Loans.    For all Post-Petition Obligations now existing or hereafter arising pursuant to this Interim Order, the Financing Agreements or otherwise, Agent, for the benefit of itself and the other DIP Lenders, is granted an allowed superpriority administrative claim pursuant to § 364(c)(1) of the Bankruptcy Code, having priority in right of

01:18582955.1

payment over any and all other obligations, liabilities and indebtedness of Debtors (other than the Carve-Out), whether now in existence or hereafter incurred by Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, §§ 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 364(c)(1), 546(c), 726, 1113 or 1114 of the Bankruptcy Code (other than the Carve-Out), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof (the "<u>DIP Loan Superpriority Claim</u>").

        2.3    <u>Carve-Out</u>.

        (a)    <u>Carve-Out</u>. As used in this Interim Order, the "<u>Carve-Out</u>" means the sum of: (i) all allowed administrative expenses pursuant to 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of the Bankruptcy Court and pursuant to 28 U.S.C. § 1930(a)(6) for fees payable to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code, plus interest at the statutory rate, as determined by agreement of the U.S. Trustee or by final order of the Bankruptcy Court (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, or otherwise, all Reported Fee Accruals (as defined in the Ratification Agreement), less the amount of any fee retainers received by professionals retained by the Debtors or any Committee pursuant to Sections 327, 328 or 1103 of the Bankruptcy Code (the "<u>Professionals</u>") and not previously applied to the fees and expenses of the Professionals (the "<u>Pre-Trigger Allowed Professional</u>

Fees") incurred by such Professionals at any time before or on the date of delivery by the Agent of a Carve-Out Trigger Notice (as defined in the Ratification Agreement) (the "Pre-Trigger Date Professional Fee Carve Out"); provided, that the Pre-Trigger Date Professional Fee Carve Out (A) shall not at any time exceed the aggregate amount of the fees and expenses identified in the Budget for each such Professional or category of Professional covering the period of time through (but not after) the date of delivery of a Carve-Out Trigger Notice, and (B) shall be permanently reduced by the amount set forth in any Carve Out Escrow Notice (defined below) received by Agent in accordance with Section 2.3(c) of this Interim Order; and (iv) all fees, disbursements, costs and expenses of the Professionals to the extent allowed by the Bankruptcy Court, whether by interim order, procedural order or otherwise, incurred on and after the first Business Day following delivery by the Agent of a Carve Out Trigger Notice (the "Post-Trigger Allowed Professional Fees"; and together with the Pre-Trigger Allowed Professional Fees, collectively, the "Allowed Professional Fees") in an aggregate amount not to exceed $500,000 (the "Post-Trigger Date Professional Fee Carve Out"; and together with the Pre-Trigger Date Professional Fee Carve Out, collectively, the "Professional Fee Carve-Out").

For the avoidance of doubt, nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described herein.

(b)      Excluded Professional Fees.   Notwithstanding anything to the contrary in this Interim Order, neither the Professional Fee Carve-Out nor the proceeds of Collateral or any Loans, Letters of Credit or any other credit or financial accommodations provided under or in connection with the Financing Agreements shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following:

01:18582955.1

(i)       an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of (A) the Pre-Petition Obligations or Agent's and any DIP Lender's liens on and security interests in the Pre-Petition Collateral, (B) the Pre-Petition Term Obligations or Pre-Petition Term Agent's or the Pre-Petition Term Lenders' liens on and security interests in the Pre-Petition Collateral, (C) the Third Lien Obligations or Third Lien Agent's or the Third Lien Lenders' liens on and security interests in the Third Lien Collateral, (D) the Post-Petition Obligations or Agent's or DIP Lenders' liens on and security interests in the Collateral, (E) the Term Loan Adequate Protection Parties' Term Loan Adequate Protection Liens (each as defined below), and (F) the Third Lien Adequate Protection Parties' Third Lien Adequate Protection Liens (each as defined below); (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, (A) the Pre-Petition Obligations or the Agent's and DIP Lenders' liens on and security interests in the Pre-Petition Collateral, (B) the Pre-Petition Term Obligations or Pre-Petition Term Agent's or the Pre-Petition Term Lenders' liens on and security interests in the Pre-Petition Collateral, (C) the Third Lien Obligations or Third Lien Agent's or the Third Lien Lenders' liens on and security interests in the Third Lien Collateral, (D) the Post-Petition Obligations or Agent's or DIP Lenders' liens on and security interests in the Collateral, (E) the Term Loan Adequate Protection Parties' Term Loan Adequate Protection Liens (each as defined below), or (F) the Third Lien Adequate Protection Parties' Third Lien Adequate Protection Liens (each as defined below); or (iii) preventing, hindering or delaying Agent's or DIP Lenders' assertion or enforcement of

any lien, claim, right or security interest or realization upon any Collateral in accordance with the terms and conditions of the Loan Agreement, the Financing Agreements, and this Interim Order;

(ii)     a request to use Cash Collateral (as such term is defined in section 363 of the Bankruptcy Code), except as set forth in the Loan Agreement, the Financing Agreements, and this Interim Order, without the prior written consent of Agent in accordance with the terms and conditions of this Interim Order;

(iii)    a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to section 364(c) or § 364(d) of the Bankruptcy Code, other than as provided in the Loan Agreement, the Financing Agreements, and this Interim Order, without the prior written consent of Agent;

(iv)     the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against Agent, any DIP Lender, Pre-Petition Term Agent, any Pre-Petition Term Lender, Third Lien Agent, any Third Lien Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from Agent, any DIP Lender, Pre-Petition Term Agent, any Pre-Petition Term Lender, Third Lien Agent or any Third Lien Lender under chapter 5 of the Bankruptcy Code;

(v)      the cost of investigation into any claims against Agent or any DIP Lender arising under or in connection with the Pre-Petition Revolving Loan Documents or Pre-Petition Term Agent, any Pre-Petition Term Lender, Third Lien Agent or any Third Lien Lender in excess of $50,000; or

(vi)     any act which has or could directly, materially and adversely modify or compromise the rights and remedies of Agent or any DIP Lender under this Interim Order, or which directly results in the occurrence of an Event of Default under any Financing Agreements, or this Interim Order.

(c)     <u>Carve-Out Reserve</u>.  At the Agent's discretion, Agent may, at any time and in any increment in accordance with the Loan Agreement, establish a Reserve (the "<u>Professional Fee Reserve</u>") against the amount of Revolving Loans and Letters of Credit that would otherwise be available to Borrowers in respect of the Professional Fee Carve-Out; <u>provided</u>, that upon Agent's receipt from Debtors of a written notice certified by Debtors' chief financial officer (the " <u>Carve Out Escrow Notice</u>") that identifies (i) the amount of funds deposited by Debtors into an escrow account maintained by Young Conaway Stargatt & Taylor, LLP, Debtors' counsel, in respect of any Reported Fee Accruals, and (ii) the Professionals and the week set forth in the Budget to which such funded Reported Fee Accruals relate, then Agent shall reduce or not increase (as applicable) the Professional Fee Reserve by the amount equal to such funded Reported Fee Accrual.

2.4     <u>Payment of Carve-Out</u>.

Payment from the Carve-Out, whether by or on behalf of the Agent or any DIP Lender, shall not and shall not be deemed to reduce the Post-Petition Obligations, and shall not and shall not be deemed to subordinate any of any of Agent's or DIP Lender's liens and security interests in the Pre-Petition Collateral, any other Collateral, the Revolving Loan A/L Adequate Protection Superpriority Claim (as defined below), or the DIP Loan Superpriority Claim to any junior pre- or post-petition lien, interest or claim in favor of any other party.  Agent and DIP Lenders shall not, under any circumstance, be responsible for the direct payment or

reimbursement of any fees or disbursements of any Professionals incurred in connection with the Cases under any chapter of the Bankruptcy Code, and nothing in Section 2.3 of this Interim Order shall be construed to obligate the Agent or any DIP Lender in any way, to directly pay compensation to or to reimburse expenses of any Professional, or to ensure that the Debtors have sufficient funds to pay such compensation or reimbursement.

2.5    <u>Use of Cash Collateral; Adequate Protection.</u>

(a)    <u>Authorization to Use Cash Collateral.</u>    Subject to the terms and conditions of this Interim Order, the Loan Agreement, the Financing Agreements, and in accordance with the Budget (subject to the Permitted Variances), Borrowers shall be and are hereby authorized to use the Cash Collateral (as defined in section 363 of the Bankruptcy Code) for the period commencing on the date of this Interim Order and terminating upon the earlier of (i) the date that is the final day of the Interim Financing Period; and (ii) the date on which the Agent delivers an Enforcement Notice (as defined below) to counsel for the Debtors, counsel for the Committee (if appointed), and the U.S. Trustee, subject to the liens and security interests granted to the Agent and the DIP Lenders, Pre-Petition Term Agent and Pre-Petition Term Lenders, and Third Lien Agent and Third Lien Lenders; provided, however, during the Default Notice Period, the Debtors may use Cash Collateral solely to meet payroll (other than severance), to pay expenses critical to the preservation of the Debtors and their estates as agreed by the Agent in its Permitted Discretion, in each case in accordance with the terms and provisions of the Budget, and to fund the Professional Fee Reserve with respect to unfunded Reported Fee Accruals relating to the period prior to the last date of the Default Notice Period. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their Estates outside the ordinary course of business, or any Borrower's use of Cash Collateral or other proceeds

resulting therefrom, except as expressly permitted in this Interim Order, the Financing Agreements and in accordance with the Budget (subject to the Permitted Variances).

(b)    <u>Replacement Liens</u>.  As adequate protection for the diminution in value of their interests in the Collateral (including Cash Collateral) on account of the Borrowers' use of such Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve-Out (collectively, the "<u>Diminution in Value</u>"), the Agent, for the benefit of itself and the DIP Lenders, is hereby granted pursuant to §§ 361 and 363 of the Bankruptcy Code, and solely to the extent of the Diminution in Value, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral (the "<u>Revolving Loan A/L Replacement Lien</u>").  The Revolving Loan A/L Replacement Lien shall be junior and subordinate only to (A) the Carve-Out (B) the Permitted Liens, and (C) Agent's and DIP Lenders' liens on the Collateral to secure the Post-Petition Obligations, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.

(c)    <u>Section 507(b) Priority Claims</u>.  As adequate protection for the Diminution in Value, the Agent, for the benefit of itself and DIP Lenders, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, and solely to the extent of the Diminution in Value, an allowed superpriority administrative expense claim in each of the Cases and any successor bankruptcy cases (the "<u>Revolving Loan A/L Adequate Protection Superpriority Claim</u>").  The Revolving Loan A/L Adequate Protection Superpriority Claim shall be junior only to (A) the Carve-Out, and (B) the DIP Loan Superpriority Claim, and shall otherwise have priority over all administrative expense claims and unsecured claims against Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever.

01:18582955.1

(d)    <u>Pre-Petition Term Agent Adequate Protection</u>. Pre-Petition Term Agent, for the benefit of itself and the Pre-Petition Term Lenders (collectively, the "<u>Term Loan Adequate Protection Parties</u>"), shall be granted the following protection, pursuant to sections 361, 507, and 363(e) of the Bankruptcy Code for the consent to the use of its collateral (including Cash Collateral), consent to the transactions contemplated by the Financing Agreements and this Interim Order, and for the Diminution in Value of the security interests and liens of such party.  The Term Loan Adequate Protection Parties are granted the following adequate protection (the "<u>Term Loan Adequate Protection Obligations</u>"):

(i)    <u>Adequate Protection Lien</u>.  Pre-Petition Term Agent, on behalf of the Term Loan Adequate Protection Parties, shall be granted for their benefit, effective and perfected as of the date of entry of this Interim Order and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements, and solely to the extent of the Diminution in Value, a security interest in and lien on the Collateral (together, the "<u>Term Loan Adequate Protection Liens</u>"), subject and subordinate only to (i) the Carve-Out, (ii) Permitted Liens, and (iii) the liens of Agent and DIP Lenders securing all Obligations arising under or in connection with the Loan Agreement and the other Financing Agreements and/or this Interim Order in and upon the Collateral, including, without limitation, the Revolving Loan A/L Replacement Lien; provided that, the Term Loan Adequate Protection Liens shall only encumber the Avoidance Actions upon entry of the Final Order.

(ii)    <u>Pre-Petition Term Loan Adequate Protection Super-Priority Claim</u>. The Pre-Petition Term Agent, on behalf of the Term Loan Adequate Protection Parties, shall be granted, solely to the extent of the Diminution in Value, a super-priority administrative expense claim junior and subordinate only to the Carve-Out, DIP Loan Superpriority Claim and the

Revolving Loan A/L Adequate Protection Superpriority Claim; <u>provided</u> that the Pre-Petition Term Agent and the Pre-Petition Term Lenders shall not receive or retain any payments, property or other amounts in respect of such super-priority claims unless and until all Obligations under the Loan Agreement and the other Financing Agreements have indefeasibly been paid in cash in full in accordance with the terms of the Loan Agreement and subject to the terms of the Pre-Petition Intercreditor Agreement.

(iii)    <u>Interest</u>.  To the extent set forth in the Pre-Petition Term Loan Agreement, all Pre-Petition Term Obligations, including accrued but unpaid interest, owing by the Debtors to the Pre-Petition Term Agent and Pre-Petition Term Lenders under the Pre-Petition Term Loan Agreement and other fees owing by the Debtors thereunder shall continue to accrue interest (including interest on interest) at the default rate applicable on the Petition Date under the Pre-Petition Term Loan Agreement, which shall be payable in cash.

(iv)    <u>Mandatory Prepayment</u>. Following the indefeasible payment in cash in full of all Obligations in accordance with the Financing Agreements and this Interim Order, and subject to the terms of the Pre-Petition Intercreditor Agreement, the Debtors shall make mandatory prepayments and payments to the Pre-Petition Term Agent and Pre-Petition Term Lenders from the net sale proceeds generated from any sales, dispositions, or proceeds of casualty insurance of all Collateral outside the ordinary course of Debtors' businesses, including sales or dispositions of Collateral with respect to all "going out of business" sales and all 363 Sales (as defined in the Ratification Agreement) of the Collateral until all Pre-Petition Term Obligations are paid in full.  For the avoidance of doubt, such mandatory prepayments and payments to Pre-Petition Term Agent and Pre-Petition Term Lenders shall include Pre-Petition Term Agent's and Pre-Petition Term Lenders' professional fees subject to Section 5.12 of this

Interim Order.  Further, Debtors shall deliver to Pre-Petition Term Agent (i) all Budgets and other reporting required under the Ratification Agreement and (ii) all reporting as required under the Pre-Petition Term Loan Agreement.

(e)    Third Lien Agent Adequate Protection. Third Lien Agent, for the benefit of itself and the Third Lien Lenders (collectively, the Third Lien Adequate Protection Parties"), shall be granted the following protection, pursuant to sections 361, 507 and 363(e) of the Bankruptcy Code for the consent to the use of its collateral (including Cash Collateral), consent to the transactions contemplated by the Financing Agreements and this Interim Order, and for the Diminution in Value of the security interests and liens of such party.  The Third Lien Adequate Protection Parties are granted the following adequate protection (the "Third Lien Adequate Protection Obligations"):

(i)    Third Lien Adequate Protection Lien.  Third Lien Agent, on behalf of the Third Lien Adequate Protection Parties, shall be granted for their benefit, effective and perfected as of the date of entry of this Interim Order and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements, and solely to the extent of the Diminution in Value, a security interest in and lien on the Collateral (together, the "Third Lien Adequate Protection Liens"), subject and subordinate only to (i) the Carve-Out, (ii) Permitted Liens, (iii) the liens of Agent and DIP Lenders securing all Obligations arising under or in connection with the Loan Agreement, the other Financing Agreements and this Interim Order in and upon the Collateral, including, without limitation, the Revolving Loan A/L Replacement Liens; and (iv) the Term Loan Adequate Protection Liens; provided that;

the Third Lien Adequate Protection Liens shall only encumber the Avoidance Actions upon the entry of the Final Order.

(ii)    Third Lien Adequate Protection Super-Priority Claim.  Third Lien Agent, on behalf of the Third Lien Adequate Protection Parties, shall be granted, solely to the extent of the Diminution in Value, a super-priority administrative expense claim junior and subordinate only to the Carve-Out, DIP Loan Superpriority Claim, Revolving Loan A/L Adequate Protection Superpriority Claim and the claims under section 507(b) of the Bankruptcy Code held by Pre-Petition Term Agent and Pre-Petition Term Lenders; provided that the Third Lien Agent and the Third Lien Lenders shall not receive or retain any payments, property or other amounts in respect of such super-priority claims unless and until all Obligations under the Loan Agreement and the Pre-Petition Term Obligations have indefeasibly been paid in cash in full in accordance with the terms of the Loan Agreement and the Pre-Petition Term Loan Agreement, as applicable, and subject in each case to the terms of the Pre-Petition Intercreditor Agreement and the Third Lien Intercreditor Agreement, as applicable;

(iii)    Interest.  Subject to the entry of the Final Order, all Third Lien Obligations, including accrued but unpaid interest, owing by the Debtors to the Third Lien Agent and Third Lien Lenders under the Third Lien Loan Documents and other fees owing by the Debtors thereunder shall continue to accrue interest (including interest on interest) at the default rate applicable on the Petition Date under the Third Lien Loan Documents, which shall be accreted to principal payable under the Third Lien Loan Documents.  For the avoidance of doubt, nothing in this Interim Order authorizes the cash

01:18582955.1

36

payment of any of the Third Lien Obligations, including, without limitation, accrued but unpaid interest.

Section 3.        Default; Rights and Remedies; Relief from Stay.

3.1        Events of Default.  The occurrence of any of the following events shall constitute an "Event of Default" under this Interim Order: (a) any Debtor's failure to perform, in any respect, any of their obligations under this Interim Order; or (b) an "Event of Default" under the Loan Agreement or any of the other Financing Agreements.

3.2        Rights and Remedies upon Event of Default.  Upon the occurrence of and during the continuance of an Event of Default, (a) the Debtors shall be bound by all restrictions, prohibitions and other terms as provided in this Interim Order, the Loan Agreement and the other Financing Agreements, and (b) the Agent shall be entitled to take any act or exercise any right or remedy (subject to Section 3.4 below) as provided in this Interim Order or any Financing Document, as applicable, including, without limitation, declaring all Obligations immediately due and payable, accelerating the Obligations, ceasing to extend Revolving Loans or provide or arrange for Letters of Credit on behalf of Debtors, setting off any Obligations with Collateral or proceeds in Agent's possession, and enforcing any and all rights with respect to the Collateral. Agent and DIP Lenders shall have no obligation to lend or advance any additional funds to or on behalf of Debtors, or provide any other financial accommodations to Debtors, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

3.3        Expiration of Revolving Loan Commitment.  Upon the expiration of Borrowers' authority to borrow and obtain other credit accommodations from Agent and DIP Lenders pursuant to the terms of this Interim Order and the Financing Agreements (except if

such authority shall be extended with the prior written consent of Agent, which consent shall not be implied or construed from any action, inaction or acquiescence by Agent or any DIP Loan Lender), unless an Event of Default set forth in Section 3.1 above occurs sooner and the automatic stay has been lifted or modified pursuant to Section 3.4 of this Interim Order, all of the Post-Petition Obligations shall immediately become due and payable and Agent and DIP Lenders shall have no obligation whatsoever to make or extend any loans, advances, provide any financial or credit accommodations to Debtors or permit the use of Cash Collateral, subject to the conditions set forth in Section 2.5(a) of this Interim Order.

3.4    <u>Modification of Automatic Stay</u>.    The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application or order of the Court to the extent necessary to permit Agent and each DIP Lender to perform any act authorized or permitted under or by virtue of this Interim Order or the Financing Agreements, as applicable, including, without limitation, (a) to implement the post-petition financing arrangements authorized by this Interim Order and pursuant to the terms of the Financing Agreements, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, (c) to assess, charge, collect, advance, deduct and receive payments with respect to the Pre-Petition Obligations or the Post-Petition Obligations, as applicable, including, without limitation, all interests, fees, costs and expenses permitted under the Financing Agreements (subject to Section 5.12 of this Interim Order) and apply such payments to the Pre-Petition Obligation or Post-Petition Obligations pursuant to the Financing Agreements and/or this Interim Order, as applicable, and (d) immediately following the expiration of the Default Notice Period, to take any action and exercise all rights and remedies provided to it by this

Interim Order, the Financing Agreements or applicable law other than those rights and remedies against the Collateral as provided in the following sentence.  In addition, and without limiting the foregoing, upon the occurrence of an Event of Default and after providing five (5) business days (the "Default Notice Period") prior written notice (the "Enforcement Notice") to (i) counsel for the Debtors, (ii) counsel for the Committee (if appointed), (iii) counsel for the Pre-Petition Term Agent, (iv) counsel for the Third Lien Agent, and (v) the U.S. Trustee, the Agent, acting on behalf of itself and the DIP Lenders, shall be entitled to take any action and exercise all rights and remedies provided to it by this Interim Order, the Financing Agreements or applicable law that Agent may deem appropriate in its sole discretion to proceed against and realize upon the Collateral or any other assets or properties of Debtors' Estates upon which the Agent, for the benefit of itself and the applicable DIP Lenders, has been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all Post-Petition Obligations. Notwithstanding anything to the contrary, any action that Agent is otherwise permitted to take pursuant to this Interim Order to (i) terminate the commitments under the Financing Agreements, (ii) accelerate the Loans, (iii) send blocking notices or activation notices pursuant to the terms of any Deposit Account Control Agreement, (iv) repay any amounts owing in respect of the Post-Petition Obligations (including, without limitation, fees, indemnities and expense reimbursements) and (v) cash collateralize Letters of Credit and/or Bank Products issued pursuant to the Financing Agreements, in each case, shall not require any advance notice to the Debtors.  In any hearing regarding any exercise of rights or remedies (which hearing must take place within the Default Notice Period), the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors shall not be entitled to seek relief, including, without limitation, under

section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Agent or the DIP Lenders set forth in this Interim Order or the Financing Agreements. The Court may stay the Agent's and the DIP Lenders' exercise of rights and remedies pursuant to this Section 3.4 only if the Court determines within the Default Notice Period that an Event of Default has not occurred or is not continuing.

Section 4.    Representations; Covenants; and Waivers.

4.1    Objections to Pre-Petition Obligations.

(a)    Objections to Pre-Petition Obligations.  Notwithstanding anything to the contrary in the Interim Order, any action, claim, defense, complaint, motion or other written opposition (hereinafter, an "Objection") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind: (a) the existence, validity or amount of the Pre-Petition Obligations as of the Petition Date, or (b) the extent, legality, validity, perfection or enforceability of Agent's and DIP Lenders' pre-petition liens and security interests in the Pre-Petition Collateral shall be properly filed with the Court (x) by any Committee within sixty (60) calendar days from the date of appointment of the Committee by the U.S. Trustee, or (y) by any party in interest with requisite standing within seventy-five (75) calendar days from the date of entry of this Interim Order; provided, however, that nothing herein shall permit any party to challenge the extent or validity of the Post-Petition Obligations for any disbursements in excess of the Pre-Petition Obligations.  If any such Objection is timely and properly filed and a final, non-appealable order is entered by a court of competent jurisdiction sustaining and ordering some or all of the relief requested in such Objection, nothing in this Interim Order shall prevent the Court from granting appropriate relief with respect to the Pre-Petition Obligations or Agent's or DIP Lenders' pre-petition liens on the Pre-Petition Collateral, including, without limitation,

01:18582955.1

40

with respect to Sections E, 1.3, 1.4, 1.5, 1.6, 2.5, 4.5, 5.6, and 5.11 of this Interim Order.  If no Objection is timely and properly filed, or if an Objection is timely and properly filed but denied, (i) the Pre-Petition Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and Agent's and DIP Lenders' pre-petition liens on and security interest in the Pre-Petition Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes and of first and senior priority, subject to only the Carve-Out and Permitted Liens, and (ii) the Agent and the DIP Lenders, and each of their respective participants, agents, officers, directors, employees, attorneys, professionals, successors, and assigns (each in their respective capacities as such) shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the Pre-Petition Financing Agreements and shall not be subject to any further objection or challenge relating thereto or arising therefrom by any party at any time.  Nothing contained in this Section 4.1(a) or otherwise shall or shall be deemed or construed to impair, prejudice or waive any rights, claims or protections afforded to Agent or any DIP Lenders in connection with all post-petition Loans and Letters of Credit, and any other post-petition financial and credit accommodations provided by Agent and the DIP Lenders to Debtors in reliance on section 364(e) of the Bankruptcy Code and in accordance with the terms and provisions of this Interim Order and the Financing Agreements.

(b)     <u>Objections to Pre-Petition Term Obligations</u>.  Notwithstanding anything to the contrary in the Interim Order, any action, claim, defense, complaint, motion or other written opposition (hereinafter, an "<u>Term Loan Objection</u>") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment,

counterclaim, deduction, disgorgement or claim of any kind: (a) the existence, validity or amount of the Pre-Petition Term Obligations, or (b) the extent, legality, validity, perfection or enforceability of Pre-Petition Term Agent's and Pre-Petition Term Lenders' pre-petition liens and security interests in the Pre-Petition Term Loan Collateral, shall be properly filed with the Court (x) by any Committee within sixty (60) calendar days from the date of appointment of the Committee by the U.S. Trustee, or (y) by any party in interest with requisite standing within seventy-five (75) calendar days from the date of entry of this Interim Order.  If any such Term Loan Objection is timely and properly filed and a final, non-appealable order is entered by a court of competent jurisdiction sustaining and ordering some or all of the relief requested in such Term Loan Objection, nothing in this Interim Order shall prevent the Court from granting appropriate relief with respect to the Pre-Petition Term Obligations or Pre-Petition Term Agent's or Pre-Petition Term Lenders' pre-petition liens on the Pre-Petition Term Collateral, including, without limitation, with respect to Sections E, 2.5, 4.5, 5.6, and 5.11 of this Interim Order.  If no Term Loan Objection is timely and properly filed, or if a Term Loan Objection is timely and properly filed but denied, (i) the Pre-Petition Term Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and Pre-Petition Term Agent's or Pre-Petition Term Lenders' pre-petition liens on and security interest in the Pre-Petition Term Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes, and (ii) the Pre-Petition Term Agent and the Pre-Petition Term Lenders, and each of their respective participants, agents, officers, directors, employees, attorneys, professionals, successors, and assigns (each in their respective capacities as such) shall be deemed released and discharged from any and all claims and causes of action related to or

01:18582955.1

arising out of the Pre-Petition Term Loan Documents and shall not be subject to any further objection or challenge relating thereto or arising therefrom by any party at any time.

(c)    <u>Objections to Third Lien Obligations</u>.    Notwithstanding anything to the contrary in the Interim Order, but subject to the terms of this paragraph (c), any action, claim, defense complaint, motion or other written opposition (hereinafter, an "<u>Third Lien Objection</u>") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind: (a) the existence, validity or amount of the Third Lien Obligations, or (b) the extent, legality, validity, perfection or enforceability of Third Lien Agent's and Third Lien Lenders' pre-petition liens and security interests in the Third Lien Collateral shall be properly filed with the Court (x) by any Committee within sixty (60) calendar days from the date of appointment of the Committee by the U.S. Trustee, or (y) by any party in interest with requisite standing within seventy-five (75) calendar days from the date of entry of this Interim Order.  If any such Third Lien Objection is timely and properly filed and a final, non-appealable order is entered by a court of competent jurisdiction sustaining and ordering some or all of the relief requested in such Third Lien Objection, nothing in this Interim Order shall prevent the Court from granting appropriate relief with respect to the Third Lien Obligations or Third Lien Agent's or Third Lien Lenders' pre-petition liens on the Third Lien Collateral, including, without limitation, with respect to Sections E, 2.5, 5.6, and 5.11 of this Interim Order.  Notwithstanding the foregoing, subject to entry of the Final Order, from and after the Closing (as defined in the Stalking Horse APA) of the transactions contemplated by that certain Asset Purchase Agreement, dated as of April 17. 2016 (the "Stalking Horse APA"), by and between the Debtors and Third Lien Agent, (i) no person or entity, including the Committee or any chapter 11 or 7 trustee appointed in the Cases, shall be

entitled to file a Third Lien Objection and (ii) the Third Lien Obligations shall conclusively constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the Debtors that are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors, their estates and all other parties in interest, including the Committee and any chapter 11 or 7 trustee appointed in the Cases, shall be forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Third Lien Obligations or the liens and security interests securing the same. If no Third Lien Objection is timely and properly filed, or if a Third Lien Objection is timely and properly filed but denied, (i) the Third Lien Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and Third Lien Agent's or Third Lien Lenders' pre-petition liens on and security interest in the Third Lien Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes, and (ii) the Third Lien Agent and the Third Lien Lenders, and each of their respective participants, agents, officers, directors, employees, attorneys, professionals, successors, and assigns (each in their respective capacities as such) shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the Third Lien Loan Documents and shall not be subject to any further objection or challenge relating thereto or arising therefrom by any party at any time.

4.2    Debtors' Waivers.  At all times during the Cases, and whether or not an Event of Default has occurred, the Debtors irrevocably waive any right that they may have to seek further authority (a) to use Cash Collateral of Agent and DIP Lenders or of Pre-Petition

Term Agent and Pre-Petition Term Lenders under section 363 of the Bankruptcy Code, (b) to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, other than as provided in this Interim Order or as may be otherwise expressly permitted pursuant to the Financing Agreements, (c) to challenge the application of any payments authorized by this Interim Order as pursuant to section 506(b) of the Bankruptcy Code, or to assert that the value of the Pre-Petition Collateral is less than the Pre-Petition Obligations, that the value of the Pre-Petition Term Collateral is less than the Pre-Petition Term Obligations, or that the value of the Third Lien Collateral is less than the Third Lien Obligations, (d) to propose, support or have a plan of reorganization or liquidation that does not provide for the indefeasible payment in cash in full and satisfaction of all Post-Petition Obligations (other than unmatured indemnity obligations for which claims have not been asserted) on the effective date of such plan in accordance with the terms and conditions set forth in the Loan Agreement, or (e) to seek relief under the Bankruptcy Code, including without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of Agent or any DIP Lender as provided in this Interim Order and the Financing Agreements or Agent's or any DIP Loan Lender's exercise of such rights or remedies (other than to object to the exercise of the rights and remedies within the Default Notice Period on the grounds set forth in Section 3.4 of this Interim Order); provided, however, that Agent may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by Agent or any DIP Lender.

4.3     Section 506(c) Claims.  Subject to entry of the Final Order granting such relief, no costs or expenses of administration which have or may be incurred in the Cases shall be charged against Agent or any DIP Lender, their respective claims or the Collateral pursuant to

§ 506(c) of the Bankruptcy Code without the prior written consent of Agent, and no such consent shall be implied from any other action, inaction or acquiescence by Agent or any DIP Lender.

      4.4    <u>Collateral Rights</u>.  Until all Obligations shall have been indefeasibly paid and satisfied in full in accordance with the terms of the Loan Agreement and the other Financing Agreements and subject to the terms of the Pre-Petition Intercreditor Agreement:

      (a)    no other party shall foreclose or otherwise seek to enforce any junior lien or claim in Collateral; and

      (b)    upon and after the declaration of the occurrence of an Event of Default, other than the Existing Defaults, and subject to Agent obtaining relief from the automatic stay as provided for herein to enforce its rights and remedies against the Collateral, in connection with a liquidation of any of the Collateral, Agent (or any of its employees, agents, consultants, contractors or other professionals) shall have the right, at the sole cost and expense of Debtors, to: (i) enter upon, occupy and use any real or personal property, fixtures, equipment, leasehold interests or warehouse arrangements owned or leased by Debtors and (ii) use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in their businesses.  Agent and DIP Lenders will be responsible for the payment of any applicable fees, rentals, royalties or other amounts due such lessor, licensor or owner of such property for the period of time that Agent actually uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals or other amounts due for any period prior to the date that Agent actually occupies or uses such assets or properties or for any fees, rentals or other amounts that may become due following the end of Agent's occupation or use).

01:18582955.1

4.5    Releases.

Upon the earlier of (a) the entry of the Final Order or (b) the entry of an order extending the Interim Financing Period beyond thirty-five (35) calendar days after the date of this Interim Order, and in each instance, subject to Section 4.1 above, in consideration of Agent, DIP Lenders, Pre-Petition Term Agent and Pre-Petition Term Lenders permitting Debtors to use the Pre-Petition Collateral (including Cash Collateral) and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the Financing Agreements and this Interim Order, each Debtor, on behalf of itself and its successors and assigns, (collectively, the "Releasors"), shall, forever release, discharge and acquit Agent, each DIP Lender, Pre-Petition Term Agent and each Pre-Petition Term Lender and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives in their respective capacities as such (collectively, the "Pre-Petition Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that Releasors had, have or hereafter can or may have against Pre-Petition Releasees as of the date hereof, in respect of events that occurred on or prior to the date hereof with respect to the Debtors, the Obligations, Financing Agreements and any Loans, Letters of Credit, Bank Products or other financial accommodations made by Agent and/or the DIP Lenders to Debtors pursuant to the Financing Agreements.  In addition, upon the repayment of all Obligations (as defined in the Loan Agreement) owed to the Agent and the DIP Lenders by Debtors and termination of the rights and obligations arising under the Financing Agreements (which payment and termination shall be on terms and conditions

01:18582955.1

acceptable to the Agent), the Agent and the DIP Lenders shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the Financing Agreements, this Interim Order or the Final Order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve-Out and/or the Professional Fee Carve-Out, on terms and conditions acceptable to the Agent, but for the avoidance of doubt, excluding any claims or causes of action for gross negligence or willful misconduct).  Finally, upon the repayment of all Pre-Petition Term Loan Obligations owed to the Pre-Petition Term Agent and Pre-Petition Term Lenders by Debtors and termination of the rights and obligations arising under the Pre-Petition Term Loan Documents (which payment and termination shall be on terms and conditions acceptable to the Pre-Petition Term Agent),  the Pre-Petition Term Agent and the Pre-Petition Term Lenders shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the Pre-Petition Term Loan Documents, this Interim Order or the Final Order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve-Out and/or the Professional Fee Carve-Out, on terms and conditions acceptable to the Pre-Petition Term Agent, but for the avoidance of doubt, excluding any claims or causes of action for gross negligence or willful misconduct).

Section 5.    Other Rights and Post-Petition Obligations.

    5.1    No Modification or Stay of This Interim Order.  Notwithstanding (a) any stay, modification, amendment, supplement, vacating, revocation or reversal of this Interim Order, the Financing Agreements or any term hereunder or thereunder, (b) the failure to obtain a

Final Order pursuant to Bankruptcy Rule 4001(c)(2), or (c) the dismissal or conversion of one or more of the Cases (each, a "Subject Event"), (x) the acts taken by each of the Agent and the DIP Lenders in accordance with this Interim Order, and (y) the Post-Petition Obligations incurred or arising prior to Agent's actual receipt of written notice from Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of this Interim Order, and the acts taken by Agent and DIP Lender in accordance with this Interim Order, and the liens granted to Agent and DIP Lender in the Collateral, and all other rights, remedies, privileges, and benefits in favor of Agent and each DIP Lenders pursuant to this Interim Order and the Financing Agreements shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code.  For purposes of this Interim Order, the term "appeal", as used in section 364(e) of the Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this Interim Order by this Court or any other tribunal.

       5.2      Power to Waive Rights; Duties to Third Parties.  Agent shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order that are in favor of Agent and DIP Lenders (the "DIP Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Right(s).  Any waiver by Agent of any DIP Lender Rights shall not be or constitute a continuing waiver.  Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject Agent or any DIP Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to Agent or any DIP Lender.

01:18582955.1

5.3    <u>Disposition of Collateral</u>.  Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral, other than pursuant to the terms of the Loan Agreement and the Budget, without the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the Agent or any DIP Lenders) and, in each case, an order of this Court.

5.4    <u>Inventory</u>.  Debtors shall not, without the consent of the Agent, (a) enter into any agreement to return any inventory to any of their creditors for application against any pre-petition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its pre-petition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

5.5    <u>Reservation of Rights</u>.  The terms, conditions and provisions of this Interim Order are in addition to and without prejudice to the rights of Agent and each DIP Lender to pursue any and all rights and remedies under the Bankruptcy Code, the Financing Agreements or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the Collateral, as applicable, or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Estates.

5.6    <u>Binding Effect</u>.

(a)    The provisions of this Interim Order and the Financing Agreements, the Post-Petition Obligations, the Revolving Loan A/L Adequate Protection

Superpriority Claim, the DIP Loan Superpriority Claim and any and all rights, remedies, privileges and benefits in favor of each of the Agent and the DIP Lenders provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Interim Order notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h) and 7062, shall continue in full force and effect, and shall survive entry of any such other order, including without limitation any order which may be entered confirming any plan of reorganization, converting one or more of the Cases to any other chapter under the Bankruptcy Code, or dismissing one or more of the Cases.

(b)    Any order dismissing one or more of the Cases under section 1112 or otherwise shall be deemed to provide (in accordance with §§ 105 and 349 of the Bankruptcy Code) that (a) the DIP Loan Superpriority Claim and Agent's and DIP Lenders' liens on and security interests in the Collateral and all other claims, liens, adequate protections and other rights granted pursuant to the terms of this Interim Order shall continue in full force and effect notwithstanding such dismissal until the Obligations are indefeasibly paid and satisfied in full, and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing all such claims, liens, protections and rights.

(c)    In the event this Court modifies any of the provisions of this Interim Order or the Financing Agreements following a Final Hearing, such modifications shall not affect the rights or priorities of Agent and DIP Lenders pursuant to this Interim Order with respect to the Collateral or any portion of the Obligations which arises or is incurred or is advanced prior to such modifications, and this Interim Order shall otherwise remain in full force and effect to such extent.

(d)    This Interim Order shall be binding upon Debtors, all parties in interest in the Cases and their respective successors and assigns, including any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of any Debtor.  This Interim Order shall also inure to the benefit of Debtors, Agent, DIP Lenders, Pre-Petition Term Agent, Pre-Petition Term Lenders, Third Lien Agent, Third Lien Lenders and each of their respective successors and assigns.

5.7    Restrictions on Cash Collateral Use, Additional Financing, Plan Treatment.

(a)    All post-petition advances and other financial accommodations under the Loan Agreement and the other Financing Agreements are made in reliance on this Interim Order and there shall not at any time be entered in the Cases, or in any subsequently converted case under chapter 7 of the Bankruptcy Code, any order (other than the Final Order) which (a) authorizes the use of cash collateral of Debtors in which Agent or DIP Lenders have an interest, or the sale, lease, or other disposition of property of any Debtor's Estate in which Agent or DIP Lenders have a lien or security interest, except as expressly permitted hereunder or in the Financing Agreements, or (b) authorizes under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which Agent or DIP Lenders hold a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to Agent and DIP Lenders herein; unless, in each instance (x) Agent shall have given its express prior written consent with respect thereto, no such consent being implied from any other action, inaction or acquiescence by Agent or any DIP Lender, or (y) such other order requires that all Post-Petition Obligations shall first be indefeasibly paid and satisfied in

01:18582955.1

full in accordance with the terms of the Loan Agreement and the other Financing Agreements (other than unmatured indemnity obligations for which claims have not been asserted), including, without limitation, all debts and obligations of Debtors to Agent and DIP Lenders which arise or result from the obligations, loans, security interests and liens authorized herein, on terms and conditions acceptable to Agent.  The security interests and liens granted to or for the benefit of Agent, DIP Lenders, Third Lien Agent and the Third Lien Lenders hereunder and the rights of Agent, DIP Lenders, Third Lien Agent and the Third Lien Lenders pursuant to this Interim Order and the Financing Agreements with respect to the Post-Petition Obligations and the Collateral are cumulative and shall not be altered, modified, extended, impaired, or affected by any plan of reorganization or liquidation of Debtors and, if Agent shall expressly consent in writing that the Post-Petition Obligations shall not be repaid in full upon confirmation thereof, shall continue after confirmation and consummation of any such plan.

5.8    No Owner/Operator Liability.  Subject to the entry of the Final Order granting such relief, neither the Agent nor any DIP Lender shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).

5.9    Marshalling.  Subject to entry of the Final Order granting such relief, in no event shall Agent or any DIP Lender be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral.  Agent and DIP Lender shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code

shall not apply to Agent or any DIP Lender with respect to proceeds, products, offspring or profits of any of the Collateral, as applicable.

5.10    Right of Setoff.  To the extent any funds were on deposit with Agent as of the Petition Date, including, without limitation, all funds deposited in, or credited to, an account of any Debtor with Agent or any DIP Lender immediately prior to the filing of the Cases (regardless of whether, as of the Petition Date, such funds had been collected or made available for withdrawal by any such Debtor), such funds (the "Deposited Funds") are subject to rights of setoff.  By virtue of such setoff rights, the Deposited Funds are subject to a lien in favor of Agent or the applicable DIP Lenders pursuant to §§ 506(a) and 553 of the Bankruptcy Code.

5.11    Right to Credit Bid.

(a)    The Agent, on behalf of itself and the DIP Lenders, shall have the right to "credit bid" the amount of its and their claims that are Obligations arising under the terms of the Financing Agreements, during any sale of all or substantially all of the Debtors' assets, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code.

(b)    Subject to Section 4.1(a) of this Interim Order and the entry of the Final Order, the Pre-Petition Term Agent, on behalf of itself and the Pre-Petition Term Lenders, shall have the right to "credit bid" the amount of its and their claims arising under the terms of the Pre-Petition Term Agreements, during any sale of all or substantially all of the Debtors' assets, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code, provided that, in connection with any

such credit bid, the Pre-Petition Term Agent pays all Obligations in cash indefeasibly in full accordance with the terms of the Loan Agreement and the other Financing Agreements and subject to the terms of the Pre-Petition Intercreditor Agreement.

(c)     Subject to Section 4.1(a) of this Interim Order, the entry of the Final Order and compliance with the Third Lien Intercreditor Agreement, the Third Lien Agent, on behalf of itself and the Third Lien Lenders, shall have the right to "credit bid" the amount of its and their claims arising under the terms of the Third Lien Loan Documents, during any sale of all or substantially all of the Debtors' assets, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code, provided that, in connection with any such credit bid, the Third Lien Agent pays (X) all Obligations in cash indefeasibly in full accordance with the terms of the Loan Agreement and the other Financing Agreements and subject to the terms of the Pre-Petition Intercreditor Agreement; and (Y) all Pre-Petition Term Obligations in cash indefeasibly in full accordance with the terms of the Pre-Petition Term Loan Agreement and the other Pre-Petition Term Loan Documents and subject to the terms of the Third Lien Intercreditor Agreement.

5.12   Payment and Review of Lender Fees and Expenses.  Each Debtor shall pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Loan Agreement or the Pre-Petition Term Loan Agreement, as applicable, including, without limitation, the non-refundable payment to the Agent, the DIP Lenders, the Pre-Petition Term Agent, and the Pre-Petition Term Lenders, as the case may be, of the reasonable fees and expenses (including without limitations professional fees and legal fees and expenses) set forth in the Financing Agreements or the Pre-Petition Term Loan Agreement, as

applicable, whether incurred before or after the Petition Date; provided, that Debtors shall pay all such reasonable fees and expenses within ten (10) business days of delivery of a statement or invoice for such fees and expenses (it being understood that such statements or invoices shall not be required to be maintained in accordance with the U.S. Trustee Guidelines, nor shall any such counsel or other professional be required to file any interim or final fee applications with the Court or otherwise seek Court's approval of any such payments) to the Debtors, the U.S. Trustee and the Committee, unless, within such ten (10) business day period, the Debtors, the U.S. Trustee or the Creditors' Committee serve a written objection upon the requesting party, in which case, the Debtors shall pay only such amounts that are not the subject of any objection and the withheld amount subsequently agreed by the parties or ordered by the Court to be paid.

5.13    Term; Termination.  Notwithstanding any provision of this Interim Order to the contrary, the term of the financing arrangements among Debtors, Agent and DIP Lenders authorized by this Interim Order may be terminated pursuant to the terms of the Loan Agreement.

5.14    Limited Effect.  In the event of a conflict between the terms and provisions of any of the Financing Agreements and this Interim Order, the terms and provisions of this Interim Order shall govern, interpreted as most consistent with the terms and provisions of the Financing Agreements.

5.15    Objections Overruled.  All objections to the entry of this Interim Order are (to the extent not withdrawn, waived, withdrawn, or settled) hereby overruled.

5.16    Retention of Jurisdiction.  The Court retains jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of this Interim Order, the Loan Agreement, and the other Financing Agreements.

01:18582955.1

Section 6.    <u>Final Hearing and Response Dates.</u>

The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled

for May ___, 2016, at _____ before this Court.  The Debtors shall promptly mail copies of

this Interim Order to the Noticed Parties, and to any other party that has filed a request for

notices with this Court and to any Committee after same has been appointed, or such

Committee's counsel, if same shall have filed a request for notice.  The Debtors may serve the

Motion and the Interim Order without the exhibits attached thereto as such exhibits are

voluminous and available, free of charge, at http://www.kccllc.net/VestisRetailGroup.   Such

notice is deemed good and sufficient and that no further notice need be given.  Any party in

interest objecting to the relief sought at the Final Hearing shall serve and file written objections,

which objections shall be served upon (a) proposed counsel to the Debtors, Klee, Tuchin,

Bogdanoff & Stern LLP, 1999 Avenue of the Stars, Thirty-Ninth Floor, Los Angeles, California

90067; Attn:  Michael L. Tuchin, Esq. and Lee R. Bogdanoff, Esq., Fax: (310) 407-9090, and

Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington,

Delaware 19801; Attn: Robert S. Brady, Esq.. and Robert F. Poppiti, Jr., Fax:  (302) 576-3283;

(b) counsel for the Agent, Otterbourg, P.C., 230 Park Avenue, New York, New York 10169-

0075; Attn: Daniel F. Fiorillo, Esq. and Chad B. Simon, Esq., Fax: (212) 682-6104; (c) counsel

for the Pre-Petition Term Agent, Greenberg Traurig, LLP, One International Place, Boston,

Massachusetts 02110; Attn: Jeffrey M. Wolf, Esq., Fax: (617) 279-8447; (d) counsel for the

Third Lien Agent, Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004;

Attn: Michael H. Torkin, Esq., Fax: (212) 558-3588; (e) counsel to any Committee; and (f) the

U.S. Trustee, 844 King Street, Room 2207, Wilmington, Delaware 19801, Attn: Jane M. Leamy,

Esq. and Timothy Fox, Esq.; Fax: (302) 573-6497; and shall be filed with the Clerk of the United

States Bankruptcy Court for the District of Delaware, in each case, to allow actual receipt of the

foregoing no later than _____, prevailing Eastern time, on May ___, 2016.

Dated: Wilmington, Delaware

      April _____, 2016

                                                            _____

                                                      UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1**

**Loan Agreement**

01:18582955.1

# **EXHIBIT B**

## **Ratification Agreement**

Execution Version

<u>RATIFICATION AND AMENDMENT AGREEMENT</u>

This RATIFICATION AND AMENDMENT AGREEMENT (the "**Ratification Agreement**"), dated as of April 17, 2016, is by and among Bob's Stores, LLC, a New Hampshire limited liability company, as Debtor and Debtor-in-Possession ("**Bob's**"), Sport Chalet, LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("**Sport Chalet**"), Sport Chalet Value Services, LLC, a Virginia limited liability company, as Debtor and Debtor-in-Possession ("**Value Services**"), Sport Chalet Team Sales, LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("**Team Sales**"), EMS Operating Company, LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("**EMS OpCo**" and, together with Bob's, Sport Chalet, Value Services and Team Sales, each a "**Borrower**", and, collectively, "**Borrowers**"), Vestis Retail Financing, LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("**Parent**"), Vestis Retail Group, LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("**Intermediate Holdco**"), EMS Acquisition LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("**EMS Acquisition**"), Vestis IP Holdings, LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("**Vestis IP Holdings**" and, together with Parent, Intermediate Holdco and EMS Acquisition, each a "**Guarantor**" and collectively "**Guarantors**"), the lenders party to the Pre-Petition Loan Agreement referred to below ("**Lenders**"), and Wells Fargo Capital Finance, LLC ("**Wells Fargo**"), as administrative agent and collateral agent for the Lenders and others (in such capacity, the "**Administrative Agent**").

<u>W I T N E S S E T H</u>:

WHEREAS, Borrowers and Guarantors (collectively, the "**Debtors**", which, for the avoidance of doubt, excludes SME, as defined below) have commenced cases under Chapter 11 of the Bankruptcy Code (as defined herein) in the United States Bankruptcy Court for the District of Delaware and each Borrower and each Guarantor has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession;

WHEREAS, prior to the commencement of the Chapter 11 Case (as defined below), Agent and Lenders made loans and advances and provided other financial or credit accommodations to Borrowers and SME Holding Company, LLC (f/k/a Eastern Mountain Sports LLC) a Delaware limited liability company ("**SME**" together with the Borrowers, referred to as the "**Pre-Petition Borrowers**") secured by substantially all assets and properties of Borrowers, SME and Guarantors as set forth in the Pre-Petition Financing Agreements (as defined below);

WHEREAS, the Debtors are requesting that the Bankruptcy Court enter a Financing Order (defined below) pursuant to which Agent and Lenders may make post-petition loans and advances, and provide other financial accommodations, to Borrowers secured by substantially all the assets and properties of Borrowers and Guarantor as set forth in the Financing Order and the Financing Agreements (as defined below);

WHEREAS, Borrowers and Guarantors have requested that Administrative Agent and Lenders make post-petition loans and advances and provide other financial or credit

accommodations to Borrowers and make certain amendments to the Pre-Petition Loan Agreement (as defined below) and the other Pre-Petition Financing Agreements (as defined below), and Administrative Agent and Lenders are willing to do so, subject to the terms and conditions contained herein; and

WHEREAS, Borrowers and Guarantors desire to reaffirm their obligations to Administrative Agent and Lenders pursuant to the Pre-Petition Financing Agreements and acknowledge their continuing liabilities to Administrative Agent and Lenders thereunder in order to induce Administrative Agent and Lenders to make such post-petition loans and advances, and provide other financial accommodations, to Borrowers secured by substantially all the assets and properties of Borrowers and Guarantors set forth in the Financing Order.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Administrative Agent, Lenders, Borrowers, and Guarantors mutually covenant, warrant and agree as follows:

1.      DEFINITIONS.

     1.1      Additional Definitions.  As used herein, the following terms shall have the respective meanings given to them below and the Pre-Petition Loan Agreement and the other Pre-Petition Financing Agreements shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

     (a)      "**Adequate Protection Liens**" means, collectively, the "Term Loan Adequate Protection Liens" and the "Third Lien Adequate Protection Liens", each as defined in the Financing Order.

     (b)      "**Bankruptcy Court**" means the United States Bankruptcy Court or the United States District Court for the District of Delaware

     (c)      "**Bankruptcy Code**" means the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

     (d)      "**Bankruptcy Events**" means the commencement of the Chapter 11 Case, the events and conditions leading up to the commencement of the Chapter 11 Case, the occurrence and existence of any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement thereof, the Store GOB Sales and the SC GOB Sales, the reduction in payment terms by suppliers, any reclamation claims and the incurrence of any claim or liability that is pre-petition, unsecured and junior in priority to the Obligations.

     (e)      "**Budget**" means the thirteen (13) week budget delivered to Administrative Agent in accordance with Section 5.3 of the Ratification Agreement (a summary of such initial Budget attached to the Ratification Agreement as Exhibit A, in form and substance approved by the Administrative Agent), together with any subsequent or amended budgets

thereto delivered to Administrative Agent and Lenders, in form and substance reasonably satisfactory to Administrative Agent (each such subsequent budget, a "Budget"), in accordance with the terms and conditions of the Ratification Agreement.

(a)      "Carve-Out" means the sum of (i) all allowed administrative expenses pursuant to 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of the Bankruptcy Court and pursuant to 28 U.S.C. § 1930(a)(6) for fees payable to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code as determined by agreement of the United States Trustee or by final order of the Bankruptcy Court (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, or otherwise, all Reported Fee Accruals, less the amount of any fee retainers received by Professionals and not previously applied to the fees and expenses of the Professionals (the "**Pre-Trigger Allowed Professional Fees**") incurred by such Professionals at any time before or on the date of delivery by the Administrative Agent of a Carve-Out Trigger Notice (the "**Pre-Trigger Date Professional Fee Carve Out**"); provided, that the Pre-Trigger Date Professional Fee Carve Out shall (A) not at any time exceed the aggregate amount of the fees and expenses identified in the Budget for each such Professional or category of Professional covering the period of time through (but not after) the date of delivery of a Carve-Out Trigger Notice, and (B) shall permanently reduce on a dollar for dollar basis in respect of the amount of any payment made into the Carve-Out Escrow Account or, without duplication, any amount of Pre-Trigger Allowed Professional Fees identified on any Carve-Out Escrow Notice (as defined in the Financing Order); and (iv) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, or otherwise, all fees, disbursements, costs and expenses of the Professionals incurred on the first Business Day following delivery by the Administrative Agent of the Carve-Out Trigger Notice in an aggregate amount not to exceed $500,000  (the amount set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**").

(b)      "**Carve-Out Escrow Account**" means that certain trust account held by Young, Conaway, Stargatt & Taylor, LLP ("**YCST**") on behalf of the Loan Parties, for the payment of Pre-Trigger Allowed Professional Fees funded by, or on behalf of, the Loan Parties in accordance with the Budget, as and when such Pre-Trigger Allowed Professionals Fees are projected to be paid therein.  YCST shall be authorized to pay to the applicable Professionals from the funds in such account the amounts owed for such Pre-Trigger Allowed Professional Fees, as such fees become due and payable.

(c)      "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the Administrative Agent to the Debtors, Debtors' lead counsel in the Chapter 11 Case, counsel to any Committee and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(d)      "**Chapter 11 Case**" means the cases under Chapter 11 of the Bankruptcy Code commenced by Debtors which are being jointly administered under the Bankruptcy Code and are pending in the Bankruptcy Court.

(e) **"Committee"** means any official committee of unsecured creditors in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Code.

(f) **"Debtors"** means, collectively, Borrowers and Guarantors (excluding, for the avoidance of doubt, SME), each as Debtor and Debtor-in-Possession in the Chapter 11 Case.

(g) **"Financing Order"** means the Interim Financing Order, the Permanent Financing Order and such other orders relating thereto or authorizing the granting of credit by Administrative Agent and Lenders to Borrowers on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Case.

(h) **"Interim Financing Order"** means, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing, in the form attached hereto as Exhibit B and/or otherwise in form and substance satisfactory to the Administrative Agent, together with all extension, modifications, and amendments thereto consented to by the Administrative Agent, which, among other matters but not by way of limitation, authorizing, on an interim basis, the Borrowers to execute and perform under the terms of the Pre-Petition Financing Agreements, as amended and supplemented by the terms and conditions of the Ratification Agreement.

(i) **"Loan Agreement"** means, the Pre-Petition Loan Agreement as ratified, amended, supplemented and otherwise modified by the Ratification Agreement, as the same now exists or may hereafter be amended from time to time.

(j) **"Permanent Financing Order"** means, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing of the Bankruptcy Court, which order shall be in form and substance satisfactory to the Administrative Agent and from which no appeal or motion to reconsider has been filed, together with all extensions, modifications and amendments thereto, consented to by the Administrative Agent, which among other matters, but not by way of limitation, authorizing the Borrowers to obtain credit, incur the Post-Petition Obligations, and grant Liens therefor and granting super-priority expense claims to Administrative Agent and Lenders with respect to all obligations due Administrative Agent and Lenders, subject to no priority claim or administrative expenses of the Chapter 11 Case or any other entity (other than the Carve-Out and Pre-Petition Priority Liens).

(k) **"Petition Date"** means the date of the commencement of the Chapter 11 Case.

(l) **"Post-Petition Collateral"** means, collectively, all now existing and hereafter acquired real and personal property of each Debtor's estate, wherever located, of any kind, nature or description, including any such property in which a lien is granted to Administrative Agent pursuant to the Financing Agreements, the Financing Order or any other order entered or issued by the Bankruptcy Court, and shall include, without limitation:

(i) all of the Pre-Petition Collateral;

(ii)     all Accounts;

(iii)     all general intangibles, including, without limitation, all Intellectual Property;

(iv)     all goods, including, without limitation, Inventory and Equipment;

(v)     all Real Property and fixtures;

(vi)     all chattel paper, including, without limitation, all tangible and electronic chattel paper;

(vii)     all instruments, including, without limitation, all promissory notes;

(viii)     documents and all credit card sales drafts, credit card sales slips or charge slips or receipts, and other forms of store receipts;

(ix)     deposit accounts;

(x)     all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

(xi)     all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (i) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (ii) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (iii) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (iv) deposits by and property of account debtors or other persons securing the obligations of account debtors;

(xii)     all (i) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (ii) monies, credit balances, deposits and other property of any Debtor now or hereafter held or received by or in transit to any Lender, the Administrative Agent or its Affiliates or at any other depository or other institution from or for the account of any Debtor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xiii)     all commercial tort claims, including, without limitation, those identified in the Information Certificate;

(xiv)     to the extent not otherwise described above, all Receivables;

(xv)     all Records;

4322232.2

5

(xvi)    all proceeds of any Excluded Contract;

(xvii)    effective upon entry of a Permanent Financing Order, all claims, rights, interests, assets and properties (recovered by or on behalf of each Borrower and Guarantor or any trustee of such Borrower or Guarantor (whether in the Chapter 11 Case or any subsequent case to which any Chapter 11 Case is converted), including, without limitation, all property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to (among others) Sections 542, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code; and

(xviii)    to the extent not covered by the foregoing clauses, all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral.

Notwithstanding anything herein to the contrary, "Post-Petition Collateral" shall not include any security interests or liens (a) on any leasehold interest in Real Property that was not previously encumbered by security interests or liens in favor of Administrative Agent, for the ratable benefit of Lenders, as of the Petition Date, but shall instead include all proceeds of such leasehold interests; (b) any executory contract or agreement to the extent the contract or agreement does not permit the grant of a lien thereon and was not previously encumbered by security interest or liens in favor of Administrative Agent, for the ratable benefit of Lenders (the items described in clauses (a) and through (b) above, collectively, the "**Excluded Contracts**"); or (c) on the Carve-Out Escrow Account.

(m)    **"Post-Petition Obligations"** means all Obligations (as defined in the Pre-Petition Loan Agreement) of any Debtor arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Case, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Case, and whether arising under or related to this Ratification Agreement, the Loan Agreement, the other Financing Agreements, a Financing Order, by operation of law or otherwise, and whether incurred by such Debtor as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, debtor-in-possession facility fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing. For the avoidance of doubt, the Post-Petition Obligations shall include that portion of the outstanding Pre-Petition Obligations, which have been "rolled-up" from time to time as provided in the Financing Order.

(n)    **"Pre-Petition Collateral"** means, collectively, (i) all "Collateral" as such term is defined in the Pre-Petition Loan Agreement as in effect immediately prior to the Petition Date, (ii) all "Collateral" and "Pledged Collateral" as such terms are defined in each of the other Pre-Petition Financing Agreements as in effect immediately prior to the Petition Date, and (iii) all other security for the Pre-Petition Obligations as provided in the Pre-Petition Loan Agreement and the other Pre-Petition Financing Agreements immediately prior to the Petition Date.

(o)    **"Pre-Petition Financing Agreements"** means the Financing Agreements (as defined in the Pre-Petition Loan Agreement), as in effect immediately prior to the Petition Date.

(p)    **"Pre-Petition Loan Agreement"** means the Fourth Amended and Restated Loan and Security Agreement, dated as of February 11, 2015, by and among Borrowers, SME, Guarantors, Lenders and Administrative Agent (as amended by Amendment No. 1 to Fourth Amended and Restated Loan and Security Agreement dated as of November 2, 2015, Amendment No. 2 to Fourth Amended and Restated Loan and Security Agreement dated as of January 7, 2016, Amendment No. 3 to Fourth Amended and Restated Loan and Security Agreement dated as of January 13, 2016, Amendment No. 4 to Fourth Amended and Restated Loan and Security Agreement dated as of February 9, 2016 and Amendment No. 5 to Amended and Restated Loan and Security Agreement dated as of March 15, 2016, as in effect immediately prior to the Petition Date.

(q)    **"Pre-Petition Obligations"** means all Obligations (as such term is defined in the Pre-Petition Loan Agreement) arising at any time before the Petition Date.

(r)    **"Pre-Petition Priority Liens"** means, collectively, the Liens permitted by the Pre-Petition Financing Agreements, to the extent any such permitted Liens are valid, enforceable, properly perfected, non-avoidable and senior in priority to the Liens securing the Pre-Petition Obligations as of the Petition Date.

(s)    **"Professionals"** means the Debtors' and any Committee's professionals, retained by either of them by final order of the Bankruptcy Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under Sections 327, 328 or 1103(a) of the Bankruptcy Code.

(t)    **"Reported Fee Accruals"** means all fees, disbursements, costs and expenses of the Professionals which have been incurred, accrued or invoiced (but remain unpaid) through the date of service of a Carve-Out Trigger Notice. For purposes of determining the amount of the Carve Out, "*Reported Fee Accruals*" shall be equal to the aggregate amounts under the heading "Accrued Professional Fees" in the Budget (reflected on an accrual basis and not on a cash basis) for the line item for each such Professional (or if less, such Professional's actual fees, disbursements, costs and expenses incurred to such time) minus any payments received on account thereof. Any Professional's fees, disbursements, costs and expenses which have been incurred, accrued or invoiced (and remain unpaid) but are in excess of the aggregate amounts reflected in the Budget in the line item for each such Professional shall not constitute "*Reported Fee Accruals*", and shall not constitute part of the Carve-Out.

(u)    **"Ratification Agreement"** means the Ratification and Amendment Agreement, dated as of the April 17, 2016, by and among Borrowers, Guarantors, Agent and Lenders, as the same may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(v)    **"Ratification Closing Date"** means the date on which all of the conditions precedent in Section 9 of the Ratification Agreement have been satisfied (or waived).

1.2     Amendments to Definitions.

(a)     Applicable Margin.  The definition of "Applicable Margin" in the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Applicable Margin' means three and a half percent (3.50%) on a per annum basis."

(b)     Administrative Agent and Lenders.  All references to the terms "Administrative Agent" and "Lenders" shall include their respective successors and assigns.

(c)     Borrowers. Guarantors and Debtors.  All references to the terms "Borrowers", "Guarantors" or "Debtors" in the Financing Agreements shall be deemed and each such reference is hereby amended to mean and include (as applicable) the Debtors (excluding, for the avoidance of doubt, SME), each as defined herein, and their successors and assigns (including any trustee or other fiduciary hereafter appointed as any Debtor's legal representative, as applicable, or with respect to any Debtor the property of the estate of such Debtor whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case or cases and its successor upon conclusion of the Chapter 11 Case of such Debtor, as the case may be); provided, that, SME is a Borrower for purposes of the Pre-Petition Obligations but is not a Debtor and shall not be deemed to be a Debtor.

(d)     Borrowing Base Reporting Period.  The definition of "Borrowing Base Reporting Period" in the Pre-Petition Loan Agreement is hereby amended by deleting the "." at the end of such definition and substituting the following therefor:

"; provided further that, on and after the Petition Date, the Borrowing Base Reporting Period shall be weekly, ending on the Saturday of each week, or such more frequent interval as the Administrative Agent may determine in its Permitted Discretion."

(e)     Collateral.  All references to the term "Collateral" in the Loan Agreement or the other Financing Agreements, or any other term referring to the security for the Pre-Petition Obligations, shall be deemed, and each such reference is hereby amended to mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.

(f)     Debtors.  All references to Debtors, including, without limitation, to the terms "Borrower," "Borrowers," "Guarantor" or "Guarantors" in the Loan Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to mean and include the Debtors as defined herein, and their successors and assigns (including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation); provided, that, SME is a Borrower for purposes of the Prepetition Obligations and the Pre-Petition Financing Agreements but is not a Debtor and shall not be deemed to be a Debtor.

(g)     Eligible Inventory.  The definition of "Eligible Inventory" in the Pre-Petition Loan Agreement is hereby amended by deleting the reference to "9,000,000" in clause (g) of such definition and substituting the term "$7,500,000" therefor.

(h)     Financing Agreements.  All references to the term "Financing Agreements" in the Loan Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to include, in addition and not in limitation, this Ratification Agreement and all of the Pre-Petition Financing Agreements, as ratified, assumed and adopted by each Borrower and Guarantor pursuant to the terms of the Ratification Agreement, as amended and supplemented thereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(i)     Indebtedness.  The definition of "Indebtedness" in the Pre-Petition Loan Agreement is hereby amended by deleting clause (b)(i) therein and replacing it with the following:

"(i) trade accounts payable or accrued obligations incurred in the ordinary course of business or during the pendency of the Chapter 11 Case and payable in accordance with the Budget,"

(j)     Information Certificate.   The definition of "Information Certificate" in the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Information Certificate' shall mean, collectively, the Information Certificates of Borrowers and Guarantors constituting Exhibit C to the Ratification Agreement containing material information with respect to Borrowers and Guarantors, their respective business and assets provided by or on behalf of Borrowers and Guarantors to the Administrative Agent in connection with the preparation of this Loan Agreement and the other Financing Agreements and the financing arrangements provided for herein."

(k)     Letter of Credit Limit.  The definition of "Letter of Credit Limit" in the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Letter of Credit Sublimit' means $15,000,000."

(l)     Loan Agreement.  All references to the term "Agreement" in the Pre-Petition Loan Agreement or the term "Loan Agreement" in the other Financing Agreements shall be deemed, and each such reference is hereby amended, to mean the Loan Agreement (as defined in the Ratification Agreement), and as ratified, assumed and adopted by each Borrower and Guarantor pursuant to the terms hereof and the Financing Order.

(m)     Material Adverse Effect.  All references to the term "Material Adverse Effect," "material adverse effect" or "material adverse change" in the Loan Agreement,

the Ratification Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to add at the end thereof: "provided, that, the Bankruptcy Events shall not, individually or collectively, constitute a Material Adverse Effect."

(n)    Maturity Date. The definition of "Maturity Date" in the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Maturity Date' shall mean the earliest to occur of (a) August 18, 2016, (b) thirty (30) days after the entry of the Interim Financing Order if the Permanent Financing Order has not been entered prior to the expiration of such thirty (30) day period (or such longer period if consented to in writing by the Administrative Agent), (c) the effective date of a plan of reorganization filed in the Chapter 11 Case pursuant to an order entered by the Bankruptcy Court, (d) the consummation of the sale or sales of all or substantially all of the Debtors' assets and properties, other than, for the avoidance of doubt, the Store Closing GOB Sales and the SC GOB Sales (each as defined in Section 5.4(a) of the Ratification Agreement), (e) the date the Bankruptcy Court orders the conversion of the bankruptcy case of any Debtor to a Chapter 7 liquidation, (f) the date this Agreement is otherwise terminated for any reason whatsoever (including pursuant to Section 12.2) pursuant to the terms of this Agreement and (g) subject to the Financing Order, the acceleration of the Obligations or termination of the Commitments hereunder, including without limitation, as a result of the occurrence of an Event of Default."

(o)    Obligations. All references to the term "Obligations" in the Loan Agreement, this Ratification Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to mean both the Pre-Petition Obligations and the Post-Petition Obligations.

(p)    Permitted Dispositions. The definition of "Permitted Dispositions" in the Pre-Petition Loan Agreement is hereby amended by (i) deleting the period appearing at the end of clause (j)(iv) of such definition and replacing it with a semi-colon, and (ii) adding the following clause at the end thereof:

"(k) the Store Closing GOB Sales and the SC GOB Sales."

(q)    Permitted Investments. The definition of "Permitted Investments" in the Pre-Petition Loan Agreement is hereby amended by (i) deleting clause (j) of such definition and replacing it with "(j) [Intentionally Deleted];" and (ii) deleting clause (w) of such definition and replacing it with "(w) [Intentionally Deleted]; and".

(r)    Permitted Liens. The definition of "Permitted Liens" in the Pre-Petition Loan Agreement is hereby amended by (i) deleting the period appearing at the end of clause (w) of such definition and replacing it with a semi-colon, and (ii) adding the following clauses at the end thereof:

"(x) all Liens existing on the Petition Date that constituted "Permitted Liens" as defined in and under the Pre-Petition Loan Agreement to the extent such liens were legal, valid, binding, enforceable and non-avoidable as of the Petition Date, and are not otherwise avoided, recharacterized or subordinated after the Petition Date";

(y) the Adequate Protection Liens; and

(z) Liens on the Collateral in respect of the Carve-Out."

(s)    Reserves.  The definition of "Reserves" in the Pre-Petition Loan Agreement is hereby amended by deleting the following phrase:

"and (xix) the Second Lien Pushdown Reserve.  Notwithstanding the foregoing, the Administrative Agent will provide at least three (3) Business Days' prior notice to Borrowers before the Administrative Agent establishes a new category of Reserves or changes the methodology of calculating Reserves (which notice will include a reasonably detailed description of such new category or change in methodology); provided that no prior notice shall be required after the occurrence and during the continuance of an Event of Default.  During such three (3) Business Day period, the Administrative Agent will, if requested, discuss any such new category or change in methodology with the Borrowers and the Borrowers may take such action as may be required so that the event, condition or matter that is the basis for such new category or change in methodology no longer exists or exists in a manner that would result in the establishment of a lower reserve or result in a lesser change, in each case, in a manner and to the extent satisfactory to the Administrative Agent in its Permitted Discretion."

and replacing it with the following:

"; (xix) the Second Lien Pushdown Reserve; (xx) any reserves as provided in clauses (i) through (xix) in this definition which the Administrative Agent deems necessary in the exercise of its Permitted Discretion to maintain with respect to any Loan Party or the Collateral for any amounts which Administrative Agent may be obligated to pay in the future for the account of any Loan Party (other than the Carve-Out in clause (xxi) below) and (xxi) the amount of the Carve-Out.  Notwithstanding the foregoing, the Administrative Agent will provide two (2) Business Days' prior notice to Borrowers, or if Administrative Agent determines in its Permitted Discretion that two (2) Business Days' prior notice to Borrowers is not practical then as much prior notice as

Administrative Agent can reasonably (from the perspective of an asset based lender) provide before the Administrative Agent establishes (subject to clause (xx) herein) a new category of Reserves or changes the methodology of calculating Reserves (which notice will include a reasonably detailed description of such new category or change in methodology); provided that no prior notice shall be required after the occurrence and during the continuance of an Event of Default."

> **1.3**   Interpretation.

> (a)   For purposes of this Ratification Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Pre-Petition Loan Agreement, as amended, supplemented or otherwise modified by this Ratification Agreement.

> (b)   All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular unless the context of such usage requires otherwise.

> (c)   All terms not specifically defined herein which are defined in the Uniform Commercial Code, as in effect in the State of New York as of the date hereof, shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

> **2.**   ACKNOWLEDGMENTS.

> **2.1**   Pre-Petition Obligations.  Each Pre-Petition Borrower and Guarantor hereby acknowledges, confirms and agrees that, as of April 17, 2016, Pre-Petition Borrowers are indebted to Administrative Agent and Lenders in respect of all Pre-Petition Obligations in an aggregate principal amount of not less than $103,946,056.65 consisting of (a) Revolving Loans to each Pre-Petition Borrower made pursuant to the Pre-Petition Financing Agreements, together with interest accrued and accruing thereon, and (b) Letter of Credit Obligations outstanding under the Pre-Petition Loan Agreement together with interest accrued and accruing thereon, and all costs, expenses, fees (including attorneys' fees and legal expenses), plus all other charges now or hereafter owed by Pre-Petition Borrowers to Administrative Agent and Lenders, all of which are unconditionally owing by the Borrowers and SME to the Administrative Agent and Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

> **2.2**   Guaranteed Obligations.  Each Guarantor hereby acknowledges, confirms and agrees that:

> (a)   all obligations of such Guarantors under the Pre-Petition Financing Agreements are unconditionally owing by such Guarantor to Administrative Agent and Lenders without offset, defense or counterclaim of any kind, nature and description whatsoever, and

(b)      the absolute and unconditional guarantee of the payment of the Pre-Petition Obligations by such Guarantor pursuant to the Pre-Petition Financing Agreements extends to all Post-Petition Obligations, subject only to the limitations set forth in the Pre-Petition Financing Agreements.

2.3      Acknowledgment of Security Interests.  Each Pre-Petition Borrower (and, solely in the case of clause (b) below, each Borrower) and Guarantor hereby acknowledges, confirms and agrees that Administrative Agent, for the benefit of itself and the other Secured Parties, has and shall continue to have (a) valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to Administrative Agent pursuant to the Pre-Petition Financing Agreements as in effect immediately prior to the Petition Date to secure all of the Obligations, and (b) valid and enforceable first priority and senior security interests in and liens upon all Post-Petition Collateral granted to Administrative Agent, for the benefit of itself and the Secured Parties, under the Financing Order or hereunder or under any of the other Financing Agreements or otherwise granted to or held by Administrative Agent and Lenders, in each case, subject only to liens or encumbrances expressly permitted by the Loan Agreement (including, without limitation, Pre-Petition Priority Liens) and any other liens or encumbrances expressly permitted by the Financing Order that may have priority over the liens in favor of Administrative Agent.

2.4      Binding Effect of Documents.  Each Pre-Petition Borrower and Guarantor hereby acknowledges, confirms and agrees that: (a) each of the Pre-Petition Financing Agreements to which it is a party was duly executed and delivered to Administrative Agent and Lenders by such Pre-Petition Borrower or Guarantor and each is in full force and effect as of the date hereof, (b) the agreements and obligations of such Pre-Petition Borrower or Guarantor contained in the Pre-Petition Financing Agreements constitute the legal, valid and binding obligations of such Pre-Petition Borrower or Guarantor enforceable against it in accordance with the terms thereof, and such Pre-Petition Borrower or Guarantor has no valid defense, offset or counterclaim to the enforcement of such obligations, and (c) Administrative Agent and Lenders are and shall be entitled to all of the rights, remedies and benefits provided for in (i), subject to the entry and terms of the Financing Order, the Financing Agreements and (ii) the Financing Order.

2.5      Termination of Commitment to SME.  Notwithstanding anything to the contrary contained in the Pre-Petition Financing Agreements, the Administrative Agent, Lenders and other Secured Parties have no further commitment or obligation to make any Loans to, or issue any Letter of Credit for the account of, SME; it being agreed that the Commitment of each Lender to make any Loans to SME, issue any Letter of Credit for the account of SME, or make any other financial accommodations to SME are hereby terminated and, for the avoidance of doubt, none of the Debtors shall be deemed, to join in or make, on behalf of SME, any of the acknowledgements, confirmations or agreements set forth in Sections 2.1, 2.3, 2.4 and 2.6 of this Ratification Agreement, or the ratification, assumption, adoption and agreement set forth in Section 3 and Section 5.4 below.

2.6      Early Termination Fee.  Each Borrower and Guarantor hereby acknowledges and confirms that, effective as of the date hereof, (a) the Pre-Petition Borrowers are liable to the Administrative Agent, for the account of Lenders, for an early termination fee in

the amount of $450,000 pursuant to Section 15.1(c) of the Pre-Petition Loan Agreement, and (b) the Administrative Agent may charge any loan account of a Borrower for such early termination fee.

3.      ADOPTION AND RATIFICATION.

3.1.    Each Pre-Petition Borrower and Guarantor hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Pre-Petition Financing Agreements to which it is a party and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Pre-Petition Financing Agreements, as supplemented and amended by this Ratification Agreement, and in accordance with the Financing Order.  All of the Pre-Petition Financing Agreements are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Borrowers and Guarantors, each as Debtor and Debtor-in-Possession and considered as agreements between such Borrowers or Guarantors, on the one hand, and Administrative Agent and Lenders, on the other hand.  Each Pre-Petition Borrower and Guarantor party hereto hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Pre-Petition Financing Agreements, as amended and supplemented pursuant hereto and the Financing Order, and each Borrower and Guarantor, as Debtor and Debtor-in-Possession, agrees to be fully bound by the terms of the Financing Agreements to which such Borrower or Guarantor is a party.

3.2.    Notwithstanding anything in Section 3.1 of this Ratification Agreement to the contrary, the Administrative Agent and Lenders acknowledge that certain Events of Default, as further described on Exhibit D hereto, have occurred and are continuing under the Pre-Petition Loan Agreement and the other Pre-Petition Financing Agreements, including, but not limited to, as a result of the commencement of the Chapter 11 Case and the other Bankruptcy Events (the "**Existing Defaults**").  From and after the Ratification Closing Date, for purposes of determining whether any Default or Event of Default has occurred under the Loan Agreement or any other Financing Agreement, the Agent and the Lenders hereby agree that all such Existing Defaults shall be excluded from any determination of such Default or Event of Default and only Defaults and Events of Default (as provided  in the Loan Agreement) occurring from and after the Ratification Closing Date shall constitute Defaults and Events of Default under the Loan Agreement.  For the avoidance of doubt, none of the Existing Defaults shall give any right to the Administrative Agent or any Lender to exercise or enforce any of their respective rights or remedies under the Loan Agreement or the other Financing Agreements on the basis of the occurrence and/or existence of any one or more of the Existing Defaults.

4.      GRANT OF SECURITY INTEREST.

As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), Borrowers and Guarantors, each as Debtor and Debtor-in-Possession, hereby grant, pledge and assign to the Administrative Agent, for the benefit of itself and the other Secured Parties, and also confirm, reaffirm and restate the prior grant to Administrative Agent, for the benefit of itself and the other Secured Parties of, continuing senior priority security interests in and liens upon, and rights of setoff against, all of the Collateral.

5.    ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS.

In addition to the representations, warranties and covenants made by Borrowers and Guarantors to Administrative Agent and Lenders, under the Loan Agreement or the other Financing Agreements (in each case, for the avoidance of doubt, as amended by or provided in this Ratification Agreement) each Borrower and Guarantor hereby represents, warrants and covenants to Administrative Agent and Lenders the following (which shall survive the execution and delivery of this Ratification Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition precedent to the making of Revolving Loans by Administrative Agent and Lenders:

5.1    Financing Order.  No Loan Party shall seek to have any Financing Order vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by Administrative Agent).

5.2    Use of Proceeds.    All Loans and Letters of Credit provided by Administrative Agent or any Lender to Borrowers pursuant to the Financing Order, the Loan Agreement or otherwise, shall only be used by Debtors to the extent (a) provided for in the Budget, (b) permitted by the Financing Agreements, or (c) as authorized by the Bankruptcy Court and consented to by the Administrative Agent for: (i) general working capital needs, (ii) the repayment of the Obligations and (iii) the payment of fees, expenses, and costs incurred in connection with this Ratification Agreement and the Chapter 11 Case, including the payment of any adequate protection payments approved in the Financing Order.

5.3    Budget.

(a)    Borrowers have prepared and delivered to Administrative Agent and Lenders a thirteen (13) week post-petition Budget.  The Budget has been thoroughly reviewed by the Borrowers and their management and sets forth, for the periods covered thereby, projected weekly cash receipts and cash disbursements for each week (each such week ending on Saturday) of the thirteen (13) consecutive week period commencing with the week ending April 23, 2016.  Subsequent thirteen (13) week budgets shall be delivered to the Administrative Agent and Lenders, in form and substance satisfactory to the Administrative Agent and Lenders in their Permitted Discretion, during the tenth week of the Budget.  Upon approval by the Administrative Agent and Lenders, such budget shall be deemed to be the Budget for the next thirteen (13) week period.

(b)    Not later than 3:00 p.m. (Eastern time) on the Wednesday of each week commencing with the Wednesday following the first full week ending after the Petition Date, Borrowers shall furnish to Administrative Agent a weekly report (the "**Budget Compliance Report**") that (i) sets forth as of the preceding Saturday of each such week on a cumulative basis from the Petition Date until the sixth (6th) full week ending on a Saturday after the Petition Date and then on a rolling six (6) week basis at all times thereafter (each such period referred to herein as a "**Measurement Period**"), the actual results for the following line items set forth in the Budget: (A) total cash receipts, and (B) total cash disbursements, noting therein variances from values set forth for such periods in the Budget, and (ii) an explanation for all such

variances greater than fifteen percent (15%) in any line items or sub-line items, certified by the chief financial officer of the Borrowers.  Such report/reconciliation shall also note any variances with values set forth in the Budget as of the day of such report/reconciliation.

(c)     Each Debtor acknowledges, confirms and agrees that the following covenants shall be tested pursuant to the Budget Compliance Report for the applicable Measurement Period ending as of each Saturday, with such testing commencing on the Wednesday following the first full three (3) weeks ending after the Petition Date: (i) the actual total cash receipts shall not be less than ninety percent (90%) of the projected total cash receipts set forth in the Budget in respect of such Measurement Period, and (ii) the actual total cash disbursements shall not be more than one hundred and ten percent (110%) of the projected total cash disbursements set forth in the Budget in respect of such Measurement Period (other than with respect to any and all professional fees and expenses, which shall be tested on an aggregate basis solely with respect to such line item).

(d)     Each Debtor hereby confirms, acknowledges and agrees that, unless waived in writing by Administrative Agent, (i) a failure to maintain the deviations in the Budget in an amount equal to or less than the percentage set forth in Section 5.3(c) hereof shall constitute a material deviation from the Budget and an additional Event of Default (each, a "Material Budget Deviation") and (ii)  the failure to deliver any reports with respect to any Budget, in form and substance satisfactory to Administrative Agent in its Permitted Discretion, as provided in Section 5.3(b) hereof shall constitute an Event of Default.  Notwithstanding any approval by Administrative Agent or any Lender of the Budget or any subsequent or amended Budget(s), Administrative Agent and Lenders will not, and shall not be required to, provide any Loans or Letters of Credit to any Borrower pursuant to the Budget, but shall only provide Loans and Letters of Credit in accordance with the terms and conditions set forth in the Loan Agreement as amended by this Ratification Agreement, the other Financing Agreements and the Financing Order.  Administrative Agent and Lenders are relying upon the Borrowers' delivery of, and compliance with, the Budget in accordance with this Section 5.3 in determining to enter into the post-petition financing arrangements provided for herein.

(e)     Notwithstanding any projected amounts set forth in the Budget relating to the costs and expenses of Administrative Agent and the other Secured Parties that are reimbursable by Borrowers or any other amounts owing by Borrowers to Administrative Agent and the Secured Parties (including, without limitation reasonable attorneys and consulting fees and expenses) in accordance with the Loan Agreement and the other Financing Agreements, such projections shall not limit, impair, modify or waive the Debtors' obligation to pay the actual amounts due to Administrative Agent and/or the other Secured Parties in respect of such costs, expenses and other amounts owing to Administrative Agent and Lenders in accordance with the Loan Agreement and the other Financing Agreements and the actual amounts paid in respect of such costs, expenses and other amounts other shall not be subject to the variance compliance set forth in Section 5.3(c).

(f)     Notwithstanding anything herein to the contrary, the Budget may be updated, modified or supplemented (with the consent and/or at the request of the Administrative Agent) from time to time, and each such updated, modified or supplemented budget shall be approved by, and in form and substance satisfactory to, the Administrative Agent

in its Permitted Discretion and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed the Budget; provided, that (i) Borrowers shall not be permitted to update, modify or supplement the Budget until after the last day of the fourth (4th) full week following the Petition Date; and (ii) during the tenth (10th) week of the Budget, the Borrowers shall submit a budget for the next successive thirteen week period to the Administrative Agent, which budget shall be in (A) form substantially similar to the previous initial Budget (or otherwise in form reasonably acceptable to Administrative Agent) and (B) substance acceptable to the Administrative Agent in its Permitted Discretion; provided, further, that in the event that the Administrative Agent and the Borrowers cannot, while acting diligently, reasonably, and in good faith, agree as to an updated, modified or supplemented budget, such disagreement shall give rise to an Event of Default hereunder once the period covered by the most recent Budget has terminated. Each Budget delivered to the Administrative Agent shall be accompanied by such supporting documentation as requested by the Administrative Agent in its Permitted Discretion. Each Budget shall be prepared in good faith based upon assumptions which the Borrowers believe to be reasonable and are satisfactory to the Administrative Agent in its Permitted Discretion.

**5.4**    Sale Milestones.    Debtors covenant and agree to satisfy each of the following conditions:

(a)    On the Petition Date, the Debtors shall file motions, each in form and substance satisfactory to the Administrative Agent, requesting approval from the Bankruptcy Court (i) to continue the Debtors' going out of business sales conducted at the nine (9) store locations identified on Schedule 1 attached hereto on terms and conditions acceptable to Administrative Agent (the "**Store Closing GOB Sales**"); (ii) to continue the Debtors' going out of business sales conducted at all of the Sport Chalet store locations on terms and conditions acceptable to Administrative Agent (the "**SC GOB Sales**"); and (iii) of bidding and auction procedures, in form and substance satisfactory to Administrative Agent, in connection with the sale or sales of all or substantially all of the Debtors' assets and properties (the "**Bidding Procedures Motion**");

(b)    On or before the third (3rd) day following the Petition Date, the Bankruptcy Court shall have entered interim orders, each in form and substance satisfactory to Administrative Agent, authorizing the continuation of the Store Closing GOB Sales and the SC GOB Sales, which orders shall authorize and direct, among other things, that all proceeds from the Store Closing GOB Sales and the SC GOB Sales shall be remitted to Administrative Agent, for the ratable benefit of Lenders, for application against the Obligations;

(c)    On or before the fifth (5th) day following the Petition Date, the Debtors shall file a motion, in form and substance satisfactory to the Administrative Agent, requesting approval from the Bankruptcy Court to retain a nationally-recognized investment banking firm on terms and conditions acceptable to Administrative Agent ("**Investment Banker**") to conduct the marketing and sale process for all or substantially all of the assets of each Borrower and Guarantor; it being agreed and understood that the terms and conditions of the Lincoln Partner Advisors LLC ("**Lincoln**") engagement are acceptable to the Administrative Agent;

(d)     On or before the thirtieth (30th) day following the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance satisfactory to Administrative Agent, approving the Bidding Procedures Motion (the "**Bidding Procedures Order**");

(e)     On or before the thirtieth (30th) day following the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance satisfactory to Administrative Agent, authorizing the retention of the Investment Banker on terms and conditions acceptable to Administrative Agent; it being agreed and understood that the terms and conditions of the Lincoln engagement are acceptable to the Administrative Agent;

(f)     On or before the fiftieth (50th) day following the Petition Date, the Investment Banker shall have distributed Bid Packages (as defined in the Bidding Procedures Order) to each Person meeting the criteria for receipt of a Bid Package as set forth in the Bidding Procedures Order;

(g)     On or before the fifty-seventh (57th) day following the Petition Date, (i) the qualifying bid deadline shall have occurred in accordance with the Bidding Procedures Order;

(h)     On or before the sixtieth (60th) day following the Petition Date, the Debtors shall conduct an auction in accordance with the Bidding Procedures Order to select the highest and best bid(s) for the sale of all or substantially all of the Debtors' assets in accordance with the Bidding Procedures Order, which bid shall provide for, among other things, a minimum cash amount not less than the amount required to satisfy the Obligations owed to Administrative Agent and Lenders in full in cash on or before the eighty-first (81st) day following the Petition Date, and copies of which shall be provided to the Administrative Agent;

(i)     On or before the sixty-fifth (65th) day following the Petition Date, the Bankruptcy Court shall have entered an order (the "**Sale Order**"), which order shall provide for, among other things, distribution of sale proceeds to Administrative Agent in a minimum cash amount not less than the amount required to satisfy the Obligations owed to Administrative Agent and Lenders in full in cash on or before the eighty-first (81st) day following the Petition Date, and otherwise in form and substance satisfactory to Administrative Agent, approving the sale or sales of all or substantially of the Debtors' assets, on terms and conditions acceptable to Administrative Agent (the "**363 Sale**"), and authorizing and directing that all proceeds from the 363 Sale be remitted to Administrative Agent for application against and permanent reduction of the Obligations;

(j)     On or before the eighty-first (81st) day following the Petition Date, the Debtors shall have consummated the 363 Sale; and

(k)     On or before the sixtieth (60th) day following the Petition Date the Loan Parties shall have received court approval to extend the general time period to accept/reject leases from the permitted 120 day time period to not less than 210 days.

**5.5**     Ratification of Deposit Account Control Agreement.     To the extent Administrative Agent deems it necessary in its reasonable discretion and promptly upon

Administrative Agent's request, Borrowers and Guarantors shall promptly provide Agent with evidence, in form and substance satisfactory to Administrative Agent, that the Deposit Account Control Agreements (as defined in the Financing Order) and other deposit account arrangements provided for under Section 6.3 of the Loan Agreement have been ratified and amended by the parties thereto, or their respective successors in interest to reflect the commencement of the Chapter 11 Case, that each Borrower and each Guarantor, as Debtor and Debtor-in-Possession, is the successor in interest to such Borrower or Guarantor, that the Obligations include both the Pre-Petition Obligations and the Post-Petition Obligations, that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for in the Ratification Agreement.

       5.6    ERISA.    Each Borrower and Guarantor hereby represents and warrants with, to and in favor of Administrative Agent and Lenders that (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of any Borrower or Guarantor arising under ERISA, whether held by the Pension Benefit Guaranty Corporation (the "**PBGC**") or the contributing sponsor of, or a member of the controlled group thereof, any pension benefit plan of any Borrower or Guarantor and (b) no notice of lien has been filed by the PBGC (or any other Person) pursuant to ERISA against any assets or properties of any Borrower or Guarantor.

       5.7    <u>Maximum Outstanding Loans and Letters of Credit</u>.

       (a)    Notwithstanding anything to the contrary contained in the Loan Agreement or the other Financing Agreements, Administrative Agent and Lenders shall have no obligation whatsoever to make any Loan to the Borrowers or issue any Letters of Credit on behalf of the Borrowers to the extent that, immediately after giving effect to the making of such Loan or issuance of such Letter of Credit, the then aggregate outstanding amount of all Loans and Letter of Credit Obligations would exceed at any time $125,000,000 as determined by Administrative Agent in its discretion.

       (b)    In the event that the aggregate principal amount of all Loans and Letter of Credit Obligations outstanding exceed $125,000,000, such event shall not limit, waive or otherwise affect any rights of the Administrative Agent or the Lenders in such circumstances or on any future occasions and Borrowers and Guarantors shall, upon demand by the Administrative Agent, which may be made at any time or from time to time, immediately repay the entire amount of any such excess(es) for which payment is demanded.  Failure to repay such amount shall constitute an Event of Default.

       5.8    <u>Chief Restructuring Officer</u>.

       (a)    The Debtors shall retain, at all times during which the Obligations remain outstanding, Robert J. Duffy of FTI Consulting, Inc. and/or, from and after the Petition Date, Mark Weinsten of FTI Consulting, Inc., or such other Person(s) acceptable to Administrative Agent as its chief restructuring officer (the "**CRO**"), at the sole cost and expense of the Debtors, on terms and conditions acceptable to Administrative Agent.  The CRO shall (i) negotiate the terms of debtor in possession financing facilities for the Company and related adequate protection arrangements in respect of the Debtors' credit facilities, (ii) negotiate the

terms of any plan or pre- or post-petition asset purchase agreement to which any affiliate of Versa Capital Management, LLC is proposed to act as sponsor or party thereto, and to enter into binding and definitive agreement(s) on behalf of the Debtors with respect to the foregoing, (iii) supervise the structuring and conduct a sale or plan process for the Debtors, including negotiating the terms of any competing bids, and (iv) in connection with the preceding clauses (i), (ii) and (iii), but subject to such notice and court-approvals as may be required, to enter into binding agreements on behalf of the Debtors.  The Debtors hereby irrevocably authorize and direct the CRO to consult with Administrative Agent and Lenders and to share with Administrative Agent and Lenders, upon reasonable request therefor, all financial reports, budgets and any variances from same, other financial information, operational issues, matters related to the Collateral, all reports prepared or reviewed by the CRO, information on the sale and maintenance of the Debtors' businesses and assets and such other matters as the Administrative Agent may reasonably request; provided that the CRO shall not be required to provide copies of any reports (financial or otherwise) that are in "draft" or "work product" form or privileged.  The Debtors agree to provide the CRO with complete access to all of the books and records of the Debtors, all of premises of the Debtors and to all management and employees of the Debtors as and when deemed necessary by the CRO.

(b)    Any amendment, modification or termination of the retention agreement with the CRO without the prior written consent of Administrative Agent shall constitute an Event of Default.  The Debtors acknowledge and agree that the Debtors shall cause the CRO, as further described in clause (a) above, (i) to keep Administrative Agent and Lenders fully informed of the progress of the business and operations of the Debtors and to respond to any reasonable inquiries of Lender regarding the maintenance of the Borrower's businesses and the sale of their assets and (ii) to communicate and cooperate with Administrative Agent and Lenders and share all information, as reasonably requested thereby, with Administrative Agent and Lenders regarding the Debtors, and the sale and maintenance of the Debtors' businesses and assets.

(c)    If the CRO resigns, the Debtors shall immediately notify Administrative Agent in writing and promptly after receipt thereof, provide Administrative Agent with a copy of any notice of resignation from such CRO.  Any replacement or successor CRO shall be reasonably acceptable to Administrative Agent, shall be retained pursuant to a new retention agreement on terms and conditions reasonably acceptable to Administrative Agent within five (5) Business Days immediately following the notice of resignation of the resigning CRO and shall be approved by the Bankruptcy Court.  Failure to comply with the terms and conditions of this Section shall constitute an Event of Default.

**6.**    DIP FACILITY FEE.

Borrowers shall pay to Administrative Agent, for the account of Lenders on a pro rata basis according to their respective Commitments, a debtor-in-possession financing facility fee, in the amount of $1,250,000, on account of the financing provided by Administrative Agent and Lenders to Borrowers in the Chapter 11 Case, which fee shall be fully earned and due and payable on the Ratification Closing Date and which may be charged directly to the loan account of any Borrower maintained by Agent or paid by the Loan Parties concurrently with the of the initial Loans, as provided under Section 9 of this Ratification Agreement.

7.    AMENDMENTS.

7.1    Elimination of Eurodollar Rate Loans.

(a)    Section 3.1(b) of the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following is substituted therefor:

"(b) [Intentionally Deleted]"

(b)    Notwithstanding anything to the contrary contained in the Loan Agreement, (i) all Eurodollar Rate Loans shall automatically convert to Base Rate Loans as of the Ratification Closing Date without any action taken or required to be taken by any Person, (ii) Borrowers shall not request or have any right to receive any Eurodollar Rate Loans from Administrative Agent and Lenders, and Borrowers shall not request or have any right to convert any Base Rate Loans to Eurodollar Rate Loans, and (iii) Administrative Agent and Lenders shall not have any obligation to make any Eurodollar Rate Loans to any Borrower or to convert any Base Rate Loans into Eurodollar Rate Loans. Notwithstanding anything to the contrary contained herein or in the Loan Agreement, the reference to the London Interbank Offered Rate in the definition of "Base Rate" is only with reference to determining the Base Rate and any Loan made in reference to such rate shall not constitute a Eurodollar Rate Loan such that the provisions under Sections 3.5 through 3.11 and Section 3.13 would have any application to the Base Rate Loans.

7.2    Increase in Maximum Credit.  Section 2.5 of the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following is substituted therefor:

"2.5  [Intentionally Deleted.]"

7.3    Extensions of Revolving Facility Commitments.  Section 2.8 of the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following is substituted therefor:

"2.8 [Intentionally Deleted.]"

7.4    Limits and Sublimits.  Section 2 of the Pre-Petition Loan Agreement is hereby amended by adding the following new Section 2.9 at the end of such Section:

"2.9    Limit and Sublimit Construction.  All limits and sublimits set forth in this Agreement, and any formula or other provision to which a limit or sublimit may apply, shall be determined on an aggregate basis considering together both the Pre-Petition Obligations and the Post-Petition Obligations."

7.5    Letter of Credit Fees.  The first sentence in Section 3.4 of the Pre-Petition Loan Agreement is hereby deleted and the following is substituted therefor:

"Borrowers shall pay to the Administrative Agent, for the account of the Lenders, monthly a fee at the rate per annum equal to (a) the Applicable

Margin less 0.50% on the average daily outstanding balance of Commercial Letters of Credit for the immediately preceding month (or part thereof), payable in arrears as of the first day of each month, computed for each day from the date of issuance to the date of expiration and (b) the Applicable Margin on the average daily outstanding balance of Standby Letters of Credit for the immediately preceding month (or part thereof), payable in arrears as of the first day of each month, computed for each day from the date of issuance to the date of expiration; provided, that, Borrowers shall, at the Administrative Agent's option, pay such fee at a rate two percent (2%) greater than the rate provided for above on such average daily maximum amount for: (a) the period from and after the date of termination or non-renewal hereof until the Administrative Agent and Lenders have received full and final payment of all Obligations (notwithstanding entry of a judgment against Borrowers) and (b) the period from and after the date of the occurrence of an Event of Default for so long as such Event of Default is continuing."

**7.6**    Payments.  Section 6.5 of the Pre-Petition Loan Agreement is hereby amended by adding the following new subsection (c) at the end of such Section:

"(c) Notwithstanding anything to the contrary contained in this Agreement or any of the other Financing Agreements, Administrative Agent may, in its discretion, apply any such payments or proceeds first, to the Pre-Petition Obligations until such Pre-Petition Obligations are paid and satisfied in full and second, to the Post-Petition Obligations until such Post-Petition Obligations are paid and satisfied in full."

**7.7**    Collateral Reporting.  Section 7.1(a) of the Pre-Petition Loan Agreement is hereby amended by (i) deleting the "." at the end of such section and substituting ";" therefor; and (i) adding the following new subsections at the end of Section 7.1(a) as follows:

"(viii) by no later than 3:00 pm (Eastern Time) on each day on and after the Petition Date, a report (A) updating the "Total Inventory" line item on the Borrowing Base Certificate, (B) specifying the portion of such "Total Inventory" that is attributable to each Borrower and Guarantor; and (C) specifying the total amount (x) all sales receipts and (y) all inventory receipts from the day prior to such report for each Borrower and Guarantor; and

(ix) notwithstanding anything to the contrary in the Loan Agreement or other Financing Agreements, by not later than 3:00 pm (Eastern Time) on the Wednesday of the first full week following the Petition Date and on each Wednesday thereafter, updated Borrowing Base Certificates together with all supporting documents and schedules as the Administrative Agent may request in its Permitted Discretion from time to time."

**7.8**    Inventory Covenants.  Section 7.3(c) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:

"(c) other than as a result of the Store GOB Sales and the SC GOB Sales, Borrowers shall not remove any Inventory from the locations set forth or permitted herein, without the prior written consent of the Administrative Agent, except for sales of Inventory in the ordinary course of Borrowers' business and except to move Inventory directly from one location set forth or permitted herein to another such location and except for Inventory shipped from the manufacturer thereof to Borrowers which is in transit to the locations set forth or permitted herein;"

**7.9**    Equipment Covenants.  Section 7.4(e) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:

"(e) other than as a result of the Store GOB Sales and the SC GOB Sales, Borrowers shall not remove any Equipment from the locations set forth or permitted herein, except to the extent necessary to have any Equipment repaired or maintained in the ordinary course of the business of Borrowers or to move Equipment directly from one location set forth or permitted herein to another such location and except for the movement of motor vehicles used by or for the benefit of Borrowers in the ordinary course of business;"

**7.10**    Corporate Existence; Power and Authority.  Section 8.1 of the Pre-Petition Loan Agreement is hereby amended by (i) lower casing the word "The" in the second sentence therein and inserting immediately prior to such second sentence the following phrase "Subject to any entry of any required orders of the Bankruptcy Court including, without limitation, the entry of the Interim Financing Order and the Permanent Financing Order, as applicable," and (ii) lower casing the word "The" in the third sentence therein and inserting immediately prior to such third sentence the following phrase "Subject to the entry of the Interim Financing Order and the Permanent Financing Order, as applicable,".

**7.11**    Financial Statements.  Section 8.3 of the Pre-Petition Loan Agreement is hereby amended by deleting the reference to "October 31, 2014" and substituting "February 27, 2016" therefor.

**7.12**    Litigation.  Section 8.6 of the Pre-Petition Loan Agreement is hereby amended by lower casing the word "Except" in the first sentence therein and inserting immediately prior to such first sentence the following phrase "Except for the Bankruptcy Events or".

**7.13**    Compliance with Other Agreements and Applicable Laws.  (i) Section 8.7(a) of the Pre-Petition Loan Agreement is hereby amended by inserting immediately prior to the first sentence therein the following phrase "Other than as a result of the Bankruptcy Event (the exercise of remedies as a result of which are stayed under the Bankruptcy Code), the" and (ii) Section 8.7(b) of the Pre-Petition Loan Agreement is hereby amended by inserting

immediately prior to the first sentence therein the following phrase "Subject to the entry of the Interim Financing Order and the Final Financing Order, as applicable, the".

7.14    <u>Subsidiaries</u>. Section 8.12(e) of the Pre-Petition Loan Agreement is hereby amended by inserting immediately prior to the first sentence therein the following phrase "Other than the Obligations, the".

7.15    Material Contracts. Section 8.15 of the Pre-Petition Loan Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

> "8.15    <u>Material Contracts</u>. Schedule 8.15 to the Information Certificate sets forth all Material Contracts to which Loan Parties are a party or are bound as of the date hereof. Borrowers have delivered true, correct and complete copies of such Material Contracts to the Administrative Agent on or before the date hereof. Other than the Bankruptcy Events, the Loan Parties are not in breach or in default in any material respect of or under any Material Contract and have not received any notice of the intention of any other party thereto to terminate any Material Contract, except where such breach, default or termination has not had or could not reasonably be expected to have a Material Adverse Effect or would otherwise be stayed by the filing of the Chapter 11 Case."

7.16    <u>Payable Practices</u>. Section 8.16 of the Pre-Petition Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

> "8.16    <u>Payable Practices</u>. Borrowers have not made any material change in the historical accounts payable practices from those in effect immediately prior to the Ratification Closing Date, except (i) as in accordance with the Budget, or (ii) with the written consent of the Administrative Agent.

7.17    <u>Credit Card Agreements</u>.    Section 8.18 of the Pre-Petition Loan Agreement is hereby amended (i) by lower casing the word "No" in the fourth sentence therein and inserting immediately prior to such fourth sentence the following phrase "Other than the Bankruptcy Events," and (ii) by inserting immediately prior to the fifth sentence therein the following phrase "Other than the Bankruptcy Events,".

7.18    <u>Accuracy and Completeness of Information</u>.    Section 8.20 of the Pre-Petition Loan Agreement is hereby amended by lower casing the word "No" in the last sentence therein and inserting immediately prior to such last  sentence the following phrase "Other than the Bankruptcy Events,".

7.19    <u>Equity Contribution</u>.  Section 8.22 of the Pre-Petition Loan Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

> "8.22    [Intentionally Deleted]"

7.20    <u>Compliance with Laws, Regulations, Etc</u>.    Section 9.3(a) of the Pre-Petition Loan Agreement is hereby amended by inserting immediately prior to the first sentence

therein the following phrase "Except to the extent non-compliance is permitted under the Bankruptcy Code,".

      **7.21**    _Financial Statements and Other Information._  Section 9.6(a) of the Pre-Petition Loan Agreement is hereby amended by (i) deleting in its entirety the last sentence in the first paragraph of clause (a) therein and (ii) deleting in its entirety subclauses (i) and (ii) of clause (a).

      **7.22**    _Financial Statements and Other Information._  Section 9.6(b) of the Pre-Petition Loan Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

> "(b)    Loan Parties shall promptly notify the Administrative Agent in writing of the details of (i) any loss, damage, investigation, action, suit, proceeding or claim relating to Collateral having a value of more than $600,000 or which if adversely determined could reasonably be expected to have a Material Adverse Effect, other than events arising as a result of the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code;, (ii) any Material Contract being terminated or amended or any new Material Contract entered into (in which event Loan Parties shall provide the Administrative Agent with a copy of such Material Contract), (iii) any order, judgment or decree in excess of $600,000 shall have been entered against Loan Parties any of their properties or assets, (iv) any notification of a material violation of laws or regulations received by Loan Parties, (v) any ERISA Event, and (vi) the occurrence of any Default or Event of Default (other than the Existing Defaults)."

      **7.23**    _Financial Statements and Other Information._  Section 9.6(c)(c) of the Pre-Petition Loan Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

> "(c) other than in connection with the Store Closing GOB Sales and the SC GOB Sales, the intention of any Subsidiary of Loan Parties to wind up, liquidate or dissolve as permitted under Section 10.1(c) hereof, together with such other information with respect thereto as the Administrative Agent may reasonably request."

      **7.24**    _Financial Statements and Other Information._  Section 9.6(d) of the Pre-Petition Loan Agreement is hereby amended by deleting sub clauses (i), (ii) and (iii) therein in their entirety and replacing them with the following:

> "(i)    [intentionally deleted];
>
> (ii)    [intentionally deleted];
>
> (iii)    [intentionally deleted];"

      **7.25**    _Financial Statements and Other Information._  Section 9.6(d)(vii) of the Pre-Petition Loan Agreement is hereby amended by deleting the phrase "concurrently with the

delivery of the financial statements referred to in Section 9.6(a)(ii)" and replacing it with the phrase "promptly after any renewal, replacement or material modification thereof,"

      **7.26**   <u>Additional Financial Reporting Requirements</u>.  Section 9.6 of the Pre-Petition Loan Agreement is hereby amended by adding the following new subsection at the end of such Section:

> "(f)  Each Loan Party shall also provide Administrative Agent and Lenders with copies of all financial reports, schedules and other materials and information at any time furnished by or on behalf of any Loan Party to the Bankruptcy Court, or the U.S. Trustee, or any material information not previously provided to Administrative Agent with respect to the Chapter 11 Case that is provided to any creditors' committee or such Loan Party's shareholders, substantially concurrently with the delivery thereof to the Bankruptcy Court, creditors' committee, U.S. Trustee or shareholders, as the case may be."

      **7.27**   <u>Credit Card Agreements</u>.  Section 9.11 of the Pre-Petition Loan Agreement is hereby amended by inserting immediately prior to the first sentence therein the following phrase "Other the Bankruptcy Events,".

      **7.28**   <u>Sale of Assets</u>.  Section 10.1(c) of the Pre-Petition Loan Agreement is hereby amended by:

    (i) inserting immediately prior to the first sentence therein the following phrase "other than with respect to the Store Closing GOB Sales and the SC GOB Sales,";

    (ii) inserting the word "and" immediately before clause (v) therein;

    (iii) deleting the word "and" immediately after clause (v) therein; and

    (iv) deleting clause (vi) therein in its entirety.

      **7.29**   <u>Activities of Guarantors</u>.  Section 10.12 of the Pre-Petition Loan Agreement is hereby amended by lowercasing the word "No" in the first sentence thereof and inserting immediately prior to such first sentence the phrase "Other than as provided in the Financing Order or the Ratification Agreement,".

      **7.30**   <u>Intercompany Transfers</u>.  Section 10 of the Loan Agreement is hereby amended by adding a new subsection 10.15 at the end of such section as follows:

> "10.15   <u>Intercompany Transfers</u>.  Notwithstanding anything to the contrary contained in this Loan Agreement or any other Financing Agreements, no Borrower or Guarantor shall transfer the proceeds of any Loan or any of its other property or assets to, nor make any intercompany loan to or investment in or payment on behalf of SME, without in each case the prior written consent of Administrative Agent (and no such consent shall be implied, from any other

action, inaction or acquiescence by Administrative Agent), except to the extent specifically set forth in the Budget."

**7.31**    Encumbrances.    Section 10.2 of the Pre-Petition Loan Agreement is hereby amended by deleting Section 10.2 in its entirety and substituting the following therefor:

> "10.2    Encumbrances.    Each Loan Party shall not, and shall not permit any Subsidiary, after the Ratification Closing Date, to, create, incur, assume or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom without the prior written consent of  the Required Lenders excluding (a) Permitted Liens, (b) Liens securing the Obligations, (c) Allowed Professional Fees covered by the Carve-Out and (d) any existing Liens that are unenforceable as provided under the Bankruptcy Code."

**7.32**    Indebtedness.    Section  10.3 of the Pre-Petition Loan Agreement is hereby amended by (a) deleting subsection (j) and replacing it with "(j) [Intentionally Deleted];", (b) deleting subsection (k) and replacing it with "(k) [Intentionally Deleted];" and (c) deleting subsection (m) and replacing it with "(m) other unsecured indebtedness as provided in the Budget."

**7.33**    Restricted Payments.    Section 10.5 of the Pre-Petition Loan Agreement is hereby amended by (a) deleting subsection (c) and replacing it with "(c) any Borrower or Subsidiary of a Borrower may pay reasonable fees and expenses to Vestis IP Holdings pursuant to any agreements and other arrangements for the use of Intellectual Property in effect from time to time;" and (b) deleting subsection (d) and replacing it with "(d) [Intentionally Deleted]; and".

**7.34**    Prepayments and Amendments.    Notwithstanding anything to the contrary contained in Section 10.9 of the Loan Agreement or any other provision of the Loan Agreement or any of the other Financing Agreements, the Loan Parties will not, and will not permit any Subsidiary, after the Ratification Closing Date, to optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness for borrowed money (other than the Obligations or as otherwise made in accordance with the Budget) without the prior written consent of the Required Lenders.

**7.35**    Financial Covenants.

(a) Section 11.1 of the Pre-Petition Loan Agreement is hereby amended and restated as follows:

> "11.1    Minimum Excess Availability.    At all times from and after the Ratification Closing Date, Excess Availability shall be no less than the greater of (a) $7,500,000 or (b) ten percent (10%) of the Borrowing Base, as determined from time to time by Administrative Agent in its discretion."

(b) Section 11.2 of the Pre-Petition Loan Agreement is hereby amended and restated as follows:

"11.2 [Intentionally Deleted]."

(c) Section 11.3 of the Pre-Petition Loan Agreement is hereby amended and restated as follows:

"11.3 [Intentionally Deleted]."

**7.36**    <u>Events of Default</u>.  Section 12.1 of the Pre-Petition Loan Agreement is hereby amended as follows:

(a)    Section 12.1(a)(iv) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(iv) [intentionally deleted];".

(b)    Section 12.1(a)(v) of the Pre-Petition Loan Agreement is hereby amended by inserting the word "and" after the reference "12.1(a)(ii)" and deleting the reference to "Section 12.1(a)(iv)" therein.

(c)    Section 12.1(e) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(e) [intentionally deleted];".

(d)    Section 12.1(f) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(f) [intentionally deleted];".

(e)    Section 12.1(g) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(g) [intentionally deleted];".

(f)    Section 12.1(h) of the Pre-Petition Loan Agreement is hereby amended by inserting immediately at the beginning thereof the following phrase "other than the Bankruptcy Events".

(g)    Section 12.1(k) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:

"(k)    other than as a result of the Store GOB Sales and the SC GOB Sales, there shall occur a cessation of a substantial part of the business of a Borrower or any Guarantor for a period which materially adversely affects Borrowers' and Guarantors' capacity, taken as a whole, to continue to operate its business in accordance with past practice;"

(h)    Section 12.1(q) of the Pre-Petition Loan Agreement is hereby amended by inserting immediately after the phrase "any Credit Card Issuer or Credit Card Processor shall send notice to any Borrower or any Guarantor that it is ceasing to make or suspending payments" the following parenthetical "(excluding, for the avoidance of doubt, any additional reserves or holdbacks put in place as a result of the Bankruptcy Events)".

(i)    Section 12.1 of the Pre-Petition Loan Agreement is hereby amended by (i) deleting the word "and" at the end of Section 12.1(p), (ii) replacing the period appearing at the end of Section 12.1(q) with a semicolon, and (iii) adding the following at the end of such Section:

"(r)    the occurrence of any condition or event which permits Administrative Agent and Lenders to exercise any of the remedies set forth in the Financing Order, including, without limitation, any "Event of Default" (as defined in any Financing Order);

(s)    the termination or non-renewal of the Financing Agreements as provided for in any Financing Order;

(t)    any Loan Party suspends or discontinues all or any material part of its business (other than with respect to the Store Closing GOB Sales and the SC GOB Sales as defined in and permitted by the Ratification Agreement), or is enjoined by any court or governmental agency from continuing to conduct all or any material part of its business, or a trustee or examiner with expanded powers is appointed for any Loan Party, or any of their respective properties;

(u)    any act, condition or event occurring after the Petition Date that has or could reasonably expect to have a Material Adverse Effect;

(v)    conversion of any Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code;

(w)    dismissal of any Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

(x)    grant of a lien on or other interest in any property of any Loan Party, other than a Permitted Lien or a lien or encumbrance permitted by any Financing Order (including the Carve-Out), which is superior to or ranks in parity with Administrative Agent's security interest in or lien upon the Collateral;

(y)    the grant of an administrative expense claim in any Chapter 11 Case which is superior to or ranks in parity with the rights of the Administrative Agent (other than administrative expense claims permitted by any Financing Order or the Ratification Agreement, or the Carve-Out;

(z)    the failure of Borrowers or Guarantors to comply with any Financing Order or the Ratification Agreement, or any

Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of the Required Lenders;

(aa)   the appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(bb)  the appointment of an examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code;

(cc)  the filing of a plan of reorganization or liquidation by or on behalf of any Loan Party which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein, unless otherwise consented to by the Administrative Agent and the Lenders;

(dd) the confirmation of any plan of reorganization or liquidation in the Chapter 11 Case of any Loan Party which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein, unless otherwise consented to by the Administrative Agent and the Lenders;

(ee) the filing of a motion by any Debtor (or any Affiliate) that is not dismissed or denied within thirty (30) days after the date of filing such motion seeking, or the entry of any order permitting, recovery from any portion of the Collateral (or from Administrative Agent or any of the Lenders directly) any costs or expenses of preserving or disposing of the Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or otherwise);

(ff)  (i) the failure of Borrowers or Guarantors to comply with any material provision, unless with the prior consent of the Administrative Agent, of the (A) the letter agreement dated as of April 15, 2016 between Intermediate Holdco and Hilco Merchant Resources and Gordon Brothers Group for the Store Closing GOB Sales and the SC GOB Sales (the "**GOB Agreement**"), (B) the letter of engagement dated as of March 14, 2016, as amended on April 16, 2016, between the Debtors and FTI Consulting, Inc. (the "**FTI Engagement Letter**"), or (C) the letter agreement dated as of April 16, 2016 between Intermediate Holdco and Lincoln Partners LLC (the "**Lincoln Engagement Letter**") or (ii) the termination of any such agreements for any reason without the prior written consent of the Required Lenders; and

(gg) any Material Budget Deviation, as defined in Section 5.3(d) of the Ratification Agreement.

**7.37** <u>Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver</u>. Section 13.1(a) and (b) of the Pre-Petition Loan Agreement is hereby amended by deleting such Sections in their entirety and replacing them with the following:

"(a)    The validity, interpretation and enforcement of this Agreement and the other Financing Agreements (except as otherwise provided therein) and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by (i) the internal laws of the State of New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New York and (ii) to the extent applicable, the Bankruptcy Code.

(b)    Each Borrower, the Administrative Agent, each Lender and the Issuing Bank irrevocably consent and submit to the non-exclusive jurisdiction of the Bankruptcy Court and the United States District Court for the Southern District of New York, and any appellate court from any thereof. whichever the Administrative Agent may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement or any of the other Financing Agreements or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the other Financing Agreements or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described above (except that the Administrative Agent shall have the right to bring any action or proceeding against a Borrower or its property in the courts of any other jurisdiction which the Administrative Agent deems reasonably necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against such Borrower or its property)."

**7.38** <u>Schedule of Commitments</u>. Schedule 1 of the Loan Agreement is hereby amended by deleting such Schedule in its entirety and replacing it with Schedule 1 in the form attached hereto as <u>Exhibit E</u> to this Ratification Agreement.

**7.39** <u>Schedule of Existing Letters of Credit</u>. Schedule 3 of the Pre-Petition Loan Agreement is hereby amended by deleting such Schedule in its entirety and replacing it with Schedule 3 in the form attached hereto as <u>Exhibit F</u> to this Ratification Agreement.

**7.40** <u>Schedule of Credit Card Agreements</u>. Schedule 8.18 of the Pre-Petition Loan Agreement is hereby amended by deleting such Schedule in its entirety and replacing it with Schedule 8.18 in the form attached hereto as <u>Exhibit G</u> to this Ratification Agreement.

**7.41**    Form of Borrowing Base Certificate.  Exhibit B to the Pre-Petition Loan Agreement is hereby amended by deleting the Form of Borrowing Base Certificate in its entirety and replacing it with the Form of Borrowing Base Certificate attached hereto as Exhibit H to this Ratification Agreement.

**8.**    RELEASE.

**8.1**    Release of Pre-Petition Claims.

(a)    Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, in consideration of the agreements of Administrative Agent and Lenders contained herein and the making of any Revolving Loans by Administrative Agent and Lenders, each Loan Party, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, on behalf of itself and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Administrative Agent, each Lender and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Administrative Agent, each Lender and all such other parties being hereinafter referred to collectively as the "**Releasees**" and individually as a "**Releasee**"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever but, for the avoidance of doubt, excluding any claims or causes of action for gross negligence or willful misconduct (individually, a "**Pre-Petition Released Claim**" and collectively, "**Pre-Petition Released Claims**") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which any Borrower or Guarantor, or any of their respective successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the Ratification Closing Date, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Pre-Petition Loan Agreement, as amended and supplemented through the date hereof, and the other Financing Agreements.

(b)    Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, each Loan Party, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Borrower and Guarantor pursuant to this Section 8.1.  If any Loan Party violates the foregoing covenant, Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

8.2    Release of Post-Petition Claims. Upon the Payment in Full of all of the Obligations, in consideration of the agreements of Administrative Agent and Lenders contained herein and the making of any Revolving Loans by Administrative Agent and Lenders, each Loan Party hereby covenants and agrees to execute and deliver in favor of Administrative Agent and Lenders a valid and binding termination and release agreement, in form and substance satisfactory to Agent. If any Loan Party violates such covenant, Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

8.3    Releases Generally.

(a)    Each Loan Party understands, acknowledges and agrees that the releases set forth above in Sections 8.1 and 8.2 hereof  may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

(b)    Each Loan Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 8.1 hereof and, when made, Section 8.2 hereof.

9.    CONDITIONS PRECEDENT.

The amendments, representations and warranties, covenants, defaults and all other agreements and obligations contained in Sections 1 through 8 of this Ratification Agreement shall only become effective upon the satisfaction (or waiver) of all of the following conditions precedent (the time of such satisfaction (or waiver) referred to herein as the "**Ratification Closing Date**"):

9.1    as of the Petition Date, the Pre-Petition Financing Agreements shall not have been terminated;

9.2    Debtors shall have commenced a voluntary case under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware by no later than April 20, 2016. Debtors shall have complied in full with the notice and other requirements of the Bankruptcy Code in a manner reasonably acceptable to Administrative Agent and its counsel, with respect to the Interim Financing Order) and Administrative Agent shall have received such evidence thereof as it shall reasonably require. All of the first day orders entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Case shall be in form and substance reasonably satisfactory to Administrative Agent;

9.3    no trustee or examiner with expanded powers shall have been appointed or designated with respect to any Borrower or Guarantor, as Debtor and Debtor-in-Possession, or its respective business, properties and assets and no motion or proceeding shall be pending seeking such relief;

9.4    the Interim Financing Order has been duly entered, is valid, subsisting and continuing and has not been vacated, reversed, or modified by any order of the Bankruptcy Court

(other than as consented to by Administrative Agent) and is not subject to any pending appeal or stay;

9.5    a cash management order amending and ratifying the cash management arrangements of Borrowers and Guarantors on terms acceptable to Administrative Agent has been duly entered, is valid, subsisting and continuing and has not been vacated, reversed, or modified by any order of the Bankruptcy Court (other than as consented to by Administrative Agent) and is not subject to any pending appeal or stay;

9.6    the execution and delivery of this Ratification Agreement to be delivered in connection herewith by Borrowers, Guarantors and Lenders in form and substance satisfactory to Administrative Agent;

9.7    the implementation of the terms of this Ratification Agreement and the other Financing Agreements, as modified pursuant to this Ratification Agreement, all of which contains provisions, representations, warranties, covenants and Events of Default, as are satisfactory to Administrative Agent and its counsel;

9.8    the receipt by Administrative Agent of the following documents, agreements, or other information: (a) GOB Agreement, (b) the FTI Engagement Letter, and (c) the Lincoln Engagement Letter.

9.9    the Excess Availability, as determined by the Administrative Agent, shall not be less than $5,000,000 after giving effect to initial Loans to be made or the initial Letters of Credit to be issued immediately after the Ratification Closing Date and the payment of the fees and expenses required to be paid;

9.10    each Borrower and Guarantor shall have complied in full with the notice and other requirements of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to any relevant Financing Order in a manner prescribed by the Bankruptcy Code and the applicable Bankruptcy Rules;

9.11    receipt by Administrative Agent of the initial Budget;

9.12    other than the voluntary commencement of the Chapter 11 Case, no material impairment of the priority of Administrative Agent's and Lenders' security interests in the Collateral shall have occurred from the date of the latest field examinations of Administrative Agent and Lenders to the Petition Date;

9.13    Borrowers shall have (i) engaged the CRO and Investment Banker in accordance with Section 5.4 and Section 5.8 of the Ratification Agreement, and (ii) have provided the CRO and the investment banking firm with such information as they may reasonably require;

9.14    Other than the Bankruptcy Events, no Material Adverse Effect shall have occurred since February 27, 2016;

9.15    None of the materials previously furnished to Administrative Agent by Borrowers and Guarantors contain any material misstatements in, or omit to state, any material facts necessary to make the statements therein taken as a whole, in the light of the circumstances under which they were made, not misleading in any material respect.

9.16    Agent, for the benefit of itself and the other Secured Parties, shall hold perfected, first priority security interests in and liens upon the Collateral (subject to the Permitted Liens and the Carve-Out) and Administrative Agent shall have received such evidence thereof as it requires; and

9.17    Other than the Existing Defaults, no Default or Event of Default shall have occurred or be existing under any of the Financing Agreements, as modified pursuant hereto, and assumed by Borrowers and Guarantor.

10.    **ADDITIONAL CONDITIONS PRECEDENT TO ALL LOANS AND LETTERS OF CREDIT.**

In addition to the satisfaction of the conditions precedent under Section 9 of this Ratification Agreement with respect to the effectiveness of the noted Sections of this Ratification Agreement and the making of the initial Loans under the Loan Agreement, and the satisfaction of the conditions precedent in Sections 4.2(a), (b), (d) and (e) of the Loan Agreement with respect to all Loans and other financial accommodations available to Borrowers (such conditions in Section 4.2, except as modified or made pursuant to this Ratification Agreement shall remain applicable to the Loans and be applicable to other financial accommodations available to Borrowers), the following are conditions to Administrative Agent's and Lenders' obligation to extend further loans, advances or other financial accommodations to Borrowers pursuant to the Loan Agreement:

10.1    with respect to further credit after expiration of the Interim Financing Order, on or before the expiration of the Interim Financing Order, the Bankruptcy Court shall have entered the Permanent Financing Order. Neither Administrative Agent nor any Lender shall provide any Revolving Loans (or other financial accommodations) other than those authorized under the Interim Financing Order unless, on or before the expiration of the Interim Financing Order, the Permanent Financing Order shall have been entered, and there shall be no appeal or other contest with respect to either the Interim Financing Order or the Permanent Financing Order and the time to appeal to contest such order shall have expired;

10.2    requests for further credit shall be for purposes and in amounts in accordance with the Budget (subject to the variances permitted under Section 5.3(c) of the Ratification Agreement);

10.3    subject to the Financing Order, all fees and expenses required to be paid to the Administrative Agent and the Lenders pursuant to the Ratification Agreement and the Loan Agreement, as amended thereby, shall have been paid or shall be paid concurrently with the making of the Loans after the Ratification Closing Date; and

10.4    other than the Existing Defaults, no Default or Event of Default shall have occurred or be existing under any of the Financing Agreements, as amended, supplemented or

otherwise modified pursuant this Ratification Agreement and assumed by Borrowers and Guarantor.

**11.**    **MISCELLANEOUS**.

**11.1**    Amendments and Waivers.  Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

**11.2**    Further Assurances.  Each Borrower and Guarantor shall, at its expense, at any time or times duly execute and deliver, or shall use its best efforts to cause to be duly executed and delivered, such further agreements, instruments and documents, and do or use its best efforts to cause to be done such further acts as may be reasonably necessary or proper in Administrative Agent's opinion to evidence, perfect, maintain and enforce the security interests of Administrative Agent, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Ratification Agreement, any of the other Financing Agreements or the Financing Order.  Upon the request of Agent, at any time and from time to time, each Borrower and Guarantor shall, at its cost and expense, do, make, execute, deliver and record, register or file updates to the filings of Administrative Agent and Lenders with respect to the Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office, the financing statements, and other instruments, acts, pledges, assignments and transfers (or use its best efforts to cause the same to be done) and will deliver to Administrative Agent and Lenders such instruments evidencing items of Collateral as may be requested by Administrative Agent.

**11.3**    Headings.  The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

**11.4**    Counterparts.  This Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement.  In making proof of this Ratification Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto.  Delivery of an executed counterpart of this Ratification Agreement by telefacsimile or other means of electronic transmission shall have the same force and effect as delivery of an original executed counterpart of this Ratification Agreement.  Any party delivering an executed counterpart of this Ratification Agreement by telefacsimile or other means of electronic transmission also shall deliver an original executed counterpart of this Ratification Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Ratification Agreement as to such party or any other party.

**11.5**    Additional Events of Default.  The parties hereto acknowledge, confirm and agree that the failure of any Borrower or Guarantor to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by such Borrower or Guarantor in connection herewith shall constitute an Event of Default under the Financing Agreements.

**11.6**    <u>Costs and Expenses</u>.    Subject to the terms of the Financing Order, Borrowers shall pay to Administrative Agent and any Lender on demand all costs and expenses that Administrative Agent or any Lender pays or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Ratification Agreement and the other Financing Agreements and the Financing Order.    Subject to the terms of the Financing Order, the foregoing shall not be construed to limit any other provisions of the Financing Agreements regarding costs and expenses to be paid by Borrowers.    Subject to the terms of the Financing Order, all sums provided for in this Section 11.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Financing Agreements. Administrative Agent is hereby irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by Administrative Agent with respect to any Borrower or Guarantor.

**11.7**    <u>Effectiveness</u>.    This Ratification Agreement shall become effective upon the execution hereof by the Borrowers, Guarantors, Administrative Agent and Lenders and the entry of the Interim Financing Order.


[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Ratification Agreement to be duly executed as of the day and year first above written.

**BOB'S STORES, LLC**

By: _____
Name: Robert J. Duffy
Title:   Chief Restructuring Officer

**SPORT CHALET, LLC**

By: _____
Name: Robert J. Duffy
Title:   Chief Restructuring Officer

**SPORT CHALET VALUE SERVICES, LLC**

By: _____
Name: Robert J. Duffy
Title:   Chief Restructuring Officer

**SPORT CHALET TEAM SALES, LLC**

By: _____
Name: Robert J. Duffy
Title:   Chief Restructuring Officer

**EMS OPERATING COMPANY, LLC**

By: _____
Name: Robert J. Duffy
Title:   Chief Restructuring Officer

[Signature Page to Ratification and Amendment Agreement]

**VESTIS RETAIL GROUP, LLC**

By: _____

Name:  Robert J. Duffy

Title:   Chief Restructuring Officer


**VESTIS RETAIL FINANCING, LLC**

By: _____

Name:  Robert J. Duffy

Title:   Chief Restructuring Officer


**EMS ACQUISITION LLC**

By: _____

Name:  Robert J. Duffy

Title:   Chief Restructuring Officer


**VESTIS IP HOLDINGS, LLC**

By: _____

Name:  Robert J. Duffy

Title:   Chief Restructuring Officer


[Signature Page to Ratification and Amendment Agreement]

WELLS FARGO CAPITAL FINANCE, LLC,
as Administrative Agent, an Issuing Bank, and a Lender

By: _____
Name: Maggie S. Townsend
Title: Vice President

**BANK OF AMERICA, N.A.,**
as an Issuing Bank and a Lender

By: _____

Name: Robert Q. Mahoney
Title: Senior Vice President

## EXHIBIT C

**Pre-Petition Loan Agreement (Composite Version)**

01:18582954.1

[EXECUTION]

Composite through Amendment No. 5

FOURTH AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

by and among

BOB'S STORES, LLC
EASTERN MOUNTAIN SPORTS LLC
SPORT CHALET, LLC
SPORT CHALET VALUE SERVICES, LLC
EMS OPERATING COMPANY, LLC
SPORT CHALET TEAM SALES, LLC
as Borrowers,

and

VESTIS RETAIL FINANCING, LLC
VESTIS RETAIL GROUP, LLC
EMS ACQUISITION LLC
VESTIS IP HOLDINGS, LLC
as Guarantors,

and

THE LENDERS PARTY HERETO,

and

WELLS FARGO CAPITAL FINANCE, LLC,
as Administrative Agent,

and

BANK OF AMERICA, N.A.,
as Documentation Agent,

and

WELLS FARGO BANK, NATIONAL ASSOCIATION

and

BANK OF AMERICA, N.A.,
as Joint Lead Arrangers and Joint Bookrunners.

Dated as of February 11, 2015

# TABLE OF CONTENTS

Page

SECTION 1.  DEFINITIONS ...................................................................................2

SECTION 2.  CREDIT FACILITIES ......................................................................58

    2.1  Revolving Loans ..........................................................................58
    2.2  Swing Line Loans .......................................................................58
    2.3  Letters of Credit ..........................................................................59
    2.4  Requests for Borrowings..............................................................65
    2.5  Increase in Maximum Credit .......................................................66
    2.6  Joint and Several Liability of Borrowers .....................................67
    2.7  Mandatory Prepayment................................................................70
    2.8  Extensions of Revolving Facility Commitments ..........................70

SECTION 3.  INTEREST AND FEES ....................................................................72

    3.1  Interest.........................................................................................72
    3.2  Administrative Agent Fee; Other Fees ........................................73
    3.3  Unused Line Fee .........................................................................73
    3.4  Letter of Credit Fees ...................................................................73
    3.5  Inability to Determine Applicable Interest Rate ..........................74
    3.6  Illegality .....................................................................................74
    3.7  Increased Costs ...........................................................................75
    3.8  Capital Requirements ..................................................................75
    3.9  Certificates for Reimbursement ..................................................75
    3.10  Delay in Requests .......................................................................76
    3.11  Funding Losses ...........................................................................76
    3.12  Maximum Interest .......................................................................76
    3.13  No Requirement of Match Funding .............................................77

SECTION 4.  CONDITIONS PRECEDENT ..........................................................77

    4.1  Conditions Precedent to Initial Loans and Letters of Credit................................77
    4.2  Conditions Precedent to All Loans and Letters of Credit .....................................79

SECTION 5.  GRANT AND PERFECTION OF SECURITY INTEREST ...............80

    5.1  Grant of Security Interest............................................................80
    5.2  Exclusions from Collateral .........................................................81
    5.3  Perfection of Security Interests...................................................81

SECTION 6.  COLLECTION AND ADMINISTRATION .........................................85

    6.1  Register .......................................................................................85
    6.2  Statements; Loan Accounts..........................................................86
    6.3  Cash Management; Collection of Proceeds of Collateral ....................................86
    6.4  Bills of Lading and Other Documents of Title ....................................................88

6.5     Payments ................................................................................88
6.6     Authorization to Make Revolving Loans....................................89
6.7     Use of Proceeds.........................................................................89
6.8     Bank Products ...........................................................................90
6.9     Withholding Taxes .....................................................................90
6.10    Mitigation Obligations ..............................................................93
6.11    Pro Rata Treatment ...................................................................94
6.12    Sharing of Payments, Etc..........................................................94
6.13    Settlement Procedures ...............................................................95

SECTION 7.    COLLATERAL REPORTING AND COVENANTS ..........................99

7.1     Collateral Reporting..................................................................99
7.2     Accounts Covenants.................................................................101
7.3     Inventory Covenants ................................................................102
7.4     Equipment Covenants...............................................................103
7.5     Power of Attorney.....................................................................103
7.6     Right to Cure............................................................................104
7.7     Access to Premises...................................................................105

SECTION 8.    REPRESENTATIONS AND WARRANTIES.............................105

8.1     Corporate Existence; Power and Authority ..............................105
8.2     Name; State of Organization; Chief Executive Office; Collateral Locations......106
8.3     Financial Statements; No Material Adverse Change .................106
8.4     Priority of Liens .......................................................................107
8.5     Tax Returns...............................................................................107
8.6     Litigation..................................................................................107
8.7     Compliance with Other Agreements and Applicable Laws.................107
8.8     Environmental Compliance ......................................................108
8.9     Employee Benefits ....................................................................109
8.10    Bank Accounts ..........................................................................109
8.11    Intellectual Property.................................................................109
8.12    Subsidiaries; Affiliates; Capitalization; Solvency ..................110
8.13    Labor Disputes .........................................................................111
8.14    Restrictions on Subsidiaries ....................................................111
8.15    Material Contracts....................................................................111
8.16    Payable Practices .....................................................................111
8.17    OFAC ........................................................................................111
8.18    Credit Card Agreements ...........................................................112
8.19    Interrelated Businesses.............................................................112
8.20    Accuracy and Completeness of Information..............................112
8.21    Survival of Warranties; Cumulative .........................................113
8.22    Equity Contribution. .................................................................113
8.23    Second Lien Loan Documents ...................................................113

SECTION 9.    AFFIRMATIVE COVENANTS .............................................113

9.1     Maintenance of Existence .........................................................113

ii

9.2     [Reserved]. ....................................................................................114
9.3     Compliance with Laws, Regulations, Etc. .............................................114
9.4     Payment of Taxes and Claims ...........................................................115
9.5     Insurance ....................................................................................116
9.6     Financial Statements and Other Information ..........................................116
9.7     Compliance with ERISA ...................................................................119
9.8     License Agreements ........................................................................119
9.9     Additional Guaranties and Collateral Security; Further Assurances .................120
9.10    Costs and Expenses .........................................................................121
9.11    Credit Card Agreements ...................................................................122

SECTION 10. NEGATIVE COVENANTS .......................................................122

10.1    Sale of Assets, Consolidation, Merger, Dissolution, Etc. ............................122
10.2    Encumbrances ...............................................................................124
10.3    Indebtedness ................................................................................124
10.4    Investments ..................................................................................128
10.5    Restricted Payments ........................................................................128
10.6    Transactions with Affiliates ...............................................................129
10.7    Change in Business ..........................................................................130
10.8    Limitation of Restrictions Affecting Subsidiaries .....................................130
10.9    Certain Payments of Indebtedness, Etc. .................................................130
10.10   End of Fiscal Years; Accounting Practices ...............................................131
10.11   Modifications of Indebtedness, Organizational Documents and Certain
        Other Agreements ...........................................................................131
10.12   Activities of Guarantors ....................................................................131
10.13   Foreign Assets Control Regulations, Etc. ...............................................131
10.14   Acquisition of the Second Lien Debt ....................................................132

SECTION 11. FINANCIAL COVENANTS .......................................................132

11.1    Minimum Excess Availability. ............................................................132
11.2    Fixed Charge Coverage Ratio. ............................................................132
11.3    Permitted Cure of Breach of Fixed Charge Coverage Ratio Financial
        Covenant; Curative Equity ................................................................132

SECTION 12. EVENTS OF DEFAULT AND REMEDIES .....................................133

12.1    Events of Default ...........................................................................133
12.2    Remedies .....................................................................................135

SECTION 13. JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS;
        GOVERNING LAW .........................................................................139

13.1    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver .........139
13.2    Waiver of Notices ...........................................................................140
13.3    Amendments and Waivers .................................................................140
13.4    Waiver of Counterclaims ..................................................................144
13.5    Indemnification .............................................................................144

SECTION 14.  THE AGENT ...................................................................................145

    14.1    Appointment, Powers and Immunities...............................................145
    14.2    Reliance by Agent..............................................................................145
    14.3    Events of Default ...............................................................................146
    14.4    Wells Fargo in Its Individual Capacity .............................................146
    14.5    Indemnification..................................................................................146
    14.6    Non-Reliance on Administrative Agent and Other Lenders...............147
    14.7    Failure to Act .....................................................................................147
    14.8    Additional Loans................................................................................147
    14.9    Concerning the Collateral and the Related Financing Agreements ....148
    14.10   Field Audit, Examination Reports and other Information; Disclaimer by
          Lenders...............................................................................................148
    14.11   Collateral Matters..............................................................................149
    14.12   Agency for Perfection ........................................................................151
    14.13   Administrative Agent May File Proofs of Claim................................151
    14.14   Successor Agent .................................................................................152
    14.15   Legal Representation of Agent ...........................................................153
    14.16   Other Administrative Agent Designations..........................................153

SECTION 15.  TERM OF AGREEMENT; MISCELLANEOUS ............................................153

    15.1    Term...................................................................................................153
    15.2    Confidentiality ...................................................................................155
    15.3    Interpretative Provisions ....................................................................156
    15.4    Intercreditor Agreement.....................................................................158
    15.5    Notices ...............................................................................................158
    15.6    Partial Invalidity................................................................................160
    15.7    Successors ..........................................................................................160
    15.8    Assignments; Participations...............................................................160
    15.9    [Reserved] ..........................................................................................163
    15.10   USA PATRIOT Act ...........................................................................163
    15.11   Register .............................................................................................163
    15.12   Entire Agreement...............................................................................163
    15.13   Counterparts, Etc................................................................................163
    15.14   Acknowledgment and Restatement....................................................163

INDEX
TO
EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Assignment and Acceptance Agreement |
| Exhibit B | Form of Borrowing Base Certificate |
| Exhibit C | Information Certificate |
| Exhibit D | Form of Compliance Certificate |
| Exhibit E | Form of Solvency Certificate |
| Exhibit T-1 | Form of U.S. Tax Compliance Certificate for Foreign Lenders That Are Not Partnerships |
| Exhibit T-2 | Form of U.S. Tax Compliance Certificate for Foreign Participants That Are Not Partnerships |
| Exhibit T-3 | Form of U.S. Tax Compliance Certificate for Foreign Participants That Are Partnerships |
| Exhibit T-4 | Form of U.S. Tax Compliance Certificate for Foreign Lenders That Are Partnerships |
| Schedule 1 | Commitments |
| Schedule 2 | Credit Card Reserves |
| Schedule 3 | Existing Letters of Credit |
| Schedule 4 | Freight Forwarders |
| Schedule 8.18 | Credit Card Agreements |

**FOURTH AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT**

This Fourth Amended and Restated Loan and Security Agreement (the "Agreement") dated as of February 11, 2015 is entered into by and among Bob's Stores LLC, a New Hampshire limited liability company ("Bob's"), Eastern Mountain Sports LLC, a Delaware limited liability company ("EMS"), Sport Chalet, LLC a Delaware limited liability company, successor by conversion to Sport Chalet, Inc., a Delaware corporation ("Sport Chalet"), Sport Chalet Value Services, LLC, a Virginia limited liability company ("Value Services") Sport Chalet Team Sales, LLC, a Delaware limited liability company, successor by conversion to Sport Chalet Team Sales, Inc., a California limited liability company ("Team Sales"), EMS Operating Company, LLC, a Delaware limited liability company ("EMS OpCo"), and together with Bob's, EMS, Sport Chalet, Value Services, Team Sales and any other Person that hereinafter becomes a borrower party hereto, each a "Borrower", and, collectively, "Borrowers"), Vestis Retail Financing, LLC, a Delaware limited liability company ("Parent"), Vestis Retail Group, LLC, a Delaware limited liability company ("Intermediate Holdco"), EMS Acquisition LLC, a Delaware limited liability company ("EMS Acquisition"), Vestis IP Holdings, LLC, a Delaware limited liability company ("Vestis IP Holdings") and, together with Parent, Intermediate Holdco, EMS Acquisition and any other Person that hereafter becomes a guarantor party hereto, each a "Guarantor" and collectively "Guarantors"), the Lenders (such term and each other capitalized term used but not defined herein having the meaning given to it in Section 1), Wells Fargo Capital Finance, LLC ("Wells Fargo"), as administrative agent and collateral agent for the Lenders (in such capacity, the "Administrative Agent") and Bank of America, N.A, as documentation agent for the Lenders.

W I T N E S S E T H :

WHEREAS, Borrowers and Guarantors are parties to the Third Amended and Restated Loan and Security Agreement, dated as of August 19, 2014, the "Existing Loan Agreement"), by and among the lenders party thereto (the "Existing Lenders") and Agent, pursuant to which Existing Lenders have made loans and advances and provided other financial accommodations to Borrowers;

WHEREAS, Borrowers have requested Agent and Existing Lenders continue the financing arrangements with Borrowers pursuant to an amendment and restatement to the Existing Loan Agreement and pursuant to which the Lenders may make loans and provide other financial accommodations to Borrowers; and

WHEREAS, the Lenders are willing to agree to make such loans and advances and provide such financial accommodations to Borrowers on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree that the Existing Loan Agreement shall be (and each hereby is) amended and restated in its entirety as follows:

# SECTION 1.    **DEFINITIONS**

For purposes of this Agreement, the following terms shall have the respective meanings given to them below:

"Account Debtor" or "account debtor" shall mean a person obligated on an Account, and including, without limitation, an account debtor as such term is defined in the UCC, a Credit Card Issuer or a Credit Card Processor.

"Accounts" shall mean all present and future rights of Borrowers to payment of a monetary obligation, whether or not earned by performance, which is not evidenced by chattel paper or an instrument, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a secondary obligation incurred or to be incurred, or (d) arising out of the use of a credit or charge card or information contained on or for use with the card, including, without limitation, Credit Card Receivables.

"Acquired Business" shall have the meaning set forth in the definition of the term Permitted Acquisition.

"Acquisition" shall mean the acquisition contemplated by the Agreement and Plan of Merger, dated as of June 30, 2014, by and among Intermediate Holdco, Everest and Sport Chalet, pursuant to which Everest acquired Sport Chalet on August 19, 2014, pursuant to a merger whereby Everest was merged with and into Sport Chalet, with Sport Chalet as the surviving entity and an indirect Wholly-Owned Subsidiary of the Parent.

"Act" shall have the meaning set forth in Section 15.10 hereto.

"Adjusted Eurodollar Rate" shall mean, with respect to each Interest Period for any Eurodollar Rate Loan comprising part of the same borrowing (including conversions, extensions and renewals), the rate per annum determined by dividing (a) the London Interbank Offered Rate for such Interest Period by (b) a percentage equal to: (i) one (1) minus (ii) the Reserve Percentage. For purposes hereof, "Reserve Percentage" shall mean for any day, that percentage (expressed as a decimal) which is in effect from time to time under Regulation D of the Board of Governors of the Federal Reserve System (or any successor), as such regulation may be amended from time to time or any successor regulation, as the maximum reserve requirement (including, without limitation, any basic, supplemental, emergency, special, or marginal reserves) applicable with respect to Eurocurrency liabilities as that term is defined in Regulation D (or against any other category of liabilities that includes deposits by reference to which the interest rate of Eurodollar Loans is determined), whether or not the Lender have any Eurocurrency liabilities subject to such reserve requirement at that time. Eurodollar Loans shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credits for proration, exceptions or offsets that may be available from time to time to the Lenders. The Adjusted Eurodollar Rate shall be adjusted automatically on and as of the effective date of any change in the Reserve Percentage.

"Adjusted Payment Conditions" shall mean, with respect to any applicable payment or other transaction, the following conditions:

(a)      as of the date of any such payment or transaction, and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing;

(b)      as of the date of any such payment or transaction and after giving effect thereto, the Excess Availability for the immediately preceding 30 consecutive day period shall have been not less than twenty percent (20%) of the Maximum Credit and after giving effect to any such payment or transaction, using the most recent calculation of the Borrowing Base immediately prior to any such payment or transaction, the Excess Availability shall be not less than twenty percent (20%) of the Maximum Credit;

(c)      receipt by the Administrative Agent of reasonably satisfactory projections for the twelve month period after the date of such payment or transaction showing that the Excess Availability for the twelve month period following the date on which such payment or transaction occurs shall be not less than twenty percent (20%) of the Maximum Credit; and

(d)      receipt by the Administrative Agent of a certificate of an authorized officer of the Parent certifying as to compliance with the preceding clauses and demonstrating (in reasonable detail) the calculations required thereby.

"Administrative Agent" shall have the meaning set forth in the preamble hereto.

"Administrative Agent Payment Account" shall mean account no. 3707282023200156 of the Administrative Agent at Wells Fargo Bank, National Association or such other account of the Administrative Agent as Administrative Agent may from time to time designate to Borrowers as the Administrative Agent Payment Account for purposes of this Agreement.

"Affiliate" as to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under control with") means possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract, or otherwise).

"Agents" shall mean the Arrangers, the Documentation Agent and the Administrative Agent, and "Agent" shall mean any of them, as the context may require.

"Agreement" shall have the meaning set forth in the preamble hereto.

"Amendment No. 1"[1] shall mean Amendment No. 1 to Fourth Amended and Restated Loan and Security Agreement, dated as of November 2, 2015, by and among Borrowers, Guarantors, Lenders and Administrative Agent.

"Amendment No. 1 Effective Date"[2] shall mean the date on which each of the conditions precedent to the effectiveness of Amendment No. 1 have been satisfied.

---

[1] Amendment No. 1
[2] Amendment No. 1

4241829.6

"Amendment No. 2"[3] shall mean Amendment No. 2 to Fourth Amended and Restated Loan and Security Agreement, dated as of January 7, 2016, by and among Borrowers, Guarantors, Lenders and Administrative Agent.

"Amendment No. 2 Effective Date"[4] shall mean the date on which each of the conditions precedent to the effectiveness of Amendment No. 2 have been satisfied.

"Amendment No. 3"[5] shall mean Amendment No. 3 to Fourth Amended and Restated Loan and Security Agreement, dated as of January 11, 2016, by and among Borrowers, Guarantors, Lenders and Administrative Agent.

"Amendment No. 3 Effective Date"[6] shall mean the date on which each of the conditions precedent to the effectiveness of Amendment No. 3 have been satisfied.

"Amendment No. 4"[7] shall mean Amendment No. 4 to Fourth Amended and Restated Loan and Security Agreement, dated as of February 9, 2016, by and among Borrowers, Guarantors, Lenders and Administrative Agent.

"Amendment No. 4 Effective Date"[8] shall mean the date on which each of the conditions precedent to the effectiveness of Amendment No. 4 have been satisfied.

"Amendment No. 5"[9] shall mean Amendment No. 5 to Fourth Amended and Restated Loan and Security Agreement, dated as of March 15, 2016, by and among Borrowers, Guarantors, Lenders and Administrative Agent.

"Amendment No. 5 Effective Date"[10] shall mean the date on which each of the conditions precedent to the effectiveness of Amendment No. 5 have been satisfied.

"Applicable Margin" shall mean, with respect to Base Rate Loans and Eurodollar Rate Loans, the applicable percentage (on a per annum basis) set forth below based on the Quarterly Average Excess Availability for the immediately preceding calendar quarter.

| Tier | Quarterly Average Excess Availability | Applicable Eurodollar Rate Margin for Revolving Loans | Applicable Base Rate Margin for Revolving Loans |
|---|---|---|---|
| 1 | Greater than 66-2/3% of the Maximum Credit | 2.25% | 1.00% |

---

[3] Amendment No. 2
[4] Amendment No. 2
[5] Amendment No. 3
[6] Amendment No. 3
[7] Amendment No. 4
[8] Amendment No. 4
[9] Amendment No. 5
[10] Amendment No. 5

4

| Tier | Quarterly Average Excess Availability | Applicable Eurodollar Rate Margin for Revolving Loans | Applicable Base Rate Margin for Revolving Loans |
|---|---|---|---|
| 2 | Greater than or equal to 33-1/3% of the Maximum Credit but less than or equal to 66-2/3% of the Maximum Credit | 2.50% | 1.25% |
| 3 | Less than 33-1/3% of the Maximum Credit | 2.75% | 1.50% |

provided, that, (i) the Applicable Margin shall be calculated and established once every three (3) months and shall remain in effect until adjusted for the next three (3) month period, (ii) each adjustment of the Applicable Margin shall be effective as of the first day of each such three (3) month period based on the Quarterly Average Excess Availability for the immediately preceding three (3) month period, (iii) notwithstanding anything to the contrary contained herein, the Applicable Margin through March 31, 2015 shall be the amount for Tier 3 set forth above and (iv) in the event that Borrowers fail to provide any Borrowing Base Certificate or other information with respect thereto for any period on the date required hereunder, effective as of the date on which such Borrowing Base Certificate or other information was otherwise required, at the Administrative Agent's option, the Applicable Margin shall be based on the highest rate above until the next Business Day after a Borrowing Base Certificate or other information is provided for the applicable period at which time the Applicable Margin shall be adjusted as otherwise provided herein. In the event that at any time after the end of any three (3) month period the Quarterly Average Excess Availability for such three (3) month period used for the determination of the Applicable Margin was less than the actual amount of the Quarterly Average Excess Availability for such period as a result of the inaccuracy of information provided by or on behalf of Borrowers to the Administrative Agent for the calculation of Excess Availability, the Applicable Margin for such prior period shall be adjusted to the applicable percentage based on such actual Quarterly Average Excess Availability and any additional interest for the applicable period as a result of such recalculation shall be promptly paid to the Administrative Agent. The foregoing shall not be construed to limit the rights of the Administrative Agent and the Lenders with respect to the amount of interest payable after a Default or Event of Default whether based on such recalculated percentage or otherwise.

"Arrangers" shall mean Wells Fargo Bank, National Association and Bank of America, as joint lead arrangers and joint bookrunners.

"Assignment and Acceptance" shall mean an assignment and acceptance agreement, substantially in the form of Exhibit A.

4241829.6

"Bank Product Provider" shall mean any Lender or any Affiliate of any Lender that provides any Bank Products to a Loan Party.

"Bank Products" shall mean any one or more of the following types or services or facilities provided to a Loan Party by any Lender or any Affiliate of any Lender: (a) credit cards, debit cards, purchase cards, or stored value cards or the processing of credit card sales or receipts, (b) cash management or related services, including (i) the automated clearinghouse transfer of funds for the account of any Loan Party pursuant to agreement or overdraft for any accounts of any Loan Party maintained at any Lender or any Affiliate of any Lender and (ii) controlled disbursement services, and (c) Hedge Agreements if and to the extent permitted hereunder.

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (i) the Federal Funds Rate plus ½ of 1.0%, (ii) the rate of interest in effect for such day as publicly announced by Wells Fargo Bank, N.A. as its "prime rate" and (iii) the London Interbank Offered Rate for interest periods of one month plus 1.0%.

"Base Rate Loans" shall mean any Loans or portion thereof on which interest is payable based on the Base Rate in accordance with the terms hereof.

"Blocked Accounts" shall have the meaning set forth in Section 6.3 hereto.

"Bob's" shall have the meaning set forth in the preamble hereto.

"Borrowers" shall have the meaning set forth in the recitals hereto, together with their respective successors and permitted assigns.

"Borrowing Base" shall mean, at any time, the amount equal to:

       (a)     the amount equal to ninety percent (90%) of the net amount of Eligible Credit Card Receivables (including, without limitation, net of discount fees); plus

       (b)     the amount equal to ninety percent (90%) of the Net Recovery Percentage of each category of Eligible Inventory multiplied by the Value thereof; plus

       (c)     the amount equal to ninety percent (90%) of the Net Recovery Percentage of each category of Eligible Rental Inventory multiplied by the Value thereof; plus

       (d)     the amount equal to seventy-five percent (75%) of the amount of Eligible Accounts, minus

       (e)     Reserves.

The amounts of Eligible Inventory shall, at the Administrative Agent's option, be determined based on the lesser of the amount of Inventory set forth in the general ledgers of Borrowers or the perpetual inventory record maintained by Borrowers. For purposes hereof, the net amount of Eligible Credit Card Receivables at any time shall be the face amount of such Eligible Credit Card Receivables less any and all returns, rebates, discounts (which may, at the Administrative

Agent's option, be calculated on shortest terms), credits, allowances, chargebacks or taxes of any nature at any time issued, owing, claimed by account debtors, or granted, outstanding or payable in connection with such accounts at such time, all as determined by the Administrative Agent in its Permitted Discretion.

"Borrowing Base Certificate" shall mean a certificate by the chief executive officer, chief financial officer, vice president of finance, treasurer or controller of Intermediate Holdco, substantially in the form of Exhibit B (or another form reasonably acceptable to the Administrative Agent) setting forth the calculation of the Borrowing Base, including a calculation of each component thereof, all in such detail as shall be reasonably satisfactory to the Administrative Agent. All calculations of the Borrowing Base in connection with the preparation of any Borrowing Base Certificate shall originally be made by Borrowers and certified to the Administrative Agent; provided, that, the Administrative Agent shall have the right to review and adjust, in the exercise of its Permitted Discretion, any such calculation after giving notice thereof to any Borrower, (a) to reflect its reasonable estimate of declines in value of any of the Collateral described therein, and (b) to the extent that the Administrative Agent determines that such calculation is not in accordance with this Agreement.  Each Borrower hereby authorizes Intermediate Holdco to execute any Borrowing Base Certificate on its behalf.

"Borrowing Base Reporting Period" shall mean each fiscal month (or, in the event a Liquidity Period exists, a more frequent period as Administrative Agent may request but not more frequently than weekly); provided, that, Borrowers may change the Borrowing Base Reporting Period to each week, effective five (5) Business Days following the receipt by the Administrative Agent of written notice to that effect; provided, further, that, Borrowers may only change the Borrowing Base Reporting Period one time during the term of this Agreement and the Borrowing Base Reporting Period shall be each week at all times from and after the date that is five (5) Business Days after the receipt by the Administrative Agent of such notice.

"Business Day" shall mean any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the laws of the State of California, State of Massachusetts, the State of New York or the State of North Carolina, except that if a determination of a Business Day shall relate to any Eurodollar Rate Loans, the term Business Day shall also exclude any day on which banks are closed for dealings in dollar deposits in the London interbank market or other applicable London Interbank Offered Rate market.

"Capital Expenditures" shall mean for any period, the aggregate of all expenditures (whether paid in cash and not theretofore accrued subsequent to the date of this Agreement or accrued as liabilities during such period and including that portion of Capital Leases which is capitalized on the consolidated balance sheet of Borrowers and their Subsidiaries in accordance with GAAP as in effect on the Closing Date) by the Parent and its Subsidiaries during such period that, in conformity with GAAP, are required to be included in or reflected by the property, plant, equipment or intangibles or similar fixed asset accounts reflected in the consolidated balance sheet of the Parent and its Subsidiaries, in each case excluding any Tenant Allowances that would otherwise constitute Capital Expenditures in accordance with the foregoing definition.

"Capital Leases" shall mean, as applied to any Person, any lease of (or any agreement conveying the right to use) any property (whether real, personal or mixed) by such Person as

4241829.6

lessee which in accordance with GAAP (as in effect on the Closing Date), is required to be reflected as a liability on the balance sheet of such Person.

"Capital Stock" shall mean any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Cash Equivalents" shall mean, at any time, (a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within twelve months from the date of acquisition thereof; (b) without limiting the provisions of paragraph (d) below, investments in commercial paper maturing within six months from the date of acquisition thereof and having, at such date of acquisition, a rating of at least "A-2" or the equivalent thereof from S&P or of at least "P-2" or the equivalent thereof from Moody's; (c) investments in operating deposit accounts, certificates of deposit, banker's acceptances and time deposits maturing within six (6) months from the date of acquisition thereof issued or guaranteed by or placed with (i) any domestic office of a Lender or the bank with whom a Borrower maintains its cash management system; provided, that, if at any time such bank is not a Lender, such bank shall have entered into an agreement with the Administrative Agent pursuant to which such bank shall have waived all rights of setoff and confirmed that such bank does not have, nor shall it claim, a security interest therein or (ii) any domestic office of any other commercial bank of recognized standing organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $250,000,000 and is the principal banking Subsidiary of a bank holding company having a long-term unsecured debt rating of at least "A-2" or the equivalent thereof from S&P or at least "P-2" or the equivalent thereof from Moody's; (d) investments in commercial paper maturing within six (6) months from the date of acquisition thereof and issued by the holding company of any commercial bank of recognized standing organized under the laws of the United States of America or any State thereof that has (i) a combined capital and surplus in excess of $250,000,000 and (ii) commercial paper rated at least "A-2" or the equivalent thereof from S&P or of at least "P-2" or the equivalent thereof from Moody's; (e) investments in repurchase obligations with a term of not more than seven (7) days for underlying securities of the types described in clause (a) above entered into with any office of a bank or trust company meeting the qualifications specified in clause (c) above; and (f) investments in money market funds substantially all the assets of which are comprised of securities of the types described in clauses (a) through (e) above.

"Cash Flow Forecast"[11] shall mean, as of any date, a forecast, in form and substance reasonably satisfactory to Administrative Agent, which sets forth a statement of cash flow of Loan Parties including projected cash receipts, expenditures and loan availability of Loan Parties for each of the succeeding thirteen (13) consecutive weeks, which shall be prepared and reviewed by Loan Parties and their management and shall include a comparison of the actual cash receipts, expenditures and loan availability to the projected cash receipts, expenditures and loan availability for the week ending as of the close of business on Friday of the immediately

---

[11] Amendment No. 2

preceding week, together with a report in reasonable detail summarizing any variances reflected therein.

"Change of Control" shall mean (a) at any time prior to the consummation of a Qualified IPO, the Permitted Holders cease to beneficially own, in the aggregate, directly or indirectly, at least a majority of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Parent (in each case, determined on a fully diluted basis but not giving effect to contingent voting rights that have not vested); or (b) at any time upon or after the consummation of a Qualified IPO, (1) any Person (other than one or more Permitted Holders or any underwriter or placement agent participating in a Qualified IPO) or (2) Persons (other than one or more Permitted Holders or any underwriter or placement agent participating in a Qualified IPO) constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person and its subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), becomes the beneficial owner, directly or indirectly, of Equity Interests representing more than thirty-five percent (35.0%) of the aggregate ordinary voting power for the election of directors represented by the issued and outstanding Equity Interests of the Parent (or if the Parent is or becomes a wholly owned subsidiary of another Person, such Person) (in each case, determined on a fully diluted basis but not giving effect to contingent voting rights that have not vested) and the percentage of aggregate ordinary voting power for the election of directors so held is greater than the percentage of the aggregate ordinary voting power for the election of directors represented by the Equity Interests of the Parent beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders (in each case, determined on a fully diluted basis but not giving effect to contingent voting rights that have not vested); or (c) at any time, (i) the Parent shall fail to own, directly or indirectly, beneficially, 100.0% of the issued and outstanding voting Equity Interests of each Borrower or (ii) during any period of twenty-four (24) months, the composition of the board of directors of the Parent changes such that a majority of the members of such board of directors are not either (x) Persons who were members of such board of directors on the Closing Date or (y) Persons who were approved, appointed or nominated by the Permitted Holders or by then-serving directors or by such other members so approved, appointed or nominated; unless, in the case of either clause (a) or (b) above, the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of the Parent.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"Closing Date" shall mean February 11, 2015.

"Code" shall mean the Internal Revenue Code of 1986, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"Collateral" shall have the meaning set forth in Section 5 hereto.

"Collateral Access Agreement" shall mean an agreement in writing, in form and substance reasonably satisfactory to the Administrative Agent, from any lessor of premises to any Borrower, or any other person to whom any Collateral is consigned or who has custody, control or possession of any such Collateral or is otherwise the owner or operator of any premises on which any of such Collateral is located, in favor of the Administrative Agent with respect to the Collateral at such premises or otherwise in the custody, control or possession of such lessor, consignee or other person.

"Commercial Letter of Credit" shall mean any Letter of Credit issued for the purpose of providing the primary manner of payment for the purchase price of goods or services by a Borrower or a Guarantor in the ordinary course of the business of such Borrower or such Guarantor.

"Commitment" shall mean, with respect to each Lender, the commitment of such Lender to make Revolving Loans hereunder pursuant to Section 2.1 up to the amount set forth for such Lender in Schedule 1 hereto or on Schedule 1 to the Assignment and Acceptance pursuant to which such Lender assumed its Commitment, as applicable, as the same may be further increased from time to time pursuant to Section 2.5.  The aggregate principal amount of the Lenders' Commitments on the Closing Date is $180,000,000.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended, the rules and regulations promulgated thereunder, and any successor statute.

"Competitor" shall mean a person, other than a Loan Party, who directly provides products or services that compete or may compete with products or services provided by the Loan Parties taken as a whole and who has been identified as a competitor by a Borrower to the Administrative Agent in writing from time to time.

"Consolidated EBITDA" shall mean, with respect to Intermediate Holdco and its Subsidiaries for any period, (a) the sum, without duplication, of the amounts for such period of (i) Consolidated Net Income, plus (ii) to the extent deducted in the calculation of Consolidated Net Income, the sum of (A) Interest Expense, plus (B) total depreciation expense, plus (C) total amortization expense, plus (D) provisions for taxes based on income, profits, or capital, including federal, foreign, state, local, franchise, excise and similar taxes paid or accrued, plus (E) non-cash stock compensation expenses, plus (F) non-cash warrant expense, plus (G) prepayment premiums in connection with the repayment of Indebtedness permitted to be incurred by this Agreement, plus (H) costs, fees and expenses in connection with the execution and delivery of this Agreement and the consummation of the Transactions, plus (I) reasonable costs, fees and expenses in connection with an initial public offering or other equity issuance or incurrence of Indebtedness (in each case whether or not consummated), plus (J) all other non-cash charges, expenses and losses, plus (K) fees and expenses paid pursuant to the Management Agreements, to the extent permitted to be paid in accordance with the terms of this Agreement, plus (L) losses, charges and expenses attributable to asset dispositions or the sale or other disposition of any Equity Interests of any Loan Party, in each case other than in the ordinary course of business, plus (M) losses, charges and expenses attributable to abandoned,

10

closed, disposed or discontinued operations and losses, charges and expenses related to the disposal of disposed, abandoned, closed or discontinued operations, plus (N) (i) business optimization expenses (including consolidation initiatives), relocation or integration expenses, (ii) expenses, costs and charges related to consolidation or closing of distribution centers or other facilities or exiting lines of business, acquisitions and mergers after the Closing Date, initiatives aimed at profitability improvement; strategic initiatives, personnel relocation, restructuring, redundancy, severance, termination, settlement or judgment, (iii) one-time compensation charges and (iv) the amount of any signing, retention and completion bonuses; provided that (x) the aggregate amount added back pursuant to this clause (N) during the first twenty-four (24) month period following August 19, 2014 with respect to restructuring expenses, costs and charges to integrate Sport Chalet and its Subsidiaries substantially as described in the Everest Assessment dated May 14, 2014 prepared by AT Kearney shall be added back solely in respect of the period incurred and solely in respect of the twenty-four (24) month period immediately following August 19, 2014 and shall not exceed $9,100,000 in the aggregate during such twenty-four (24) month period (it being understood that any amounts added back pursuant to this clause (N)(x) shall not be subject to the limit set forth in clause (N)(y)), and (y) the aggregate amount added back pursuant to this clause (N) for all other adjustments described in this clause (N) (but not including any amounts added back pursuant to clause (N)(x)) during any twelve (12) month period, plus the aggregate amount pursuant to clauses (G), (I), (K), (L), (M), (O), (P) and (Q) during such period, shall not exceed fifteen (15.0%) of Consolidated EBITDA for such period (calculated prior to giving effect to any increase pursuant to this clause (N)(y) and clauses (G), (I), (K), (L), (M), (O), (P) and (Q); plus (O) one-time costs, fees and expenses in connection with Permitted Acquisitions or other transactions that if closed, would have constituted a Permitted Acquisition, plus (P) any other extraordinary, non-recurring or unusual losses, charges and expenses, plus (Q) losses, charges and expenses attributable to the early extinguishment or conversion of Indebtedness or any Hedge Agreements or other derivative instruments, in each case entered into in the ordinary course of business (including deferred financing expenses written off and premiums paid); provided that Consolidated EBITDA for any period shall be determined on a Pro Forma Basis.

"Consolidated Net Income" shall mean for any period as at any date of determination, the net profit (or loss), after provision for taxes, of Intermediate Holdco and its Subsidiaries, determined on a consolidated basis in accordance with GAAP.

"Covenant Compliance Period" shall mean the period beginning on the date that Excess Availability has fallen below the greater of (a) ten percent (10.0%) of the Line Cap and (b) $12,000,000 and ending on the date on which Excess Availability shall have been at least equal to the greater of (c) ten percent (10.0%) of the Line Cap and (d) $12,000,000 for at least thirty (30) consecutive days thereafter.

"Covenant Conversion Date" shall mean the first date to occur on which each of the following conditions have been satisfied: (a) the Discharge of Second Lien Debt shall have occurred, (b) the Adjusted Payment Conditions shall have been satisfied and (c) the Administrative Agent shall have received a certificate of an authorized officer of the Parent certifying as to compliance with the preceding clauses.

"Credit Card Acknowledgments" shall mean, collectively, the agreements by Credit Card Issuers or Credit Card Processors who are parties to Credit Card Agreements in favor of the Administrative Agent acknowledging the Administrative Agent's first priority security interest in the monies due and to become due to any Borrower (including, without limitation, credits and reserves) under the Credit Card Agreements, and agreeing to transfer all such amounts to the Blocked Accounts, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced; sometimes being referred to herein individually as a "Credit Card Acknowledgment".

"Credit Card Agreements" shall mean all agreements now or hereafter entered into by any Borrower with any Credit Card Issuer or any Credit Card Processor, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, including, but not limited to, the agreements set forth on Schedule 8.18 hereto; sometimes being referred to herein individually as a "Credit Card Agreement".

"Credit Card Issuer" shall mean any person (other than Borrowers) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc. and Novus Services, Inc.

"Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary (including General Electric Money Bank in the case of EMS's private label credit card program, GSI in the case of EMS's internet sales and Vantiv Merchant Services in the case of Sport Chalet, Value Services and Team Sales) who services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to Borrowers' sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Receivables" shall mean, collectively, (a) all present and future rights of any Borrower to payment from any Credit Card Issuer, Credit Card Processor or other third party arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit or debit card and (b) all present and future rights of any Borrower to payment from any Credit Card Issuer, Credit Card Processor or other third party in connection with the sale or transfer of Accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any Credit Card Issuer or Credit Card Processor under the Credit Card Agreements or otherwise.

"Credit Facility" shall mean the Loans and Letters of Credit provided to or for the benefit of Borrowers pursuant to Sections 2.1, 2.2 and 2.3 hereof.

"Deemed Tax Due" shall have the meaning set forth in Section 10.5(e)(ii)(A) hereto.

"Deemed Tax Rate" shall have the meaning set forth in Section 10.5(e)(ii)(B) hereto.

"Default" shall mean an act, condition or event which with notice or passage of time or both would constitute an Event of Default.

"Defaulting Lender" shall have the meaning set forth in Section 6.13(e) hereto.

"Deposit Account Control Agreement" shall mean an agreement in writing, in form and substance reasonably satisfactory to the Administrative Agent, by and among the Administrative Agent, any Borrower and any bank at which any deposit account of such Borrower is at any time maintained which provides that such bank will comply with instructions originated by Administrative Agent directing disposition of the funds in the deposit account without further consent by such Borrower and has such other terms and conditions as Administrative Agent may reasonably require.

"Discharge of Second Lien Debt" shall have the meaning set forth in the Intercreditor Agreement (as in effect on the date hereof)

"Disqualified Institutions" shall mean those persons that are (a) Competitors of any Borrower or its Subsidiaries, identified in writing by the Parent or any Borrower to the Administrative Agent from time to time (it being understood that notwithstanding anything herein to the contrary, in no event shall a supplement apply retroactively to disqualify any parties that have previously acquired an assignment or participation under this Agreement that is otherwise permitted herein, but upon the effectiveness of such designation, any such party may not acquire any additional Commitments, Loans or participations), (b) the persons identified in writing by the Parent or any Borrower to the Administrative Agent on or prior to the Closing Date and (c) Affiliates of any such Competitors or Persons that are reasonably identifiable.

"Disqualified Stock" shall mean Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days after the date on which the Loans mature. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Loan Parties may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends. Notwithstanding the preceding sentence, any Capital Stock that would constitute Disqualified Stock solely because the holders of the Capital Stock have the right to be paid upon liquidation, dissolution, or winding up of the issuer of such Capital Stock will not constitute Disqualified Stock if the terms of such Capital Stock provide that such payments may not be made with respect to such Capital Stock unless such payments are made in accordance with Section 10.5 hereof.

"Documentation Agent" shall have the meaning set forth in the preamble hereto.

"Eligible Accounts" shall mean, as to each Borrower, the Accounts (other than Credit Card Receivables) of such Borrower which are and continue to be acceptable to the Administrative Agent based on the criteria set forth below as determined by the Administrative Agent in its Permitted Discretion. Accounts of Borrowers shall be Eligible Accounts if:

4241829.6

       (a)     such Accounts arise from the actual and <u>bona</u> <u>fide</u> sale and delivery of goods by such Borrower or rendition of services by such Borrower in the ordinary course of its business;

       (b)     such Accounts are not unpaid more than one hundred twenty (120) days after the date of the original invoice for them or more than sixty (60) days of the original due date for them;

       (c)     such Accounts comply with the terms and conditions contained in <u>Section 7.2</u> of this Agreement;

       (d)     such Accounts do not arise from sales on consignment, guaranteed sale, sale and return, sale on approval, or other terms under which payment by the account debtor may be conditional or contingent (other than the normal return policies of the Loan Parties);

       (e)     the chief executive office of the account debtor with respect to such Accounts is located in the United States of America or, at Administrative Agent's option, if the chief executive office and principal place of business of the account debtor with respect to such Accounts is located other than in the United States of America, then if the account debtor has delivered to such Borrower an irrevocable letter of credit or bankers acceptance issued or confirmed by a bank reasonably satisfactory to Administrative Agent, in each case payable only in the United States of America and in U.S. dollars, sufficient to cover such Account, in form and substance reasonably satisfactory to Agent and if required by Agent, the original of such letter of credit or bankers acceptance has been delivered to Agent or Agent's agent and the issuer thereof, and such Borrower has complied with the terms of Section 5.3(f) hereof with respect to the assignment of the proceeds of such letter of credit or bankers acceptance to Administrative Agent or naming Administrative Agent as transferee beneficiary thereunder, as Administrative Agent may specify;

       (f)     such Accounts do not consist of progress billings (such that the obligation of the account debtors with respect to such Accounts is conditioned upon such Borrower's satisfactory completion of any further performance under the agreement giving rise thereto) (other than the normal return policies of the Loan Parties), bill and hold invoices or retainage invoices, except as to bill and hold invoices, if Agent shall have received an agreement in writing from the account debtor, in form and substance reasonably satisfactory to Agent, confirming the unconditional obligation of the account debtor to take the goods related thereto and pay such invoice;

       (g)     the account debtor with respect to such Accounts has not asserted a counterclaim, defense or dispute and is not owed or does not claim to be owed any amounts that may give rise to any right of setoff or recoupment against such Accounts (but the portion of the Accounts of such account debtor in excess of the amount at any time and from time to time owed by such Borrower to such account debtor or claimed owed by such account debtor may be deemed Eligible Accounts);

       (h)     such Accounts are subject to the first priority, valid and perfected security interest of Administrative Agent (other than, as to priority, Permitted Liens described in

14

clauses (b) and (n) of the definition of Permitted Liens to the extent such Permitted Liens have priority by operation of law), and any goods giving rise thereto are not, and were not at the time of the sale thereof, subject to any liens not permitted under the terms hereof;

(i)     neither the account debtor nor any officer or employee of the account debtor with respect to such Accounts is an officer, employee, agent or other Affiliate of any Borrower;

(j)     the account debtors with respect to such Accounts are not any foreign government, the United States of America, any State, political subdivision, department, agency or instrumentality of any of the foregoing, unless, if the account debtor is the United States of America, any State, political subdivision, department, agency or instrumentality of any of the foregoing, the Federal Assignment of Claims Act of 1940, as amended or any similar State or local law, if applicable, has been complied with in a manner reasonably satisfactory to Administrative Agent;

(k)     the aggregate amount of such Accounts owing by a single account debtor do not constitute more than ten (10%) percent of the aggregate amount of all otherwise Eligible Accounts (but the portion of the Accounts not in excess of such percentage may be deemed Eligible Accounts);

(l)     such Accounts are not owed by an account debtor where at least fifty (50%) percent of the total Accounts of such account debtor are deemed ineligible under clause (b) above;

(m)     the account debtor is not located in a state requiring the filing of a Notice of Business Activities Report or similar report in order to permit such Borrower to seek judicial enforcement in such State of payment of such Account, unless such Borrower has qualified to do business in such state or has filed a Notice of Business Activities Report or equivalent report for the then current year;

(n)     such Accounts have been billed and invoiced to the account debtor with respect thereto;

(o)     the relevant Borrower has not made any agreement with any account debtor for any deduction therefrom (to the extent of any such deduction), except for discounts or allowances made in the ordinary course of business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each respective invoice related thereto;

(p)     no return, rejection or repossession of the merchandise has occurred or rendition of services has been disputed (but only to the extent of such return, rejection, repossession, or dispute);

(q)     the sale of goods or the rendition of services giving rise to such Account is not supported by a performance, surety or similar bond unless the issuer of such bond shall have waived in writing any rights or interest in and to all Collateral, in form and substance reasonably satisfactory to Agent; and

15

(r)      such Accounts, the collection of which the Administrative Agent, in its Permitted Discretion, believes not to be doubtful by reason of the account debtor's financial condition.

The criteria for Eligible Accounts set forth above may only be changed and any new criteria for Eligible Accounts may only be established by Agent in its Permitted Discretion based on either: (i) an event, condition or other circumstance arising after the date hereof, or (ii) an event, condition or other circumstance existing on the date hereof to the extent Agent has no written notice thereof from a Borrower or knowledge thereof prior to the date hereof, in either case under clause (i) or (ii) which adversely affects or could reasonably be expected to adversely affect the Accounts in any material respect in the good faith determination of Agent.  Any Account that is not an Eligible Account shall nevertheless be part of the Collateral.

"Eligible Credit Card Receivables" shall mean, as to each Borrower, the Credit Card Receivables of such Borrower which are and continue to be acceptable to the Administrative Agent based on the criteria set forth below as determined by Administrative Agent in its Permitted Discretion. Credit Card Receivables of Borrowers shall be Eligible Credit Card Receivables if:

(a)      such Credit Card Receivables arise from the actual and bona fide sale and delivery of goods or rendition of services by such Borrower in the ordinary course of the business of such Borrower which transactions are completed in accordance with the terms and provisions contained in any agreements binding on Borrowers or the other party or parties related thereto;

(b)      such Credit Card Receivables are not past due (beyond any stated applicable grace period, if any, therefor) pursuant to the terms set forth in the Credit Card Agreements with the Credit Card Issuer or Credit Card Processor of the credit card or debit card used in the purchase which give rise to such Credit Card Receivables;

(c)      such Credit Card Receivables are paid within five (5) days after the date of the sale of Inventory giving rise to such Credit Card Receivables, except, that, with respect to such Credit Card Receivables arising from GSI Internet Sales Accounts, such Credit Card Receivables are paid within ten (10) days after the date of the sale of Inventory giving rise to such Credit Card Receivables;

(d)      all procedures required by the Credit Card Issuer or the Credit Card Processor of the credit card or debit card used in the purchase which gave rise to such Credit Card Receivables shall have been followed in all material respects by such Borrower and all documents required for the authorization and approval by such Credit Card Issuer or Credit Card Processor shall have been obtained in connection with the sale giving rise to such Credit Card Receivables;

(e)      the required authorization and approval by such Credit Card Issuer or Credit Card Processor shall have been obtained for the sale giving rise to such Credit Card Receivables;

(f)      such Borrower shall have submitted all sales slips, drafts, charges and other reports and other materials required by the Credit Card Issuer or Credit Card Processor obligated in respect of such Credit Card Receivables in order for such Borrower to be entitled to payment in respect thereof;

(g)      such Credit Card Receivables comply in all material respects with the applicable terms and conditions contained in Section 7.2 of this Agreement;

(h)      the Credit Card Issuer or Credit Card Processor with respect to such Credit Card Receivables has not asserted a counterclaim, defense or dispute and does not have any right of setoff against such Credit Card Receivables (other than transactions in the ordinary course of the business of such Borrower) and, except to the extent set forth on Schedule 2 hereto, such Credit Card Issuer or Credit Card Processor has not set off against amounts otherwise payable by such Credit Card Issuer or Credit Card Processor to such Borrower for the purpose of establishing a reserve or collateral for obligations of such Borrower to such Credit Card Issuer or Credit Card Processor (notwithstanding that the Credit Card Issuer or Credit Card Processor may have setoffs for fees and chargebacks consistent with the practices of such Credit Card Issuer or Credit Card Processor with such Borrower as of the date hereof or as such practices may hereafter change as a result of changes to the policies of such Credit Card Issuer or Credit Card Processor applicable to its customers generally and unrelated to the circumstances of such Borrower);

(i)      there are no facts, events or occurrences which would impair in any material respect the validity, enforceability or collectability of such Credit Card Receivables or reduce the amount payable or delay payment thereunder (other than for setoffs for fees and chargebacks consistent with the practices of such Credit Card Issuer or Credit Card Processor with such Borrower as of the date hereof or as such practices may hereafter change as a result of changes to the policies of such Credit Card Issuer or Credit Card Processor applicable to its customers generally and unrelated to the specific circumstances of such Borrower);

(j)      such Credit Card Receivables are subject to the first priority, valid and perfected security interest and lien of the Administrative Agent as to such Credit Card Receivables of such Borrower (other than, as to priority, the Permitted Liens described in clauses (b) and (n) of the definition of Permitted Liens to the extent such Permitted Liens have priority by operation of law), and any goods giving rise thereto are not, and were not at the time of the sale thereof, subject to any encumbrances not permitted under the terms hereof;

(k)      [reserved];

(l)      with respect to such Credit Card Receivables arising from GSI Internet Sales Accounts, the Credit Card Processor shall be GSI or such other third party reasonably acceptable to Agent;

(m)      Administrative Agent shall have received, in form and substance reasonably satisfactory to Agent, a Credit Card Acknowledgment duly authorized, executed and delivered by the Credit Card Issuer (except in the case of American Express) or Credit Card Processor for the credit card or debit card used in the sale which gave rise to such Credit Card

17

Receivable, such Credit Card Acknowledgment shall be in full force and effect and the Credit Card Issuer or Credit Card Processor party thereto shall be in compliance with the terms thereof;

(n)    there are no proceedings or actions which are pending or, to such Borrower's knowledge, threatened against the Credit Card Issuers or Credit Card Processors with respect to such Credit Card Receivables which could reasonably be expected to result in any material adverse change in the continued collectability of the Credit Card Receivables with respect to the Credit Card Issuers or Credit Card Processors;

(o)    such Credit Card Receivables are owed by Credit Card Issuers or Credit Card Processors deemed creditworthy at all times by Administrative Agent in its Permitted Discretion;

(p)    no default or event of default has occurred under the Credit Card Agreement of such Borrower with the Credit Card Issuer or Credit Card Processor who has issued the credit card or debit card or handles payments under the credit card or debit card used in the sale which gave rise to such Credit Card Receivables which default gives such Credit Card Issuer or Credit Card Processor the right to cease or suspend payments to such Borrower and no default or event of default shall have occurred which gives such Credit Card Issuer or Credit Card Processor the right to set off against amounts otherwise payable to such Borrower (other than for then current fees and chargebacks consistent with the current practices of such Credit Card Issuer or Credit Card Processor as of the date hereof or as such practices may hereafter change as a result of changes to the policies of such Credit Card Issuer or Credit Card Processor applicable to its customers generally and unrelated to the specific circumstances of such Borrower) or the right to establish reserves or establish or demand collateral and such Credit Card Agreements are otherwise in full force and effect and constitute the legal, valid, binding and enforceable obligations of the parties thereto;

(q)    the terms of the sale giving rise to such Credit Card Receivables and all practices of such Borrower with respect to such Credit Card Receivables comply in all material respects with applicable Federal, State, and local laws and regulations;

(r)    the Credit Card Issuer or Credit Card Processor has not sent any notice of default and/or notice of its intention to cease or suspend payments to such Borrower in respect of such Credit Card Receivables or to establish reserves or collateral for obligations of such Borrower to such Credit Card Issuer or Credit Card Processor (other than for then current fees and chargebacks consistent with the current practices of such Credit Card Issuer or Credit Card Processor as of the date hereof or as such practices may hereafter change as a result of changes to the policies of such Credit Card Issuer or Credit Card Processor applicable to its customers generally and unrelated to the circumstances of such Borrower); and

(s)    the customer using the credit card or debit card giving rise to such Credit Card Receivable shall not have returned the merchandise purchased giving rise to such Credit Card Receivable.

"Eligible In-Transit Inventory" shall mean Inventory owned by each Borrower that otherwise satisfies the criteria for Eligible Inventory set forth herein but which is in transit by

18

vessel or land to either the premises of a Freight Forwarder in the United States of America or the premises of such Borrower in the United States of America which are either owned and controlled by such Borrower or leased by such Borrower (but only if Administrative Agent has received a Collateral Access Agreement duly authorized, executed and delivered by such Freight Forwarder and the owner and lessor of such leased premises, as the case may be), provided, that,

(a)    Administrative Agent has a first priority perfected security interest in and lien upon such Inventory and all documents of title with respect thereto,

(b)    such Inventory either (i) is the subject of a bill of lading that was issued by the carrier respecting such Inventory or (ii) is the subject of a forwarder's cargo receipt and such cargo receipt on its face indicates the name of the freight forwarder as a carrier or multimodal transport operator and has been signed or otherwise authenticated by it in such capacity or as a named agent for or on behalf of the carrier or multi-modal transport operator, in any case respecting such Inventory, and in each case such Inventory is in transit to a Freight Forwarder located in the United States of America which has executed and delivered a Collateral Access Agreement.

(c)    such Borrower has title to such Inventory, and the Administrative Agent shall have received such evidence thereof as it may from time to time require,

(d)    Administrative Agent shall have received a Collateral Access Agreement, duly authorized, executed and delivered by the Freight Forwarder located in the United States of America handling the importing, shipping and delivery of such Inventory,

(e)    such Inventory is insured against types of loss, damage, hazards, and risks, and in amounts, reasonably satisfactory to the Administrative Agent in its discretion, and the Administrative Agent shall have received a copy of the certificate of marine cargo insurance in connection therewith in which it has been named as an additional insured and loss payee in a manner reasonably acceptable to the Administrative Agent, Administrative Agent shall have received (i) a certificate duly executed and delivered by an officer of the applicable Borrower certifying to the Administrative Agent that, to the knowledge of such Borrower, such Inventory meets all of such Borrower's representations and warranties contained herein concerning Eligible Inventory and that the shipment as evidenced by the documents conforms to the related order documents, and (ii) upon the Administrative Agent's request, a copy of the invoice, packing slip and manifest with respect thereto,

(f)    such Inventory is not subject to a Letter of Credit,

(g)    such Inventory shall not have been in transit for more than sixty (60) days (in the case of Inventory located outside of the United States of America) or fifteen (15) days (in the case of Inventory located within the United States of America); and

(h)    solely with respect to domestic inventory in-transit, Administrative Agent shall have received reasonably satisfactory evidence that such Borrower has implemented a system to report domestic inventory in-transit in a manner reasonably satisfactory to Agent, as determined following a field review conducted in accordance with Section 7.7 hereof.

19

"Eligible Inventory" shall mean, as to each Borrower, Inventory of such Borrower consisting of finished goods (excluding ski lift tickets, books, magazines, food and beverages) held for resale in the ordinary course of the business (but not held for lease or rental) of such Borrower that in each case satisfy the criteria set forth below as determined by Administrative Agent in its Permitted Discretion. Eligible Inventory shall not include any Inventory:

(a)     which is not subject to a first priority, valid and perfected security interest in favor of the Administrative Agent (other than, as to priority, the Permitted Liens described in clauses (b), (c), (i) and (n), to the extent that such Permitted Liens may have priority by operation of law);

(b)     which is subject to any security interest, lien or other encumbrance other than the security interest and lien of the Administrative Agent and those permitted in clauses (b), (c), (i), and (n) of the definition of the term Permitted Liens (but as to liens referred to in clause (n) only to the extent that Administrative Agent has established a Reserve as provided therein) and any other liens permitted under this Agreement that are subject to an intercreditor agreement in form and substance reasonably satisfactory to the Administrative Agent between the holder of such security interest or lien and Agent;

(c)     which is, in the Administrative Agent's Permitted Discretion, obsolete, unmerchantable, defective, used, unfit for sale, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business or unacceptable due to age, type, category and/or quantity;

(d)     with respect to which any covenant, representation, or warranty contained in this Agreement or any of the other Financing Agreements has been breached or is not true, in each case, in any material respect or which does not conform to all standards imposed by any Governmental Authority if such non-conformity causes such Inventory to be non-saleable in the ordinary course;

(e)     in which any Person other than a Borrower shall (i) have any direct or indirect ownership, interest or title to such Inventory or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein;

(f)     which constitutes spare or replacement parts, subassemblies, packaging and shipping material, manufacturing supplies, samples, prototypes, displays or display items, advertising items, shoe mismatches, bill-and-hold goods, goods that are returned or marked for return (other than unused goods which are returned and held for sale in the ordinary course of business), repossessed goods, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business;

(g)     which is not located at premises owned or leased and controlled by such Borrower, except for Eligible In-Transit Inventory not to exceed $9,000,000 and Eligible LC Inventory and except as set forth in clause (h) or (i) below;

(h)     which is located in any location leased by a Borrower unless (i) the lessor has delivered to the Administrative Agent a Collateral Access Agreement that Administrative Agent has acknowledged in writing is acceptable to it or (ii) a Reserve for rent, charges, and

other amounts due or to become due with respect to such facility has been established by Administrative Agent in accordance with the terms of <u>clause (xii)</u> of the definition of Reserves;

(i)        which is located in any third party warehouse or is in the possession of a bailee or is being processed offsite at a third party location or outside processor and, in any such case, is not evidenced by a Document, unless (i) such warehouseman or bailee or the owner of such third party location or such outside processor has delivered to the Administrative Agent a Collateral Access Agreement that Administrative Agent has acknowledged in writing is acceptable to it and such other documentation as Administrative Agent may reasonably require or (ii) a Reserve has been established by Administrative Agent in accordance with the terms of <u>clause (xii)</u> of the definition of Reserves;

(j)        which is the subject of a consignment by such Person as consignor;

(k)        which contains or bears any intellectual property rights licensed to a Borrower unless Administrative Agent is satisfied that it may sell or otherwise dispose of such Inventory without (i) infringing or otherwise violating the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(l)        which is not reflected in a current perpetual inventory report of such Person; or

(m)        for which reclamation rights have been asserted by the seller.

The criteria for Eligible Inventory set forth above may only be changed and any new criteria for Eligible Inventory may only be established by Administrative Agent in its Permitted Discretion based on either: (i) an event, condition or other circumstance arising after the date hereof, or (ii) an event, condition or other circumstance existing on the date hereof to the extent Administrative Agent has no written notice thereof from a Borrower or no actual knowledge thereof prior to the date hereof, in either case under <u>clause (i)</u> or <u>(ii)</u> which adversely affects or could reasonably be expected to adversely affect the Inventory in the good faith determination of Agent. Any Inventory that is not Eligible Inventory shall nevertheless be part of the Collateral.

"<u>Eligible LC Inventory</u>" shall mean Inventory that would otherwise be Eligible Inventory (other than for its location) as to which: (a) the Inventory is purchased with and subject to a Letter of Credit issued hereunder, (b) the Inventory is then in transit by vessel or land from a location inside or outside of the continental United States of America to a location permitted hereunder and for which Administrative Agent shall have received such evidence thereof as Administrative Agent may reasonably require, (c) a Borrower has title to such Inventory, and the Administrative Agent shall have received such evidence thereof as it may from time to time reasonably require, (d) Administrative Agent has received each of the following: (e) a copy of the certificate of marine cargo insurance (or other similar certificate of insurance) in connection therewith in which Administrative Agent has been named as an additional insured and loss payee in a manner reasonably acceptable to the Administrative Agent and (f) a copy of the invoice, packing slip and manifest with respect thereto, (g) in the case of any Inventory in transit from a

location outside the continental United States, such Inventory is either (i) subject to a bill of lading that was issued by the carrier in respect of such Inventory or (ii) subject to a cargo receipt and is not the subject of a bill of lading (other than a bill of lading consigned to, and in the possession of a consolidator or Agent, or their respective agents) and such cargo receipt is issued by a consolidator in respect of such Inventory, (h) such Inventory is insured against types of loss, damage, hazards, and risks, and in amounts, satisfactory to the Administrative Agent, and (i) such Inventory shall not have been in transit for more than ten (10) days (in the case of Inventory in transit from a location inside the continental United States) or sixty (60) days (in the case of Inventory in transit from a location outside the continental United States).

"Eligible Rental Inventory" shall mean at any date of determination thereof, all Inventory of each Borrower that would otherwise constitute Eligible Inventory but for the fact that such Inventory is held for lease or rental, may be used, and may not be resalable at a price approximating at least the cost thereof; provided, that, such Inventory satisfies the criteria for Eligible Rental Inventory set forth below as determined by the Administrative Agent in its Permitted Discretion: (a) such Inventory is in rentable condition, (b) such Inventory is in the possession and control of a Borrower (and is not rented or leased); (c) such Inventory is not subject to any claim disputing the applicable Borrower's right to or title to possession or subject to any negotiable or non-negotiable document of title or purchase money security interest; (d) such Inventory is not subject to any contractual limitations or restrictions that would prevent the Administrative Agent from either acquiring ownership of, or selling, such Inventory in the course of exercising its rights and remedies under this Agreement, (e) such Inventory is in good condition and usable for the purpose for which it is intended (determined in accordance with applicable industry standards); and (f) such Inventory is covered by casualty, theft or fire insurance required in accordance with the terms of this Agreement.

"Eligible Transferee" shall mean (a) a Lender; (b) the parent company of a Lender and/or any Affiliate of a Lender which is at least fifty percent (50%) owned by a Lender or its parent company; (c) any person (whether a corporation, partnership, trust or otherwise) that is engaged in the business of making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of its business and is administered or managed by a Lender or an Eligible Transferee or with respect to a Lender or an Eligible Transferee that is a fund which invests in bank loans and similar extensions of credit, any other fund that invests in bank loans and similar extensions of credit and is managed by the same investment advisor as a Lender or an Eligible Transferee by an Affiliate of such investment advisor, and in each case is approved by the Administrative Agent; and (d) a (x) bank, (y) insurance company, or (z) company engaged in the business of providing revolving loans, which any Person set forth in this clause (d), together with its Affiliates, has a combined capital and surplus in excess of $250,000,000 and approved by the Administrative Agent, provided, that, (i) none of the Sponsor, the Parent, any Borrower nor any Guarantor or any Affiliate of any Borrower or any Guarantor shall qualify as an Eligible Transferee, (ii) no Person to whom any Indebtedness which is in any way subordinated in right of payment to any other Indebtedness of any Borrower or any Guarantor shall qualify as an Eligible Transferee, except as the Administrative Agent may otherwise specifically agree, (iii) no Disqualified Institution shall qualify as an Eligible Transferee, (iv) no natural Person shall qualify as an Eligible Transferee and (v) so long as no Default or Event of Default shall exist or have occurred and be continuing, the Borrowers shall have the right to approve an Eligible Transferee described in clause (c) or (d) above, which

22

consent shall not be unreasonably withheld or delayed (it being agreed that it shall not be unreasonable for Borrowers to withhold their consent with respect to an Eligible Transferee that is a Foreign Lender).

"EMS" shall have the meaning set forth in the preamble hereto.

"EMS Acquisition" shall have the meaning set forth in the preamble hereto.

"EMS Management Agreement" shall mean any management services agreement entered into between EMS and EMS OpCo (or their respective successors and assigns) in connection with the EMS Reorganization, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"EMS OpCo" shall have the meaning set forth in the preamble hereto.

"EMS Reorganization" shall mean (a) the acquisition by EMS OpCo of the assets, liabilities, rights, obligations and business of EMS (other than certain real property leases), any equity contribution to or Investments in EMS OpCo by a Loan Party necessary to effect the acquisition and any payment of consideration to EMS Acquisition or EMS in connection with the acquisition, (b) the entry by EMS OpCo and EMS into the EMS Management Agreement, and (c) the change by EMS of its name to SME Holding Company, LLC; provided, that, the Administrative Agent shall have received, within fifteen (15) days following such name change, a copy of the amendment to the certificate of formation or other organizational document of EMS providing for such name change certified by the Secretary of State of the jurisdiction of organization of EMS.

"Energy Savings Program" shall mean the energy savings program implemented by any Borrower or any Guarantor with its electric utility companies pursuant to which such electric utility companies will provide loans or other extensions of credit to such Loan Party to finance such Borrower's or Guarantor's acquisition and/or installation of energy efficient products and services.

"Environmental Laws" shall mean all applicable foreign, Federal, State and local laws (including common law), legislation, rules, codes, licenses, permits (including any conditions imposed therein), authorizations, judicial or administrative decisions, injunctions or agreements between any Borrower and any Governmental Authority, (a) relating to pollution and the protection, preservation or restoration of the environment (including air, water vapor, surface water, ground water, drinking water, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or to human health or safety, (b) relating to the exposure to, or the use, storage, recycling, treatment, generation, manufacture, processing, distribution, transportation, handling, labeling, production, release or disposal, or threatened release, of Hazardous Materials, or (c) relating to all laws with regard to recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials. The term "Environmental Laws" includes (i) the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Federal Superfund Amendments and Reauthorization Act, the Federal Water Pollution Control Act of 1972, the Federal Clean Water Act, the Federal Clean Air Act, the Federal Resource Conservation and Recovery Act of 1976

(including the Hazardous and Solid Waste Amendments thereto), the Federal Solid Waste Disposal and the Federal Toxic Substances Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, and the Federal Safe Drinking Water Act of 1974, (ii) applicable state counterparts to such laws, and (iii) any common law or equitable doctrine that may impose liability or obligations for injuries or damages due to, or threatened as a result of, the presence of or exposure to any Hazardous Materials.

"Equipment" shall mean, as to each Borrower, all of such Borrower's now owned and hereafter acquired equipment, wherever located, including machinery, data processing and computer equipment (whether owned or licensed and including embedded software) vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located.

"Equity Contribution" shall mean the cash equity contribution or contributions by Sponsor or Parent in an aggregate amount equal to $20,000,000 made from January 14, 2015 through and including the Closing Date by Sponsor to the Parent, the cash proceeds of which were contributed by the Parent to Borrowers.

"Equity Cure Period" shall have the meaning set forth in Section 11.3 hereto.

"Equity Interests" shall mean, with respect to any Person, (a) all of the shares, interests, participations or other equivalents (however designated) of such Person's capital stock or partnership, limited liability company or other equity, ownership or profit interests at any time outstanding, (b) all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other interests in) such Person, (c) all of the securities convertible into or exchangeable for shares of capital stock of (or other interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and including any interests in phantom equity plans and any debt security that is convertible into or exchangeable for such shares, and (d) all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, together with all rules, regulations and interpretations thereunder or related thereto.

"ERISA Affiliate" shall mean any person required to be aggregated with Borrowers or any of their Subsidiaries under Sections 414(b) or 414(c) and, solely with respect to the application of Section 412 of the Code, Section 414(m) or 414(o) of the Code.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Pension Plan, other than events as to which the requirement of notice has been waived in regulations by the Pension Benefit Guaranty Corporation; (b) the imposition of a lien with respect to a Pension Plan pursuant to Section 430(k) of the Code or Section 303(k) of ERISA; (c) a complete or partial withdrawal by the Borrowers or any ERISA Affiliate from a Multiemployer Plan or a cessation of operations

Case 16-10971-CSS    Doc 13    Filed 04/18/16    Page 175 of 319

which is treated as such a withdrawal or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the Pension Benefit Guaranty Corporation to terminate a Pension Plan; (e) an event or condition which could reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (f) the imposition of any liability under Title IV of ERISA, other than the Pension Benefit Guaranty Corporation premiums due but not delinquent under Section 4007 of ERISA, upon Borrowers or any ERISA Affiliate in excess of $3,000,000; and (g) any other event or condition with respect to a Plan, including any Pension Plan subject to Title IV of ERISA, maintained, or contributed to, by any ERISA Affiliate that could reasonably be expected to result in liability of Borrowers in excess of $3,000,000.

"Eurodollar Rate Loans" shall mean any Loans or portion thereof on which interest is payable based on the Adjusted Eurodollar Rate in accordance with the terms hereof.

"Event of Default" shall mean the occurrence or existence of any event or condition described in Section 12.1 hereof.

"Excess" shall have the meaning set forth in Section 3.12 hereto.

"Excess Availability" shall mean the amount, as determined by Administrative Agent in its Permitted Discretion, calculated at any date, equal to:

      (a)     the lesser of: (i) the Borrowing Base (after giving effect to any Reserves) and (ii) the Maximum Credit, minus

      (b)     the sum of: (i) the amount of all then outstanding and unpaid Revolving Loans, plus all then outstanding and unpaid Swing Line Loans, plus the Letter of Credit Obligations, plus (ii) the aggregate amount of all then outstanding and unpaid trade payables and other obligations of any Borrower which are outstanding more than ninety (90) days past due as of the end of the immediately preceding month or at Agent's option, as of a more recent date based on such reports as Administrative Agent may from time to time specify (other than trade payables or other obligations being contested or disputed by any Borrower in good faith).

"Everest" shall mean Everest Merger Sub, Inc., a Delaware corporation.

"Exchange Act" shall mean the Securities Exchange Act of 1934, together with all rules, regulations and interpretations thereunder or related thereto.

"Excluded Hedging Obligation" shall mean, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Loan Party of, or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure to constitute an "eligible contract participant," as defined in the Commodity Exchange Act and the regulations thereunder, at the time the guarantee of or grant of such security interest by such Loan Party becomes or

would become effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one Swap Obligation, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Hedge Agreements for which such guarantee or security interest is or becomes illegal.

"Excluded Property" shall mean:

(a)        any rights or interests in any contract, lease, permit, license, charter or license agreement, as such, if under the terms of such contract, lease, permit, license, charter or license agreement, or applicable law with respect thereto, the valid grant of a security interest or lien therein to the Administrative Agent is prohibited (or gives rise to a termination right for the other party thereto) and such prohibition (or termination right) has not been or is not waived or the consent of the other party to such contract, lease, permit, license, charter or license agreement has not been or is not otherwise obtained or under applicable law such prohibition cannot be waived; provided, that, the foregoing exclusion shall in no way be construed (i) to apply if any such prohibition is unenforceable under Sections 9-406, 9-407 or 9-408 of the UCC or other applicable law or (ii) so as to limit, impair or otherwise affect the Administrative Agent's unconditional continuing security interests in and liens upon any rights or interests of a Borrower in or to monies due or to become due under any such contract, lease, permit, license, charter or license agreement (including any Receivables);

(b)        any Equipment which is, or at the time of a Borrower's or a Guarantor's acquisition thereof shall be, subject to a purchase money mortgage or other purchase money lien or security interest (including such interest under Capital Leases) permitted under clause (k) of the definition of the term Permitted Liens hereof if: (i) the valid grant of a security interest or lien to the Administrative Agent in such item of Equipment is prohibited by the terms of the agreement between such Borrower or such Guarantor and the holder of such purchase money mortgage or other purchase money lien or security interest or under applicable law and such prohibition has not been or is not waived, or the consent of the holder of the purchase money mortgage or other purchase money lien or security interest has not been or is not otherwise obtained, or under applicable law such prohibition cannot be waived and (ii) the purchase money mortgage or other purchase money lien or security interest on such item of Equipment is or shall become valid and perfected;

(c)        (i) any leasehold interest in Real Property and (ii) unless an Event of Default has occurred and is continuing, any hereafter acquired fee owned Real Property having a value of $1,000,000 or less;

(d)        any United States or foreign intent to use trademark or service mark application to the extent, and solely during the period in which, the grant of a lien therein would impair the validity or the enforceability of such intent to use trademark or service mark under federal law or other applicable foreign laws;

(e)        the Equity Interests of any Subsidiary organized under the laws of any state of the United States of America or the District of Columbia substantially all of the assets of which consist, directly or indirectly, of equity securities of one or more "controlled foreign corporations" (as such term is defined in Section 957(a) of the Code or a successor provision

thereof) in excess of sixty-five percent (65%) of all of the issued and outstanding shares of Equity Interests of such Subsidiary entitled to vote (within the meaning of Treasury Regulation Section 1.956-2);

(f)    the Equity Interests of any Subsidiary organized under the laws of a jurisdiction outside the United States of America, its territories or its possessions that is a "controlled foreign corporation" (as such term is defined in Section 957(a) of the Code or a successor provision thereof) in excess of sixty-five percent (65%) of all of the issued and outstanding shares of Equity Interests of such Subsidiary entitled to vote (within the meaning of Treasury Regulation Section 1.956-2);

(g)    assets of any "controlled foreign corporation" (as such term is defined in Section 957(a) of the Code or a successor provision thereof) or of any subsidiary that has no material assets or material operations other than the Equity Interests of a "controlled foreign corporation";

(h)    any motor vehicles or other assets subject to certificates of title (except to the extent perfection therein can be obtained by filing of UCC financing statements);

(i)    letter of credit rights (except to the extent constituting a support obligation for other Collateral as to which perfection of the security interest in such other Collateral may be accomplished solely by the filing of a UCC financing statement);

(j)    commercial tort claims having a value reasonably believed by the Borrowers to be, individually or in the aggregate, not in excess of (i) prior to the Discharge of Second Lien Debt, $100,000 and (ii) upon and after the Discharge of Second Lien Debt, $1,000,000;

(k)    any Equity Interests (A) constituting margin stock (provided that the Required Lenders may require the pledge of any such margin stock individually or in the aggregate having a value in the aggregate in excess of (i) prior to the Discharge of Second Lien Debt, $100,000 and (ii) upon and after the Discharge of Second Lien Debt, $1,000,000) and (B) in any Subsidiary that is not a Wholly-Owned Subsidiary if the granting of a security interest in such equity would be prohibited by law or by organizational or governance documents (including as a result of minority ownership) of any Subsidiary to which any third parties are party or which would trigger a termination event pursuant to any "change of control" or similar provision (so long as the prohibition in such organizational or governance documents is not implemented in contemplation of the acquisition of such Subsidiary);

(l)    any deposit accounts specifically and exclusively used (A) for payroll, payroll taxes, workers' compensation or unemployment compensation, pension benefits and other similar expenses to or for the benefit of any Loan Party's employees and accrued and unpaid employee compensation (including salaries, wages, benefits and expense reimbursements), (B) for escrow, trust or fiduciary purposes in the ordinary course of business and (C) for all taxes required to be collected or withheld (including, without limitation, sales taxes) for which any Loan Party may become liable; and

(m)    assets in circumstances where the Administrative Agent and the Borrower agree in writing that the cost, burden or consequences (including adverse tax consequences) of obtaining or perfecting a security interest in such assets is excessive in relation to the practical benefit afforded thereby.

"Excluded Subsidiary" shall mean (a) any Subsidiary that is prohibited by applicable law, rule or regulation or by any contractual obligation existing on the date any such Subsidiary is acquired (so long in respect of any such contractual prohibition, such prohibition is not incurred in contemplation of such acquisition), in each case, from guaranteeing the Obligations or which would require governmental (including regulatory) consent, approval, license or authorization to provide such a guarantee, (b) any Subsidiary if the guarantee of the Obligations by such Subsidiary would result in adverse tax consequences (including as a result of the operation of Section 956 of the Code or any similar law or regulation in any applicable jurisdiction) to the Parent or one of its Subsidiaries (as reasonably determined by the Parent), (c) any "controlled foreign corporation" (as such term is defined in Section 957(a) of the Code or a successor provision thereof), (d) any Subsidiary of the Parent organized under the laws of a jurisdiction in the United States that has no material assets or material operations other than the Equity Interests of a "controlled foreign corporation" and (e) any Subsidiary of the Parent in circumstances where the Administrative Agent and the Borrower agree in writing that the cost, burden or consequences (including adverse tax consequences) of such Subsidiary providing a guarantee of the Obligations is excessive in relation to the practical benefit afforded thereby.

"Excluded Taxes" shall have the meaning set forth in Section 6.9(a) hereto.

"Executive Order" shall have the meaning set forth in Section 10.13 hereto.

"Existing Letters of Credit" shall mean, collectively, the letters of credit issued by Wells Fargo Bank, National Association or Bank of America, N.A. for the account of a Borrower for which such Borrower is otherwise liable listed on Schedule 3 hereto, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Existing Loan Agreement" shall have the meaning set forth in the recitals hereto.

"Extended Revolving Commitment" shall have the meaning assigned to such term in Section 2.8(a).

"Extending Lender" shall have the meaning assigned to such term in Section 2.8(a).

"Extension" shall have the meaning assigned to such term in Section 2.8(a).

"Extension Amendment" shall have the meaning assigned to such term in Section 2.8(c).

"Extension Offer" shall have the meaning assigned to such term in Section 2.8(a).

"FATCA" shall mean (a) Sections 1471 through 1474 of the Code, as of date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), (b) any current or future regulations or official interpretations thereof, (c) any agreements entered into pursuant to Section 1471(b)(1) of the

Code and (d) any applicable intergovernmental agreements with the United States of America with respect to the implementation of the provisions described in clause (a).

"Fair Market Value" shall mean at any time with respect to an asset to be sold by a Borrower or a Subsidiary of a Borrower, an amount equal to the sale value of such asset which would be obtained in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer.

"Federal Funds Rate" shall mean, for any period, a fluctuating interest rate per annum equal, for each day during such period, to the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day on such transactions received by Administrative Agent from three Federal Funds brokers of recognized standing selected by it.

"Fee Letter" shall mean the Initial Lenders Fee Letter, dated June 26, 2014, by and among Parent, Bob's, EMS, Everest, certain affiliates of Parent, Wells Fargo Bank, National Association and Bank of America, N.A.

"Financing Agreements" shall mean, collectively, this Agreement and all notes, guarantees, security agreements, deposit account control agreements, investment property control agreements, intercreditor agreements and all other agreements, documents and instruments now or at any time hereafter executed and/or delivered by any Borrower or any Guarantor in connection with this Agreement; provided, that, in no event shall the term Financing Agreements be deemed to include any Hedge Agreement.

"Fixed Charge Coverage Ratio" means, with respect to any period and with respect to Intermediate Holdco and its Subsidiaries determined on a consolidated basis in accordance with GAAP, the ratio of (i) Consolidated EBITDA for such period, to (ii) Fixed Charges for such period. Each calculation of the Fixed Charge Coverage Ratio shall be made on a Pro Forma Basis.

"Fixed Charge Coverage Ratio Financial Covenant" shall mean the financial covenant set forth in Section 11.2 hereto.

"Fixed Charges" means, with respect to any period and with respect to Intermediate Holdco and its Subsidiaries determined on a consolidated basis in accordance with GAAP, the sum, without duplication, of (a) Interest Expense paid in cash during such period, (b) regularly scheduled principal payments in respect of Indebtedness that are required to be paid (including payments in respect of Capital Leases but excluding (i) payments in respect of Indebtedness owing by one Loan Party to another Loan Party and (ii) any payments due on the final maturity of any Indebtedness which are repaid with proceeds of Indebtedness permitted under Section 10.3(g), (h), (j), (k) or (m), the proceeds of any equity contribution by a non-Loan Party to Parent or the proceeds of any sale of capital stock of Parent) in cash during such period, (c) all federal, state, and local income taxes paid in cash during such period (including any Restricted Payments

made to Parent to enable Parent to pay taxes), and (d) all Restricted Payments paid in cash by Parent or made pursuant to Section 10.5(c) or (d) during such period, in each case calculated on a Pro Forma Basis.

"Foreign Asset Control Regulations" shall have the meaning set forth in Section 10.13.

"Foreign Lender" shall mean any Eligible Transferee that is organized under the laws of a jurisdiction other than that in which a Borrower is resident for tax purposes. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Freight Forwarders" shall mean the persons listed on Schedule 4 hereto or such other person or persons as may be selected by a Borrower after the date hereof and after written notice by a Borrower to the Administrative Agent to handle the receipt of Inventory within the United States of America and/or to clear Inventory through the Bureau of Customs and Border Protection (formerly the Customs Service) or other domestic or foreign export control authorities or otherwise perform port of entry services to process Inventory imported by such Borrower from outside the United States of America (such persons sometimes being referred to herein individually as a "Freight Forwarder"), provided, that, as to each such person, (a) Administrative Agent shall have received a Collateral Access Agreement by such person in favor of the Administrative Agent (in form and substance reasonably satisfactory to Agent) duly authorized, executed and delivered by such person, (b) such agreement shall be in full force and effect and (c) such person shall be in compliance in all material respects with the terms thereof.

"GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board which are applicable to the circumstances as of the date of determination consistently applied, except that, unless otherwise agreed by Administrative Agent, for purposes of Section 11 hereof, GAAP shall be determined on the basis of such principles in effect on the date hereof and consistent with those used in the preparation of the most recent audited financial statements delivered to the Administrative Agent prior to the date hereof, subject, however, in the case of determination of compliance with the financial covenants in Section 11, to the provisions of Section 15.3(h) hereof.

"Governmental Authority" shall mean any nation or government, any state, province, or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"GSI" shall mean GSI Commerce Solutions, Inc., and its successors and assigns.

"GSI Internet Sales Accounts" shall mean Accounts or other rights to payment due to EMS on a non-recourse basis in respect of EMS's internet sales and processed through GSI pursuant to that certain Master Services Agreement dated as of April 17, 2009, by and between EMS and GSI as in effect on the date hereof, as amended.

"Guarantors" shall have the meaning set forth in the preamble hereto, together with their successors and permitted assigns (but shall not in any event include any Excluded Subsidiary).

"Guaranty Obligations" shall mean, with respect to any Person, without duplication, any obligations of such Person (other than endorsements in the ordinary course of business of negotiable instruments for deposit or collection) guaranteeing or intended to guarantee any Indebtedness of any other Person in any manner, whether direct or indirect, and including, without limitation, any obligation, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting security therefor, (b) to advance or provide funds or other support for the payment or purchase of any such Indebtedness or to maintain working capital, solvency or other balance sheet condition of such other Person (including, without limitation, keep-well agreements, maintenance agreements, comfort letters or similar agreements or arrangements) for the benefit of any holder of Indebtedness of such other Person, (c) to lease or purchase property, securities or services primarily for the purpose of assuring the holder of such Indebtedness, or (d) to otherwise assure or hold harmless the holder of such Indebtedness against loss in respect thereof. The amount of any Guaranty Obligation hereunder shall (subject to any limitations set forth therein) be deemed to be an amount equal to the outstanding principal amount (or maximum reasonably anticipated liability in respect thereof, if larger) of the Indebtedness in respect of which such Guaranty Obligation is made.  Guaranty Obligations shall not include Excluded Hedging Obligations.

"Hazardous Materials" shall mean any hazardous, toxic or dangerous substances, materials and wastes, including hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Law (including any that are or become classified as hazardous or toxic under any Environmental Law).

"Hedge Agreement" shall mean an agreement between any Loan Party and a Bank Product Provider that is a swap agreement as such term is defined in 11 U.S.C. Section 101, and including any rate swap agreement, basis swap, forward rate agreement, commodity swap, interest rate option, forward foreign exchange agreement, spot foreign exchange agreement, rate cap agreement rate, floor agreement, rate collar agreement, currency swap agreement, cross-currency rate swap agreement, currency option, any other similar agreement (including any option to enter into any of the foregoing or a master agreement for any the foregoing together with all supplements thereto) for the purpose of protecting against or managing exposure to fluctuations in interest or exchange rates, currency valuations or commodity prices; sometimes being collectively referred to herein as "Hedge Agreements".

"Indebtedness" shall mean, with respect to any Person, any liability, whether or not contingent, (a) in respect of borrowed money (whether or not the recourse of the lender is to the whole of the assets of such Person or only to a portion thereof) or evidenced by bonds, notes, debentures or similar instruments; (b) representing the balance deferred and unpaid of the purchase price of any property or services (other than (i) trade accounts payable and accrued

31

obligations incurred in the ordinary course of business and payable in accordance with customary trade practices, (ii) customary deferred compensation to employees and directors or former employees or directors and (iii) earnouts, escrows, holdbacks and similar deferred payment obligations, in each case under this <u>clause (iii)</u> except to the extent such amount would be required to be reflected as a liability on a balance sheet prepared in accordance with GAAP), (c) all obligations as lessee under leases which have been, or should be, in accordance with GAAP recorded as Capital Leases; (d) any contractual obligation, contingent or otherwise, of such Person to pay or be liable for the payment of any indebtedness described in this definition of another Person, including, without limitation, any such indebtedness, directly or indirectly guaranteed, or any agreement to purchase, repurchase, or otherwise acquire such indebtedness, obligation or liability or any security therefor, or to provide funds for the payment or discharge thereof, or to maintain solvency, assets, level of income, or other financial condition; (e) all obligations with respect to redeemable stock and redemption or repurchase obligations under any Equity Interests or other equity securities issued by such Person; (f) all reimbursement obligations and other liabilities of such Person with respect to surety bonds (whether bid, performance or otherwise), letters of credit, banker's acceptances, drafts or similar documents or instruments issued for such Person's account; (g) all indebtedness of such Person in respect of indebtedness of another Person for borrowed money or indebtedness of another Person otherwise described in this definition which is secured by any consensual lien, security interest, collateral assignment, conditional sale, mortgage, deed of trust, or other encumbrance on any asset of such Person, whether or not such obligations, liabilities or indebtedness are assumed by or are a personal liability of such Person, all as of such time; (h) all obligations, liabilities and indebtedness of such Person (marked to market) arising under swap agreements, cap agreements and collar agreements and other agreements or arrangements designed to protect such person against fluctuations in interest rates or currency or commodity values; (i) indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer to the extent such Person is liable therefor as a result of such Person's ownership interest in such entity, except to the extent that the terms of such indebtedness expressly provide that such Person is not liable therefor or such Person has no liability therefor as a matter of law; and (j) the principal and interest portions of all rental obligations of such Person under any synthetic lease or similar off-balance sheet financing where such transaction is considered to be borrowed money for tax purposes but is classified as an operating lease in accordance with GAAP.

"<u>Indemnitee</u>" shall heave the meaning set forth in <u>Section 13.5</u> hereto.

"<u>Information Certificate</u>" shall mean, collectively, the Information Certificates of Borrowers and Guarantors constituting <u>Exhibit C</u> hereto containing material information with respect to Borrowers and Guarantors, their respective business and assets provided by or on behalf of Borrowers and Guarantors to the Administrative Agent in connection with the preparation of this Agreement and the other Financing Agreements and the financing arrangements provided for herein.

"<u>Initial Lenders</u>" shall mean Wells Fargo and Bank of America.

"<u>Intellectual Property</u>" shall mean, as to each Borrower, all of such Borrower's now owned and hereafter arising or acquired: patents, patent rights, patent applications, copyrights, works which are the subject matter of copyrights, copyright applications, copyright registrations,

trademarks, service marks, trade names, trade styles, trademark and service mark applications, and licenses and rights to use any of the foregoing and all applications, registrations and recordings relating to any of the foregoing as may be filed in the United States Copyright Office, the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, any political subdivision thereof or in any other country or jurisdiction, together with all rights and privileges arising under applicable law with respect to such Borrower's use of any of the foregoing; all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing; all rights to sue for past, present and future infringement of any of the foregoing; inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, and operating standards; goodwill (including any goodwill associated with any trademark or servicemark or the license of any trademark or servicemark); customer and other lists in whatever form maintained; trade secret rights, copyright rights, rights in works of authorship, domain names and domain name registration; software and contract rights relating to computer software programs, in whatever form created or maintained.

"Intercreditor Agreement" shall mean the Intercreditor Agreement, dated as of the date hereof, between Administrative Agent and Second Lien Agent, as acknowledged by Loan Parties, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated, replaced or restructured.

"Interest Expense" shall mean, for any period, as to any Person, as determined in accordance with GAAP, the amount of all interest, premium payments, debt discount, fees, charges and related expenses of such Person and its Subsidiaries on a consolidated basis, in each case to the extent treated as interest in accordance with GAAP, whether paid or accrued (including the interest component of any Capital Lease for such period), excluding (1) costs associated with obtaining, or breakage costs in respect of, obligations under Hedge Agreements and (2) amortization of deferred financing costs.

"Interest Period" shall mean for any Eurodollar Rate Loan, a period of approximately one (1), two (2), three (3), six (6) months or, if available to all Lenders, one (1) week duration as Borrowers may elect, the exact duration to be determined in accordance with the customary practice in the applicable Eurodollar Rate market; provided, that, Borrowers may not elect an Interest Period which will end after the last day of the then-current term of this Agreement.

"Interest Rate" shall mean,

(a)     Subject to clause (b) of this definition below:

(i)     as to Loans that are Base Rate Loans, a rate equal to the then Applicable Margin for such Base Rate Loans on a per annum basis plus the Base Rate, and

(ii)     as to Loans that are Eurodollar Rate Loans, a rate equal to the then Applicable Margin for such Eurodollar Rate Loans on a per annum basis plus the Adjusted Eurodollar Rate.

(b)    Notwithstanding anything to the contrary contained herein,

(i)    The Administrative Agent may increase the Applicable Margin otherwise used to calculate the Interest Rate for Base Rate Loans and Eurodollar Rate Loans in each case to the otherwise then applicable percentage set forth in the definition of the term Applicable Margin for each category of Revolving Loans (without regard to the amount of Quarterly Average Excess Availability) plus two percent (2%) per annum, for the period from and after the date of the occurrence of an Event of Default but only for so long as such Event of Default is continuing; and

(ii)    The Administrative Agent may increase the Applicable Margin otherwise used to calculate the Interest Rate for Base Rate Loans and Eurodollar Rate Loans in each case to the otherwise then applicable percentage set forth in the definition of the term Applicable Margin for each category of Revolving Loans (without regard to the amount of Quarterly Average Excess Availability) plus two percent (2%) per annum, on Revolving Loans at any time outstanding in the aggregate in excess of the Borrowing Base (in each case whether or not such excess(es) arise or are made with or without the knowledge or consent of the Administrative Agent or any Lender and whether made before or after an Event of Default); provided, that, the increases set forth in clauses (i) and (ii) above shall not be imposed cumulatively.

"Intermediate Holdco" shall have the meaning set forth in the recitals hereto.

"Inventory" shall mean, as to each Borrower, all of such Borrower's now owned and hereafter existing or acquired goods, wherever located, which (a) are leased by such Borrower as lessor; (b) are held by such Borrower for sale or lease or to be furnished under a contract of service; (c) are furnished by such Borrower under a contract of service; or (d) consist of raw materials, work in process, finished goods or materials used or consumed in its business.

"Investment" shall have the meaning set forth in Section 10.4 hereto.

"Investment Property Control Agreement" shall mean an agreement in writing, in form and substance reasonably satisfactory to Agent, by and among Agent, any Borrower and any securities intermediary, commodity intermediary or other person who has custody, control or possession of any investment property of such Borrower acknowledging that such securities intermediary, commodity intermediary or other person has custody, control or possession of such investment property on behalf of Agent, that it will comply with entitlement orders originated by the Administrative Agent with respect to such investment property, or other instructions of Agent, and has such other terms and conditions as the Administrative Agent may reasonably require.

"IP Security Agreement" shall mean the Second Amended and Restated Intellectual Property Security Agreement, dated August 19, 2014, by and among certain Loan Parties and the Administrative Agent.

"IP Transfer" shall mean (a) the transfer by each Borrower and its Subsidiaries of all Intellectual Property owned by such Borrower or Subsidiary to Vestis IP Holdings, any equity contribution to or Investments in Vestis IP Holdings by a Loan Party necessary to effect the

transfer and any payment of consideration to any Loan Party in connection with the transfer, and (b) the entry by Vestis IP Holdings and each Borrower and Subsidiary into agreements and other arrangements pursuant to which such Borrower or Subsidiary, as the case may be, shall have a license or other right to use the Intellectual Property owned by Vestis IP Holdings.

"IRS" shall have the meaning set forth in Section 6.9(f)(ii)(B) hereto.

"Issuing Bank" shall mean, as the context may require, (a) Wells Fargo Bank, National Association and (b) any other Lender designated as an Issuing Bank by the Borrowers with the consent of such other Lender; provided, that, Bank of America, N.A. shall be the Issuing Bank with respect to each Existing Letter of Credit issued by it.

"Lender" shall mean (a) the financial institutions and other persons party hereto as "Lenders" on the date hereof, and (b) each financial institution or other person that becomes a party hereto pursuant to an Assignment and Acceptance or pursuant to Section 15.8, other than, in each case, any such financial institution or person that has ceased to be a party hereto pursuant to an Assignment and Acceptance.

"Letter of Credit Documents" shall mean, with respect to any Letter of Credit, such Letter of Credit, any amendments thereto, any documents delivered in connection therewith, any application therefor, and any agreements, instruments, guarantees or other documents (whether general in application or applicable only to such Letter of Credit) governing or providing for (a) the rights and obligations of the parties concerned or at risk or (b) any collateral security for such obligations.

"Letter of Credit Exposure" means, as of any date of determination with respect to any Lender, such Lender's Pro Rata Share of the Letter of Credit Obligations on such date.

"Letter of Credit Limit" shall mean $20,000,000.

"Letter of Credit Obligations" shall mean, at any time, the sum of (a) the aggregate undrawn amount of all Letters of Credit outstanding at such time, plus (b) the aggregate amount of all drawings under Letters of Credit for which the Issuing Bank has not at such time been reimbursed.

"Letters of Credit" shall mean all letters of credit (whether documentary or stand-by and whether for the purchase of inventory, equipment or otherwise) issued by the Issuing Bank for the account of any Borrower pursuant to the Existing Loan Agreement and this Agreement, and all amendments, renewals, extensions or replacements thereof and including, but not limited to, the Existing Letters of Credit.

"License Agreements" shall have the meaning set forth in Section 8.11 hereto.

"Line Cap" shall mean the lesser of (a) the Maximum Credit and (b) the Borrowing Base.

"Liquidity Period" shall mean (a) the period beginning on the first date on which Excess Availability shall have been less than 20% of the Line Cap and ending on the date when Excess Availability shall have been greater than or equal to 20% of the Line Cap for a period of 30

consecutive calendar days thereafter or (b) the period during which an Event of Default shall have occurred and be continuing.

"Loan Parties" shall mean the Borrowers and the Guarantors.

"Loans" shall mean, as the context requires, Revolving Loans and Swing Line Loans.

"London Interbank Offered Rate" shall mean, with respect to any Eurodollar Rate Loan for the Interest Period applicable thereto, the rate per annum appearing on Reuters Screen LIBOR01(or on any successor or substitute page of such service, or any successor to or substitute for such service) two (2) Business Days prior to the commencement of such  Interest Period, for a term, and in an amount, comparable to the Interest Period and the amount of the Eurodollar Rate Loan requested (whether as an initial Eurodollar Rate Loan or as a continuation of a Eurodollar Rate Loan or as a conversion of a Base Rate Loan to a Eurodollar Rate Loan) by Borrowers in accordance with the Agreement (and, if any such rate is below zero, the LIBOR Rate shall be deemed to be zero), which determination shall be made by Agent and shall be conclusive in the absence of manifest error.

"Management Agreements" shall mean the EMS Management Agreement and the Versa Management Agreement.

"Manager" shall mean Versa Capital Management, Inc.

"Material Adverse Effect" shall mean (a) prior to the Discharge of Second Lien Debt, a "Material Adverse Effect" under the Second Lien Loan Agreement or (b) a material adverse effect on (i) the business, financial condition or results of operations, in each case, of the Parent and its Subsidiaries taken as a whole, (ii) the rights and remedies of the Administrative Agent or the Lenders under the Financing Agreements, or (iii) the ability of the Parent and its Subsidiaries, taken as a whole to perform their payment obligations hereunder.

"Material Contract" shall mean any written contract or other agreement (other than purchase orders) of the Parent or any of its Subsidiaries involving monetary liability of or to any Person in an amount in excess of $4,000,000 in any fiscal year and any other contract or other agreement, whether written or oral, to which the Parent or any of its Subsidiaries is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto would have a Material Adverse Effect.

"Maturity Date" shall mean, as the context may require, (a) with respect to Commitments existing on the Closing Date and Loans arising from such Commitments, the earlier of (1) August 19, 2019 and (ii) the date that is 45 days prior to the maturity date of the Second Lien Loans if any Second Lien Loans are then outstanding, and (b) with respect to any Extended Revolving Commitments, the earlier of (1) the final maturity date specified therefor in the applicable Extension Amendment (which shall not be earlier than August 19, 2019) and  (ii) the date that is 45 days prior to the maturity date of the Second Lien Loans if any Second Lien Loans are then outstanding.

"Maximum Credit" shall mean $180,000,000, as such amount may be increased from time to time in accordance with Section 2.5 hereof.

"<u>Maximum Interest Rate</u>" shall mean the maximum non-usurious rate of interest under applicable Federal or State law as in effect from time to time that may be contracted for, taken, reserved, charged or received in respect of the indebtedness of Borrowers to the Lenders, or to the extent that at any time such applicable law may thereafter permit a higher maximum non-usurious rate of interest, then such higher rate.

"<u>Minimum Extension Condition</u>" shall have the meaning assigned to such term in <u>Section 2.8(b)</u>.

"<u>Moody's</u>" shall mean Moody's Investors Service, Inc., and its successors and assigns.

"<u>Multiemployer Plan</u>" shall mean a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA which is or was at any time during the current year or the immediately preceding six (6) years contributed to by any Borrower or any ERISA Affiliate or with respect to which any Borrower, any Guarantor or any ERISA Affiliate could reasonably be expected to incur any liability.

"<u>Net Cash Proceeds</u>" shall mean the aggregate cash proceeds received by Borrowers or any of their Subsidiaries in respect of any sale, lease, transfer or other disposition of any assets or properties, or interest in assets and properties or as proceeds of any loans or other financial accommodations provided to it or as proceeds from the issuance and/or sale of any Equity Interests or Indebtedness, in each case net of the reasonable and customary direct costs relating to such sale, lease, transfer or other disposition or loans or other financial accommodation or issuance and/or sale (including, without limitation, legal, accounting and investment banking fees, and sales commissions) and taxes paid or payable as a result thereof and in the case of a sale of any assets or properties or interest in assets and properties, amounts applied to the repayment of Indebtedness secured by a valid and enforceable lien (other than a lien created under the Financing Agreements) on the asset or assets that are the subject of such sale or other disposition required to be repaid in connection with such transaction.

"<u>Net Recovery Percentage</u>" shall mean the fraction, expressed as a percentage, (a) the numerator of which is the amount equal to the amount of the recovery in respect of the Inventory at such time on a "going out of business sale" basis as set forth in the most recent acceptable appraisal of Inventory received by the Administrative Agent in accordance with <u>Section 7.3</u>, net of operating expenses, liquidation expenses and commissions, and (b) the denominator of which is the applicable original cost of the aggregate amount of the Inventory subject to such appraisal (it being understood that the Net Recovery Percentage may differ for one category of inventory to another and may differ from one seasonal period to another).

"<u>Non-Consenting Lender</u>" shall have the meaning set forth in <u>Section 13.3(c)</u> hereto.

"<u>Non-Excluded Taxes</u>" shall have the meaning set forth in <u>Section 6.9(a)</u> hereto.

"<u>Obligations</u>" shall mean (a) any and all Loans, Letter of Credit Obligations and all other obligations, liabilities and indebtedness of every kind, nature and description owing by any or all of Borrowers to the an Agent, the Lenders and/or Issuing Bank, including principal, interest, charges, fees, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under this Agreement or any of the other Financing Agreements

or on account of any Letter of Credit and all other Letter of Credit Obligations, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of this Agreement or after the commencement of any case with respect to any Borrower under the United States Bankruptcy Code or any similar statute (including the payment of interest and other amounts which would accrue and become due but for the commencement of such case, whether or not such amounts are allowed or allowable in whole or in part in such case), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, or secured or unsecured and (b) for purposes only of Section 5.1 hereto and subject to the priority in right of payment set forth in Section 6.5 hereto, all obligations, liabilities and indebtedness of every kind, nature and description owing by any Loan Party to a Bank Product Provider arising under or pursuant to any Bank Products, whether now existing or hereafter arising provided, that, (i) as to any such obligations, liabilities and indebtedness arising under or pursuant to a Hedge Agreement, the same shall only be included within the Obligations if upon Administrative Agent's request, Administrative Agent shall have entered into an agreement, in form and substance reasonably satisfactory to Administrative Agent, with the Bank Product Provider that is a counterparty to such Hedge Agreement, as acknowledged and agreed to by Borrowers and Guarantors, providing for the delivery to Administrative Agent by such counterparty of information with respect to the amount of such obligations, (ii) such Bank Product Provider, other than Wells Fargo and its Affiliates, shall have delivered written notice to Administrative Agent that (A) such Bank Product Provider has entered into a transaction to provide Bank Products to a Borrower or  Guarantor and (B) the obligations arising pursuant to such Bank Products constitute Obligations entitled to the benefits of the security interest of Agent granted hereunder, and (iii) in no event shall any Bank Product Provider to whom such obligations, liabilities or indebtedness are owing be deemed a Lender for purposes hereof to the extent of and as to such obligations, liabilities or indebtedness other than for purposes of Section 5.1 hereof.  Notwithstanding the foregoing, Excluded Hedging Obligation shall not constitute Obligations.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Other Taxes" shall have the meaning set forth in Section 6.9(b) hereto.

"Parent" shall have the meaning set forth in the recitals hereto.

"Payment Conditions" shall mean, with respect to any applicable payment or other transaction, the following conditions:

(a)     as of the date of any such payment or transaction, and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing;

(b)     as of the date of any such payment or transaction and after giving effect thereto, the Excess Availability for the immediately preceding 30 consecutive day period shall have been not less than twenty-five percent (25%) (in the case of any Restricted Payment) or twenty percent (20%) (in the case of any other payment or transaction) of the Maximum Credit and after giving effect to any such Restricted Payment, payment or transaction, using the most recent calculation of the Borrowing Base immediately prior to any such payment or transaction, the Excess Availability shall be not less than twenty-five percent (25%) (in the case of any

Restricted Payment) or twenty percent (20%) (in the case of any other payment or transaction) of the Maximum Credit;

(c)      after giving effect to any such payment or transaction, the Fixed Charge Coverage Ratio for the immediately preceding period of twelve consecutive months ending on the last day of the month prior to the date of such payment or transaction for which the Administrative Agent has received financial statements pursuant to Section 9.6(a)(i) shall be not less than 1.10 to 1.00 (in the case of a Restricted Payment) or 1.00 to 1.00 (in the case of any other payment or transaction);

(d)      receipt by the Administrative Agent of reasonably satisfactory projections for the twelve month period after the date of such payment or transaction showing that the Excess Availability for the twelve month period following the date on which such Restricted Payment, payment or transaction occurs shall be not less than twenty-five percent (25%) (in the case of a Restricted Payment) or twenty percent (20%) (in the case of any other payment or transaction) of the Maximum Credit; and

(e)      receipt by the Administrative Agent of a certificate of an authorized officer of the Parent certifying as to compliance with the preceding clauses and demonstrating (in reasonable detail) the calculations required thereby.

"Payment in Full" shall have the meaning set forth in Section 15.1(a) hereto.

"Pension Plan" shall mean a pension plan (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA which Borrowers sponsor, maintain, or to which Borrowers or any ERISA Affiliate makes, is making, or is obligated to make contributions, other than a Multiemployer Plan.

"Permits" shall have the meaning set forth in Section 8.7(b) hereto.

"Permitted Acquisitions" shall mean the acquisition of all or substantially all of the assets (or a division of business line) of any Person or the Equity Interests of a Person (each, an "Acquired Business"); provided, that, (a) the acquisition shall be with respect to an operating company or division or line of business that engages in a line of business substantially similar, reasonably related or incidental to the business that a Borrower is engaged in, (b) the board of directors (or other comparable governing body) of the Person to be acquired shall have duly approved such acquisition and such Person shall not have announced that it will oppose such acquisition or shall not have commenced any action which alleges that such acquisition will violate applicable law, (c) a Borrower shall have furnished the Administrative Agent with not less than ten (10) Business Days' prior written notice (or such shorter period as the Administrative Agent may agree) of the intention to execute a purchase agreement in connection with an intended acquisition and shall have furnished the Administrative Agent as soon as practicable thereafter with a current draft of the purchase agreement and the other material purchase documents (and final copies thereof as and when executed), and a summary of any due diligence undertaken by the Loan Parties in connection with such acquisition, and (d) as of the date of such acquisition, the Payment Conditions shall be satisfied.

39

No Accounts, Credit Card Receivables or Inventory of any Acquired Business shall be Eligible Accounts, Eligible Credit Card Receivables, Eligible Inventory, Eligible Rental Inventory, or Eligible In-Transit Inventory until Administrative Agent has completed a field examination with respect to the business and assets of the Acquired Business in accordance with Administrative Agent's customary procedures and practices and as otherwise required by the nature and circumstances of the business of the Acquired Business, the scope and results of which shall be reasonably satisfactory to Administrative Agent, and the criteria for Eligible Accounts, Eligible Credit Card Receivables, Eligible Inventory, Eligible Rental Inventory, or Eligible In-Transit Inventory set forth herein are satisfied with respect thereto in accordance with this Agreement or such other or additional criteria as Administrative Agent may, at its option, reasonably establish with respect thereto and subject to such Reserves as Administrative Agent may establish in connection with the Acquired Business in accordance with the definition of such term, and in the case of Inventory acquired pursuant to a Permitted Acquisition to the extent that it has been subject to an appraisal that satisfies the requirements of Section 7.3 hereof); provided, that, notwithstanding anything to the contrary contained in this Agreement, (a) Borrowers shall reimburse Administrative Agent for the reasonable costs and expenses of any field examination and appraisal conducted pursuant to this paragraph and (b) any field examination and appraisal conducted pursuant to this paragraph shall be in addition to any field examination and appraisal contemplated by Sections 7.3 and 7.7 hereof.

"Permitted Discretion" shall mean, as used in this Agreement with reference to the Administrative Agent, any Issuing Bank and any Lender, the reasonable (from the perspective of a secured asset-based lender) credit judgment exercised in good faith in accordance with customary business practices of the Administrative Agent, such Issuing Bank or such Lender, as the case may be, for comparable asset-based lending transactions.

"Permitted Dispositions" shall mean each of the following:

      (a)     sales of Inventory in the ordinary course of business (including sales of Inventory at discounted prices in connection with retail store closings);

      (b)     the sale or other disposition of used, worn-out, obsolete Equipment and interests in Real Property or Equipment and interests in Real Property no longer used or useful in the conduct of the business of Borrowers and Borrowers' Subsidiaries (including a sale or other disposition in connection with the sale or closing of any retail store), provided, that, (i) all of the Net Cash Proceeds of the sale or other disposition shall be paid to Administrative Agent for application to the Obligations in accordance with the terms hereof, (ii) the consideration paid or payable shall be in an amount not less than the Fair Market Value of the property sold or disposed of, and (iii) the number of retail stores closed or sold by Borrowers during the term of this Agreement minus the number of retail stores opened by Borrowers during the term of this Agreement shall not exceed twenty (20).

      (c)     the sale of accounts receivable in connection with the collection or compromise thereof in the ordinary course of business consistent with the practices of Guarantors, Borrowers and Borrowers' Subsidiaries as of the date hereof;

(d)    the transfer of cash for the payment of Indebtedness to the extent such payments are permitted hereunder and for the payment of other payables in the ordinary course of the business of Borrowers and Guarantors;

(e)    the issuance and sale by Guarantors, Borrowers and Borrowers' Subsidiaries of Equity Interests of Guarantors, Borrowers and Borrowers' Subsidiaries after the date hereof for cash; provided, that, (i) Guarantors, Borrowers and Borrowers' Subsidiaries shall not be required to pay any cash dividends or repurchase or redeem such Equity Interests or make any other payments in respect thereof, except as otherwise permitted in Section 10.5 hereof, (ii) except as the Administrative Agent and Lenders may otherwise agree in writing and except as provided in Section 10.3(o) hereof, all of the Net Cash Proceeds of the sale and issuance of such Equity Interests shall be paid to the Administrative Agent for application to the Obligations in accordance with the terms hereof and (iii) as of the date of such issuance and sale and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing;

(f)    any transfer of property or assets, or issuance of Equity Interests, that is a Restricted Payment permitted under Section 10.5 or Permitted Investment permitted under Section 10.4;

(g)    sales or other dispositions of assets of Guarantors, Borrowers and Borrowers' Subsidiaries not otherwise subject to the provisions set forth in this definition, provided, that, as to any such sale or other disposition, each of the following conditions is satisfied:

(i)    the cumulative proceeds from all such sales or other dispositions shall not exceed $4,000,000 during the immediately preceding four (4) full consecutive fiscal quarters and such sale or other disposition of such assets could not reasonably be expected to have a Material Adverse Effect or materially inhibit the ability of Guarantors, Borrowers and Borrowers' Subsidiaries to operate their businesses or collect Receivables in the ordinary course;

(ii)    not less than seventy-five percent (75%) of the consideration to be received by Guarantors, Borrowers and Borrower Subsidiaries shall be paid or payable in cash and shall be paid contemporaneously with consummation of the transaction;

(iii)    the consideration paid or payable shall be in an amount not less than the Fair Market Value of the property disposed of;

(iv)    such transaction does not involve the sale or other disposition of any Equity Interest in any Subsidiary or of Receivables other than Receivables owned by or attributable to other property concurrently being disposed of in a transaction otherwise constituting a Permitted Disposition (but in no event constituting Accounts of Borrowers);

(v)    the Net Cash Proceeds from any such sale or other disposition, shall be applied to the Obligations (without permanent reduction thereof); and

(vi)    as of the date of any such sale or other disposition, and in each case after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing;

(h)    the grant of non-exclusive licenses or covenants not to sue under Intellectual Property in the ordinary course of business;

(i)    the IP Transfer and the EMS Reorganization; and

(j)    the sale of One Vose Farm Road, Peterborough, New Hampshire; provided, that, as to such sale, each of the following conditions is satisfied:

(i)    not less than seventy-five percent (75%) of the consideration to be received by Guarantors and Borrowers shall be paid or payable in cash and shall be paid contemporaneously with consummation of the transaction;

(ii)    the consideration paid or payable shall be in an amount not less than the Fair Market Value of the property disposed of;

(iii)    the Net Cash Proceeds from such sale shall be applied to the Obligations (without permanent reduction thereof); and

(iv)    as of the date of such sale, and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing.

"Permitted Holders" shall mean any of (a) the Sponsor and any of its Affiliates and funds or partnerships managed or advised by any of them or any of their Affiliates, but not including any portfolio company of any of the foregoing, (b) members of management and directors of Parent in place as of the Closing Date or appointed or elected by any of the persons described in clause (a) after the Closing Date, and family members or trusts of any Person listed in clauses (a) and (b), and (c) any Person that forms a group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) with any of the Persons listed in clauses (a) and (b).

"Permitted Investments" shall mean each of the following:

(a)    Investments consisting of accounts receivables owing to any Borrower or any Guarantor if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms;

(b)    the endorsement of instruments for collection or deposit in the ordinary course of business;

(c)    Investments in cash or Cash Equivalents; provided, that, (i) no Revolving Loans are then outstanding; except that notwithstanding that any Revolving Loans are outstanding, Borrowers and Borrowers' Subsidiaries may from time to time in the ordinary course of business consistent with reasonable business practices, make deposits of cash or other immediately available funds in operating demand deposit accounts used for disbursements to the

42

extent required to provide funds for amounts drawn or anticipated to be drawn shortly on such accounts and such funds may be held in Cash Equivalents consisting of overnight investments until so drawn (so long as such funds and Cash Equivalents are not held more than two (2) Business Days from the date of the initial deposit thereof) and (ii) the terms and conditions of Section 5.3 hereof shall have been satisfied with respect to the deposit account, investment account or other account in which such cash or Cash Equivalents are held;

(d)    deposits of cash for leases, utilities, worker's compensation and similar matters in the ordinary course of business;

(e)    obligations under Hedge Agreements permitted under Section 10.3(c) hereof;

(f)    receivables owing to Guarantors, Borrowers or any of Borrowers' Subsidiaries if created or acquired in the ordinary course of business consistent with current practices as of the date hereof;

(g)    payroll, travel, relocation, commission and similar advances to cover matters that in good faith are expected at the time of such advances to be treated as expenses for accounting purposes in accordance with GAAP and that are made in the ordinary course of business consistent with current practices as of the date hereof;

(h)    additional Investments held by Guarantors, Borrowers or any Subsidiary in any non-wholly-owned Subsidiary solely to the extent that such Investments reflect an increase in the stockholders' equity of such Subsidiary resulting from retained earnings of such Subsidiary;

(i)    Investments held by Guarantors, Borrowers or any Subsidiary in the Equity Interests of any Subsidiary existing on the date hereof;

(j)    Permitted Acquisitions;

(k)    Investments consisting of non-cash consideration received in connection with Permitted Dispositions;

(l)    loans and advances by Guarantors, Borrowers and Borrowers' Subsidiaries to directors, officers and employees of Guarantors, Borrowers and Borrowers' Subsidiaries in the ordinary course of business for bona fide (including, without limitation, in connection with the purchase of Equity Interests by such directors, officers and employees) business purposes not in excess of $100,000 at any time outstanding;

(m)    stock or obligations issued to Guarantors, Borrowers and Borrowers' Subsidiaries by any Person (or the representative of such Person) in respect of Indebtedness of such Person owing to Guarantors, Borrowers and Borrowers' Subsidiaries in connection with the insolvency, bankruptcy, receivership or reorganization of such Person or a composition or readjustment of the debts of such Person; provided, that, the original of any such stock or instrument evidencing such obligations shall be promptly delivered to the Administrative Agent, upon the Administrative Agent's request, together with such stock power, assignment or

endorsement by Guarantors, Borrowers and Borrowers' Subsidiaries as the Administrative Agent may request;

(n)    obligations of account debtors to Guarantors, Borrowers and Borrowers' Subsidiaries arising from Accounts which are past due evidenced by a promissory note made by such account debtor payable to Borrowers and Borrowers' Subsidiaries; provided, that, such promissory note shall be endorsed to the order of the Administrative Agent by Guarantors, Borrowers and Borrowers' Subsidiaries and promptly delivered to the Administrative Agent as so endorsed;

(o)    Investments constituting Restricted Payments permitted by Section 10.5;

(p)    Investments by Guarantors, Borrowers or any of Borrowers' Subsidiaries in the form of Equity Interests received as consideration for the sale of assets pursuant to a Permitted Disposition by Guarantors, Borrowers or such Subsidiary to the extent permitted under Section 10.1(b);

(q)    Investments permitted under Section 10.6;

(r)    loans, advances and other Investments by a Borrower or a Guarantor to or in a Borrower or a Guarantor after the date hereof; provided, that, as to any such Investments, each of the following conditions is satisfied: (1) to the extent that such Investment gives rise to any Indebtedness, such Indebtedness is permitted hereunder, (2) to the extent that such Investment gives rise to the issuance of any Equity Interests, such issuance is permitted hereunder and (3) as of the date of any such Investment and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing; provided, however, that Borrowers and the Parent may make loans and/or advances to any Guarantor (other than the Parent) to the extent required to enable such Guarantor to pay the costs and expenses of such Guarantor's operation of a distribution center in a manner consistent with the practices of Borrowers and Guarantor as of the date hereof, whether or not a Default or Event of Default shall exist or have occurred and be continuing;

(s)    the Investments consisting of loans and advances set forth on Schedule 10.4 to the Information Certificate which are not otherwise permitted by the other clauses of this definition;

(t)    Investments made in Team Sales in the ordinary course of business when no Event of Default has occurred and is continuing or would result therefrom;

(u)    Investments made in Value Services in the ordinary course of business consisting of purchases and redemptions of gift card liabilities without the transfer of cash;

(v)    prepaid expenses and extensions of trade credit to customers in the ordinary course of business and consistent with past practice;

(w)    from and after August 19, 2015, other Investments so long as the Payment Conditions are met; and

(x)      to the extent constituting Investments, the EMS Reorganization and the IP Transfer.

"Permitted Liens" shall mean:

(a)      the security interests and liens of the Administrative Agent and the Lenders and the rights of setoff of the Administrative Agent and the Lenders provided for herein or under applicable law;

(b)      liens (other than environmental liens and liens arising under ERISA) securing the payment of taxes, assessments or other governmental charges or levies either not yet delinquent or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to Guarantors, Borrowers and Borrowers' Subsidiaries, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such lien and with respect to which adequate reserves have been set aside on its books in accordance with GAAP;

(c)      non-consensual statutory liens (other than environmental liens and liens arising under ERISA or securing the payment of taxes) arising in the ordinary course of business that do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's suppliers', repairmen's and mechanics' liens, to the extent: (i) such liens do not in the aggregate materially detract from the value of the property of the Parent and its Subsidiaries taken as a whole and do not materially impair the use thereof in the operation of the Parent and its Subsidiaries taken as a whole, (ii) such liens secure Indebtedness which is not past due or is adequately insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued and available to the Parent and its Subsidiaries, in each case prior to the commencement of foreclosure or other similar proceedings, which proceedings (or orders entered in connection with such proceeding) have the effect of preventing the forfeiture or sale of the property subject to any such lien and with respect to which adequate reserves have been set aside on its books in accordance with GAAP;

(d)      liens (other than any lien arising under ERISA) on cash or deposits of cash made (including, without limitation, surety, bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits, and deposits of cash securing liabilities to insurance companies or to secure the performance of tenders, bids, leases, contracts (other than for the repayment of Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other similar obligations incurred in the ordinary course of business;

(e)      easements (including, without limitation, reciprocal easement agreements and utility agreements), rights-of-way, covenants, consents, reservations, encroachments, variations and zoning and other restrictions and minor defects or irregularities in title, charges or encumbrances (whether or not recorded) and interest of ground lessors, which do not materially detract from the value of the property to which they attach or materially impair the use thereof to Borrowers or Guarantors;

(f)    liens existing on any property of any Person at the time such Person becomes a Subsidiary of the Parent in compliance with this Agreement or the other Financing Agreements or is merged or consolidated with or into a Subsidiary of the Parent in compliance with the terms hereof or thereof and, in each case, not created in contemplation of or in connection with such event; provided, that, such liens do not extend to any property of Borrowers or Guarantors;

(g)    any obligations or duties affecting any of the property of Borrowers to any municipality or public authority with respect to any franchise, grant, license, or permit which do not materially impair the use of such property for the purposes for which it is held;

(h)    any interest or title of a lessor or sublessor under any lease permitted by this Agreement;

(i)    liens in favor of customs and revenue authorities arising as a matter of law to secure payment of custom duties in connection with the importation of goods so long as (i) such liens attach only to the imported goods, (ii) such customs duties are not delinquent, (iii) the customs and revenue authorities have no right to enforce or take any actions with respect to such liens and (iv) adequate reserves have been set aside on the books of Borrowers or Guarantors (as applicable) in accordance with GAAP with respect to such liens;

(j)    liens arising out of consignment or similar arrangements for the sale of goods entered into by Borrowers in the ordinary course of business and in compliance with the terms of the Agreement;

(k)    security interests in Equipment arising after the date hereof to secure Indebtedness permitted under Section 10.3(b) hereof, whether such Indebtedness is assumed or incurred by Borrowers or Guarantors;

(l)    liens arising from (i) operating leases and the precautionary UCC financing statement filings in respect thereof and (ii) equipment or other materials which are not owned by any Borrower or any Guarantor located on the premises of such Borrower or such Guarantor (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and consistent with current practices of such Borrower or such Guarantor and the precautionary UCC financing statement filings in respect thereof;

(m)    statutory or common law liens or rights of setoff of depository banks with respect to funds of any Borrower or any Guarantor at such banks to secure fees and charges in connection with returned items or the standard fees and charges of such banks in connection with the deposit accounts maintained by such Borrower or such Guarantor at such banks (but not any other Indebtedness or obligations);

(n)    judgments and other similar liens arising in connection with court proceedings that do not constitute an Event of Default, provided, that, (i) such liens are being contested in good faith and by appropriate proceedings diligently pursued, (ii) adequate reserves or other appropriate provision, if any, as are required by GAAP have been made therefor, (iii) a stay of enforcement of any such liens is in effect or (iv) the Administrative Agent may establish a Reserve with respect thereto;

46

(o)    leases or subleases of Real Property granted by any Borrower or any Guarantor in the ordinary course of business and consistent with past practice to any Person so long as any such leases or subleases do not interfere in any material respect with the ordinary conduct of the business of such Borrower or such Guarantor as presently conducted thereon;

(p)    liens or rights of setoff against credit balances of Borrowers with Credit Card Issuers or Credit Card Processors or amounts owing by such Credit Card Issuers or Credit Card Processors to Borrowers in the ordinary course of business, but not liens on or rights of setoff against any other property or assets of Borrowers, pursuant to the Credit Card Agreements (as in effect on the date hereof) to secure the obligations of Borrowers to the Credit Card Issuers or Credit Card Processors arising as a result of fees and chargebacks;

(q)    liens to secure Indebtedness of any Borrower or any Guarantor permitted under Section 10.3(j) hereof; provided, that, (i) such liens shall only encumber a Borrower's leasehold interest in the Real Property owned by such Borrower or such Guarantor as of the date hereof and proceeds thereof and (ii) as of the date of incurring such liens and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing;

(r)    the security interests and liens set forth on Schedule 8.4 to the Information Certificate which are not otherwise permitted under the other clauses of this definition and any security interests and liens to secure Refinancing Indebtedness of the Indebtedness secured by such security interests and liens to the extent permitted under Section 10.3(g) hereof;

(s)    security interests and liens in Real Property;

(t)    other liens on assets (other than Accounts or Inventory) of any Borrower or any Guarantor securing obligations of any Borrower or any Guarantor in an aggregate amount not to exceed $2,500,000;

(u)    non-exclusive licenses of, or covenants not to sue under, Intellectual Property in the ordinary course of business;

(v)    Liens in favor of the Second Lien Agent securing the Indebtedness described in Section 10.3(o) hereof; provided, that, such liens are and continue to be subject and subordinate on a second-lien basis to the liens granted in favor of the Administrative Agent pursuant to the terms and conditions of the Intercreditor Agreement; and

(w)    Liens in favor of the Subordinated Loan Agent securing the Indebtedness described in Section 10.3(h) hereof; provided, that, such liens are and continue to be subject and subordinate on a third-lien basis to the liens granted in favor of the Administrative Agent and Second Lien Agent pursuant to the terms and conditions of the Subordination Agreement.[12]

"Person" or "person" shall mean any individual, sole proprietorship, partnership, corporation (including any corporation which elects subchapter S status under the Code), limited liability company, limited liability partnership, business trust, unincorporated association, joint

---

[12] Amendment No. 2

stock corporation, trust, joint venture or other entity or any government or any agency or instrumentality or political subdivision thereof.

"Plan" shall mean an employee benefit plan (as defined in Section 3(3) of ERISA) which Borrowers sponsor, maintain, or to which they make, are making, or are obligated to make contributions, or in the case of a Multiemployer Plan have made contributions at any time during the immediately preceding six (6) plan years or with respect to which Borrowers could reasonably be expected to incur liability.

"Pro Forma Basis" shall mean, for purposes of determining compliance with any provision of this Agreement, including the determination of the Fixed Charge Coverage Ratio or any test, after giving effect on a pro forma basis for the relevant period to:

(a)    the incurrence or repayment of any Indebtedness of Intermediate Holdco and its Subsidiaries (including by assumption of then outstanding Indebtedness or by a Person becoming a Subsidiary after the beginning of the applicable period and on or before the relevant date of determination to the extent the Indebtedness is outstanding or is to be incurred on the relevant date of determination) (and the application of the proceeds thereof), other than the incurrence or repayment of Indebtedness in the ordinary course of business for working capital purposes pursuant to this Agreement (which shall be computed based upon the average daily balance of such Indebtedness during the period), as if such incurrence or repayment, as the case may be (and the application of the proceeds thereof), occurred on the first day of such period;

(b)    calculations of interest on Indebtedness bearing a floating interest rate will be made as if the rate in effect on the relevant date of determination (taking into account any Hedge Agreement applicable to the Indebtedness) had been the applicable rate for the entire reference period;

(c)    any disposition, Investment, asset sale, or acquisition (including any Permitted Acquisition) by Intermediate Holdco and any of its Subsidiaries occurring since the beginning of such period, including any disposition, Investment, asset sale or acquisition since the beginning of such period by a Person that became a Subsidiary after the beginning of such period, as if such disposition (including the application of proceeds therefrom), Investment, asset sale or acquisition occurred on the first day of such period; provided, that, any adjustment for cost savings or synergies relating to such disposition, Investment, asset sale or acquisition shall only be included to the extent (i) Administrative Agent, in the exercise of its Permitted Discretion, has approved such adjustment for cost savings or synergies in writing or (ii) such pro forma adjustments (A) arise out of events which are directly attributable to a specific transaction, are factually supportable and are reasonably expected to have a continuing impact, (B) are determined on a basis consistent with Article II of Regulation S-X promulgated under the Securities Act and as interpreted by the staff of the Securities and Exchange Commission, and (C) give effect to cost savings and synergies reductions solely to the extent all steps have been completed in order to realize such cost savings and synergies and such cost savings and synergies are quantifiable; provided, further, that, no adjustment for cost savings or synergies relating to such disposition, Investment, asset sale or acquisition shall be made to the extent duplicative of any expense or charge otherwise added to Consolidated EBITDA.

48

"Pro Rata Share" shall mean as to any Lender, the fraction (expressed as a percentage) the numerator of which is such Lender's Commitment and the denominator of which is the aggregate amount of all of the Commitments of Lenders; provided, that, if the Commitments have been terminated, the numerator shall be the unpaid amount of such Lender's Loans and its interest in the Letter of Credit Obligations and the denominator shall be the aggregate amount of all unpaid Loans and Letter of Credit Obligations.

"Qualified ECP Borrower" means, in respect of any Swap Obligations, each Borrower that constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Qualified IPO" shall mean (a) an underwritten primary or secondary (or combination of primary or secondary) public offering of the Equity Interests of the Parent or any direct or indirect parent entity of the Parent that generates gross cash proceeds of at least $20,000,000 or (b) any merger, consolidation or amalgamation following which the Parent is or becomes a Wholly-Owned Subsidiary of another Person, which Person has equity securities listed on a national securities exchange, regardless of whether the Parent is the surviving entity.

"Quarterly Average Excess Availability" shall mean, for any calendar quarter, the daily average Excess Availability for such calendar quarter.

"Real Property" shall mean all now owned and hereafter acquired real property of Borrowers, including leasehold interests, together with all buildings, structures, and other improvements located thereon and all licenses, easements and appurtenances relating thereto, wherever located.

"Receivables" shall mean all of the following now owned or hereafter arising or acquired property of a Person: (a) all Accounts; (b) all interest, fees, late charges, penalties, collection fees and other amounts due or to become due or otherwise payable in connection with any Account; (c) all payment intangibles of such Borrower; (d) letters of credit, indemnities, guarantees, security or other deposits and proceeds thereof issued payable to such Borrower or otherwise in favor of or delivered to such Borrower in connection with any Account; (e) all other accounts, contract rights, chattel paper, instruments, notes, general intangibles and other forms of obligations owing to such Borrower, whether from the sale and lease of goods or other property, licensing of any property (including Intellectual Property or other general intangibles), rendition of services or from loans or advances by such Borrower or to or for the benefit of any third person (including loans or advances to any Affiliates or Subsidiaries of such Borrower) or otherwise associated with any Accounts, Inventory or general intangibles of such Borrower (including, without limitation, choses in action, causes of action, tax refunds, tax refund claims, any funds which may become payable to such Borrower in connection with the termination of any Plan or other employee benefit plan and any other amounts payable to such Borrower from any Plan or other employee benefit plan, rights and claims against carriers and shippers, rights to indemnification, business interruption insurance and proceeds thereof, casualty or any similar types of insurance and any proceeds thereof and proceeds of insurance covering the lives of employees on which such Borrower is a beneficiary).

49

"Records" shall mean, as to each Borrower, all of such Borrower's present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any account debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of such Borrower with respect to the foregoing maintained with or by any other person).

"Refinancing Indebtedness" shall have the meaning set forth in Section 10.3(g) hereto.

"Register" shall have the meaning set forth in Section 6.1 hereto.

"Registered Loans" shall have the meaning set forth in Section 6.1 hereto.

"Report" shall have the meaning set forth in Section 14.10(a) hereto.

"Required Lenders" shall mean at any time, those non-Defaulting Lenders whose Pro Rata Shares aggregate more than fifty (50%) percent of the aggregate of the Commitments of all non-Defaulting Lenders, or if the Commitments shall have been terminated, non-Defaulting Lenders to whom more than fifty (50%) percent of the then outstanding Obligations are owing; provided, that, at any time that there are two (2) or more unaffiliated Lenders, "Required Lenders" must include at least two (2) unaffiliated Lenders.

"Reserves" shall mean as of any date of determination, such amounts as the Administrative Agent may from time to time establish and revise in its Permitted Discretion reducing the amount of Revolving Loans and Letters of Credit that would otherwise be available to Borrowers under the lending formula(s) provided for herein: (a) to reflect events, conditions, contingencies or risks which, as determined by the Administrative Agent in its Permitted Discretion, adversely affect, or would have a reasonable likelihood of adversely affecting, either (i) the Collateral or any other property which is security for the Obligations or its value or (ii) the assets, business or prospects of any Borrower or any Guarantor or (iii) the security interests and other rights of the Administrative Agent in the Collateral (including the enforceability, perfection and priority thereof) or (b) to reflect the Administrative Agent's good faith belief that any collateral report or financial information furnished by or on behalf of any Loan Party to the Administrative Agent is or may have been incomplete, inaccurate or misleading in any material respect or (c) in respect of any state of facts which the Administrative Agent determines in its Permitted Discretion constitutes a Default or an Event of Default. Without limiting the generality of the foregoing, Reserves may, at the Administrative Agent's option in its Permitted Discretion, be established to reflect: (i) dilution with respect to the Accounts (based on the ratio of the aggregate amount of non-cash reductions in Accounts for any period to the aggregate dollar amount of the sales of Borrowers for such period) as calculated by the Administrative Agent for any period is or is reasonably anticipated to be greater than five percent (5%); (ii) returns, discounts, claims, credits and allowances of any nature that are not paid pursuant to the reduction of Accounts; (iii) sales, excise, use or similar taxes included in the amount of any Accounts reported to the Administrative Agent; (iv) a change in the turnover, age or mix of the categories of Inventory that adversely affects the aggregate value of all Inventory; (v) variances between the perpetual inventory records of Borrowers and the results of the test counts of Inventory

50

conducted by the Administrative Agent with respect thereto in excess of the percentage acceptable to the Administrative Agent, (vi) the aggregate amount of deposits, if any, received by Borrowers from their customers in respect of unfilled orders for goods, (vii) reserves for in-transit Inventory, including freight, taxes, duty and other amounts which the Administrative Agent estimates must be paid in connection with such Inventory upon arrival and for delivery to one of Borrowers' locations for Eligible Inventory within the United States of America; (viii) amounts due or to become due to owners and licensors of trademarks and other Intellectual Property used by Borrowers; (ix) obligations, liabilities or indebtedness (contingent or otherwise) of any Loan Party to any Lender or any Affiliate of any Lender arising under or in connection with any Bank Products to the extent that such obligations, liabilities or indebtedness constitute Obligations as such term is defined herein or otherwise receive the benefit of the security interest of the Lenders in any Collateral, (x) inventory shrinkage (including, without limitation, to reflect Eligible Rental Inventory which is not in the possession or control of Borrowers); (xi) markdowns and cost variances (pursuant to discrepancies between the purchase order price of Inventory and the actual cost thereof); (xii) unless the Administrative Agent has received a Collateral Access Agreement with respect to any such Real Property or property referenced below, any rental payments, service charges or other amounts to become due to lessors of real property and other Persons who have custody, possession or control of Inventory or Records to the extent Inventory or Records are located in or on such property or such Records are needed to monitor or otherwise deal with the Collateral, provided, that, (a) with respect to real property located in any State in which a landlord has, by operation of law, a priority lien in the assets located in such real property for unpaid rent and related charges and with respect to any distribution center, the Reserves established pursuant to this clause (xii) as to real property locations that are leased shall not generally, except as the Administrative Agent may otherwise determine in its Permitted Discretion, exceed at any time the aggregate of amounts payable for the next two (2) months from any such time to the lessors of such real property, except that such general practice with respect to the amount of the Reserves pursuant to this clause (xii) shall only apply so long as: (1) no Default or Event of Default shall exist or have occurred and be continuing, (2) neither the Administrative Agent, any Borrower or any Guarantor shall have received notice of any event of default by the lessee under the lease with respect to such location and (3) any Borrower shall not have granted to the lessor a security interest or lien upon any assets of such Borrower and (b) with respect to real property locations that are leased and located in any other States (other than distribution centers), the Reserves established pursuant to this clause (xii) as to real property locations that are leased shall not apply unless (a) a Default or Event of Default shall exist or have occurred and be continuing, (b) the Administrative Agent, any Borrower or any Guarantor shall have received notice of any event of default by the lessee under the lease with respect to such location or (c) any Borrower shall have granted to the lessor a security interest or lien upon any assets of such Borrower, in which case such Reserve shall, except as the Administrative Agent may otherwise determine in its Permitted Discretion, not exceed the aggregate of amounts payable for the next two (2) months from any such time to the lessors of such real property store locations; (xiii) any rental payments, service charges or other amounts due or to become due to lessors of personal property; (xiv) amounts owing by Borrowers to Credit Card Issuers or Credit Card Processors in connection with the Credit Card Agreements; (xv) fifty percent (50%) of the amount of merchandise gift certificates or gift cards issued by Borrowers, net of a breakage calculation for gift certificates or gift cards unlikely to be redeemed (as determined in accordance with GAAP); (xvi) the purchase price paid by any

51

customers or other deposits to Borrowers in respect of layaway goods; (xvii) the amount of refund checks issued to customers of Borrowers; (xviii) the amount of any Inventory sales price discounts in connection with retail store closings but solely to the extent the sales price of any such Inventory is less than the cost of such Inventory (with cost computed on a first-in-first-out basis in accordance with GAAP); and (xix) the Second Lien Pushdown Reserve. Notwithstanding the foregoing, the Administrative Agent will provide at least three (3) Business Days' prior notice to Borrowers before the Administrative Agent establishes a new category of Reserves or changes the methodology of calculating Reserves (which notice will include a reasonably detailed description of such new category or change in methodology); provided that no prior notice shall be required after the occurrence and during the continuance of an Event of Default.  During such three (3) Business Day period, the Administrative Agent will, if requested, discuss any such new category or change in methodology with the Borrowers and the Borrowers may take such action as may be required so that the event, condition or matter that is the basis for such new category or change in methodology no longer exists or exists in a manner that would result in the establishment of a lower reserve or result in a lesser change, in each case, in a manner and to the extent satisfactory to the Administrative Agent in its Permitted Discretion. The amount of any Reserve established by the Administrative Agent shall have a reasonable relationship to the event, condition or other matter which is the basis for such reserve as determined by the Administrative Agent in its Permitted Discretion and to the extent that such Reserve is in respect of amounts that may be payable to third parties the Administrative Agent may, at its option, deduct such Reserve from the Maximum Credit, at any time that such limit is less than the amount of the Borrowing Base. To the extent the lending formulas used to determine the Borrowing Base or the criteria for Eligible Credit Card Receivables or Eligible Inventory address any circumstances, condition, event or contingency in a manner reasonably satisfactory to the Administrative Agent, the Administrative Agent shall not establish a Reserve for the same purpose.

"Restricted Payment" shall mean any (a) dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests of Borrowers or any of their Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or on account of any return of capital to Borrowers or such Subsidiary's stockholders, partners or members (or the equivalent Person thereof), or payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire any Equity Interests of Borrowers or any of their Subsidiaries, or any setting apart of funds or property for any of the foregoing, and (b) the payment by Borrowers or any of their Subsidiaries of any management, advisory or consulting fee to any Person or the payment of any extraordinary salary, bonus or other form of compensation to any Person who is directly or indirectly a significant partner, shareholder, owner or executive officer of any such Person, to the extent such extraordinary salary, bonus or other form of compensation is not included in the corporate overhead of Borrowers or such Subsidiary.

"Revolving Loan Exposure" means, with respect to any Lender, as of any date of determination (a) prior to the termination of the Commitments, the amount of such Lender's Commitment, and (b) after the termination of the Commitments, the aggregate outstanding principal amount of the Revolving Loans of such Lender.

"Revolving Loans" shall mean the loans now or hereafter made by the Lenders to or for the benefit of Borrowers on a revolving basis (involving advances, repayments and readvances) as set forth in Section 2.1 hereto.

"S&P" shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and its successors and assigns.

"Sanctioned Entity" shall mean (a) an agency of the government of, (b) an organization directly or indirectly controlled by, or (c) a person resident in, a country that is subject to a sanctions program identified on the list maintained and published by OFAC and available at http://www.treas.gov/offices/enforcement/ofac/programs, or as otherwise published from time to time as such program may be applicable to such agency, organization or person.

"Sanctioned Person" shall mean a person named on the list of Specially Designated Nationals or Blocked Persons maintained by OFAC available at http://www.treas.gov/offices/ enforcement/ofac/sdn/index.html, or as otherwise published from time to time.

"Second Lien Agent" shall mean Wells Fargo Bank, National Association, in its capacity as administrative and collateral agent under the Second Lien Documents, and also includes any successor, replacement or permitted assignee.

"Second Lien Borrowing Base" shall mean, at any time, the amount equal to:

(a)     the amount equal to ten percent (10.0%) of the net amount of Eligible Credit Card Receivables (including net of discount fees); plus

(b)     the amount equal to seven and one half percent (7.5%) of the Net Recovery Percentage of each category of Eligible Inventory multiplied by the Value thereof; plus

(c)     the amount equal to seven and one half percent (7.5%) of the Net Recovery Percentage of each category of Eligible Rental Inventory multiplied by the Value thereof.

"Second Lien Debt" shall mean the Indebtedness evidenced by or arising under the Second Lien Documents.

"Second Lien Documents" shall mean, collectively, the Second Lien Loan Agreement and all agreements, documents and instruments at any time executed and/or delivered by any Loan Party or any other person to, with or in favor of any Second Lien Secured Party in connection therewith or related thereto, as all of the foregoing now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured, in accordance with the terms of Section 10.3(o) (in whole or in part and including any agreements with, to or in favor of any other lender or group of lenders that at any time refinances, replaces or succeeds to all or any portion of the Second Lien Debt).

"Second Lien Loan Agreement" shall mean the Term Loan and Security Agreement, dated of even date herewith, by and among Borrowers, Guarantors, Second Lien Agent and Second Lien Lenders, as the same now exists or may hereafter be amended, modified,

supplemented, extended, renewed, refinanced, restated or replaced, in accordance with the terms of Section 10.3(o).

"Second Lien Lenders" shall mean, collectively, any person party to the Second Lien Documents as lender; sometimes being referred to herein individually as a "Second Lien Lender".

"Second Lien Loans" shall mean the lesser of (a) $10,000,000 and (b) the term loans made by the Second Lien Lenders pursuant to the Second Lien Loan Agreement.

"Second Lien Push Down Reserve" shall mean, at any time, a reserve in an amount equal to the difference (if positive) between (a) the Second Lien Loans outstanding at such time and (b) the Second Lien Borrowing Base.

"Second Lien Secured Parties" shall mean, collectively, (a) Second Lien Agent, (b) the Second Lien Lenders, (c) each other person to whom any of the Second Lien Debt is owed and (d) the successors, replacements and permitted assigns of each of the foregoing.

"Secured Party" shall mean, with respect to the Obligations, the Agents, the Lenders, the Bank Product Providers and the Issuing Bank.

"Settlement Period" shall have the meaning set forth in Section 6.13(b) hereto.

"Solvent" means, with respect to any Person on any date of determination, that on such date (a) the fair value of the assets of such Person and its Subsidiaries, on a consolidated basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise, (b) the present fair saleable value of the property of such Person and its Subsidiaries, on a consolidated basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, (c) such Person is able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured and (d) such Person and its Subsidiaries, on a consolidated basis, are not engaged in, and are not about to engage in, business for which they have unreasonably small capital. The amount of any contingent liability at any time shall be computed as the amount that would reasonably be expected to become an actual and matured liability.

"Special Administrative Agent Advance" shall have the meaning set forth in Section 14.11(a) hereto.

"Specified Equity Contribution" shall mean cash common or preferred equity (other than Disqualified Stock) contributions made directly by Sponsor to Parent in immediately available funds (and Parent shall immediately contribute all of such cash proceeds to a Borrower as a cash common or preferred equity (other than Disqualified Stock) contribution), which equity contribution is added to Consolidated EBITDA for the purposes of calculating compliance with the Fixed Charge Coverage Ratio Financial Covenant.

54

"<u>Specified Subordinated Debt</u>"[13] shall mean the Indebtedness evidenced by or arising under the Subordinated Loan Documents.

"<u>Sponsor</u>" shall mean Versa Capital Fund II, L.P., a Delaware limited partnership.

"<u>Sponsor Portfolio Company</u>" shall mean any Person that is an Affiliate of Borrowers or Guarantors solely due to the fact that such Person is controlled, directly or indirectly, by Sponsor and which does not otherwise have any managerial control over the business of any Borrower or any Guarantor in any capacity.

"<u>Sport Chalet</u>" shall have the meaning set forth in the preamble hereto.

"<u>Standby Letters of Credit</u>" shall mean all Letters of Credit other than Commercial Letters of Credit.

"<u>Store Accounts</u>" shall have the meaning set forth in <u>Section 6.3(a)</u> hereto.

"<u>Subordinated Debt</u>" shall mean any Indebtedness of any Loan Party that is subject to, and subordinate in right of payment to, the right of any Lender to receive the prior Payment in Full.

"<u>Subordinated Loan Agent</u>"[14] shall mean Vestis BSI Funding II, LLC, a Delaware limited liability company.

"<u>Subordinated Loan Agreement</u>"[15] shall mean the Term Loan and Security Agreement, dated on or about the Amendment No. 2 Effective Date, by and among Borrowers, Guarantors, Subordinated Loan Agent and Subordinated Loan Lenders, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, refinanced, restated or replaced in accordance with the terms of Section 10.3(h).

"<u>Subordinated Loan Documents</u>"[16] shall mean, collectively, the Subordinated Loan Agreement and all agreements, documents and instruments at any time executed and/or delivered by any Loan Party or any other person to, with or in favor of any Subordinated Secured Party in connection therewith or related thereto, as all of the foregoing now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured in accordance with the terms of Section 10.3(h) (in whole or in part and including any agreements with, to or in favor of any other lender or group of lenders that at any time refinances, replaces or succeeds to all or any portion of the Specified Subordinated Debt).

"<u>Subordinated Loan Lenders</u>"[17] shall mean, collectively, any person party to the Subordinated Loan Documents as lender; sometimes being referred to herein individually as a "Subordinated Loan Lender".

---

[13] Amendment No. 2
[14] Amendment No. 2
[15] Amendment No. 2
[16] Amendment No. 2
[17] Amendment No. 2

4241829.6

"Subordinated Secured Parties"[18] shall mean, collectively, (a) Subordinated Loan Agent, (b) the Subordinated Loan Lenders, (c) each other person to whom any of the Specified Subordinated Debt is owed and (d) the successors, replacements and permitted assigns of each of the foregoing.

"Subordination Agreement"[19] shall mean the Intercreditor and Subordination Agreement, dated on or about the Amendment No. 2 Effective Date, among Administrative Agent, Second Lien Agent and Subordinated Loan Agent, as acknowledged by Loan Parties, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated, replaced or restructured.

"Subsidiary" or "subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, limited liability partnership or other limited or general partnership, trust, association or other business entity of which an aggregate of at least a majority of the outstanding Equity Interests or other interests entitled to vote in the election of the board of directors of such corporation (irrespective of whether, at the time, Equity Interests of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency), managers, trustees or other controlling persons, or an equivalent controlling interest therein, of such Person is, at the time, directly or indirectly, owned by such Person and/or one or more subsidiaries of such Person.

"Supermajority Lenders" shall mean at any time, those non-Defaulting Lenders whose Pro Rata Shares aggregate more than seventy-five percent (75%) of the aggregate of the Commitments of all non-Defaulting Lenders, or if the Commitments shall have been terminated, non-Defaulting Lenders to whom more than seventy-five percent (75%) of the then outstanding Obligations are owing; provided, that, at any time that there are two (2) or more unaffiliated Lenders, "Supermajority Lenders" must include at least two (2) unaffiliated Lenders.

"Swap Obligation" shall mean, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swing Line Lender" shall mean Wells Fargo, the Administrative Agent acting on behalf of the Swing Line Lender, or any successor to the Swing Line Lender.

"Swing Line Loan" shall mean any loan made by the Swing Line Lender pursuant to Section 2.2.

"Swing Line Loan Limit" shall mean $18,000,000.

"Swing Loan Exposure" means, as of any date of determination with respect to any Lender, such Lender's Pro Rata Share of the Swing Line Loans on such date.

"Taxes" shall have the meaning set forth in Section 6.9(a) hereto.

---

[18] Amendment No. 2
[19] Amendment No. 2

56

"Team Sales" shall have the meaning set forth in the preamble hereto.

"Tenant Allowances" shall mean, with respect to any real property leased by a Borrower, any amounts contributed or committed to be contributed by the landlord of such property to the Borrower, or other reimbursement by such landlord to Borrower, in connection with Borrower's improvements of such property, in each case regardless of accounting treatment.

"tranche" shall have the meaning set forth in Section 2.8(a) hereof.

"Trading With the Enemy Act" shall have the meaning set forth in Section 10.13.

"Transactions" shall mean the Acquisition, the Equity Contribution, the Credit Facility, the Second Lien Loans, and the related transactions.

"Triggering Event of Default" shall mean an Event of Default pursuant to Section 12.1(a)(i), 12.1(e), 12.1(f) or 12.1(g).

"UCC" shall mean the Uniform Commercial Code as in effect in the State of New York, and any successor statute, as in effect from time to time (except that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Administrative Agent may otherwise determine).

"U.S." shall have the meaning set forth in Section 6.9(a).

"U.S. Tax Compliance Certificate" shall have the meaning set forth in Section 6.9(f).

"Value" shall mean, as determined by the Administrative Agent in its Permitted Discretion, with respect to Inventory, the lower of (a) cost computed on a first-in first-out basis in accordance with GAAP or (b) market value provided, that, for purposes of the calculation of the Borrowing Base, (i) the Value of the Inventory shall not include: (a) the portion of the value of Inventory equal to the profit earned by any Affiliate on the sale thereof to Borrowers (except for any sale of Inventory from Polartec LLC to a Borrower if such sale complies with Section 10.6 hereof) or (b) write-ups or write-downs in value with respect to currency exchange rates, (ii) the Value of the Inventory shall include the value of any Inventory acquired by Permitted Acquisitions only upon a field examination and receipt and acceptance by the Administrative Agent (acting reasonably) of an appraisal of such Inventory and completion of satisfactory legal diligence and (iii) notwithstanding anything to the contrary contained herein, the cost of the Inventory shall be computed in the same manner and consistent with the most recent appraisal of the Inventory received and accepted by the Administrative Agent prior to the date hereof, if any.

"Value Services" shall have the meaning set forth in the preamble hereto.

"Versa Management Agreement" shall mean the Amended and Restated Management Services Agreement, dated as of January 4, 2013, by and among certain of the Borrowers and the Manager, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"<u>Vestis IP Holdings</u>" shall have the meaning set forth in the preamble hereto.

"<u>Weighted Average Life to Maturity</u>" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing (a) the then outstanding principal amount of such Indebtedness into (b) the total of the product obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment.

"<u>Wells Fargo</u>" shall have the meaning set forth in the recitals hereto.

"<u>Wholly-Owned Subsidiary</u>" shall mean, with respect to any person, a Subsidiary of such person all of the outstanding capital stock or other ownership interests of which will at the time be owned by such person and/or by one or more Wholly-Owned Subsidiaries of such person.

## SECTION 2.    CREDIT FACILITIES

2.1    <u>Revolving Loans</u>.

(a)    Subject to and upon the terms and conditions contained herein, each Lender severally (and not jointly) agrees to make its Pro Rata Share of Revolving Loans to Borrowers from time to time in amounts requested by any Borrower up to the aggregate amount outstanding equal to the Commitment of such Lender, <u>provided</u>, that, after giving effect to any such Revolving Loan, (i) the aggregate principal amount of the Revolving Loans, Swing Line Loans and Letter of Credit Obligations outstanding shall not exceed the Line Cap at such time. Subject to the terms and conditions hereof, each Borrower may from time to time borrow, prepay and reborrow Revolving Loans. No Lender shall be required to make any Revolving Loan, if, after giving effect thereto the aggregate outstanding principal amount of all Revolving Loans of such Lender, together with such Lender's Pro Rata Share of the aggregate amount of all Swing Line Loans and Letter of Credit Obligations, would exceed such Lender's Commitment.

(b)    In the event that the aggregate principal amount of the Loans and Letter of Credit Obligations outstanding exceed the Line Cap, such event shall not limit, waive or otherwise affect any rights of the Administrative Agent or the Lenders in such circumstances or on any future occasions and Borrowers shall, upon demand by the Administrative Agent, which may be made at any time or from time to time, immediately repay the entire amount of any such excess(es) for which payment is demanded.

2.2    <u>Swing Line Loans</u>.

(a)    Subject to the terms and conditions contained herein, the Swing Line Lender agrees that it will make Swing Line Loans to Borrowers from time to time in amounts requested by any Borrower up to the aggregate amount outstanding equal to the Swing Line Loan Limit, <u>provided</u>, that, after giving effect to any such Swing Line Loan, the aggregate principal amount of the Revolving Loans, Swing Line Loans and Letter of Credit Obligations outstanding shall not exceed the lesser of (i) the Borrowing Base at such time; or (ii) the Maximum Credit at such time. On the terms and subject to the conditions hereof, each Borrower may from time to time borrow, prepay and reborrow Swing Line Loans. Swing Line Lender shall

not be required to make Swing Line Loans, if, after giving effect thereto, the aggregate outstanding principal amount of all Swing Line Loans would exceed the then-existing Swing Line Loan Limit. Swing Line Lender shall not be required to make a Swing Line Loan to refinance an outstanding Swing Line Loan. Each Swing Line Loan shall be a Base Rate Loan and shall be subject to all of the terms and conditions applicable to other Base Rate Loans funded by the Lenders constituting Revolving Loans, except that all payments thereon shall be payable to the Swing Line Lender solely for its own account. All Revolving Loans and Swing Line Loans shall be subject to the settlement among Lenders provided for in <u>Section 6.13</u> hereof.

(b)    Upon the making of a Swing Line Loan, without further action by any party hereto, each Lender shall be deemed to have irrevocably and unconditionally purchased and received from the Swing Line Lender, without recourse or warranty, an undivided interest and participation to the extent of such Lender's Pro Rata Share in such Swing Line Loan. To the extent that there is no settlement in accordance with <u>Section 6.13</u> below, the Swing Line Lender may at any time, require the Lenders to fund their participations. From and after the date, if any, on which any Lender has funded its participation in any Swing Line Loan, the Administrative Agent shall promptly distribute to such Lender, such Lender's Pro Rata Share of all payments of principal and interest received by the Administrative Agent in respect of such Swing Line Loan.

(c)    If the maturity date shall have occurred in respect of any tranche of Commitments at a time when another tranche or tranches of Commitments is or are in effect with a longer maturity date, then on the earliest occurring maturity date all then outstanding Swing Loans shall be repaid in full on such date (and there shall be no adjustment to the participations in such Swing Loans as a result of the occurrence of such maturity date); <u>provided</u>, <u>however</u>, that if on the occurrence of such earliest maturity date (after giving effect to any repayments of Loans and any reallocation of Letter of Credit participations as contemplated in <u>Section 2.3(l)</u>), there shall exist sufficient unutilized Extended Revolving Commitments so that the respective outstanding Swing Loans could be incurred pursuant to the Extended Revolving Commitments that will remain in effect after the occurrence of such maturity date, then there shall be an automatic adjustment on such date of the participations in such Swing Loans and same shall be deemed to have been incurred solely pursuant to the relevant Extended Revolving Commitments, and such Swing Loans shall not be so required to be repaid in full on such earliest maturity date; <u>provided</u>, in no event shall such adjustment cause a Lender's share of the Extended Revolving Commitments to exceed such Lender's Commitment.

2.3    <u>Letters of Credit</u>.

(a)    Subject to and upon the terms and conditions contained herein and in the Letter of Credit Documents, at the request of a Borrower, each Issuing Bank agrees to issue, for the account of such Borrower one or more Letters of Credit, for the ratable risk of each Lender according to its Pro Rata Share, containing terms and conditions reasonably acceptable to the Administrative Agent and such Issuing Bank.

(b)    The Borrower requesting such Letter of Credit shall give the Administrative Agent and the Issuing Bank with respect thereto three (3) Business Days' prior written notice of such Borrower's request for the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit). Such notice shall be

irrevocable and shall (i) specify the original face amount of the Letter of Credit requested (or identify the Letter of Credit to be amended, renewed or extended), (ii) the effective date (which date shall be a Business Day and in no event shall be a date less than ten (10) days prior to the end of the then current term of this Agreement) of issuance of such requested Letter of Credit (or such amendment, renewal or extension), (iii) whether such Letter of Credit may be drawn in a single or in partial draws, (iv) the date on which such requested Letter of Credit is to expire, (v) the purpose for which such Letter of Credit is to be issued, (vi) the name and address of the beneficiary of the requested Letter of Credit, (vii) such other information as shall be necessary to enable the Issuing Bank to prepare, amend, renew or extend such Letter of Credit and (viii) if requested by Issuing Bank or Administrative Agent, the Borrower requesting such Letter of Credit shall have delivered to Issuing Bank with respect thereto at such times and in such manner as such Issuing Bank may require, an application, in form and substance reasonably satisfactory to such Issuing Bank and Administrative Agent, for the issuance of the Letter of Credit and such other Letter of Credit documents as may be required pursuant to the terms thereof. If requested by the Issuing Bank, the Borrower requesting the Letter of Credit shall attach to the request the proposed terms of the Letter of Credit. In no event shall a Letter of Credit be issued, amended, renewed or extended unless the forms and terms of the proposed Letter of Credit (as amended, renewed or extended, as the case may be) is reasonably satisfactory to the Administrative Agent and the Issuing Bank. The renewal or extension of, or increase in the amount of, any Letter of Credit shall, for purposes hereof, be treated in all respects the same as the issuance of a new Letter of Credit hereunder.

(c)    In addition to being subject to the satisfaction of the applicable conditions precedent contained in Section 4 hereof and the other terms and conditions contained herein, a Letter of Credit shall be issued, amended, renewed or extended only if (and on issuance, amendment, renewal or extension of each Letter of Credit, Borrowers shall, as to clauses (ii) and (iii) below, be deemed to represent and warrant that) immediately after giving effect to such issuance, amendment, renewal or extension: (i) no order of any court, arbitrator or other Governmental Authority shall purport by its terms to enjoin or restrain money center banks generally from issuing letters of credit of the type and in the amount of the proposed Letter of Credit, and no law, rule or regulation applicable to money center banks generally and no request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over money center banks generally shall prohibit, or request that such Issuing Bank refrain from, the issuance of letters of credit generally or the issuance of such Letter of Credit, (ii) except as otherwise expressly permitted hereunder, after giving effect to the issuance, amendment, renewal or extension of such Letter of Credit, the Letter of Credit Obligations shall not exceed the Letter of Credit Limit, and (iii) after giving effect to the issuance, amendment, renewal or extension of any such Letter of Credit, (a) the aggregate principal amount of the Revolving Loans, Swing Line Loans and Letter of Credit Obligations outstanding shall not exceed the Borrowing Base at such time and (b) the aggregate principal amount of the Revolving Loans, Swing Line Loans and Letter of Credit Obligations outstanding shall not exceed the Maximum Credit at such time. Promptly after the delivery of any Letter of Credit or amendment to a Letter of Credit, the applicable Issuing Bank will also deliver to the applicable Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment. Except in the Administrative Agent's Permitted Discretion and with the consent of all Lenders, the amount of all outstanding Letter of Credit Obligations shall not at any time exceed the Letter of Credit Limit.

(d)     Each Standby Letter of Credit shall expire at or prior to the earlier of (i) twelve (12) months after the date of the issuance of such Standby Letter of Credit (or in the case of any renewal or extension thereof, twelve (12) months after such renewal or extension) and (ii) the date that is three (3) Business Days prior to the Maturity Date, provided, that, (a) any Standby Letter of Credit with a one year tenor may provide for automatic renewal or extension thereof for additional one year periods (which in no event shall extend beyond the date referred to in clause (ii) above) so long as such Standby Letter of Credit permits the Issuing Bank to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Standby Letter of Credit) by giving prior notice to the beneficiary thereof within a time period during such twelve-month period to be agreed upon at the time such Standby Letter of Credit is issued and (b) if the Issuing Bank and the Administrative Agent each consent, the expiration date on any Standby Letter of Credit may extend beyond the date referred to in clause (ii) above. Each Commercial Letter of Credit shall expire on the earlier of one hundred eighty (180) days after such Commercial Letter of Credit's date of issuance, renewal or extension (as applicable) or the date three (3) Business Days prior to the Maturity Date.

(e)     Immediately upon the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the applicable Issuing Bank or the Lenders, each Lender shall be deemed to have irrevocably and unconditionally purchased and received, without recourse or warranty, an undivided interest and participation to the extent of such Lender's Pro Rata Share of the liability with respect to such Letter of Credit and the obligations of Borrowers with respect thereto (including all Letter of Credit Obligations with respect thereto). Each Lender shall absolutely, unconditionally and irrevocably assume, as primary obligor and not as surety, and be obligated to pay to the Issuing Bank therefor and discharge when due, its Pro Rata Share of all of such obligations arising under such Letter of Credit. Without limiting the scope and nature of each Lender's participation in any Letter of Credit, to the extent that an Issuing Bank has not been reimbursed or otherwise paid as required hereunder or under any such Letter of Credit, each such Lender shall pay to such Issuing Bank its Pro Rata Share of such unreimbursed drawing or other amounts then due to such Issuing Bank in connection therewith. The obligations of each Lender as to its participations pursuant hereto in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default or Event of Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(f)     If an Issuing Bank shall make any payment in respect of a Letter of Credit, Borrowers shall reimburse Issuing Bank by paying to the Administrative Agent an amount equal to such payment by Issuing Bank not later than 12:00 noon on the date that such payment by Issuing Bank is made, if the applicable Borrower shall have received notice of such payment by the Issuing Bank prior to 10:00 a.m. on such date, or, if such notice shall not have been received by such Borrower prior to such time on such date, then not later than 12:00 noon on (i) the Business Day that such Borrower receives such notice, if such notice is received prior to 10:00 a.m., New York City time, on the day of receipt, or (ii) the Business Day immediately following the day that such Borrower receives such notice, if such notice is not received prior to such time on the day of receipt; provided, that, unless such Borrower requests otherwise, and, subject to the applicable conditions to borrowing set forth in Section 4 hereto, each drawing

61

under any Letter of Credit or other amount payable in connection therewith when due shall constitute a request by the Borrower for whose account such Letter of Credit was issued to the Administrative Agent for a Base Rate Loan in the amount of such drawing or other amount then due, and shall be made by the Administrative Agent on behalf of Lenders as a Revolving Loan or Swing Line Loan as such Borrower requests, or if such request is not received in a timely manner, as the Administrative Agent determines (or Special Administrative Agent Advance, as the case may be) in an equivalent amount and, to the extent so financed, such Borrower's obligation to make such payment shall be discharged and replaced by the resulting Revolving Loan, Swing Line Loan (or Special Administrative Agent Advance, as the case may be). If the applicable Borrower fails to make such payment when due, subject to the rights of the Administrative Agent under Section 6.13 hereof, the Administrative Agent may notify each Lender of the applicable payment made by the Issuing Bank in respect of such Letter of Credit, the payment then due from such Borrower in respect thereof and such Lender's Pro Rata Share thereof. Promptly following receipt of such notice, each Lender shall pay to the Administrative Agent its Pro Rata Share of the payment then due and the Administrative Agent shall promptly pay to the applicable Issuing Bank the amounts so received by it from Lenders. Promptly following receipt by the Administrative Agent of any payment from a Borrower pursuant to this paragraph, the Administrative Agent shall distribute such payment to the applicable Issuing Bank or, to the extent that Lenders have made payments pursuant to this paragraph to reimburse such Issuing Bank, then to such Lenders and such Issuing Bank as their interests may appear. Any payment made by a Lender pursuant to this paragraph to reimburse an Issuing Bank for any payment made by such Issuing Bank (other than the funding of a Revolving Loan, Swing Line Loan or Special Administrative Agent Advance as contemplated above) shall not constitute a Loan and shall not relieve the applicable Borrower of its obligation to reimburse such Issuing Bank for such payment.

(g)     The obligations of Borrowers to pay each Letter of Credit Obligations and the obligations of Lenders to make payments to the Administrative Agent for the account of an Issuing Bank with respect to Letters of Credit shall be absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances, whatsoever, notwithstanding the occurrence or continuance of any Default, Event of Default, the failure to satisfy any other condition set forth in Section 4 hereof or any other event or circumstance, and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by an Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, a Borrower's obligations hereunder. None of the Administrative Agent, the Lenders or the Issuing Bank, or any of their Affiliates, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence

arising from causes beyond the control of an Issuing Bank; <u>provided</u>, that, the foregoing shall not be construed to excuse an Issuing Bank from liability to the applicable Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by each Borrower to the extent permitted by applicable law) suffered by a Borrower that are caused by an Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or wilful misconduct on the part of an Issuing Bank (as determined pursuant to a final, non-appealable order of a court of competent jurisdiction), such Issuing Bank shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, an Issuing Bank may, in its Permitted Discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(h)    The applicable Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. Such Issuing Bank shall promptly notify the Administrative Agent and the applicable Borrower by telephone (confirmed by facsimile or otherwise as such Borrower and Issuing Bank may agree) of such demand for payment and whether such Issuing Bank has made or will make any payment in respect thereof; <u>provided</u>, that, any failure to give or delay in giving such notice shall not relieve the applicable Borrower of its obligation to reimburse such Issuing Bank and Lenders with respect to any such payment.

(i)    If an Issuing Bank shall make any payment in respect of a Letter of Credit, or otherwise be owed any amounts in respect thereof, then, unless the applicable Borrower shall reimburse Issuing Bank for such payment or other amount in full on the date such payment is made or amount due, the unpaid amount thereof shall bear interest, for each day from and including the date such payment is made or amount due but excluding the date that the applicable Borrower reimburses such payment or other amount, at the rate per annum then applicable to Base Rate Loans. Interest accrued pursuant to this paragraph shall be for the account of the applicable Issuing Bank, except that interest accrued on and after the date of payment by the Administrative Agent or any Lender pursuant to <u>Section 2.3(f)</u> above to reimburse such Issuing Bank shall be for the account of the Administrative Agent or such Lender to the extent of such payment, and shall be payable on demand or, if no demand has been made, on the date on which the applicable Borrower reimburses the applicable payment in full.

(j)    Borrowers and Guarantors shall indemnify and hold the Administrative Agent, Issuing Banks and Lenders harmless from and against any and all losses, claims, damages, liabilities, costs and expenses which the Administrative Agent, any Issuing Bank or any Lender may suffer or incur in connection with any Letter of Credit and any documents, drafts or acceptances relating thereto, including any losses, claims, damages, liabilities, costs and expenses due to any action taken by an Issuing Bank or correspondent with respect to any Letter of Credit, except for such losses, claims, damages, liabilities, costs or expenses that are a direct result of the gross negligence or willful misconduct of the Administrative Agent or an Issuing

63

Bank as determined pursuant to a final non-appealable order of a court of competent jurisdiction. Each Loan Party assumes all risks for, and agrees to pay, all foreign, Federal, State and local taxes, duties and levies relating to any goods subject to any Letter of Credit or any documents, drafts or acceptances thereunder. Each Loan Party hereby releases and holds the Administrative Agent, each Lender and each Issuing Bank harmless from and against any acts, waivers, errors, delays or omissions with respect to or relating to any Letter of Credit, except for the gross negligence or willful misconduct of the Administrative Agent, a Lender or an Issuing Bank as determined pursuant to a final, non-appealable order of a court of competent jurisdiction. The provisions of this <u>Section 2.3(j)</u> shall survive the payment of Obligations and the termination of this Agreement.

(k)    Each Loan Party hereby irrevocably authorizes and directs each Issuing Bank to name such Loan Party as the account party therein and to deliver to the Administrative Agent all instruments, documents and other writings and property received by such Issuing Bank pursuant to the Letter of Credit and to accept and rely upon Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit or the Letter of Credit Documents with respect thereto. Nothing contained herein shall be deemed or construed to grant any Loan Party any right or authority to pledge the credit of the Administrative Agent or any Lender in any manner. Borrowers and Guarantors shall be bound by any reasonable interpretation made in good faith by Agent, or an Issuing Bank under or in connection with any Letter of Credit or any documents, drafts or acceptances thereunder, notwithstanding that such interpretation may be inconsistent with any instructions of any Loan Party. In connection with Inventory purchased pursuant to any Letter of Credit, Borrowers and Guarantors shall, at Agent's prior written request, instruct all suppliers, carriers, forwarders, customs brokers, warehouses or others receiving or holding cash, checks, Inventory, documents or instruments in which the Administrative Agent holds a security interest that upon Agent's prior written request, such items are to be delivered to the Administrative Agent and/or subject to Agent's order, and if they shall come into such Borrower's or Guarantor's possession, to deliver them, upon Agent's prior written request, to the Administrative Agent in their original form. Except as otherwise provided herein, the Administrative Agent shall not exercise such right to request such items so long as no Default or Event of Default shall exist or have occurred and be continuing.

(l)    If the maturity date in respect of any tranche of Commitments occurs prior to the expiration of any Letter of Credit, then (i) if one or more other tranches of Commitments in respect of which the maturity date shall not have occurred are then in effect, such Letters of Credit shall automatically be deemed to have been issued (including for purposes of the obligations of the Lenders to purchase participations therein and to make Loans and payments in respect thereof pursuant to <u>Section 2.3(f)</u>) under (and ratably participated in by Lenders pursuant to) the Commitments in respect of such non-terminating tranches up to an aggregate amount not to exceed the aggregate principal amount of the unutilized Commitments thereunder at such time (it being understood that no partial face amount of any Letter of Credit may be so reallocated); <u>provided</u>, in no event shall such reallocation cause a Lender's share of the Commitments to exceed such Lender's Commitment, and (ii) to the extent not reallocated pursuant to the immediately preceding <u>clause (i)</u>, the Borrowers shall cash collateralize the portion of any such Letter of Credit not reallocated pursuant to a cash collateral agreement to be entered into in form and substance reasonably satisfactory to the Administrative Agent (but which shall not provide for cash collateral in excess of an amount equal to one hundred five percent (105%) of such

portion not reallocated). If, for any reason, such cash collateral is not provided or the reallocation does not occur, the Lenders under the maturing tranche shall continue to be responsible for their participating interests in the Letters of Credit. Except to the extent of reallocations of participations pursuant to clause (i) of the second preceding sentence, the occurrence of a maturity date with respect to a given tranche of Commitments shall have no effect upon (and shall not diminish) the obligations of the Lenders with respect to any Letter of Credit issued before such maturity date.

      2.4    Requests for Borrowings.

      (a)    To request a Revolving Loan or Swing Line Loan, the applicable Borrower shall notify the Administrative Agent of such request by telephone (a) in the case of a Eurodollar Rate Loan, not later than 11:00 a.m., New York time, three (3) Business Days before the date of the proposed Eurodollar Rate Loan or (b) in the case of a Base Rate Loan (including a Swing Line Loan), not later than 1:00 p.m. on the same Business Day as the date of the proposed Base Rate Loan. Each such telephonic request shall be irrevocable and to the extent required by Agent, shall be confirmed promptly by hand delivery, facsimile, e-mail or intranet website to the Administrative Agent of a written request in a form approved by the Administrative Agent and signed by or on behalf of Borrowers. Each such telephonic and written request shall specify the following information:

      (i)    the Borrower requesting such Revolving Loan or Swing Line Loan;

      (ii)    whether such Loan is a Revolving Loan or Swing Line Loan;

      (iii)    the aggregate amount of such Revolving Loan or Swing Line Loan;

      (iv)    the date of such Revolving Loan, which shall be a Business Day;

      (v)    if such Loan is to be a Revolving Loan, whether such Revolving Loan is to be a Base Rate Loan or a Eurodollar Rate Loan;

      (vi)    in the case of a Eurodollar Rate Loan, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

      (vii)    the deposit account of the applicable Borrower specified on Schedule 8.10 of the Information Certificate or any other account with the Administrative Agent (or one of its Affiliates) that shall be specified in a written notice signed by an officer of such Borrower and delivered to and approved by the Administrative Agent (such approval not to be unreasonably withheld).

      (b)    If no election as to whether a Revolving Loan is to be a Base Rate Loan or Eurodollar Rate Loan is specified in the applicable request, then the requested Revolving Loan shall be a Base Rate Loan. If no Interest Period is specified with respect to any request for a Eurodollar Rate Loan, then the applicable Borrower shall be deemed to have selected an Interest

4241829.6

Period of one month's duration. Promptly following receipt of a request for a Revolving Loan in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Revolving Loan to be made as part of the request.

(c)      All Loans and Letters of Credit under this Agreement shall be conclusively presumed to have been made to, and at the request of and for the benefit of, any Borrower when deposited to the credit of any Borrower or otherwise disbursed or established in accordance with the instructions of any Borrower or in accordance with the terms and conditions of this Agreement.

(d)      Except in the Administrative Agent's Permitted Discretion and with the consent of all Lenders, or as otherwise provided herein, the aggregate amount of the Revolving Loans, the Swing Line Loans and the Letter of Credit Obligations outstanding at any time shall not exceed the Line Cap.

2.5      Increase in Maximum Credit.

(a)      At any time upon or following the Discharge of Second Lien Debt (or if the Discharge of Second Lien Debt would occur upon giving effect to the use of proceeds of such increase), Borrowers may deliver a written request to the Administrative Agent to request additional revolving loan commitments that shall increase the Maximum Credit. Any such written request shall specify the amount of the additional revolving loan commitments and increase in the Maximum Credit that Borrowers are requesting; provided, that, (i) in no event shall the aggregate amount of any such increase cause the Maximum Credit to exceed $205,000,000, (ii) in no event shall any such request be for an increase of not less than $5,000,000 (or, if less, the remaining amount required to cause the Commitments to equal $205,000,000), (iii) any such request shall be irrevocable, (iv) in no event shall there be more than one such increase in any calendar quarter and (v) no Event of Default shall exist or have occurred and be continuing.

(b)      Upon the receipt by the Administrative Agent of any such written request, the Administrative Agent shall notify each of the Lenders of such request and each Lender shall have the option (but not the obligation) to increase the amount of its Commitment by an amount up to its Pro Rata Share of the amount of the increase in the Maximum Credit requested by the Borrowers as set forth in the notice from the Administrative Agent to such Lender.  Each Lender shall notify the Administrative Agent within ten (10) Business Days (or such shorter period of time specified by the Administrative Agent) after the receipt of such notice from the Administrative Agent whether such Lender is willing to so increase its commitment and the Maximum Credit, and if so, the amount of such increase; provided, that, a Lender shall not be obligated to agree to any such increase; it being agreed that the determination whether to agree to any such increase shall be within the sole and absolute discretion of a Lender.  If the aggregate amount of the increases in the Commitments received from the Lenders does not equal or exceed the amount of the increase in the Maximum Credit requested by Borrowers, the Borrower may seek additional increases from Lenders or Commitments from such Eligible Transferees as it may determine, subject to the Administrative Agent's consent (not to be unreasonably withheld, conditioned or delayed). In the event Lenders (or Lenders and any such Eligible Transferees, as the case may be) have agreed to provide increases in their Commitments or new Commitments in

an aggregate amount in excess of the increase in the Maximum Credit requested by Borrowers or permitted hereunder, the Administrative Agent shall then have the right to allocate such commitments, first to Lenders and then to Eligible Transferees, in such amounts and manner as the Administrative Agent may determine, after consultation with Borrower.

(c)     The Maximum Credit shall be increased by the amount of the increase in Commitments from Lenders or Eligible Transferees, whether or not the amount of the increase in the Maximum Credit equals the entire amount of the increase in the Maximum Credit requested by Borrowers in accordance with the terms hereof, effective on the date that each of the following conditions have been satisfied:

(i)     the conditions precedent to the making of Revolving Loans set forth in Section 4.2 hereto (other than Section 4.2(a) hereto unless otherwise required by the Lenders and any Eligible Transferees providing the new or increased Commitments) shall be satisfied as of the date of the increase in the Maximum Credit, both before and after giving effect to such increase;

(ii)     such increase in the Maximum Credit, on the date of the effectiveness thereof, shall not violate any applicable law, regulation or order or decree of any court or other Governmental Authority and shall not be enjoined, temporarily, preliminarily or permanently;

(iii)     Administrative Agent shall have received from each Lender or Eligible Transferee that is providing an additional or new Commitment, an agreement reasonably acceptable to Agent duly executed by such Lender or Eligible Transferee and Borrowers; and

(iv)     Administrative Agent shall have received from Borrowers, in form and substance reasonably satisfactory to the Administrative Agent, evidence of the Discharge of Second Lien Debt.

(d)     As of the effective date of any such increase in the Maximum Credit, (i) each reference to the term Maximum Credit herein and in any of the other Financing Agreements shall be deemed amended to mean the amount of the Maximum Credit as increased by the additional Commitments agreed to by the Lender and/or such Eligible Transferees in accordance with this Section 2.5 and (ii) the Financing Agreements shall be amended to give effect to such increase by documentation executed by the Lenders or Eligible Transferees making the Commitments with respect thereto, the Administrative Agent and the Borrowers without the consent of any other Lender.

2.6     Joint and Several Liability of Borrowers.

(a)     Notwithstanding anything in this Agreement or any other Financing Agreements to the contrary, each Borrower, jointly and severally, in consideration of the financial accommodations to be provided by the Lenders under this Agreement and the other Financing Agreements, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment

67

and performance of all of the Obligations, it being the intention of the parties hereto that all of the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them. Borrowers shall be liable for all amounts due to the Administrative Agent, the Issuing Banks and the Lenders under this Agreement, regardless of which Borrower actually receives the Revolving Loans, Swing Line Loans or Letter of Credit Obligations hereunder or the amount of such Revolving Loans received or the manner in which any Lender accounts for such Revolving Loans, Swing Line Loans, Letter of Credit Obligations or other extensions of credit on its books and records. The Obligations of Borrowers with respect to Revolving Loans made to one of them, and the Obligations arising as a result of the joint and several liability of one of the Borrowers hereunder, with respect to Revolving Loans made to the other of the Borrowers hereunder, shall be separate and distinct obligations, but all such other Obligations shall be primary obligations of all Borrowers.

(b)    If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event, the other Borrowers will make such payment with respect to, or perform, such Obligation.

(c)    Except as otherwise expressly provided herein, to the extent permitted by law, each Borrower (in its capacity as a joint and several obligor in respect of the obligations of the other Borrower) hereby waives notice of acceptance of its joint and several liability, notice of occurrence of any Default or Event of Default (except to the extent notice is expressly required to be given pursuant to the terms of this Agreement), or of any demand for any payment under this Agreement or the other Financing Agreements, notice of any action at any time taken or omitted by any Lender under or in respect of any of the obligations hereunder, any requirement of diligence and, generally, all demands, notices and other formalities of every kind (other than those not permitted to be waived by the UCC or applicable law) in connection with this Agreement and the other Financing Agreements. Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by the Administrative Agent or any Lender at any time or times in respect of any default by the other Borrowers in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by the Administrative Agent or any Lender in respect of any of the obligations hereunder, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of such obligations or the addition, substitution or release, in whole or in part, of the other Borrowers. Without limiting the generality of the foregoing, each Borrower (in its capacity as a joint and several obligor in respect of the obligations of the other Borrower) assents to any other action or delay in acting or any failure to act on the part of the Administrative Agent or any Lender, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder which might, but for the provisions of this <u>Section 2.6</u>, afford grounds for terminating, discharging or relieving such Borrower, in whole or in part, from any of its obligations under this <u>Section 2.6</u>, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the obligations of such Borrower under this <u>Section 2.6</u> shall not be discharged except by performance and then only to the extent of such performance. The obligations of each Borrower under this <u>Section 2.6</u> shall not be diminished or rendered unenforceable by any

68

winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any Borrower or any Lender. The joint and several liability of the Borrowers hereunder shall continue in full force and effect notwithstanding any absorption, merger, amalgamation or any other change whatsoever in the name, membership, constitution or place of formation of any Borrower or any Lender.

(d)     The provisions of this <u>Section 2.6</u> are made for the benefit of the Administrative Agent, the Lenders and their successors and assigns and may be enforced by them from time to time against any Borrower as often as occasion therefor may arise and without requirement on the part of the Administrative Agent or any Lender first to marshal any of its claims or to exercise any of its rights against the other Borrowers or to exhaust any remedies available to it against the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this <u>Section 2.6</u> shall remain in effect until the Payment in Full. If at any time, any payment, or any part thereof, made in respect of any of the Obligations is rescinded or must otherwise be restored or returned by the Administrative Agent or any Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this <u>Section 2.6</u> will forthwith be reinstated and in effect as though such payment had not been made.

(e)     Notwithstanding any provision to the contrary contained herein or in any of the other Financing Agreements, to the extent the obligations of a Borrower shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or federal law relating to fraudulent conveyances or transfers) then the obligations of such Borrower hereunder shall be limited to the maximum amount that is permissible under applicable law (whether federal or state and including, without limitation, the Bankruptcy Code of the United States).

(f)     With respect to the Obligations arising as a result of the joint and several liability of Borrowers hereunder with respect to Revolving Loans, Swing Line Loans, Letter of Credit Obligations or other extensions of credit made to the other Borrowers hereunder, each of Borrowers waives, until the Payment in Full and the termination of this Agreement, any right to enforce any right of subrogation or any remedy which the Administrative Agent or any Lender now has or may hereafter have against any Borrower, any endorser or any guarantor of all or any part of the Obligations, and any benefit of, and any right to participate in, any security or collateral given to the Administrative Agent on behalf of the Lenders. Any claim which any Borrower may have against any other Borrower with respect to any payments to the Lenders hereunder or under any of the other Financing Agreements are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior Payment in Full. Upon the occurrence of any Event of Default and for so long as the same is continuing, the Administrative Agent may proceed directly and at once, without notice, against (i) with respect to Obligations of Borrowers, either or all of them or (ii) with respect to Obligations of any Borrower, to collect and recover the full amount, or any portion of the applicable Obligations, without first proceeding against the other applicable Borrowers or any other Person, or against any security or collateral for the Obligations. Each Borrower consents and agrees that the Administrative Agent and the Lenders shall be under no obligation to marshal any assets in favor of Borrower(s) or against or in payment of any or all of the Obligations

(g)    Each Qualified ECP Borrower hereby jointly and severally, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Borrower to fulfill the Obligations of such other Borrowers in respect of Swap Obligations (provided, that, each Qualified ECP Borrower shall only be liable for the maximum amount of such liability that can be hereby incurred without rendering the obligations of such Qualified ECP Borrower under this Section 2.6(g) or otherwise under the Financing Agreements, as it relates to such Qualified ECP Borrower, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer and not for any greater amount).  The obligations of each Qualified ECP Borrower under this Section 2.6(g) shall remain in full force and effect until the Payment in Full.  Each Qualified ECP Borrower intends that this Section 2.6(g) constitutes, and this Section 2.6(g) shall be deemed to constitute, a "keepwell, support, other agreement" for the benefit of each other Borrower for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

2.7    Mandatory Prepayment.  Within one (1) Business Day of the date of receipt by Borrowers of the proceeds of any Specified Equity Contribution pursuant to Section 11.3, Borrowers shall prepay the outstanding principal of the Obligations in accordance with Section 6.5(a) in an amount equal to one hundred percent (100%) of such proceeds.

2.8    Extensions of Revolving Facility Commitments.

(i)    Notwithstanding anything to the contrary in this Agreement, pursuant to one or more offers (each, an "Extension Offer") made from time to time by the Borrowers to all Lenders on a *pro rata* basis (based on the aggregate outstanding principal amount of the respective Commitments) and on the same terms to each such Lender, the Borrowers may consummate from time to time transactions with individual Lenders that accept the terms contained in such Extension Offers to extend the maturity date of each such Lender's Commitments and otherwise modify the terms of such Commitments pursuant to the terms of the relevant Extension Offer (including by increasing the interest rate or fees payable in respect of such Commitments) (each, an "Extension", and each group of Commitments so extended, as well as the original Commitments not so extended, being a "tranche").  Any Extended Revolving Commitments shall constitute a separate tranche of Commitments from the tranche of Commitments from which they were converted, so long as the following terms are satisfied: (i) no Default or Event of Default shall have occurred and be continuing at the time the offering document in respect of an Extension Offer is delivered to the Lenders or immediately prior to the effectiveness of such Extension; (ii) except as to pricing (interest rate and fees) and maturity (which shall be set forth in the relevant Extension Offer but shall be no earlier than the Maturity Date of the then existing Commitments), the Commitment of any Lender that agrees to an Extension with respect to such Commitment (an "Extending Lender") extended pursuant to any Extension (an "Extended Revolving Commitment"), and the related outstandings, shall be a Commitment (or related outstandings, as the case may be) with the same terms as the original Commitments (and related outstandings); provided that (A) the borrowing and repayment (except for (1) payments of interest and fees at different rates on Extended Revolving Commitments (and related outstandings), (2) repayments required upon the Maturity Date of the non-extending Commitments and (3) repayment made in connection with a permanent repayment and termination of Commitments) of Loans with respect to Extended Revolving Commitments after the applicable extension date shall be made on a *pro rata* basis with all other

Commitments, (B) the permanent repayment of Loans with respect to, and termination of, Extended Revolving Commitments after the applicable extension date shall be made on a *pro rata* basis with all other Commitments, except that the Borrowers shall be permitted to permanently repay and terminate Commitments prior to any Extended Revolving Commitments, (C) assignments and participations of Extended Revolving Commitments and extended Loans shall be governed by the same assignment and participation provisions applicable to Commitments and Loans, (D) subject to the provisions of Section 2.2(c) and Section 2.3(l) to the extent dealing with Swing Loans and Letters of Credit that mature or expire after a maturity date when there exist Extended Revolving Commitments with a longer maturity date, all Swing Loans and Letters of Credit shall be participated in on a *pro rata* basis by all Lenders with Commitments in accordance with their Pro Rata Shares of the Commitments (and except as provided in Section 2.2(c) and Section 2.3(l), without giving effect to changes thereto on an earlier maturity date with respect to Swing Loans and Letters of Credit theretofore incurred or issued) and (E) at no time shall there be Commitments hereunder (including Extended Revolving Commitments and any Commitments) which have more than two different Maturity Dates; (iii) if the aggregate principal amount of Commitments (calculated on the face amount thereof) in respect of which Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Commitments offered to be extended by the Borrowers pursuant to such Extension Offer, then the Commitments of such Lenders shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders have accepted such Extension Offer; (iv) any applicable Minimum Extension Condition shall be satisfied unless waived by the Borrowers and, to extent provided below, the Administrative Agent; and (v) Administrative Agent shall have received from Borrowers, in form and substance reasonably satisfactory to the Administrative Agent, evidence of the Discharge of Second Lien Debt.

(b)     With respect to all Extensions consummated by the Borrowers pursuant to this Section 2.8, (i) such Extensions shall not constitute voluntary or mandatory payments for purposes of this Agreement and (ii) each Extension Offer shall specify the minimum amount of Commitments to be tendered, which shall be an integral multiple of $1.0 million and an aggregate principal amount that is not less than $10.0 million (or if less, the remaining outstanding principal amount thereof) (or such lesser minimum amount reasonably approved by the Administrative Agent) (a "Minimum Extension Condition"). The transactions contemplated by this Section 2.8 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Revolving Commitments on such terms as may be set forth in the relevant Extension Offer) shall not require the consent of any Lender or any other person (other than as set forth in clause (c) of this Section 2.8), and the requirements of any provision of this Agreement (including Sections 2.7, 6.5, 6.11 and 6.12) or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section 2.8 shall not apply to any of the transactions effected pursuant to this Section 2.8.    All obligations in respect of an Extended Revolving Commitment shall be Obligations under this Agreement and the other Financing Agreements that are secured by the Collateral on a *pari passu* basis with all other applicable Obligations with respect to the tranche from which they were extended.

(c)     The consent (such consent not to be unreasonably withheld, delayed or conditioned) of the Administrative Agent shall be required to effectuate any Extension. No

4241829.6

consent of any Lender or any other person shall be required to effectuate any Extension, other than the consent of the Borrowers and each Lender agreeing to such Extension with respect to one or more of its Commitments.  The Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Agreement and the other Financing Agreements (an "Extension Amendment") with the Borrowers as may be necessary in order to establish new tranches in respect of Commitments so extended and such technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrowers in connection with the establishment of such new tranches, in each case, on terms consistent with this Section 2.8.  This Section 2.8 shall supersede any provisions in Section 13.3 to the contrary.  For the avoidance of doubt, it is understood that no existing Lenders will have any obligation to commit to any such extension.

(d)    For the avoidance of doubt, no Extensions may be consummated by the Borrowers pursuant to this Section 2.8 prior to the Discharge of Second Lien Debt.

## SECTION 3.    INTEREST AND FEES

3.1    Interest.

(a)    Borrowers shall pay to Agent, for the account of the Lenders, interest on the outstanding principal amount of the Loans at the Interest Rate. All interest accruing hereunder on and after the date of any Event of Default or termination hereof shall be payable on demand.

(b)    Borrowers may from time to time request Eurodollar Rate Loans or may request that Base Rate Loans be converted to Eurodollar Rate Loans or that any existing Eurodollar Rate Loans continue for an additional Interest Period. Such request from Borrowers shall specify the amount of the Eurodollar Rate Loans or the amount of the Base Rate Loans to be converted to Eurodollar Rate Loans or the amount of the Eurodollar Rate Loans to be continued (subject to the limits set forth below) and the Interest Period to be applicable to such Eurodollar Rate Loans. Subject to the terms and conditions contained herein, three (3) Business Days after receipt by the Administrative Agent of such a request from Borrowers, such Eurodollar Rate Loans shall be made or Base Rate Loans shall be converted to Eurodollar Rate Loans or such Eurodollar Rate Loans shall continue, as the case may be, provided, that, (i) no Default or Event of Default shall exist or have occurred and be continuing, (ii) no party hereto shall have sent any notice of termination of this Agreement, (iii) Borrowers shall have complied with such customary procedures as are established by the Administrative Agent and specified by the Administrative Agent to Borrowers from time to time for requests by Borrowers for Eurodollar Rate Loans, (iv) no more than six (6) Interest Periods may be in effect at any one time, (v) the aggregate amount of the Eurodollar Rate Loans must be in an amount not less than $1,000,000 or an integral multiple of $100,000 in excess thereof, and (vi) the Administrative Agent and each Lender shall have determined, in their Permitted Discretion, that the Interest Period or Adjusted Eurodollar Rate is available to the Administrative Agent and such Lender and can be readily determined as of the date of the request for such Eurodollar Rate Loan by Borrowers. Any request by Borrowers for Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans or to continue any existing Eurodollar Rate Loans shall be irrevocable.

(c)     Any Eurodollar Rate Loans shall automatically convert to Base Rate Loans upon the last day of the applicable Interest Period, unless the Administrative Agent has received and approved a request to continue such Eurodollar Rate Loan at least three (3) Business Days prior to such last day in accordance with the terms hereof. Any Eurodollar Rate Loans shall, at the Administrative Agent's option, upon notice by the Administrative Agent to Borrowers, be subsequently converted to Base Rate Loans in the event that this Agreement shall terminate or not be renewed.

(d)     Interest shall be payable by Borrowers to the Administrative Agent, for the account of the Lenders, monthly in arrears not later than the first day of each calendar month and shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed, other than for Base Rate Loans which shall be calculated on the basis of three hundred sixty-five (365) or three hundred sixty-six (366) day year, as applicable, and actual days elapsed. The interest rate on non-contingent Obligations (other than Eurodollar Rate Loans) shall increase or decrease by an amount equal to each increase or decrease in the Base Rate effective on the date of any change in such Base Rate. In no event shall charges constituting interest payable by Borrowers to the Administrative Agent and Lenders exceed the maximum amount or the rate permitted under any applicable law or regulation, and if any such part or provision of this Agreement is in contravention of any such law or regulation, such part or provision shall be deemed amended to conform thereto.

3.2     <u>Administrative Agent Fee; Other Fees.</u>

(a)     Borrowers shall pay to the Administrative Agent, for its own account, monthly a fee in an amount equal to $10,000 in respect of the Administrative Agent's services for each month (or part thereof) while this Agreement remains in effect and for so long thereafter as any of the Obligations are outstanding, which fee shall be fully earned as of and payable in advance on the date hereof and on the first day of each month hereafter.

(b)     Borrowers shall pay the fees set forth in the Fee Letter in the amounts and at the times specified therein.

3.3     <u>Unused Line Fee</u>. Borrowers shall pay to the Administrative Agent, for the account of the Lenders, monthly an unused line fee at a rate equal to three-eighths of one percent (3/8%) per annum calculated upon the amount by which the Maximum Credit exceeds the average daily principal balance of the outstanding Revolving Loans and Letters of Credit during the immediately preceding month (or part thereof) while this Agreement is in effect and for so long thereafter as any of the Obligations are outstanding, which fee shall be payable on the first day of each month in arrears.  For the avoidance of doubt, Swing Line Loans will not be considered utilization of the Credit Facility for purposes of this calculation of the unused line fee.

3.4     <u>Letter of Credit Fees</u>. Borrowers shall pay to the Administrative Agent, for the account of the Lenders, monthly a fee at the rate per annum equal to (a) the Applicable Margin for Eurodollar Rate Loans less 0.50% on the average daily outstanding balance of Commercial Letters of Credit for the immediately preceding month (or part thereof), payable in arrears as of the first day of each month, computed for each day from the date of issuance to the date of expiration and (b) the Applicable Margin for Eurodollar Rate Loans on the average daily

73

outstanding balance of Standby Letters of Credit for the immediately preceding month (or part thereof), payable in arrears as of the first day of each month, computed for each day from the date of issuance to the date of expiration; provided, that, Borrowers shall, at the Administrative Agent's option, pay such fee at a rate two percent (2%) greater than the rate provided for above on such average daily maximum amount for: (a) the period from and after the date of termination or non-renewal hereof until the Administrative Agent and Lenders have received full and final payment of all Obligations (notwithstanding entry of a judgment against Borrowers) and (b) the period from and after the date of the occurrence of an Event of Default for so long as such Event of Default is continuing. Such letter of credit fee shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed and the obligation of Borrowers to pay such fee shall survive the termination or non-renewal of this Agreement. In addition to the letter of credit fee provided above, Borrowers shall pay to the Administrative Agent, for the account of the Issuing Bank, the letter of credit fronting fee of one eighth of one percent (.125%) per annum and the other customary charges from time to time of the issuing bank with respect to the issuance, amendment, transfer, administration, cancellation and conversion of, and drawings under, such Letters of Credit.

3.5     Inability to Determine Applicable Interest Rate. If the Administrative Agent shall determine in good faith (which determination shall, absent manifest error, be final and conclusive and binding on all partier hereto) that on any date by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to Eurodollar Rate Loans on the basis provided for in the definition of Adjusted Eurodollar Rate, the Administrative Agent shall on such date give notice to Borrowers of such determination. Upon such date no Revolving Loans may be made as, or converted to, Eurodollar Rate Loans until such time as the Administrative Agent notifies Borrowers that the circumstances giving rise to such notice no longer exist (which notice shall be given promptly after such circumstance shall cease to exist) and any request for Revolving Loans or the conversion or continuation of any Eurodollar Rate Loans received by the Administrative Agent shall be deemed to be a request, or a continuation or conversion, for or into Base Rate Loans. During any period in which any Eurodollar Rate Loans are affected by the circumstances described in this Section 3.5, a Borrower may request that the Administrative Agent request the Required Lenders to confirm that such circumstances continue to be in effect; provided that (A) the Borrowers shall not be permitted to submit any such request more than once in any 30-day period and (B) nothing contained in this Section 3.5 or the failure to provide confirmation of the continued effectiveness of such circumstances shall in any way affect the Administrative Agent's or Required Lenders' right to provide any additional notices of such circumstances as provided in this Section 3.5.

3.6     Illegality. Notwithstanding anything to the contrary contained herein, if (a) any Change in Law by any Governmental Authority makes it unlawful for a Lender to make or maintain a Eurodollar Rate Loan or to maintain any commitment with respect to a Eurodollar Rate Loan or (b) a Lender determines in good faith (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) has become impracticable as a result of a circumstance that adversely affects the London interbank market or the position of such Lender in such market, then such Lender shall give notice thereof to Borrowers and may (i) declare that Eurodollar Rate Loans will not thereafter be made by such Lender, such that any request for a Eurodollar Rate Loan from such Lender shall be deemed to be a request for a Base

Rate Loan unless such Lender's declaration has been withdrawn (and it shall be withdrawn promptly upon the cessation of the circumstances described in clause (a) or (b) above) and (ii) require that all outstanding Eurodollar Rate Loans made by such Lender be converted to Base Rate Loans immediately, in which event all outstanding Eurodollar Rate Loans of such Lender shall be so converted.

3.7    Increased Costs. If any Change in Law shall: (a) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the Adjusted Eurodollar Rate); (b) subject such Lender to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, or any Eurodollar Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Excluded Taxes described in Section 6.9 hereof, Non-Excluded Taxes and Other Taxes, which are covered by Section 6.9 hereof); or (c) impose on such Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by Lender or any Letter of Credit, and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, Borrowers will pay to such Lender, such additional amount or amounts as will compensate such Lender or the Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered; provided, that a Lender shall only be entitled to such additional amount or amounts to the extent such Lender is imposing applicable costs similar to those described in this Section 3.7 generally on other borrowers of comparable loans under United States revolving credit facilities under credit agreements having similar reimbursement provisions.

3.8    Capital Requirements. If a Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, as a consequence of this Agreement, the commitments of such Lender or the Revolving Loans or Swing Line Loans made by, or the Letters of Credit issued by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time Borrowers will pay to such Lender such additional amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered; provided, that a Lender shall only be entitled to such additional amounts to the extent such Lender is imposing additional amounts similar to those described in this Section 3.8 generally on other borrowers of comparable loans under United States revolving credit facilities under credit agreements having similar reimbursement provisions.

3.9    Certificates for Reimbursement. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender as the case may be, as specified in Sections 3.7 or 3.8 (including the calculation of such amount or amounts in reasonable detail) and delivered to

Borrowers shall be conclusive absent manifest error. Borrowers shall pay Lender the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

3.10    Delay in Requests. Failure or delay on the part of Lender to demand compensation pursuant to Sections 3.7 or 3.8 shall not constitute a waiver of Lender's right to demand such compensation, provided, that, Borrowers shall not be required to compensate Lender pursuant to such Sections for any increased costs incurred or reductions occurring more than one hundred eighty (180) days prior to the date of such demand (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the one hundred eighty (180) day period referred to above shall be extended to include the period of retroactive effect thereof).

3.11    Funding Losses. Borrowers shall pay to any Lender its customary administrative charge and all losses, expenses and liabilities (including any interest paid by any Lender to lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or redeployment of such) that it sustains (a) if for any reason (other than a default by such Lender) a borrowing of any Eurodollar Rate Loan does not occur on a date specified therefor in a request for borrowing, or a conversion to or continuation of, any Eurodollar Rate Loan does not occur on a date specific therefor in a request for conversion or continuation, (b) if any prepayment or other principal payment of, or any conversion of, any of its Eurodollar Rate Loans occurs on a date prior to the last day of an Interest Period applicable to such Revolving Loan, or (c) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of prepayment given by Borrowers. This covenant shall survive the termination or non-renewal of this Agreement and the payment of the Obligations.

3.12    Maximum Interest. Notwithstanding anything to the contrary contained in this Agreement or any of the other Financing Agreements, in no event whatsoever shall the aggregate of all amounts that are contracted for, charged or received by the Administrative Agent or any Lender pursuant to the terms of this Agreement or any of the other Financing Agreements and that are deemed interest under applicable law exceed the Maximum Interest Rate (including, to the extent applicable, the provisions of Section 5197 of the Revised Statutes of the United States of America as amended, 12 U.S.C. Section 85, as amended). In no event shall any Borrower or any Guarantor be obligated to pay interest or such amounts as may be deemed interest under applicable law in amounts which exceed the Maximum Interest Rate. In the event any Interest is charged or received in excess of the Maximum Interest Rate ("Excess"), each Borrower and each Guarantor acknowledges and stipulates that any such charge or receipt shall be the result of an accident and bona fide error, and that any Excess received by the Administrative Agent or any Lender shall be applied, first, to the payment of the then outstanding and unpaid principal hereunder; second to the payment of the other Obligations then outstanding and unpaid; and third, returned to such Borrower or such Guarantor. All monies paid to the Administrative Agent or any Lender hereunder or under any of the other Financing Agreements, whether at maturity or by prepayment, shall be subject to any rebate of unearned interest as and to the extent required by applicable law. For the purpose of determining whether or not any Excess has been contracted for, charged or received by the Administrative Agent or any Lender, all interest at any time contracted for, charged or received from any Borrower or any Guarantor in connection with this Agreement or any of the other Financing Agreements shall, to the extent permitted by applicable

law, be amortized, prorated, allocated and spread during the entire term of this Agreement in accordance with the amounts outstanding from time to time hereunder and the Maximum Interest Rate from time to time in effect in order to lawfully charge the maximum amount of interest permitted under applicable laws. The provisions of this Section 3.12 shall be deemed to be incorporated into each of the other Financing Agreements (whether or not any provision of this Section is referred to therein).

3.13    No Requirement of Match Funding. Notwithstanding anything to the contrary contained herein, the Administrative Agent and the Lenders shall not be required to acquire US Dollar deposits in the London interbank market or any other offshore US Dollar market to fund any Eurodollar Rate Loan or to otherwise match fund any Obligations as to which interest accrues based on the Eurodollar Rate. All of the provisions of this Section 3 shall be deemed to apply as if the Administrative Agent and each Lender had acquired such deposits to fund any Eurodollar Rate Loan or any other Obligation as to which interest is accruing at the Adjusted Eurodollar Rate by acquiring such US Dollar deposits for each Interest Period in the amount of the Eurodollar Rate Loans or other applicable Obligations.

## SECTION 4.    CONDITIONS PRECEDENT

4.1    Conditions Precedent to Initial Loans and Letters of Credit. The obligation of each Lender to make the Loans requested to be made by it on the Closing Date or to issue the initial Letters of Credit hereunder is subject to the satisfaction of, or waiver of, immediately prior to or concurrently with the making of such Loan or the issuance of such Letter of Credit of each of the following conditions precedent:

(a)    the Sponsor shall have contributed not less than $20,000,000 to the Borrowers in the form of common equity or any other form of equity that is not Disqualified Stock;

(b)    since October 31, 2014, there shall not have occurred any Material Adverse Effect;

(c)    all fees and expenses required to be paid or reimbursed hereunder on the Closing Date to the Administrative Agent and the Lenders (to the extent invoiced at least one (1) Business Day prior to the Closing Date except as otherwise agreed by the Borrowers) shall have been paid, in each case, at the Borrower's option, from the proceeds of the initial Loans under the Credit Facility;

(d)    with respect to the Parent, Initial Lenders shall have received audited financial statements for the years ended February 1, 2014, February 2, 2013 and January 28, 2012 and unaudited financial statements for each subsequent fiscal quarter ended at least 45 days prior to the Closing Date and the comparative period in the preceding year and pro forma consolidated income statement and balance sheet for the twelve month period ending on the last day of the most recently ended four fiscal quarter period ended at least 45 days prior to the Closing Date.  With respect to Sport Chalet, the Initial Lenders shall have received audited financial statements for the years ended March 30, 2014, March 31, 2013 and April 1, 2012 and

unaudited financial statements for each subsequent fiscal quarter ended at least 45 days prior to the Closing Date and the comparative period in the preceding year;

(e)    to the extent reasonably requested at least five (5) Business Days prior to the Closing Date, the Initial Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Act, at least three (3) Business Days prior to the Closing Date;

(f)    the Financing Agreements shall have been executed and delivered by the Loan Parties;

(g)    all requisite corporate or limited liability company action and proceedings of Borrowers and Guarantors in connection with this Agreement and the other Financing Agreements shall be reasonably satisfactory in form and substance to the Initial Lenders, and the Initial Lenders shall have received all information and copies of all documents, including records of requisite corporate or limited liability company action and proceedings which the Initial Lenders may have requested in connection therewith, such documents where requested by the Initial Lenders or its counsel to be certified by appropriate corporate or limited liability company officers or Governmental Authority (and including a copy of the certificate of formation of Borrowers and Guarantors certified by the Secretary of State (or equivalent Governmental Authority) which shall set forth the same complete corporate or limited liability company name of Borrowers and Guarantors as is set forth herein and such document as shall set forth the organizational identification number of Borrowers and Guarantors, if one is issued in its jurisdiction of incorporation or formation).  The Initial Lenders shall have received good standing certificates (to the extent applicable) in the respective jurisdictions of organization of the Loan Parties;

(h)    Administrative Agent shall have received (i) at least two (2) Business Days prior to the Closing Date, projected financial statements of Borrowers and Guarantors (including projected availability under the Credit Facility) for the period through the end of the 2016 fiscal year, prepared on a monthly basis, together with a certificate, dated the date hereof, of an authorized officer of Parent stating that such projected financial statements were prepared in good faith and based on assumptions that are believed in good faith to be reasonable in light of the facts and circumstances known to Parent at such time, all of which shall be in form and substance reasonably satisfactory to Administrative Agent (it being understood that such projections are as to future events and are not to be viewed as facts, subject to significant uncertainties and contingencies, many of which are beyond the control of Borrowers and Guarantors, no assurance can be given that the projections will be realized, and actual results may materially differ from the projections), and (ii) such other information as Administrative Agent shall have reasonably requested at least ten (10) Business Days prior to the Closing Date.

(i)    immediately following the Transactions, none of the Borrowers nor any of their respective Subsidiaries will have any indebtedness other than the Credit Facility, overdraft facilities, financial leases and hedging and any other indebtedness permitted herein;

78

(j)      the Excess Availability as determined by the Administrative Agent, as of the date hereof, shall be not less than $22,000,000 after giving effect to the initial Loans made or to be made and Letters of Credit issued or to be issued in connection with the Transactions and the making of the Second Lien Loans;

(k)      the Administrative Agent shall have received a borrowing request and a Borrowing Base Certificate setting forth the Revolving Loans, Swing Line Loans and Letters of Credit available to Borrowers as of the date hereof as completed in a manner reasonably satisfactory to the Initial Lender and duly authorized, executed and delivered on behalf of Borrowers (together with an update of the Borrowing Base consistent with the Administrative Agent's customary procedures and practices so as to obtain current results);

(l)      Administrative Agent shall have received, on behalf of itself, the Lenders and the Issuing Bank, in form and substance reasonably satisfactory to the Administrative Agent, such customary opinion letters (and reliance letters) of counsel to Borrowers and Guarantors with respect to the Financing Agreements and such other matters as the Administrative Agent may reasonably request;

(m)      The Second Lien Documents shall have been executed and delivered on terms reasonably satisfactory to the Administrative Agent, all conditions precedent to the closing and effectiveness of the Second Lien Documents shall have been satisfied or waived and Borrowers shall have received gross proceeds of loans thereunder of not less than $10,000,000;

(n)      Administrative Agent shall have received evidence, in form and substance reasonably satisfactory to Administrative Agent, that Administrative Agent has a valid perfected first priority security interest in all of the Collateral; and

(o)      the Initial Lenders shall have received a solvency certificate substantially in the form set forth in Exhibit E.

4.2      Conditions Precedent to All Loans and Letters of Credit. The obligation of the Lenders to make any of the Loans or to issue any Letter of Credit is subject to the satisfaction of, or waiver of, immediately prior to or concurrently with the making of each such Loan or the issuance of such Letter of Credit of each of the following conditions precedent:

(a)      all representations and warranties contained herein and in the other Financing Agreements that are qualified as to materiality or Material Adverse Effect shall be true and correct (after giving effect to such qualifications therein) and the representations and warranties that are not so qualified shall be true and correct in all material respects, in each case with the same effect as though such representations and warranties had been made on and as of the date of the making of each such Loan or providing each such Letter of Credit and after giving effect thereto, except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and correct to the extent required hereunder or under the other Financing Agreements on and as of such earlier date);

(b)      no law, regulation, order, judgment or decree of any Governmental Authority shall exist, and no action, suit, investigation, litigation or proceeding shall be pending

or threatened in any court or before any arbitrator or Governmental Authority, which purports to enjoin, prohibit, restrain or otherwise affect (i) the making of the Revolving Loans or Swing Line Loans or providing the Letters of Credit, or (ii) the consummation of the transactions contemplated pursuant to the terms hereof or the other Financing Agreements;

(c)     no Default or Event of Default shall exist or have occurred and be continuing on and as of the date of the making of such Revolving Loan, Swing Line Loan or providing each such Letter of Credit and after giving effect thereto;

(d)     Excess Availability exceeds zero prior to on and as of the date of the making of such Revolving Loan, Swing Line Loan or providing each such Letter of Credit and after giving effect thereto; and

(e)     the Administrative Agent shall have received a borrowing request from Borrowers.

## SECTION 5.     GRANT AND PERFECTION OF SECURITY INTEREST

5.1     Grant of Security Interest.  To secure payment and performance of all Obligations, each Loan Party hereby grants (and reaffirms its prior grant) to the Administrative Agent, for itself and for the benefit of the Secured Parties, a continuing security interest in, a lien upon, and a right of set off against, and hereby assigns (and reaffirms its prior assignment) to the Administrative Agent, for itself and for the benefit of the Secured Parties, as security, all right, title and interest of each Loan Party in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such person (including under any trade names, styles or derivations thereof), and whether owned or consigned by, or leased from, such Person, and regardless of where located (the "Collateral"):

(a)     all Accounts;

(b)     all general intangibles, including, without limitation, all Intellectual Property;

(c)     all goods, including, without limitation, Inventory and Equipment;

(d)     all chattel paper, including, without limitation, all tangible and electronic chattel paper;

(e)     all instruments, including, without limitation, all promissory notes;

(f)     documents and all credit card sales drafts, credit card sales slips or charge slips or receipts, and other forms of store receipts;

(g)     deposit accounts;

(h)     all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

4241829.6

(i)      all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (i) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (ii) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (iii) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (iv) deposits by and property of account debtors or other persons securing the obligations of account debtors;

(j)      all (i) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (ii) monies, credit balances, deposits and other property of any Loan Party now or hereafter held or received by or in transit to any Lender, the Administrative Agent or its Affiliates or at any other depository or other institution from or for the account of any Loan Party, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(k)      all commercial tort claims, including, without limitation, those identified in the Information Certificate;

(l)      to the extent not otherwise described above, all Receivables;

(m)      all Records; and

(n)      all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral.

5.2      Exclusions from Collateral. Notwithstanding anything to the contrary contained in Section 5.1 above, the types or items of Collateral described in such Section shall not include Excluded Property.

5.3      Perfection of Security Interests.

(a)      Each Loan Party irrevocably and unconditionally authorize the Administrative Agent to file at any time and from time to time such financing statements with respect to the Collateral naming the Administrative Agent as the secured party and the Loan Parties as debtor, as the Administrative Agent may reasonably require, and including any other information with respect to the Loan Parties or otherwise required by part 5 of Article 9 of the Uniform Commercial Code of such jurisdiction as the Administrative Agent may determine, together with any amendment and continuations with respect thereto, which authorization shall apply to all financing statements filed on, prior to or after the date hereof. The Loan Parties hereby ratify and approve all financing statements naming the Administrative Agent or its designee as secured party and the Loan Parties as debtor with respect to the Collateral (and any amendments with respect to such financing statements) filed by or on behalf of the Administrative Agent prior to the date hereof and ratify and confirm the authorization of the Administrative Agent to file such financing statements (and amendments, if any). The Loan Parties hereby authorize the Administrative Agent to adopt on behalf of the Loan Parties any

4241829.6

symbol required for authenticating any electronic filing. In the event that the description of the collateral in any financing statement naming the Administrative Agent or its designee as the secured party and the Loan Parties as debtor includes assets and properties of the Loan Parties that do not at any time constitute Collateral, whether hereunder, under any of the other Financing Agreements or otherwise, the filing of such financing statement shall nonetheless be deemed authorized by the Loan Parties to the extent of the Collateral included in such description and it shall not render the financing statement ineffective as to any of the Collateral or otherwise affect the financing statement as it applies to any of the Collateral. In no event shall the Loan Parties at any time file, or permit or cause to be filed, any correction statement or termination statement with respect to any financing statement (or amendment or continuation with respect thereto) naming the Administrative Agent or its designee as secured party and the Loan Parties as debtor.

(b)      The Loan Parties do not have any chattel paper (whether tangible or electronic) or instruments as of the date hereof, except as set forth in the Information Certificate. In the event that any Loan Party shall be entitled to or shall receive any chattel paper or instrument after the date hereof, such Loan Party shall promptly notify the Administrative Agent thereof in writing. Promptly upon the receipt thereof by or on behalf of such Loan Party (including by any agent or representative), such Loan Party shall deliver, or cause to be delivered to the Administrative Agent, all tangible chattel paper and instruments that the Loan Parties may acquire, accompanied by such instruments of transfer or assignment duly executed in blank as the Administrative Agent may from time to time reasonably specify, in each case except as the Administrative Agent may otherwise agree. At the Administrative Agent's option, the Loan Parties shall, or the Administrative Agent may at any time on behalf of the Loan Parties, cause the original of any such instrument or chattel paper to be conspicuously marked in a form and manner reasonably acceptable to the Administrative Agent with the following legend referring to chattel paper or instruments as applicable: "This [chattel paper][instrument] is subject to the security interest of Wells Fargo Capital Finance, LLC and any sale, transfer, assignment or encumbrance of this [chattel paper][instrument] violates the rights of such secured party."

(c)      In the event that Loan Parties shall at any time hold or acquire an interest in any electronic chattel paper or any "transferable record" (as such term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction), Loan Parties shall promptly notify the Administrative Agent thereof in writing. Promptly upon the Administrative Agent's request, Loan Parties shall take, or cause to be taken, such actions as the Administrative Agent may reasonably request to give the Administrative Agent control of such electronic chattel paper under Section 9-105 of the UCC and control of such transferable record under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as in effect in such jurisdiction.

(d)      Loan Parties do not have any deposit accounts as of the date hereof, except as set forth in the Information Certificate. Loan Parties shall not, directly or indirectly, after the date hereof open, establish or maintain any deposit account, unless each of the following conditions is satisfied: (i) the Administrative Agent shall have received not less than five (5) Business Days prior written notice of the intention of Loan Parties to open or establish such account which notice shall specify in reasonable detail and specificity reasonably acceptable to

82

the Administrative Agent the name of the account, the owner of the account, the name and address of the bank at which such account is to be opened or established, the individual at such bank with whom Loan Parties are dealing and the purpose of the account, (ii) the bank where such account is opened or maintained shall be reasonably acceptable to the Administrative Agent, and (iii) on or before the opening of such deposit account, Loan Parties shall as the Administrative Agent may specify either (a) deliver to the Administrative Agent a Deposit Account Control Agreement with respect to such deposit account duly authorized, executed and delivered by Loan Parties and the bank at which such deposit account is opened and maintained or (b) arrange for the Administrative Agent to become the customer of the bank with respect to the deposit account on terms and conditions reasonably acceptable to the Administrative Agent. The terms of this subsection (d) shall not apply to Store Accounts (other than Store Accounts maintained at Wells Fargo Bank) deposit accounts specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Loan Parties' salaried employees or are otherwise Excluded Property.

(e)     Loan Parties do not own or hold, directly or indirectly, beneficially or as record owner or both, any investment property, as of the date hereof, or have any investment account, securities account, commodity account or other similar account with any bank or other financial institution or other securities intermediary or commodity intermediary as of the date hereof, in each case except as set forth in the Information Certificate.

(i)     In the event that Loan Parties shall be entitled to or shall at any time after the date hereof hold or acquire any certificated securities, Loan Parties shall promptly endorse, assign and deliver the same to the Administrative Agent, accompanied by such instruments of transfer or assignment duly executed in blank as the Administrative Agent may from time to time reasonably request. If any securities, now or hereafter acquired by Loan Parties are uncertificated and are issued to Loan Parties or their nominee directly by the issuer thereof, Loan Parties shall immediately notify the Administrative Agent thereof and shall as the Administrative Agent may specify, either (a) cause the issuer to agree to comply with instructions from the Administrative Agent as to such securities, without further consent of Loan Parties or such nominee, or (b) arrange for the Administrative Agent to become the registered owner of the securities.

(ii)     Loan Parties shall not, directly or indirectly, after the date hereof open, establish or maintain any investment account, securities account, commodity account or any other similar account (other than a deposit account) with any securities intermediary or commodity intermediary unless each of the following conditions is satisfied: (a) the Administrative Agent shall have received not less than five (5) Business Days prior written notice of the intention of Loan Parties to open or establish such account which notice shall specify in reasonable detail and specificity reasonably acceptable to the Administrative Agent the name of the account, the owner of the account, the name and address of the securities intermediary or commodity intermediary at which such account is to be opened or established, the individual at such intermediary with whom Loan Parties are dealing and the purpose of the account, (b) the securities intermediary or commodity intermediary (as the case may be) where such account is opened or maintained shall be reasonably acceptable to the Administrative Agent, and (c) on or before the opening of such investment account, securities account or other similar account with a securities intermediary or commodity intermediary, Loan Parties shall as

83

the Administrative Agent may specify either (1) execute and deliver, and cause to be executed and delivered to the Administrative Agent, an Investment Property Control Agreement with respect thereto duly authorized, executed and delivered by Loan Parties and such securities intermediary or commodity intermediary or (2) arrange for the Administrative Agent to become the entitlement holder with respect to such investment property on terms and conditions acceptable to the Administrative Agent.

(f)     Loan Parties are not the beneficiary or otherwise entitled to any right to payment under any letter of credit, banker's acceptance or similar instrument as of the date hereof, except as set forth in the Information Certificate. In the event that Loan Parties shall be entitled to or shall receive any right to payment under any letter of credit, banker's acceptance or any similar instrument, whether as beneficiary thereof or otherwise after the date hereof, Loan Parties shall promptly notify the Administrative Agent thereof in writing. Loan Parties shall immediately, as the Administrative Agent may specify, either (i) deliver, or cause to be delivered to the Administrative Agent, with respect to any such letter of credit, banker's acceptance or similar instrument, the written agreement of any nominated person obligated to make any payment in respect thereof (including any confirming or negotiating bank), in form and substance reasonably satisfactory to the Administrative Agent, consenting to the assignment of the proceeds of the letter of credit to the Administrative Agent by Loan Parties and agreeing to make all payments thereon directly to the Administrative Agent or as the Administrative Agent may otherwise direct or (ii) cause the Administrative Agent to become, at Loan Parties' expense, the transferee beneficiary of the letter of credit, banker's acceptance or similar instrument (as the case may be).

(g)     Loan Parties have no commercial tort claims as of the date hereof, except as set forth in the Information Certificate. In the event that Loan Parties shall at any time after the date hereof have any commercial tort claims with an amount in controversy in excess of (x) prior to the Discharge of Second Lien Debt, $100,000 and (y) upon and after the Discharge of Second Lien Debt, $1,000,000, Loan Parties shall promptly notify the Administrative Agent thereof in writing, which notice shall (i) set forth in reasonable detail the basis for and nature of such commercial tort claim and (ii) include the express grant by Loan Parties to the Administrative Agent of a security interest in such commercial tort claim (and the proceeds thereof). In the event that such notice does not include such grant of a security interest, the sending thereof by Loan Parties to the Administrative Agent shall be deemed to constitute such grant to the Administrative Agent. Upon the sending of such notice, any commercial tort claim described therein shall constitute part of the Collateral and shall be deemed included therein. Without limiting the authorization of the Administrative Agent provided in Section 5.3(a) hereof or otherwise arising by the execution by Loan Parties of this Agreement or any of the other Financing Agreements, the Administrative Agent is hereby irrevocably authorized from time to time and at any time to file such financing statements naming the Administrative Agent or its designee as secured party and Loan Parties as debtor, or any amendments to any financing statements, covering any such commercial tort claim as Collateral. In addition, Loan Parties shall promptly upon the Administrative Agent's request, execute and deliver, or cause to be executed and delivered, to the Administrative Agent such other agreements, documents and instruments as the Administrative Agent may reasonably require in connection with such commercial tort claim.

(h)    Loan Parties do not have any goods, documents of title or other Collateral in the custody, control or possession of a third party as of the date hereof, except as set forth in the Information Certificate and except for goods located in the United States in transit to a location of Loan Parties permitted herein in the ordinary course of business of Loan Parties in the possession of the carrier transporting such goods. In the event that any goods, documents of title, Records or other tangible Collateral are at any time after the date hereof in the custody, control or possession of any other person not referred to in the Information Certificate or such carriers, Loan Parties shall promptly notify the Administrative Agent thereof in writing. Promptly upon the Administrative Agent's request and except with respect to leased retail stores, Loan Parties shall use their commercially reasonable efforts to deliver to the Administrative Agent a Collateral Access Agreement duly authorized, executed and delivered by such person and Loan Parties.

(i)    Loan Parties shall take any other actions reasonably requested by the Administrative Agent from time to time to cause the attachment, perfection and first priority of, and the ability of the Administrative Agent to enforce, the security interest of the Administrative Agent in any and all of the Collateral, including, without limitation, (i) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC or other applicable law, to the extent, if any, that Loan Parties' signature thereon is required therefor, (ii) causing the Administrative Agent's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Administrative Agent's to enforce, the security interest of the Administrative Agent in such Collateral, (iii) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Administrative Agent to enforce, the security interest of the Administrative Agent in such Collateral, (iv) obtaining the consents and approvals of any Governmental Authority or third party, including, without limitation, any consent of any licensor, lessor or other person obligated on Collateral, and taking all actions required by any earlier versions of the UCC or by other law, as applicable in any relevant jurisdiction.  For the avoidance of doubt, no perfection steps shall be required under the laws of any jurisdiction outside the United States, any state thereof or the District of Columbia.

## SECTION 6.    COLLECTION AND ADMINISTRATION

6.1    Register.  The Administrative Agent (or its agent or sub-agent appointed by it) shall maintain a register (the "Register") for the recordation of the names and addresses of Lenders and the Commitments of, and principal amount of the Loans (the "Registered Loans") and Letter of Credit Obligations owing to each Lender from time to time. The Register, as in effect at the close of business on the preceding Business Day, shall be available for inspection by Borrowers or any Lender (with respect to a Lender, solely with respect to the Obligations owing to such Lender) at a reasonable time and from time to time upon reasonable prior notice. The Administrative Agent shall record, or cause to be recorded, in the Register, the Commitments and the Loans in accordance with the provisions of Section 15.8 and the Administrative Agent shall also maintain a copy of each Assignment and Acceptance delivered to and accepted by it and shall modify the Register to give effect to each Assignment and Acceptance, and any such recording shall be presumptively correct, absent manifest error; provided, that, the failure to make any entry or any error in such records, shall not affect any Lender's Commitments or

Obligations in respect of any Loan. Borrowers, Guarantors, Administrative Agent and Lenders shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. Borrowers hereby designate and authorize Agent, and the Administrative Agent agrees, to maintain, or cause to be maintained as agent for Borrowers' solely for purposes of maintaining the Register as provided in this <u>Section 6.1</u>.

6.2     <u>Statements; Loan Accounts</u>.  The Administrative Agent shall render to Borrowers each month a statement setting forth the balance in the Borrowers' loan account(s) maintained by the Administrative Agent for Borrowers pursuant to the provisions of this Agreement, including principal, interest, fees, costs and expenses. Each such statement shall be subject to subsequent adjustment by the Administrative Agent but shall, absent manifest errors or omissions, be considered correct and deemed accepted by Borrowers and conclusively binding upon Borrowers as an account stated except to the extent that the Administrative Agent receives a written notice from Borrowers of any specific exceptions of Borrowers thereto within forty-five (45) days after the date such statement has been mailed by the Administrative Agent. Until such time as the Administrative Agent shall have rendered to Borrowers a written statement as provided above, the balance in Borrowers' loan account(s) shall be presumptive evidence of the amounts due and owing to the Administrative Agent by Borrowers. Administrative Agent shall maintain one or more loan account(s) on its books in which shall be recorded (a) all Loans, Letter of Credit Obligations and other Obligations and the Collateral, (b) all payments made by or on behalf of any Borrower or Guarantor and (c) all other appropriate debits and credits as provided in this Agreement, including fees, charges, costs, expenses and interest.  All entries in the loan account(s) shall be made in accordance with Administrative Agent's customary practices as in effect from time to time.

6.3     <u>Cash Management; Collection of Proceeds of Collateral</u>.

(a)     Loan Parties shall establish and maintain, at their expense, deposit account arrangements and merchant payment arrangements with the banks set forth on <u>Schedule 8.10</u> to the Information Certificate and, subject to <u>Section 5.3(d)</u> hereof, such other banks as Loan Parties may hereafter select. The banks set forth on <u>Schedule 8.10</u> to the Information Certificate constitute all of the banks with which Loan Parties have deposit account arrangements and merchant payment arrangements as of the date hereof and identifies each of the deposit accounts at such banks that are used solely for receiving store receipts from a retail store location of Loan Parties (together with any other deposit accounts at any time established or used by Loan Parties for receiving such store receipts from any retail store location, collectively, the "<u>Store Accounts</u>" and each individually, a "<u>Store Account</u>") or otherwise describes the nature of the use of such deposit account by Loan Parties.

(i)     Loan Parties shall deposit all proceeds from sales, lease or rental of Inventory in every form, including, without limitation, cash, checks, credit card sales drafts, credit card sales or charge slips or receipts and other forms of store receipts (other than nominal amounts retained in registers at the retail stores as cash on hand which nominal amounts shall not exceed (x) in the aggregate for all retail stores of Bob's at any time an amount equal to the product of $100,000 or, solely during the month of December, $300,000 multiplied by the number of retail stores of Bob's, (y) in the aggregate for all retail stores of EMS at any time an amount equal to the product of $4,000 multiplied by the number of retail stores of EMS, and

86

(z) in the aggregate for all retail stores of Sport Chalet at any time an amount equal to the product of $12,000 multiplied by the number of retail stores of Sport Chalet), no less than one time per week (in the case of EMS, EMS OpCo and EMS Acquisition) or two times per week (in the case of all other Loan Parties) into the Store Accounts of the Loan Parties[20] used solely for such purpose. All such funds deposited into the Store Accounts shall (to the extent such funds are available funds) be sent by wire transfer or other electronic funds transfer on each Business Day to the Blocked Accounts as provided in Section 6.3(a)(ii) below.

(ii)    Loan Parties shall establish and maintain, at their expense, deposit accounts with such banks as are reasonably acceptable to the Administrative Agent (the "Blocked Accounts") into which Loan Parties shall promptly either cause all amounts on deposit in the Store Accounts to be sent as provided in Section 6.3(a)(i) above or shall itself deposit or cause to be deposited all proceeds from sales of Inventory, and all other amounts payable to Loan Parties from Credit Card Issuers and Credit Card Processors and all other proceeds of Collateral on each Business Day; provided, that, proceeds of Collateral (other than proceeds of Inventory and amounts payable by Credit Card Issuers and Credit Card Processors) shall be so deposited or cause to be so deposited promptly, if such proceeds in the aggregate exceed $300,000, or otherwise at least once per week. The Loan Parties shall deliver, or cause to be delivered to the Administrative Agent a Deposit Account Control Agreement duly authorized, executed and delivered by each bank where a Blocked Account is maintained as provided in Section 5.3 hereof or at any time and from time to time the Administrative Agent may become the bank's customer with respect to any of the Blocked Accounts and promptly upon the Administrative Agent's request, Loan Parties shall execute and deliver such agreements and documents as the Administrative Agent may require in connection therewith. Loan Parties agree that all payments made to the Blocked Accounts and all other funds received and collected by the Administrative Agent or any Lender at any time, whether in respect of the Receivables, as proceeds of Inventory or other Collateral or otherwise shall be treated as payments to the Administrative Agent and Lenders in respect of the Obligations and therefore shall constitute the property of the Administrative Agent and the Lenders to the extent of the then outstanding Obligations.

(b)    For purposes of calculating the amount of the Loans and Letters of Credit available to Borrowers, such payments will be applied (conditional upon final collection) to the Obligations on the Business Day of receipt by the Administrative Agent of immediately available funds in the Administrative Agent Payment Account provided such payments and notice thereof are received in accordance with the Administrative Agent's usual and customary practices as in effect from time to time and within sufficient time to credit the applicable loan account on such day, and if not, then on the next Business Day. For the purposes of calculating interest on the Obligations, such payments or other funds received will be applied (conditional upon final collection) to the Obligations one (1) Business Day following the date of receipt of immediately available funds by the Administrative Agent in the Administrative Agent Payment Account provided such payments or other funds and notice thereof are received in accordance with the Administrative Agent's usual and customary practices as in effect from time to time and within sufficient time to credit such Loan Parties' loan account on such day, and if not, then on the next Business Day.

---

[20] Amendment No. 1

(c)     Loan Parties and their employees, agents and Subsidiaries shall, acting as trustee for the Administrative Agent, receive, as the property of the Administrative Agent, any monies, checks, notes, drafts or any other payment relating to and/or proceeds of Accounts or other Collateral which come into their possession or under their control and promptly upon receipt thereof, shall deposit or cause the same to be deposited in the Store Accounts or Blocked Accounts in accordance with Section 6.3(a) hereof or remit the same or cause the same to be remitted, in kind, to the Administrative Agent. In no event shall the same be commingled with any Borrower's or any Guarantor's own funds. Borrowers agree to reimburse the Administrative Agent on demand for any amounts owed or paid to any bank or other financial institution at which a Blocked Account or any other deposit account or investment account is established or any other bank, financial institution or other person involved in the transfer of funds to or from the Blocked Accounts arising out of the Administrative Agent's payments to or indemnification of such bank, financial institution or other person. The obligations of Borrowers to reimburse the Administrative Agent for such amounts pursuant to this Section 6.3 shall survive the termination of this Agreement.

6.4    Bills of Lading and Other Documents of Title.  There shall be no more than three (3) originals of any bills of lading and other documents of title relating to goods being purchased by Loan Parties which are outside the United States of America and in transit to the premises of the Loan Parties or the premises of a Freight Forwarder in the United States of America. As to any such bills of lading or other documents of title, unless and until the Administrative Agent shall direct otherwise, (i) two (2) originals of each of such bill of lading or other document of title shall be delivered to such Freight Forwarder as Loan Parties may specify and that is party to a Collateral Access Agreement and (ii) one (1) original of each such bill of lading or other document of title shall be delivered to the Administrative Agent.  To the extent that the terms of this Section have not been satisfied as to any Inventory, such Inventory shall not constitute Eligible Inventory, except as the Administrative Agent may otherwise agree.

6.5    Payments.

(a)     All Obligations shall be payable to the Administrative Agent Payment Account as provided in Section 6.3 or such other place as the Administrative Agent may designate from time to time. Subject to the other terms and conditions contained herein, the Administrative Agent shall apply payments received or collected from any Loan Party or for the account of any Loan Party (including the monetary proceeds of collections or of realization upon any Collateral) as follows: first, to pay any fees, indemnities or expense reimbursements then due to the Administrative Agent and Lenders from any Loan Party; second, to pay interest due in respect of any Loans (and including any Special Administrative Agent Advances) or Letter of Credit Obligations; third, to pay or prepay principal in respect of Special Administrative Agent Advances and Swing Line Loans; fourth, to pay principal due in respect of the Loans and to pay Obligations then due arising under or pursuant to any Hedge Agreements of any Borrower or any Guarantor with the Administrative Agent or any Affiliate of the Administrative Agent (but, as to Obligations arising under or pursuant to such Hedge Agreements, only up to the amount of any then effective Reserve established in respect of such Obligations), on a pro rata basis; fifth, to pay or prepay any other Obligations whether or not then due, in such order and manner as the Administrative Agent determines and at any time an Event of Default exists or has occurred and is continuing, to provide cash collateral for any Letter of Credit Obligations or other contingent

Obligations (but not including for this purpose any Obligations arising under or pursuant to any Bank Products); and sixth, to pay or prepay any Obligations arising under or pursuant to any Bank Products (other than to the extent provided for in clause third above) on a pro rata basis. Notwithstanding anything to the contrary contained in this Agreement, (i) unless so directed by Borrowers, or unless a Default or an Event of Default shall exist or have occurred and be continuing, the Administrative Agent and the Lenders shall not apply any payments which they receive to any Eurodollar Rate Loans, except (A) on the expiration date of the Interest Period applicable to any such Eurodollar Rate Loans or (B) in the event that there are no outstanding Base Rate Loans and (ii) to the extent Borrowers use any proceeds of the Revolving Loans or Letters of Credit to acquire rights in or the use of any Collateral or to repay any Indebtedness used to acquire rights in or the use of any Collateral, payments in respect of the Obligations shall be deemed applied first to the Obligations arising from Revolving Loans and Letters of Credit that were not used for such purposes and second to the Obligations arising from Revolving Loans and Letters of Credit the proceeds of which were used to acquire rights in or the use of any Collateral in the chronological order in which Borrowers acquired such rights in or the use of such Collateral.

(b)     At the Administrative Agent's option, all principal, interest, fees, costs, expenses and other charges provided for in this Agreement or the other Financing Agreements may be charged directly to the loan account(s) of Borrowers. If after receipt of any payment of, or proceeds of Collateral applied to the payment of, any of the Obligations, the Administrative Agent is required to surrender or return such payment or proceeds to any Person for any reason, then the Obligations intended to be satisfied by such payment or proceeds shall be reinstated and continue and this Agreement shall continue in full force and effect as if such payment or proceeds had not been received by the Administrative Agent. Borrowers shall be liable to pay to the Administrative Agent, and do hereby jointly and severally indemnify and hold the Administrative Agent harmless for the amount of any payments or proceeds surrendered or returned. This Section 6.5 shall remain effective notwithstanding any contrary action which may be taken by the Administrative Agent in reliance upon such payment or proceeds. This Section 6.5(b) shall survive the payment of the Obligations and the termination of this Agreement.

6.6     Authorization to Make Revolving Loans. The Administrative Agent are authorized to make the Revolving Loans based upon telephonic or other instructions received from anyone purporting to be an officer of Borrowers or other authorized person or, at the discretion of the Administrative Agent, if such Revolving Loans are necessary to satisfy any Obligations. All requests for Revolving Loans or Letters of Credit hereunder shall specify the date on which the requested advance is to be made (which day shall be a Business Day) and the amount of the requested Revolving Loan. Requests received after 11:00 a.m. on any day shall be deemed to have been made as of the opening of business on the immediately following Business Day. All Revolving Loans and Letters of Credit under this Agreement shall be conclusively presumed to have been made to, and at the request of and for the benefit of, Borrowers when deposited to the credit of Borrowers or otherwise disbursed or established in accordance with the instructions of Borrowers or in accordance with the terms and conditions of this Agreement.

6.7     Use of Proceeds. Borrowers shall use the initial proceeds of the Revolving Loans hereunder only (i) to fund fees and expenses related to the Transactions and (ii) for working

capital and general corporate purposes.  All other Loans made or Letters of Credit provided by the Lenders to or for the benefit of Borrowers pursuant to the provisions hereof shall be used by Borrowers only for general operating, working capital and other proper corporate purposes of Borrowers (including capital expenditures and Permitted Acquisitions) not otherwise prohibited by the terms hereof. None of the proceeds will be used, directly or indirectly, for the purpose of purchasing or carrying any margin security or for the purposes of reducing or retiring any indebtedness which was originally incurred to purchase or carry any margin security or for any other purpose which might cause any of the Revolving Loans to be considered a "purpose credit" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System, as amended.

6.8    <u>Bank Products</u>. Each Loan Party may (but no such Person is required to) request that any Bank Product Provider provide or arrange for such Person to obtain Bank Products from such Bank Product Provider and such Bank Product Provider may, in its sole discretion, provide or arrange for Loan Parties to obtain the requested Bank Products. Each Loan Party acknowledges and agrees that the obtaining of Bank Products from any Bank Product Provider (a) is in the sole discretion of such Bank Product Provider, and (b) is subject to all rules and regulations of such Bank Product Provider with respect thereto.

6.9    <u>Withholding Taxes</u>.

(a)    Any and all payments with respect to or on account of any of the Obligations shall be made free and clear of and without deduction or withholding for or on account of, any setoff, counterclaim, defense, taxes, levies, imposts, duties, deductions, withholdings (including backup withholdings), assessments, fees or other charges, including any imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto (collectively, "<u>Taxes</u>"), except as required by applicable laws, and excluding in the case of the Administrative Agent, the Lenders and each Eligible Transferee (i) Taxes measured by or imposed on its net income, and franchise taxes and backup withholding taxes imposed on it, by the jurisdiction (or any political subdivision thereof) under the laws of which the Administrative Agent, the Lenders or such Eligible Transferee (as the case may be) is organized, or in which its principal lending office is located or in which its applicable lending office is located, (ii) any Taxes payable with respect to payments under the Financing Agreements under laws (including any statute, treaty or regulation) in effect on the date of this Agreement (or, in the case of an Eligible Transferee, the date of the assignment and acceptance) applicable to the Administrative Agent, the Lenders or such Eligible Transferee, as the case may be, but not excluding any United States of America ("<u>U.S.</u>") withholding taxes payable as a result of any change in such laws occurring after the date of this Agreement (or the date of such assignment and acceptance); (iii) any branch profits taxes imposed on it by the United States of America or any similar tax imposed by any other jurisdiction described in <u>clause (i)</u> above; (iv) any Taxes that are attributable to the Administrative Agent's, the Lenders' or such Eligible Transferee's failure to comply with the requirements of <u>Section 6.9(f)</u> hereof; (v) Taxes measured by its net income, and franchise taxes imposed on it as a result of a present or former connection between any of the Administrative Agent, any Lender or Eligible Transferee, as applicable, and the jurisdiction of the Governmental Authority imposing such tax or any taxing authority thereof or therein; (vi) any U.S. federal withholding Taxes imposed under FATCA; and (vii) any U.S. withholding taxes imposed as a result of a change by the Administrative Agent, the

90

Lenders or any Eligible Transferee in its applicable lending office to a jurisdiction outside of the United States of America, other than taxes accrued prior to such change that are otherwise Non-Excluded Taxes (all such excluded Taxes referred to herein as "<u>Excluded Taxes</u>" and all such non-excluded Taxes being hereinafter referred to as "<u>Non-Excluded Taxes</u>").

(b)    In addition, each Loan Party agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies of the United States of America or any political subdivision thereof or any applicable foreign jurisdiction, and all liabilities with respect thereto, in each case arising from any payment made hereunder or under any of the other Financing Agreements or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any of the other Financing Agreements (collectively, "<u>Other Taxes</u>").

(c)    Each Loan Party shall jointly and severally indemnify the Administrative Agent, the Lenders and each Eligible Transferee for the full amount of Non-Excluded Taxes and Other Taxes (including any Non-Excluded Taxes and Other Taxes imposed by any jurisdiction on amounts payable under this <u>Section 6.9</u>) paid by the Administrative Agent, the Lenders or such Eligible Transferee (as the case may be) and any liability (including for penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Non-Excluded Taxes or Other Taxes were correctly or legally asserted, except to the extent such Non-Excluded Tax or Other Taxes arise as a result of the gross negligence or willful misconduct of the Administrative Agent, the Lenders or such Eligible Transferee as finally determined by a court of competent jurisdiction. This indemnification shall be made within thirty (30) days from the date the Administrative Agent, the Lenders or such Eligible Transferee (as the case may be) makes written demand therefor. A certificate as to the amount of such payment or liability delivered to Borrowers by the Administrative Agent, the Lenders or such Eligible Transferee or by the Administrative Agent, the Lenders on its own behalf or on behalf of an Eligible Transferee, shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Non-Excluded Taxes or Other Taxes by any Loan Party, such Loan Party shall furnish to the Administrative Agent, at its address referred to herein, the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment reasonably satisfactory to the Administrative Agent.

(e)    Without prejudice to the survival of any other agreements of any Borrower or any Guarantor hereunder or under any of the other Financing Agreements, the agreements and obligations of such Loan Party contained in this <u>Section 6.9</u> shall survive the termination of this Agreement and the Payment in Full.

(f)    (i) To the extent the Administrative Agent or any Lender is entitled to an exemption from or reduction of withholding Tax with respect to payments made hereunder or under any of the other Financing Agreements, the Administrative Agent or such Lender shall deliver to the Borrowers, at the time or times reasonably requested by the Borrowers, such properly completed and executed documentation reasonably requested by the Borrowers as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, the Administrative Agent or such Lender, if reasonably requested by the Borrowers, shall deliver such other documentation prescribed by applicable law or reasonably requested by

the Borrowers as will enable the Borrowers to determine whether or not the Administrative Agent or such Lender is subject to backup withholding or information reporting requirements. Each Lender agrees that if any documentation it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such documentation or promptly notify the Borrowers in writing of its legal inability to do so.  Notwithstanding anything to the contrary in the preceding three sentences, the completion, execution or submission of such documentation shall not be required if in the Administrative Agent reasonable judgment such completion, execution or submission would subject the Administrative Agent or such Lender to any material unreimbursed cost of expense or would materially prejudice the legal or commercial position of the Administrative Agent or such Lender.

(ii)      Without limiting the generality of the foregoing,

(A)      To the extent any Lender is a U.S. person, such Lender shall deliver to the Borrowers (and from time to time thereafter upon the reasonable request of the Borrowers), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)      Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any of the other Financing Agreements shall deliver to Borrowers (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by Borrowers or the Administrative Agent (in such number of copies as is reasonably requested by the recipient), whichever of the following is applicable (but only to the extent such Foreign Lender is legally entitled to do so): (1) in the case of a Foreign Lender claiming benefits of an income tax treaty to which the United States is a party, executed originals of Internal Revenue Service Form ("IRS") W-8BEN or W-8BEN-E claiming exemption from, or a reduction to, withholding tax under an income tax treaty, or any successor form, (2) executed originals of IRS Form W-8ECI claiming exemption from withholding because the income is effectively connected with a U.S. trade or business, or any successor form, (3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Sections 871(h) or 881(c) of the Code, (x) a certificate substantially in the form of Exhibit T-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(a) of the Code, a "10 percent shareholder" of Borrowers within the meaning of Section 881(c)(3)(b) of the Code, or a "controlled foreign corporation" described and Section 881(c)(3)(c) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN or W-8BEN-E claiming exemption from withholding under the portfolio interest exemption or any successor form, (4) to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit T-2 or Exhibit T-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit T-4 on behalf of each such direct and indirect partner; or (5) executed originals of any other applicable form, certificate or document prescribed by applicable law as a basis for claiming exemption from or a

92

reduction in U.S. federal withholding tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Borrowers to determine the withholding or deduction required to be made. Such forms shall be delivered by each Foreign Lender on or before the date it becomes a party to this Agreement. Each Foreign Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and the Administrative Agent in writing of its legal inability to do so.

(C)     If a payment made to any Lender under this Agreement or any other Financing Agreement would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrowers and the Administrative Agent at the time or times prescribed by law such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrowers or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (C), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(g)     If Loan Parties pay any additional amount pursuant to this Section 6.9 with respect to the Administrative Agent, any Lender or any Eligible Transferee, the Administrative Agent, such Lender or such Eligible Transferee, as the case may be, shall use its reasonable efforts to obtain a refund of Tax or credit against its tax liabilities on account of such payment; provided that, the Administrative Agent, such Lender or such Eligible Transferee shall have no obligation to use such reasonable efforts to obtain a credit if it is in an excess foreign tax credit position and shall have no obligation to use such reasonable efforts if it believes in good faith that claiming a refund or credit would cause adverse tax consequences to it. In the event that the Administrative Agent, such Lender or such Eligible Transferee receives such a refund or credit, the Administrative Agent, such Lender or such Eligible Transferee, as the case may be, shall pay to Borrowers an amount that Lender or such Eligible Transferee reasonably determines is equal to the net tax benefit obtained by the Administrative Agent, such Lender or such Eligible Transferee as a result of such payment by Borrowers, so as to leave the Administrative Agent, such Lender or such Eligible Transferee in no worse position than it would have been in if payment of the relevant additional amount had not been made. Nothing contained in this Section 6.9(g) shall require the Administrative Agent, any Lender or any Eligible Transferee to disclose or detail the basis of its calculation of the amount of any tax benefit or any other amount or the basis of its determination to the Loan Parties or any other party.

6.10   Mitigation Obligations.

(a)     The Administrative Agent, any Lender or any Eligible Transferee claiming any additional amounts payable pursuant to Section 6.9 shall use its reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its applicable lending office if the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts that would be payable or may thereafter

accrue and would not, in the sole determination of the Administrative Agent, such Lender or such Eligible Transferee, be otherwise materially disadvantageous to the Administrative Agent, such Lender or such Eligible Transferee.

6.11    Pro Rata Treatment.

(a)    Except to the extent otherwise provided in this Agreement or as otherwise agreed by the applicable Lenders: (a) the making and conversion of Loans shall be made among the Lenders based on their respective Pro Rata Shares as to the Loans and (b) each payment on account of any Obligations to or for the account of one or more of Lenders in respect of any Obligations due on a particular day shall be allocated among the Lenders entitled to such payments based on their respective Pro Rata Shares and shall be distributed accordingly.

6.12    Sharing of Payments, Etc.

(a)    Each Loan Party agrees that, in addition to (and without limitation of) any right of setoff, banker's lien or counterclaim, Administrative Agent or any Lender may otherwise have, each Lender shall be entitled, at its option (but subject, as among Administrative Agent and Lenders, to the provisions of Section 14.3(b) hereof), to offset balances held by it for the account of such Loan Party at any of its offices, in dollars or in any other currency, against any principal of or interest on any Loans owed to such Lender or any other amount payable to such Lender hereunder, that is not paid when due (regardless of whether such balances are then due to such Loan Party), in which case it shall promptly notify Borrowers and the Administrative Agent thereof; provided, that, such Lender's failure to give such notice shall not affect the validity thereof.

(b)    If any Lender (including Agent) shall obtain from any Loan Party payment of any principal of or interest on any Loan owing to it or payment of any other amount under this Agreement or any of the other Financing Agreements through the exercise of any right of setoff, banker's lien or counterclaim or similar right or otherwise (other than from Administrative Agent as provided herein), and, as a result of such payment, such Lender shall have received more than its Pro Rata Share of the principal of the Loans or more than its share of such other amounts then due hereunder or thereunder by any Loan Party to such Lender than the percentage thereof received by any other Lender, it shall promptly pay to the Administrative Agent, for the benefit of Lenders, the amount of such excess and simultaneously purchase from such other Lenders a participation in the Loans or such other amounts, respectively, owing to such other Lenders (or such interest due thereon, as the case may be) in such amounts, and make such other adjustments from time to time as shall be equitable, to the end that all Lenders shall share the benefit of such excess payment (net of any expenses that may be incurred by such Lender in obtaining or preserving such excess payment) in accordance with their respective Pro Rata Shares or as otherwise agreed by Lenders. To such end all Lenders shall make appropriate adjustments among themselves (by the resale of participation sold or otherwise) if such payment is rescinded or must otherwise be restored.

(c)    Each Loan Party agrees that any Lender purchasing a participation (or direct interest) as provided in this Section may exercise, in a manner consistent with this Section, all rights of setoff, banker's lien, counterclaim or similar rights with respect to such participation

4241829.6

as fully as if such Lender were a direct holder of Loans or other amounts (as the case may be) owing to such Lender in the amount of such participation.

(d)    Nothing contained herein shall require any Lender to exercise any right of setoff, banker's lien, counterclaims or similar rights or shall affect the right of any Lender to exercise, and retain the benefits of exercising, any such right with respect to any other Indebtedness or obligation of any Loan Party. If, under any applicable bankruptcy, insolvency or other similar law, any Lender receives a secured claim in lieu of a setoff to which this Section applies, such Lender shall, to the extent practicable, assign such rights to the Administrative Agent for the benefit of Lenders and, in any event, exercise its rights in respect of such secured claim in a manner consistent with the rights of Lenders entitled under this Section to share in the benefits of any recovery on such secured claim.

6.13    Settlement Procedures.

(a)    In order to administer the Credit Facility in an efficient manner and to minimize the transfer of funds between Administrative Agent and Lenders, Administrative Agent may, at its option, subject to the terms of this Section, make available, on behalf of Lenders, including the Swing Line Lender, the full amount of the Revolving Loans or Swing Line Loans requested or charged to any Borrower's loan account(s) or otherwise to be advanced by Lenders pursuant to the terms hereof, without requirement of prior notice to Lenders of the proposed Loans.

(b)    With respect to all Revolving Loans made by Administrative Agent on behalf of Lenders, or any Swing Line Loans made by Swing Line Lender or Administrative Agent on behalf of Swing Line Lender, the amount of each Lender's Pro Rata Share of the outstanding Loans shall be computed weekly, and shall be adjusted upward or downward on the basis of the amount of the outstanding Loans as of 5:00 p.m. on the Business Day immediately preceding the date of each settlement computation; provided, that, Administrative Agent retains the absolute right at any time or from time to time to make the above described adjustments at intervals more frequent than weekly, but in no event more than twice in any week. The Administrative Agent shall deliver to each of the Lenders after the end of each week, or at such lesser period or periods as Administrative Agent shall determine, a summary statement of the amount of outstanding Loans for such period (such week or lesser period or periods being hereinafter referred to as a "Settlement Period"). If the summary statement is sent by Administrative Agent and received by a Lender prior to 12:00 p.m., then such Lender shall make the settlement transfer described in this Section by no later than 3:00 p.m. on the same Business Day and if received by a Lender after 12:00 p.m., then such Lender shall make the settlement transfer by not later than 3:00 p.m. on the next Business Day following the date of receipt. If, as of the end of any Settlement Period, the amount of a Lender's Pro Rata Share of the outstanding Loans is more than such Lender's Pro Rata Share of the outstanding Loans as of the end of the previous Settlement Period, then such Lender shall forthwith (but in no event later than the time set forth in the preceding sentence) transfer to the Administrative Agent by wire transfer in immediately available funds the amount of the increase. Alternatively, if the amount of a Lender's Pro Rata Share of the outstanding Loans in any Settlement Period is less than the amount of such Lender's Pro Rata Share of the outstanding Loans for the previous Settlement Period, Administrative Agent shall forthwith transfer to such Lender by wire transfer in

95

immediately available funds the amount of the decrease. The obligation of each of the Lenders to transfer such funds and effect such settlement shall be irrevocable and unconditional and without recourse to or warranty by the Administrative Agent. The Administrative Agent and each Lender agrees to mark its books and records at the end of each Settlement Period to show at all times the dollar amount of its Pro Rata Share of the outstanding Loans and Letters of Credit. Each Lender shall only be entitled to receive interest on its Pro Rata Share of the Loans to the extent such Loans have been funded by such Lender. Because the Administrative Agent on behalf of Lenders may be advancing and/or may be repaid Loans prior to the time when Lenders will actually advance and/or be repaid such Loans, interest with respect to Loans shall be allocated by Administrative Agent in accordance with the amount of Loans actually advanced by and repaid to each Lender and the Administrative Agent and shall accrue from and including the date such Loans are so advanced to but excluding the date such Loans are either repaid by Borrowers or actually settled with the applicable Lender as described in this Section.

(c)     To the extent that Administrative Agent has made any such amounts available and the settlement described above shall not yet have occurred, upon repayment of any Loans by a Borrower, Administrative Agent may apply such amounts repaid directly to any amounts made available by Administrative Agent pursuant to this Section. In lieu of weekly or more frequent settlements, Administrative Agent may, at its option, at any time require each Lender to provide Administrative Agent with immediately available funds representing its Pro Rata Share of each Loan, prior to Administrative Agent's disbursement of such Loan to Borrower. In such event, all Loans under this Agreement shall be made by the Lenders simultaneously and proportionately to their Pro Rata Shares. No Lender shall be responsible for any default by any other Lender in the other Lender's obligation to make a Loan requested hereunder nor shall the Commitment of any Lender be increased or decreased as a result of the default by any other Lender in the other Lender's obligation to make a Loan hereunder.

(d)     Upon the making of any Loan by Administrative Agent as provided herein, without further action by any party hereto, each Lender shall be deemed to have irrevocably and unconditionally purchased and received from Agent, without recourse or warranty, an undivided interest and participation to the extent of such Lender's Pro Rata Share in such Loan. To the extent that there is no settlement in accordance with the terms hereof, Administrative Agent may at any time require the Lenders to fund their participations. From and after the date, if any, on which any Lender has funded its participation in any such Loan, Administrative Agent shall promptly distribute to such Lender, such Lender's Pro Rata Share of all payments of principal and interest received by Administrative Agent in respect of such Loan.

(e)     If Administrative Agent is not funding a particular Loan to a Borrower pursuant to Sections 6.13(a) and 6.13(b) above on any day, but is requiring each Lender to provide Administrative Agent with immediately available funds on the date of such Loan as provided in Section 6.13(c) above, Administrative Agent may assume that each Lender will make available to the Administrative Agent such Lender's Pro Rata Share of the Loan requested or otherwise made on such day and the Administrative Agent may, in its discretion, but shall not be obligated to, cause a corresponding amount to be made available to or for the benefit of such Borrower on such day. If Administrative Agent makes such corresponding amount available to a Borrower and such corresponding amount is not in fact made available to the Administrative Agent by such Lender, Administrative Agent shall be entitled to recover such corresponding

96

amount on demand from such Lender together with interest thereon for each day from the date such payment was due until the date such amount is paid to the Administrative Agent at the Federal Funds Rate for each day during such period (as published by the Federal Reserve Bank of New York or at Administrative Agent's option based on the arithmetic mean determined by Administrative Agent of the rates for the last transaction in overnight Federal funds arranged prior to 9:00 a.m. on that day by each of the three leading brokers of Federal funds transactions in New York selected by Agent) and if such amounts are not paid within three (3) days of Administrative Agent's demand, at the highest Interest Rate provided for in <u>Section 3.1</u> hereof applicable to Base Rate Loans. During the period in which such Lender has not paid such corresponding amount to Administrative Agent, notwithstanding anything to the contrary contained in this Agreement or any of the other Financing Agreements, the amount so advanced by Administrative Agent to or for the benefit of any Borrower shall, for all purposes hereof, be a Loan made by Administrative Agent for its own account. Upon any such failure by a Lender to pay Agent, Administrative Agent shall promptly thereafter notify Borrowers of such failure and Borrowers shall pay such corresponding amount to the Administrative Agent for its own account within five (5) Business Days of Borrowers' receipt of such notice. A Lender who fails to pay Administrative Agent its Pro Rata Share of any Loans made available by the Administrative Agent on such Lender's behalf, or any Lender who fails to pay any other amount owing by it to Administrative Agent, Swing Line Lender or Issuing Bank, is a "<u>Defaulting Lender</u>".

(f)     Administrative Agent shall not be obligated to transfer to a Defaulting Lender any payments received by Administrative Agent for the Defaulting Lender's benefit, nor shall a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees). Amounts payable to a Defaulting Lender shall instead be paid to or retained by Agent. The Administrative Agent may hold and, in its reasonable discretion, relend to a Borrower the amount of all such payments received or retained by it for the account of such Defaulting Lender. For purposes of voting or consenting to matters with respect to this Agreement and the other Financing Agreements and determining Pro Rata Shares, such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero (0). This Section shall remain effective with respect to a Defaulting Lender until such default is cured. The operation of this Section shall not be construed to increase or otherwise affect the Commitment of any Lender, or relieve or excuse the performance by any Loan Party of their duties and obligations hereunder. The Administrative Agent or Borrowers shall have the right, but not the obligation, at any time, and upon the exercise by Administrative Agent or Borrowers of such right, any Defaulting Lender shall have the obligation, to immediately sell, assign and transfer to the Administrative Agent or such Eligible Transferee as Administrative Agent or Borrowers may specify, the Commitment of such Defaulting Lender and all rights and interests of such Defaulting Lender pursuant thereto, <u>provided</u>, that, such Defaulting Lender shall have received payment of an amount equal to the outstanding principal amount of its Loans and participations in Letter of Credit Obligations and Swing Line Loans that it has funded, if any, accrued interest thereon, accrued fees and other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal) and Borrowers (in the case of accrued interest, fees and other amounts, including amounts under <u>Section 3.10</u>). The Administrative Agent shall provide the Defaulting Lender with prior written notice of its intent to exercise its right under this Section (or if Administrative Agent does not exercise such right, Borrowers shall provide Administrative Agent and the Defaulting Lender with prior written notice of its intent to exercise its right under this Section), which notice shall specify the date on

which such purchase and sale shall occur. Such purchase and sale shall be pursuant to the terms of an Assignment and Acceptance (whether or not executed by the Defaulting Lender).

(g)    If any Swing Loan or Letter of Credit is outstanding at the time that a Lender becomes a Defaulting Lender then:

(i)    such Defaulting Lender's Swing Loan Exposure and Letter of Credit Exposure shall be reallocated among the non-Defaulting Lenders in accordance with their respective Pro Rata Shares but only to the extent the sum of all non-Defaulting Lenders' Revolving Loan Exposures plus such Defaulting Lender's Swing Loan Exposure and Letter of Credit Exposure does not exceed the total of all non-Defaulting Lenders' Commitments;

(ii)    if the reallocation described in clause (i) above cannot, or can only partially, be effected, Borrowers shall within one (1) Business Day following notice by the Agent (A) _first_, prepay such Defaulting Lender's Swing Loan Exposure (after giving effect to any partial reallocation pursuant to clause (i) above) and (B) _second_, cash collateralize such Defaulting Lender's Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to clause (i) above), pursuant to a cash collateral agreement to be entered into in form and substance reasonably satisfactory to the Administrative Agent (but which shall not provide for cash collateral in excess of an amount equal to one hundred five percent (105%) of such Letter of Credit Exposure after giving effect to any partial reallocation pursuant to clause (i) above), for so long as such Letter of Credit Exposure is outstanding; provided, that, Borrowers shall not be obligated to cash collateralize any Defaulting Lender's Letter of Credit Exposure if such Defaulting Lender is also the Issuing Bank;

(iii)    to the extent the Letter of Credit Exposure of the non-Defaulting Lenders is reallocated pursuant to this Section 6.13(g), then the letter of credit fees payable to the non-Defaulting Lenders pursuant to Section 3.4 shall be adjusted in accordance with such non-Defaulting Lenders' Letter of Credit Exposure;

(iv)    to the extent any Defaulting Lender's Letter of Credit Exposure is neither cash collateralized nor reallocated pursuant to this Section 6.13(g), then, without prejudice to any rights or remedies of the Issuing Bank or any Lender hereunder, all letter of credit fees that would have otherwise been payable to such Defaulting Lender under Section 3.4 with respect to such portion of such Letter of Credit Exposure shall instead be payable to the Issuing Bank until such portion of such Defaulting Lender's Letter of Credit Exposure is cash collateralized or reallocated;

(v)    so long as any Lender is a Defaulting Lender, the Swing Line Lender shall not be required to make any Swing Loan and the Issuing Bank shall not be required to issue, amend, or increase any Letter of Credit, in each case, to the extent (x) the Defaulting Lender's Pro Rata Share of such Swing Line Loans or Letter of Credit cannot be reallocated pursuant to this Section 6.13(g) or (y) the Swing Line Lender or Issuing Bank, as applicable, has not otherwise entered into arrangements reasonably satisfactory to the Swing Line Lender or Issuing Bank, as applicable, and Borrowers to eliminate the Swing Line Lender's or Issuing Bank's risk with respect to the Defaulting Lender's participation in Swing Line Loans or Letters of Credit; and

(vi)     Administrative Agent may release any cash collateral provided by Borrowers pursuant to this Section 6.13(g) to the Issuing Bank and the Issuing Bank may apply any such cash collateral to the payment of such Defaulting Lender's Pro Rata Share of any Letter of Credit drawing that is not reimbursed by Borrowers pursuant to Section 2.3(f).

(h)     Nothing in this Section or elsewhere in this Agreement or the other Financing Agreements shall be deemed to require Administrative Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitment hereunder or to prejudice any rights that any Borrower may have against any Lender as a result of any default by any Lender hereunder in fulfilling its Commitment.

## SECTION 7.     COLLATERAL REPORTING AND COVENANTS

7.1     Collateral Reporting.

(a)     Borrowers shall provide the Administrative Agent with the following documents in a form reasonably satisfactory to the Administrative Agent:

(i)     as soon as possible after the end of each Borrowing Base Reporting Period (but in any event within three (3) Business Days after the end thereof), or, in the event that a Liquidity Period exists, more frequently as the Administrative Agent may from time to time request at any time (but not more frequently than weekly), (A) a Borrowing Base Certificate setting forth the calculation of the Borrowing Base as of the last Business Day of the immediately preceding Borrowing Base Reporting Period, duly completed and executed by the chief financial officer, vice president of finance, treasurer or controller of each Borrower, together with all schedules required pursuant to the terms of the Borrowing Base Certificate duly completed, (B) agings of accounts receivable (together with a reconciliation to the previous period's aging and the general ledger) and a report of credit card sales during such period, including the amount of chargebacks and credits with respect thereto, (C) a detailed breakdown of the calculations of Inventory to be returned to vendors, (D) a detailed breakdown of all outstanding merchandise gift certificates or gift cards, (E) a report setting forth the merchandise credits, merchandise refunds and loyalty rewards, (F) a week-end calculation of the Borrowing Base reflecting the "stock ledger" activity for such Borrowing Base Reporting Period, and (G) a calculation of the Second Lien Pushdown Reserve;

(ii)     as soon as possible after the end of each fiscal month of each Borrower (but in any event ten (10) Business Days after the end thereof), in each case certified by an authorized officer of such Borrower as true and correct: (A) the addresses of all new retail store locations of such Borrower opened and existing retail store locations closed or sold, in each case since the date of the most recent certificate delivered to Administrative Agent containing the information required under this clause, and (B) a report of any new deposit account established or used by such Borrower with any bank or other financial institution, including the name of the account, the account number, the name and address of the financial institution at which such account is maintained, the purpose of such account and, if any, the amount held in such account on or about the date of such report;

(iii)    upon Administrative Agent's reasonable request, (A) reports of sales for each category of Inventory, (B) summary reports on sales and use tax collections, deposits and payments, including monthly sales and use tax accruals, (C) true, correct and complete copies of all agreements, documents or instruments evidencing or otherwise related to Indebtedness that Lender has not otherwise received and (D) a certificate of the chief financial officer, vice president of finance, treasurer or controller of Borrowers listing (1) all applications, if any, for Intellectual Property made since the date of the prior certificate (or, in the case of the first such certificate, the date hereof), (2) all issuances of registrations or letters on existing applications for Intellectual Property received since the date of the prior certificate (or, in the case of the first such certificate, the date hereof), (3) all material License Agreements entered into since the date of the prior certificate (or, in the case of the first such certificate, the date hereof), (4) the statements received by Borrowers from any Credit Card Issuers and Credit Card Processors, together with such additional information with respect thereto as reasonably requested by Lender to enable Lender to monitor the transactions pursuant to the Credit Card Agreements, and (5) a report of the outstanding principal amount of the Second Lien Loans;

(iv)    as soon as possible after the end of each fiscal month (but in any event within thirty (30) days after the end thereof), or, in the event that a Liquidity Period exists, more frequently as the Administrative Agent may from time to time request at any time (but not more frequently than weekly), (A) inventory reports by category (and including the amounts of Inventory and the value thereof at any leased locations and at premises of freight forwarders, warehouses, processors or other third parties or consignees), (B) agings of outstanding accounts payable (and including information indicating the amounts owing to owners and lessors of leased premises, freight forwarders, warehouses, processors, and other third parties from time to time in possession of any Collateral), (C) a report setting forth the total amount of any purchase price paid by any customers to each Borrower in respect of layaway goods, if any, (D) a report summarizing closed retail store locations and results by class of Inventory of any going-out-of-business sales and identifying the proceeds of any other asset sales of such Borrower sold in connection with such store closures, (E) a report setting forth the Inventory  acquired or accepted by each Borrower on consignment or approval, (F) an inventory rollforward report by product class, and (G) an inventory rollforward report which reflects a computation of the inventory at retail price as of the last Business Day of the immediately preceding period, plus inventory purchased during such period, minus the inventory sold during such period, minus markdowns (other than point of sale markdowns) of the inventory sold during such period, minus point of sale markdowns of the inventory sold during such period;

(v)    as soon as possible after the end of each fiscal month of each Borrower (but in any event thirty (30) days after the end thereof) for the immediately preceding fiscal month, certified by an authorized officer of each Borrower as true and correct, a statement of store activity in a form reasonably acceptable to the Administrative Agent; and

(vi)    such other reports as to the Collateral as the Administrative Agent shall reasonably request from time to time; and

4241829.6

(vii)    by no later than Wednesday of each week, an updated Cash Flow Forecast.[21]

(b)    Nothing contained in any Borrowing Base Certificate shall be deemed to limit, impair or otherwise affect the rights of the Administrative Agent or any Lender contained herein and in the event of any conflict or inconsistency between the calculation of the Borrowing Base as set forth in any Borrowing Base Certificate and as determined by the Administrative Agent in its Permitted Discretion, the determination of the Administrative Agent shall govern and, absent manifest error, be conclusive and binding upon Borrowers and Guarantors. Without limiting the foregoing, Borrowers shall furnish to the Administrative Agent any information which the Administrative Agent may reasonably request regarding the determination and calculation of any of the amounts set forth in any Borrowing Base Certificate. Subject to the terms set forth herein, the Borrowing Base may be adjusted based on the information received by the Administrative Agent pursuant to this Agreement. If any Borrower's or any Guarantor's records or reports of the Collateral are prepared or maintained by an accounting service, contractor, shipper or other the Administrative Agent, such Borrower and such Guarantor hereby irrevocably authorizes such service, contractor, shipper or the Administrative Agent to deliver such records, reports, and related documents to the Administrative Agent and to follow the Administrative Agent's reasonable instructions with respect to further services.

7.2    <u>Accounts Covenants</u>.

(a)    Borrowers shall notify the Administrative Agent promptly of: (i) any material delay in Borrowers' performance of any of their obligations to any account debtor or the assertion of any material claims, offsets, defenses or counterclaims by any account debtor, or any disputes with account debtors, or any material settlement, adjustment or compromise thereof, (ii) all material adverse information relating to the financial condition of any account debtor and (iii) any event or circumstance which, to the Borrowers' knowledge, could be reasonably expected to cause the Administrative Agent to consider any then-existing Accounts or Credit Card Receivables as no longer constituting Eligible Accounts or Eligible Credit Card Receivables. No credit, discount, allowance or extension or agreement for any of the foregoing shall be granted to any account debtor without the Administrative Agent's consent, except in the ordinary course of Borrowers' business in accordance with practices and policies previously disclosed in writing to the Administrative Agent and except as set forth in the reports delivered to the Administrative Agent pursuant to <u>Section 7.1(a)</u> above. So long as no Event of Default exists or has occurred and is continuing, Borrowers shall settle, adjust or compromise any claim, offset, counterclaim or dispute with any account debtor. At any time that a Triggering Event of Default exists or has occurred and is continuing or at any time the Administrative Agent has commenced exercising any of its rights or remedies pursuant to <u>Section 12.2</u> hereof, the Administrative Agent shall, at its option and upon prior written notice to Borrower, have the exclusive right to settle, adjust or compromise any claim, offset, counterclaim or dispute with account debtors or grant any credits, discounts or allowances.

(b)    With respect to each Account: (i) the amounts shown on any invoice delivered to the Administrative Agent or schedule thereof delivered to the Administrative Agent

---

[21] Amendment No. 2

4241829.6

shall be true and complete, (ii) no payments shall be made thereon except payments remitted in accordance with Section 6.3 hereof, (iii) no credit, discount, allowance or extension or agreement for any of the foregoing shall be granted to any account debtor except as reported to the Administrative Agent in accordance with this Agreement and except for credits, discounts, allowances or extensions made or given in the ordinary course of Borrowers' business in accordance with practices and policies previously disclosed to the Administrative Agent, (iv) there shall be no setoffs, deductions, contras, defenses, counterclaims or disputes existing or asserted with respect thereto except as reported to the Administrative Agent in accordance with the terms of this Agreement, (v) none of the transactions giving rise thereto will violate any applicable foreign, Federal, State or local laws or regulations, all documentation relating thereto will be legally sufficient under such laws and regulations and all such documentation will be legally enforceable in accordance with its terms.

(c)       Borrowers shall notify the Administrative Agent promptly of: (i) any notice of a material default by Borrowers under any of the Credit Card Agreements or of any default which has a reasonable likelihood of resulting in the Credit Card Issuer or Credit Card Processor ceasing to make payments or suspending payments to Borrowers, (ii) any notice from any Credit Card Issuer or Credit Card Processor that such person is ceasing or suspending, or will cease or suspend, any present or future payments due or to become due to Borrowers from such person, or that such person is terminating or will terminate any of the Credit Card Agreements, and (iii) the failure of Borrowers to comply with any material terms of the Credit Card Agreements or any terms thereof which have a reasonable likelihood of resulting in the Credit Card Issuer or Credit Card Processor ceasing or suspending payments to Borrowers.

(d)       The Administrative Agent shall have the right, in the Administrative Agent's name (at any time or times during which any Event of Default shall exist or have occurred and be continuing) or in the name of a nominee of the Administrative Agent (at all other times), to verify the validity, amount or any other matter relating to any Receivables or other Collateral, by mail, telephone, facsimile transmission or otherwise.

7.3    Inventory Covenants. With respect to the Inventory: (a) Borrowers shall at all times maintain inventory records reasonably satisfactory to the Administrative Agent, keeping correct and accurate records itemizing and describing the kind, type, quality and quantity of Inventory, Borrowers' cost therefor and daily withdrawals therefrom and additions thereto; (b) Borrowers shall conduct a physical count of the Inventory either through periodic cycle counts or wall to wall counts, so that all Inventory is subject to such counts at least once each year but at any time or times as the Administrative Agent may request upon the occurrence and during the continuance of an Event of Default, and promptly following such physical inventory (whether through periodic cycle counts or wall to wall counts) shall supply the Administrative Agent with a report in the form and with such specificity as may be reasonably satisfactory to the Administrative Agent concerning such physical count; (c) Borrowers shall not remove any Inventory from the locations set forth or permitted herein, without the prior written consent of the Administrative Agent, except for sales of Inventory in the ordinary course of Borrowers' business and except to move Inventory directly from one location set forth or permitted herein to another such location and except for Inventory shipped from the manufacturer thereof to Borrowers which is in transit to the locations set forth or permitted herein; (d) upon the Administrative Agent's request, Borrowers shall, at their expense, no more than two (2) times

(or, if Excess Availability has fallen below fifteen percent (15%) of the Maximum Credit, three (3) times) in any twelve (12) month period, but at any time as the Administrative Agent may request if an Event of Default shall exist or have occurred and be continuing or otherwise at the expense of the Administrative Agent, deliver or cause to be delivered to the Administrative Agent written appraisals as to the Inventory in form, scope and methodology reasonably acceptable to the Administrative Agent and by an appraiser reasonably acceptable to the Administrative Agent, addressed to the Administrative Agent and upon which the Administrative Agent is expressly permitted to rely; (e) Borrowers shall produce, use, store and maintain the Inventory with all reasonable care and caution and in accordance with applicable standards of any insurance and in conformity with applicable laws (including the requirements of the Federal Fair Labor Standards Act of 1938, as amended and all rules, regulations and orders related thereto); (f) none of the Inventory or other Collateral constitutes farm products or the proceeds thereof; (g) as between Borrowers and the Administrative Agent, Borrowers assume all responsibility and liability arising from or relating to the production, use, sale or other disposition of the Inventory; (h) Borrowers shall not sell Inventory to any customer on approval, or any other basis which entitles the customer to return or may obligate Borrowers to repurchase such Inventory except for the return of goods in accordance with the practices and policies of Borrowers previously disclosed to the Administrative Agent; (i) Borrowers shall keep the Inventory in good and marketable condition; and (j) Borrowers shall not, without prior written notice to the Administrative Agent or the specific identification of such Inventory in a report with respect thereto provided by Borrowers to the Administrative Agent pursuant to Section 7.1(a) hereof, acquire or accept any Inventory on consignment or approval.

7.4     Equipment Covenants. With respect to the Equipment: (a) Borrowers shall, at their expense, at any time as the Administrative Agent may request if an Event of Default shall exist or have occurred and be continuing, deliver or cause to be delivered to the Administrative Agent written appraisals as to the Equipment in form, scope and methodology reasonably acceptable to lender and by an appraiser reasonably acceptable to the Administrative Agent, addressed to the Administrative Agent upon which the Administrative Agent is expressly permitted to rely; (b) Borrowers shall keep the Equipment in good order, repair, running and marketable condition (ordinary wear and tear excepted); (c) Borrowers shall use the Equipment with all reasonable care and caution and in accordance with applicable standards of any insurance and in conformity in all material respects with all applicable laws; (d) the Equipment is and shall be used in Borrowers' business and not for personal, family, household or farming use; (e) Borrowers shall not remove any Equipment from the locations set forth or permitted herein, except to the extent necessary to have any Equipment repaired or maintained in the ordinary course of the business of Borrowers or to move Equipment directly from one location set forth or permitted herein to another such location and except for the movement of motor vehicles used by or for the benefit of Borrowers in the ordinary course of business; (f) the Equipment is now and shall remain personal property and Borrowers shall not permit any of the Equipment to be or become a part of or affixed to real property; and (g) as between Borrowers and the Administrative Agent, Borrowers assume all responsibility and liability arising from the use of the Equipment.

7.5     Power of Attorney. Loan Parties hereby irrevocably designate and appoint the Administrative Agent (and all persons designated by the Administrative Agent) as Loan Parties' true and lawful attorney-in-fact, and authorize the Administrative Agent, in Loan Parties' or the

4241829.6

Administrative Agent's name, to: (a) at any time an Event of Default exists or has occurred and is continuing (i) demand payment on any Collateral, (ii) enforce payment of any of the Collateral by legal proceedings or otherwise, (iii) exercise all of Loan Parties' rights and remedies to collect any Collateral, (iv) sell or assign any Collateral upon such terms, for such amount and at such time or times as the Administrative Agent deems advisable, (v) settle, adjust, compromise, extend or renew any of the Collateral, (vi) discharge and release any Collateral, (vii) prepare, file and sign Loan Parties' name on any proof of claim in bankruptcy or other similar document against an account debtor or other obligor in respect of any Collateral, (viii) notify the post office authorities to change the address for delivery of remittances from account debtors or other obligors in respect of Collateral to an address designated by the Administrative Agent, and open and dispose of all mail addressed to Loan Parties and handle and store all mail relating to the Collateral, (ix) clear Inventory the purchase of which was financed with a Letter of Credit through U.S. Bureau of Customs and Border Protection or foreign export control authorities in Loan Parties' or the Administrative Agent's name or the name of the Administrative Agent's designee, and to sign and deliver to customs officials powers of attorney in Loan Parties' name for such purpose, and to complete in Loan Parties' or the Administrative Agent's name, any order, sale or transaction, obtain the necessary documents in connection therewith and collect the proceeds thereof, and (x) do all acts and things which are necessary, in the Administrative Agent's reasonable determination, to fulfill Loan Parties' obligations under this Agreement and the other Financing Agreements and (b) at any time to (i) take control in any manner of any item of payment constituting Collateral or otherwise received in or for deposit in the Store Accounts or Blocked Accounts, (ii) have access to any lockbox or postal box into which remittances from account debtors or other obligors in respect of Collateral are sent or received, (iii) take control of any item of payment constituting Collateral that is received by the Administrative Agent, (iv) endorse a Loan Party's name upon any items of payment in respect of Collateral received by the Administrative Agent and deposit the same in the Administrative Agent's account for application to the Obligations, (v) endorse a Loan Party's name upon any chattel paper, document, instrument, invoice, or similar document or agreement relating to any Receivable or any goods pertaining thereto or any other Collateral, including any warehouse or other receipts, or bills of lading and other negotiable or non-negotiable documents, and (vi) sign a Loan Party's name on any verification of amounts owing constituting Collateral and notices thereof to account debtors or any secondary obligors or other obligors in respect thereof. Loan Parties hereby release the Administrative Agent and its respective officers, employees and designees from any liabilities arising from any act or acts under this power of attorney and in furtherance thereof, whether of omission or commission, except as a result of the Administrative Agent's own gross negligence or willful misconduct as determined pursuant to a final non-appealable order of a court of competent jurisdiction.

7.6    <u>Right to Cure</u>. The Administrative Agent may, at its option, upon prior notice to Loan Parties (a) cure any default by Loan Parties under any material agreement with a third party that materially and adversely affects the Collateral, its value or the ability of the Administrative Agent to collect, sell or otherwise dispose of the Collateral or the rights and remedies of the Administrative Agent therein or the ability of Loan Parties to perform their obligations hereunder or under the other Financing Agreements, (b) pay or bond on appeal any judgment entered against Loan Parties, (c) discharge taxes, liens, security interests or other encumbrances at any time levied on or existing with respect to the Collateral and (d) pay any amount, incur any expense or perform any act which, in the Administrative Agent's Permitted Discretion, is

necessary or appropriate to preserve, protect, insure or maintain the Collateral and the rights of the Administrative Agent with respect thereto. The Administrative Agent may add any amounts so expended to the Obligations and charge Borrowers' account therefor, such amounts to be repayable by Loan Parties on demand. The Administrative Agent shall be under no obligation to effect such cure, payment or bonding and shall not, by doing so, be deemed to have assumed any obligation or liability of Loan Parties. Any payment made or other action taken by the Administrative Agent under this Section 7.6 shall be without prejudice to any right to assert an Event of Default hereunder and to proceed accordingly.

7.7    Access to Premises. From time to time as requested by the Administrative Agent, at the cost and expense of Loan Parties, (a) the Administrative Agent or its designee shall have complete access to all of Loan Parties' premises during normal business hours and after at least three (3) days prior written notice to Loan Parties, or at any time and without notice to Loan Parties if an Event of Default exists or has occurred and is continuing, for the purposes of inspecting, verifying and auditing the Collateral and all of Loan Parties' books and records, including the Records, (b) Loan Parties shall promptly furnish to the Administrative Agent such copies of such books and records or extracts therefrom as the Administrative Agent may request, and (c) the Administrative Agent or its designee may use during normal business hours such of Loan Parties' personnel, equipment, supplies and premises as may be reasonably necessary for the foregoing and if an Event of Default exists or has occurred and is continuing for the collection of Receivables and realization of other Collateral. Notwithstanding the foregoing, the Administrative Agent shall not conduct more than two (2) (or, if Excess Availability has fallen below fifteen percent (15%) of the Maximum Credit, three (3)) field examinations with respect to the Collateral or Loan Parties' books and records in any twelve (12) month period at the expense of Loan Parties, except if a Default or an Event of Default shall exist or have occurred and be continuing, the Administrative Agent may conduct such other field examinations at the cost and expense of Loan Parties as the Administrative Agent may require. The foregoing shall not limit the right of the Administrative Agent to conduct additional field examinations, at the expense of the Administrative Agent, as the Administrative Agent may require.

**SECTION 8.    REPRESENTATIONS AND WARRANTIES**

Each Loan Party hereby represents and warrants to the Administrative Agent and the Lenders the following (which shall survive the execution and delivery of this Agreement):

8.1    Corporate Existence; Power and Authority. Each Loan Party is a corporation or limited liability company duly organized and in good standing under the laws of its jurisdiction of organization or formation and is duly qualified as a foreign corporation or limited liability company and in good standing in all states or other jurisdictions where the nature and extent of the business transacted by it or the ownership of assets makes such qualification necessary, except for those jurisdictions in which the failure to so qualify has not had or would not reasonably be expected to have a Material Adverse Effect. The execution, delivery and performance of this Agreement, the other Financing Agreements and the transactions contemplated hereunder and thereunder (a) are all within Loan Parties' limited liability company powers, (b) have been duly authorized, (c) are not in contravention of any applicable law or the terms of Loan Parties' certificate of formation, operating agreement, or other organizational documentation, or any indenture, agreement or undertaking to which Loan Parties are a party or

by which Loan Parties or their property are bound and (d) will not result in the creation or imposition of, or require or give rise to any obligation to grant, any lien, security interest, charge or other encumbrance upon any property of Loan Parties, except for liens in favor of the Administrative Agent. This Agreement and the other Financing Agreements constitute legal, valid and binding obligations of Loan Parties enforceable in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally.

8.2    <u>Name; State of Organization; Chief Executive Office; Collateral Locations</u>.

(a)    The exact legal name of each Loan Party is as set forth on the signature page of this Agreement and in the Information Certificate. Loan Parties have not, during the five years prior to the date of this Agreement, been known by or used any other corporate, limited liability company or fictitious name or been a party to any merger or consolidation, or acquired all or substantially all of the assets of any Person, or acquired any of its property or assets out of the ordinary course of business, except as set forth in the Information Certificate.

(b)    Without limitation upon the rights of Loan Parties under <u>Section 9.1</u> hereof, each Borrower is an organization of the type and organized in the jurisdiction set forth in the Information Certificate. The Information Certificate accurately sets forth the organizational identification number of each Loan Party or accurately states that a Loan Party has none and accurately sets forth the federal employer identification number of each Borrower, subject to changes permitted under <u>Section 9.1</u> hereof.

(c)    The chief executive office and mailing address of Loan Parties and Loan Parties' Records concerning Accounts are located only at the address identified as such in <u>Schedule 8.2</u> to the Information Certificate and their only other places of business and the only other locations of Collateral, if any, are the addresses set forth in <u>Schedule 8.2</u> to the Information Certificate and except for Collateral in transit to or between such locations in the ordinary course of business. The Information Certificate correctly identifies any of such locations which are not owned by Loan Parties and sets forth the owners and/or operators thereof as of the date hereof.

8.3    <u>Financial Statements; No Material Adverse Change</u>. All financial statements relating to Loan Parties which may hereafter be delivered by Loan Parties to the Administrative Agent have been prepared in accordance with GAAP (except as to any interim financial statements, to the extent such statements are subject to normal year-end adjustments and do not include any footnotes), and all financial statements relating to Borrowers and Guarantors which have been delivered by Borrowers and Guarantors to the Administrative Agent on or prior to the date hereof fairly present in all material respects the financial condition and the results of operation of Borrowers and Guarantors as at the dates and for the periods set forth therein. Except as disclosed in any interim financial statements furnished by Borrowers and Guarantors to the Administrative Agent prior to the date of this Agreement, there has been no act, condition or event which has had or is reasonably likely to have a Material Adverse Effect since October 31, 2014. The projections that have been delivered to the Administrative Agent pursuant to <u>Section 4.2(e)</u> hereof or any updates or modifications to such projections hereafter delivered to the Administrative Agent have been prepared in good faith based upon assumptions believed in

good faith to be reasonable when made (it being understood that such projections are subject to significant uncertainties and contingencies, many of which are beyond the control of Company and no assurance can be given that the projections will be realized).

8.4     <u>Priority of Liens</u>. The security interests and liens granted to the Administrative Agent under this Agreement and the other Financing Agreements constitute valid and perfected first priority liens and security interests in and upon the Collateral subject only to the liens indicated on <u>Schedule 8.4</u> to the Information Certificate and the other liens permitted under <u>Section 10.2</u> hereof, and with respect to Intellectual Property, to the extent such liens and security interests can be perfected by filing of UCC financing statements or by filings at the United States Patent and Trademark Office or the United States Copyright Office. Each Loan Party has good, valid and merchantable title to all of its properties and assets (other than Real Property) subject to no liens, mortgages, pledges, security interests, encumbrances or charges of any kind, except those granted to the Administrative Agent and such others as are specifically listed on <u>Schedule 8.4</u> to the Information Certificate or permitted under <u>Section 10.2</u> hereof.

8.5     <u>Tax Returns</u>. The Loan Parties have filed, or caused to be filed, in a timely manner all Federal and other material tax returns, reports and declarations which are required to be filed by them. All information in such tax returns, reports and declarations is complete and accurate in all material respects. The Loan Parties have paid or caused to be paid all Taxes due and payable or claimed due and payable in any assessment received by it, except for (a) Taxes that have unintentionally not been paid in an amount not to exceed $375,000 in the aggregate at any time and (b) Taxes the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to the Loan Parties and with respect to which adequate reserves have been set aside on their books, and adequate provision has been made for the payment of all accrued and unpaid Federal, State, county, local, foreign and other Taxes whether or not yet due and payable and whether or not disputed (other than with respect to Taxes that have unintentionally not been paid in an amount not to exceed $375,000 in the aggregate at any time).

8.6     <u>Litigation</u>. Except as set forth on <u>Schedule 8.6</u> to the Information Certificate, there is no investigation by any Governmental Authority pending, or to the Loan Parties' knowledge threatened, against or affecting any Loan Party, its assets or business and there is no action, suit, proceeding or claim by any Person pending, or to the Loan Parties' knowledge threatened, against any Loan Party or its assets or goodwill, or against or affecting any transactions contemplated by this Agreement which if adversely determined against a Loan Party has or could reasonably be expected to have a Material Adverse Effect.

8.7     <u>Compliance with Other Agreements and Applicable Laws</u>.

(a)     Loan Parties are not in default in any respect under, or in violation in any respect of the terms of, any material agreement, contract, instrument, lease or other commitment to which it is a party or by which it or any of its assets are bound and Loan Parties are in compliance with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority relating to their business, including, without limitation, those set forth in or promulgated pursuant to the Occupational Safety and Health Act of 1970, as amended, the Fair Labor Standards Act of 1938, as amended, ERISA, the Code, as amended, and the rules and

107

regulations thereunder, and all Environmental Laws, in each case where the failure to comply has or could reasonably be expected to have a Material Adverse Effect.

(b)     Loan Parties have obtained all permits, licenses, approvals, consents, certificates, orders or authorizations of any Governmental Authority required for the lawful conduct of their business (the "Permits") where the failure to have such Permit has or could reasonably be expected to have a Material Adverse Effect. All of the Permits are valid and subsisting and in full force and effect. There are no actions, claims or proceedings pending or to the Borrowers' knowledge, threatened that seek the revocation, cancellation, suspension or modification of any of the Permits where any such action, claim or proceeding has or could reasonably be expected to have a Material Adverse Effect.

    8.8    Environmental Compliance.

(a)     Except as set forth on Schedule 8.8 to the Information Certificate, Loan Parties and any of their Subsidiaries have not generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Materials, on or off their premises (whether or not owned by it) in any manner which at any time violates any applicable Environmental Law or Permit, and the operations of Loan Parties and any of their Subsidiaries complies in all material respects with all Environmental Laws and all Permits where any such violation or non-compliance has or could reasonably be expected to have a Material Adverse Effect.

(b)     Except as set forth on Schedule 8.8 to the Information Certificate, there has been no investigation by any Governmental Authority or any proceeding, complaint, order, directive, claim, citation or notice by any Governmental Authority or any other person nor is any pending or to the Borrowers' knowledge threatened, with respect to any non-compliance with or violation of the requirements of any Environmental Law by Loan Parties and any of their Subsidiaries or with respect to the release, spill or discharge, threatened or actual, of any Hazardous Material or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter, which has or could reasonably be expected to have a Material Adverse Effect.

(c)     Except as set forth on Schedule 8.8 to the Information Certificate, Loan Parties and their Subsidiaries have no liability (contingent or otherwise) in connection with a release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials which has or could reasonably be expected to have a Material Adverse Effect.

(d)     Loan Parties and their Subsidiaries have all Permits required to be obtained or filed in connection with the operations of Borrowers under any Environmental Law and all of such licenses, certificates, approvals or similar authorizations and other Permits are valid and in full force and effect, except where the failure to have such Permits has not and could not reasonably be expected to have a Material Adverse Effect.

8.9     Employee Benefits.

(a)     Except as could not reasonably be expected to have a Material Adverse Effect, (i) each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or State law, (ii) each Plan which is intended to qualify under Section 401(a) of the Code has received, or has timely applied for, a favorable determination letter from the Internal Revenue Service and to the Borrowers' knowledge, nothing has occurred which would cause the loss of such qualification or which would cause the application for such favorable determination not to be granted on a timely basis and (iii) Borrowers have made all required contributions to any Pension Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Pension Plan.

(b)     Except as could not reasonably be expected to have a Material Adverse Effect, (i) there are no pending or threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan, and (ii) there has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan.

(c)     (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) based on the latest valuation of each Pension Plan and on the actuarial methods and assumptions employed for such valuation (determined in accordance with the assumptions used for funding such Pension Plan pursuant to Section 412 of the Code) the aggregate current value of accumulated benefit liabilities of such Pension Plan under Section 4001(a)(16) of ERISA does not exceed the aggregate current value of the assets of such Pension Plan; (iii) Borrowers have not incurred and do not reasonably expect to incur any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) Borrowers have not incurred and do not reasonably expect to incur any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) Borrowers have not engaged in a transaction that would be subject to Section 4069 or 4212(c) of ERISA.

8.10     Bank Accounts. All of the deposit accounts, investment accounts or other accounts in the name of or used by Loan Parties maintained at any bank or other financial institution as of the date of this Agreement are set forth on Schedule 8.10 to the Information Certificate, subject to the right of Loan Parties to establish new accounts in accordance with Section 5.3 hereof.

8.11     Intellectual Property. To the Loan Parties' knowledge, Loan Parties own or license or otherwise have the right to use all Intellectual Property used in the operation of their businesses as presently conducted. As of the date hereof, Loan Parties do not have any Intellectual Property registered, or subject to pending applications, in the United States Patent and Trademark Office or any similar office or agency in the United States, any State thereof, any political subdivision thereof or in any other country, other than those described in Exhibit A to the IP Security Agreement and has not granted any written licenses with respect thereto other than as set forth in Exhibit A to the IP Security Agreement. No event has occurred which permits or would permit after notice or passage of time or both, the revocation, suspension or termination

4241829.6

of such rights and which has or could reasonably be expected to have a Material Adverse Effect. To the Loan Parties' knowledge, no slogan or other advertising device, product, process, method, substance or use of Intellectual Property or goods bearing or using any Intellectual Property presently contemplated to be sold by or employed by Loan Parties infringes any patent, trademark, service mark, trade name, copyright or other Intellectual Property owned by any other Person presently and no claim or litigation is pending or threatened against or affecting Loan Parties contesting its right to sell or use any such device, product, process, method, substance, Intellectual Property or goods which, in each case, has or could reasonably be expected to have a Material Adverse Effect. The IP Security Agreement sets forth all of the agreements or other arrangements of Loan Parties pursuant to which Loan Parties have a license or other right to use any trademarks, logos, design, or other Intellectual Property (other than off-the-shelf software) owned by another person as in effect on the date hereof (collectively, together with such agreements or other arrangements as may be entered into by Loan Parties after the date hereof, collectively, the "License Agreements" and individually, a "License Agreement"). No trademark, service mark or copyright at any time used by Loan Parties which is owned by another person is affixed to any Eligible Inventory, except (a) to the extent permitted under the terms of the applicable License Agreement and (b) to the extent the sale of Inventory to which such trademark, service mark or copyright is affixed is permitted to be sold by Loan Parties under applicable law (including the United States Copyright Act of 1976).

8.12    Subsidiaries; Affiliates; Capitalization; Solvency.

(a)    As of the date hereof, Loan Parties do not have any direct or indirect Subsidiaries or Affiliates (other than any Sponsor Portfolio Company) and are not engaged in any joint venture or partnership except as set forth in Schedule 8.12 to the Information Certificate.

(b)    As of the date hereof, Loan Parties are the record and beneficial owner of all of the issued and outstanding shares of Equity Interests of each of the Subsidiaries listed on Schedule 8.12 to the Information Certificate as being owned by Loan Parties and there are no proxies, irrevocable or otherwise, with respect to such shares and no equity securities of any of the Subsidiaries are or may become required to be issued by reason of any options, warrants, rights to subscribe to, calls or commitments of any kind or nature and there are no contracts, commitments, understandings or arrangements by which any Subsidiary is or may become bound to issue additional shares of its Equity Interests or securities convertible into or exchangeable for such shares.

(c)    As of the date hereof, the issued and outstanding shares of Equity Interests of Loan Parties are directly and beneficially owned and held by the persons indicated in the Information Certificate, and in each case all of such shares have been duly authorized and are fully paid and non-assessable, free and clear of all claims, liens, pledges and encumbrances of any kind, except as disclosed in writing to the Administrative Agent prior to the date hereof.

(d)    Parent and its Subsidiaries (on a consolidated basis) are Solvent and will continue to be Solvent after the creation of the Obligations, the security interests of the Administrative Agent and the other transactions contemplated hereunder.

4241829.6

(e)    Guarantors do not have any material liabilities, are not engaged in any business or commercial activities (other than the operation of the distribution center for and on behalf of Borrowers), do not own any assets with a book value of more than $100,000 in the aggregate and are not obligated or liable, directly or indirectly, contingently or otherwise, in respect of any material Indebtedness or other material obligations; provided, that the Parent owns the Equity Interests of Intermediate Holdco, and Intermediate Holdco owns the Equity Interests of the Guarantors (other than the Parent).

8.13    Labor Disputes.

(a)    Set forth on Schedule 8.13 to the Information Certificate is a list (with dates of termination) of all collective bargaining or similar agreements between any Borrower and any union or labor organization in respect of the employees of any Borrower on the date hereof.

(b)    There is (i) no unfair labor practice complaint pending against any Loan Party or, to the Borrowers' knowledge, threatened against any Loan Party, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is pending against any Loan Party or, to Borrowers' knowledge, threatened against any Loan Party, and (ii) no strike, labor dispute, slowdown or stoppage is pending against any Loan Party or, to Borrowers' knowledge, threatened against any Loan Party which, with respect to either clause (i) above or this clause (ii), has or could reasonably be expected to have a Material Adverse Effect.

8.14    Restrictions on Subsidiaries. Except for restrictions contained in this Agreement or any other agreement with respect to Indebtedness of Loan Parties permitted hereunder as in effect on the date hereof, there are no contractual or consensual restrictions on Loan Parties or any of their Subsidiaries which prohibit or otherwise restrict (a) the transfer of cash or other assets (i) between a Loan Party and any of its Subsidiaries or (ii) between any Subsidiaries of Loan Parties or (b) the ability of Loan Parties or any of their Subsidiaries to incur Indebtedness or grant security interests to the Administrative Agent in the Collateral.

8.15    Material Contracts. Schedule 8.15 to the Information Certificate sets forth all Material Contracts to which Loan Parties are a party or are bound as of the date hereof. Borrowers have delivered true, correct and complete copies of such Material Contracts to the Administrative Agent on or before the date hereof. Loan Parties are not in breach or in default in any material respect of or under any Material Contract and have not received any notice of the intention of any other party thereto to terminate any Material Contract, except where such breach, default or termination has not had or could not reasonably be expected to have a Material Adverse Effect.

8.16    Payable Practices. Borrowers have not made any material change in the historical accounts payable practices from those in effect immediately prior to the date hereof.

8.17    OFAC. None of Loan Parties, any Subsidiary of Loan Parties or, to the knowledge of Loan Parties, any Affiliate of Loan Parties: (a) is a Sanctioned Person, (b) has more than ten percent (10%) of its assets in Sanctioned Entities, or (c) derives more than ten percent (10%) of

its operating income from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. The proceeds of any Loan will not be used and have not been used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity.

8.18    Credit Card Agreements. Set forth in Schedule 8.18 hereto is a correct and complete list of (a) all of the Credit Card Agreements and all other material agreements, documents and instruments existing as of the date hereof between or among Borrowers, the Credit Card Issuers, the Credit Card Processors and any of their affiliates, (b) the percentage of each sale payable to the Credit Card Issuer or Credit Card Processor under the terms of the Credit Card Agreements, (c) all other fees and charges payable by any Borrower or any Guarantor under or in connection with the Credit Card Agreements and (d) the term of such Credit Card Agreements. The Credit Card Agreements constitute all of such agreements necessary for Borrowers to operate their business as presently conducted with respect to credit cards and debit cards and no Accounts of Borrowers or Guarantors arise from purchases by customers of Inventory with credit cards or debit cards, other than those which are issued by Credit Card Issuers with whom Borrowers have entered into one of the Credit Card Agreements set forth on Schedule 8.18 hereto or with whom Borrowers have entered into a Credit Card Agreement in accordance with Section 9.11 hereof. Each of the Credit Card Agreements constitutes the legal, valid and binding obligations of Borrowers and, to the Borrowers' knowledge, the other parties thereto, enforceable in accordance with their respective terms and are in full force and effect. No material default or material event of default, or act, condition or event which after notice or passage of time or both, would constitute a material default or a material event of default under any of the Credit Card Agreements exists or has occurred and is continuing. Borrowers and the other parties thereto have complied with all of the material terms and conditions of the Credit Card Agreements to the extent necessary for Borrowers to be entitled to receive all payments thereunder. Borrowers have delivered, or caused to be delivered to the Administrative Agent, true, correct and complete copies of all of the Credit Card Agreements.

8.19    Interrelated Businesses. Borrowers and Guarantors make up a related organization of various entities constituting a single economic and business enterprise so that Borrowers and Guarantors share an identity of interests such that any benefit received by any one of them benefits the others. Borrowers and Guarantors render services to or for the benefit of the other Borrowers and/or Guarantors, as the case may be, purchase or sell and supply goods to or from or for the benefit of the others, make loans, advances and provide other financial accommodations to or for the benefit of the other Borrowers and Guarantors and provide administrative, marketing, payroll and management services to or for the benefit of the other Borrowers and Guarantors. Borrowers and Guarantors have the same chief executive office, certain centralized accounting and legal services, certain common officers and directors.

8.20    Accuracy and Completeness of Information. All information (other than any such information that the Administrative Agent, in its Permitted Discretion, does not consider to be material) furnished by or on behalf of any Loan Party in writing to the Administrative Agent in connection with this Agreement or any of the other Financing Agreements or any transaction contemplated hereby or thereby, including all information on the Information Certificate is true and correct in all material respects on the date as of which such information is dated or certified

112

and does not omit any material fact necessary in order to make such information not misleading in any material respect. Any financial projections delivered by Loan Parties hereunder have been prepared in good faith based on assumptions believed by management of the Loan Parties to be accurate and reasonable at the time made, it being recognized by the Administrative Agent that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results and that such differences may be material. No event or circumstance has occurred which has had or could reasonably be expected to have a Material Adverse Effect, which has not been fully and accurately disclosed to the Administrative Agent in writing prior to the date hereof.

8.21    <u>Survival of Warranties; Cumulative</u>. All representations and warranties contained in this Agreement or any of the other Financing Agreements shall survive the execution and delivery of this Agreement and shall be deemed to have been made again to the Administrative Agent on the date of each additional borrowing or other credit accommodation hereunder and shall be conclusively presumed to have been relied on by the Administrative Agent regardless of any investigation made or information possessed by the Administrative Agent. The representations and warranties set forth herein shall be cumulative and in addition to any other representations or warranties which Borrowers shall now or hereafter give, or cause to be given, to the Administrative Agent.

8.22    <u>Equity Contribution</u>.  Borrowers have received $20,000,000 of cash proceeds from the Equity Contribution.

8.23    <u>Second Lien Loan Documents</u>.  Borrowers have delivered, or caused to be delivered, to Administrative Agent correct and complete copies of the Second Lien Loan Agreement and the other material Second Lien Documents.  On the date hereof, the Second Lien Loan Agreement is in full force and effect and Borrowers have received gross proceeds of loans thereunder of not less than $10,000,000.

## SECTION 9.    <u>AFFIRMATIVE COVENANTS</u>

Until the Payment in Full (except with respect to any provision that expressly survives termination of this Agreement as set forth herein):

9.1    <u>Maintenance of Existence</u>.

(a)    Loan Parties and each of Loan Parties' Subsidiaries shall at all times preserve, renew and keep in full force and effect their corporate or limited liability company or limited partnership existence and rights and franchises with respect thereto and maintain in full force and effect all Permits necessary to carry on the business as presently or proposed to be conducted, other than as (i) permitted in <u>Section 10.1</u> hereof or (ii) otherwise permitted hereunder or under any of the other Financing Agreements.

(b)    A Loan Party shall not change its name unless each of the following conditions is satisfied: (i) the Administrative Agent shall have received not less than fifteen (15) days (or at such later time as the Administrative Agent may agree) prior written notice from such Loan Party of such proposed change in its name, which notice shall accurately set forth the new name; and (ii) the Administrative Agent shall have received a copy of the amendment to the

113

certificate of incorporation, certificate of formation or other organizational document of such Loan Party providing for the name change certified by the Secretary of State of the jurisdiction of incorporation or organization of Loan Party promptly when it is available.

(c)     A Loan Party shall not change its chief executive office or its mailing address or organizational identification number (or if it does not have one, shall not acquire one) unless the Administrative Agent shall have received not less than fifteen (15) days' prior written notice from such Loan Party of such proposed change, which notice shall set forth such information with respect thereto as the Administrative Agent may reasonably require and the Administrative Agent shall have received such agreements as the Administrative Agent may reasonably require in connection therewith. A Loan Party shall not change its type of organization, jurisdiction of organization or other legal structure, except that a Loan Party may convert (either directly or by way of merger) into a corporation or limited partnership or other form of legal entity reasonably acceptable to the Administrative Agent, provided, that, each of the following conditions is satisfied: (i) such corporation, partnership or other legal entity is organized under the laws of a jurisdiction in the United States of America, (ii) the Administrative Agent shall have received not less than fifteen (15) days' prior written notice from Borrowers of such proposed change, which notice shall accurately set forth a description of the new form, (iii) the Administrative Agent shall have received the organizational documents of such entity (certified by the appropriate Governmental Authority, where available to be so certified), together with such other agreements, documents, and instruments related thereto as the Administrative Agent may reasonably request, (iv) such change shall not adversely affect the security interests and liens of the Administrative Agent in the assets of such Loan Party or the ability of the Administrative Agent to enforce any of its rights or remedies with respect to such Loan Party, in the determination of the Administrative Agent and (v) as of the date of such conversion, and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing.

9.2     [Reserved].

9.3     Compliance with Laws, Regulations, Etc.

(a)     Loan Parties shall, and shall cause any Subsidiary to, at all times, comply in all respects with all laws, rules, regulations, licenses, approvals, orders and other Permits applicable to it and duly observe all requirements of any foreign, Federal, State or local Governmental Authority where the failure to do so has or could reasonably be expected to have a Material Adverse Effect.

(b)     Borrowers shall give written notice to the Administrative Agent promptly upon Loan Parties' receipt of any notice of, or Borrowers' otherwise obtaining knowledge of, (i) the occurrence of any event involving the release, spill or discharge, threatened or actual, of a material amount of any Hazardous Material that has or could reasonably be expected to have a Material Adverse Effect or (ii) any investigation, proceeding, complaint, order, directive, claims, citation or notice that with respect to any of the following that has or could reasonably be expected to have a Material Adverse Effect: (a) any non-compliance with or violation of any Environmental Law by Loan Parties or (b) the release, spill or discharge of any Hazardous Material by Loan Parties other than in the ordinary course of business and other than as

permitted under any applicable Environmental Law. Upon the request of the Administrative Agent, copies of all environmental surveys, audits, assessments, feasibility studies and results of remedial investigations in the possession or control of Loan Parties shall be promptly furnished, or caused to be furnished, by Loan Parties to the Administrative Agent upon the Administrative Agent's request. Borrowers shall take prompt action to respond to any material non-compliance with any of the Environmental Laws and shall regularly report to the Administrative Agent on such response.

(c)     Without limiting the generality of the foregoing, whenever the Administrative Agent reasonably determines that there is non-compliance, or any condition which requires any action by or on behalf of Loan Parties in order to avoid any non-compliance, with any Environmental Law that has or could reasonably be expected to have a Material Adverse Effect, Loan Parties shall, at the Administrative Agent's request and Loan Parties' expense, except to the extent prohibited by applicable law or regulation and, solely with respect to real property leased by Loan Parties as lessee, subject to Loan Parties having authority to do so: (i) cause an independent environmental engineer reasonably acceptable to the Administrative Agent to conduct such tests of the site where non-compliance or alleged non-compliance with such Environmental Laws has occurred as to such non-compliance and prepare and deliver to the Administrative Agent a report as to such non-compliance setting forth the results of such tests, a proposed plan for responding to any environmental problems described therein, and an estimate of the costs thereof and (ii) provide to the Administrative Agent a supplemental report of such engineer whenever the scope of such non-compliance, or Loan Parties' response thereto or the estimated costs thereof, shall change in any material respect.

(d)     Borrowers shall indemnify and hold harmless the Administrative Agent and its respective directors, officers, employees, lenders, invitees, representatives, successors and assigns, from and against any and all losses, claims, damages, liabilities, costs, and expenses (including reasonable and documented attorneys' fees and expenses) directly or indirectly arising out of or attributable to the use, generation, manufacture, reproduction, storage, release, threatened release, spill, discharge, disposal or presence of a Hazardous Material, including the costs of any required or necessary repair, cleanup or other remedial work with respect to any property of Loan Parties and the preparation and implementation of any closure, remedial or other required plans, except to the extent any such losses, claims, damages, liabilities, costs and expenses result from the gross negligence or willful misconduct of the Administrative Agent or any of its directors, officers, employees, lenders, invitees, representatives, successors or assigns as determined pursuant to a final, non-appealable order of a court of competent jurisdiction. All indemnifications in this Section 9.3 shall survive the payment of the Obligations and the termination of this Agreement.

9.4     Payment of Taxes and Claims. Loan Parties shall, and shall cause any Subsidiary to, duly pay and discharge all material taxes, assessments, contributions and governmental charges upon or against it or its properties or assets, except for taxes the validity of which is being contested in good faith by appropriate proceedings diligently pursued and available to Borrowers or such Subsidiary, as the case may be, and with respect to which adequate reserves have been set aside on its books to the extent required by GAAP.

9.5    Insurance. Loan Parties shall, and shall cause any Subsidiary to, at all times, maintain with financially sound and reputable insurers insurance with respect to the Collateral against loss or damage and all other insurance of the kinds and in the amounts customarily insured against or carried by corporations of established reputation engaged in the same or similar businesses and similarly situated and in a manner consistent with past practice. Said policies of insurance shall be reasonably satisfactory to the Administrative Agent as to form, amount and insurer. Borrowers shall furnish certificates, policies or endorsements to the Administrative Agent as the Administrative Agent shall reasonably require as proof of such insurance, and, the Administrative Agent is authorized, following notice to Borrowers, but not required, to obtain such insurance at the expense of Borrowers if Borrowers fail at any time to do so. All policies shall provide for at least thirty (30) days prior written notice to the Administrative Agent of any cancellation of coverage other than with respect to non-payment of premium (in which case, the policy shall provide for at least ten (10) days prior written notice to the Administrative Agent). Loan Parties shall promptly provide the Administrative Agent with written notice of any reduction of coverage in connection any of its insurance policies. The Administrative Agent may act as attorney for Loan Parties in obtaining, and at any time an Event of Default exists or has occurred and is continuing, adjusting, settling, amending and canceling such insurance. Loan Parties shall cause the Administrative Agent to be named as a loss payee as its interests may appear and an additional insured (but without any liability for any premiums) under such insurance policies and Loan Parties shall obtain non-contributory lender's loss payable endorsements to all insurance policies in form and substance reasonably satisfactory to the Administrative Agent. Such lender's loss payable endorsements shall specify that the proceeds of such insurance shall be payable to the Administrative Agent as its interests may appear and further specify that the Administrative Agent shall be paid regardless of any act or omission by Loan Parties or any of their respective Affiliates. Without limiting any other rights of the Administrative Agent, any insurance proceeds received by the Administrative Agent or proceeds of condemnation awards payable at any time may be applied to payment of the Obligations (without permanent reduction thereof), whether or not then due, in any order and in such manner as the Administrative Agent may determine. Upon application of such proceeds to the Revolving Loans, Revolving Loans may be available subject and pursuant to the terms hereof to be used for the costs of repair or replacement of the Collateral lost or damages resulting in the payment of such insurance proceeds.

9.6    Financial Statements and Other Information.

(a)    Loan Parties shall keep proper books and records in which true and complete entries shall be made of all dealings or transactions of or in relation to the Collateral and the business of the Parent and its Subsidiaries in accordance with GAAP.  Loan Parties shall furnish to the Administrative Agent all such financial and other information as the Administrative Agent shall reasonably request relating to the Collateral and the assets, business and operations of the Parent and its Subsidiaries, and Loan Parties shall notify the auditors and accountants of Loan Parties that the Administrative Agent is authorized to obtain such information directly from them (other than materials protected by the attorney-client or accountant-client privileges and materials which the Borrowers may not disclose without violation of a confidentiality obligation binding upon it) at any reasonable time. Without limiting the foregoing, Loan Parties shall furnish or cause to be furnished to the Administrative Agent the following:

4241829.6

(i)        as soon as available, but in any event within thirty (30) days after the end of each fiscal month, (a) monthly unaudited consolidated financial statements and unaudited consolidating financial statements (including in each case balance sheets, statements of income and loss, and statements of cash flow) of Intermediate Holdco and its Subsidiaries all in reasonable detail (but without footnotes), and (b) a monthly statement of income and loss for each retail store (excluding overhead allocations), in each case, which fairly present in all material respects the financial position and the results of the operations of Intermediate Holdco and its Subsidiaries as of the end of and through such fiscal month, subject to normal year-end adjustments; and

(ii)       within ninety (90) days after the end of each fiscal year, audited consolidated financial statements of Intermediate Holdco and its Subsidiaries (including in each case a balance sheet, a statement of income and loss and a statement of cash flow prepared on a consolidated basis, with appropriate footnote disclosure related to its primary Subsidiaries, Bob's, EMS and Sport Chalet), and the accompanying notes thereto, all in reasonable detail, fairly presenting in all material respects the financial position and the results of the operations of Intermediate Holdco and its Subsidiaries prepared on a consolidated basis as of the end of and for such fiscal year.

(b)       Loan Parties shall promptly notify the Administrative Agent in writing of the details of (i) any loss, damage, investigation, action, suit, proceeding or claim relating to Collateral having a value of more than $600,000 or which if adversely determined could reasonably be expected to have a Material Adverse Effect, (ii) any Material Contract being terminated or amended or any new Material Contract entered into (in which event Loan Parties shall provide the Administrative Agent with a copy of such Material Contract), (iii) any order, judgment or decree in excess of $600,000 shall have been entered against Loan Parties any of their properties or assets, (iv) any notification of a material violation of laws or regulations received by Loan Parties, (v) any ERISA Event, and (vi) the occurrence of any Default or Event of Default.

(c)       Loan Parties shall furnish to the Administrative Agent not less than ten (10) Business Days' prior written notice of (a) the intention of any Subsidiaries of Loan Parties to merge or consolidate as permitted under Section 10.1(a) hereof, together with such other information with respect thereto as the Administrative Agent may reasonably request, (b) the issuance and sale by Loan Parties or any Subsidiary of Equity Interests as permitted under clause (e) of the definition of Permitted Dispositions, together with such other information with respect thereto as the Administrative Agent may reasonably request, (c) the intention of any Subsidiary of Loan Parties to wind up, liquidate or dissolve as permitted under Section 10.1(c) hereof, together with such other information with respect thereto as the Administrative Agent may reasonably request.

(d)       Loan Parties shall furnish to the Administrative Agent, in form and detail reasonably satisfactory to the Administrative Agent:

(i)        concurrently with the delivery of the financial statements referred to in Section 9.6(a)(ii), the unqualified opinion (other than solely with respect to, or resulting from the occurrence of, an upcoming maturity date of the Credit Facility or any other material

4241829.6

Indebtedness within one year) of independent certified public accountants with respect to the audited consolidated financial statements, which independent accounting firm shall be a "big four" accounting firm or otherwise reasonably acceptable to the Administrative Agent, that such audited consolidated financial statements have been prepared in accordance with GAAP, and present fairly in all material respects the results of operations and financial condition of the Intermediate Holdco and its Subsidiaries as of the end of and for the fiscal year then ended and stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default insofar as they relate to accounting matters, or if any such Default or Event of Default shall exist, stating the nature and status of such event;

(ii)     concurrently with the delivery of the financial statements referred to in Sections 9.6(a)(i) and (ii), a compliance certificate substantially in the form of Exhibit D hereto by the chief or senior financial officer, vice president of finance, treasurer or controller of Intermediate Holdco, along with a schedule in form reasonably satisfactory to the Administrative Agent of the calculations used in determining, as of the end of such month, amounts provided for in Section 11 of this Agreement for such month (whether or not compliance is then required) and a written summary of material changes (if any) in either GAAP or in the consistent application thereof that materially affected the financial covenant calculations for the applicable period;

(iii)     at such time as available, but in any event on or before the thirtieth day of each fiscal year of Loan Parties, projected consolidated financial statements (including in each case substantially in the same format and with the same scope of information as in the projections most recently provided to the Administrative Agent prior to the date hereof) of the Intermediate Holdco and its Subsidiaries on a consolidated basis for the then current year, all in reasonable detail, and otherwise in form and substance reasonably satisfactory to the Administrative Agent, together with such supporting information as the Administrative Agent may reasonably request, which projected financial statements shall be prepared on a monthly basis for such current year and shall represent the reasonable best estimate by Intermediate Holdco of the future financial performance of Intermediate Holdco and its Subsidiaries on a consolidated basis for the periods set forth therein and shall have been prepared on the basis of the assumptions set forth therein which Intermediate Holdco believes is fair and reasonable as of the date of preparation in light of current and reasonably foreseeable business conditions at such time (it being understood that actual results may differ from those set forth in such projected financial statements and such results may be material);

(iv)     promptly after the same are available, copies of each annual report, proxy or annual or quarterly financial statement or other report or communication, if any, sent to the equity holders of any Borrower or any Guarantor which are of a type and nature typically sent to shareholders of a public company;

(v)     promptly after any request by the Administrative Agent, copies of any detailed final audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Borrower or any Guarantor by independent accountants in connection with the accounts or books of any Borrower or any Guarantor, or any audit of any of them;

(vi)    promptly, and in any event within five (5) Business Days after receipt thereof by any Borrower or any Guarantor or any Subsidiary thereof, copies of each notice or other correspondence received from the Securities and Exchange Commission (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of the Parent or any Subsidiary thereof;

(vii)    concurrently with the delivery of the financial statements referred to in <u>Section 9.6(a)(ii)</u>, a certificate by the chief executive officer, chief financial officer, vice president of finance, treasurer or controller of the Parent attaching the insurance binder or other evidence of insurance for any insurance coverage of the Parent or any Subsidiary that was renewed, replaced or materially modified during the period covered by such financial statements.

(e)    Loan Parties shall furnish or cause to be furnished to the Administrative Agent such other information respecting the Collateral and the business of Borrowers and Guarantors, as the Administrative Agent may, from time to time, reasonably request. Any documents, schedules, invoices or other papers delivered to the Administrative Agent may be destroyed or otherwise disposed of by the Administrative Agent one (1) year after the same are delivered to the Administrative Agent, except as otherwise designated by Loan Parties to the Administrative Agent in writing.

9.7    <u>Compliance with ERISA</u>. Borrowers shall, and shall cause each of their Subsidiaries to: (a) maintain each Plan in compliance with the applicable provisions of ERISA, the Code and other Federal and State law; (b) cause each Plan which is qualified under Section 401(a) of the Code to maintain such qualification; (c) not terminate any Pension Plan so as to incur any liability in excess of $3,000,000 to the Pension Benefit Guaranty Corporation; (d) not allow or suffer to exist any prohibited transaction involving any Plan or any trust created thereunder which would subject such Borrower, such Guarantor or such Subsidiary to a tax or other liability in excess of 3,000,000 on prohibited transactions imposed under Section 4975 of the Code or ERISA; (e) make all required contributions to any Plan which it is obligated to pay under Section 302 of ERISA, Section 412 of the Code or the terms of such Plan; (f) not allow or suffer to exist any accumulated funding deficiency, whether or not waived, with respect to any such Pension Plan; (g) not engage in a transaction that could be subject to Section 4069 or 4212(c) of ERISA; or (h) not allow or suffer to exist any occurrence of a reportable event or any other event or condition which presents a risk of termination by the Pension Benefit Guaranty Corporation of any Plan that is a single employer plan, which termination could result in any liability in excess of $3,000,000 to the Pension Benefit Guaranty Corporation.

9.8    <u>License Agreements</u>.

(a)    With respect to a material License Agreement applicable to Intellectual Property that is owned by a third party and licensed to Loan Parties and that is affixed to or otherwise necessary for the manufacture, sale or distribution of any Inventory or the collection of Receivables (other than generally available off-the-shelf computer software products), each Loan Party shall (i) give the Administrative Agent prompt prior written notice of its intention to not renew or to terminate, cancel, surrender or release its rights under any such License Agreement, or any amendment of any such License Agreement that limits the scope of the rights of such

119

Loan Party to use the Intellectual Property subject to such License Agreement in any material respect, either with respect to product, territory, term or otherwise, or that increases in any material respect the amounts to be paid by a Loan Party thereunder or in connection therewith (and the Administrative Agent may establish such Reserves as a result of any of the foregoing as the Administrative Agent may determine), (ii) give the Administrative Agent prompt written notice of any such License Agreement entered into by Loan parties after the date hereof, or any material amendment to any such License Agreement existing on the date hereof, in each case together with a true, correct and complete copy thereof and such other information with respect thereto as the Administrative Agent may in good faith request, (iii) to the knowledge of any Loan Party, give the Administrative Agent prompt written notice of any material breach of any obligation, or any default, by the third party that is the licensor or by any Loan Party that is the licensee or any other party under any such License Agreement, and deliver to the Administrative Agent (promptly upon the receipt thereof by Loan Parties in the case of a notice to Loan Parties and concurrently with the sending thereof in the case of a notice from Loan Parties) a copy of each notice of default and any other notice received or delivered by Loan Parties connection with any such License Agreement that relates to the scope of the right, or the continuation of the right, of Loan Parties to use the Intellectual Property subject to such License Agreement or the amounts required to be paid thereunder.

(b)       With respect to a material License Agreement applicable to Intellectual Property that is owned by a third party and licensed to a Loan Party and that is affixed to or otherwise necessary for the manufacture, sale or distribution of any Inventory or the collection of Receivables (other than an off-the-shelf product with a shrink wrap license or that is generally available), at any time an Event of Default shall exist or have occurred and be continuing, the Administrative Agent shall have, and is hereby granted, the irrevocable right and authority, at its option, to renew or extend the term of such License Agreement, whether in its own name and behalf, or in the name and behalf of a designee or nominee of the Administrative Agent or in the name and behalf of a Loan Party, subject to and in accordance with the terms of such License Agreement. The Administrative Agent may, but shall not be required to, perform any or all of such obligations of Loan Parties any of the License Agreements, including, but not limited to, the payment of any or all sums due from such Loan Party thereunder. Any sums so paid by the Administrative Agent shall constitute part of the Obligations.

9.9     Additional Guaranties and Collateral Security; Further Assurances.

(a)       In the case of the formation or acquisition by any Borrower or any Guarantor of any Subsidiary after the date hereof, as to any such Subsidiary, (i) Loan Parties shall cause any such Subsidiary to execute and deliver to the Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent, a joinder agreement to the Financing Agreements in order to make such Subsidiary a party to this Agreement as a "Borrower" if it owns accounts or inventory that would constitute Eligible Credit Card Receivables, Eligible Accounts or Eligible Inventory or otherwise as a "Guarantor", and a party to any guarantee as a "Guarantor" or pledge agreement as a "Pledgor", and including, but not limited to, supplements and amendments hereto and to any of the other Financing Agreements, authorization to file UCC financing statements, Collateral Access Agreements, other agreements, documents or instruments contemplated under Section 5.3 and other consents, waivers, acknowledgments and other agreements from third persons which the Administrative Agent may

120

deem reasonably necessary or desirable in order to permit, protect and perfect its security interests in and liens upon the assets of such Subsidiary and the Equity Interests of such Borrower or such Guarantor in such Subsidiary, corporate resolutions and other organization and authorizing documents of such Person, and favorable opinions of counsel to such person and (ii) such Loan Party shall, execute and deliver to the Administrative Agent, a pledge and security agreement, in form and substance reasonably satisfactory to the Administrative Agent, granting to the Administrative Agent a first pledge of and lien on all of the issued and outstanding shares of Equity Interests of any such Subsidiary, and otherwise comply with the terms of <u>Section 5.3</u> hereof with respect thereto, such other agreements, documents and instruments as the Administrative Agent may reasonably require in connection with the documents referred to above, including, but not limited to, supplements and amendments hereto, corporate resolutions and other organization and authorizing documents and favorable opinions of counsel to such person.

        (b)     At the request of the Administrative Agent at any time and from time to time, Loan Parties shall, at their expense, duly execute and deliver, or cause to be duly executed and delivered, such further agreements, documents and instruments, and do or cause to be done such further acts as may be necessary or proper to evidence, perfect, maintain and enforce the security interests and the priority thereof in the Collateral and to otherwise effectuate the provisions or purposes of this Agreement or any of the other Financing Agreements. The Administrative Agent may at any time and from time to time request a certificate from an officer of any Borrower representing that all conditions precedent to the making of Revolving Loans and providing Letters of Credit contained herein are satisfied. In the event of such request by the Administrative Agent, the Administrative Agent may, at the Administrative Agent's option, cease to make any further Revolving Loans or provide any further Letters of Credit until the Administrative Agent has received such certificate and, in addition, the Administrative Agent has determined that such conditions are satisfied.

        9.10    <u>Costs and Expenses</u>. Borrowers shall pay to the Administrative Agent on demand all reasonable and documented costs, expenses, filing fees and taxes paid or payable in connection with the preparation, negotiation, execution, delivery, recording, syndication, administration, collection, liquidation, enforcement and defense of the Obligations, the Administrative Agent's rights in the Collateral, this Agreement, the other Financing Agreements and all other documents related hereto or thereto, including any amendments, supplements or consents which may hereafter be contemplated (whether or not executed) or entered into in respect hereof and thereof, including: (a) all costs and expenses of filing or recording (including UCC financing statement filing taxes and fees, documentary taxes, intangibles taxes and mortgage recording taxes and fees, if applicable); (b) costs and expenses and fees for insurance premiums, environmental audits, title insurance premiums, surveys, assessments, engineering reports and inspections, appraisal fees and search fees, background checks, costs and expenses of remitting loan proceeds, collecting checks and other items of payment, and establishing and maintaining the Blocked Accounts and/or Store Accounts, together with the Administrative Agent's customary charges and fees with respect thereto; (c) customary charges, fees or expenses in connection with any Letter of Credit; (d) actual costs and expenses of preserving and protecting the Collateral; (e) actual costs and expenses paid or incurred in connection with obtaining payment of the Obligations, enforcing the security interests and liens of the Administrative Agent in the Collateral, selling or otherwise realizing upon the Collateral, and

otherwise enforcing the provisions of this Agreement and the other Financing Agreements or defending any claims made or threatened against the Administrative Agent arising out of the transactions contemplated hereby and thereby (including preparations for and consultations concerning any such matters); (f) all reasonably and documented out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by the Administrative Agent during the course of periodic field examinations of the Collateral and Borrowers' operations, plus a per diem charge at the Administrative Agent's then standard rate for the Administrative Agent's examiners in the field and office (subject to the limitations with respect thereto set forth in <u>Section 7.7</u> hereto); and (g) the reasonable and documented fees and disbursements of counsel (including legal assistants) to the Administrative Agent in connection with any of the foregoing.

9.11    <u>Credit Card Agreements</u>. Borrowers shall (a) observe and perform all material terms, covenants, conditions and provisions of the Credit Card Agreements to be observed and performed by Borrowers at the times set forth therein; (b) not do, permit, suffer or refrain from doing anything, as a result of which there could be a material default under or material breach of any of the terms of any of the Credit Card Agreements and (c) at all times maintain in full force and effect the Credit Card Agreements and not terminate, cancel, surrender, modify, amend, waive or release any of the Credit Card Agreements, or consent to or permit to occur any of the foregoing; except, that, (i) Borrowers may terminate or cancel any of the Credit Card Agreements in the ordinary course of the business of Borrowers; <u>provided</u>, that, Borrowers shall give the Administrative Agent not less than thirty (30) days prior written notice of Borrowers' intention to so terminate or cancel any of the Credit Card Agreements; (d) not enter into any new Credit Card Agreements with any new Credit Card Issuer or Credit Card Processor unless (i) the Administrative Agent shall have received not less than fifteen (15) days prior written notice of the intention of Borrowers to enter into such agreement (together with such other information with respect thereto as the Administrative Agent may reasonably request) and (ii) Borrowers deliver, or cause to be delivered to the Administrative Agent, a Credit Card Acknowledgment in favor of the Administrative Agent duly authorized, executed and delivered by the new Credit Card Issuer or Credit Card Processor; (e) give the Administrative Agent prompt written notice of any Credit Card Agreement entered into by Borrowers after the date hereof, together with a true, correct and complete copy thereof and such other information with respect thereto as the Administrative Agent may request; and (f) furnish to the Administrative Agent, promptly upon the request of the Administrative Agent, such information and evidence as the Administrative Agent may reasonably require from time to time concerning the observance, performance and compliance by Borrowers or the other party or parties thereto with the terms, covenants or provisions of the Credit Card Agreements.

**SECTION 10.    <u>NEGATIVE COVENANTS</u>**

Until Payment in Full (except with respect to any provision that expressly survives termination of this Agreement as set forth herein):

10.1    <u>Sale of Assets, Consolidation, Merger, Dissolution, Etc.</u> Each Loan Party shall not, and shall not permit any Subsidiary to, directly or indirectly,

(a)    merge into or with or consolidate with any other Person or permit any other Person to merge into or with or consolidate with it except that any Borrower may merge

with any Guarantor (other than the Parent) pursuant to a merger in respect of which such Borrower is the surviving entity and any wholly-owned Subsidiary of Borrowers may merge with and into or consolidate with any other wholly-owned Subsidiary of Borrowers; provided, that, in each case each of the following conditions is satisfied: (i) as of the effective date of the merger or consolidation and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing, (ii) the Administrative Agent shall have received, true, correct and complete copies of all agreements, documents and instruments relating to such merger or consolidation, including, but not limited to, the certificate or certificates of merger to be filed with each appropriate Secretary of State (with a copy as filed promptly after such filing), and (iii) the surviving entity shall expressly assume, ratify and assume the Obligations and the Financing Agreements to which it is a party in writing, in form and substance reasonably satisfactory to the Administrative Agent, and Borrowers shall execute and deliver such other agreements, documents and instruments as the Administrative Agent may reasonably request in connection therewith;

    (b)  sell, issue, assign, lease, license, transfer, abandon or otherwise dispose of any Equity Interests or any of its assets to any other Person, except for Permitted Dispositions; provided, that, to the extent that any Collateral is sold as permitted by this Section 10.1(b), other than to any Borrower or any Guarantor, or to the extent that the Administrative Agent may consent to any other sale of any assets, concurrently with, and subject to the satisfaction of the conditions to such sale (including the receipt of the Net Cash Proceeds related thereto), upon the written request of Borrowers and effective upon the transfer of the title of the assets sold and the satisfaction of the applicable conditions to such Permitted Disposition, the Administrative Agent shall, at Borrowers' expense, cause to be filed a UCC financing statement amendment providing for the release by the Administrative Agent of the assets so sold from its security interest granted hereunder; or

    (c)  suspend operations, wind up, liquidate or dissolve except that any Subsidiary of any Borrower or any Guarantor (other than the Parent) may wind up, liquidate and dissolve; provided, that, each of the following conditions is satisfied, (i) the winding up, liquidation and dissolution of such Subsidiary or Guarantor, as the case may be, shall not violate any law or any order or decree of any court or other Governmental Authority in any material respect and shall not conflict with or result in the breach of, or constitute a default under, any indenture, mortgage, deed of trust, or any other agreement or instrument to which any Borrower or any Guarantor is a party or may be bound, (ii) such winding up, liquidation or dissolution shall be done in accordance with the requirements of all applicable laws and regulations, (iii) effective upon such winding up, liquidation or dissolution, all of the assets and properties of such Subsidiary or Guarantor, as the case may be, shall be duly and validly transferred and assigned to its shareholders or to Borrowers, free and clear of any liens, restrictions or encumbrances other than the security interest and liens of the Administrative Agent or as are otherwise permitted hereunder (and the Administrative Agent shall have received such evidence thereof as the Administrative Agent may reasonably require) and the Administrative Agent shall have received such deeds, assignments or other agreements as the Administrative Agent may request to evidence and confirm the transfer of such assets, (iv) the Administrative Agent shall have received all documents and agreements that any Borrower or any Guarantor has filed with any Governmental Authority or as are otherwise required to effectuate such winding up, liquidation or dissolution, (v) Borrowers and Guarantors shall not assume any Indebtedness,

obligations or liabilities as a result of such winding up, liquidation or dissolution, or otherwise become liable in respect of any obligations or liabilities of the entity that is winding up, liquidating or dissolving, unless such Indebtedness is otherwise expressly permitted hereunder, and (vi) as of the date of such winding up, liquidation or dissolution and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing.

10.2    Encumbrances. Each Loan Party shall not, and shall not permit any Subsidiary to, create, incur, assume or suffer to exist any security interest, mortgage, pledge, lien, charge or other encumbrance of any nature whatsoever on any of its assets or properties, including the Collateral, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any security interest or lien with respect to any such assets or properties, except Permitted Liens.

10.3    Indebtedness. Each Loan Party shall not, and shall not permit any Subsidiary to, incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), the Indebtedness, performance, obligations or dividends of any other Person, except:

(a)    the Obligations (excluding Obligations under Hedge Agreements permitted pursuant to Section 10.3(c) below);

(b)    Indebtedness (including obligations under Capital Leases) arising after the date hereof to the extent secured by security interests in Equipment acquired after the date hereof; provided, that, (i) the aggregate outstanding principal amount of such Indebtedness shall not exceed $10,000,000 at any time outstanding, (ii) such security interests do not apply to any property of Borrowers or such Guarantor or Subsidiary other than specific items of Equipment, (iii) the Indebtedness secured thereby does not exceed the cost of the applicable Equipment and (iv) as of the date any such Indebtedness is incurred and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing;

(c)    Indebtedness of any Borrower or any Guarantor entered into in the ordinary course of business pursuant to a Hedge Agreement; provided, that, (i) such arrangements are not for speculative purposes and (ii) such Indebtedness shall be unsecured, except to the extent such Indebtedness constitutes part of the Obligations arising under or pursuant to Hedge Agreements with any Bank Product Provider that are secured under the terms hereof;

(d)    Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts and Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; provided, that, such Indebtedness is extinguished within five (5) Business Days of incurrence;

(e)    Guaranty Obligations in respect of Indebtedness of Guarantors, Borrowers or Borrowers' Subsidiaries to the extent that such Indebtedness is otherwise permitted pursuant to this Section 10.3;

(f)     Indebtedness consisting of insurance premium financings in an aggregate principal amount not to exceed $4,000,000 at any time;

(g)     Indebtedness of Guarantors or Borrowers arising after the date hereof issued in exchange for, or the proceeds of which are used to extend, refinance, replace or substitute for Indebtedness permitted under this Section 10.3 hereof (the "Refinancing Indebtedness"); provided, that, as to any such Refinancing Indebtedness, each of the following conditions is satisfied: (i) the Administrative Agent shall have received not less than ten (10) Business Days' prior written notice of the intention to incur such Indebtedness, which notice shall set forth in reasonable detail satisfactory to the Administrative Agent, the amount of such Indebtedness, the schedule of repayments and maturity date with respect thereto and such other information with respect thereto as the Administrative Agent may reasonably request, (ii) promptly upon the Administrative Agent's request, the Administrative Agent shall have received true, correct and complete copies of all agreements, documents and instruments evidencing or otherwise related to such Indebtedness, as duly authorized, executed and delivered by the parties thereto, (iii) the Refinancing Indebtedness shall have a Weighted Average Life to Maturity and a final maturity equal to or greater than the Weighted Average Life to Maturity and the final maturity, respectively, of the Indebtedness being extended, refinanced, replaced, or substituted for, (iv) the Refinancing Indebtedness shall rank in right of payment no more senior than, and be at least as subordinated (if subordinated) to, the Obligations as the Indebtedness being extended, refinanced, replaced or substituted for, (v) the Refinancing Indebtedness shall not include terms and conditions with respect to Guarantors or Borrowers which are more burdensome or restrictive in any material respect than those included in the Indebtedness so extended, refinanced, replaced or substituted for, taken as a whole, (vi) as of the date of incurring such Indebtedness and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing, (vii) the principal amount of such Refinancing Indebtedness shall not exceed the principal amount of the Indebtedness so extended, refinanced, replaced or substituted for (plus the lesser of (a) the stated amount of any premium or other payment required to be paid in connection with such refinancing pursuant to the terms of the Indebtedness being refinanced and (b) the amount of premium or other payment actually paid at such time to refinance the Indebtedness, plus, in either case, the amount of reasonable fees and expenses of Guarantors and Borrowers incurred in connection with such refinancing), (viii) the Refinancing Indebtedness (if secured) shall be secured by substantially the same assets, provided, that, such security interests (if any) with respect to the Refinancing Indebtedness shall have a priority no more senior than, and be at least as subordinated, if subordinated (on terms and conditions substantially similar to the subordination provisions applicable to the Indebtedness so extended, refinanced, replaced or substituted for or as is otherwise acceptable to the Administrative Agent) as the security interest with respect to the Indebtedness so extended, refinanced, replaced or substituted for, and (ix) Borrowers and Guarantors may only make payments of principal, interest and fees, if any, in respect of such Indebtedness to the extent such payments would have been permitted hereunder in respect of the Indebtedness so extended, refinanced, replaced or substituted for;

(h)     Indebtedness of Borrowers and Guarantors evidenced by or arising under the Subordinated Loan Documents; provided, that, each of the following conditions is satisfied: (i) the Administrative Agent shall have received the Subordination Agreement, duly authorized, executed and delivered by the parties thereto, (ii) Borrowers and Guarantors shall not, directly or

125

indirectly, amend, modify, alter or change the terms of such Indebtedness or any of the Subordinated Loan Documents except as permitted by the Subordination Agreement and (iii) the aggregate amount of such Indebtedness shall not exceed $40,000,000 (plus (i) the amount of any additional Indebtedness received in connection with the payment in kind of interest on Indebtedness under the Subordinated Loan Documents, (ii) any commitment fees due and payable under the Subordinated Loan Agreement that are capitalized and added to the unpaid principal amount of such Indebtedness outstanding pursuant to Section 3.2 of the Subordinated Loan Agreement and (iii) any amounts otherwise due and payable pursuant to Section 15.1(c) of the Subordinated Loan Agreement (which may be paid in kind and capitalized and added to the unpaid principal amount of such Indebtedness then outstanding));[22]

(i)     Indebtedness of any Loan Party to any other Loan Party arising on or after the date hereof pursuant to Permitted Investments consisting of loans and advances to such Loan Party; provided, that, (i) as to any such Indebtedness at any time owing by Borrowers to a Guarantor, the Indebtedness arising pursuant to such Investment shall be Subordinated Debt, and promptly upon the Administrative Agent's request, the Administrative Agent shall have received a subordination agreement, in form and substance reasonably satisfactory to the Administrative Agent, providing for the terms of the subordination in right of payment of such Indebtedness of Borrowers to the prior Payment in Full, duly authorized, executed and delivered by such Guarantor and Borrowers, (ii) Borrowers shall not, directly or indirectly make, or be required to make, any payments in respect of such Indebtedness except subject to the terms of subordination applicable thereto, (iii) the Indebtedness arising pursuant to any such loan shall not be evidenced by a promissory note or other instrument, unless the single original of such note or other instrument is promptly delivered to the Administrative Agent upon its request to hold as part of the Collateral, with such endorsement and/or assignment by the payee of such note or other instrument as the Administrative Agent may require, and (iv) except as the Administrative Agent may otherwise agree, as of the date any such Indebtedness is incurred and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing;

(j)     Indebtedness of Borrowers or any Guarantor arising after the date hereof to any Person that is not an Affiliate of Borrowers or such Guarantor secured by a lien on Borrowers' or such Guarantor's leasehold interest in Real Property owned by Borrowers or such Guarantor as of the date hereof and proceeds thereof; provided, that, each of the following conditions is satisfied: (i) the Administrative Agent shall have received not less than ten (10) Business Days prior written notice of the intention of Borrowers or such Guarantor to incur such Indebtedness, which notice shall set forth in reasonable detail the amount of such Indebtedness, the schedule of repayments and maturity date with respect thereto and such other information as the Administrative Agent may reasonably request, (ii) the aggregate outstanding principal amount of such Indebtedness shall not exceed $10,000,000 at any time, (iii) such Indebtedness shall have a Weighted Average Life to Maturity and a final maturity equal to or greater than Indebtedness having a one hundred twenty (120) month straight line amortization with a final maturity at the end of one hundred twenty (120) months, (iv) except as the Administrative Agent may otherwise agree, the Administrative Agent shall have received a Collateral Access Agreement with respect to such Real Property, duly executed and delivered by the mortgagee which has a lien on any such Real Property (v) the Administrative Agent shall have received

---

[22] Amendment Nos. 2, 3, 4, 5

true, correct and complete copies of all material agreements, documents and instruments evidencing or otherwise related to such Indebtedness, and (vi) as of the date of incurring such Indebtedness and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing;

(k)    Indebtedness arising after the date hereof to the extent secured by mortgages on Real Property acquired after the date hereof; provided, that (i) such mortgages do not apply to any property of Borrowers or such Guarantor or Subsidiary other than specific items of Real Property; (ii) the Indebtedness secured thereby does not exceed the cost of the applicable Real Property; and (iii) as of the date any such Indebtedness is incurred and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing;

(l)    Indebtedness to the extent incurred pursuant to the Energy Savings Program; provided, that, (i) the aggregate outstanding principal amount of such Indebtedness shall not exceed $4,000,000 at any time outstanding less the aggregate amount of all repayments, repurchases or redemptions thereof, (ii) such Indebtedness shall be unsecured, (iii) the original principal amount of such Indebtedness does not exceed the cost of the goods acquired and the services obtained pursuant to the Energy Savings Program, (iv) Borrowers and Guarantors shall not be required to make, and shall not make, any payments in respect of such Indebtedness, except for regularly scheduled payments of principal, (v) the Administrative Agent shall have received true, correct and complete copies of all material agreements, documents and instruments evidencing or otherwise related to such Indebtedness, which shall be in form and substance reasonably satisfactory to the Administrative Agent and (vi) as of the date of incurring such Indebtedness and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing;

(m)    other unsecured indebtedness in an aggregate outstanding principal amount not to exceed $5,000,000 at any time;

(n)    Indebtedness set forth on Schedule 10.3 to the Information Certificate which is not otherwise permitted by the other clauses of this Section 10.3; and

(o)    Indebtedness of Borrowers and Guarantors evidenced by or arising under the Second Lien Documents (as in effect on the date hereof or as permitted to be amended or refinanced pursuant to the Intercreditor Agreement), provided, that, each of the following conditions is satisfied: (i) the aggregate outstanding principal amount of such Indebtedness does not to exceed $11,000,000 at any time, (ii) Borrowers and Guarantors shall not, directly or indirectly, amend, modify, alter or change the terms of such Indebtedness or any of the Second Lien Documents except as permitted by the Intercreditor Agreement, and (iii) Borrowers and Guarantors shall not optionally prepay, redeem, defease, purchase or otherwise acquire any Indebtedness under the Second Lien Documents except (A) in connection with the refinancing of such Indebtedness as permitted by the Intercreditor Agreement or (B) Borrowers and Guarantors may optionally prepay, redeem, defease, purchase or otherwise acquire such Indebtedness (x) if such prepayment, redemption, defeasance, purchase or acquisition of such Indebtedness is promptly (and in any event within two Business Days after the receipt by Parent of such cash equity proceeds) made with the proceeds of a cash equity contribution or contributions by Sponsor to Parent (other than the Equity Contribution or any Specified Equity Contribution), the

127

cash proceeds of which have been contributed by Parent to Borrowers or (y) if the Adjusted Payment Conditions are satisfied.

10.4    <u>Investments</u>. The Loan Parties shall not, nor shall they permit any of their Subsidiaries to, directly or indirectly, purchase, hold or acquire (including pursuant to any merger with any Person that was not a Wholly-Owned Subsidiary immediately prior to such merger) any Equity Interests, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, or make or permit to exist any capital contribution or other investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit or all or a substantial part of the assets or property of any other Person (whether through purchase of assets, merger or otherwise), or form or acquire any Subsidiaries, or agree to do any of the foregoing (each of the foregoing an "<u>Investment</u>"), except for Permitted Investments.

10.5    <u>Restricted Payments</u>.  The Loan Parties shall not, nor shall they permit any of their Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except:

(a)    Borrowers, Guarantors, and each Subsidiary, may declare and make dividend payments or other distributions payable solely in the Equity Interests of such Person;

(b)    any Subsidiary of Borrowers may pay dividends or other distributions to a Borrower;

(c)    (i) Borrowers may pay (A) management fees in an aggregate amount not to exceed $2,000,000 each fiscal year to the Manager pursuant to the Versa Management Agreement (as in effect on the date hereof), and (B) reasonable out-of-pocket expenses and indemnification amounts payable to the Manager pursuant to the Versa Management Agreement (as in effect on the date hereof); (ii) EMS may pay (A) management fees in an aggregate amount not to exceed $100,000 each fiscal year to EMS OpCo pursuant to the EMS Management Agreement and (B) reasonable out-of-pocket expenses and indemnification amounts payable to EMS OpCo pursuant to the EMS Management Agreement; and (iii) any Borrower or Subsidiary of a Borrower may pay reasonable fees and expenses to Vestis IP Holdings pursuant to any agreements and other arrangements for the use of Intellectual Property in effect from time to time; <u>provided</u>, <u>that</u>, as of the date of any payment of such amounts under <u>clauses (i)(A)</u>, <u>(ii)(A)</u> and <u>(iii)</u> and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing;

(d)    From and after August 19, 2015, each Loan Party may make Restricted Payments <u>provided</u> that the Payment Conditions are satisfied; and

(e)    EMS, Bob's and Sport Chalet may pay or make distributions to Intermediate Holdco, which Intermediate Holdco may subsequently distribute to the Parent, in each case if such distributions are used to make substantially contemporaneous payments of any of the following:

4241829.6

(i) to pay out-of-pocket expenses of the Parent or Intermediate Holdco for administrative, legal and accounting services provided by third parties incurred in the ordinary course of business in connection with the business of holding the Equity Interests of their respective Subsidiaries, or to pay franchise fees and similar costs incurred in connection with the business of holding the Equity Interests of such Subsidiaries; and

(ii) EMS, Bob's and Sport Chalet may pay or make distributions to Intermediate Holdco, which Intermediate Holdco may subsequently distribute to the Parent, and the Parent may distribute to each of its direct or indirect members, in amounts not to exceed each such member's Deemed Tax Due for the relevant taxable period; provided, that, with respect to the payment of each such dividend (a) the Administrative Agent shall have received, at least ten (10) days prior to the payment thereof, a certificate signed by an authorized officer of Borrowers, in form and substance reasonably satisfactory to the Administrative Agent, stating the estimated amount of such distribution, the estimated taxable gain and income for the relevant period, and the Deemed Tax Rate used, and providing information and computations supporting such statement and (b) such dividend is not in violation of applicable law or any other agreement to which any Borrower or any Guarantor (including the Parent) is a party or by which any Borrower or any Guarantor (including the Parent) is bound. For this purpose, (A) "Deemed Tax Due" means the applicable member's allocable share of the sum of the products of the taxable income attributable to each Borrower and each of its Subsidiaries (without duplication) and the Deemed Tax Rate for each and every taxable period which falls in the period beginning on the first day of the applicable tax period and ending on the last day of the last period with respect to which tax (including estimated tax) is due; and (B) "Deemed Tax Rate" means the maximum combined federal, state, and local rate applicable to a corporation or individual residing in the United States, whichever is higher (but adjusting for deductibility of state income taxes).

10.6    Transactions with Affiliates. Each Loan Party shall not, and shall not permit any Subsidiary to, directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, any officer, director or other Affiliates of such Loan Party or such Subsidiary, except pursuant to the reasonable requirements of such Loan Party's or such Subsidiary's business (as the case may be) and upon fair and reasonable terms no less favorable to such Loan Party or Subsidiary than such Loan Party or Subsidiary would obtain in a comparable arm's length transaction with an unaffiliated person, except for the following:

(a) Restricted Payments permitted under Section 10.5 hereof;

(b) the payment of reasonable fees to directors of a Loan Party who are not employees of such Loan Party or Subsidiary;

(c) advances permitted under clause (g) of the definition of Permitted Investments and loans or advances permitted under clause (l) of the definition of Permitted Investments;

(d) any employee benefit plan available to employees of Loan Parties or such Subsidiary generally; and

(e)     any transaction between Borrowers and any Guarantor (other than the Parent) which is not otherwise prohibited by the terms of this Agreement, including the EMS Reorganization and the IP Transfer.

10.7     <u>Change in Business</u>. Each Loan Party shall not engage in any business other than the business of such Loan Party on the date hereof and any business reasonably related, ancillary or complimentary to the business in which such Loan Party is engaged on the date hereof.

10.8     <u>Limitation of Restrictions Affecting Subsidiaries</u>. Each Loan Party shall not, directly, or indirectly, create or otherwise cause or suffer to exist any encumbrance or restriction which prohibits or limits the ability of any Subsidiary of such Loan Party to (a) pay dividends or make other distributions or pay any Indebtedness owed to such Loan Party or any Subsidiary of such Loan Party; (b) make loans or advances to such Loan Party or any Subsidiary of such Loan Party, (c) transfer any of its properties or assets to such Loan Party or any Subsidiary of such Loan Party; except for encumbrances and restrictions arising under (i) applicable law, rule, regulation or order, including of any regulatory body, (ii) this Agreement, the other Financing Agreements, any documentation related to Refinancing Indebtedness and the Second Lien Documents, (iii) such restrictions with respect to the transfer of those assets subject to a lien permitted under <u>Section 10.2</u>, (iv) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of such Loan Party or a Subsidiary of such Loan Party, and (v) with respect to restrictions described in <u>Section 10.8(c)</u> only, restrictions in any agreement relating to any Permitted Disposition. Each Loan Party will not, not it permit any of its Subsidiaries, to directly or indirectly create or otherwise cause or suffer to exist any limitation on the ability of such Loan Party to incur Indebtedness under this Agreement, as it may be amended or modified from time to time.

10.9     <u>Certain Payments of Indebtedness, Etc.</u>  Each Loan Party shall not, and shall not permit any Subsidiary to, make or agree to make any payment, prepayment, redemption, retirement, defeasance, purchase or sinking fund payment or other acquisition for value of any of its Indebtedness other than the Indebtedness under the Financing Agreements (including, without limitation, by way of depositing money or securities with the trustee therefor before the date required for the purpose of paying any portion of such Indebtedness when due), or otherwise set aside or deposit or invest any sums for such purpose, except that:

(a)     with respect to any Subordinated Debt, make any payment of any part or all of such Subordinated Debt or take any other action or omit to take any other action in respect of such Subordinated Debt, except in accordance with the subordination agreement relative thereto or the subordination provisions thereof;

(b)     Borrowers may make payments in respect of Indebtedness permitted under <u>Section 10.3</u>, in each case with proceeds of Refinancing Indebtedness as permitted under <u>Section 10.3(g)</u>;

(c)     Borrowers may make payments at any time in respect of Indebtedness permitted under <u>Section 10.3(o)</u>, except to the extent otherwise provided in <u>Section 10.3(o)</u>; and

(d)      as to payments in respect of any other Indebtedness permitted under Section 10.3 hereof not subject to the provisions above in this Section 10.9, Borrowers and Guarantors may make payments of regularly scheduled principal and interest or other mandatory payments as and when due in respect of such Indebtedness in accordance with the terms thereof (and in the case of Subordinated Debt, subject to the terms of subordination set forth therein or applicable thereto).

10.10   End of Fiscal Years; Accounting Practices.  Loan Parties shall not change their, nor permit any of their Subsidiaries, to change, (i) fiscal years or (ii) accounting methods (except as required by GAAP) provided that the fiscal years and accounting methods of Sport Chalet and its Subsidiaries may be changed to align with those of the other Loan Parties and their Subsidiaries; it being agreed that all of the Loan Parties shall have the same fiscal years and accounting methods from and after the first day of the first full calendar month occurring after the date hereof.

10.11   Modifications of Indebtedness, Organizational Documents and Certain Other Agreements. Loan Parties shall not, and shall not permit any Subsidiary to amend, modify or otherwise change its certificate of incorporation, articles of association, certificate of formation, limited liability agreement, limited partnership agreement or other organizational documents, as applicable, including, without limitation, entering into any new agreement with respect to any of its Equity Interests, except for amendments, modifications or other changes that do not affect the rights and privileges of Borrowers or any Guarantor, or Loan Parties' Subsidiaries and do not affect the ability of any Borrower, any Guarantor or such Subsidiary to amend, modify, renew or supplement the terms of this Agreement or any of the other Financing Agreements, or otherwise affect the interests of the Administrative Agent or any Lender and so long as at the time of any such amendment, modification or change, no Default or Event of Default shall exist or have occurred and be continuing.  The foregoing shall not limit the ability to carry out the EMS Reorganization.

10.12   Activities of Guarantors. No Guarantor shall incur any Indebtedness or grant any security interests, liens or other encumbrances upon any of its properties or assets or engage in any operations, business or activity other than holding the Equity Interests of EMS (in the case of EMS Acquisition), EMS Acquisition, Bob's and Sport Chalet (in the case of Intermediate Holdco) or Intermediate Holdco (in the case of the Parent) and any administrative, management or other activities incidental to such holdings, pledging its respective assets to the Administrative Agent and executing and delivering the Financing Agreements to which it is a party and fulfilling its obligations thereunder. Guarantors (other than the Parent and Intermediate Holdco) shall not incur any Indebtedness, except for the Obligations, and shall not engage in any operations, business or activity other than operating the distribution center for and on behalf of Borrowers and other activities incidental thereto, pledging their assets to the Administrative Agent and executing and delivering the Financing Agreements to which they are a party and fulfilling their obligations thereunder.

10.13   Foreign Assets Control Regulations, Etc. None of the requesting or borrowing of the Loans or the requesting or issuance, extension or renewal of any Letter of Credit or the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. §1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of

the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (including, but not limited to (a) Executive order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56). Neither Borrowers nor any of their respective Subsidiaries or other Affiliates is or will become a Sanctioned Entity or Sanctioned Person as described in the Executive Order, the Trading with the Enemy Act or the Foreign Assets Control Regulations or engages or will engage in any dealings or transactions, or be otherwise associated, with any such Sanctioned Entity or Sanctioned Person.

10.14    Acquisition of the Second Lien Debt.  No Loan Party shall permit the Sponsor nor any Affiliate of the Sponsor to acquire (by assignment, participation or otherwise) any portion of the Second Lien Debt without the consent of the Administrative Agent in its Permitted Discretion.

## SECTION 11.    FINANCIAL COVENANTS

11.1    Minimum Excess Availability.  At all times prior to the Covenant Conversion Date, Excess Availability shall be no less than the greater of (a) $12,000,000 or (b) ten percent (10.0%) of the Line Cap.

11.2    Fixed Charge Coverage Ratio.  At any time on or following the Covenant Conversion Date, if a Covenant Compliance Period exists, the Fixed Charge Coverage Ratio of Intermediate Holdco and its Subsidiaries (on a consolidated basis), determined as of the end of the fiscal month most recently ended for which the Administrative Agent has received financial statements of Intermediate Holdco and its Subsidiaries pursuant to Section 9.1, shall be not less than 1.00:1.00 for the period of twelve consecutive fiscal months ended on the last day of such fiscal month.

11.3    Permitted Cure of Breach of Fixed Charge Coverage Ratio Financial Covenant; Curative Equity.  For purposes of determining satisfaction with the Fixed Charge Coverage Ratio Financial Covenant, any Specified Equity Contribution made during the period (the "Equity Cure Period") of ten (10) consecutive Business Days after the later of the date on which the Covenant Compliance Period commenced and the date on which financial statements are required to be delivered hereunder with respect to the relevant test period for the Fixed Charge Coverage Ratio Financial Covenant will, at the request of the Parent, be included in the calculation of Consolidated EBITDA for any period of calculation of the Fixed Charge Coverage Ratio Financial Covenant which includes the quarter in which such Specified Equity Contribution was received by a Borrower, provided that (A) there shall be no more than two (2) Specified Equity Contributions during any twelve (12) month period (which may be in consecutive months), (B) no more than five (5) Specified Equity Contributions shall be made during the term of this Agreement, (C) the amount of any Specified Equity Contribution shall be no greater than one hundred fifty percent (150%) of the amount required to cause the Parent and its Subsidiaries to be in compliance with the Fixed Charge Coverage Ratio Financial Covenant specified above on a Pro Forma Basis, (D) all Specified Equity Contributions shall be disregarded for all other

132

purposes of this Agreement, including for purposes of determining pricing or the amount or availability of any baskets with respect to the covenants contained herein, and (E) no Secured Party shall be required to make any Loan or other extension of credit hereunder during such ten (10) Business Day period unless a Borrower has received the Specified Equity Contribution.

## SECTION 12.    EVENTS OF DEFAULT AND REMEDIES

12.1    <u>Events of Default</u>. The occurrence or existence of any one or more of the following events are referred to herein individually as an "Event of Default", and collectively as "Events of Default":

(a)    (i) any Borrower fails to make any principal payment hereunder when due or fails to pay interest, fees or any of the other Obligations within three (3) Business Days after the due date thereof, or (ii) any Borrower or any Guarantor fails to perform any of the covenants contained in <u>Sections 2.1</u>, <u>2.2</u>, <u>5.3(i)</u>, <u>6.3</u>, <u>7.1</u>, <u>7.7</u>, <u>9.1</u>, <u>9.5</u>, <u>9.6</u>, and <u>10</u> hereof, (iii) the Borrowers fail to perform the covenant contained in <u>Section 11.1</u>, (iv) the Borrowers fail to perform the Fixed Charge Coverage Ratio Financial Covenant after the expiration of the applicable Equity Cure Period (if any) or (v) any Borrower or any Guarantor fails to perform any of the terms, covenants, conditions or provisions contained in this Agreement or any of the other Financing Agreements other than those described in <u>Sections 12.1(a)(i)</u>, <u>12.1(a)(ii)</u>, <u>12.1(a)(iii)</u> and <u>12.1(a)(iv)</u> above and such failure shall continue for twenty (20) Business Days; <u>provided</u> that, such twenty (20) Business Day period shall not apply in the case of any failure to observe any such covenant which is not capable of being cured at all or within such twenty (20) Business Day period;

(b)    any representation, warranty or statement of fact made by any Borrower or any Guarantor to the Administrative Agent or the Lenders in this Agreement, the other Financing Agreements or any other written agreement, schedule, confirmatory assignment or otherwise that are qualified as to materiality or Material Adverse Effect shall when made or deemed made be incorrect, false or misleading, and any other such representation, warranty or statement of fact made by any Borrower or any Guarantor to the Administrative Agent and the Lenders shall when made or deemed made be incorrect, false or misleading in any material respect;

(c)    any Guarantor revokes or terminates or purports to revoke or terminate any guarantee of such party in favor of the Administrative Agent, except as a result of a transaction permitted under <u>Section 10.1</u> hereof;

(d)    any judgment for the payment of money is rendered against any Borrower or any Guarantor in excess of $3,000,000 in the aggregate (to the extent not covered by independent third party insurance where the insurer has not declined or disputed coverage) and shall remain undischarged, unbonded or unvacated for a period in excess of thirty (30) days or execution shall at any time not be effectively stayed, or any judgment other than for the payment of money, or injunction, attachment, garnishment or execution is rendered against any Borrower or any Guarantor or any of the Collateral having a value in excess of $3,000,000;

(e)    any Borrower or any Guarantor makes an assignment for the benefit of creditors or makes or sends notice of a bulk transfer;

(f)    a case or proceeding under the bankruptcy laws of the United States of America now or hereafter in effect or under any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at law or in equity) is filed against a Borrower or any Guarantor or all or any part of its properties and such petition or application is not dismissed within sixty (60) days after the date of its filing or a Borrower or any Guarantor shall file any answer admitting or not contesting such petition or application or indicates its consent to, acquiescence in or approval of, any such action or proceeding or the relief requested is granted sooner;

(g)    a case or proceeding under the bankruptcy laws of the United States of America now or hereafter in effect or under any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at a law or equity) is filed by a Borrower or any Guarantor or for all or any part of its property;

(h)    any of the following shall occur: (i) any default or event of default on the part of any Borrower or any Guarantor under any agreement, document or instrument to which such Borrower or such Guarantor is a party or by which such Borrower or such Guarantor or any of its property is bound (beyond the period of grace, if any, provided in such agreement, document or instrument and after giving effect to any waivers or consents relating thereto obtained before the expiration of any such period of grace), evidencing or relating to any Indebtedness (other than the Obligations) with an outstanding principal balance in excess of $3,000,000, if the payment or maturity of such Indebtedness is or could be accelerated in consequence of such event of default or demand for payment of such Indebtedness is made or could be made in accordance with the terms thereof, (ii) any Credit Card Issuer or Credit Card Processor withholds payment of amounts otherwise payable to a Borrower or any Guarantor to fund a reserve account or otherwise hold as collateral, or shall require a Borrower or any Guarantor to pay funds into a reserve account or for such Credit Card Issuer or Credit Card Processor to otherwise hold as collateral, or a Borrower or any Guarantor shall provide a letter of credit, guarantee, indemnity or similar instrument to or in favor of such Credit Card Issuer or Credit Card Processor such that in the aggregate all of such funds in the reserve account, other amounts held as collateral and the amount of such letters of credit, guarantees, indemnities or similar instruments shall exceed $3,000,000, (iii) any Credit Card Issuer or Credit Card Processor shall debit or deduct any amounts in excess of $3,000,000 in the aggregate in any fiscal year of Borrowers and Guarantors from any amounts or proceeds otherwise payable to any Borrower or any Guarantor or (iv) a default under the Second Lien Loan Agreement, the result of which is to cause or permit the Second Lien Agent or the Second Lien Lender to cause the acceleration of the maturity of the Borrowers' obligations under the Second Lien Loan Agreement.;

(i)    any material provision hereof or of any of the other Financing Agreements shall for any reason cease to be valid, binding and enforceable with respect to any party hereto or thereto (other than the Administrative Agent or any Lender) in accordance with its terms, or any such party shall challenge the enforceability hereof or thereof, or shall assert in writing, or shall take any action or fail to take any action based on the assertion that any provision hereof or of any of the other Financing Agreements has ceased to be or is otherwise not valid, binding or enforceable in accordance with its terms, or any security interest provided for herein or in any of

134

the other Financing Agreements shall cease to be a valid and perfected first priority security interest in any of the Collateral purported to be subject thereto (except as otherwise permitted herein or therein);

(j)    an ERISA Event shall occur which results in or could reasonably be expected to result in a Material Adverse Effect;

(k)    there shall occur a cessation of a substantial part of the business of a Borrower or any Guarantor for a period which materially adversely affects Borrowers' and Guarantors' capacity, taken as a whole, to continue to operate its business in accordance with past practice;

(l)    there shall occur any event, development of condition that has or would have a Material Adverse Effect after the date hereof;

(m)    any subordination provision in any document or instrument governing Subordinated Debt shall cease to be in full force and effect; or any Borrower or any Guarantor, any subordinating party or any Governmental Authority having jurisdiction over any of them or over the Administrative Agent or any Lender shall contest in any judicial or administrative proceeding the validity, binding nature or enforceability of any such provision or agreement;

(n)    a Borrower or any Guarantor shall be criminally indicted or convicted under any law that could lead to a forfeiture of any property of such Borrower or such Guarantor;

(o)    any material loss, theft, damage or destruction of any portion of the Collateral having a book value of $3,000,000, in the aggregate, if not fully covered (subject to such deductibles and self-insurance retentions as the Administrative Agent shall have permitted) by insurance;

(p)    any Change of Control; and

(q)    any Credit Card Issuer or Credit Card Processor shall send notice to any Borrower or any Guarantor that it is ceasing to make or suspending payments to such Borrower or any Guarantor of amounts due or to become due to such Borrower or such Guarantor or shall cease or suspend such payments, or shall send notice to a Borrower or any Guarantor that it is terminating its arrangements with such Borrower or such Guarantor or such arrangements shall terminate as a result of any event of default under such arrangements, which continues for more than the applicable cure period, if any, with respect thereto, unless such Borrower or such Guarantor shall have entered into arrangements with another Credit Card Issuer or Credit Card Processor, as the case may be, within thirty (30) days after the date of any such notice.

12.2    Remedies.

(a)    At any time an Event of Default exists or has occurred and is continuing, the Administrative Agent and the Lenders shall have all rights and remedies provided in this Agreement, the other Financing Agreements, the UCC and other applicable law, all of which rights and remedies may be exercised without notice to or consent by any Borrower or any Guarantor, except as such notice or consent is expressly provided for hereunder or required by

135

applicable law. All rights, remedies and powers granted to the Administrative Agent and the Lenders hereunder or required by applicable law. All rights, remedies and powers granted to the Administrative Agent and the Lenders hereunder, under any of the other Financing Agreements, the UCC or other applicable law, are cumulative, not exclusive and enforceable, in the Administrative Agent's discretion, alternatively, successively, or concurrently on any one or more occasions, and shall include, without limitation, the right to apply to a court of equity for an injunction to restrain a breach or threatened breach by Borrowers of this Agreement or any of the other Financing Agreements. The Administrative Agent may, at any time or times, proceed directly against any Borrower or any Guarantor to collect the Obligations without prior recourse to any Guarantor or any of the Collateral.

      (b)     Without limiting the generality of the foregoing, at any time an Event of Default exists or has occurred and is continuing, the Administrative Agent with the consent of the Required Lenders may, and at the request of the Required Lenders shall, upon notice to Borrowers, accelerate the payment of all Obligations and demand immediate payment thereof (provided, that, upon the occurrence of any Event of Default described in Sections 12.1(f) and 12.1(g), all Obligations shall automatically become immediately due and payable).

      (c)     Without limiting the foregoing, at any time an Event of Default exists or has occurred and is continuing, the Administrative Agent may, in its discretion (i) with or without judicial process or the aid or assistance of others, enter upon any premises on or in which any of the Collateral may be located and take possession of the Collateral or complete processing, manufacturing and repair of all or any portion of the Collateral, (ii) require any Loan Party, at Borrowers' expense, to assemble and make available to the Administrative Agent any part or all of the Collateral at any place and time designated by the Administrative Agent, (iii) collect, foreclose, receive, appropriate, setoff and realize upon any and all Collateral, (iv) remove any or all of the Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose, (v) sell, lease, transfer, assign, deliver or otherwise dispose of any and all Collateral (including entering into contracts with respect thereto, public or private sales at any exchange, broker's board, at any office of the Administrative Agent or elsewhere) at such prices or terms as the Administrative Agent may deem reasonable, for cash, upon credit or for future delivery, with the Administrative Agent having the right to purchase the whole or any part of the Collateral at any such public sale, all of the foregoing being free from any right or equity of redemption of any Borrower, which right or equity of redemption is hereby expressly waived and released by such Borrower and/or (vi) terminate this Agreement. If any of the Collateral is sold or leased by the Administrative Agent upon credit terms or for future delivery, the Obligations shall not be reduced as a result thereof until payment therefor is finally collected by the Administrative Agent. If notice of disposition of Collateral is required by law, ten (10) days prior notice by the Administrative Agent to Borrowers designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made, shall be deemed to be reasonable notice thereof and each Loan Party waives any other notice. In the event the Administrative Agent institutes an action to recover any Collateral or seeks recovery of any Collateral by way of prejudgment remedy, each Loan Party waives the posting of any bond which might otherwise be required. At any time an Event of Default exists or has occurred and is continuing, upon the Administrative Agent's request, Loan Parties shall furnish cash collateral to the Administrative Agent for the Letter of Credit Obligations. Such

4241829.6

cash collateral shall be in the amount equal to one hundred five percent (105%) of the amount of the Letter of Credit Obligations plus the amount of any fees and expenses payable in connection therewith through the end of the latest expiration date of the Letters of Credit giving rise to such Letter of Credit Obligations.

(d)    The Administrative Agent may, at any time or times that an Event of Default exists or has occurred and is continuing, enforce each Loan Party's rights against any account debtor, secondary obligor or other obligor in respect of any of the Accounts or other Receivables. Without limiting the generality of the foregoing, the Administrative Agent may at such time or times (i) notify any or all account debtors, secondary obligors or other obligors in respect thereof that the Receivables have been assigned to the Administrative Agent and that the Administrative Agent has a security interest therein and the Administrative Agent may direct any or all account debtors, secondary obligors and other obligors to make payment of Receivables directly to the Administrative Agent, (ii) extend the time of payment of, compromise, settle or adjust for cash, credit, return of merchandise or otherwise, and upon any terms or conditions, any and all Receivables or other obligations included in the Collateral and thereby discharge or release the account debtor or any secondary obligors or other obligors in respect thereof without affecting any of the Obligations, (iii) demand, collect or enforce payment of any Receivables or such other obligations, but without any duty to do so, and the Administrative Agent shall not be liable for its failure to collect or enforce the payment thereof nor for the negligence of its agents or attorneys with respect thereto and (iv) take whatever other action the Administrative Agent may deem necessary or desirable for the protection of its interests. At any time that an Event of Default exists or has occurred and is continuing, at the Administrative Agent's request, all invoices and statements sent to any account debtor shall state that the Accounts and such other obligations have been assigned to the Administrative Agent and are payable directly and only to the Administrative Agent and Loan Parties shall deliver to the Administrative Agent such originals of documents evidencing the sale and delivery of goods or the performance of services giving rise to any Accounts as the Administrative Agent may require. In the event any account debtor returns Inventory when an Event of Default exists or has occurred and is continuing, Loan Parties shall, upon the Administrative Agent's request, hold the returned Inventory in trust for the Administrative Agent, segregate all returned Inventory from all of its other property, dispose of the returned Inventory solely according to the Administrative Agent's instructions, and not issue any credits, discounts or allowances with respect thereto without the Administrative Agent's prior written consent.

(e)    To the extent that applicable law imposes duties on the Administrative Agent to exercise remedies in a commercially reasonable manner (which duties cannot be waived under such law), each Loan Party acknowledges and agrees that it is not commercially unreasonable for the Administrative Agent (i) to fail to incur expenses reasonably deemed significant by the Administrative Agent to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain consents of any Governmental Authority or other third party for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against account debtors, secondary obligors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (iv) to exercise collection remedies against account debtors

137

and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other persons, whether or not in the same business as Borrowers for expressions of interest in acquiring all or any portion of the Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, (xi) to purchase insurance or credit enhancements to insure the Administrative Agent against risks of loss, collection or disposition of Collateral or to provide to the Administrative Agent a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by the Administrative Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or disposition of any of the Collateral. Each Loan Party acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by the Administrative Agent would not be commercially unreasonable in the Administrative Agent's exercise of remedies against the Collateral and that other actions or omissions by the Administrative Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section. Without limitation of the foregoing, nothing contained in this Section shall be construed to grant any rights to Borrowers or to impose any duties on the Administrative Agent that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section.

(f)     For the purpose of enabling the Administrative Agent to exercise the rights and remedies hereunder, each Loan Party hereby grants to the Administrative Agent, to the extent assignable, an irrevocable, non-exclusive license (exercisable at any time an Event of Default shall exist or have occurred and for so long as the same is continuing without payment of royalty or other compensation to Loan Parties) to use, assign, license or sublicense any of the trademarks, service-marks, trade names, business names, trade styles, designs, logos and other source of business identifiers and other Intellectual Property and general intangibles now owned or hereafter acquired by any Loan Party, wherever the same maybe located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof.

(g)     At any time an Event of Default exists or has occurred and is continuing, the Administrative Agent may apply the cash proceeds of Collateral actually received by the Administrative Agent from any sale, lease, foreclosure or other disposition of the Collateral to payment of the Obligations, in whole or in part and in accordance with the terms hereof, whether or not then due or may hold such proceeds as cash collateral for the Obligations. Loan Parties shall remain liable to the Administrative Agent for the payment of any deficiency with interest at the highest rate provided for herein and all costs and expenses of collection or enforcement, including reasonable attorneys' fees and legal expenses.

(h)     Without limiting the foregoing, upon the occurrence of a Default or Event of Default, the Administrative Agent and Lenders may, at the option of Administrative Agent or the Required Lenders, without notice, (i) cease making Revolving Loans or Swing Line Loans or

arranging for Letters of Credit or reduce the lending formulas contained in the Borrowing Base or amounts of Revolving Loans, Swing Line Loans and Letters of Credit available to Borrowers, (ii) terminate any provision of this Agreement providing for any future Revolving Loans, Swing Line Loans or Letters of Credit to be made by Lenders or Issuing Bank to Borrowers and/or (iii) establish such Reserves as the Administrative Agent determines without limitation or restriction, notwithstanding anything to the contrary contained herein.

## SECTION 13.  JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS; GOVERNING LAW

13.1    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver.

(a)    The validity, interpretation and enforcement of this Agreement and the other Financing Agreements (except as otherwise provided therein) and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New York.

(b)    Each Borrower, the Administrative Agent, each Lender and the Issuing Bank irrevocably consent and submit to the non-exclusive jurisdiction of the Supreme Court of the State of New York, New York County and the United States District Court for the Southern District of New York, whichever the Administrative Agent may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement or any of the other Financing Agreements or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the other Financing Agreements or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described above (except that the Administrative Agent shall have the right to bring any action or proceeding against a Borrower or its property in the courts of any other jurisdiction which the Administrative Agent deems reasonably necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against such Borrower or its property).

(c)    Each Borrower hereby waives personal service of any and all process upon it and consents that all such service of process may be made by certified mail (return receipt requested) directed to its address set forth herein and service so made shall be deemed to be completed five (5) days after the same shall have been so deposited in the U.S. mails, or, at the Administrative Agent's option, by service upon such Borrower in any other manner provided under the rules of any such courts. Within thirty (30) days after such service, such Borrower shall appear in answer to such process, failing which such Borrower shall be deemed in default and judgment may be entered by the Administrative Agent against such Borrower for the amount of the claim and other relief requested.

(d)    EACH LOAN PARTY, LENDER, ISSUING BANK AND THE ADMINISTRATIVE AGENT HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING UNDER THIS

139

AGREEMENT OR ANY OF THE OTHER FINANCING AGREEMENTS OR (ii) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER FINANCING AGREEMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE. EACH LOAN PARTY, LENDER, ISSUING BANK AND THE ADMINISTRATIVE AGENT HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT BORROWER OR LENDER MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(e)    Neither the Administrative Agent nor the Lenders shall have any liability to any Borrower (whether in tort, contract, equity or otherwise) for losses suffered by such Loan Party in connection with, arising out of, or in any way related to the transactions or relationships contemplated by this Agreement, or any act, omission or event occurring in connection herewith, unless it is determined by a final and non-appealable judgment or court order binding on the Administrative Agent, Issuing Bank or any Lender, that the losses were the result of acts or omissions constituting gross negligence or willful misconduct of the Administrative Agent, such Issuing Bank or such Lender. In any such litigation, the Administrative Agent, any Issuing Bank or any Lender, as applicable, shall be entitled to the benefit of the rebuttable presumption that it acted in good faith and with the exercise of ordinary care in the performance by it of the terms of this Agreement. Each Borrower: (i) certifies that neither the Administrative Agent, any Issuing Bank or any Lender nor any representative, agent or attorney acting for or on behalf of the Administrative Agent, any Issuing Bank or any Lender has represented, expressly or otherwise, that the Administrative Agent, such Issuing Bank or such Lender would not, in the event of litigation, seek to enforce any of the waivers provided for in this Agreement or any of the other Financing Agreements and (ii) acknowledges that in entering into this Agreement and the other Financing Agreements, the Administrative Agent, the Issuing Bank and the Lenders are relying upon, among other things, the waivers and certifications set forth in this Section 13.1 and elsewhere herein and therein.

13.2    Waiver of Notices. Each Loan Party hereby expressly waives demand, presentment, protest and notice of protest and notice of dishonor with respect to any and all instruments and chattel paper, included in or evidencing any of the Obligations or the Collateral, and any and all other demands and notices of any kind or nature whatsoever with respect to the Obligations, the Collateral and this Agreement, except such as are expressly provided for herein. No notice to or demand on any Loan Party which the Administrative Agent may elect to give shall entitle such Borrower to any other or further notice or demand in the same, similar or other circumstances.

13.3    Amendments and Waivers.  (a) Neither this Agreement nor any other Financing Agreement nor any terms hereof or thereof may be amended, waived, discharged or terminated unless such amendment, waiver, discharge or termination is in writing signed by Administrative Agent and the Required Lenders or at Agent's option, by Administrative Agent with the authorization or consent of the Required Lenders, and as to amendments to any of the Financing

140

Agreements (other than with respect to any provision of <u>Section 14</u> hereof), by any Borrower and such amendment, waiver, discharger or termination shall be effective and binding as to all Lenders and each Issuing Bank only in the specific instance and for the specific purpose for which given; except, that, no such amendment, waiver, discharge or termination shall:

        (i)     reduce the interest rate or any fees (but not by virtue of a waiver of any condition precedent, Default, Event of Default or mandatory prepayment or change to a financial ratio) or extend the time of payment of principal, interest or any fees or reduce the principal amount of any Loan or Letters of Credit (it being understood that a waiver of any condition precedent or the waiver of any Default, Event of Default or mandatory prepayment shall not constitute an extension of the Maturity Date), in each case without the consent of each Lender directly affected thereby,

        (ii)     increase the Commitment of any Lender over the amount thereof then in effect or provided hereunder (it being understood that a waiver of any condition precedent or the waiver of any Default, Event of Default, mandatory prepayment or financial ratio shall not constitute an increase or extension of any Commitment), in each case without the consent of the Lender directly affected thereby,

        (iii)     release all or substantially all of the Collateral (except as expressly permitted hereunder or under any of the other Financing Agreements or applicable law and except as permitted under <u>Section 14.11(b)</u> hereto), or release of all or substantially all of the value of the Guarantors, or agree to the subordination of payment of any of the Obligations, or alter the order of application set forth in <u>Section 6.5(a)</u> hereto in each case without the consent of the Administrative Agent and all of Lenders,

        (iv)     consent to the assignment or transfer other than as permitted pursuant to <u>Section 10.1</u> by any Loan Party of any of their rights and obligations under this Agreement, without the consent of the Administrative Agent and all of Lenders,

        (v)     amend, modify or waive any terms of the definition of Pro Rata Share, <u>Section 6.11</u> or this <u>Section 13.3</u>, without the consent of the Administrative Agent and all of Lenders;

        (vi)     reduce any percentage specified in the definition of Required Lenders or Supermajority Lenders, without the consent of the Administrative Agent and all of Lenders, and

        (vii)     increase the advance rates constituting part of the Borrowing Base (in each case other than as provided for in the definition of such terms), or amend, modify or waive any provisions of the definition of the term Borrowing Base or any of the defined terms referred to in the definition of the term Borrowing Base, in each case as to any of the foregoing if the effect thereof increases the amount of the Borrowing Base, without the consent of the Administrative Agent and the Supermajority Lenders; <u>provided</u> that the foregoing shall not limit the discretion of the Administrative Agent to change, establish or eliminate any reserve without the consent of any of the Lenders.

(b)     Agent, Lenders and each Issuing Bank shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of its or their rights, powers and/or remedies unless such waiver shall be in writing and signed as provided herein. Any such waiver shall be enforceable only to the extent specifically set forth therein. A waiver by Agent, any Lender or Issuing Bank of any right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such right, power and/or remedy which Agent, any Lender or Issuing Bank would otherwise have on any future occasion, whether similar in kind or otherwise.

(c)     Notwithstanding anything to the contrary contained in Section 13.3(a) above, in connection with any amendment, waiver, discharge or termination, in the event that any Lender whose consent thereto is required shall fail to consent or fail to consent in a timely manner (such Lender being referred to herein as a "Non-Consenting Lender"), but the consent of any other Lenders to such amendment, waiver, discharge or termination that is required are obtained, if any, then the Administrative Agent or the Borrowers shall have the right, but not the obligation, at any time within one hundred twenty (120) days thereafter, and upon the exercise by the Administrative Agent or the Borrowers of such right, such Non-Consenting Lender shall have the obligation, to sell, assign and transfer to the Administrative Agent or such Eligible Transferee as the Administrative Agent may specify, the Commitment of such Non-Consenting Lender and all rights and interests of such Non-Consenting Lender pursuant thereto. The Administrative Agent shall provide the Non-Consenting Lender with prior written notice of its intent to exercise its right under this Section (or if the Administrative Agent does not exercise such right, Borrowers shall provide the Administrative Agent and the Non-Consenting Lender with prior written notice of its intent to exercise its right under this Section), which notice shall specify the date on which such purchase and sale shall occur, which date shall be within thirty (30) days after such notice. Such purchase and sale shall be pursuant to the terms of an Assignment and Acceptance (whether or not executed by the Non-Consenting Lender), except that on the date of such purchase and sale, the Administrative Agent, or such Eligible Transferee specified by the Administrative Agent shall pay to the Non-Consenting Lender (except as the Administrative Agent and such Non-Consenting Lender may otherwise agree) the amount equal to: (i) the principal balance of the Loans held by the Non-Consenting Lender outstanding as of the close of business on the business day immediately preceding the effective date of such purchase and sale, plus (ii) amounts accrued and unpaid in respect of interest and fees payable to the Non-Consenting Lender to the effective date of the purchase (including amounts payable under Section 3.8 as if the Non-Consenting Lender's Eurodollar Rate Loans were being prepaid on the purchase date, but in no event shall the Non-Consenting Lender be deemed entitled to any early termination fee). Such purchase and sale shall be effective on the date of the payment of such amount to the Non-Consenting Lender and the Commitment of the Non-Consenting Lender shall terminate on such date.

(d)     The consent of the Administrative Agent shall be required for any amendment, waiver or consent affecting the rights or duties of the Administrative Agent hereunder or under any of the other Financing Agreements, in addition to the consent of the Lenders otherwise required by this Section and the exercise by Administrative Agent of any of its rights hereunder with respect to Reserves or Eligible Inventory, Eligible In-Transit Inventory, Eligible Credit Card Receivables, Eligible Rental Inventory, Eligible Accounts shall not be deemed an amendment to the advance rates provided for in this Section 13.3. The consent of an

Issuing Bank shall be required for any amendment, waiver or consent affecting the rights or duties of such Issuing Bank hereunder or under any of the other Financing Agreements, in addition to the consent of the Lenders otherwise required by this Section; provided, that, the consent of any Issuing Bank shall not be required for any other amendments, waivers or consents. The consent of Swing Line Lender shall be required for any amendment, waiver or consent affecting the rights or duties of Swing Line Lender hereunder or under any of the other Financing Agreements, in addition to the consent of the Lenders otherwise required by this Section. Notwithstanding anything to the contrary contained in Section 13.3(a) above, (i) in the event that Administrative Agent shall agree that any items otherwise required to be delivered to the Administrative Agent as a condition of the initial Loans and Letters of Credit hereunder may be delivered after the date hereof, Administrative Agent may, in its discretion, agree to extend the date for delivery of such items or take such other action as Administrative Agent may deem appropriate as a result of the failure to receive such items as Administrative Agent may determine or may waive any Event of Default as a result of the failure to receive such items, in each case without the consent of any Lender, (ii) Administrative Agent may consent to any change in the type of organization, jurisdiction of organization or other legal structure of any Borrower, Guarantor or any of their Subsidiaries and amend the terms hereof or of any of the other Financing Agreements as may be necessary or desirable to reflect any such change, in each case without the approval of any Lender and (iii) the consent of the Administrative Agent, the Borrowers and each Lender or Eligible Transferee that is providing a new or additional Commitment pursuant to Section 2.5 hereof shall only be required for any amendment to the Financing Agreements to consummate the increase in Commitments contemplated by Section 2.5 hereof.

(e)    The consent of the Administrative Agent and any Bank Product Provider that is providing Bank Products and has outstanding any such Bank Products at such time that are secured hereunder shall only be required for any amendment to the priority of payment of Obligations arising under or pursuant to any Hedge Agreements of a Loan Party or other Bank Products as set forth in Section 6.8(a) hereto.

(f)    Notwithstanding anything to the contrary herein, (i) no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender, (ii) each Lender is entitled to vote as such Lender sees fit on any bankruptcy reorganization plan that affects the Loans, and each Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code of the United States supersedes the unanimous consent provisions set forth herein and (iii) Administrative Agent and the Required Lenders shall determine whether or not to allow a Loan Party to use cash collateral in the context of a bankruptcy or insolvency proceeding and such determination shall be binding on all of the Lenders.

(g)    Notwithstanding the foregoing, (i) any provision of the Fee Letter may be amended by an agreement in writing entered into by the parties to the Fee Letter, and (ii) any provision of this Agreement may be amended by an agreement in writing entered into by Borrowers and the Administrative Agent with the express consent of the Required Lenders (and, if its rights or obligations are affected thereby, the Issuing Bank or Swing Line Lender) if (A) by the terms of such agreement the Commitment of each Lender not consenting to the amendment

provided for therein shall terminate upon the effectiveness of such amendment and (B) at the time such amendment becomes effective, each Lender not consenting thereto receives payment in full of the principal of and interest accrued on each Loan made by it and all other amounts owing to it or accrued for its account under this Agreement.

(h)    Notwithstanding anything in this Agreement or in any other Financing Agreement to the contrary, the Borrowers, Administrative Agent and the Lenders participating in the applicable increase or Extended Revolving Commitment (as the case may be) may enter into amendments in connection with an increase to the Maximum Credit in accordance with Section 2.5, and Extension Amendments in accordance with Section 2.8 and any such amendments referred to in this clause (h) shall be effective to amend the terms of this Agreement and any other applicable Financing Agreements, in each case, without any further action or consent of any other party to any Financing Agreement.

13.4    Waiver of Counterclaims. Each Borrower waives all rights to interpose any claims, deductions, setoffs or counterclaims of any nature (other than compulsory counterclaims) in any action or proceeding with respect to this Agreement, the Obligations, the Collateral or any matter arising therefrom or relating hereto or thereto.

13.5    Indemnification. Each Loan Party shall indemnify and hold the Agents, each Lender, the Issuing Bank and each of their respective officers, directors, agents, employees, advisors and counsel and their respective Affiliates (each such person being an "Indemnitee"), harmless from and against any and all losses, claims, damages, penalties, liabilities, costs or expenses (including reasonable and documented attorneys' fees and expenses) imposed on, incurred by or asserted against any of them in connection with any litigation, investigation, claim or proceeding commenced or threatened related to the negotiation, preparation, execution, delivery, enforcement, performance or administration of this Agreement, any other Financing Agreements, or any undertaking or proceeding related to any of the transactions contemplated hereby or any act, omission, event or transaction related or attendant thereto, including amounts paid in settlement, court costs, and the fees and expenses of counsel except that Loan Parties shall not have any obligation under this Section 13.5 to indemnify an Indemnitee with respect to a matter covered hereby resulting from the gross negligence or willful misconduct of such Indemnitee as determined pursuant to a final, non-appealable order of a court of competent jurisdiction (but without limiting the obligations of Borrowers or Guarantors as to any other Indemnitee). To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section may be unenforceable because it violates any law or public policy, Borrowers shall pay the maximum portion which they are permitted to pay under applicable law to such Indemnitee in satisfaction of indemnified matters under this Section. To the extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any of the other Financing Agreements or any undertaking or transaction contemplated hereby. No Indemnitee referred to above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or any of the other Financing Agreements or the transaction contemplated hereby or thereby. All amounts due under this Section 13.5 shall be payable upon demand. The

144

foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

## SECTION 14.    THE AGENT

14.1    Appointment, Powers and Immunities.

(a)    Each Secured Party irrevocably designates, appoints and authorizes Wells Fargo to act as Administrative Agent hereunder and under the other Financing Agreements with such powers as are specifically delegated to the Administrative Agent by the terms of this Agreement and of the other Financing Agreements, together with such other powers as are reasonably incidental thereto. The Administrative Agent (b) shall have no duties or responsibilities except those expressly set forth in this Agreement and in the other Financing Agreements, and shall not by reason of this Agreement or any other Financing Agreement be a trustee or fiduciary for any Secured Party; (c) shall not be responsible to Secured Parties for any recitals, statements, representations or warranties contained in this Agreement or in any of the other Financing Agreements, or in any certificate or other document referred to or provided for in, or received by any of them under, this Agreement or any other Financing Agreement, or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Financing Agreement or any other document referred to or provided for herein or therein or for any failure by any Borrower or any Guarantor or any other Person to perform any of its obligations hereunder or thereunder; and (d) shall not be responsible to Secured Parties for any action taken or omitted to be taken by it hereunder or under any other Financing Agreement or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith, except for its own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction. The Administrative Agent may employ agents and attorneys in fact and shall not be responsible for the negligence or misconduct of any such agents or attorneys in fact selected by it in good faith. The Administrative Agent may deem and treat the payee of any note as the holder thereof for all purposes hereof unless and until the assignment thereof pursuant to an agreement (if and to the extent permitted herein) in form and substance reasonably satisfactory to the Administrative Agent shall have been delivered to and acknowledged by Administrative Agent.

14.2    Reliance by Agent.

Administrative Agent shall be entitled to rely upon any certification, notice or other communication (including any thereof by telephone, telecopy or other electronic means) believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person or Persons, and upon advice and statements of legal counsel, independent accountants and other experts selected by Administrative Agent. As to any matters not expressly provided for by this Agreement or any other Financing Agreement, Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder or thereunder in accordance with instructions given by the Required Lenders, all of Lenders, or such other number of Lenders as is required in such circumstance, and such instructions of Administrative Agent and any action taken or failure to act pursuant thereto shall be binding on all Lenders.

145

4241829.6

14.3    Events of Default.

(a)    Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of a Default or an Event of Default or other failure of a condition precedent to the Loans and Letters of Credit hereunder, unless and until Administrative Agent has received written notice from a Lender, or a Borrower specifying such Event of Default or any unfulfilled condition precedent, and stating that such notice is a "Notice of Default or Failure of Condition". In the event that the Administrative Agent receives such a Notice of Default or Failure of Condition, Administrative Agent shall give prompt notice thereof to the Lenders. The Administrative Agent shall (subject to Section 14.7) take such action with respect to any such Event of Default or failure of condition precedent as shall be directed by the Required Lenders to the extent provided for herein; provided, that, unless and until Administrative Agent shall have received such directions, Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to or by reason of such Event of Default or failure of condition precedent, as it shall deem advisable in the best interest of Lenders. Without limiting the foregoing, and notwithstanding the existence or occurrence and continuance of an Event of Default or any other failure to satisfy any of the conditions precedent set forth in Section 4 hereto to the contrary, unless and until otherwise directed by the Required Lenders, Administrative Agent may, but shall have no obligation to, continue to make Loans and an Issuing Bank may, but shall have no obligation to, issue or cause to be issued any Letter of Credit for the ratable account and risk of Lenders from time to time if Administrative Agent believes making such Loans or issuing or causing to be issued such Letter of Credit is in the best interests of Lenders.

(b)    Except with the prior written consent of Agent, no Secured Party may assert or exercise any enforcement right or remedy in respect of the Loans, Letter of Credit Obligations or other Obligations, as against any Loan Party or any of the Collateral or other property of any Loan Party or otherwise under any of the Financing Agreements.

14.4    Wells Fargo in Its Individual Capacity. With respect to its Commitment and the Loans made and Letters of Credit issued or caused to be issued by it (and any successor acting as Administrative Agent), so long as Wells Fargo shall be a Lender hereunder, it shall have the same rights and powers hereunder as any other Lender and may exercise the same as though it were not acting as Administrative Agent, and the term "Lender" or "Lenders" shall, unless the context otherwise indicates, include Wells Fargo in its individual capacity as Lender hereunder. Wells Fargo (and any successor acting as Administrative Agent) and its Affiliates may (without having to account therefor to any Lender) lend money to, make investments in and generally engage in any kind of business with Borrowers (and any of its Subsidiaries or Affiliates) as if it were not acting as Administrative Agent, and Wells Fargo and its Affiliates may accept fees and other consideration from any Loan Party and any of its Subsidiaries and Affiliates for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

14.5    Indemnification. Lenders agree to indemnify Administrative Agent and the Issuing Bank (to the extent not reimbursed by Borrowers hereunder and without limiting any obligations of Borrowers hereunder) ratably, in accordance with their Pro Rata Shares, for any and all claims of any kind and nature whatsoever that may be imposed on, incurred by or asserted against Administrative Agent or the Issuing Bank (including by any Lender) arising out

146

of or by reason of any investigation in or in any way relating to or arising out of this Agreement or any other Financing Agreement or any other documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby (including the costs and expenses that Administrative Agent or the Issuing Bank is obligated to pay hereunder) or the enforcement of any of the terms hereof or thereof or of any such other documents; provided, that, no Lender shall be liable for any of the foregoing to the extent it arises from the gross negligence or willful misconduct of the party to be indemnified as determined by a final non-appealable judgment of a court of competent jurisdiction. The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

14.6   Non-Reliance on Administrative Agent and Other Lenders.

(a)   Each Secured Party agrees that it has, independently and without reliance on Administrative Agent or any other Secured Party, and based on such documents and information as it has deemed appropriate, made its own credit analysis of Borrowers and Guarantors and has made its own decision to enter into this Agreement and that it will, independently and without reliance upon Administrative Agent or any other Secured Party, and based on such documents and information as it shall deem appropriate at the time, continue to make its own analysis and decisions in taking or not taking action under this Agreement or any of the other Financing Agreements. The Administrative Agent shall not be required to keep itself informed as to the performance or observance by any Loan Party of any term or provision of this Agreement or any of the other Financing Agreements or any other document referred to or provided for herein or therein or to inspect the properties or books of any Loan Party. The Administrative Agent will use reasonable efforts to provide Lenders with any information received by Administrative Agent from any Loan Party which is required to be provided to Lenders or deemed to be requested by Lenders hereunder and with a copy of any Notice of Default or Failure of Condition received by Administrative Agent from any Borrower or any Lender; provided, that, Administrative Agent shall not be liable to any Lender for any failure to do so, except to the extent that such failure is attributable to Agent's own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction. Except for notices, reports and other documents expressly required to be furnished to Lenders by Administrative Agent or deemed requested by Lenders hereunder (including the documents provided for in Section 14.10 hereof), Administrative Agent shall not have any duty or responsibility to provide any Lender with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of Agent.

14.7   Failure to Act. Except for action expressly required of the Administrative Agent hereunder and under the other Financing Agreements, Administrative Agent shall in all cases be fully justified in failing or refusing to act hereunder and thereunder unless it shall receive further assurances to its satisfaction from Lenders of their indemnification obligations under Section 14.5 hereof against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.

14.8   Additional Loans.  The Administrative Agent and Swing Line Lender (or Administrative Agent on behalf of Swing Line Lender) shall not make any Loans and an Issuing Bank shall not provide any Letter of Credit to any Borrower on behalf of Lenders intentionally

and with actual knowledge that such Loans or Letter of Credit would cause the aggregate amount of the total outstanding Loans and Letters of Credit to exceed the Borrowing Base, without the prior consent of all Lenders, except, that, Administrative Agent or Swing Line Lender may make such additional Revolving Loans or Swing Line Loans or an Issuing Bank may provide such additional Letter of Credit on behalf of Lenders, intentionally and with actual knowledge that such Revolving Loans, Swing Line Loans or Letter of Credit will cause the total outstanding Revolving Loans, Swing Line Loans and Letters of Credit to exceed the Borrowing Base, as Administrative Agent or Swing Line Lender may deem necessary or advisable in its discretion; provided, that: (a) the aggregate principal amount of the additional Revolving Loans, Swing Line Loans or additional Letters of Credit that Administrative Agent may make or Issuing Bank provide after obtaining actual knowledge that the aggregate principal amount of the Loans and Letter of Credit Obligations equal or exceed the Borrowing Base shall not cause such additional Loans and Letter of Credit Obligations, plus the amount of Special Administrative Agent Advances made pursuant to Section 14.11(a)(i) and (ii) hereof then outstanding, to exceed the aggregate amount equal to ten percent (10%) of the then most current Borrowing Base available to the Administrative Agent as of the date such additional Loans are made or Letters of Credit provided and shall not cause the total outstanding principal amount of the Loans and Letter of Credit Obligations to exceed the Maximum Credit and (b) no such additional Revolving Loan, Swing Line Loan or Letter of Credit shall be outstanding more than thirty (30) days after the date such additional Revolving Loan, Swing Line Loan or Letter of Credit is made or issued (as the case may be), except as the Required Lenders may otherwise agree. Each Lender shall be obligated to pay Administrative Agent the amount of its Pro Rata Share of any such additional Loans or Letter of Credit Obligations.

14.9    Concerning the Collateral and the Related Financing Agreements. Each Secured Party authorizes and directs Administrative Agent to enter into this Agreement and the other Financing Agreements. Each Secured Party agrees that any action taken by Administrative Agent or Required Lenders (or such greater percentage as may be required hereunder) in accordance with the terms of this Agreement or the other Financing Agreements and the exercise by Administrative Agent or Required Lenders (or such greater percentage as may be required hereunder) of their respective powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all Secured Parties.

14.10    Field Audit, Examination Reports and other Information; Disclaimer by Lenders. By signing this Agreement, each Lender:

(a)    is deemed to have requested that Administrative Agent furnish such Lender (and the Administrative Agent agrees that it will furnish to such Lender), promptly after it becomes available, a copy of each field audit or examination report and Borrowing Base Certificate prepared or received by Administrative Agent (each field audit or examination report and Borrowing Base Certificate being referred to herein as a "Report" and collectively, "Reports"), appraisals with respect to the Collateral and financial statements with respect to the Parent and its Subsidiaries received by Administrative Agent;

(b)    expressly agrees and acknowledges that Administrative Agent (i) does not make any representation or warranty as to the accuracy of any Report, appraisal or financial

statement or (ii) shall not be liable for any information contained in any Report, appraisal or financial statement;

(c)     expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Administrative Agent or any other party performing any audit or examination will inspect only specific information regarding Borrowers and Guarantors and will rely significantly upon Borrowers' and Guarantors' books and records, as well as on representations of Borrowers' and Guarantors' personnel; and

(d)     agrees to keep all Reports confidential and strictly for its internal use in accordance with the terms of Section 15.2 hereof, and not to distribute or use any Report in any other manner.

14.11   Collateral Matters.

(a)     Administrative Agent may, at its option, from time to time, at any time on or after an Event of Default and for so long as the same is continuing or upon any other failure of a condition precedent to the Loans and Letters of Credit hereunder, make such disbursements and advances ("Special Administrative Agent Advances") which Administrative Agent, in its sole discretion, (i) deems necessary or desirable either to preserve or protect the Collateral or any portion thereof or (ii) to enhance the likelihood or maximize the amount of repayment by Borrowers and Guarantors of the Loans and other Obligations, provided, that, (A) the aggregate principal amount of the Special Administrative Agent Advances pursuant to clauses (i) and (ii) of this subsection (a) outstanding at any time, plus the then outstanding principal amount of the additional Loans and Letters of Credit which Administrative Agent, Swing Line Lender or Issuing Bank may make or provide as set forth in Section 14.8 hereto, shall not exceed the aggregate amount equal to ten percent (10%) of the then most current Borrowing Base available to the Administrative Agent as of the date such Special Administrative Agent Advances are made and (B) the aggregate principal amount of the Special Administrative Agent Advances pursuant to clauses (i) and (ii) of this subsection (a) outstanding at any time, plus the then outstanding principal amount of the Loans and the Letter of Credit Obligations, shall not exceed the Maximum Credit, and (c) no such Special Administrative Agent Advances under clause (i) or clause (ii) of this subsection (a) shall be outstanding more than thirty (30) days after the date such Special Administrative Agent Advance is made, except as the Required Lenders may otherwise agree or (iii) to pay any other amount chargeable to any Loan Party pursuant to the terms of this Agreement or any of the other Financing Agreements consisting of (a) costs, fees and expenses and (b) payments to Issuing Bank in respect of any Letter of Credit Obligations. The Special Administrative Agent Advances shall be repayable on demand of the Administrative Agent or the Required Lenders and together with all interest thereon shall constitute Obligations secured by the Collateral. Special Administrative Agent Advances shall not constitute Loans but shall otherwise constitute Obligations hereunder. Interest on Special Administrative Agent Advances shall be payable at the Interest Rate then applicable to Base Rate Loans and shall be payable on demand of the Administrative Agent or the Required Lenders. Without limitation of its obligations pursuant to Section 6.13, each Lender agrees that it shall make available to Administrative Agent, upon Administrative Agent's demand, in immediately available funds, the amount equal to such Lender's Pro Rata Share of each such Special Administrative Agent Advance. If such funds are not made available to the Administrative Agent by such Lender, such

149

Lender shall be deemed a Defaulting Lender and the Administrative Agent shall be entitled to recover such funds, on demand from such Lender together with interest thereon for each day from the date such payment was due until the date such amount is paid to the Administrative Agent at the Federal Funds Rate for each day during such period (as published by the Federal Reserve Bank of New York or at Agent's option based on the arithmetic mean determined by Administrative Agent of the rates for the last transaction in overnight Federal funds arranged prior to 9:00 a.m. on that day by each of the three leading brokers of Federal funds transactions in New York selected by Agent) and if such amounts are not paid within three (3) days of Agent's demand, at the highest Interest Rate provided for in <u>Section 3.1</u> hereof applicable to Base Rate Loans.

(b)    Lenders hereby irrevocably authorize the Administrative Agent, at its option and in its discretion to release any security interest in, mortgage or lien upon, any of the Collateral (i) upon termination of the Commitments and Payment in Full, or (ii) constituting property being sold or disposed of if any Loan Party certifies to the Administrative Agent that the sale or disposition is made in compliance with <u>Section 10.1</u> hereof (and the Administrative Agent may rely conclusively on any such certificate, without further inquiry), or (iii) constituting property in which any Loan Party did not own an interest at the time the security interest, mortgage or lien was granted or at any time thereafter, or (iv) having a value in the aggregate in any twelve (12) month period of less than $2,500,000, and to the extent Administrative Agent may release its security interest in and lien upon any such Collateral pursuant to the sale or other disposition thereof, such sale or other disposition shall be deemed consented to by Lenders, or (v) to the extent a security interest in, mortgage or lien has previously been granted on any Excluded Property, (vi) if required or permitted under the terms of any of the other Financing Agreements, including any intercreditor agreement, or (vii) subject to <u>Section 13.3</u>, if the release is approved, authorized or ratified in writing by the Required Lenders. Except as provided above, Administrative Agent will not release any security interest in, mortgage or lien upon, any of the Collateral without the prior written authorization of all of Lenders. Upon request by Administrative Agent at any time, Lenders will promptly confirm in writing Administrative Agent's authority to release particular types or items of Collateral pursuant to this Section. In no event shall the consent or approval of an Issuing Bank to any release of Collateral be required. Nothing contained herein shall be construed to require the consent of any Bank Product Provider to any release of any Collateral or termination of security interests in any Collateral.

(c)    Without any manner limiting Administrative Agent's authority to act without any specific or further authorization or consent by the Required Lenders, each Lender agrees to confirm in writing, upon request by Administrative Agent, the authority to release Collateral conferred upon Administrative Agent under this Section. The Administrative Agent shall (and is hereby irrevocably authorized by Lenders to) execute such documents as may be necessary to evidence the release of the security interest, mortgage or liens granted to the Administrative Agent upon any Collateral to the extent set forth above; <u>provided</u>, that, (i) Administrative Agent shall not be required to execute any such document on terms which, in the Administrative Agent's Permitted Discretion, would expose Administrative Agent to liability or create any obligations or entail any consequence other than the release of such security interest, mortgage or liens without recourse or warranty and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any security interest, mortgage or lien upon (or obligations of any Loan Party in respect of) the Collateral retained by such Loan Party.

4241829.6

(d)    Administrative Agent shall have no obligation whatsoever to any Secured Party or any other Person to investigate, confirm or assure that the Collateral exists or is owned by any Loan Party or is cared for, protected or insured or has been encumbered, or that any particular items of Collateral meet the eligibility criteria applicable in respect of the Loans or Letters of Credit hereunder, or whether any particular reserves are appropriate, or that the liens and security interests granted to the Administrative Agent pursuant hereto or any of the Financing Agreements or otherwise have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Administrative Agent in this Agreement or in any of the other Financing Agreements, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, subject to the other terms and conditions contained herein, Administrative Agent may act in any manner it may deem appropriate, in its discretion, given Agent's own interest in the Collateral as a Lender and that Administrative Agent shall have no duty or liability whatsoever to any other Lender or Issuing Bank.

14.12    Agency for Perfection.

Each Secured Party hereby appoints Administrative Agent and each other Secured Party as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral of the Administrative Agent in assets which, in accordance with Article 9 of the UCC can be perfected only by possession (or where the security interest of a secured party with possession has priority over the security interest of another secured party) and the Administrative Agent and each Secured Party hereby acknowledges that it holds possession of any such Collateral for the benefit of the Administrative Agent as secured party. Should any Secured Party obtain possession of any such Collateral, such Secured Party shall notify Administrative Agent thereof, and, promptly upon Agent's request therefor shall deliver such Collateral to the Administrative Agent or in accordance with Agent's instructions.

14.13    Administrative Agent May File Proofs of Claim.

(a)    In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, Administrative Agent (irrespective of whether the principal of any Loan or Letter of Credit Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(i)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, Letter of Credit Obligations and all other Obligations (other than obligations under Bank Products to which Administrative Agent is not a party) that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of Lenders, Issuing Bank and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of Lenders, Issuing Bank and the Administrative Agent and their respective agents and counsel and

4241829.6

all other amounts due Lenders, Issuing Bank and the Administrative Agent allowed in such judicial proceeding; and

(ii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and Issuing Bank to make such payments to the Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to Lenders and Issuing Bank, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due Agent.

(b)    Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or Issuing Bank any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

14.14    Successor Agent.

(a)    The Administrative Agent may resign as the Administrative Agent upon thirty (30) days' notice to Lenders and the Parent. If the Administrative Agent resigns under this Agreement, the Required Lenders shall appoint from among the Lenders a successor agent for Lenders, subject to Borrowers' consent.  If no successor agent is appointed prior to the effective date of the resignation of Agent, Administrative Agent may appoint, after consulting with Lenders and the Parent, a successor agent from among Lenders.  If, at the time that Administrative Agent's resignation is effective, it is acting as Issuing Bank or the Swing Line Lender, such resignation shall also operate to effectuate its resignation as Issuing Bank or the Swing Line Lender, as applicable, and it shall automatically be relieved of any further obligation to issue Letters of Credit, or to make Swing Line Loans.  Upon the acceptance by the Lender so selected of its appointment as successor agent hereunder, such successor agent shall succeed to all of the rights, powers and duties of the retiring Administrative Agent and the term "Agent" as used herein and in the other Financing Agreements shall mean such successor agent and the retiring Administrative Agent's appointment, powers and duties as the Administrative Agent shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 14 shall inure to its benefit as to any actions taken or omitted by it while it was the Administrative Agent under this Agreement. If no successor agent has accepted appointment as the Administrative Agent by the date which is thirty (30) days after the date of a retiring Agent's notice of resignation, the retiring Administrative Agent's resignation shall nonetheless thereupon become effective and Required Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.

(b)    If Wells Fargo resigns as an Issuing Bank, it shall retain all the rights, powers, privileges and duties of the Issuing Bank hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as Issuing Bank and all Obligations with respect thereto, including the right to require the Lenders to make Base Rate Loans or fund risk

4241829.6

participations in the Letter of Credit Exposure with respect to such Letters of Credit pursuant to Section 2.3. If Wells Fargo resigns as Swing Line Lender, it shall retain all the rights of the Swing Line Lender provided for hereunder with respect to Swing Line Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Base Rate Loans or fund risk participations in outstanding Swing Line Loans pursuant to Section 2.2. Upon the appointment by the Borrowers of a successor Issuing Bank or Swing Line Lender hereunder (which successor shall in all cases be a Lender other than a Defaulting Lender) and upon the acceptance by such Lender of such appointment, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank and Swing Line Lender, as applicable, and (b) the retiring Issuing Bank and Swing Line Lender shall be discharged from all of their respective duties and obligations hereunder or under the other Financing Agreements.

14.15   Legal Representation of Agent. In connection with the negotiation, drafting, and execution of this Agreement and the other Financing Agreements, or in connection with future legal representation relating to loan administration, amendments, modifications, waivers, or enforcement of remedies, a single team at Otterbourg P.C. has represented Wells Fargo in its capacity as Issuing Bank, the Administrative Agent and as a Lender.

14.16   Other Administrative Agent Designations. The Administrative Agent may at any time and from time to time, with the prior consent of the Borrowers (such consent not to be unreasonably withheld, delayed or conditioned), determine that a Lender may, in addition, be a "Co-Agent", "Syndication Agent", "Documentation Agent" or similar designation hereunder and enter into an agreement with such Lender to have it so identified for purposes of this Agreement. Any Lender that is so designated as a Co-Agent, Syndication Agent, Documentation Agent or such similar designation by the Administrative Agent shall have no right, power, obligation, liability, responsibility or duty under this Agreement or any of the other Financing Agreements other than those applicable to all Lenders as such. Without limiting the foregoing, the Lenders so identified shall not have or be deemed to have any fiduciary relationship with any Lender and no Lender shall be deemed to have relied, nor shall any Lender rely, on a Lender so identified as a Co-Agent, Syndication Agent, Documentation Agent, or such similar designation in deciding to enter into this Agreement or in taking or not taking action hereunder.

**SECTION 15.    TERM OF AGREEMENT; MISCELLANEOUS**

15.1   Term.

(a)    This Agreement and the other Financing Agreements shall become effective as of the date set forth on the first page hereof and shall continue in full force and effect for a term ending on the Maturity Date, unless sooner terminated pursuant to the terms hereof. In addition, Borrowers may terminate this Agreement at any time upon ten (10) days prior written notice to the Administrative Agent (which notice shall, unless such termination is conditioned, in writing, upon a financing transaction, be irrevocable) and the Administrative Agent may, and at the request of the Required Lenders shall, terminate this Agreement at any time on or after an Event of Default and for so long as the same is continuing. Upon the Maturity Date or any other effective date of termination of the Financing Agreements, Borrowers shall pay to the Administrative Agent for the account of the Secured Parties, in cash (or as otherwise specified

4241829.6

below), all outstanding and unpaid Obligations (other than unasserted contingent indemnification obligations) and shall furnish cash collateral to the Administrative Agent (or at the Administrative Agent's option, a letter of credit issued for the account of Borrowers and at Borrowers' expense, in form and substance reasonably satisfactory to the Administrative Agent, by an issuer reasonably acceptable to the Administrative Agent and payable to the Administrative Agent on behalf of the Lenders) in such amounts as the Administrative Agent determines are reasonably necessary to secure the Administrative Agent and the Secured Parties from loss, cost, damage or expense, including attorneys' fees and legal expenses, in connection with (i) any contingent Obligations (other than unasserted contingent indemnification obligations), including issued and outstanding Letter of Credit Obligations and checks or other payments provisionally credited to the Obligations and/or as to which the Administrative Agent has not yet received final and irrevocable payment (and including any contingent liability of the Administrative Agent to any bank at which deposit accounts of any Borrower are maintained under any Deposit Account Control Agreement) and (ii) any Obligations arising under or in connection with any Bank Products except for such Obligations, that, at such time, are allowed by the applicable Bank Product Provider to remain outstanding without being required to be repaid or cash collateralized (the requirements in this sentence, together with the amount of such cash collateral or letter of credit set forth in the following sentence and the termination of the Commitments, is collectively referred to herein as, "<u>Payment in Full</u>"). The amount of such cash collateral (or letter of credit, as the Administrative Agent may determine) as to any Letter of Credit Obligations shall be in the amount equal to one hundred five percent (105%) of the amount of the Letter of Credit Obligations plus the amount of any fees and expenses payable in connection therewith through the end of the latest expiration date of the Letters of Credit giving rise to such Letter of Credit Obligations. Such payments in respect of the Obligations and cash collateral shall be remitted by wire transfer in Federal funds to the Administrative Agent Payment Account or such other bank account of the Administrative Agent, as the Administrative Agent may, in its discretion, designate in writing to Borrowers for such purpose. Interest shall be due until and including the next business day, if the amounts so paid by Borrowers to the Administrative Agent Payment Account or other bank account designated by the Administrative Agent are received in such bank account later than 12:00 noon.

(b)     No termination of this Agreement or any of the other Financing Agreements shall relieve or discharge any Loan Party of its respective duties, obligations and covenants under this Agreement or any of the other Financing Agreements until the Payment in Full, and the Administrative Agent's continuing security interest in the Collateral and the rights and remedies of the Administrative Agent and the Lenders hereunder, under the other Financing Agreements and applicable law, shall remain in effect until the Payment in Full. Accordingly, each Loan Party waives any rights they may have under the UCC to demand the filing of termination statements with respect to the Collateral, and the Administrative Agent shall not be required to send such termination statements to any Loan Party, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and the Payment in Full.

(c)     If for any reason this Agreement is terminated prior to August 19, 2016, in view of the impracticality and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of the Lenders' lost profits as a result

thereof, each Borrower agrees to pay to the Administrative Agent, for the account of the Lenders, upon the effective date of such termination, an early termination fee in the amount equal to:

| Amount | Period |
|---|---|
| (i)    0.50% of Maximum Credit | From Closing Date to and including August 18, 2015 |
| (ii)  0.25% of Maximum Credit | From August 19, 2015 to and including August 18, 2016 |

Such early termination fee shall be presumed to be the amount of damages sustained by the Lenders as a result of such early termination and each Loan Party agrees that it is reasonable under the circumstances currently existing (including, but not limited to, the borrowings that are reasonably expected by Borrowers hereunder and the interest, fees and other charges that are reasonably expected to be received by Lenders pursuant to the Credit Facility). In addition, Lenders shall be entitled to such early termination fee upon the occurrence of any Event of Default described in Sections 12.1(f) and (g) hereof prior to August 19, 2016, even if the Administrative Agent or the Lenders do not exercise the right to terminate this Agreement, but elect, at its or their option, to provide financing to Borrowers or permit the use of cash collateral under the United States Bankruptcy Code. The early termination fee provided for in this Section 15.1(c) shall be deemed included in the Obligations.

(d)    Notwithstanding anything to the contrary contained in Section 15.1(c) hereof, in the event of the termination of this Agreement by Borrowers prior to August 19, 2016 and the full and final repayment of all of the Obligations and the receipt by the Lenders of cash collateral all as provided in Section 15.1(a) hereof (or letter of credit, at the Administrative Agent's option, as provided therein) in connection with the acquisition by a Person (other than an Affiliate of Borrowers) of all or substantially all of the assets or Equity Interests of Borrowers, the Parent, or Intermediate Holdco so long as an Event of Default under Section 12.1(f) or 12.1(g) shall not have occurred Borrowers shall not be required to pay the early termination fee provided for in Section 15.1(c) above.

15.2    Confidentiality.

(a)    Each of the Administrative Agent and each Lender shall use all reasonable efforts to keep confidential, in accordance with its customary procedures for handling confidential information and safe and sound lending practices, any non-public information supplied to it by Parent, Borrowers and their Subsidiaries pursuant to this Agreement, provided, that, nothing contained herein shall limit the disclosure of any such information: (i) to the extent required by statute, rule, regulation, subpoena or court order, (ii) to bank examiners and other regulators, auditors and/or accountants, in connection with any litigation to which the Administrative Agent or any Lender is a party, (iii) to any participant (or prospective participant), any Lender (or prospective Lender) or any Affiliate of any Lender so long as such Lender or such participant (or prospective Lender or participant) or Affiliate shall have been instructed to treat such information as confidential in accordance with this Section 15.2, or (iv) to counsel for the Administrative Agent, the Lenders or any participant (or prospective Lender or

participant) as long as such counsel is advised of its obligation to retain such information as confidential and Administrative Agent, the relevant Lender or the relevant participant (or prospective Lender or participant) shall be responsible for its counsel's compliance with this paragraph; provided, that (x) in the case of clauses (i) and (ii), to the extent permitted by applicable law, regulation or order and otherwise practical, and other than to the extent such request or demand is in the ordinary course of business of Administrative Agent or such Lender or consistent with the regulatory compliance practices and procedures of Administrative Agent or such Lender, Parent and the Borrowers are promptly notified of such proceeding, process, requirement, request or demand and given a reasonable opportunity to seek confidential treatment, a protective order or other appropriate relief or remedy and (y) if disclosure of such information is required, the Administrative Agent or such Lender shall disclose only the portion of information that is required to be disclosed or as is consistent with the regulatory practices and procedures of Administrative Agent or such Lender and, subject to reimbursement by Borrowers of the Administrative Agent's or Lenders' expenses, as the case may be, cooperate with Borrowers in the reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the disclosed information which Borrowers so designate.

(b)    In no event shall this Section 15.2 or any other provision of this Agreement, any of the other Financing Agreements or applicable law be deemed: (i) to apply to or restrict disclosure of information that has been or is made public by any Loan Party or otherwise becomes generally available to the public other than as a result of a disclosure in violation hereof, (ii) to apply to or restrict disclosure of information that was or becomes available to the Administrative Agent or the Lenders (or any Affiliate of such parties) on a non-confidential basis from a person other than a Loan Party and, to the Administrative Agent or Lenders' knowledge (or the knowledge of such Affiliate), such source was not subject to a confidentiality agreement with respect to such information, or (iii) to restrict the Administrative Agent or any Lender from responding to routine informational requests in accordance with the Code of Ethics for the Exchange of Credit Information promulgated by The Robert Morris Associates or other applicable industry standards relating to the exchange of credit information. The obligations of the Administrative Agent and the Lenders under this Section 15.2 shall supersede and replace the obligations of such persons under any confidentiality letter signed prior to the date hereof.

15.3    Interpretative Provisions.

(a)    All terms used herein which are defined in Article 1, Article 8 or Article 9 of the UCC shall have the meanings given therein unless otherwise defined in this Agreement.

(b)    All references to the plural herein shall also mean the singular and to the singular shall also mean the plural unless the context otherwise requires.

(c)    All references to Borrowers, Guarantors, Loan Parties, Administrative Agent, Issuing Bank and Lenders pursuant to the definitions set forth in the recitals hereto, or to any other person herein, shall include their respective successors and assigns.

156

(d)     The words "hereof", "herein", "hereunder", "this Agreement" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not any particular provision of this Agreement and as this Agreement now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(e)     The word "including" when used in this Agreement shall mean "including, without limitation" and the word "will" when used in this Agreement shall be construed to have the same meaning and effect as the word "shall".

(f)     An Event of Default shall exist or continue or be continuing until such Event of Default is waived in accordance with Section 13.3 or is cured in a manner satisfactory to Administrative Agent, if such Event of Default is capable of being cured as determined by Administrative Agent in its Permitted Discretion.

(g)     All references to the term "good faith" used herein when applicable to the Administrative Agent shall mean, notwithstanding anything to the contrary contained herein or in the UCC, honesty in fact in the conduct or transaction concerned. Borrowers shall have the burden of proving any lack of good faith on the part of the Administrative Agent alleged by Borrowers at any time.

(h)     Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP applied on a basis consistent with the most recent audited consolidated financial statements of Borrowers delivered to the Administrative Agent; provided, that, in the event of any change in GAAP after the date hereof that affects the covenants in Section 11 hereof, then upon the written request of the Borrowers or the Administrative Agent, the Borrower, the Administrative Agent and the Lenders shall enter into good faith negotiations in order to amend such provisions of this Agreement so as to equitably reflect such change with the desired result that the criteria for evaluating the Borrowers' financial condition shall be the same after such change as if such change had not occurred; provided that if such notice is given then the provisions of this Agreement in effect on the date of such change shall remain in effect until the effective date of such amendment.  Borrowers shall deliver to the Administrative Agent at the same time as the delivery of any financial statements given in accordance with the provisions of Section 9.6 hereof (i) a description in reasonable detail of any material change in the application of accounting principles employed in the preparation of such financial statements from those applied in the most recently preceding monthly, quarterly or annual financial statements and (ii) a reasonable estimate of the effect on the financial statements on account of such changes in application. Notwithstanding anything to the contrary contained in GAAP or any interpretations or other pronouncements by the Financial Accounting Standards Board or otherwise, the term "unqualified opinion" as used herein to refer to opinions or reports provided by accountants shall mean an opinion or report that is unqualified and also does not include any explanation, supplemental comment or other comment concerning the ability of the applicable person to continue as a going concern or the scope of the audit.

(i)     Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City on such

day. For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to and including"; provided, that, with respect to a computation of fees or interest payable to any Lender, such period shall in any event consist of at least one full day.

(j)    Unless otherwise expressly provided herein, (i) references herein to any agreement, document or instrument shall be deemed to include all subsequent amendments, modifications, supplements, extensions, renewals, restatements or replacements with respect thereto, but only to the extent the same are not prohibited by the terms hereof or of any other Financing Agreement, and (ii) references to any statute or regulation are to be construed as including all statutory and regulatory provisions consolidating, amending, replacing, recodifying, supplementing or interpreting the statute or regulation.

(k)    The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

(l)    This Agreement and other Financing Agreements (as  may use several different limitations, tests or measurements to regulate the same or similar matters. All such limitations, tests and measurements are cumulative and shall each be performed in accordance with their terms.

(m)    This Agreement and the other Financing Agreements are the result of negotiations among and have been reviewed by counsel to the Administrative Agent and the Lenders and the other parties, and are the products of all parties. Accordingly, this Agreement and the other Financing Agreements shall not be construed against the Administrative Agent and the Lenders merely because of such persons' involvement in their preparation.

(n)    Unless otherwise indicated herein, each reference to one or more months, quarters or years shall refer to one or more calendar months, calendar quarters or calendar years, respectively.

15.4    Intercreditor Agreement. Each Secured Party (a) consents to the terms of the Intercreditor Agreement, (b) agrees that it will be bound by, and take no actions contrary to, the provisions of the Intercreditor Agreement and (c) authorizes and instructs Administrative Agent to enter into the Intercreditor Agreement on its behalf.  Notwithstanding anything to the contrary herein, the liens granted to Administrative Agent pursuant to this Agreement and the exercise of any right or remedy by Administrative Agent hereunder with respect to the Collateral are subject to the provisions of the Intercreditor Agreement.  In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement with respect to such matters, the terms of the Intercreditor Agreement shall govern and control.

15.5    Notices.

(a)    All notices, requests and demands hereunder shall be in writing and deemed to have been given or made: if delivered in person, immediately upon delivery; if by telex, telegram or facsimile transmission, immediately upon sending and upon confirmation of receipt; if by nationally recognized overnight courier service with instructions to deliver the next Business Day, one (1) Business Day after sending; and if by certified mail, return receipt

4241829.6

requested, five (5) days after mailing. Notices delivered through electronic communications shall be effective to the extent set forth in Section 15.5(b) hereto. All notices, requests and demands upon the parties are to be given to the following addresses (or to such other address as any party may designate by notice in accordance with this Section 15.5):

|  |  |
|---|---|
| If to any Loan Party: | Bob's Stores, LLC<br>Eastern Mountain Sports, LLC<br>Sport Chalet, LLC<br>160 Corporate Court<br>Meriden, Connecticut 06450<br>Attention:  Dan Bliss, Controller<br>　　　　　　　Mark Walsh, CEO<br>Facsimile No.: (203) 235-5775 |
| with a copy to: | Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, New York 10004<br>Attention:  S. Neal McKnight, Esq.<br>Facsimile No.: (212) 291-9097 |
| with a copy to: | Vestis Retail Financing, LLC.<br>Cira Centre<br>2929 Arch Street<br>Philadelphia, Pennsylvania 19104-2808<br>Attention:  General Counsel<br>Facsimile No.: (215) 609-3499 |
| If to the Administrative Agent: | Wells Fargo Capital Finance, LLC<br>One Boston Place, 18th Floor<br>Boston, Massachusetts 02108<br>Attention:  Portfolio Manager - Vestis<br>Facsimile No.: (617) 523-4032 |
| with a copy to: | Otterbourg P.C.<br>230 Park Avenue<br>New York, NY 10169<br>Attention:  Michael Barocas, Esq.<br>Facsimile No.: (212) 905-3602 |
| If to any Lender: | To it at its address set forth in Schedule 1 or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto. |

(b)     Notices and other communications to the Administrative Agent and Lenders hereunder may be delivered or furnished by electronic communication (including e-mail

and Internet or intranet websites) pursuant to procedures approved by Administrative Agent, or as otherwise determined by Administrative Agent. Unless Administrative Agent otherwise requires, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided, that, if such notice or other communication is not given during the normal business hours of the recipient, such notice shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communications is available and identifying the website address therefor.

15.6    Partial Invalidity. If any provision of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Agreement as a whole, but this Agreement shall be construed as though it did not contain the particular provision held to be invalid or unenforceable and the rights and obligations of the parties shall be construed and enforced only to such extent as shall be permitted by applicable law.

15.7    Successors. This Agreement, the other Financing Agreements and any other document referred to herein or therein shall be binding upon the parties hereto and their respective successors and assigns, except that Loan Parties may not assign their rights under this Agreement, the other Financing Agreement and any other document referred to herein or therein without the prior written consent of the Administrative Agent and each Lender or as permitted pursuant to Section 10.1.  Any Lender may assign its rights and delegate its obligations under this Agreement and the other Financing Agreements and further may assign, or sell participations in, all or any part of the Revolving Loans, the Swing Line Loans, the Letters of Credit or any other interest herein to another financial institution or other person on terms and conditions reasonably acceptable to such Lender; provided; that, any such assignment of (but not participation in) the Revolving Loans, Letters of Credit or any interest therein shall (i) be subject to the terms of this Agreement and (ii) be to an Eligible Transferee.

15.8    Assignments; Participations.

(a)    Each Lender may assign all or, if less than all, a portion equal to at least $10,000,000 in the aggregate for the assigning Lender, of such rights and obligations under this Agreement to one or more Eligible Transferees (but not including for this purpose any assignments in the form of a participation), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Acceptance; provided, that, (i) such transfer or assignment will not be effective without the prior written consent of Administrative Agent and the Parent (except, in the case of the Parent, if an Event of Default exists), which consent shall not be unreasonably withheld, conditioned or delayed, provided, that, such consent shall not be required in connection with an assignment to another Lender or to any Affiliate of a Lender and the Parent will be deemed to have consented after a period of ten (10) days, provided further, that there shall be no deemed consent with respect to any assignments to Disqualified Institutions, (ii) in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a

Lender or an Affiliate of a Lender, no minimum amount need be assigned, (iii) such transfer or assignment will not be effective until recorded by Administrative Agent on the Register, and (iv) Administrative Agent shall have received for its sole account payment of a processing fee from the assigning Lender or the assignee in the amount of $3,500 (unless waived by Administrative Agent in its sole discretion).

        (b)     Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and to the other Financing Agreements and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations (including, without limitation, the obligation to participate in Letter of Credit Obligations) of a Lender hereunder and thereunder and the assigning Lender shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement.

        (c)     By execution and delivery of an Assignment and Acceptance, the assignor and assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any of the other Financing Agreements or the execution, legality, enforceability, genuineness, sufficiency or value of this Agreement or any of the other Financing Agreements furnished pursuant hereto, (ii) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Borrower, Guarantor or any of their Subsidiaries or the performance or observance by any Loan Party of any of the Obligations; (iii) such assignee confirms that it has received a copy of this Agreement and the other Financing Agreements, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance, (iv) such assignee will, independently and without reliance upon the assigning Lender, Administrative Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Financing Agreements, (v) such assignee appoints and authorizes Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Financing Agreements as are delegated to the Administrative Agent by the terms hereof and thereof, together with such powers as are reasonably incidental thereto, and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Financing Agreements are required to be performed by it as a Lender. The Administrative Agent and Lenders may furnish any information concerning any Loan Party in the possession of the Administrative Agent or any Lender from time to time to assignees and participants.

        (d)     Each Lender may sell participations to one or more banks or other entities (other than Disqualified Institutions) in or to all or a portion of its rights and obligations under this Agreement and the other Financing Agreements (including, without limitation, all or a portion of its Commitments and the Loans owing to it and its participation in the Letter of Credit Obligations, without the consent of the Administrative Agent or the other Lenders); provided,

4241829.6

that, (i) such Lender's obligations under this Agreement (including, without limitation, its Commitment hereunder) and the other Financing Agreements shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and Borrowers, Guarantors, the other Lenders and the Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Financing Agreements, (iii) the participant shall not have any rights under this Agreement or any of the other Financing Agreements (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by any Loan Party hereunder shall be determined as if such Lender had not sold such participation, (iv) each Lender shall retain the sole right to vote, approve or consent, or to not approve or not consent, to or in connection with any amendment, waiver or other modifications of any of the terms and provisions hereof or of any of the other Financing Agreements or to otherwise act or refrain from acting hereunder or thereunder within its exclusive discretion and without any vote, approval or consent of any participant, other than for the forgiveness of principal, interest or fees, reductions in the interest rate or fees payable with respect to any Loan or Commitment in which such participant has an interest, the extension of the Maturity Date for a Loan or Commitment in which such participant has an interest, or any date fixed for any regularly scheduled payment of principal, interest or fees in such Loan or Commitment, the release of a Loan Party or all or substantially all of the Collateral and in the case of any participant that may be an Affiliate of a Loan Party or change the percentage set forth in the definition of "Required Lenders" or any other provision of the Credit Facility specifying the number of percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder.  No participant shall have any of the rights to vote, approve or consent to any amendment, waiver or modification hereof or of any of the other Financing Agreements or the right to vote, approve or consent to any vote, approval of consent or other action or refraining from action of the Lender in whose Loans and Commitments such participant has an interest except as expressly provided in this clause (d). Each participant shall not, and shall not have the right to, attend any meeting (whether conducted by telephone or in person) with the Loan Parties.

(e)    Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans hereunder to a Federal Reserve Bank or other Federal banking authority or institution in support of borrowings made by such Lenders from such Federal Reserve Bank or other such banking authority or institution; provided, that, no such pledge shall release such Lender from any of its obligations hereunder or substitute any such pledgee for such Lender as a party hereto.

(f)    Any Lender that is an Issuing Bank may at any time assign all of its Commitments pursuant to this Section 15.7. If such Issuing Bank ceases to be a Lender, it may, at its option, resign as Issuing Bank and such Issuing Bank's obligations to issue Letters of Credit shall terminate but it shall retain all of the rights and obligations of Issuing Bank hereunder with respect to Letters of Credit outstanding as of the effective date of its resignation and all Letter of Credit Obligations with respect thereto (including the right to require Lenders to make Loans or fund risk participations in outstanding Letter of Credit Obligations), shall continue.

15.9    [Reserved].

15.10    USA PATRIOT Act. The Administrative Agent and each Lender subject to the USA PATRIOT Act (Title III of Pub.L. 107-56 (signed into law October 26, 2001) (the "Act") hereby notifies each Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies each person or corporation who opens an account and/or enters into a business relationship with it, which information includes the name and address of Borrowers and other information that will allow each the Administrative Agent and each Lender to identify Borrowers in accordance with the Act and any other applicable law. Each Borrower is hereby advised that any Loans or Letters of Credit hereunder are subject to satisfactory results of such verification.

15.11    Register. In the event any Lender assigns, or sells participations in, any part of the Loans, the Letters of Credit or any other interest herein, the Administrative Agent shall maintain a register on which it enters the name and address of each assignee or participant and the principal amounts (and stated interest) of each assignee's or participant's interest.

15.12    Entire Agreement. This Agreement, the other Financing Agreements, any supplements hereto or thereto, and any instruments or documents delivered or to be delivered in connection herewith or therewith represents the entire agreement and understanding concerning the subject matter hereof and thereof between the parties hereto, and supersede all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written. In the event of any inconsistency between the terms of this Agreement and any schedule or exhibit hereto, the terms of this Agreement shall govern.

15.13    Counterparts, Etc. This Agreement or any of the other Financing Agreements may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement or any of the other Financing Agreements by telefacsimile or other electronic method of transmission shall have the same force and effect as the delivery of an original executed counterpart of this Agreement or any of such other Financing Agreements. Any party delivering an executed counterpart of any such agreement by telefacsimile or other electronic method of transmission shall also deliver an original executed counterpart, but the failure to do so shall not affect the validity, enforceability or binding effect of such agreement.

15.14    Acknowledgment and Restatement.

(a)    Acknowledgment of Security Interests.

(i)    Each Loan Party hereby acknowledges, confirms and agrees that the Administrative Agent has and shall continue to have a security interest in and lien upon the Collateral heretofore granted to Administrative Agent pursuant to the Existing Loan Agreement and the other Financing Agreements (as defined in the Existing Loan Agreement) to secure the Obligations, as well as any Collateral granted under this Agreement or under any of the other Financing Agreements or otherwise granted to or held by Administrative Agent.

4241829.6

(ii)     The liens and security interests of the Administrative Agent in the Collateral of Loan Parties shall be deemed to be continuously granted and perfected from the earliest date of the granting and perfection of such liens and security interests, whether under the Existing Loan Agreement and the other Financing Agreements (as defined in the Existing Loan Agreement), this Agreement or any other Financing Agreements.

(b)     Existing Loan Agreement, etc.. Each Loan Party hereby acknowledges, confirms and agrees that: (a) each of the Existing Loan Agreement and other Financing Agreement (as defined in the Existing Loan Agreement) has been duly executed and delivered by each Loan Party that is a party thereto and is in full force and effect as of the date hereof and (b) the agreements and obligations of Loan Parties contained in the Existing Loan Agreement and other Financing Agreement (as defined in the Existing Loan Agreement) constitute the legal, valid and binding obligation of each Loan Party that is party thereto in accordance with its terms and each Loan Party has no valid defense to the enforcement of such obligations and (c) Administrative Agent and the Lenders are entitled to all of the rights and remedies provided for in the Existing Loan Agreement and the Financing Agreements (as defined in the Existing Loan Agreement).

(c)     Restatement.

(i)     Except as otherwise stated in this Section 15.14 as of the date hereof, the terms, conditions, agreements, covenants, representations and warranties set forth in the Existing Loan Agreement and other Financing Agreement (as defined in the Existing Loan Agreement) are hereby amended and restated in their entirety, and as so amended and restated, replaced and superseded, by the terms, conditions, agreements, covenants, representations and warranties set forth in this Agreement, except that nothing herein or in the other Financing Agreements shall impair or adversely affect the continuation of the liability of the Loan Parties for the Obligations heretofore incurred, granted, pledged and/or assigned to Lender under the Existing Loan Agreement and the Financing Agreement (as defined in the Existing Loan Agreement).  The amendment and restatement contained herein shall not, in any manner, be construed to constitute payment of, or impair, limit, cancel or extinguish, or constitute a novation in respect of, the indebtedness and other obligations and liabilities of the Loan Parties evidenced by or arising under the Existing Loan Agreement and the Financing Agreements (as defined in the Existing Loan Agreement), and the liens and security interests securing such indebtedness and other obligations and liabilities, which shall not in any manner be impaired, limited, terminated, waived or released.

(ii)     The principal amount of the Revolving Loans (as defined in the Existing Loan Agreement) outstanding as of the date hereof under the Existing Loan Agreement shall be deemed to be Revolving Loans hereunder. The principal amount of the Swing Line Loans (as defined in the Existing Loan Agreement) outstanding as of the date hereof under the Existing Loan Agreement shall be deemed to be Swing Line Loans hereunder. The Letter of Credit Obligations (as defined in the Existing Loan Agreement) outstanding as of the date hereof under the Existing Loan Agreement shall be deemed to be Letter of Credit Obligations hereunder.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

164

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**BOB'S STORES, LLC**

By: _____
Name: _____
Title: _____

**EASTERN MOUNTAIN SPORTS LLC**

By: _____
Name: _____
Title: _____

**SPORT CHALET, LLC**

By: _____
Name: _____
Title: _____

**SPORT CHALET VALUE SERVICES, LLC**

By: _____
Name: _____
Title: _____

**SPORT CHALET TEAM SALES, LLC**

By: _____
Name: _____
Title: _____

**EMS OPERATING COMPANY, LLC**

By: _____
Name: _____
Title: _____

**VESTIS RETAIL GROUP, LLC**

By: _____
Name: _____
Title: _____


**VESTIS RETAIL FINANCING, LLC**

By: _____
Name: _____
Title: _____


**EMS ACQUISITION LLC**

By: _____
Name: _____
Title: _____


**VESTIS IP HOLDINGS, LLC**

By: _____
Name: _____
Title: _____

[Signature Page of Fourth Amended and Restated Loan Agreement]

**WELLS FARGO CAPITAL FINANCE, LLC,** as Administrative Agent and a Lender

By: _____

Name: _____

Title: _____


**BANK OF AMERICA, N.A.**

By: _____

Name: _____

Title: _____

[Signature Page of Fourth Amended and Restated Loan Agreement]

**<u>EXHIBIT D</u>**

**Budget**

**Vestis Retail Group (Consolidated)**
**Summary DIP Budget**
($ in 000's)

| Month | April | April | May | May | May | May | June | Jun | Jun | Jun | Jun | Jul | Jul | Post-Petition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 4/23/16 | 4/30/16 | 5/7/16 | 5/14/16 | 5/21/16 | 5/28/16 | 6/4/16 | 6/11/16 | 6/18/16 | 6/25/16 | 7/2/16 | 7/9/16 | 7/16/16 | 13-Week |
| Week of Forecast | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
| Forecast/Actual | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| **I. CASH FLOW** | | | | | | | | | | | | | | |
| 1) Total Cash Receipts | 13,479 | 15,911 | 16,532 | 16,794 | 17,986 | 18,027 | 17,164 | 17,072 | 18,516 | 17,475 | 10,891 | 7,462 | 6,367 | 193,676 |
| Cash Disbursements | | | | | | | | | | | | | | |
| 2) Operating Disbursements | (8,740) | (13,537) | (9,727) | (5,691) | (10,557) | (11,746) | (8,755) | (4,842) | (12,307) | (6,703) | (12,839) | (6,957) | (12,134) | (124,536) |
| 3) Financing Cash Disbursements | (1,350) | (151) | (614) | (75) | (75) | (75) | (554) | (75) | (75) | (75) | (376) | (75) | (75) | (3,644) |
| 4) Professional Fee Cash Disbursements | (650) | (375) | (375) | (388) | (238) | (238) | (213) | (338) | (213) | (1,213) | (528) | (188) | (188) | (5,140) |
| 5) Bankruptcy Cash Disbursements | (500) | (41) | (268) | (240) | (238) | (241) | (256) | (242) | (19) | (19) | (33) | (970) | (1,411) | (4,478) |
| 6) **Total Cash Disbursements** | (11,240) | (14,104) | (10,984) | (6,394) | (11,108) | (12,299) | (9,778) | (5,497) | (12,613) | (8,010) | (13,776) | (8,189) | (13,808) | (137,799) |
| 7) **Net Cash Flow Before Borrowings** | $ 2,239 | $ 1,807 | $ 5,549 | $ 10,401 | $ 6,878 | $ 5,728 | $ 7,386 | $ 11,575 | $ 5,903 | $ 9,465 | $ (2,885) | $ (727) | $ (7,441) | $ 55,877 |
| **II. FINANCING** | | | | | | | | | | | | | | |
| 8) Starting Pre-Petition Revolver Balance | 96,600 | 83,121 | 67,210 | 50,678 | 33,884 | 15,898 | - | - | - | - | - | - | - | 96,600 |
| 9) Revolver Borrowings / (Paydowns) | (13,479) | (15,911) | (16,532) | (16,794) | (17,986) | (15,898) | - | - | - | - | - | - | - | (96,600) |
| 10) **Ending Pre-Petition Revolver Balance** | 83,121 | 67,210 | 50,678 | 33,884 | 15,898 | - | - | - | - | - | - | - | - | - |
| 11) O/S Checks: | | | | | | | | | | | | | | |
| 12) Beginning O/S Checks | 100 | 2,652 | 10,486 | 4,971 | 3,727 | 2,783 | 9,732 | 6,306 | 3,063 | 3,063 | 4,193 | 7,401 | 4,655 | 100 |
| 13) Ending O/S Checks | 2,652 | 10,486 | 4,971 | 3,727 | 2,783 | 9,732 | 6,306 | 3,063 | 3,063 | 4,193 | 7,401 | 4,655 | 4,243 | 4,243 |
| 14) Change in O/S Checks | 2,552 | 7,834 | (5,515) | (1,244) | (944) | 6,949 | (3,426) | (3,243) | (0) | 1,130 | 3,208 | (2,746) | (412) | 4,143 |
| Post-Petition DIP Borrowings / (Paydowns) | | | | | | | | | | | | | | |
| 15) Net Cash Flow Before Borrowings | (2,239) | (1,807) | (5,549) | (10,401) | (6,878) | (5,728) | (7,386) | (11,575) | (5,903) | (9,465) | 2,885 | 727 | 7,441 | (55,877) |
| 16) Change in O/S Checks | (2,552) | (7,834) | 5,515 | 1,244 | 944 | (6,949) | 3,426 | 3,243 | 0 | (1,130) | (3,208) | 2,746 | 412 | (4,143) |
| 17) Pre-Petition Revolver Borrowings / (Paydowns) | 13,479 | 15,911 | 16,532 | 16,794 | 17,986 | 15,898 | | | | | | | | 96,600 |
| 18) Total Post-Petition DIP Borrowings / (Paydown) | 8,688 | 6,270 | 16,499 | 7,637 | 12,052 | 3,221 | (3,960) | (8,332) | (5,903) | (10,595) | (323) | 3,472 | 7,853 | 36,580 |
| 19) Starting Post-Petition DIP Balance | - | 8,688 | 14,958 | 31,457 | 39,095 | 51,147 | 54,367 | 50,408 | 42,076 | 36,173 | 25,578 | 25,254 | 28,727 | - |
| 20) Post-Petition DIP Borrowings / (Paydowns) | 8,688 | 6,270 | 16,499 | 7,637 | 12,052 | 3,221 | (3,960) | (8,332) | (5,903) | (10,595) | (323) | 3,472 | 7,853 | 36,580 |
| 21) **Ending Post-Petition DIP Balance** | 8,688 | 14,958 | 31,457 | 39,095 | 51,147 | 54,367 | 50,408 | 42,076 | 36,173 | 25,578 | 25,254 | 28,727 | 36,580 | 36,580 |
| 22) Pre-Petition Revolver Balance | 83,121 | 67,210 | 50,678 | 33,884 | 15,898 | - | - | - | - | - | - | - | - | - |
| 23) LC Balance | 7,354 | 7,354 | 7,354 | 7,354 | 7,354 | 7,354 | 7,354 | 7,354 | 7,354 | 7,354 | 7,354 | 7,354 | 7,354 | 7,354 |
| 24) Term Loan | 9,250 | 9,250 | 9,250 | 9,250 | 9,250 | 9,250 | 9,250 | 9,250 | 9,250 | 9,250 | 9,250 | 9,250 | 9,250 | 9,250 |
| 25) Sub-Total (Pre-Petition) | 99,725 | 83,814 | 67,282 | 50,488 | 32,502 | 16,604 | 16,604 | 16,604 | 16,604 | 16,604 | 16,604 | 16,604 | 16,604 | 16,604 |
| 26) Post-Petition DIP Balance | 8,688 | 14,958 | 31,457 | 39,095 | 51,147 | 54,367 | 50,408 | 42,076 | 36,173 | 25,578 | 25,254 | 28,727 | 36,580 | 36,580 |
| 27) **Total Obligations** | $ 108,414 | $ 98,773 | $ 98,739 | $ 89,583 | $ 83,649 | $ 70,972 | $ 67,012 | $ 58,680 | $ 52,777 | $ 42,182 | $ 41,859 | $ 45,331 | $ 53,185 | $ 53,185 |
| **III. TOTAL LIQUIDITY** | | | | | | | | | | | | | | |
| 28) Borrowing Base Revolver Availability | 119,110 | 114,827 | 113,028 | 107,665 | 88,723 | 81,987 | 77,956 | 72,846 | 67,474 | 60,065 | 57,412 | 60,347 | 60,850 | |
| 29) Borrowing Base Term Loan Availability | 9,250 | 9,250 | 9,250 | 9,250 | 7,725 | 7,176 | 6,823 | 6,433 | 6,052 | 5,397 | 5,095 | 5,162 | 5,199 | |
| 30) Total Borrowing Base Availability | 128,360 | 124,077 | 122,278 | 116,915 | 96,448 | 89,163 | 84,779 | 79,279 | 73,526 | 65,462 | 62,507 | 65,509 | 66,049 | |
| 31) Add: Ending Est. Bank Available Cash | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | |
| 32) Less: Total Obligations | (108,414) | (98,773) | (98,739) | (89,583) | (83,649) | (70,972) | (67,012) | (58,680) | (52,777) | (42,182) | (41,859) | (45,331) | (53,185) | |
| 33) **Ending Total Available Liquidity (bank)** | $ 20,046 | $ 25,404 | $ 23,639 | $ 27,432 | $ 12,899 | $ 18,291 | $ 17,867 | $ 20,699 | $ 20,849 | $ 23,380 | $ 20,748 | $ 20,278 | $ 12,964 | |
| 34) Minimum Availability Covenant | (11,911) | (11,483) | (11,303) | (10,766) | (8,872) | (8,199) | (7,796) | (7,500) | (7,500) | (7,500) | (7,500) | (7,500) | (7,500) | |
| 35) **Excess Availability** | $ 8,135 | $ 13,921 | $ 12,336 | $ 16,666 | $ 4,027 | $ 10,092 | $ 10,071 | $ 13,199 | $ 13,349 | $ 15,880 | $ 13,248 | $ 12,778 | $ 5,464 | |
| *Accrued Professional Fees:* | | | | | | | | | | | | | | |
| 36) Klee Tuchin/Young Conaway | 125 | 125 | 125 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,375 |
| 37) FTI Consulting | 125 | 100 | 100 | 75 | 75 | 75 | 50 | 50 | 50 | 50 | 50 | 25 | 25 | 850 |
| 38) Lincoln International LLC | 325 | - | - | 125 | - | - | - | 125 | - | 1,000 | - | - | - | 1,575 |
| 39) A&G Realty | - | - | - | - | - | - | - | - | - | - | 200 | - | - | 200 |
| 40) KCC | 75 | 75 | 75 | 50 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 500 |
| 41) Sub-Total - Debtor's Professionals | 650 | 300 | 300 | 350 | 200 | 200 | 175 | 300 | 175 | 1,175 | 375 | 150 | 150 | 4,500 |
| 42) Committee Professionals | - | 75 | 75 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 525 |
| 43) U.S. Trustee Fees | - | - | - | - | - | - | - | - | - | - | 115 | - | - | 115 |
| 44) Total Professional Fees (Weekly Escrow) | $ 650 | $ 375 | $ 375 | $ 388 | $ 238 | $ 238 | $ 213 | $ 338 | $ 213 | $ 1,213 | $ 528 | $ 188 | $ 188 | $ 5,140 |

Note: The professional fees and expenses in the Budget are escrowed ratably each week based on estimated amounts incurred over the thirteen week period (with the Lincoln Transaction Fee being funded during the week ended 6/25/16). However, in the event that a 363 asset sale closes before the end of the 13 week period, actual fees incurred may be higher than the total amount accrued through the closing date. In this event, regardless of timing reflected in the Budget, professional fees and expenses incurred through closing shall be funded under the DIP Loan and Closing, subject to the total amounts reflected during the remaining period of the Budget. Moreover, A&G Realty fees are based on the sale of SPCH leases. Currently no lease sale proceeds are reflected in the budget. To the extent that the sale of leases occur, A&G's fees will be paid out of lease sale proceeds; any amounts owing to A&G from out of such proceeds shall be included in the carve-out.