## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| VESTIS RETAIL GROUP, LLC, *et al.*,[1] | Case No.:  16-10971 (___) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE CONTINUATION OF STORE CLOSING SALES IN ACCORDANCE WITH THE DISPOSITION AGREEMENT AND SALE GUIDELINES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES; (II) AUTHORIZING THE ASSUMPTION OF THE DISPOSITION AGREEMENT; AND (III) GRANTING RELATED RELIEF

Vestis Retail Group, LLC and its chapter 11 affiliates, the debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Cases"), hereby move the Court (the "Motion") for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Proposed Interim Order" and the "Proposed Final Order," respectively, and together, the "Proposed Orders"),[2] pursuant to sections 105, 363, 365, and 554 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6003, 6004, 6006, and 6007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing the Debtors to continue store-closing or similar-themed sales in certain of the Debtors' retail stores in accordance with the terms of (a) that certain Letter Agreement Governing Inventory Disposition, dated as of April 15, 2016 (the "Agreement"), by and between

---

[1]   The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Vestis Retail Group, LLC (1295); Vestis Retail Financing, LLC (9362); EMS Operating Company, LLC (2061); Vestis IP Holdings, LLC (2459); Bob's Stores, LLC (4675); EMS Acquisition LLC (0322); Sport Chalet, LLC (0071); Sport Chalet Value Services, LLC (7320); and Sport Chalet Team Sales, LLC (8015).  The Debtors' executive headquarters are located at 160 Corporate Court, Meriden, CT 06450.

[2]   The Proposed Final Order will be filed prior to the Final Hearing (as defined below).

Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC, on the one hand

(together, "Agent"), and EMS Operating Company, LLC, Bob's Stores, LLC, Sport Chalet, LLC,

and Sport Chalet Team Sales, LLC, on the other hand, a copy of which is attached as Exhibit 1 to

the Proposed Interim Order, and (b) the store-closing sale guidelines (the "Sale Guidelines")

attached as Exhibit 2 to the Proposed Interim Order, with such sales to be free and clear of all

liens, claims, encumbrances, and interests; (ii) authorizing the Debtors party to the Agreement to

assume the Agreement following service of this Motion and after a final hearing (the "Final

Hearing");[3] and (iii) granting certain related relief (collectively, the "Store Closing Relief").  In

support of the Motion, the Debtors rely on the *Declaration of Mark T. Walsh in Support of the*

*First Day Motions* (the "First Day Declaration")[4] and the *Declaration of Robert J. Duffy in*

*Support of (i) Debtors' DIP Financing Motion and (ii) Debtors' Emergency Store Closing Sales*

*Motion* (the "Store Closing Declaration"), each concurrently filed herewith.  In further support of

the Motion, the Debtors respectfully represent as follows:

## I. JURISDICTION

1.      The United States Bankruptcy Court for the District of Delaware (the "Court")

has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the

*Amended Standing Order of Reference* from the United States District Court for the District of

Delaware dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C.

§ 157(b)(2).  Venue of these Cases and the Motion in this district is proper under 28 U.S.C.

§§ 1408 and 1409.

---

[3]    For the avoidance of doubt, pursuant to this Motion, the Debtors seek entry of the Proposed Interim Order confirming that the Agreement is operative and effective, and after the Final Hearing, the Proposed Final Order granting the Debtors party to the Agreement authority to assume the Agreement.

[4]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration.

2.       Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware, the Debtors

consent to the entry of a final judgment or order with respect to the Motion if it is determined

that the Court, absent consent of the parties, cannot enter final orders or judgments consistent

with Article III of the United States Constitution.

3.       The statutory and legal predicates for the relief requested herein are sections 105,

363, 365, and 554 of the Bankruptcy Code and Bankruptcy Rules 2002, 6003, 6004, 6006, and

6007.

## II. BACKGROUND

### A.    General

4.       On the date hereof (the "Petition Date"), each of the Debtors commenced a

voluntary case under chapter 11 of the Bankruptcy Code.

5.       The Debtors are authorized to continue to operate their businesses and manage

their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  No trustee, examiner or statutory committee has been appointed in these Cases by the

Office of the United States Trustee for the District of Delaware (the "U.S. Trustee").

6.       The Debtors are comprised of three regional multi-channel retailers engaged in

the apparel, footwear, and sporting goods lines of business: (a) Bob's Stores, (b) Eastern

Mountain Sports ("EMS"), and (c) Sport Chalet.  Prior to the Petition Date, each of the three

retailers was comprised of two primary units: (a) a retail store business and (b) an e-commerce

business.  Collectively, the Debtors currently operate 144 stores and 2 distributions centers

across 15 states.  Bob's Stores and EMS primarily operate stores located in the Northeastern

states, while Sport Chalet's stores are located in the Western states.  Bob's Stores and Sport

Chalet have roots dating back to the 1950's, while EMS was founded in the 1960's.

7.      Vestis Group directly and indirectly owns the entities that operate Bob's Stores, EMS, and Sport Chalet. The chains were acquired in three separate acquisitions: Bob's Stores in 2008, EMS in 2012, and most recently, Sport Chalet in 2014. The Debtors currently employ over 4,000 full and part-time employees and generate over $660 million in annual consolidated revenues. The Debtors transact business with a wide array of vendors and suppliers both nationally and internationally.

8.      As discussed at length in the First Day Declaration, prior to the Petition Date, the Debtors implemented a series of internal restructuring and synergy initiatives, designed to integrate the three chains into Vestis Group and streamline and improve operations, but various challenges remained, including from the prior ownership of EMS and Sport Chalet. The Debtors ultimately were unable to preserve Sport Chalet as a going concern and, accordingly, the Debtors commenced going out of business sales (the "Store Closing Sales") of the Sport Chalet stores (along with a limited number of EMS stores and one Bob's Stores location) (collectively, the "Closing Stores") prior to the Petition Date, on April 16, 2016 (the "Sale Commencement Date").

9.      The purpose of these Cases is to facilitate the continuation, and completion, of the operating initiatives the Debtors have undertaken and that are underway at Bob's Stores and EMS, while allowing the Debtors to address external factors that have negatively contributed to the Debtors' recent financial performance. The Cases also will enable the Debtors to continue the Store Closing Sales on an expedited and orderly basis.

10.      The Debtors embark upon these Cases with optimism for a swift and certain resolution of the issues they now face, despite the challenging retail environment. The Bob's Stores and EMS brands enjoy competitive market positions. The Debtors are confident that this

01:18582937.1

restructuring effort will allow these core brands to emerge as part of a stable and strong

enterprise, positioning the Debtors to take advantage of the many opportunities in the markets in

which they will continue to operate.  The chapter 11 process also will allow the Debtors to

maximize value from their non-core businesses, primarily through the Store Closing Sales and

the sale of the remaining related assets.

11.      Toward that end, the Debtors have entered into that certain *Ratification and

*Amendment Agreement* with Wells Fargo Capital Finance, LLC, as administrative agent (the

"DIP Agent"), and the lenders party thereto, pursuant to which, subject to Court approval, the

Debtors will receive a senior secured debtor-in-possession revolver (the "DIP Facility") that

should provide them with sufficient runway to navigate through the chapter 11 process.  The

relief sought in this Motion is intended to preserve value and facilitate the Debtors' operations

through this process.

12.      More detailed factual background regarding the Debtors and the commencement

of these Cases is set forth in the First Day Declaration.

**B.      The Proposed Store Closing Sales and Pre-Petition Marketing Efforts**

13.      As discussed in more detail in the Store Closing Declaration, the Debtors

determined to commence the Cases to restructure their balance sheets and position themselves

for future success of their core brands.  As part of this process, the Debtors, with assistance from

their financial advisor FTI Consulting, Inc. ("FTI"), conducted an analysis of the performance,

sales, and profitability of all of the retail stores across the Bob's Stores, EMS, and Sport Chalet

brands.  Ultimately, the Debtors determined that commencing the Store Closing Sales was the

best way under the circumstances to maximize the value of the Debtors' businesses and assets

for their estates and creditors.  Specifically, the Closing Stores are comprised of (i) all Sport

01:18582937.1

Chalet retail stores; (ii) one (1) Bob's Stores retail store; and (iii) eight (8) EMS retail stores.  A full list of the Closing Stores, including location, is attached hereto as **Exhibit C**.

14.     Accordingly, in early April 2016, the Debtors and FTI contacted certain nationally recognized liquidators to solicit interest in bidding on the right to conduct the Store Closing Sales.  Ultimately, the Debtors received two individual bid packages: (i) a package consisting of separate bids for all Closing Stores and for just the Sport Chalet Closing Stores; and (ii) a package consisting of a bid for all Closing Stores.

15.     After an expedited but active negotiation process with the bidding liquidators, the Debtors, with assistance from FTI, selected the Agent to conduct the Store Closing Sales and determined to liquidate the merchandise (the "Merchandise") and certain furnishings, trade fixtures, equipment, and improvements to real property at the respective Closing Stores (collectively, the "FF&E"), in accordance with the terms of the Agreement (the material terms of which are set forth below) and the Sale Guidelines.

**C.     The Agreement**

16.     Under the terms of the Agreement, subject to this Court's entry of the Proposed Orders, the Agent will serve as the exclusive agent to the Debtors for the purpose of conducting a sale of certain Merchandise and FF&E at the Closing Stores using the procedures outlined in the Sale Guidelines.  Through the Proposed Final Order, the Debtors party to the Agreement seek to assume the Agreement so that they may leverage the experience and resources of the Agent in performing large-scale liquidations while retaining control over the sale process, which the Debtors believe will provide the maximum value to their estates and creditors.  Specifically, the Debtors have agreed to remit all proceeds from the Store Closing Sales to the DIP Agent for payment of the Debtors' secured obligations in accordance with the terms and conditions of the DIP Facility.

01:18582937.1

17.     The material terms of the Agreement are described in the summary chart below.[5]

| Provision | Description |
|---|---|
| Store Closing Sales Term | The Store Closing Sales commenced on April 16, 2016 and will terminate on June 30, 2016 (the "Sale Termination Date"). Merchant and the Agent may mutually agree to terminate or extend the Sale Termination Date at any store, and Merchant may unilaterally terminate or extend the Sale Termination Date at any of the Bob's Stores or the EMS Stores upon five (5) business days' prior notice to the Agent. |
| Closing Stores | The Closing Stores include forty-seven (47) Sport Chalet Stores, eight (8) EMS Stores, and one (1) Bob's Store. |
| Services Provided by Agent | The Agent will be retained as the Merchant's exclusive agent for the purpose of conducting the Store Closing Sales during the Sale Term, to, among other things:  (a) provide qualified supervisors (the "Supervisors") engaged by Agent to oversee the management of the Closing Stores; (b) determine appropriate point-of-sale and external advertising for the Closing Stores, as approved in advance by Merchant and, unless otherwise provided in a final order approving this Motion, in compliance with the lease provisions for each Closing Store; (c) recommend appropriate discounts of Merchandise, staffing levels for the Closing Stores, and appropriate bonus and incentive programs, if any, for the Closing Stores' employees, in each case, as approved in advance by Merchant; (d) oversee displays of Merchandise for the Closing Stores; (e) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (f) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by Merchant and the Agent; (g) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (h) assist Merchant with developing a customer transition program for the Bob's Stores and the EMS Stores; and (i) provide such other related services deemed necessary or appropriate by Merchant and Agent. |
| Merchant's Undertakings | Merchant will (a) be the employer of the Closing Stores' employees, other than the Supervisors; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Closing Stores, the Closing Stores' employees, and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay or remit such taxes to the appropriate taxing authorities for the Closing Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors; (f) execute all agreements determined by Merchant and |

---

[5]     Capitalized terms used but not otherwise defined in this summary chart shall have the meanings ascribed to them in the Agreement.  To the extent that this summary differs in any way from the terms set forth in the Agreement, the terms of the Agreement shall control.

| | Agent to be necessary or desirable for the operation of the Closing Stores during the Store Closing Sales; (g) arrange for the ordinary maintenance of all point-of-sale equipment required for the Closing Stores; and (h) use reasonable efforts to ensure that Agent has quiet use and enjoyment of the Closing Stores for the Sale Term in order to perform its obligations under the Agreement. |
|---|---|
| Agent's Fee and Expenses | Merchant will pay Agent a fee for the sale of Merchandise at (a) the Sport Chalet Stores that is between 0% and 1.25% of the Gross Proceeds applicable to the Sport Chalet Stores, based on the Recovery Percentage, (b) the EMS Stores that is between 0% and 1.25% of Gross Proceeds applicable to the EMS Stores, based on the Recovery Percentage, and (c) the Bob's Store that is 1% of Gross Proceeds applicable to the Bob's Store.  Agent will also earn a commission of 15% on the sale of any FF&E.<br><br>Merchant will pay for all Expenses of the Store Closing Sales, which are subject to Expense Budgets for each of the Sport Chalet Stores, the EMS Stores, and the Bob's Stores.  Merchant has funded to Agent an advance payment of expenses in the amount of $600,000 in the aggregate to be applied to Expenses as incurred.  Any portion of the advance not used to pay Expenses of the Store Closing Sales will be returned to Merchant within three (3) days following the Final Reconciliation. |
| Commission to Merchant for Sale of Non-Merchant Goods | Agent shall have the right, at Agent's sole cost and expense, to supplement the Merchandise in the Store Closing Sales at the Sport Chalet Stores only with additional goods procured by Agent which are of like kind to, and no lesser quality than the Merchandise in the Store Closing Sales at the Sport Chalet Stores ("Additional Agent Goods"); provided, however, that the cost of Additional Agent Goods shall not exceed 7.5% of the aggregate Cost Value of Merchandise in the Store Closing Sales at the Sport Chalet Stores.<br><br>Merchant is entitled to a commission equal to 5% of all Additional Agent Goods sold during the Store Closing Sales at the Closing Stores. |
| Insurance; Risk of Loss | Merchant will maintain liability insurance policies during the Store Closing Sales.  Agent does not have any right, title, or interest in the Merchandise. |
| Indemnification by Agent | Agent will indemnify, defend, and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, and affiliates (other than the Agent or the Agent Indemnified Parties) (collectively, the "Merchant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs, and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Agent or the Agent Indemnified Parties (as defined below); (b) the breach of any provision of, or the failure to perform any obligation under, the Distribution Agreement by Agent; (c) any liability |

| | or other claims made by Agent's Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Store Closing Sales, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortuous, or otherwise actionable treatment of Merchant Indemnified Parties, or Merchant's customers by Agent or any of the Agent Indemnified Parties; and (e) any claims made by any party engaged by Agent as an employee, agent, representative, or independent contractor arising out of such engagement. |
|---|---|
| Indemnification by Merchant | Merchant shall indemnify, defend, and hold Agent and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, affiliates, and Supervisors (collectively, the "<u>Agent Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs, and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties; (b) the material breach of any provision of the Distribution Agreement by Merchant; (c) any liability or other claims, including, without limitation, product liability claims, asserted by customers, any Closing Store employees (under a collective bargaining agreement or otherwise), or any other person (excluding Agent Indemnified Parties) against Agent or an Agent Indemnified Party, except claims arising from Agent's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination, or violation of any laws or regulations, or any other unlawful, tortuous, or otherwise actionable treatment of Agent's Indemnified Parties or Merchant's customers by Merchant or Merchant's Indemnified Parties; and (e) Merchant's failure to pay or remit to the appropriate taxing authority any taxes required to be paid or remitted by Merchant during the Sale Term in accordance with applicable law. |

## III.  RELIEF REQUESTED

18.     By this Motion, the Debtors seek entry of the Proposed Orders (i) authorizing the continuation of the Store Closing Sales in accordance with the Agreement and the Sale Guidelines, with such sales to be free and clear of all liens, claims, and encumbrances; (ii) authorizing the Debtors party to the Agreement to assume the Agreement following the Final Hearing and entry of the Proposed Final Order; and (iii) granting the related Store Closing Relief.

## IV.  BASIS FOR RELIEF REQUESTED

A. **Sufficient Business Justification Exists for the Store Closing Sales Under Section 363(b).**

19.        Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate …." 11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts have required that such use, sale, or lease be based upon the sound business judgment of the debtor.  *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.*); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (finding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Icho Kangyo Bank v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999) (following *Delaware & Hudson Railway Co.*).

20.        "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Accordingly, similar store-closing or liquidation sales are routinely approved by courts in this district in chapter 11 cases involving retail debtors.  *See, e.g.*, *Ames Dept. Stores*, 136 B.R. at 359 (stating that liquidation sales are an important part of "overriding federal policy requiring [a] Debtor to

maximize estate assets"); *see also In re Sports Auth. Holdings, Inc.*, Case No. 16-10572 (MFW) (Bankr. D. Del. Mar. 3, 2016); *In re Fresh & Easy, LLC*, Case No. 15-12220 (BLS) (Bankr. D. Del. Nov. 24, 2015); *In re Haggen Holdings, LLC*, Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 15, 2015); *In re USA Discounters, Ltd.*, Case No. 15-11755 (CSS) (Bankr. D. Del. Oct. 14, 2015).

21.    The Debtors' decision to conduct the Store Closing Sales represents the best path forward to maximize recoveries to the Debtors' estates with respect to the Merchandise and FF&E, is based upon their sound business judgment, and should thus be approved under section 363(b) of the Bankruptcy Code.  The Agent, comprised of two nationally recognized liquidation firms, has the experience necessary to assist the Debtors in monetizing the Merchandise and FF&E through an efficient and orderly process, and any interruption in the ongoing Store Closing Sales would harm the Debtors' ability to successfully monetize the Merchandise and FF&E.  Absent the relief requested in this Motion, the Closing Stores will impose a significant drain on the Debtors' liquidity.  Upon the sale of the Merchandise and FF&E and the wind-up of the Closing Stores, the Debtors expect to realize an immediate benefit in terms of reducing their secured obligations in accordance with the terms of the DIP Facility, as well as ultimately reducing occupancy costs in connection with the wind down of the Closing Stores.

22.    For the foregoing reasons, the Debtors request that the Court approve the Debtors' continuation of the Store Closing Sales in accordance with the terms of the Agreement, the Sale Guidelines, and the Proposed Orders.

**B.    The Sale of the Merchandise and FF&E Free and Clear of All Liens, Encumbrances, and Other Interests Is Authorized Under Section 363(f).**

23.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such

> interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

24. Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Merchandise and FF&E and through the Store Closing Sales free and clear of liens and interests. *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, a debtor possesses broad authority to sell assets free and clear of liens. *See In re TWA Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

25. The Debtors submit that it is appropriate to sell the Merchandise and FF&E on a final, "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to the sale of the Merchandise and FF&E. In particular, the Debtors believe that at least section 363(f)(5) of the Bankruptcy Code will be met here because the Debtors' prepetition secured lenders are secured by, among other things, security interests in the Merchandise and FF&E, and can be compelled to accept a money satisfaction of such interests. Moreover, with respect to any other party asserting a lien, claim, or encumbrance against the

Merchandise and FF&E, the Debtors anticipate that they likewise will be able to satisfy one or

more of the conditions set forth in section 363(f).  The Debtors propose that any liens, claims,

and encumbrances asserted against the Merchandise and FF&E be transferred to and attach to the

amounts earned by the Debtors under the Store Closing Sales, with the same priority and subject

to the same rights, claims, defenses, and objections, if any, of all parties with respect thereto.

26.     Accordingly, the Debtors submit that section 363(f) authorizes the transfer and

conveyance of the Merchandise and FF&E free and clear of any such claims, interests, liabilities,

or liens.

**C.      The Court Should Approve the Proposed Sale Guidelines.**

27.     As set forth in greater detail below, many Liquidation Laws (as defined below)

require special and cumbersome licenses, waiting periods, time limits, and other procedures for

store-closing and liquidation sales.  Therefore, although the Debtors intend to comply fully with

applicable state and local health, safety, and consumer-protection laws in connection with the

Store Closing Sales, the Debtors seek a waiver of compliance with the Liquidation Laws and

request the authority to conduct the Store Closing Sales in accordance with the Sale Guidelines.

28.     The Debtors developed the Sale Guidelines with the intent to provide a means of

controlling the administrative burdens on their estates that may be associated with complying

with the Liquidation Laws, while at the same time protecting the interests of their landlords and

the applicable governmental agencies enforcing such laws.  Moreover, the Sale Guidelines are in

all material respects substantially similar to sale guidelines that have been routinely approved by

this Court, most recently in *In re Fresh & Easy, LLC*.  *See* Case No. 15-12220 (BLS) (Bankr. D.

Del. Nov. 24, 2015) (approving sale guidelines, which in all material respects are substantially

similar to the Sale Guidelines); *see also In re Haggen Holdings, LLC*, Case No. 15-11874 (KG)

(Bankr. D. Del. Oct. 15, 2015) (same).  Accordingly, the Debtors submit that the Sale Guidelines

01:18582937.1

adequately address any concerns that their landlords or any governmental agencies may raise

with respect to the Store Closing Sales and that, therefore, the Debtors' requested waiver of the

Liquidation Laws should be approved.

**D.      Strict Compliance with the Liquidation Laws Should Be Waived.**

29.      Certain states in which the Closing Stores are located have or may have licensing

and other requirements governing the conduct of store-closing, liquidation, or other inventory-

clearance sales, including (but not limited to) state and local laws, statutes, rules, regulations, and

ordinances related to store-closing and liquidation sales; establishing licensing, permitting, or

bonding requirements; waiting periods; time limits; bulk sale restrictions; augmentation

limitations that would otherwise apply to the Store Closing Sales; and consumer fraud laws, with

the exception of deceptive-advertising laws (collectively, the "Liquidation Laws").  Typical

statutes and regulations provide that if a liquidation or bankruptcy sale is court-authorized,

however, then a company need not comply with these Liquidation Laws.

30.      The Debtors, therefore, request that the Court authorize the Debtors to conduct the

Store Closing Sales without the necessity and associated delay of complying with the

Liquidation Laws.  Because the Debtors and their assets are subject to the Court's jurisdiction,

*see* 28 U.S.C. § 1334, the Court will be able to supervise the Store Closing Sales.  The Store

Closing Sales are legitimate methods by which the Debtors can maximize the return from the

sale of the Merchandise and FF&E for the benefit of their estates and creditors.  Moreover,

creditors and the public interest are adequately protected by the jurisdiction and supervision of

this Court.

31.      Even if a state or local law does not expressly except bankruptcy sales from its

ambit, the Debtors submit that, to the extent that such state or local law conflicts with federal

bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution.  To

hold otherwise would severely impair the relief otherwise available under section 363 of the

Bankruptcy Code.  In concert with this premise, bankruptcy courts have consistently recognized

that federal bankruptcy law preempts state and local laws that contravene the underlying policies

of the Bankruptcy Code.  *See, e.g.*, *Belculfine v. Aloe (In re Shenango Grp., Inc.)*, 186 B.R. 623,

628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and

legal obligations pursuant to the bankruptcy code. . . . [A] state statute[ ] cannot place burdens on

them where the result would contradict the priorities established by the federal bankruptcy

code.").

32.     While preemption of state law is not always appropriate, as when the protection of

public health and safety is involved, *see Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev. (In

re Baker & Drake, Inc.)*, 35 F.3d 1348, 1353–54 (9th Cir. 1994) (finding no preemption when

state law prohibiting taxicab leasing was promulgated in part as a public safety measure), it is

appropriate when, as here, the only state laws involved concern economic regulation.  *Id.* at 1353

(finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned

with economic regulation rather than with protecting the public health and safety").  Moreover,

pursuant to section 105 of the Bankruptcy Code, the Court has the authority to permit the Store

Closing Sales to proceed notwithstanding contrary Liquidation Laws.  *See* 11 U.S.C. § 105(a).

33.     Here, section 363 of the Bankruptcy Code, which requires the Debtors to operate

their businesses in a way that maximizes recoveries for creditors, will be undermined if the Court

does not provide for the waiver of the Liquidation Laws, because the Liquidation Laws constrain

the Debtors' ability to marshal and maximize assets for the benefit of creditors.  Similar relief

has been granted in other bankruptcy cases in this district.  *See, e.g.*, *In re Fresh & Easy, LLC*,

Case No. 15-12220 (BLS) (Bankr. D. Del. Nov. 24, 2015) (ordering that that the debtor was

01:18582937.1

authorized to conduct store closing sales pursuant to the order and sale guidelines "without the necessity of further showing compliance" with liquidation laws); *In re Haggen Holdings, LLC*, Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 15, 2015) (ordering that that the debtors were authorized to conduct store closing sales pursuant to the order and sale guidelines "without the necessity of further showing compliance" with liquidation laws); *In re RadioShack Corp.*, Case No. Case No. 15-10197 (KJC) (Bankr. D. Del. Feb. 6, 2015) (ordering that that the debtors were authorized to conduct store closing sales in accordance with the order "without the necessity of further showing compliance" with liquidation laws).

34.     Importantly, given the supervision of the Court, the requested waiver will not unduly undermine state and local requirements that would otherwise apply to the Store Closing Sales.  The Debtors only request that the Court authorize the Debtors to conduct the Store Closing Sales without the necessity and associated delay of obtaining various state licenses or permits, observing state and local waiting periods or time limits, or satisfying any additional requirements with respect to advertising or conducting the Store Closing Sales as store-closings or similar-type sales.  The Debtors fully intend to be bound by and comply with remaining statutes and regulations, such as health and safety laws.

35.     The Debtors also request that no other person or entity, including (but not limited to) any lessor or federal, state, or local agency, department, or governmental authority, be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the Store Closing Sales, or the advertising and promotion (including through the posting of signs) of Store Closing Sales, in the manner set forth in the Proposed Orders and the Sale Guidelines.

01:18582937.1

36.    To the extent that any dispute arises with respect to the sale of Merchandise or FF&E that is subject to any Liquidation Laws, the Debtors request that the Court approve the dispute resolution procedures set forth in the Proposed Orders.

**E.    The Court Should Waive Compliance with Any Restriction in the Leases.**

37.    Certain of the Debtors' leases governing the Closing Stores contain or may contain provisions purporting to restrict or prohibit the Debtors from conducting store-closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases, as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code.  *Ames Dep't Stores*, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets"); *In re R. H. Macy and Co., Inc.*, 170 B.R. 69, 73–75 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467–68 (Bankr. N.D. Ga. 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

38.    In addition, courts in this district regularly have held that restrictive lease provisions affecting store-liquidation sales in chapter 11 cases are unenforceable.  *See, e.g.*, *In re Fresh & Easy, LLC*, Case No. 15-12220 (BLS) (Bankr. D. Del. Nov. 24, 2015) (ordering that sale of merchandise be conducted notwithstanding any restrictive lease provisions); *In re Haggen*

*Holdings, LLC*, Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 15, 2015) (same); *In re*

*RadioShack Corp.*, Case No. 15-10197 (KJC) (Bankr. D. Del. Feb. 6, 2015) (same).  Thus,

consistent with the foregoing authorities, and to the extent that such provisions or restrictions

exist in any of the leases in respect of the Closing Stores, the Debtors request that the Court

authorize the Debtors and the Agent to conduct the Store Closing Sales without interference by

any landlords or other persons affected, directly or indirectly, by the Store Closing Sales.

**F.    The Abandonment of Certain Property in Connection with the Store Closing Sales Is Justified.**

39.    Section 554(a) of the Bankruptcy Code provides that after notice and a hearing, a

debtor in possession "may abandon any property of the estate that is burdensome to the estate or

that is of inconsequential value and benefit to the estate."  *See Hanover Ins. Co. v. Tyco Indus.,*

*Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating that a debtor "may abandon his claim to any asset,

including a cause of action, he deems less valuable than the cost of asserting that claim"); *In re*

*Grossinger's Assocs.*, 184 B.R. 429, 432 (Bankr. S.D.N.Y. 1995); *see also Midlantic Nat'l Bank*

*v. N.J. Dep't of Envtl. Protection*, 474 U.S. 494, 507 n.9 (1986) ("[A] trustee [in bankruptcy]

may not abandon property in contravention of a state statute or regulation that is reasonably

designed to protect the public health or safety from identified hazards . . . .  This exception to the

abandonment power . . . is a narrow one."); *In re Bryson*, 53 B.R. 3, 4-5 (Bankr. M.D. Tenn.

1985).

40.    The Debtors intend to sell all Merchandise and FF&E at the Closing Stores,

subject to the terms of the Agreement.  The Debtors and Agent acknowledge, however, that not

all of the Merchandise and the FF&E at the Closing Stores may be sold, transferred, or otherwise

disposed of by the Agent.  Accordingly, in the event that the Agent is unable to sell or otherwise

dispose of any Merchandise or FF&E following the Store Closing Sales and exercises the

Agent's right to abandon FF&E to the Debtors, or the Debtors determine that the costs associated with holding, storing, insuring, or selling any Merchandise or FF&E exceed the proceeds that will be realized upon its sale, or that such Merchandise is not sellable at all, it may be costly and burdensome to the Debtors' estates to retain such Merchandise or FF&E once it has been abandoned by the Agent.  Thus, to the extent that the Agent does not sell any Merchandise or FF&E, the Debtors request that they be authorized, but not directed, upon the conclusion of the Store Closing Sales (or such later date as the Debtors may determine) to abandon the same, without incurring any liability to any person or entity in order to maximize the value of the Debtors' assets and to minimize the costs to their estates.

41.     Notwithstanding the foregoing, the Debtors and the Agent will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers, cash registers, or similar equipment that are to be sold or abandoned.

**G.     The Store Closing Sales Should Be Exempt from Any "Fast Pay" Laws.**

42.     Certain states in which the Debtors operate have or may have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (the "Fast Pay Laws").  In many cases, these laws require such payment to occur either immediately or within a period of only a few days from the date such employee is terminated.  The sweeping nature of the Store Closing Sales contemplated by this Motion may result in a substantial numbers of employees being terminated during the Store Closing Sales.

43.     As set forth above, the Bankruptcy Code preempts state and local laws that conflict with its underlying policies.  Preemption is appropriate where, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety.

44.     Under ordinary circumstances, the Debtors would have been able to pay individual store-level employees from the register at a store location upon termination of employment and reconcile the payment amount after the fact.  However, given the number of employees that may be terminated during the Store Closing Sales, such immediate payment will be impossible.  Thus, it will be necessary to have the Debtors' payroll department calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check, and then prepare each such check for mailing.  With employee terminations on the scale that might be necessitated by the Store Closing Sales, this process could easily take several days.

45.     To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible and under normal payment procedures.  However, the requirements imposed by these Fast Pay Laws are unworkable in these extraordinary circumstances.  If the Debtors are required to comply with Fast Pay Laws, their efforts to wind down the Closing Stores and stem unnecessary payroll costs will be hampered tremendously.  Indeed, if forced to comply with Fast Pay Laws, the Debtors will face the choice between (a) having to incur the costs of keeping employees "employed" after the conclusion of a Store Closing Sale while payroll is prepared or (b) staging terminations in waves to the detriment of the Debtors' estates.  Neither of these choices will provide any benefit to the Debtors' estates and will only increase the administrative costs of conducting the Store Closing Sales.

46.     Accordingly, the Debtors respectfully submit that, in this instance, the Fast Pay

Laws are at odds with the underlying policies of the Bankruptcy Code and that, as such, the

Debtors should be granted relief from their requirements.  *See, e.g.*, *In re Fresh & Easy, LLC*,

Case No. 15-12220 (BLS) (Bankr. D. Del. Nov. 24, 2015) (waiving "fast pay" laws and

regulations in connection with approval of store closing sales); *In re Haggen Holdings, LLC*,

Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 15, 2015) (same).

**H.      Appointment of a Consumer Privacy Ombudsman Is Unnecessary.**

47.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or

release personally identifiable information about individuals unless such sale or lease is

consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to

section 332 of the Bankruptcy Code.  The Debtors will not be selling or releasing personally

identifiable information in the course of the Store Closing Sales.  Therefore, appointment of a

consumer privacy ombudsman is unnecessary.

**I.      Assumption of the Agreement by the Debtors Party Thereto Is Authorized Under
         Section 365(a).**

48.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in

possession, "subject to the court's approval, may assume or reject any executory contract or

unexpired lease of the debtor."  11 U.S.C. § 365(a).  The United States Court of Appeals for the

Second Circuit has stated that "[t]he purpose behind allowing the assumption or rejection of

executory contracts is to permit the trustee or debtor-in-possession to use valuable property of

the estate and to 'renounce title to and abandon burdensome property.'"  *Orion Pictures Corp. v.

Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting

2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

49.    The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard.  *See In re AbitibiBowater Inc.*, 418 BR 815, 831 (Bankr. D. Del. Oct. 27, 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice).  As set forth above, the demonstration of a valid business justification by the debtor creates a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *In re Integrated Res.*, 147 B.R. at 656.  Indeed, "the sole issue is whether the rejection benefits the estate."  *In re HQ Global*, 290 B.R. at 511.

50.    The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing.  *See In re Integrated Res.*, 147 B.R. at 656; *see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").  Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease.  *See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate");

*see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 42-43 (2d Cir. 1979); *In re Riodizio, Inc.*, 204 B.R. 417, 424-25 (Bankr. S.D.N.Y. 1997); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

51.     Here, the Debtors have exercised their sound business judgment in determining that assumption of the Agreement by the Debtors party thereto is in the best interests of such Debtors and their estates, and accordingly, the Court should enter the Proposed Final Order approving the proposed assumption under section 365(a) of the Bankruptcy Code.  *See, e.g., Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").  If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease.  *See, e.g., In re Phila. Newspapers, LLC*, 424 B.R. 178, 182–83 (Bankr. E.D. Penn. 2010).

52.     As a key component of the Debtors' continuing efforts to preserve and maximize estate value, the Debtors have concluded, in their business judgment, that the assumption of the Agreement by the Debtors party thereto is beneficial to the Debtors' estates.  Furthermore, after engaging in arm's length negotiations with certain nationally recognized liquidators regarding the Store Closing Sales, the Debtors determined that entering into the Agreement would provide the greatest return to the Debtors' estates for the Merchandise and FF&E.  Additionally, the Debtors believe that the terms set forth in the Agreement are fair and reasonable and present the best path forward with respect to the conduct of the Store Closing Sales in the Closing Stores.

53.     In particular, both of the Agent firms have extensive expertise in conducting liquidation sales, which allows them to oversee and implement the Store Closing Sales, with the assistance of the Debtors' management, in an efficient and cost-effective manner.  Assumption of the Agreement and the continuation of the Store Closing Sales will present significant cost savings that will certainly inure to the benefit of the Debtors' estates and all stakeholders. Indeed, the Debtors have already dedicated substantial resources toward the Store Closing Sales. If the Store Closing Sales are interrupted and not permitted to go forward on an interim basis, and the Agreement is not ultimately assumed, the Debtors' estates would lose the benefit of the efforts that have already been expended by the Agent in commencing the Store Closing Sales. Any delay in conducting the Store Closing Sales would result in the loss of the value thus far achieved and in increased administrative expenses, including, but not limited to, additional rent payments in respect of the Closing Stores resulting from the delay.

54.     Therefore, the Debtors request that the Court authorize the assumption of the Agreement by the Debtors party thereto following the Final Hearing on this Motion.

## V.  IMMEDIATE RELIEF IS NECESSARY

55.     Bankruptcy Rule 6003 provides that the interim relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003.  As set forth throughout this Motion, there is no question that the Debtors' failure to continue to conduct the Store Closing Sales pursuant to the Agreement without interruption would likely result in immediate and irreparable harm to the Debtors' estates by detracting from, and potentially derailing, the Debtors' efforts to wind down the Closing Stores, which efforts, as discussed above, are already underway.  Indeed, the Debtors believe that the Store Closing Sales will conclude by June 30, 2016.  If the Store Closing Sales are completed as expected, the Debtors anticipate that a significant number of their leases in respect of Closing

Store locations will be rejected prior to incurring July rent, which will represent a substantial cost savings to the Debtors' estates.

56.    For these reasons, the Debtors respectfully submits that Bankruptcy Rule 6003(b) has been satisfied, to the extent applicable to the Proposed Interim Order, and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## VI.  WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

57.    The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, any delay in the Debtors' ability to continue to conduct the Store Closing Sales without interruption would be detrimental to the Debtors, their creditors, and their estates, and would impair the Debtors' ability to optimize their business performance at this critical time as they begin their chapter 11 Cases.  Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Proposed Orders, as the exigent nature of the relief sought herein justifies immediate relief.

## VII.  NOTICE

58.    Notice of this Motion shall be provided to: (i) the U.S. Trustee; (ii) holders of the forty (40) largest unsecured claims on a consolidated basis against the Debtors; (iii) the DIP Agent; (iv) the Pre-Petition Term Agent; (v) the Third Lien Agent; (vi) the Agent; (vii) all applicable federal, state, and local taxing and regulatory authorities having jurisdiction over the Merchandise and the FF&E; (viii) all of the landlords and subtenants for the Closing Stores; (ix) all parties known to the Debtors who hold any liens or security interest in the Debtors' assets who have filed UCC-1 financing statements against the Debtors, or who, to the Debtors'

01:18582937.1

knowledge, have asserted any liens on any of the Debtors' assets; and (x) all parties who, as of

the filing of this Motion, have filed a notice of appearance and request for service of papers

pursuant to Bankruptcy Rule 2002.  Due to the nature of the relief requested herein, the Debtors

respectfully submit that no further notice of this Motion is necessary.

## VIII.  CONCLUSION

WHEREFORE, for the reasons set forth herein and in the First Day Declaration and the

Store Closing Declaration, the Debtors respectfully request that the Court enter the Proposed

Orders, (a) granting the relief requested herein, and (b) granting such other relief as is just and

proper.

*[Remainder of Page Intentionally Left Blank]*

01:18582937.1

Dated:  April 18, 2016
     Wilmington, Delaware

*/s/ Robert F. Poppiti, Jr.*
Robert S. Brady, Esq. (DE Bar No. 2847)
Robert F. Poppiti, Jr., Esq. (DE Bar No. 5052)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253
Email: rbrady@ycst.com
       rpoppiti@ycst.com

and

Michael L. Tuchin, Esq.
Lee R. Bogdanoff, Esq.
Martin N. Kostov, Esq.
Kathryn T. Zwicker, Esq.
KLEE, TUCHIN, BOGDANOFF & STERN  LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Tel:    (310) 407-4031
Fax:    (310) 407-9090
Email: mtuchin@ktbslaw.com
       lbogdanoff@ktbslaw.com
       mkostov@ktbslaw.com
       kzwicker@ktbslaw.com

*Proposed Counsel to the Debtors*

01:18582937.1

**EXHIBIT A**

Proposed Interim Order

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br><br>VESTIS RETAIL GROUP, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.:  16-10971 (___)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. _____** |

### INTERIM ORDER (I) AUTHORIZING THE CONTINUATION
### OF STORE CLOSING SALES IN ACCORDANCE WITH THE DISPOSITION
### AGREEMENT AND SALE GUIDELINES, WITH SUCH SALES TO BE FREE
### AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES;
### AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of Vestis Retail Group, LLC and its chapter 11

affiliates, the debtors and debtors in possession (the "Debtors") in the above-captioned jointly

administered chapter 11 cases (the "Cases") for the entry of an interim order (this "Interim

Order"), pursuant to sections 105, 363, 365, and 554 of the Bankruptcy Code and Bankruptcy

Rules 2002, 6003, 6004, 6006, and 6007, (i) authorizing the Debtors to continue store-closing or

similar-themed sales (the "Store Closing Sales") in accordance with the terms of (a) that certain

Letter Agreement Governing Inventory Disposition, dated as of April 15, 2016 (the

"Agreement"), by and between Hilco Merchant Resources, LLC and Gordon Brothers Retail

Partners, LLC, on the one hand (together, "Agent"), and EMS Operating Company, LLC, Bob's

Stores, LLC, Sport Chalet, LLC, and Sport Chalet Team Sales, LLC, on the other hand, a copy of

---

[1]    The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Vestis Retail Group, LLC (1295); Vestis Retail Financing, LLC (9362); EMS Operating Company, LLC (2061); Vestis IP Holdings, LLC (2459); Bob's Stores, LLC (4675); EMS Acquisition LLC (0322); Sport Chalet, LLC (0071); Sport Chalet Value Services, LLC (7320); and Sport Chalet Team Sales, LLC (8015).  The Debtors' executive headquarters are located at 160 Corporate Court, Meriden, CT 06450.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

which is attached hereto as <u>Exhibit 1</u>, and (b) the store-closing sale guidelines (the "Sale

Guidelines") attached hereto as <u>Exhibit 2</u>, with such sales to be free and clear of all liens, claims,

encumbrances, and interests; and (ii) granting certain related relief, on an interim basis

(collectively, the "Store Closing Relief"); and upon consideration of the First Day Declaration,

the Store Closing Declaration, and the entire record of these Cases; and it appearing that the

Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference* from the United States District Court for the District of

Delaware dated February 29, 2012; and it appearing that the Motion is a core matter pursuant to

28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the

United States Constitution; and it appearing that venue of these Cases and of the Motion is

proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that there is good cause to

waive the stay of Bankruptcy Rule 6004(h); and it appearing that due and adequate notice of the

Motion has been given under the circumstances, and that no other or further notice need be

given; and it appearing that the relief requested in the Motion is in the best interest of the

Debtors' estates, their creditors, and other parties in interest; and after due deliberation, and good

and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:[3]**

A.      The Debtors have advanced sound business reasons for entering into the

Agreement, as set forth in the Motion and at the hearing on this Interim Order, and have

demonstrated that entering into the Agreement is a reasonable exercise of the Debtors' business

judgment and in the best interests of the Debtors and their estates.

---

[3]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.  <u>See</u> Fed. R. Bankr. P. 7052.

B.      The conduct of the Store Closing Sales will provide an efficient means for the

Debtors to maximize recoveries for their estates with respect to the Merchandise and the FF&E.

C.      The Agreement was negotiated, proposed, and entered into by the Agent and the

Debtors without collusion or fraud, in good faith, and from arm's-length bargaining positions.

D.      The relief set forth herein is necessary to avoid immediate and irreparable harm to

the Debtors and their estates, and the Debtors have demonstrated good, sufficient, and sound

business purposes and justifications for the relief approved herein thereby satisfying Bankruptcy

Rule 6003.

E.      Under the circumstances of these Cases, the Store Closing Sales are in the best

interest of the Debtors' estates.

F.      The Debtors have represented that they are neither selling nor leasing personally

identifiable information pursuant to the Motion, although the Agent will be authorized to

distribute emails and promotional materials to the Debtors' customers.

G.      The entry of this Interim Order is in the best interest of the Debtors and their

estates, creditors, interest holders, and all other parties in interest herein; and now therefore it is

hereby

**ORDERED, ADJUDGED, AND DEGREED THAT:**

1.      The Motion is GRANTED, on an interim basis, as set forth herein.

2.      The final hearing (the "Final Hearing") on the Motion shall be held on

_____, 2016, at__:__ _.m., prevailing Eastern Time.  All objections, if any, to the Motion

shall be in writing and filed with this Court and served on the following by 4:00 p.m. (ET) on

_____, 2016: (i) the Debtors, 160 Corporate Court, Meriden, CT 06450, Attn: Mark T.

Walsh, Chief Executive Officer; (ii) proposed counsel for the Debtors, (x) Klee, Tuchin,

Bogdanoff & Stern LLP, 1999 Avenue of the Stars, Thirty-Ninth Floor, Los Angeles, CA 90067, Attn: Michael L. Tuchin, Esq. and Lee R. Bogdanoff, Esq. and (y) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Robert S. Brady, Esq. and Robert F. Poppiti, Jr., Esq.; (iii) counsel for the Agent, Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, NY 10178, Attn: Steven J. Reisman, Esq.; (iv) counsel to any statutory committee appointed in these Cases; and (v) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn:  Jane M. Leamy, Esq. and Timothy Fox, Esq.  If no objections to entry of the Proposed Final Order are timely received, this Court may enter such Proposed Final Order without further notice or hearing.

3.      The Debtors and the Agent are authorized and empowered to take any and all further actions as may be reasonably necessary or appropriate to give effect to this Interim Order. The failure to include specifically any particular provision of the Agreement in this Interim Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Agreement and all of its provisions, payments, and transactions be authorized and approved as and to the extent provided for in this Interim Order.

4.      To the extent of any conflict between this Interim Order, the Sale Guidelines, and the Agreement, the Sale Guidelines shall control over the Agreement, and the terms of this Interim Order shall control over all other documents.

5.      Bankruptcy Rule 6003 has been satisfied.  The requirements of Bankruptcy Rule 6007(a) are waived, to the extent applicable to the relief provided for herein.

6.      Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall take effect immediately upon its entry.

01:18582937.1

7.      The Agreement, a copy of which is attached hereto as <u>Exhibit 1</u>, is operative and effective on an interim basis pending the entry of the Proposed Final Order.  The Debtors are authorized to act and perform in accordance with the terms of the Agreement, provided that, pending entry of the Final Order or further order of this Court, the Debtors shall not make any payments required by the Agreement to the Agent; provided, however, that with respect to costs and expenses incurred by the Agent pursuant to the Agreement from the Petition Date through the date of entry of the Final Order or further order of this Court, the Agent shall be entitled to reimbursement of such costs and expenses incurred pursuant to the Agreement immediately upon entry of the Final Order or further order of this Court.

8.      Subject to the restrictions set forth in this Interim Order and the Sale Guidelines, the Debtors and the Agent hereby are authorized to take any and all actions as may be necessary or desirable to implement the Agreement and the Store Closing Sales; and each of the transactions contemplated by the Agreement and any actions taken by the Debtors and the Agent necessary or desirable to implement the Agreement or the Store Closing Sales prior to the date of this Interim Order, are hereby approved and ratified.

**A.      Authority to Engage in Store Closing Sales**

9.      The Debtors are authorized, on an interim basis pending the Final Hearing, pursuant to 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately continue and conduct Store Closing Sales at the Closing Stores in accordance with this Interim Order, the Sale Guidelines, and the Agreement.

10.      The Sale Guidelines are approved in their entirety on an interim basis.

11.      The Debtors are authorized to discontinue operations at the Closing Stores in accordance with this Interim Order and the Sale Guidelines.

12.     The Debtors are authorized and directed to remit all proceeds from the Store Closing Sales to the DIP Agent for payment of the Debtors' secured obligations in accordance with the terms and conditions of the DIP Facility.

13.     All entities that are presently in possession of some or all of the Merchandise or FF&E in which the Debtors hold an interest that are or may be subject to the Agreement or this Interim Order hereby are directed to surrender possession of such Merchandise or FF&E to the Debtors or the Agent.

14.     Subject to the provisions herein in paragraphs 16, 17, 18, and 29, neither the Debtors nor the Agent nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any governmental unit (as defined in section 101(27) of the Bankruptcy Code) or landlord, to conduct the Store Closing Sales and to take the related actions authorized herein.

**B.     Conduct of the Store Closing Sales**

15.     All newspapers and other advertising media in which the Store Closing Sales may be advertised and all landlords are directed to accept this Interim Order as binding authority so as to authorize the Debtors and the Agent to conduct the Store Closing Sales and the sale of Merchandise, Additional Agent Goods, and FF&E pursuant to the Agreement, including, without limitation, to conduct and advertise the sale of the Merchandise, Additional Agent Goods, and FF&E in the manner contemplated by and in accordance with this Interim Order, the Sale Guidelines, and the Agreement.

16.     Nothing in this Interim Order or the Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date

of entry of this Interim Order. Nothing contained in this Interim Order or in the Agreement shall in any way (i) diminish the obligation of any entity to comply with environmental laws, or (ii) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code. Nothing herein shall be construed to be a determination that the Agent is an operator with respect to any environmental law or regulation. Moreover, the sale of the Merchandise, Additional Agent Goods, and FF&E shall not be exempt from, and the Agent shall be required to comply with, laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic, and consumer-protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws"). Nothing in this Interim Order shall alter or affect the Debtors' and Agent's obligations to comply with all applicable federal safety laws and regulations. Nothing in this Interim Order shall be deemed to bar any governmental unit from enforcing General Laws in applicable non-bankruptcy forums, subject to the Debtors' or the Agent's right to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Interim Order, or otherwise, pursuant to paragraph 31 hereunder. Notwithstanding any other provision in this Interim Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Interim Order and any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Interim Order shall be deemed to have made any rulings on any such issues.

17.     Except to the extent of the reserved rights of governmental units expressly granted elsewhere in this Interim Order, during the interim sale period, the Debtors and Agent are hereby

authorized to take such actions as may be necessary and appropriate to implement the Agreement

and to conduct the Store Closing Sales without necessity of further order of this Court as

provided in the Agreement or the Sale Guidelines, including, but not limited to, advertising the

sale as a "store closing sale," "sale on everything," "everything must go," or similar-themed

sales through the posting of signs (including the use of exterior banners at non-enclosed mall

Closing Stores, and at enclosed mall Closing Stores to the extent the applicable Closing Store

entrance does not require entry into the enclosed mall common area), use of sign-walkers and

street signage.

18.    Notwithstanding anything herein to the contrary, and in view of the importance of

the use of sign-walkers, banners, and other advertising to the sale of the Merchandise, Additional

Agent Goods, and FF&E, to the extent that, prior to the Final Hearing, disputes arise during the

course of Store Closing Sales regarding laws regulating the use of sign-walkers, banners, or other

advertising, and the Debtors and the Agent are unable to resolve the matter consensually with a

governmental unit, any party may request an immediate telephonic hearing with this Court

pursuant to these provisions.  Such hearing will, to the extent practicable, be scheduled initially

no later than the earlier of (i) the Final Hearing or (ii) within two (2) business days of such

request.  This scheduling shall not be deemed to preclude additional hearings for the presentation

of evidence or arguments as necessary.

19.    Except as expressly provided in the Agreement, the sale of the Merchandise,

Additional Agent Goods, and FF&E shall be conducted by the Debtors and the Agent

notwithstanding any restrictive provision of any lease, sublease, or other agreement relative to

occupancy affecting or purporting to restrict the conduct of the Store Closing Sales, the rejection

of leases, abandonment of assets, or "going dark" provisions.  The Agent and landlords of the

Closing Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Agent and any such landlords, provided that nothing in such Side Letters affects the provisions of Paragraphs 16, 18, 19, 20, and 29 of this Interim Order.  In the event of any conflict between the Sale Guidelines and any Side Letter, the terms of such Side Letter shall control.

20.     Except as expressly provided for herein or in the Sale Guidelines, and except with respect to any governmental unit (as to which Paragraphs 16, 18, 19, 28, 29, and 31 of this Interim Order shall apply), no person or entity, including, but not limited to, any landlord, licensor, service provider, utility, and creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder continuation of the Store Closing Sales or the sale of Merchandise, Additional Agent Goods, or FF&E, or the advertising and promotion (including the posting of signs and exterior banners or the use of sign-walkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service provider, utility, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Store Closing Sales or (ii) instituting any action or proceeding in any court (other than in the Bankruptcy Court) or administrative body seeking an order or judgment against, among others, the Debtors, the Agent, or the landlords at the Closing Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Store Closing Sales or sale of the Merchandise, Additional Agent Goods, or FF&E, or other liquidation sales at the Closing Stores, or seek to recover

damages for any breaches of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

21.     In accordance with and subject to the terms and conditions of the Agreement, the Agent shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment, and other assets of the Debtors for the purpose of conducting the Store Closing Sales, free of any interference from any entity or person, subject to compliance with the Sale Guidelines and this Interim Order and subject to Paragraphs 16, 18, 19 and 28 of this Interim Order.

22.     The Agent shall accept the Debtors' validly issued rewards certificates and gift cards that were issued by the Debtors prior to the Sale Commencement Date in accordance with the Debtors' rewards certificate and gift card policies and procedures as they existed on the Petition Date, and accept returns of merchandise sold by the Debtors prior to the Sale Commencement Date, provided that such return is otherwise in compliance with the Debtors' return policies in effect as of the date such item was purchased and the customer is not repurchasing the same item so as to take advantage of the sale price offered by the Agent; *provided, however*, that the foregoing provisions shall only be applicable at Sport Chalet Closing Stores through April 29, 2016 and thereafter no Sport Chalet rewards certificates, gift cards, returns, exchanges, or other loyalty or customer programs promotions will be accepted at the Closing Stores.[4]

---

[4] As described in more detail in the *Debtors' Motion for Entry of an Order Authorizing Maintenance, Administration, and Continuation of Certain Customer Programs* [Docket No. 10], shortly before the Petition Date, in conjunction with the Sport Chalet Store Closing Sales and in order to ease the burdens imposed on customers and encourage use of the Bob's Stores and EMS on-line offerings, the Debtors expanded the permitted use of Sport Chalet Gift Cards. Specifically, for a period from the Sale Commencement Date through July 29, 2016 (the "Expansion Period"), Sport Chalet Gift Card holders are permitted to exchange such Gift Cards for EMS or Bob's Stores Gift Cards of the same value (the "Exchange Gift Cards") (in addition to being able to use them for Sport Chalet retail purchases through April 29, 2016).

23.     All sales of Merchandise, Additional Agent Goods, and FF&E shall be "as is" and final.  However, as to the Closing Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."  Further, as to the Closing Stores only, the Debtors and the Agent shall accept the return of any goods purchased during the Store Closing Sales, which contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase, for a full refund, provided that the consumer must return the merchandise within seven (7) days of purchase, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect.  Signs stating that "Refunds may be made only for merchandise having a latent defect, when returned with a receipt within 7 days of purchase" will be posted at the cash-register areas of the Closing Stores.  Returns, if permitted, related to the purchase of Merchandise, Additional Agent Goods, and FF&E shall not be accepted at stores that are not participating in the Store Closing Sales.

24.     The Agent shall not be liable for sales taxes except as expressly provided in the Agreement, and the payment of any and all sales taxes is the responsibility of the Debtors.  The Debtors are directed to pay and/or remit all taxes arising from the Store Closing Sales to the applicable governmental units as and when due, provided that in the case of a bona fide dispute the Debtors are only directed to pay and/or remit such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable governmental unit.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable governmental unit for which the sales taxes are collected.  The Agent shall collect, remit to the Debtors, and account for sales taxes as and to the extent provided in the Agreement.  This Interim Order does not enjoin, suspend, or

restrain the assessment, levy, or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

25.     Pursuant to section 363(f) of the Bankruptcy Code, the Agent, on behalf of the Debtors, is authorized to sell the Merchandise and FF&E pursuant to the Agreement and in accordance with the Sale Guidelines.  All sales of Merchandise or FF&E pursuant to the Store Closing Sales, whether by the Agent or the Debtors, shall be, free and clear of claims, encumbrances, defenses (including, without limitation, rights of setoff and recoupment) and interests, including, without limitation, security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, liens, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state, and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights, and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances"); provided, however, that any such Encumbrances shall attach to the applicable proceeds of the sale of Merchandise and FF&E with the same validity and priority, and to the same extent that any such

Encumbrances had with respect to the Merchandise and FF&E prior to such sale, subject to any

claims and defenses that any party may possess with respect thereto and subject to the Agent's

fees and expenses (as provided in the Agreement).

26.    To the extent that the Debtors propose to sell or abandon FF&E that may contain

personal or confidential information about the Debtors' employees or customers (the

"Confidential Information"), the Debtors shall remove the Confidential Information from such

items of FF&E before such sale or abandonment.

27.    The Debtors and the Agent (as the case may be) are authorized and empowered to

transfer Merchandise and FF&E among the Closing Stores and other stores operated by the

Debtors.  The Agent is authorized to sell the Debtors' FF&E and abandon the same, in each case,

as provided for and in accordance with the terms of the Agreement.

**C.    Dispute Resolution Procedures With Governmental Units**

28.    To the extent that the sale of Merchandise or FF&E is subject to any federal, state,

or local statute, ordinance, rule, or licensing requirement directed at regulating "going out of

business," "store closing," similar inventory-liquidation sales, or bulk-sale laws (collectively,

"GOB Laws"), including laws restricting safe, professional, non-deceptive, and customary

advertising such as signs, banners, posting of signage, and use of sign-walkers in connection

with the sale and including ordinances establishing license or permit requirements, waiting

periods, time limits, or bulk-sale restrictions, or any Fast Pay Laws, that would otherwise apply

solely to the sale of the Merchandise, Additional Agent Goods, or FF&E (collectively, the

"Liquidation Laws"), the dispute resolution procedures in this section shall apply.

29.    Provided that the Store Closing Sales and the sale of Merchandise and FF&E are

conducted in accordance with the terms of this Interim Order, the Agreement and the Sale

Guidelines, and in light of the provisions in the laws of many governmental units that exempt

court-ordered sales from their provisions, the Debtors shall be presumed to be in compliance with any GOB Laws and Liquidation Laws and, subject to Paragraphs 16, 18, 19 and 29 herein, and are authorized to conduct the Store Closing Sales in accordance with the terms of this Order and the Sale Guidelines without the necessity of further showing compliance with any such GOB Laws and Liquidation Laws.

30.     Within three (3) business days of entry of this Interim Order, the Debtors shall serve copies of this Interim Order, the Agreement, and the Sale Guidelines via e-mail, facsimile, or regular mail on:  (i) the Attorney General's office for each state where the Store Closing Sales are being held, (ii) the county consumer protection agency or similar agency for each county where the Store Closing Sales are being held, (iii) the division of consumer protection for each state where the Store Closing Sales are being held; (iv) the chief legal counsel for the local jurisdiction; and (v) the Debtors' landlords of the Closing Stores.

31.     To the extent that between the Petition Date and the date of the Final Hearing there is a dispute arising from or relating to the Store Closing Sales, this Interim Order, the Agreement, or the Sale Guidelines, which dispute relates to any GOB Laws or Liquidation Laws (a "Reserved Dispute"), the following procedures shall apply:

> (a)     This Court shall retain exclusive jurisdiction to resolve the Reserved Dispute.  Any time within fourteen (14) days following service of this Interim Order, any governmental unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute (a "Dispute Notice") on the following parties so as to ensure delivery thereof within one (1) business day thereafter: (i) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn. Robert S. Brady, Esq. and Robert F. Poppiti, Esq., rbrady@ycst.com and rpoppiti@ycst.com, and (ii) Klee, Tuchin, Bogdanoff & Stern LLP, 1999 Avenue of the Stars, Thirty-Ninth Floor, Los Angeles, CA 90067, Attn: Michael L. Tuchin, Esq. and

Lee R. Bogdanoff, Esq., mtuchin@ktbslaw.com and lbogdanoff@ktbslaw.com.

(b)  If the Debtors, the Agent, and the governmental unit are unable to resolve the Reserved Dispute within fourteen (14) days of service of the notice, the aggrieved party may file a motion with this Court requesting that this Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of this Interim Order or to limit or interfere with the Debtors' or the Agent's ability to conduct or to continue the Store Closing Sales pursuant to this Interim Order and the Agreement, absent further order of this Court.

**D.    Other Provisions**

32.    The Agent shall be permitted to include in the Sale at Sport Chalet Additional Agent Goods in accordance with the terms and provisions of the Agreement.  All transactions relating to the Additional Agent Goods are, shall be construed as, and are acknowledged by the Debtors to be a true consignment from Agent to the Debtors under Article 9 of the Uniform Commercial Code in effect in the State of Delaware (the "UCC").  Agent is hereby granted a first priority security interest in (i) the Additional Agent Goods and (ii) the Additional Agent Goods proceeds, which security interest shall be deemed perfected pursuant to this Interim Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Goods (and any proceeds from the sale thereof) as consigned goods thereunder and the Debtors as the consignee therefor, and Agent's security interest in such Additional Agent Goods and Additional Agent Goods proceeds).  As part of each weekly reconciliation, the Debtors shall turnover all proceeds from the sale of Additional Agent Goods

to the Agent, net of the five percent (5.0%) fee payable to the Debtors pursuant to the Agreement.

33.     The Agreement and related documents may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court.

34.     No later than five (5) days prior to the Final Hearing, the Agent shall file a declaration disclosing connections to the Debtors, their creditors, and other parties in interest in these Cases.

35.     The Agent shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against the Agent, in each case, other than as expressly provided for in the Agreement.

36.     Except with respect to any governmental unit (as to which the provisions of Paragraphs 16, 18, 19, 28, 29, and 31 of this Interim Order shall apply), this Court shall retain exclusive jurisdiction with regard to all issues or disputes relating to this Interim Order or the Agreement, including, but not limited to, (i) any claim or issue relating to any efforts by any party or person to prohibit, restrict, or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner; (ii) any claim of the Debtors, the landlords, or the Agent for protection from interference with the Store Closing Sales; (iii) any other disputes related to the Store Closing Sales; and (iv) protection of the Debtors and the Agent against any assertions of encumbrances.  No such parties or person shall take any action against the Debtors, the Agent, the landlords, or the Store Closing Sales until this Court has resolved such dispute.

This Court shall hear the request of such parties or persons with respect to any such disputes on

an expedited basis, as may be appropriate under the circumstances.

37.     This Court shall retain jurisdiction and power to hear and determine all matters

arising from or related to the implementation, interpretation, and/or enforcement of this Interim

Order.


Dated:  Wilmington, Delaware
           April _____, 2016


_____

United States Bankruptcy Judge

## **Exhibit 1**

Agreement





April 15, 2016

***VIA EMAIL***
Vestis Retail Group, LLC
c/o Robert J. Duffy, CRO
FTI Consulting, LLC
200 State Street
9th Floor
Boston, MA  02109
Phone:  +1 617 897 1501
Email:  bob.duffy@fticonsulting.com

Re:    **Letter Agreement Governing Inventory Disposition**

Dear Bob:

By executing below, this letter shall serve as an agreement ("Agreement") between Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC, on the one hand (together, "Agent" or a "Party"), and EMS Operating Company LLC ("EMSO"), Bob's Stores, LLC ("Bob's"), Sport Chalet, LLC ("SC") and Sport Chalet Team Sales, LLC ("SCTS," and together with EMSO, Bob's and SC, "Merchant" or a "Party" and together with the Agent, the "Parties"), under which Agent shall act as the exclusive agent for the purpose of conducting a sale of certain Merchandise (as defined below) at (i) Sport Chalet's stores set forth on Exhibit A-1 (the "Sport Chalet Stores"), (ii) EMS' stores set forth on Exhibit A-2 (the "EMS Stores"), and (iii) Bob's Stores' stores set forth on Exhibit A-3 (the "Bob's Stores") (each a "Store" and collectively, the "Stores") (and, if requested by Merchant, e-commerce platforms) through a "Store Closing", "Everything Must Go", "Everything on Sale" or similar themed sale and, solely with respect to the Sport Chalet Stores, "Going Out Of Business" (the "Sale").

**A.    Merchandise**

For purposes hereof, "Merchandise" shall mean all goods, saleable in the ordinary course, located in the Stores on the Sale Commencement Date (defined below).  "Merchandise" does not mean and shall not include: (1) goods that belong to sublessees, licensees or concessionaires of Merchant; (2) owned furnishings, trade fixtures, equipment and improvements to real property that are located in the Stores (collectively, "FF&E"); (3) damaged or defective merchandise that cannot be sold; (4) goods available to rent or lease; (5) greeting cards, gift cards (third party and Merchant branded), propane, ice, vending products and the like; or (6) goods utilized for team sports (collectively without the FF&E, the "Non-Merchandise Goods").

**B.    Sale Term**

For each Store, the Sale shall commence on April 16, 2016 (the "Sale Commencement Date") and conclude no later than June 30, 2016 (the "Sale Termination Date") with respect to all Stores; provided, however, that the Parties may mutually agree in writing to extend or terminate the Sale at any Store prior to the Sale Termination Date; provided, further, that, with respect to any of

the Bob's Stores or the EMS Stores, Merchant may, in its sole discretion, upon 5 business days' notice to Agent terminate the Sale at any such Store prior to June 30, 2016; provided, however, that Merchant shall remain obligated for fees and expenses due to Agent through and including such accelerated date.  The period between the Sale Commencement Date and the Sale Termination Date shall be referred to as the "Sale Term."  At the conclusion of the Sale, Agent shall surrender the premises for each Store to Merchant or its designee in broom clean condition and in accordance with the lease requirements for such premises; provided, however, Merchant shall bear all costs and expenses associated with surrendering the premises in accordance with the lease requirements for such premises according to a budget mutually agreed to between the Agent and Merchant.  At the conclusion of the Sale at each Store, Agent shall photographically document the condition of each such Store, and provide the same to Merchant within 10 business days.

**C.**     **Project Management**

    (i)     Agent's Undertakings

During the Sale Term, Agent shall, in collaboration with Merchant, (a) provide qualified supervisors (the "Supervisors") engaged by Agent to oversee the management of the Stores; (b) determine appropriate point-of-sale and external advertising for the Stores, approved in advance by Merchant and, unless otherwise provided in the Approval Order (as defined below), in compliance with the lease provisions for each Store; (c) recommend appropriate discounts of Merchandise, staffing levels for the Stores, and appropriate bonus and incentive programs, if any, for the Stores' employees, in each case, approved in advance by Merchant; (d) oversee display of Merchandise for the Stores; (e) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (f) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (g) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (h) assist Merchant with developing a customer transition program for the Bob's Stores' and the EMS' Stores; and (i) provide such other related services deemed necessary or appropriate by Merchant and Agent.

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Agent's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

    (ii)     Merchant's Undertakings

During the Sale Term, Merchant shall (a) be the employer of the Stores' employees, other than the Supervisors; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Stores, the Stores' employees and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors; (f) execute all agreements determined by the Merchant and Agent to be necessary or desirable for the operation of the Stores during the Sale; (g) arrange for the ordinary maintenance of all point-of-sale equipment required for the Stores; and (h) use reasonable efforts to ensure that Agent has quiet use and enjoyment of the Stores for the Sale Term in order to perform its obligations under this Agreement.

Merchant shall provide throughout the Sale Term central administrative services necessary for the Sale and currently provided by Merchant in its operation of the Stores, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, as available through the Merchant's existing accounting and IT systems, all at no cost to Agent.

The Parties expressly acknowledge and agree that Agent shall have no liability to Merchant's employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Agent.

**D.** **The Sale**

All sales of Merchandise shall be made on behalf of the applicable Merchant. Agent does not have, nor shall it have, any right, title or interest in the Merchandise. All sales of Merchandise shall be by cash, gift card, gift certificate, merchandise credit, or credit or debit card and, at Merchant's discretion, by check or otherwise in accordance with Merchant's policies (including, without limitation, Merchant's member or customer appreciation points, rewards and coupons), and shall be "final" with no returns accepted or allowed, unless otherwise directed by Merchant; provided, that gift cards, merchandise credit, gift certificates, and member or customer appreciation points, rewards or coupons for the Sport Chalet Stores shall not be accepted for sales of Merchandise following the date that is 14 days after the Sale Commencement Date.

**E.** **Agent Fee and Expenses in Connection with the Sale**

(i)    Certain Defined Terms

As used in this Agreement, the following terms shall have the following meanings:

a.    "File" shall mean "SC Locations Pipe.txt", "EMS Locations.txt" and "Bobs Location 4047.txt." and updated files provided to Agent by Merchant.

b.    "Cost Value" shall mean, with respect to each item of Merchandise, "EOP_OnHand_Cost" as reflected in the File.

c.    "Gross Proceeds" shall mean the sum of the gross proceeds of all sales of Merchandise during the Sale Term, net only of sales taxes.

d.    "Recovery Percentage" shall mean the Gross Proceeds divided by the aggregate Cost Value of the Merchandise.

(ii)    Sport Chalet

In consideration of its services hereunder with respect to the Sport Chalet Stores, Agent shall earn a fee calculated in accordance with the following:

| Recovery Percentage | Agent's Percentage Fee |
|---|---|
| Less than 120.0%[1] | No fee |
| 120.0 to 121.99% | 0.6% of Gross Proceeds applicable to Sport Chalet Stores |
| 122.0 – 127.99% | 1.0% of Gross Proceeds applicable to Sport Chalet Stores |
| 128.0% or greater | 1.25% of Gross Proceeds applicable to Sport Chalet Stores |

The Recovery Percentage for the Sport Chalet Stores shall be determined in connection with the Final Reconciliation (as defined below) for the Sport Chalet Stores, and once determined, the Parties (as part of the Final Reconciliation) shall determine the applicable Agent's Percentage Fee. Once Agent's Percentage Fee is determined, Agent's fee shall be calculated using the applicable Agent's Percentage Fee back to dollar one.

If requested by Merchant, Agent shall sell Non-Merchandise Goods during the Sale at the Sport Chalet Stores, and in consideration of such services with respect to the Sport Chalet Stores, Agent shall earn a fee equal to the Percentage Fee applicable to the sale of Sport Chalet Merchandise multiplied by gross receipts, net only of sales taxes, from the sale of Non-Merchandise Goods at the Sport Chalet Stores.  Merchant hereby requests that Agent sell goods available for rent or lease and goods utilized for team sports at the Sport Chalet Stores.

(iii)    EMS Stores

In consideration of its services hereunder with respect to the EMS Stores, Agent shall earn a fee calculated in accordance with the following:

| Recovery Percentage | Agent's Percentage Fee |
|---|---|
| Less than 130.0%[2] | No fee |
| 130.0 to 132.99% | 0.6% of Gross Proceeds applicable to EMS Stores |
| 133.0 – 136.99% | 1.0% of Gross Proceeds applicable to EMS Stores |
| 137.0% or greater | 1.25% of Gross Proceeds applicable to EMS Stores |

The Recovery Percentage for the EMS Stores shall be determined in connection with the Final Reconciliation, and once determined, the Parties (as part of the Final Reconciliation) shall determine the applicable Agent's Percentage Fee.  Once Agent's Percentage Fee is determined, Agent's fee shall be calculated using the applicable Agent's Percentage Fee back to dollar one.

If requested by Merchant, Agent shall sell Non-Merchandise Goods during the Sale at the EMS Stores, and in consideration of such services with respect to the EMS Stores, Agent shall earn a fee equal to the Percentage Fee applicable to the sale of EMS Merchandise multiplied by gross receipts, net only of sales taxes, from the sale of Non-Merchandise Goods at the EMS Stores.

(iv)    Bob's Stores

In consideration of its services hereunder with respect to the Bob's Stores, Agent shall earn a fee equal to one percent (1.0%) of the Gross Proceeds applicable to the Bob's Stores.  If requested

---

[1]    The Recovery Percentages are based on a cost to retail relationship of 50.2%.
[2]    The Recovery Percentages are based on a cost to retail relationship of 45.0%.

by Merchant, Agent shall sell Non-Merchandise Goods during the Sale at the Bob's Stores, and in consideration of such services with respect to the Bob's Stores, Agent shall earn a fee equal to one percent (1.0%) multiplied by gross receipts, net only of sales taxes, from the sale of Non-Merchandise Goods at the Bob's Stores.

   (v)    Additional Agent Goods

   Agent shall have the right, at Agent's sole cost and expense, to supplement the Merchandise in the Sale at the Sport Chalet Stores only with additional goods procured by Agent which are of like kind, and no lesser quality to the Merchandise in the Sale at the Sport Chalet Stores ("Additional Agent Goods"); provided, further, that the cost of Additional Agent Goods shall not exceed 7.5% of the aggregate Cost Value of Merchandise in the Sport Chalet Sale.  The Agent shall consult with Sport Chalet with respect to the Additional Agent Goods to ensure that the Additional Agent Goods are of like kind and no lesser quality than the Merchandise in the Sale at the Sport Chalet Stores and are in categories designed to enhance the Sale at the Sports Chalet Stores.  The Additional Agent Goods shall be purchased by Agent as part of the Sale, and delivered to the Sports Chalet Stores at Agent's sole expense (including as to labor, freight and insurance relative to shipping such Additional Agent Goods to the Sports Chalet Stores).  Sales of Additional Agent Goods shall be run through Merchant's cash register systems; provided however, that Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise.  Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods as non-Merchant goods.  Additionally, Agent shall provide signage in the Stores notifying customers that the Additional Agent Goods have been included in the Sale.

   Agent shall pay to Merchant an amount equal to five percent (5.0%) percent of the gross proceeds (excluding Sale Taxes) from the sale of the Additional Agent Goods (the "Additional Agent Goods Fee") and Agent shall retain all remaining amounts from the sale of the Additional Agent Goods.  Agent shall pay Merchant its Additional Agent Goods Fee in connection with each weekly sale reconciliation with respect to sales of Additional Agent Goods sold by Agent during each then prior week (or at such other mutually agreed upon time).

   Agent and Merchant intend that the transactions relating to the Additional Agent Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes.  Subject solely to Agent's obligations to pay to Merchant the Additional Agent Goods Fee, at all times and for all purposes the Additional Agent Goods and their proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Goods or their proceeds.  The Additional Agent Goods shall at all times remain subject to the exclusive control of Agent.

   Merchant shall, at Agent's sole cost and expense, insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.  Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods.

   Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Goods shall be consigned to Merchant as a true consignment under Article 9 of the Code.  Agent is

hereby granted a first priority security interest in and lien upon (i) the Additional Agent Goods and (ii) the Additional Agent Goods proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Goods as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Goods and Additional Agent Goods proceeds).  The preceding is subject in its entirety to any consents required by any secured lender of Merchant with a floating lien on Merchant's inventory.

(vi)    Expenses

Except as expressly set forth in paragraph E(v) above, Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's e-commerce and other retail store operations, and Agent's other reasonable, documented out of pocket expenses.  To control expenses of the Sale, Merchant and Agent have established an aggregate budget for each of the Sport Chalet, EMS, and Bob's Stores Sales (each an "Expense Budget" and collectively, the "Expense Budgets"), which the Agent shall not exceed in the aggregate absent Merchant's written consent.  Each Expense Budget includes various costs and expenses of the Sale, including payroll, occupancy, costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and industry standard deferred compensation, and advertising and promotion costs (including, without limitation, interior and exterior signage, print and other media advertising, direct mail, etc.).  The Expense Budgets for the Sale are attached hereto as (i) Exhibit B-1 for the Sport Chalet Stores, (ii) Exhibit B-2 for the EMS Stores, and (iii) Exhibit B-3 for the Bob's Stores.  The Expense Budget may only be modified by mutual agreement of Agent and Merchant.

Upon execution of this Agreement, the Merchant shall pay by wire transfer to the Agent an advance payment of costs and expenses delineated in the Expense Budget of $600,000 (the "Sale Expense Advance") which shall be held by Agent and applied towards Expenses of the Sale as incurred.  Any portion of the Sale Expense Advance not used to pay Expenses of the Sale shall be returned to Merchant within three days following the Final Reconciliation.

(vii)    Reconciliation

All accounting matters (including, without limitation, all fees, expenses, or other amounts reimbursable or payable to Agent or, with respect to the Additional Goods Fee, Merchant) shall be reconciled on every Wednesday for the prior week and shall be paid within seven (7) days after each such weekly reconciliation.  The Parties shall complete a final reconciliation and settlement of all amounts payable to Agent or, with respect to the Additional Agent Goods Fee, Merchant and contemplated by this Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) no later than forty five (45) days following the Sale Termination Date for the last Store (the "Final Reconciliation").

**F.**   **Indemnification**

   (i)   Merchant's Indemnification

Merchant shall indemnify, defend, and hold Agent and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, affiliates, and Supervisors (collectively, "Agent Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) any liability or other claims, including, without limitation, product liability claims, asserted by customers, any Store employees (under a collective bargaining agreement or otherwise), or any other person (excluding Agent Indemnified Parties) against Agent or an Agent Indemnified Party, except claims arising from Agent's negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortuous or otherwise actionable treatment of Agent's Indemnified Parties or Merchant's customers by Merchant or Merchant's Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

   (ii)   Agent's Indemnification

Agent shall indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, and affiliates (other than the Agent or the Agent Indemnified Parties) (collectively, "Merchant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Agent or the Agent Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Agent; (c) any liability or other claims made by Agent's Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortuous or otherwise actionable treatment of Merchant Indemnified Parties, or Merchant's customers by Agent or any of the Agent Indemnified Parties and (e) any claims made by any party engaged by Agent as an employee, agent, representative or independent contractor arising out of such engagement.

**G.**   **Insurance**

   (i)   Merchant's Insurance Obligations

Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall cause Agent to be named an additional insured with respect to all such policies.  At Agent's request, Merchant shall provide Agent with a certificate or certificates evidencing the insurance coverage required hereunder and that Agent is an additional insured

thereunder.  In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.

(ii)     Agent's Insurance Obligations

As an expense of the Sale, Agent shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Agent's provision of services at the Stores.  Agent shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a certificate or certificates evidencing the insurance coverage required hereunder.  In addition, Agent shall maintain throughout the Sale Term, workers compensation insurance compliance with all statutory requirements.  Further, should Agent employ or engage third parties to perform any of Agent's undertakings with regard to this Agreement, Agent will ensure that such third parties are covered by Agent's insurance or maintain all of the same insurance as Agent is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

**H.     Representations, Warranties, Covenants and Agreements**

(i)     Merchant warrants, represents, covenants and agrees that (a) Merchant is a company duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and maintains its principal executive office at the address set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein, (c) all ticketing of Merchandise at the Stores has been and will be done in accordance with Merchant's customary ticketing practices; (d) all normal course hard markdowns on the Merchandise have been, and will be, taken consistent with customary Merchant's practices, and (e) the Stores will be operated in the ordinary course of business in all respects, other than those expressly agreed to by Merchant and Agent.

(ii)     Each entity comprising Agent warrants, represents, covenants and agrees that (a) such entity is a company duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform the Agent's obligations hereunder, and maintains its principal executive office at the addresses set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Agent and this Agreement constitutes a valid and binding obligation of Agent enforceable against Agent in accordance with its terms and conditions, and the consent of no other entity or person is required for Agent to fully perform all of its obligations herein, (c) Agent shall comply with and act in accordance with any and all applicable state and local laws, rules, and regulations, and other legal obligations of all governmental authorities, (d) no non-emergency repairs or maintenance in the Stores will be conducted without

Merchant's prior written consent, and (e) Agent will not take any disciplinary action against any employee of Merchant.

## I.      Furniture, Fixtures and Equipment

Agent shall sell the FF&E (a) in the Sport Chalet Stores from the Sport Chalet Stores themselves and, (b) unless otherwise directed by Merchant, in the Bob's Stores and the EMS Stores from the Bob's Stores and the EMS Stores, respectively.  Merchant shall be responsible for all reasonable costs and expenses incurred by Agent in connection with the sale of FF&E, which costs and expenses shall be incurred pursuant to a budget or budgets to be established from time to time by mutual agreement of the Parties.  Agent shall have the right to abandon at the Stores any unsold FF&E.

In consideration for providing the services set forth in this section I, Agent shall be entitled to a commission from the sale of the FF&E equal to fifteen percent (15%) of the Gross Proceeds of the sale of the FF&E.

Agent shall remit to Merchant all Gross Proceeds from the sale of FF&E.  During each weekly reconciliation described in section E above, Agent's FF&E fee shall be calculated, and Agent's calculated FF&E fee and all FF&E costs and expenses then incurred shall paid within seven (7) days after each such weekly reconciliation.

Merchant and Agent shall have the option to provide Merchant with a guaranteed recovery on the FF&E for which Merchant requests a guaranteed recovery in which case Merchant and Agent shall mutually agree upon the guaranteed/purchase amount on account of the sale of the such FF&E (the "Owned FF&E").  Under a guaranteed recovery, Agent shall be authorized to purchase the Owned FF&E for which Merchant requests a guaranteed recovery for an agreed upon amount from Merchant and sell the Owned FF&E and retain all proceeds (net of applicable sales taxes) from the sale of all Owned FF&E for Agent's sole and exclusive benefit, and Agent shall be responsible for the payment of all costs and expenses associated with the disposition of Owned FF&E (other than rent, utilities, and other occupancy expenses for the Stores).  For the avoidance of doubt, Merchant shall not be entitled to sell FF&E through other means without owing any fee to Agent for the sale by Merchant thereof.

## J.      Termination

The following shall constitute "Termination Events" hereunder:

(a)      Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting Party;

(b)      Any representation or warranty made by Merchant or Agent is untrue in any material respect as of the date made or at any time and throughout the Sale Term; or

(c)      the Sale is terminated or materially interrupted or impaired for any reason other than an event of default by Agent or Merchant.

If a Termination Event occurs, the non-defaulting Party (in the case of an event of default) or either Party (if the Sale is otherwise terminated or materially interrupted or impaired) may, in its discretion, elect to terminate this Agreement by providing seven (7) business days' written notice thereof to the other Party and, in the case of an event of default, in addition to terminating this Agreement, pursue any and all rights and remedies and damages resulting from such default.  If this Agreement is terminated, Merchant shall be obligated to pay Agent, and Agent shall be obligated to pay Merchant, all amounts due under this Agreement through and including the termination date, if any.

**K.**    **Notices**

All notices, certificates, approvals, and payments provided for herein shall be sent by fax or by recognized overnight delivery service as follows:  (a) To Merchant: at the address listed above; (b) To Agent: c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax:  847- 897-0859, Attn: Ian S. Fredericks; or (c) such other address as may be designated in writing by Merchant or Agent.

**L.**    **Independent Consultant**

Agent's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect.  No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement.  Merchant shall have no control over the hours that Agent or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Agent is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

**M.**    **Non-Assignment**

Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns.

No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party.  The Parties hereby agree that any list of Stores attached as Exhibit A-1, A-2, or A-3 may be supplemented from time to time by written amendment to this Agreement executed in accordance with the foregoing in which case any store added to Exhibit A-1, A-2, or A-3 shall be deemed a "Store" for all purposes under this Agreement and the Parties shall mutually agree upon any modifications to the Sale Term, Expense Budget(s), and other terms and conditions that may be necessary or appropriate in light of the additional retail locations.

**N.**    **Severability**

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.   If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**O.    Governing Law, Venue, Jurisdiction and Jury Waiver**

This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of Illinois (without reference to the conflicts of laws provisions therein).   Merchant and Agent waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either Agent against Merchant or Merchant against Agent on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Agent, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect.

If Merchant commences a case under Chapter 11 of Bankruptcy Code with a bankruptcy court (the "Bankruptcy Court"), Merchant shall promptly file a motion to assume both this Agreement under section 365 of the Bankruptcy Code, and utilize its reasonable best efforts to ensure that such motion is approved by an order that provides, among other things, as follows:  (i) the payment of all fees and reimbursement of expenses hereunder to Agent is approved without further order of the court and shall be free and clear of all liens, claims and encumbrances; (ii) all such payments of fees and reimbursement of expenses shall be made on a weekly basis without further order of the Bankruptcy Court and otherwise in accordance with this Agreement; (iii) approval of the transaction contemplated hereby; (iv) authorizing the Sale without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise govern the Sale; (v) authorizing the Sale notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents; (vi) approve the sale of Additional Agent Goods in accordance with the terms and conditions hereof; and (vii) take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement.   In such event, any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over Merchant, and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens.   From and after entry of the Approval Order, Agent shall conduct the Sale in accordance with the terms of the Approval Order in all material respects.

**P.    Entire Agreement**

This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof.   No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement.   All prior agreements, discussions and negotiations are entirely superseded by this Agreement.

**Q.**    **Execution**

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

\*          \*          \*

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned. Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By: Ian S. Fredericks
Its: SVP & CLO

GORDON BROTHERS RETAIL PARTNERS, LLC

By: Richard Edwards
Its: Co-President - Retail

**AGREED AND ACCEPTED as of the ___ day of April, 2016:**

EMS OPERATING COMPANY LLC;
BOB'S STORES, LLC;
SPORT CHALET, LLC;
SPORT CHALET TEAM SALES, LLC

By:
Its:

160183.6                                    13

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned. Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By: _____
Its:

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____
Its:

**AGREED AND ACCEPTED as of the 15th day of April, 2016:**

EMS OPERATING COMPANY LLC;
BOB'S STORES, LLC;
SPORT CHALET, LLC;
SPORT CHALET TEAM SALES, LLC

By:  Sue Riley
Its:   Chief Financial Officer

**Sport Chalet**

**Exhibit A**

| Store List |
| --- |

| Store # | Name | Address | City | State | Zip | Selling Sq. Ft. |
| --- | --- | --- | --- | --- | --- | --- |
| 2 | LA Canada Flintridge Town Center | Two Sport Chalet Drive | LA Canada | CA | 91011 | 45,000 |
| 3 | Huntington Beach | 16242 Beach Blvd. | Huntington Beach | CA | 92647 | 50,000 |
| 4 | Marketplace at Laguna Niguel | 27080 Alicia Parkway | Laguna Niguel | CA | 92656 | 40,018 |
| 5 | Point Loma | 3695 Midway Drive | San Diego | CA | 92110 | 34,588 |
| 6 | University Town Center | 4525 La Jolla Village D19 | San Diego | CA | 92122 | 34,850 |
| 7 | Bubank | 201E. Magnolia #145 | Burbank | CA | 91502 | 44,957 |
| 8 | Mission Viejo | 27551 Puerta Real | Mission Viejo | CA | 92691 | 29,851 |
| 10 | Valencia | 25560 The Old Road | Valencia | CA | 91381 | 40,000 |
| 11 | Marina Del Rey | 13455 Maxella Avenue | Marina Del Rey | CA | 90292 | 42,276 |
| 13 | Brea | 2500 E Imperial | Brea | CA | 92821 | 40,536 |
| 14 | Oxnard | 1885 Ventura Blvd | Oxnard | CA | 93030 | 40,471 |
| 15 | West Hills | 802 Fallbrook Avenue | West Hills | CA | 91307 | 44,000 |
| 16 | Rancho Cucamonga | 124449 Foothill Blvd | Rancho Cucamonga | CA | 91739 | 36,000 |
| 17 | Glendora | 940 South Grand Avenue | Glendora | CA | 91740 | 40,435 |
| 18 | Torrance | 21305 Hawthorne Blvd. #205 | Torrance | CA | 90503 | 43,703 |
| 19 | Irvine | 2983 Michelson Drive | Irvine | CA | 92612 | 35,049 |
| 20 | Mission Valley | 1640 Camino Del Rio N #110 | San Diego | CA | 92108 | 47,000 |
| 21 | Porter Ranch | 19817 Rinaldi Street | Porter Ranch | CA | 91326 | 43,000 |
| 22 | Temecula | 40432 Winchester Road | Temecula | CA | 92591 | 41,408 |
| 23 | Chino Hills | 13041 Peyton Drive | Chino Hills | CA | 91709 | 42,000 |
| 24 | Long Beach | 7440 Carson Street | Long Beach | CA | 90822 | 43,355 |
| 26 | Palmdale | 39180 10th Street W | Palmdale | CA | 93551 | 38,000 |
| 27 | South Coast Plaza | 3333 Bear Street | Costa Mesa | CA | 92626 | 41,579 |
| 28 | Summerlin | 8825 W. Charleston Blvd. | Las Vegas | NV | 89117 | 40,335 |
| 29 | Riverside | 3700 Taylor Street | Riverside | CA | 92503 | 46,127 |
| 31 | Redlands | 27550 W. Lugonia Avenue | Redlands | CA | 92374 | 41,991 |
| 32 | Sacramento | 2401 Butano Drive | Sacramento | CA | 95825 | 40,603 |
| 33 | Roseville | 10349 Fairway Drive | Roseville | CA | 95678 | 37,000 |
| 34 | Laguna Market Place/ Elk Grove | 8511 Bond Road | Elk Grove | CA | 95624 | 42,000 |
| 35 | Westfield Shoppingtown/Arcadia | 400 S Baldwin Avenue | Arcadia | CA | 91007 | 42,241 |
| 36 | Metro 580 Shopping Center/ Pleasanton | 4555 Rosewood Drive | Pleasanton | CA | 94588 | 40,489 |
| 37 | Parkwood Creek West Shopping Center | 4145 S Mooney Blvd. | Visalia | CA | 93277 | 41,000 |

**Sport Chalet**
**Exhibit A**

| Store List |
| --- |

| Store # | Name | Address | City | State | Zip | Selling Sq. Ft. |
|---|---|---|---|---|---|---|
| 38 | Foothill Ranch | 26532 Town Centre Drive | Foothill Ranch | CA | 92610 | 50,410 |
| 39 | Thousand Oaks | 1350 North MoorPark Road | Thousand Oaks | CA | 91360 | 40,262 |
| 60 | Happy Valley | 2501 W Happy Valley Road | Phoenix | AZ | 85027 | 42,000 |
| 61 | Chandler | 2650 E Germann Road | Chandler | AZ | 85249 | 42,000 |
| 62 | Scottdale | 8690 E Raintree Drive | Scottsdale | AZ | 85260 | 41,470 |
| 64 | Vacaville | 1621 E Monte Vista Avenue | Vacaville | CA | 95688 | 41,620 |
| 65 | San Jose | 2190 Eastridge Loop | San Jose | CA | 95122 | 44,000 |
| 66 | Mira Loma | 12399 Limonite Avenue | Eastvale | CA | 91752 | 39,309 |
| 67 | San Marcos | 177 South Las Posas Drive | San Marcos | CA | 92078 | 40,000 |
| 68 | The Arroyo Market Square/Las Vegas SW | 7230 Arroyo Crossing Parkway | Las Vegas | NV | 89113 | 42,000 |
| 70 | Bakersfield | 5200 Stockdale Highway | Bakersfield | CA | 93309 | 42,000 |
| 71 | Goodyear Marketsquare | 15277 W McDowell Road | Goodyear | AZ | 85338 | 41,535 |
| 72 | Lake Pleasant | 25406 N. Lake Pleasant Parkway | Peoria | AZ | 85383 | 42,000 |
| 74 | West Los Angeles | 11801 West Olympic Blvd. | West Los Angeles | CA | 90025 | 50,450 |
| 78 | Figat7th -Los Angeles | 735 Figueroa Street | Los Angeles | CA | 90017 | 27,480 |
| **47** | | | | *Average Sq. Ft.* | | **41,200** |

**Sport Chalet**
**Exhibit B-1**

| Expense Budget | |
|---|---:|
| # of Stores | 47 |
| | |
| Wages | 5,296,469 |
| Incentives | 529,647 |
| Benefits (1) | 926,882 |
| Total Payroll | 6,752,997 |
| | |
| Occupancy (2) | 9,133,502 |
| Advertising (3)(4) | 457,622 |
| Transfer & Consolidation Expense | 100,000 |
| Bank & Credit Card Fee | 1,378,051 |
| Other store expenses | 711,214 |
| Supervision (5) | 1,100,005 |
| | 12,880,394 |
| | |
| Total Expenses | 19,633,392 |

*Note(s):*
*1. Assumes payroll taxes and benefits are capped at  17.5%.*
*2. Occupancy based upon the attached per diem schedule.*
*3. Advertising includes expense for signs and sign walkers..*
*4. Newspaper ads and email blasts are not included, but are*
*recommended options as sale performance dictates and will not*
*exceed $1,390,000 and may be lower based upon company's*
*existing rates.*
*5. Includes Deferred Compensation and Insurance.*

**Sport Chalet**
**Occupancy Per Diem**

| Store # | Store Name | Per Diem | | | | | | | | | | | | | | | | | | | Total Occupancy |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | (53000) Basic Rent | (53001) Straight Line Rent | (53010) Percentage Rent | (52700) Telephone | (52725) Data Communication | (53032) Common Area Maintenance | (53045) Personal Property Tax | (53050) Realty Taxes | (53055) Business Tax & License Fees | (53075) Electricity | (53080) Gas | (53083) Offsite Storage | (53090) Maintenance & Repairs | (53105) Contracts - Trash Disposal | (53120) Water/Sewer/Other | (57006) Computer Expense | (57010) Equipment Rental | (58001) General Liability | (59830) Security And Alarm | |
| 2 | LA Canada Flintridge Town Center | 2,448 | - | - | - | 6 | 845 | 22 | 557 | 7 | 330 | - | - | 53 | 11 | 16 | - | - | 79 | 33 | 4,408 |
| 3 | Huntington Beach | 1,875 | - | - | 1 | 30 | 157 | 15 | 216 | 2 | 283 | 11 | 17 | 314 | 16 | 6 | 3 | - | 88 | 14 | 3,048 |
| 4 | Marketplace at Laguna Niguel | 1,530 | - | - | - | 36 | 24 | 7 | 60 | 2 | 277 | - | - | 105 | - | 4 | 3 | - | 71 | 13 | 2,133 |
| 5 | Point Loma | 1,325 | - | - | - | 23 | 292 | 9 | 256 | 13 | 298 | 8 | 9 | 132 | - | 7 | 4 | - | 61 | 21 | 2,478 |
| 6 | University Town Center | 1,340 | - | - | - | 22 | 478 | 5 | - | 7 | 273 | - | - | 43 | - | - | - | - | 36 | 7 | 2,212 |
| 7 | Bubank | 2,220 | - | - | - | 23 | - | 10 | 268 | 1 | 363 | - | - | 29 | 10 | - | 9 | - | 79 | 9 | 3,022 |
| 8 | Mission Viejo | 984 | - | - | - | 22 | 190 | 5 | 70 | 1 | 299 | 0 | - | 39 | - | 3 | 4 | - | 53 | 11 | 1,682 |
| 10 | Valencia | 1,588 | 8 | - | - | 24 | 191 | 11 | 382 | 1 | 302 | 7 | - | 75 | 4 | 5 | - | - | 70 | 30 | 2,698 |
| 11 | Marina Del Rey | 2,865 | 396 | - | - | 22 | 1,153 | 9 | 1,170 | 5 | 262 | - | - | 31 | - | 4 | - | - | 75 | 16 | 6,006 |
| 13 | Brea | 1,748 | - | - | - | 21 | 319 | 9 | 329 | 5 | 178 | 15 | 1 | 47 | 5 | 14 | 3 | - | 71 | 9 | 2,775 |
| 14 | Oxnard | 755 | - | - | - | 6 | 21 | 10 | 212 | 31 | 219 | 5 | 12 | 47 | - | 19 | - | - | 71 | 2 | 1,413 |
| 15 | West Hills | 2,176 | - | - | - | 28 | 490 | 6 | 770 | 3 | 265 | 22 | 9 | 56 | 9 | 8 | 7 | - | 78 | 23 | 3,950 |
| 16 | Rancho Cucamonga | - | - | 512 | - | 23 | - | 8 | - | 13 | 205 | 4 | 11 | 77 | - | 5 | - | - | 63 | 12 | 932 |
| 17 | Glendora | 1,151 | 29 | - | - | 30 | - | 6 | 86 | 1 | 207 | - | - | 15 | 5 | 11 | - | 1 | 71 | 7 | 1,621 |
| 18 | Torrance | 2,188 | - | - | - | 26 | 479 | 12 | 460 | 6 | 284 | - | - | 28 | - | 4 | 10 | - | 77 | 21 | 3,594 |
| 19 | Irvine | 1,757 | 211 | - | - | 25 | 509 | 8 | 261 | 2 | 216 | 9 | - | 129 | - | 4 | - | - | 62 | 9 | 3,202 |
| 20 | Mission Valley | 2,683 | - | - | - | 22 | 161 | 20 | - | 2 | 307 | - | 7 | 19 | - | - | 10 | - | 83 | 18 | 3,331 |
| 21 | Porter Ranch | 1,819 | - | - | - | 27 | 185 | 6 | 247 | 2 | 295 | - | - | 35 | 4 | 1 | - | - | 76 | 19 | 2,716 |
| 22 | Temecula | 1,281 | 148 | - | - | 23 | 98 | 11 | 196 | 2 | 216 | - | 11 | 66 | 3 | 11 | - | - | 70 | 24 | 2,175 |
| 23 | Chino Hills | 659 | - | - | - | 22 | 0 | 8 | - | 6 | 231 | 1 | - | 45 | 4 | 15 | 2 | - | 74 | 13 | 1,081 |
| 24 | Long Beach | 2,077 | - | - | - | 23 | 323 | 12 | 494 | 13 | 242 | - | 14 | 47 | 3 | 4 | 5 | - | 76 | 26 | 3,360 |
| 26 | Palmdale | 1,107 | - | - | - | 22 | 398 | 7 | 312 | 5 | 267 | 6 | - | 43 | 4 | 4 | - | - | 69 | 11 | 2,253 |
| 27 | South Coast Plaza | 3,541 | 28 | - | - | 21 | - | 43 | - | 2 | 153 | - | - | 12 | - | - | 9 | - | 73 | 15 | 3,898 |
| 28 | Summerlin | 1,884 | - | - | - | 15 | 108 | 5 | 156 | 62 | 216 | 4 | - | 94 | 12 | 7 | 6 | - | 71 | 11 | 2,651 |
| 29 | Riverside | 1,168 | 75 | - | - | 23 | - | 15 | - | 2 | 252 | - | - | 44 | 4 | - | 3 | - | 81 | 18 | 1,688 |
| 31 | Redlands | 1,989 | 106 | - | - | 23 | 269 | 22 | 274 | 2 | 224 | 5 | - | 82 | 11 | 4 | 6 | - | 74 | 16 | 3,107 |
| 32 | Sacramento | 981 | - | - | - | 23 | - | 14 | - | 7 | 220 | 8 | - | 29 | - | 8 | - | - | 72 | 24 | 1,386 |
| 33 | Roseville | 1,779 | - | - | - | 33 | 220 | 12 | 224 | 2 | 185 | 0 | 1 | 16 | 8 | 8 | 8 | - | 65 | 20 | 2,573 |
| 34 | Laguna Market Place/ Elk Grove | 1,592 | 16 | - | - | 24 | 219 | 9 | 231 | 2 | 175 | 18 | - | 66 | 12 | 6 | 6 | - | 74 | 14 | 2,461 |
| 35 | Westfield Shoppingtown/Arcadia | 2,574 | - | - | - | 24 | 851 | 12 | - | 12 | 235 | 1 | - | 59 | 42 | - | - | - | 74 | 27 | 3,912 |
| 36 | Metro 580 Shopping Center/ Pleasanton | 1,835 | - | - | - | 23 | 226 | 10 | 260 | 13 | 268 | 6 | - | 133 | 39 | - | - | - | 71 | 19 | 2,903 |
| 37 | Parkwood Creek West Shopping Center | 1,464 | 11 | - | - | 23 | 138 | 10 | 169 | 7 | 220 | 13 | - | 83 | 4 | 13 | - | - | 72 | 22 | 2,249 |
| 38 | Foothill Ranch | 1,044 | 50 | - | - | 24 | 209 | 17 | 193 | 2 | 270 | 17 | 64 | 38 | 4 | 7 | 7 | - | 77 | 10 | 2,034 |
| 39 | Thousand Oaks | 2,867 | - | - | - | 23 | 171 | 15 | 225 | 3 | 278 | 8 | - | 146 | - | 9 | - | - | 71 | 18 | 3,834 |
| 60 | Happy Valley | - | - | 316 | 29 | 12 | - | 10 | - | 0 | 229 | 4 | - | 133 | 2 | - | - | - | 74 | 13 | 820 |
| 61 | Chandler | - | - | 494 | 20 | 12 | - | 9 | - | - | 238 | 28 | - | 125 | 1 | 2 | - | - | 73 | 7 | 1,009 |
| 62 | Scottsdale | 1,481 | - | - | 27 | 12 | 136 | 8 | 340 | - | 284 | 2 | - | 70 | 7 | 17 | 2 | - | 73 | 9 | 2,469 |
| 64 | Vacaville | 1,713 | 102 | - | - | 23 | 375 | 24 | 313 | 5 | 269 | - | - | 32 | 5 | 5 | 5 | - | 73 | 15 | 2,960 |
| 65 | San Jose | 2,115 | - | - | - | 31 | 0 | 61 | 41 | 7 | 185 | 0 | - | 15 | 6 | - | - | - | 78 | 11 | 2,550 |
| 66 | Mira Loma | 1,121 | 41 | 28 | - | 14 | 168 | 19 | 199 | 5 | 214 | 11 | - | 45 | 4 | 4 | - | - | 69 | 15 | 1,958 |
| 67 | San Marcos | 586 | - | 744 | - | 18 | 52 | 17 | 90 | 2 | 313 | 2 | - | 87 | 4 | 4 | - | - | 70 | 8 | 1,998 |
| 68 | The Arroyo Market Square/Las Vegas SW | 1,971 | - | - | - | 11 | 142 | 7 | 89 | 51 | 275 | 8 | - | 99 | 4 | - | 4 | - | 74 | 12 | 2,747 |
| 70 | Bakersfield | 1,788 | - | - | - | 21 | 168 | 20 | 258 | 15 | 350 | 2 | - | 43 | 4 | 2 | 5 | - | 74 | 81 | 2,823 |
| 71 | Goodyear Marketsquare | 571 | 58 | - | 31 | 12 | 196 | 23 | 301 | - | 262 | 7 | - | 42 | 4 | 6 | - | - | 73 | 7 | 1,594 |
| 72 | Lake Pleasant | - | - | 336 | 22 | 12 | - | 9 | - | - | 259 | 22 | - | 45 | 3 | 4 | 3 | - | 74 | 7 | 808 |
| 74 | West Los Angeles | 5,501 | 494 | - | - | 26 | 333 | 30 | 497 | 1 | 324 | - | - | 69 | 11 | 17 | 14 | - | 89 | 40 | 7,447 |
| 78 | Figat7th -Los Angeles | 1,044 | 946 | 116 | - | 28 | 86 | 25 | - | - | - | - | 9 | 59 | - | 98 | 1 | - | 48 | 11 | 2,635 |
| 47 | **Total** | 76,185 | 2,720 | 2,545 | 130 | 1,020 | 10,378 | 675 | 10,227 | 333 | 11,895 | 256 | 165 | 3,133 | 270 | 365 | 127 | 1 | 3,373 | 802 | 124,600 |
| | *Per Week* | 533,298 | 19,042 | 17,818 | 910 | 7,138 | 72,643 | 4,724 | 71,590 | 2,329 | 83,265 | 1,792 | 1,156 | 21,931 | 1,887 | 2,552 | 888 | 5 | 23,613 | 5,616 | 872,198 |
| | *Per Store Week* | 11,347 | 405 | 379 | 19 | 152 | 1,546 | 101 | 1,523 | 50 | 1,772 | 38 | 25 | 467 | 40 | 54 | 19 | 0 | 502 | 119 | 18,557 |

# Eastern Mountain Sports
## Exhibit A-2

| Store List |
|---|

| Store # | Name | Address | City | State | Zip | Selling Sq. Ft. |
|---|---|---|---|---|---|---|
| 50 | W. Hartford | 1459A New Britain Avenue | W. Hartford | CT | 06110 | 7,500 |
| 151 | Christiana | 1297 New Churchmans Road | Newark | DE | 19713 | 17,025 |
| 155 | UPENN | 3401 Chestnut St | Philadelphia | PA | 19104 | 9,950 |
| 158 | Moorestown | 400 Route 38 | Moorestown | NJ | 08057 | 15,414 |
| 164 | Dulles | 22000 Dulles Retail Plaza | Dulles | VA | 20166 | 14,742 |
| 165 | Foxborough | 246 Patriot Pl | Foxborough | MA | 02035 | 14,573 |
| 172 | Warwick | 1000 Bald Hill Rd | Warwick | RI | 02886 | 14,526 |
| 178 | North Brunswick | 871A US Rte 1 South | North Brunswick | NJ | 08902 | 13,013 |
| 8 | | | | | *Average Sq. Ft.* | 13,343 |

**Eastern Mountain Sports**
**Exhibit B-2**

| Expense Budget |
| --- |

| | |
| --- | ---: |
| # of Stores | 8 |
| | |
| Wages | 241,062 |
| Incentives | 24,106 |
| Benefits (1) | 50,623 |
| Total Payroll | 315,791 |
| | |
| Occupancy (2) | 931,698 |
| Advertising (3)(4) | 79,803 |
| Transfer & Consolidation Expense | 5,000 |
| Bank & Credit Card Fee | 84,829 |
| Other store expenses | 62,786 |
| Supervision (5) | 112,461 |
| | 1,276,578 |
| | |
| Total Expenses | 1,592,369 |

Note(s):
1. Assumes payroll taxes and benefits are capped at 21.0%.
2. Occupancy based upon the attached per diem schedule.
3. Advertising includes expense for signs and sign walkers..
4. Newspaper ads and email blasts are not included, but are recommended options as sale performance dictates and will not exceed $80,000 and may be lower based upon company's existing rates.
5. Includes Deferred Compensation and Insurance.

**Eastern Mountain Sports**
**Occupancy Per Diem**

| Store # | Store Name | (53000) Basic Rent | (53001) Straight Line Rent | (3011) Real Estate/Property Taxes | (3012) CAM | (3013) Maintenance & Repairs | (3014) Utilities & Trash | (51075) Janitorial Services | (52700) Telephone | (52725) Data Communication | (53010) Percentage Rent | (53083) Offsite Storage | (57006) Computer Expense | (57162) Service Contracts | (58001) General Liability Insurance | (58002) Property Insurance | (59815) Fire Protection | (59830) Security And Alarm | Total Occupancy |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Per Diem | | | | | | | | |
| 50 | W. Hartford | 637 | - | 142 | 92 | 16 | 71 | 7 | - | 34 | - | - | - | 1 | 4 | 5 | - | 2 | 1,010 |
| 151 | Christiana | 978 | - | 85 | 61 | 23 | 99 | 5 | - | 68 | - | - | - | 1 | 7 | 8 | - | 1 | 1,335 |
| 155 | UPENN | 1,681 | - | - | 221 | 40 | 48 | 3 | - | 23 | - | - | - | 6 | - | - | - | 1 | 2,022 |
| 158 | Moorestown | 932 | - | 434 | 129 | 9 | 128 | 6 | - | 36 | - | - | 1 | 2 | 5 | 6 | 8 | 24 | 1,720 |
| 164 | Dulles | 1,134 | - | 296 | 271 | 11 | 92 | 2 | - | 32 | - | - | - | 5 | 9 | 10 | 2 | 1 | 1,865 |
| 165 | Foxborough | 1,381 | - | 116 | 552 | 10 | 121 | 9 | - | 26 | - | 9 | - | 6 | 8 | 9 | - | 1 | 2,248 |
| 172 | Warwick | 738 | 44 | 204 | 120 | 10 | 93 | 9 | - | 36 | - | - | - | 4 | 6 | 7 | 2 | 1 | 1,276 |
| 178 | North Brunswick | 644 | 66 | 181 | 187 | 23 | 128 | 6 | - | 30 | - | - | - | 3 | 6 | 8 | 11 | 1 | 1,294 |
| 8 | **Total** | 8,124 | 111 | 1,458 | 1,632 | 142 | 780 | 48 | - | 284 | - | 9 | 1 | 27 | 45 | 53 | 22 | 34 | 12,770 |
| | *Per Week* | 56,868 | 775 | 10,205 | 11,425 | 993 | 5,463 | 333 | - | 1,991 | - | 61 | 10 | 189 | 315 | 370 | 155 | 237 | 89,390 |
| | *Per Store Week* | 7,108 | 97 | 1,276 | 1,428 | 124 | 683 | 42 | - | 249 | - | 8 | 1 | 24 | 39 | 46 | 19 | 30 | 11,174 |

**Bob's Stores**
**Exhibit A-3**

| Store List |
|---|

| Store # | Name | Address | City | State | Zip | Selling Sq. Ft. |
|---|---|---|---|---|---|---|
| 47 | S Portland | 301 Maine Mall Rd | S Portland | ME | 04106 | 20,442 |

**Bob's Stores**
**Exhibit B-3**

| Expense Budget | |
|---|---|
| # of Stores | 1 |
| | |
| Wages | 54,299 |
| Incentives | 5,430 |
| Benefits (1) | 12,217 |
| Total Payroll | 71,946 |
| | |
| Occupancy (2) | 155,839 |
| Advertising (3)(4) | 17,057 |
| Bank & Credit Card Fee | 15,076 |
| Other store expenses | 8,250 |
| Supervision (5) | - |
| | 196,222 |
| | |
| Total Expenses | 268,168 |

*Note(s):*
*1. Assumes payroll taxes and benefits are capped at  22.5%.*
*2. Occupancy based upon the attached per diem schedule.*
*3. Advertising includes expense for signs and sign walkers..*
*4. Newspaper ads and email blasts are not included, but are recommended options as sale performance dictates and will not exceed $12,000 and may be lower based upon company's existing rates.*
*5. Includes Deferred Compensation and Insurance.*

**Bob's Stores**
**Occupancy Per Diem**

| Store # | Store Name | (53000) Basic Rent | (53001) Straight Line Rent | (3011) Real Estate/Property Taxes | (3012) CAM | (3013) Maintenance & Repairs | (3014) Utilities & Trash | (51075) Janitorial Services | (52700) Telephone | (52705) Telephone-Equipment & | (52710) Telephone-Long Distance | (52725) Data Communication | (57006) Computer Expense | (57010) Equipment Rental | (57162) Service Contracts | (58001) General Liability | (58002) Property Insurance | (59815) Fire Protection | (59830) Security And Alarm | Total Occupancy |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Per Diem | | | | | | | | | |
| 47 | S Portland | 1,292 | 91 | 147 | 238 | 10 | 119 | 19 | - | - | - | 40 | 38 | - | 4 | 17 | 6 | 2 | 1 | 2,024 |
| 1 | *Total* | 1,292 | 91 | 147 | 238 | 10 | 119 | 19 | - | - | - | 40 | 38 | - | 4 | 17 | 6 | 2 | 1 | 2,024 |
| | *Per Week* | 9,042 | 639 | 1,027 | 1,665 | 72 | 835 | 135 | - | - | - | 281 | 268 | - | 25 | 116 | 39 | 14 | 9 | 14,167 |
| | *Per Store Week* | 9,042 | 639 | 1,027 | 1,665 | 72 | 835 | 135 | - | - | - | 281 | 268 | - | 25 | 116 | 39 | 14 | 9 | 14,167 |

**<u>Exhibit 2</u>**

Sale Guidelines

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re<br><br>VESTIS RETAIL GROUP, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.:  16-10971 (___)<br><br>(Jointly Administered) |

## <u>SALE GUIDELINES</u>

The following procedures shall apply to the Store Closing Sales[2] to be held at the locations subject to the Agreement (the "<u>Closing Stores</u>"):

1.      The Store Closing Sales shall be conducted so that the Closing Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Closing Stores.

2.      The Store Closing Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Closing Store on a Sunday.

3.      On "shopping center" property, the Merchant or the Agent shall not distribute handbills, leaflets, or other written materials to customers outside of any Closing Store's premises, unless permitted by the lease or if distribution is customary in the "shopping center" in which such Closing Store is located; provided that the Merchant and the Agent may solicit customers in the Closing Stores themselves.  On "shopping center" property, the Merchant and the Agent shall not use any flashing lights or amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.      At the conclusion of the Store Closing Sales, the Merchant shall vacate the Closing Stores in broom-clean condition, and shall leave the Closing Stores in the same

---

[1]      The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Vestis Retail Group, LLC (1295); Vestis Retail Financing, LLC (9362); EMS Operating Company, LLC (2061); Vestis IP Holdings, LLC (2459); Bob's Stores, LLC (4675); EMS Acquisition LLC (0322); Sport Chalet, LLC (0071); Sport Chalet Value Services, LLC (7320); and Sport Chalet Team Sales, LLC (8015).  The Debtors' executive headquarters are located at 160 Corporate Court, Meriden, CT 06450.

[2]      Capitalized terms not otherwise defined herein shall have the meanings given to them in the *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Continuation of Store Closing Sales in Accordance with the Disposition Agreement and Sale Guidelines, With Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances; (II) Authorizing the Assumption of the Disposition Agreement; and (III) Granting Related Relief* [Docket No. 10] or the Agreement, as applicable.

condition as on the Sale Commencement Date, ordinary wear and tear excepted, provided, however, that the Agent and the Merchant hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Closing Store.

5.     Subject to the entry of the Final Order:  (i) the Agent and the Merchant may abandon any FF&E not sold in the Store Closing Sales at the Closing Stores at the earlier of the conclusion of the Store Closing Sales or the applicable Sale Termination Date; (ii) any abandoned FF&E and Merchandise left in a Closing Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant.

6.     The Agent and the Merchant may advertise the sale as a "sale on everything," "everything must go," or similar-themed sale.  The Agent and the Merchant may also advertise the sale as a "store closing" and have a "countdown to closing" sign prominently displayed in a manner consistent with these Sale Guidelines.  With respect to Sport Chalet, the Merchant and Agent may also advertise the sale as a "going out of business" sale.

7.     The Agent and the Merchant shall be permitted to utilize displays, hanging signs, and interior banners in connection with the Store Closing Sales; provided, however, that such displays, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  The Agent and the Merchant shall not use neon or day-glo on its displays, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Agent and the Merchant shall be permitted to utilize exterior banners at (i) non-enclosed mall Closing Stores and (ii) enclosed mall Closing Stores to the extent the entrance to the applicable Closing Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Store Closing Sale is being conducted only at the affected Closing Store, and shall not be wider than the storefront of the Closing Store.  In addition, the Agent and the Merchant shall be permitted to utilize sign walkers in a safe and professional manner.  Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Agent and the Merchant any additional restrictions not contained in the applicable lease agreement.

8.     Conspicuous signs shall be posted in the cash register areas of each of the affected Closing Stores to effect that "all sales are final."

9.     Except with respect to the hanging of exterior banners, the Agent and the Merchant shall not make any alterations to the storefront or exterior walls of any Closing Stores.

10.    The Agent and the Merchant shall not make any alterations to interior or exterior Closing Store lighting.  No property of the landlord of a Closing Store shall be removed or sold during the Store Closing Sales.  The hanging of exterior banners or signage or banners in a Closing Store shall not constitute an alteration to a Closing Store.

11.    The Agent and the Merchant shall keep Closing Store premises and surrounding areas clean and orderly consistent with present practices.

12.     Subject to the provisions of the Agreement, the Agent and the Merchant shall have the right to sell all FF&E.  The Agent and the Merchant may advertise the sale of the FF&E in a manner consistent with these guidelines at the Closing Stores.  The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, or through other areas after Closing Store business hours; provided, however, that the foregoing shall not apply to FF&E sales made whereby the item(s) can be carried out of the front door of a Store or in a shopping bag.

13.     At the conclusion of the Store Closing Sale at each Closing Store, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Store's premises as set forth in the applicable leases.  The Agent, the Merchant, and their agents and representatives shall continue to have exclusive and unfettered access to the Closing Stores until the respective Closing Stores are turned back to the landlord in a manner consistent with any lease rejection procedures approved by the Court.

14.     Postpetition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.

15.     The rights of landlords against the Merchant for any damages to a Closing Store shall be reserved in accordance with the provisions of the applicable lease.

16.     If and to the extent that the landlord of any Closing Store affected hereby contends that the Agent or the Merchant are in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant' counsel and the Agent's counsel as follows: (i) counsel for the Merchant (x) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn. Robert S. Brady, Esq. and Robert F. Poppiti, Esq., rbrady@ycst.com and rpoppiti@ycst.com, and (y) Klee, Tuchin, Bogdanoff & Stern LLP, 1999 Avenue of the Stars, Thirty-Ninth Floor, Los Angeles, CA 90067, Attn: Michael L. Tuchin, Esq. and Lee R. Bogdanoff, Esq., mtuchin@ktbslaw.com and lbogdanoff@ktbslaw.com; and (ii) counsel for the Agent, Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, NY 10178, Attn: Steven J. Reisman, Esq., sreisman@curtis.com.

01:18582937.1

## **EXHIBIT B**

Proposed Final Order

*[To be filed prior to the Final Hearing]*

# **EXHIBIT C**

Closing Stores

**(Closing Stores List)**

| Store No. | Name | Address | City | State | Zip | Selling Sq. Ft. |
|---|---|---|---|---|---|---|
| | | **EASTERN MOUNTAIN SPORTS** | | | | |
| 50 | W. Hartford | 1459A New Britain Avenue | W. Hartford | CT | 06110 | 7,500 |
| 151 | Christiana | 1297 New Churchmans Road | Newark | DE | 19713 | 17,025 |
| 155 | UPENN | 3401 Chestnut Street | Philadelphia | PA | 19104 | 9,950 |
| 158 | Moorestown | 400 Route 38 | Moorestown | NJ | 08057 | 15,414 |
| 164 | Dulles | 22000 Dulles Retail Plaza | Dulles | VA | 20166 | 14,742 |
| 165 | Foxborough | 246 Patriot Place | Foxborough | MA | 02035 | 14,573 |
| 172 | Warwick | 1000 Bald Hill Road | Warwick | RI | 02886 | 14,526 |
| 178 | North Brunswick | 871A US Rte 1 South | North Brunswick | NJ | 08902 | 13,013 |
| | | **BOB'S STORES** | | | | |
| 47 | S Portland | 301 Maine Mall Road | South Portland | ME | 04106 | 20,442 |
| | | **SPORT CHALET** | | | | |
| 02 | La Canada Flintridge Town Center | Two Sport Chalet Drive | La Canada | CA | 91011 | 45,000 |
| 03 | Huntington Beach | 16242 Beach Blvd. | Huntington Beach | CA | 92647 | 50,000 |
| 04 | Marketplace at Laguna Niguel | 27080 Alicia Parkway | Laguna Niguel | CA | 92656 | 40,018 |
| 05 | Point Loma | 3695 Midway Drive | San Diego | CA | 92110 | 34,588 |
| 06 | University Town Center | 4525 La Jolla Village D19 | San Diego | CA | 92122 | 34,850 |
| 07 | Bubank | 201E. Magnolia #145 | Burbank | CA | 91502 | 44,957 |
| 08 | Mission Viejo | 27551 Puerta Real | Mission Viejo | CA | 92691 | 29,851 |
| 10 | Valencia | 25560 The Old Road | Valencia | CA | 91381 | 40,000 |
| 11 | Marina Del Rey | 13455 Maxella Avenue | Marina Del Rey | CA | 90292 | 42,276 |
| 13 | Brea | 2500 E. Imperial | Brea | CA | 92821 | 40,536 |
| 14 | Oxnard | 1885 Ventura Blvd | Oxnard | CA | 93030 | 40,471 |
| 15 | West Hills | 802 Fallbrook Avenue | West Hills | CA | 91307 | 44,000 |
| 16 | Rancho Cucamonga | 12449 Foothill Blvd. | Rancho Cucamonga | CA | 91739 | 36,000 |
| 17 | Glendora | 940 South Grand Avenue | Glendora | CA | 91740 | 40,435 |
| 18 | Torrance | 21305 Hawthorne Blvd. #205 | Torrance | CA | 90503 | 43,703 |
| 19 | Irvine | 2983 Michelson Drive | Irvine | CA | 92612 | 35,049 |
| 20 | Mission Valley | 1640 Camino Del Rio N #110 | San Diego | CA | 92108 | 47,000 |
| 21 | Porter Ranch | 19817 Rinaldi Street | Porter Ranch | CA | 91326 | 43,000 |

**EXHIBIT 3**
**(Closing Stores List)**

| Store No. | Name | Address | City | State | Zip | Selling Sq. Ft. |
|---|---|---|---|---|---|---|
| 22 | Temecula | 40432 Winchester Road | Temecula | CA | 92591 | 41,408 |
| 23 | Chino Hills | 13041 Peyton Drive | Chino Hills | CA | 91709 | 42,000 |
| 24 | Long Beach | 7440 Carson Street | Long Beach | CA | 90822 | 43,355 |
| 26 | Palmdale | 39180 10th Street W | Palmdale | CA | 93551 | 38,000 |
| 27 | South Coast Plaza | 3333 Bear Street | Costa Mesa | CA | 92626 | 41,579 |
| 28 | Summerlin | 8825 W. Charleston Blvd. | Las Vegas | NV | 89117 | 40,335 |
| 29 | Riverside | 3700 Taylor Street | Riverside | CA | 92503 | 46,127 |
| 31 | Redlands | 27550 W. Lugonia Avenue | Redlands | CA | 92374 | 41,991 |
| 32 | Sacramento | 2401 Butano Drive | Sacramento | CA | 95825 | 40,603 |
| 33 | Roseville | 10349 Fairway Drive | Roseville | CA | 95678 | 37,000 |
| 34 | Laguna Market Place/ Elk Grove | 8511 Bond Road | Elk Grove | CA | 95624 | 42,000 |
| 35 | Westfield Shoppingtown/Arcadia | 400 S Baldwin Avenue | Arcadia | CA | 91007 | 42,241 |
| 36 | Metro 580 Shopping Center/ Pleasanton | 4555 Rosewood Drive | Pleasanton | CA | 94588 | 40,489 |
| 37 | Parkwood Creek West Shopping Center | 4145 S. Mooney Blvd. | Visalia | CA | 93277 | 41,000 |
| 38 | Foothill Ranch | 26532 Town Centre Drive | Foothill Ranch | CA | 92610 | 50,410 |
| 39 | Thousand Oaks | 1350 North Moorpark Road | Thousand Oaks | CA | 91360 | 40,262 |
| 60 | Happy Valley | 2501 W. Happy Valley Road | Phoenix | AZ | 85027 | 42,000 |
| 61 | Chandler | 2650 E. Germann Road | Chandler | AZ | 85249 | 42,000 |
| 62 | Scottdale | 8690 E. Raintree Drive | Scottsdale | AZ | 85260 | 41,470 |
| 64 | Vacaville | 1621 E. Monte Vista Avenue | Vacaville | CA | 95688 | 41,620 |
| 65 | San Jose | 2190 Eastridge Loop | San Jose | CA | 95122 | 44,000 |
| 66 | Mira Loma | 12399 Limonite Avenue | Eastvale | CA | 91752 | 39,309 |
| 67 | San Marcos | 177 South Las Posas Drive | San Marcos | CA | 92078 | 40,000 |
| 68 | The Arroyo Market Square/Las Vegas SW | 7230 Arroyo Crossing Parkway | Las Vegas | NV | 89113 | 42,000 |
| 70 | Bakersfield | 5200 Stockdale Highway | Bakersfield | CA | 93309 | 42,000 |
| 71 | Goodyear Marketsquare | 15277 W. McDowell Road | Goodyear | AZ | 85338 | 41,535 |
| 72 | Lake Pleasant | 25406 N. Lake Pleasant Parkway | Peoria | AZ | 85383 | 42,000 |
| 74 | West Los Angeles | 11801 West Olympic Blvd. | West Los Angeles | CA | 90025 | 50,450 |
| 78 | Figat7th -Los Angeles | 735 Figueroa Street | Los Angeles | CA | 90017 | 27,480 |